**The Rosen Law Firm**

November 18, 2022

<u>**VIA ECF**</u>

Honorable Nina R. Morrison
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  *Sanchez v. Arrival et al.*, No. 1:22-cv-00172-NRM-RLM (E.D.N.Y.)

Dear Judge Morrison:

We write on behalf of Plaintiffs[1] in response to Defendants Arrival SA ("Arrival"), Denis Sverdlov, Tim Holbrow, Michael Ableson, Avinash Rugoobur, Peter Cuneo and Kristen O'Hara's ("Arrival Defendants") pre-motion letter (ECF No. 64). The AC alleges violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

**<u>Factual Background</u>:** Arrival is an electric vehicle company founded in 2015 that went public in 2020 through a de-SPAC IPO. (¶¶43, 68-79). Arrival described to investors its "industry changing approach" to producing EVs in "proprietary microfactories." (*e.g.,* ¶¶5, 102-05, 111, 229, 248, 298, 417). Arrival represented it could produce EVs using Advanced Mechanical Robots (AMRs) that assembled vehicles in "technology cells." (*e.g.,* ¶¶112-13, 182, 192, 248-49, 219). Arrival's microfactories could be built anywhere in the world within six-months using existing warehouses, and could produce 10,000 vans per year, as demonstrated by Arrival's digital simulation model. (*e.g.,* ¶¶102, 111, 188, 217, 222, 229, 246, 297, 364, 386, 391, 391, 415, 19, 99, 115, 121, 184, 194, 224, 244, 251, 260). Arrival's remarkable cost-saving production method was also based on its ability to manufacture EVs with "proprietary composite material" (thermoplastic fabric) rather than paint. (*e.g.,* ¶¶8, 98, 276, 300, 316). Arrival's two existing microfactories, it stated, were "ready" and "fully integrated" even prior to the IPO. (*e.g.,* ¶¶11, 102, 229, 398). Arrival was able to precisely model financial and production figures, including the CapEx and OpEx for a microfactory based upon the above assumptions as well as Arrival's five-year history as a private company operating in "stealth mode" during which time Arrival "perfect[ed] its microfactory approach [the production]. (*e.g.*¶¶232-240; 92, 98, 217, 386, 389). In truth, Arrival and the Executive Defendants had actual knowledge that Arrival's business model was based on counterfactual assumptions, any one of which nullified Arrival's financial and production plan. **<u>First</u>**, at no point were Arrival's AMR's capable of performing vehicle production or assembly. (¶¶123-142). **<u>Second</u>**, Arrival's simulation model demonstrated that, at most, a microfactory (under perfect conditions) could produce 4,500 vans per year (not 10,000)(¶¶148-50). **<u>Third</u>**, a microfactory could not be "deployed anywhere in the world within six months using existing warehouses" because standard warehouses were not structurally equipped to handle Arrival's production method: outfitting them would require more than six-months and far more capital than Arrival represented. (¶¶143-47). **<u>Fourth</u>**, Arrival's composite material was ill-suited to production. Arrival never ordered the new production molds that *might* rectify this even though the molds had lead times of two years. (¶¶158-67). **<u>Fifth</u>**, Arrival never ordered essential production equipment such as production tools, high voltage electrical equipment and robotic equipment. (¶¶153-57). Defendants therefore knew that starting production in the fourth quarter of 2021 as they

---

[1] All capitalized terms herein have the meanings ascribed to them in the Amended Class Action Complaint (ECF No. 47). References to "¶" are to paragraphs in the Complaint. All emphasis is added. Plaintiffs incorporate by reference herein their responses to the other Defendants' pre-motion letters as applicable.

1

consistently represented to investors would be impossible. Remarkably, Defendants assured investors they were "keeping their guidance" and that everything was "tracking" to Arrival's business plan. (*e.g.* ¶¶281, 295, 298). About one year after the close of the IPO Arrival disclosed that its "previous long-term forecasts from the merger should no longer be relied on" causing Arrival stock to fall 28%. (¶¶306-10). Days later, Arrival announced it would have to raise significant capital- it was burning cash at a far higher rate than disclosed. Arrival's shares dropped 20%, further damaging investors. (¶¶311-14).

**Falsity:** Defendants made actionable false statements as set forth above. The accounts of five former employees, two of whom worked directly with certain Executive Defendants (¶¶137, 161) demonstrates that Arrival's AMRs never functioned; that its existing microfactories were never production-ready; that its digital simulation model *disproved* the production capacity it represented to investors; that the costs to set up a microfactory were materially understated; and that Arrival never ordered essential equipment necessary to start production on time, among other things. (¶¶124-67). Each of these former employees is described specifically with respect to job function and dates of employment; their accounts are corroborative of one another and they occupied positions at Arrival sufficient to possess the information alleged. (¶¶125-27, 130, 133, 137-39, 161-66). *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010).

Without addressing the substance of the alleged misstatements Defendants assert that their statements are protected by the PSLRA's safe harbor. Incorrect. Defendants' representations that Arrival had "run a whole number of digital simulations of the factory" confirming vehicle throughput (¶¶117-119); that "sales microfactories, procurement *are* all on track. We have very strong evidence that our new method works" (¶¶180, 183; 289); and that "we are highly confident we are going to hit the target, *given the amount of equipment we've **already** ordered*") (¶188) are not protected because the "misrepresentation of present or historical facts cannot be cured by cautionary language." *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004). Defendants' purported warnings, moreover, were ineffective because "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Further, the broad generality of Defendants' risk warnings made them meaningless. *In reQuantumScape Sec. Class Action Litig.*, 580 F.Supp.3d 714, 738 (N.D. Cal. 2022) (statement "speaks at a high level or generality about unspecified 'delays;' it does not adequately warn investors that QuantumScape in fact did not (allegedly) have a battery that would function as promised"). Finally, Defendants ignore that many their false statements were not forward-looking. Defendants' assertion that their misrepresentations are inactionable opinion statements is also meritless. Under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), the Supreme Court held that opinions, even if sincerely held, may nonetheless be actionable if the speaker omits information that renders the statement misleading to a reasonable investor. *Id.* at 194.

Nor does the Complaint rely on "puzzle pleading." The Complaint segregates the misrepresentations in the Registration Statement by topic: (1) prospective financial and production information (¶¶232-240); (2) production timelines (¶¶241-45) (3) status of the microfactories and ability to rapidly scale (¶¶246-47) and (4) statements concerning Arrival's technology and AMR's (¶¶248-49). When utilizing block quotes the Complaint specifies that statements in bold and italics are alleged to be misleading (¶¶218; 247; 249; 266; 268; 387; 416; 417). In enumerating the reasons why a particular statement is misleading the Complaint quotes a portion of the statement itself (*e.g.*, **Third**, Arrival's microfactories could not be "deployed anywhere in the world within six months using existing warehouses" because Arrival was aware that a traditional warehouse was not suited to be a microfactory because it did not have the structural integrity to support Arrival's production method…" (¶218). This is a far cry from puzzle pleading.

2

**Scienter for Section 10(b) Claims**[2]: Scienter is based on a holistic review of the facts. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). Plaintiffs allege scienter based on: (i) the core operations doctrine[3] (¶¶316-318); (ii) Defendants' registration of their shares for resale in connection with the June 2021 Prospectus (and corresponding motive to inflate the price of Arrival shares) and Kinetik and P. Cuneo's insider sales of approximately 3.2 million shares at a profit (¶¶318-324); and (iii) the detailed statements from former Arrival employees demonstrating that the highest levels at the Company knew that Arrival's production timelines and financial profile were unattainable, that Arrival's AMR's did not function, that Arrival could not use existing warehouses to support microfactories, that Arrival did not have the necessary production tools and could not obtain them in time for Arrival's promised start of production, and that Arrival's composite material might not be suitable for vehicle production. (¶¶324-25). While Defendants attack the Complaint's insider sales allegations for lack of specificity it is they who failed to File Form 4's or 144's with the SEC disclosing the prices and dates of their insider sales. Further, Plaintiffs can hardly be expected to allege that sales were out of line with prior trading given that Arrival was heretofore a private company.

**Section 14:** Plaintiffs' Section 14(a) claims are direct, not derivative. Plaintiffs suffered out-of-pocket losses as a result of the misstatements/omissions in the Proxy Statement that occurred after the corrective disclosures revealed the truth behind the Proxy Statement's omissions/misrepresentations. This is a direct injury, which is not due to an injury inflicted on CIIG. *In re Bank of Am. Sec. Deriv ERISA Litig.*, 575 F.Supp 2d 260, 291-92 (S.D.N.Y. 2010) (noting that a single act can inflict injury on both the corporation and the shareholder). Any analysis of whether Plaintiffs' claim is direct or derivative is governed by CIIG's place of incorporation (New York) because investors held shares of CIIG common stock prior to the IPO closing.

**Loss Causation**[4]: Plaintiffs have adequately alleged loss causation by providing Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) "A plaintiff may plead loss causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed fraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008). When Arrival disclosed that its prior production and financial forecasts should not be relied on and that its first factories would require higher working capital, this corrected Arrival's knowingly false production and financial model and the knowingly false assumptions upon which they were based. (¶¶306-10). When Arrival sought to raise over $673 million in financing (¶¶311-314) this revealed to investors that Arrival was burning cash at a much higher rate than represented, correcting Arrival's prior representations concerning its expenditures and its CapEx and OpEx being on track.[5]

---

[2] Scienter is never an element of a §11 claim. *Set Cap. LLC v. Credit Suisse Grp. AG*, 2019 WL 3940641, at *10 (S.D.N.Y. Aug. 16, 2019). Furthermore, §11 claims that are not based on fraud, such as those alleged in the Complaint, do not need to meet the more stringent Rule 9(b) standard of pleading. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) Plaintiffs have separately alleged facts specific to the §11 claims based on a theory of negligence and have expressly disclaimed that any such claims sound in fraud. (*See, e.g.*, ¶¶355-63.) *Set Cap. LLC* 2019 WL 3940641, at *10 ("Plaintiffs may plead Section 10(b) fraud and Section 11 negligence claims as alternatives, as long as the complaint is organized in a way that allows the court to determine which allegations support which claim."). Scienter is also not an element of a §14 claim. *SEC v. Hurgin*, 484 F.Supp.3d 98, 116 (S.D.N.Y. 2020).

[3] The core operations doctrine can raise a strong inference of scienter. *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) ("Plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business.").

[4] Loss causation is likewise not an element of a §11 claim. *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009).

[5] Because Plaintiffs have adequately pled a primary violation as well as the Individual Defendants' control over the Company (¶¶345-50), Plaintiffs have sufficiently alleged a control person claim. *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003).

3

Respectfully submitted,

THE ROSEN LAW FIRM, P.A.

*/s/Sara Fuks*
Sara Fuks

*Lead Counsel for Plaintiffs*

cc:    All counsel of record (via ECF)

4