# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Arrival SA, et al. Securities Litigation | **CASE No.: 1:22-cv-00172-NM-PK**<br><br>**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

**Deleted:** MIGUEL A. SANCHEZ, Individually and¶
On Behalf of All Others Similarly Situated,    ¶
    Plaintiff,  ¶
    ¶
    v.   ¶
¶
ARRIVAL SA, CIIG CAPITAL PARTNERS, DENIS
SVERDLOV, TIM HOLBROW, MICHAEL ABLESON,
AVINASH RUGOOBUR, MICHAEL ANATOLITIS,
GILLES DUSEMON, CSABA HORVATH, ALAIN
KINSCH, KRISTEN O'HARA, JAE OH, P. CUNEO,
GAVIN CUNEO, MICHAEL MINNICK, UBS
SECURITIES LLC, BARCLAY'S CAPITAL INC.,
COWEN & COMPANY, LLC and KINETIK SÀRL¶
    ¶
        Defendants.

**Deleted:** ¶

**Deleted:** DG-RLM

**Deleted:** ¶

**Formatted:** Space After:  8 pt, Line spacing:  Multiple 1.08 li

i

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   JURISDICTION AND VENUE FOR PLAINTIFFS' EXCHANGE ACT CLAIMS......... 10

III.  JURISDICTION AND VENUE FOR PLAINTIFFS' SECURITIES ACT CLAIMS ........ 11

IV.   PARTIES ......................................................................................................... 12

   A.    Plaintiffs.................................................................................................... 12

   B.    Defendants ................................................................................................ 12

      1.    Corporate Defendant Arrival ................................................................ 12

      2.    Corporate Defendant CIIG.................................................................... 13

      3.    Executive Defendants ........................................................................... 13

      4.    Director Defendants.............................................................................. 16

      5.    Additional CIIG Defendants ................................................................ 17

      6.    The Underwriter Defendants.................................................................. 18

V.    ALLEGATIONS OF MISCONDUCT ................................................................... 23

   A.    Mechanics and Timeline of Arrival's Business Combination With CIIG/Arrival's IPO . 23

   B.    Arrival's Business Model ........................................................................... 26

   C.    Arrival Debuts Itself as Ready to Hit the Ground Running............................. 30

   D.    Arrival and CIIG Announce the Proposed Business Combination.................... 32

   E.    Arrival's Files its Registration Statement .................................................... 40

   F.    The SEC Declares the Registration Statement Effective; Arrival Assures Investors the Microfactories Operate "Exactly the Way We Planned;" Arrival Shares Begin Trading 45

   G.    Unbeknownst to Investors, Arrival's Microfactory "Model" Was Just That: Arrival's AMR's Were Non-Functional and Its "Technology Cells" Were Non-Operational ........ 48

   H.    Arrival's Microfactory Model Was Based on the False Premise that a Standard Warehouse can Support a Microfactory ........................................................... 55

   I.    Arrival's Production Timelines and Capacity Were Not Based in Reality and Were a "Joke:" Arrival's Simulation Model Showed Maximum Production Capacity Per Microfactory as *Less Than Half* the Number Arrival Promised Investors, *and* Arrival Could Not Timely Obtain Essential Equipment Needed for the Start of Production ....... 57

   J.    Arrival's Composite Materials Were Ill-Suited to Produce Arrival's Vehicles ............... 59

Deleted: 29

Deleted: 39

Deleted: 44

Deleted: 47

Deleted: 54

Deleted: 56

Deleted: 58

ii

K.    Following Arrival's IPO, Arrival Continues to Represent that Arrival's Production Equipment Was Operating Effectively and that It was On Track to Deliver in Accordance With Its Business Plan ............................................................... 62

L.    The Relevant Truth is Revealed ................................................................... 73

M.    Post Class Period Events Confirm that Defendants' Statements Were False When Made ........................................................................................................ 78

VI.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS ..................................................... 81

A.    Statements Leading up to the Business Combination/IPO ........................... 81

B.    Registration Statement ............................................................................... 89

    1.    The Prospective Financial and Production Information in Arrival's Registration Statement Was False and Materially Misleading and Based on Knowingly Incorrect Assumptions .................................................................................... 90

    2.    The Statements in the Registration Statement Concerning Arrival's Production Timeline Were False and Materially Misleading ......................................... 93

    3.    The Statements in the Registration Statement Concerning the Status of Arrival's Microfactories and the Ability of Arrival's Microfactories to Scale Rapidly Were False and Misleading .......................................................................... 95

    4.    Statements in The Registration Statement Concerning Arrival's Technology and AMRs Were False and Materially Misleading ............................................... 97

C.    Additional Statements Prior to the Business Combination/IPO Closing ......... 98

D.    2020 20-F ............................................................................................... 101

E.    1Q 2021 Investor Conference Call and Earnings Release ........................... 102

F.    June 2021 Prospectus; July Media Interview and Press Releases ................ 106

G.    2Q 2021 Investor Conference Call and Earnings Release ........................... 111

H.    September 2021 Investor Conferences ....................................................... 114

VII.    ALLEGATIONS OF LOSS CAUSATION ......................................................... 119

VIII.    ADDITIONAL ALLEGATIONS OF THE EXCHANGE ACT DEFENDANTS' SCIENTER ........................................................................................................ 122

A.    The Exchange Act Defendants' Fraud Concerned a Core Arrival Operation ........ 123

B.    Information from CWs Supports a Strong Inference of the Exchange Act Defendants' Scienter .................................................................................................. 126

C.    The Exchange Act Defendants' Scienter is Imputed to Arrival .................... 127

IX.    PRESUMPTION OF RELIANCE ...................................................................... 127

X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ................................................................................................ 128

iii

Deleted: 61
Deleted: 72
Deleted: 77
Deleted: 80
Deleted: 80
Deleted: 88
Deleted: 89
Deleted: 92
Deleted: 94
Deleted: 96
Deleted: 97
Deleted: 100
Deleted: 101
Deleted: 105
Deleted: 110
Deleted: 113
Deleted: 118
Deleted: 121
Deleted: 122
Deleted: 125
Deleted: 126
Deleted: 126
Deleted: 127

XI.   CAUSES OF ACTION UNDER THE EXCHANGE ACT ............................................ 129

XII.  SECURITIES ACT DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT ...... 134

   A.   Summary of Allegations Pertaining to the Business Combination/IPO ......................... 136

XIII. THE REGISTRATION STATEMENT AND IPO COMMUNICATIONS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT AND OMISSIONS IN VIOLATION OF SECTION 11 OF THE SECURITIES ACT ...................................................... 144

   A.   Statements Leading up to the Business Combination/IPO ........................................... 144

   B.   Registration Statement ................................................................................................. 152

     1.   The Prospective Financial and Production Information in Arrival's Registration Statement Was False and Materially Misleading and Based on Knowingly Incorrect Assumptions .......................................................................................................... 152

     2.   The Statements in the Registration Statement Concerning Arrival's Production Timeline Were False and Materially Misleading ........................................................ 156

     3.   The Statements in the Registration Statement Concerning the Status of Arrival's Microfactories and the Ability of Arrival's Microfactories to Scale Rapidly Were False and Misleading .......................................................................................................... 158

     4.   Statements in The Registration Statement Concerning Arrival's Technology and AMRs Were False and Materially Misleading ........................................................... 159

   C.   Additional Statements Prior to the Business Combination/IPO Closing ....................... 160

XIV. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ............................................................................................................ 165

XV.  CAUSES OF ACTION UNDER THE SECURITIES ACT ........................................... 165

XVI. CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS .......................... 170

PRAYER FOR RELIEF ........................................................................................................... 172

Deleted: 128
Deleted: 133
Deleted: 135
Deleted: 143
Deleted: 143
Deleted: 151
Deleted: 151
Deleted: 155
Deleted: 157
Deleted: 158
Deleted: 159
Deleted: 164
Deleted: 164
Deleted: 169
Deleted: 171

iv

Lead Plaintiff Mostaco Corp. and named Plaintiff Salvatore Fiorellino ("Plaintiffs"), individually and on behalf of all others similarly situated alleges the following based upon personal knowledge as to Plaintiffs' and Plaintiffs' own acts, and upon information and belief as to all other matters, including the investigation of Plaintiffs' counsel, which included, among other things, interviews with former Arrival employees, a review of Arrival's and CIIG's United States Securities Exchange Commission ("SEC") filings, wire and press releases published by Arrival and CIIG, analyst and media reports about Arrival and other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**I.      INTRODUCTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who: (1) purchased or otherwise acquired the publicly traded securities of Arrival ("Arrival" or the "Company") between November 18, 2020 and November 19, 2021, both dates inclusive (the "Class Period") and who held such shares on November 8, 2021 and/or November 18, 2021, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (2) held common stock of CIIG (defined below) as of February 16, 2021, eligible to vote at CIIG's special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act, and/or; (3) purchased or otherwise acquired Arrival Ordinary Shares pursuant or traceable to the Company's registration statement and prospectus issued in connection with the

**Deleted:** of

March 24, 2021 business combination, seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act.[1]

2.      Arrival entered the booming electric vehicle ("EV") market in 2020. While Russian billionaire Denis Sverdlov founded the Company in 2015, Arrival remained relatively unknown until 2020, when it publicly debuted with a series of announcements signaling to investors that it was a serious contender in the commercial EV segment. After operating in self-described "stealth mode" for over five years, "perfecting its microfactory approach [to production]" Arrival signaled it was ready to mass produce electric vans and buses. For example, Arrival announced nine-figure investments from Hyundai, Kia and BlackRock and a lucrative $1.2 billion partnership with UPS for over 10,000 Arrival electric delivery vans.

3.      On November 18, 2020, CIIG Merger Corp., ("CIIG") a blank check company or special purpose acquisition company ("SPAC"), organized by SPAC sponsor CIIG Management LLC ("CIIG Management"), together with Arrival, announced a proposed business combination where Arrival would become a publicly traded company by merging with CIIG (the "Business Combination" or "IPO"). Prior to announcing the Business Combination CIIG shares traded at approximately $10.00, the standard share price for SPACs prior to announcing a merger target.

4.      To solicit investors, Arrival and CIIG issued a series of public statements, including a proxy statement and prospectus; and Arrival filed a registration statement with the SEC on Form F-4 (the "Registration Statement," together with Arrival and CIIG's additional statements and SEC filings prior to the IPO closing, the "IPO Communications").

---

[1] Excluded from the Class are Defendants herein, the officers and director of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

**Deleted:** Capital Partners

**Deleted:** "),

**Deleted:** sponsor of

**Deleted:** companies ("SPACs," or blank check companies)

**Deleted:** a

**Deleted:** -sponsored SPAC called CIIG Merger Corp.

**Deleted:** Merger Corp.

5.    In the IPO Communications, Defendants described in exacting detail Arrival's revolutionary "industry changing approach" to producing electric vehicles in Arrival's "game-changing proprietary microfactories." Defendants also described in exacting detail the Capital Expenditures (CapEx) and annual Operational Expenditures (OpEx) required to set up and run an Arrival microfactory; the timeline within which Arrival would begin production of each of its four vehicle types; the annual vehicle volumes it would produce for the next four years; the timeline within which Arrival would establish additional microfactories; and Arrival's annual revenues and gross profit through 2024.

6.    According to Defendants, Arrival had developed a new method of designing lower cost EVs using its "proprietary hardware, software and robotics technologies and low cost microfactories." Essentially, Arrival did not have to establish massive automotive factories like competitors that required billions of dollars of up-front capital and years to build because Arrival could build electric vehicles "at any scale and anywhere and still achieve highly desirable unit economics."

7.    According to Defendants, within six months' time an existing warehouse of only 200,000 meters in size could be set up as an Arrival production facility or "microfactory" capable of producing Arrival's electric vehicles. Arrival would produce these vehicles using Autonomous Mobile Robots ("AMRs") as well as traditional factory robots.  Arrival programmed these robots using its proprietary software and artificial intelligence (AI). Arrival's production process used "technology cells" where the vehicle moved between the different cells for assembly via its AMRs. As Arrival told investors, "each technology cell performs specific tasks relating to production of an electric vehicle. Linking the technology cells are AMRs, which are controlled by software

3

designed and developed in-house by Arrival. Parts delivery and vehicle movement between the technology cells is accomplished with these AMRs."

8.      Another aspect that would allow Arrival to earn "double-digit margins on a per vehicle basis" was Arrival's ability to employ lower cost composite materials to build electric vehicles (this in turn would provide customers a lower total cost of ownership or "TCO").  Rather than using steel or paint, Arrival could build vehicles using thermoplastic fabric, that would be wrapped around molds, heated, and dyed according to the customer's color choice. This would drastically reduce the typical costs involved in vehicle manufacturing: *i.e.* the costs of steel, welding, a paint shop, and the factory space necessary to house all these elements.

9.      As to the economics of Arrival's microfactories, each microfactory would require only $45-$50 million in capital expenditures ("CapEx") and $12 million annually in operating expenses ("OpEx"), far lower than competitors.  And investors would not have to wait long for Arrival to generate revenues. Defendants promised that because vehicle production would start in just months, Arrival would generate substantial profits by the end of the following year, with revenues of $1 billion in 2022, $5.1 billion in 2023, and $14.1 billion in 2024.

10.     Supporting these revenues were the Company's two microfactories in "active development" (i.e. Bicester, UK and Rock Hill South, Carolina), the four microfactories that would be "in operation by the end of 2022, 11 by end of 2023 and 31 microfactories by the end of 2024."

11.     Indeed, Defendants represented that Arrival's first two microfactories- an electric van factory in Bicester, U.K. and an electric bus factory in Rock Hill, South Carolina were "ready," and "fully integrated," and that bus production would begin in the fourth quarter of 2021, with van production following in the first half of 2022.

4

12. Further, Arrival promised that it had run "a whole number of digital simulations of the factory" which demonstrated Arrival's production capacity, to "make sure we can deliver," and that Arrival determined that each microfactory would produce a total of 10,000 vans or 1,000 buses per year.

13. Prior to the Business Combination/IPO closing, Defendants assured investors that Arrival's microfactories worked "exactly the way we planned" and that "vehicle production is right around the corner."

14. Arrival's IPO closed on March 24, 2021. When Arrival's shares began trading the next day, the Company's valuation was a whopping $13 billion, with shares of Arrival closing at $22.80 per share on March 25, 2021. But this was hardly surprising given Arrival's precisely calculated high-profit margin business model which rested on its purportedly proven technology.

15. After the IPO closed, and as the start of production grew closer, Defendants continued to represent that Arrival was on track to deliver in accordance with its business plan.

16. On May 14, 2021 Arrival held its first quarter earnings call, during which Arrival's CFO Defendant Holbrow told investors that Arrival had been able to "further validate" CapEx, OpEx and vehicle production volume, which were "tracking in line with the expectations we set out in our initial business plan last year." Arrival's CEO of Automotive, Defendant Ableson represented that Arrival had "production equipment operating in the production environment," had done "extensive modeling of all of the processes and systems in the microfactory" and that the work Arrival had done "with the actual robotic cells in Bicester" confirm Arrival's analysis that it could produce 10,000 vans and 1,000 buses per year." Ableson further reassured, "our results are exactly in line with what we've expected."

17.    Also on the first quarter earnings call, Defendant Sverdlov touted Arrival's unique competitive advantages and robotics technology stating, "there are not many companies in the world who are assembling buses using robotics."

18.    In July 2020, Arrival's Head of Product appeared in an interview on a YouTube EV focused channel, telling investors that Arrival "absolutely" had the capability of fulfilling UPS's $1.2 billion order for 10,000 Arrival electric delivery vans.

19.    During Arrival's August 12, 2021 second quarter 2021 earnings call Defendant Sverdlov represented that Arrival had "strong evidence that our new method works" and that "sales, microfactories [and] procurement are all on track." Defendant Sverdlov further provided a detailed explanation of Arrival's AMRs, the "technology that underpins [Arrival's] microfactory process" and touted Arrival's vehicles as "devices on wheels."  Defendant Ableson gave detailed information about the progress of equipment installation, assuring that "CapEx remains on track to be $50 million or less per microfactory" and that there were "no changes at all" to each Arrival microfactory's ability to deliver 10,000 vans and 1,000 buses per year.

20.    As the anticipated start of production drew closer Defendants participated in several investor conferences assuring the market that Arrival was "running a substantial number of production processes" and "from here, it's a ramp up on the factory side." In a September 2021 Cowen investor conference Defendants Rugoobur (Arrival's President) and Ableson assured investors that Arrival was "tracking where we need to be with the microfactories," "tracking on CapEx" and that Arrival could open a new microfactory anywhere within six months, i.e. "drop [microfactories] rapidly in parallel."

21.    At the conference, in response to "the number one question…from investors *do the robots work*" Defendant Ableson assured investors that Arrival had "been at this six years," and

in contrast to "companies in the past that maybe didn't deliver to all their aspirations on automation" Arrival was "operating quite a large percentage of our production equipment already and have very high confidence that our process is going to deliver."

22.    In truth, Defendants' representations set forth above were demonstrably false. Consistent with the accounts former Arrival employees have provided, Arrival's business model was a house of cards built upon a series of knowingly incorrect assumptions, any one of which nullified Arrival's IPO financial model and production plan.

23.    First, at no point before, during or after the Class Period were Arrival's AMRs capable of performing vehicle production or assembly. According to former Arrival employees Arrival's existing AMRs "just were not working" in a remotely reliable or consistent manner. Instead, Arrival employees had to perform manually the work Arrival intended the robots to perform. The robots did not "communicate" with each other as necessary for production, and Arrival was in the constant process of building robots, testing them, and then *redesigning* them. Relatedly, Arrival had not installed a single technology cell in any microfactory until after the end of the Class Period. And prior to the Class Period, Defendants Sverdlov and Rugoboor lied to early investors in Arrival who toured Arrival's production facility to cover up the fact that robots were not assembling Arrival's vehicles.

24.    Second, Arrival did in fact have a simulation model that was able to predict production capacity and throughput. However, that simulation model did not show that a microfactory could produce 10,000 vans per year. Instead, the simulation model demonstrated that at most, a microfactory could produce 4,500 vans per year- less than half the volume Arrival consistently promised investors. And of course this number assumed Arrival's technology functioned perfectly. Accordingly, Arrival's production capacity was never "tracking the

7

simulation model." Further, Arrival required triple the number of robots it initially stated it would need for production, materially increasing CapEx per microfactory.

25.     Third, a microfactory could not be "deployed anywhere in the world within six months using existing warehouses." Existing warehouses were not structurally equipped to handle Arrival's heavy production equipment. Any standard "existing" warehouse would require significant foundation work to install rebar, and pour concrete, then install base plates and bolt them into the floors. Existing warehouses also did not have the high-voltage electrical power necessary to operate Arrival's microfactory method of production. All this additional work substantially increased CapEx and would delay the start of production. Indeed, it was not until October 2021 that Arrival even began the foundation work on its Rock Hill microfactory, meaning there was no possible way production could start in the fourth quarter of 2021.

26.     Fourth, throughout the Class Period Arrival was "still trying to determine" if its composite material was going to "work for the product." Arrival's method of production using thermoplastic with color weaved into it to produce vehicles- the process which Arrival touted as eliminating the need for metal stamping and painting, and costs, permits and space associated with the same- resulted in vehicles looking "horrible" because Arrival could not smooth the thermoplastic. Arrival knew that the only way around this was to procure new production molds made of metal. However, these molds had lead times of *two years*. Arrival never ordered the molds, and accordingly would not have them in hand in time for the start of production. Further, Defendant Ableson personally participated in conference calls concerning the need to replace the defective molds. This was just one of the reasons Arrival employees regarded its production timeline as "a joke."

8

27.    Fifth, Arrival never ordered essential production equipment: as of August 2022 it had not obtained a full set of the bespoke production tools necessary to start production, it never ordered (or installed) the high-voltage electrical equipment for its U.S. microfactory, and never ordered the transformers and robotic equipment necessary for production. This equipment has lengthy lead times of 30-40 weeks. Accordingly, by June 2021 starting production in the fourth quarter of 2021 would be impossible. Yet Defendants continued to assure investors that they were "keeping their guidance" and that everything was "tracking" to Arrival's business plan.

28.    Nearing the one-year anniversary of CIIG and Arrival's announcing the proposed Business Combination investors began to learn the truth.  On November 8, 2021, after the close of trading, Arrival reported its third quarter 2021 results, announcing that it "revised its microfactory rollout and now expects significantly lower vehicle volumes and revenue in 2022." In essence, "previous long-term forecasts from the merger should no longer be relied upon."  Arrival also disclosed, among other things, that CapEx for its first microfactory in Bicester was $75 million- not the $50 million it represented just two months earlier as still "tracking"- and that OpEx per microfactory would be $15 million, 25% higher than the $12 million Defendants consistently re-affirmed to investors.  Further, in 2022 Arrival planned to produce between 400-600 vehicles, a far cry from the over 10,000 it represented just a year earlier.  Despite this drastic reduction, Arrival was unable to point to any significant internal or external factors accounting for this, other than taking logistics in-house and "de-risking" the start of production. On this news, Arrival's common stock dropped nearly 28%.

29.    Then, on November 17, 2020 Arrival announced a $200 million offering of green convertible notes and a follow-on offering of 25 million Arrival shares. Arrival "upsized" both offerings the next day, and between the two sought to raise over $673 million in cash. These

9

offerings revealed to investors that Arrival was burning through cash at a far higher rate than disclosed. On this news, Arrival shares dropped approximately 20%.

30.     After the close of the Class Period the news only got worse. On July 12, 2022 Arrival announced a "reorganization" that entailed laying off at least 30% of its employees. An August 4, 2022 Financial Times article reported that Arrival was firing all staff that did not work on the Arrival van and drastically reducing spending to get the van "out the door."

31.     When Arrival reported its second quarter 2022 financial results and held its investor conference call on August 11, 2022 Arrival further revised its 2022 "outlook." Arrival would produce a total of 20 vehicles in 2022 and have no revenue. It would also shelve its plans to produce an electric bus and an electric car focusing solely on the van. Defendants cited the need to "preserve cash."  When an analyst asked Defendant Sverdlov why Arrival had again reduced its estimate of 400-600 vehicles, as it provided in November, to only 20 vehicles, Defendant Sverdlov shrugged it off stating "its no big difference between, I would say, like 400 vehicles or like 20 because the number is small anyway." As for Arrival bus production, which had initially been slated to begin production in Rock Hill the next month, Defendant Rugoboor offered that the Arrival bus was "already operating on public roads as a shuttle between Arrival sites," cold comfort to investors given Arrival's previous assurances that it would then be producing saleable buses.

32.     This action seeks to recover Arrival investors' losses, which were a foreseeable consequence of Defendants' false statements and omissions alleged herein.

## II.     JURISDICTION AND VENUE FOR PLAINTIFFS' EXCHANGE ACT CLAIMS

33.     Plaintiffs' Exchange Act claims arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

35.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and subsequent damages took place in this Judicial District.  Pursuant to Arrival's Form 20-F filed with the SEC on April 30, 2021, as of December 31, 2020, Arrival had 606,157,267 Ordinary Shares and 20,112,500 Warrants to purchase Ordinary Shares. Arrival's common stock trades on the NASDAQ.  Accordingly, there are presumably hundreds, if not thousands, of investors in Arrival's common stock located within the U.S., some of whom undoubtedly reside in this Judicial District.

36.      In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    JURISDICTION AND VENUE FOR PLAINTIFFS' SECURITIES ACT CLAIMS

37.     Plaintiffs' Securities Act claims arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l and 77o.

38.     This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

39.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of false and materially misleading information, occurred in this District.

11

40. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Plaintiffs

41. Lead Plaintiff Mostaco Corp. as set forth in the Certification filed at Docket 9-2, incorporated by reference herein, acquired Arrival's publicly traded securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

42. Named plaintiff Salvatore Fiorellino, as set forth in the attached Certification, purchased shares of CIIG common stock prior to the Business Combination with Arrival closing and prior to the Registration Statement becoming effective, and was eligible to vote at the March 19, 2021 Special Meeting. When the Business Combination closed, Plaintiff exchanged his CIIG shares for Arrival Ordinary Shares, which were registered through the Registration Statement, and has been damaged thereby.

### B. Defendants

#### 1. Corporate Defendant Arrival

43. Defendant Arrival is an electric vehicle manufacturer founded in 2015 and incorporated under the laws of Luxembourg. According to Arrival, it develops vertically integrated technologies and products that create a new approach to design and assembly of EV's. Arrival states that its primary competitive advantage is its use of proprietary in-house developed components, materials, software and robotics technologies that, when combined with its low cost and scalable microfactories, enabled it to produce EV's that are competitively priced to fossil fuel

12

variants and with a substantially lower total cost of ownership to its customers. Prior to the Business Combination Arrival was a private company called Arrival S.à.r.l. When Arrival S.à.r.l. merged with CIIG, Arrival and CIIG became known as Arrival SA.  Arrival's U.S. headquarters is in Charlotte, North Carolina. Arrival's common stock trades on the Nasdaq under the ticker symbol "ARVL."

**2. Corporate Defendant CIIG**

39.    Defendant CIIG Management LLC ("CIIG Management") is a sponsor of special purpose acquisition companies ("SPACs"). A SPAC is a shell company formed for the sole purpose of raising money through a public offering to eventually acquire one or more companies. CIIG Management's offices are located at 40 West 57th Street in New York.

40.    Defendant CIIG Merger Corp. ("CIIG"), now known as Arrival Vault US, Inc. was CIIG Management's first SPAC. CIIG was incorporated in Delaware on September 19, 2019. CIIG's offices are located at 40 West 57th Street in New York. CIIG was formed for the purpose of effectuating an initial business combination.

**3. Executive Defendants**

41.    Defendant Denis Sverdlov ("Sverdlov") founded Arrival in 2015 and has served as the Company's CEO since 2016. According to the Registration Statement, prior to founding Arrival Sverdlov served as the Deputy Minister for Communications and Mass Media in Russia from July 2012 to August 2014. Prior to that, Sverdlov co-founded and served as the CEO for the largest 4G telecommunications operator in Russia, called Yota. Sverdlov sold Yota for $1.5 billion. Based on Sverdlov's investment in Arrival prior to the Business Combination, Sverdlov received a 3000% percent return on his investment, with an estimated net worth of $11.7 billion given his 76% share in Arrival.

13

42.     As CEO, Sverdlov signed Arrival's Registration Statement, and all of Arrival's annual and quarterly reports filed with the SEC. Sverdlov also solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

43.     Defendant Tim Holbrow ("Holbrow") has served as the Company's Senior Vice President of Strategic Finance since August 2021.  Holbrow served as Arrival's CFO from August 2019 until the Business Combination, and then served as the Interim CFO of Arrival until August 2021. Defendant Holbrow signed Arrival's Registration Statement and is therefore liable under the Securities Act for the false and materially misleading statements and omissions contained therein. Holbrow also solicited and/or permitted the use of his name to solicit consent for authorization for the Business Combination by issuing the Proxy Statement and Prospectus. In October 2020, Holbrow purchased 176,001 restricted Arrival shares at a price of €3.40909 per share, and stood to financially benefit from the increased prices of Arrival's shares through the Business Combination.

44.     Defendant Michael Abelson ("Ableson") has served as Arrival's CEO of Automotive since October 2019.  According to the Registration Statement, prior to joining Arrival Abelson spent 35 years with General Motors in a number of positions, including Vice President of EV Infrastructure. Defendant Ableson signed the Registration Statement "[p]ursuant to the requirements of Section 6(a) of the Securities Act of 1933" as Arrival's "duly authorized representative…in the United States," and as "Attorney-in-fact" on behalf of Defendants Holbrow, Anatolitis, Dusemon and Horvath (enumerated below). Ableson is therefore liable under the Securities Act for the false and materially misleading statements and omissions contained therein. Ableson also solicited and/or permitted the use of his name to solicit consent or authorization for

14

the Business Combination by issuing the Proxy Statement and Prospectus. In October 2020, Ableson purchased 440,001 restricted Arrival shares at a price of €3.40909 per share, and stood to financially benefit from the increased prices of Arrival's shares through the Arrival IPO.

45.     Defendant Avinash Rugoobur ("Rugoobur") has served as the President of Arrival since July 2020. Prior to that Rugoboor served as Arrival's Chief Strategy Officer from March 2019 to July 2020. Rugoboor also served in multiple engineering and management roles at General Motors. Rugoboor was named in the Registration Statement as about to become a director of Arrival on the closing of the Business Combination and is therefore liable under the Securities Act for the false and materially misleading statements and omissions contained therein. Rugoobur also solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus. In October 2020, Rugoobur purchased 880,001 restricted Arrival shares at a price of €3.40909 (or around $3.51) per share, and stood to financially benefit from the increased sale and price of Arrival's shares through the Business Combination.

46.     Defendants Sverdlov, Holbrow Ableson, Rugoobur are collectively referred to as the "Executive Defendants."

47.     The Executive Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Arrival's reports to the SEC, press releases and presentations to securities analysts and investors, money and portfolio managers, and institutional investors, i.e., the market. The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the

15

public, each of them knew or had reason to know that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then false and materially misleading.

### 4. Director Defendants

48.     Defendant Michael Anatolitis ("Anatolitis") served as a director of Arrival at the time of the Business Combination. Analotitis signed the Registration Statement and is therefore liable under the Securities Act for the false and materially misleading statements and omissions contained therein.

49.     Defendant Gilles Dusemon ("Dusemon") served as a director of Arrival at the time of the Business Combination. Dusemon signed the Registration Statement and is therefore liable under the Securities Act for the false and materially misleading statements and omissions contained therein.

50.     Defendant Csaba Horvath ("Horvath") served as a director of Arrival at the time of the Business Combination. Defendant Horvath signed the Registration Statement and is therefore liable under the Securities Act for the false and materially misleading statements and omissions contained therein.

51.     Defendant Alain Kinsch ("Kinsch") has served as a director of Arrival since March 2021. Kinsch was named in the Registration Statement as about to become a director of Arrival on the closing of the Business Combination and is therefore liable under the Securities Act for the false and materially misleading statements and omission therein.

52.     Defendant Kristen O'Hara ("O'Hara") has served as a member of CIIG's board of directors since December 2019. O'Hara solicited and/or permitted the use of her name to solicit consent or authorization for the Business combination by issuing the Proxy Statement and Prospectus. O'Hara was named in the Registration Statement as about to become a director of

16

Arrival on the closing of the Business Combination and is therefore liable under the Securities Act for the false and materially misleading statements and omission therein.

53.    Defendant Jae Oh ("Oh") has served as a director of Arrival from March 2021 until he resigned in July 2021. Oh was named in the Registration Statement as about to become a director of Arrival on the closing of the Business Combination and is therefore liable under the Securities Act for the false and materially misleading statements and omission therein.

### 5.    Additional CIIG Management Defendants

54.    Defendant Peter Cuneo ("P. Cuneo") was the CEO and Chairman of the board of directors of CIIG since its inception up until the closing of the Business Combination. P. Cuneo is also a managing member of CIIG Management. P. Cuneo became the Non-Executive Chairman of Arrival's board of directors following the business combination. P. Cuneo's background is in entertainment and consumer products.  From 2015-2019 P. Cuneo held various positions at Iconix Brand Group, including as interim CEO and Chairman of the Board. From 1999-2009 P. Cuneo served as President and CEO and later Vice Chairman of the Board of Marvel Entertainment, Inc. P. Cuneo solicited and/or permitted the use of his name to solicit consent or authorization for the Business combination by issuing the Proxy Statement and Prospectus. P. Cuneo was named in the Registration Statement as about to become a director of Arrival on the closing of the Business Combination and is therefore liable under the Securities Act for the false and materially misleading statements and omissions therein. At the time of the business combination, P. Cuneo owned 5,821,875 shares of CIIG common stock, or 18% of the outstanding shares, and was expected to hold 11,801,042 shares of Arrival following the business combination, or 2.02% of outstanding shares, and stood to financially benefit from the increased sale and price of Arrival's shares through the Arrival IPO.

17

**Deleted:** has been

**Deleted:** .

55.    Defendant Gavin Cuneo ("G. Cuneo") was, the Chief Operating Officer and member of CIIG's board of directors since its inception up until the closing of the Business Combination. G. Cuneo is also a managing member of CIIG Management. G. Cuneo solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and Prospectus.

56.    Defendant Michael Minnick ("Minnick") was, the Chief Investment Officer and member of CIIG's board of directors since its inception up until the closing of the Business Combination. Minnick is also a managing member of CIIG Management. Minnick solicited and/or permitted the use of his name to solicit consent or authorization for the Business combination by issuing the Proxy Statement and Prospectus.

57.    P. Cuneo, G. Cuneo and Minnick are referred to as the CIIG Management Individual Defendants.

58.    The CIIG Management Individual Defendants participated in board meetings and conference calls, voted to approve the Business Combination, signed or authorized the signing of the Registration Statement, Proxy, and approved the Proxy, solicited approval of the Business Combination through the board's recommendation that CIIG shareholders vote in favor of the Business Combination, which appeared in the Proxy, and permitted the use of their names in connection with the solicitation of proxies from the shareholders.  In their capacities as signatories of the Proxy Statement, as well as by virtue of their authority to approve the Business Combination, the CIIG Management Individual Defendants possessed the power and authority to control the contents of the Registration Statement, Proxy/Prospectus, as well as CIIG's and Arrival's press releases, investor and media presentations and other SEC filings.

**6.  The Underwriter Defendants**

18

59. Defendant UBS Securities LLC ("UBS") was a statutory underwriter of the Arrival IPO through its activities and participation in the distribution of Arrival shares to public investors. UBS served as joint book-running manager (together with Barclays) in connection with CIIG's initial public offering on December 17, 2019, raising $258,750,000. UBS sold 13,500,000 units of CIIG for $10.00 per share in connection with CIIG's IPO. However, approximately two-thirds of UBS's underwriting fees for the CIIG IPO—$4,725,000 of the $7,425,000 total—was contingent upon, and deferred until, CIIG completed the Business Combination in which Arrival "went public."

60. Accordingly, following the CIIG IPO, UBS continued to serve as a financial and capital markets advisor to CIIG in connection with the Arrival IPO by, among other things, identifying merger partners for the business combination and de-SPAC transaction, holding meetings and discussing diligence items relating to Arrival, evaluating the status of and discussing changes to the PIPE financing, and serving as a placement agent in connection with the PIPE financing. UBS also conducted due diligence in connection with the Arrival IPO by meeting with Arrival management and representatives from Cowen to discuss Arrival's key partnerships, product portfolio, intellectual property, and microfactory approach, among other things. UBS, together with Barclays, Cowen, and CIIG, also performed diligence relating to Arrival's financial projections, vehicle pricing, vehicle volume deployments, operating cost estimates, bill of materials, microfactory capital expenditure estimates, among other things. As Arrival stated in the Registration Statement, CIIG concluded that "the experience and sector expertise" provided by UBS helped enable CIIG to "make the necessary analyses and determinations regarding" the Arrival de-SPAC Business Combination without obtaining a formal fairness opinion. UBS's role in evaluating Arrival's financial condition and the de-SPAC transaction was prominently featured

19

in the Registration Statement and in other communications by Arrival concerning the Arrival IPO. UBS also bore significant risk with respect to the Arrival IPO, as approximately two-thirds of its underwriting fees depended upon Arrival successfully "going public" through the de-SPAC. Through these activities, UBS directly and indirectly participated in the distribution of Arrival shares to public investors in connection with Arrival's IPO.

61.     Defendant Barclays Capital Inc. ("Barclays") was a statutory underwriter of the Arrival IPO through its activities and participation in the distribution of Arrival shares to public investors. Barclays served as joint book-running manager (together with UBS) in connection with CIIG's initial public offering on December 17, 2019, raising $258,750,000. Barclays sold 9,000,000 units of CIIG for $10.00 per share in connection with CIIG's IPO.  However, approximately two thirds of Barclays' underwriting fees for the CIIG IPO—$3,150,000 of the $4,950,000 total—were contingent upon, and deferred until, CIIG completed the business combination in which Arrival "went public."

62.     Accordingly, following the CIIG IPO, Barclays continued to serve as a financial and capital markets advisor to CIIG in connection with the Arrival IPO by, among other things, identifying merger partners for the business combination and de-SPAC transaction, and conducting due diligence in connection with the Arrival IPO by meeting with Arrival management and representatives from Cowen to discuss Arrival's key partnerships, product portfolio, intellectual property, and microfactory approach, among other things. Barclays, joined by UBS, Cowen, and CIIG also met with Arrival management to perform diligence relating to Arrival's financial projections, vehicle pricing, vehicle volume deployments, operating cost estimates, bill of materials, microfactory capital expenditure estimates, and additional subjects. As Arrival stated in the Registration Statement, CIIG concluded that "the experience and sector expertise" provided

20

by Barclays helped enable CIIG to "make the necessary analyses and determinations regarding" the Arrival de-SPAC business combination without obtaining a formal fairness opinion. Barclays' role in evaluating Arrival's financial condition and the de-SPAC transaction was prominently featured in the Registration Statement and in other communications by Arrival concerning the Arrival IPO. Further, Barclays bore significant risk with respect to the Arrival IPO, as approximately two-thirds of its underwriting fees depended upon Arrival successfully "going public" through the de-SPAC transaction. Through these activities, Barclays directly and indirectly participated in the distribution of Arrival shares to public investors in connection with the Arrival IPO.

63.    Defendant Cowen & Company LLC ("Cowen") was a statutory underwriter of the Arrival IPO. Specifically, Cowen was hired by Arrival as a financial advisor to identify potential SPACs with which it could "go public" through a business combination, and presented Arrival to CIIG as a potential business combination target. Cowen also served as a lead financial advisor to Arrival by, among other things, attending meetings with UBS, Barclays, and Arrival executives to discuss Arrival's business, funding needs, key partnerships, product portfolio, intellectual property, and microfactory approach, among other things. Cowen also participated in due diligence related to the Arrival IPO, including by attending meetings between CIIG and Arrival executives during which the topics included accounting due diligence, the timeline and investor targeting for the proposed PIPE, Arrival's operations, strategy, financial profile, and industry position. Cowen also served as lead placement agent on the PIPE financing used to facilitate the Arrival IPO, held meetings and discussing diligence items relating to Arrival, and evaluated the status of and discussing changes to the PIPE financing. Cowen also conducted due diligence in connection with the Arrival IPO, including by meeting with Arrival management to discuss Arrival's key

21

partnerships, product portfolio, intellectual property, microfactory approach, among other things, and met with Defendant Holbrow to perform diligence relating to Arrival's financial projections, vehicle pricing, vehicle volume deployments, operating cost estimates, bill of materials, and microfactory capital expenditure estimates, among other things. Cowen's role in evaluating Arrival's financial condition and the de-SPAC transaction was prominently featured in the Registration Statement and in other communications by Arrival concerning the Arrival IPO. Further, Cowen bore significant risk with respect to the Arrival IPO, as its fees were dependent upon Arrival successfully "going public" through the de-SPAC transaction. Through these activities, Cowen directly and indirectly participated in the distribution of Arrival shares to public investors in connection with the Arrival IPO.

64.     UBS, Barclays and Cowen are collectively referred to as the Underwriter Defendants.

65.     The Underwriter Defendants served in a traditional underwriter capacity by assisting and participating in the distribution of Arrival securities. For example, negotiating the private investment in public equity (PIPE) financing was necessary to the de-SPAC transaction. The Underwriter Defendants facilitated and identified investors for negotiating the PIPE.  As Arrival stated in the Registration Statement, the PIPE investments were required to "consummate the Business Combination and securing PIPE funding was a condition to closing the de-SPAC transaction.  The PIPE financing contributed $400 million in cash proceeds to Arrival upon its IPO. Further, the CIIG IPO and the Arrival IPO functioned as a single unitary plan of financing.

**7.     Kinetik S.à.r.l.**

66.     Defendant Kinetik S.à.r.l. ("Kinetik") is Arrival's ultimate parent company. At the time of the Business Combination Kinetik owned 76.43% of Arrival, 463,275,682 Ordinary

22

Shares. Defendants Horvath and Dusemon are the executive officers and directors of Kinetik. The Kinetik Foundation is the trustee of the Kinetik Trust, which holds all the interests of Kinetik. According to Arrival's Schedule 13D Defendant Sverdlov is a beneficiary of the Kinetik Trust.

67. Arrival, CIIG, CIIG Management, the Executive Defendants, the Director Defendants, the Individual CIIG Management Defendants, the Underwriter Defendants, and Kinetik are referred to collectively as the Defendants.

**V.    ALLEGATIONS OF MISCONDUCT**

**A. Mechanics and Timeline of Arrival's Business Combination With CIIG/Arrival's IPO**

68. As noted above, CIIG is a blank check company or SPAC. CIIG was permitted to pursue a business combination in any industry or sector but focused its search on the TMT (telecommunications, media and technology) sector.

**Deleted:** Merger Corp.

69. On December 17, 2019 CIIG, which had no commercial operations of its own, completed an initial public offering (IPO) of 25,875,000 units at $10.00 per unit, generating gross proceeds of $258,750,000. Each unit consisted of one share of Class A Common Stock and one-half of one redeemable warrant of CIIG, with each whole warrant entitling the holder to purchase one share of Class A Common Stock for $11.50 per share. Simultaneously with the closing of its IPO, CIIG consummated the private sale of 7,175,000 placement warrants at a purchase price of $1.00 per placement warrant in a private placement to the sponsor and certain funds and accounts managed by subsidiaries of the direct anchor investors, generating gross proceeds of $7,175,000. The placement warrants are identical to the warrants included in the units sold as part of the units in CIIG's IPO. Each warrant was exercisable for one share of Class A common stock for $11.50 per share.

70. The proceeds from CIIG's IPO ($258,750,000) were placed in a trust account.

23

71.     CIIG's Class A common stock and warrants began trading on the Nasdaq on February 3, 2020 under the ticker symbols "CIIC" and "CIICU," respectively. CIIG's units began trading on the Nasdaq on December 13, 2019 under the ticker symbol "CIICW."  As is typical for SPAC's, CIIG shares traded at or near the $10.00 offering price until CIIG announced its target acquisition company.

72.     CIIG had until December 17, 2021 to complete a business combination.

73.     At the time of CIIG's IPO, P. Cuneo, G. Cuneo and Michael Minnick each owned 5,821,875 shares of CIIG Class B Common Stock. CIIG's Class B common stock was automatically convertible into shares of CIIG Class A common stock at the time of the Business Combination.

74.     On September 9, 2020 CIIG and Arrival executed a non-binding letter of intent setting forth the terms for a potential business combination in which CIIG would acquire Arrival at an enterprise value of $5.34 billion.

75.     On November 17, 2020 CIIG's board of directors approved a business combination agreement with Arrival.  On November 18, 2020 Arrival's board of directors likewise approved the business combination agreement with CIIG. In connection with approving the business combination, CIIG's board of directors determined not to obtain a fairness opinion.  According to CIIG, its officers and directors have "substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and background, together with the experience and sector expertise of UBS and Barclays (CIIG's financial advisors) and their global management consultant, enabled them to make the necessary determinations regarding the business combination."

24

76.     On November 18, 2020 CIIG and Arrival issued a joint press release announcing that Arrival and CIIG had agreed to the business combination agreement or "de-SPAC" transaction that would result in Arrival becoming a publicly listed company. The market reacted positively to the CIIG-Arrival announcement. After closing at $10.05 per share on November 17, 2020, the last trading day before the announcement, CIIG shares nearly tripled and closed at a price of $27.17 per share on November 24, 2020, less than a week following the announcement of the business combination, with that dramatic increase reflecting investors' perceived value of Arrival after the anticipated de-SPAC business combination.

77.     After announcing the de-SPAC business combination, on December 15, 2020, Arrival filed the Registration Statement on Form S-4 with the SEC (the "Registration Statement"). The Registration Statement was amended on January 21, 2021, February 16, 2021, and February 25, 2021 on Form S-4/A. The Registration Statement included a "Proposed maximum offering price per unit" of $28.52, reflecting the average market price of CIIG shares at that time and a "Proposed maximum aggregate offering price" for those Arrival Ordinary Shares being registered of more than $922 million.  The Registration Statement became effective on February 26, 2021. The Registration statement also incorporated by reference a Proxy Statement for Special Meeting of CIIG Merger Corp. and Prospectus for Ordinary Shares and Warrants of Arrival Group filed a definitive proxy statement ("Proxy Statement/Prospectus") inviting CIIG investors to vote on the Business Combination and submit votes to be cast at the special meeting of CIIG stockholders to take place on March 19, 2021.  Defendant P. Cuneo signed the Proxy Statement/Prospectus in his capacity as CEO of CIIG.

78.     Arrival's December 15, 2020 press release explained the mechanics of Arrival's IPO stating, "in connection with CIIG's recently-announced proposed business combination with

Arrival S.à.r.l…[t]he business combination is to be effected through a newly created holding company, Arrival Group, whereby CIIG and Arrival will become wholly owned subsidiaries of Arrival Group." "Arrival Group" was renamed "Arrival" and CIIG was renamed "Arrival Vault, US, Inc."

**Deleted:** Merger Corp.

79.    The Business Combination closed on March 24, 2021. Accordingly, on March 24, 2021, in connection with the consummation of the Business Combination/IPO, CIIG notified Nasdaq that the Business Combination became effective and requested that Nasdaq file a Notification of Removal of Listing to notify the SEC that CIIG's common stock, units and warrants were to be delisted and de-registered as a result of the business combination. Pursuant to the Business Combination, CIIG shareholders were given the choice to exchange their CIIG shares on a 1:1 basis for Arrival Ordinary Shares or redeem their shares for cash.

80.    Beginning on March 24, 2021 Arrival's Ordinary Shares and warrants began trading on the Nasdaq under the new ticker symbols ARVL and ARVLW, respectively. According to Arrival's March 25, 2021 press release announcing the Business Combination, Arrival planned to use the $660 million in proceeds from the Business Combination to "ramp up delivery of its electric vehicles and expand its global network of Microfactories."

**B.  Arrival's Business Model**

81.    Arrival's business model is premised on its purported ability to rapidly produce electric vehicles in what it calls its "game-changing proprietary microfactories." Arrival contrasted its unique approach with that of traditional vehicle manufacturing which has depended upon multi-billion-dollar up-front capital expenditures to commission massive factories that take years to build and require traditional assembly lines.

82.     Arrival promised investors that it could and would build numerous microfactories wherein electric vehicles would be manufactured by robots in modular "technology cells." This revolutionary approach to vehicle manufacturing, according to Arrival, would employ lower-cost composite materials, build and operate production facilities at a lower cost compared to both traditional fossil fuel vehicles as well as EV competitors, and require far fewer workers than traditional auto factories. Correspondingly, Arrival could offer its customers a lower total cost of ownership (TCO) while also enjoying a high profit margin.

83.     Production of electric vehicles in Arrival's microfactories purportedly consisted of a motorized platform that would carry unfinished vehicles to various robot clusters or "technology cells," with different components of the vehicle added at each stop. The microfactory cells were responsible for handling all of aspects of a vehicle's production and were to operate as "factories within a factory." The technology cells each featured robotic arms driven by computer software and artificial intelligence Arrival purportedly developed that would complete a range of tasks without the need for any tool changes.  Arrival claimed that its software and artificial intelligence enabled the robots to identify the parts necessary for a certain process, move those parts and then position them. Autonomous mobile robots or "AMRs" would link the cell production processes together by transporting the vehicle parts to the different technology cells.

84.     Arrival produced and published several promotional videos on YouTube purportedly demonstrating its robotics technology. For example, in a March 21, 2021 Arrival video entitled "Making the Microfactory" Arrival's Chief Robotics Officer Napo Montano explained that robotics was the foundation of the microfactory upon which all else followed. Montano explained: "The microfactory is basically built around two main components. ***For your robotic cell, which is the factory inside the factory. Think about it as a cluster of robotic arms***. It's

27

completely driven by computer vision and several forms of AI based control. And then you have the glue connecting all the elements inside the factory, all the cells, *this technology is mobile robotics. So robots that move in the environment autonomously, robots that interact with the cells and with any other robotic factory*. We are reactive, we are adaptable, we are reconfigurable. *This is the DNA of the microfactory*."

85.    Later in the video Montano explains how, in contrast to traditional vehicle factories which rely on "glorified automation," Arrival's microfactory featured "advanced robotics." Montano states, "In robotics, semantics is the study of understanding. How does the robot calculate his location in the space inside the microfactory? By developing AI [artificial intelligence] told to calculate all these features of semantics, we build systems that are capable of interacting. *This is extremely powerful, because we are basically moving from what I would call glorified automation to advanced robotics on the shop floor.  It's a key feature of the microfactory*." Arrival's video also featured Defendant Ableson who stated "..*we are, at our heart a tech company. I can tell you that's dramatically different than a traditional vehicle manufacturer*. One of the great enablers of the microfactory approach is keeping the capital, the investment in the microfactory relatively low because that's what allows us to build many of them. *And so in the case of robots we are buying very standard robots that several different companies produce. What we're developing at the company is very sophisticated software*."

86.    Arrival also stated that it had developed what it called "plug-and-play" components that would reduce vehicle assembly costs and maximize interchangeability across different vehicle platforms. According to Arrival, this would improve cost efficiency in terms of design, procurement and manufacturing processes, enabling new vehicle platforms to be designed and

28

developed in about 18 months compared to three years of more for traditional vehicle manufacturers.

87. Finally, rather than produce vehicles using steel and paint, Arrival touted its composite materials. Arrival represented that it could produce vehicles using fabric, rather than steel, that would be wrapped around molds, heated, and dyed according to the customer's color choice. This would drastically reduce the typical costs involved in vehicle manufacturing: *i.e.* the costs of steel, welding, a paint shop, and the factory space necessary to house all these elements. Additionally, because paint shops require lengthy permitting approvals, eliminating the paint shop would reduce the amount of time required to get a factory up and running.

88. Arrival touted that the advantages of its microfactories would substantially reduce the capital expenditures (CapEx, *i.e.* up-front costs) required to build traditional factories as well as the annual operating expenditures (OpEx). Additionally, Arrival's microfactories would require much less space than traditional factories, including those of competitor EV manufacturers. Arrival stated that its 200,000 square foot microfactories could be set up inside a standard warehouse space compared to the hundreds of acres of land traditional factories required. Accordingly, Arrival claimed that a microfactory could be operational within six months of leasing a property- compared to three years for large-scale plants- because it was able to make use of pre-existing empty warehouses to manufacture its vehicles.

89. Because of Arrival's unique microfactory model and proprietary technologies Arrival represented it could offer customers a "superior total cost of ownership," or TCO (i.e. the total cost of ownership of the vehicle over its lifecycle, which includes the initial purchase price and ongoing operating and maintenance costs). Additionally, Arrival represented that it would enjoy a remarkably high-profit margin, and revenue of $14.1 billion by the third year of operating.

And because the process for setting up new microfactories was quick and easy, and the capital expenditure to establish a microfactory was low, Arrival claimed that it would start producing vehicles in four microfactories in 2022 and expand that number to 31 in 2024.

**C.  Arrival Debuts Itself as Ready to Hit the Ground Running**

90.    While Sverdlov founded Arrival in 2015, it was not until 2020 that Arrival debuted publicly and began issuing announcements to investors. As Defendant P. Cuneo stated, prior to 2020, Arrival was "essentially operating in stealth mode." But once Arrival did make its public debut, it signaled to investors that its microfactory was operational and that it was ready to mass produce vehicles.

91.    In January 2020 Arrival announced a $110 million investment from Hyundai and Kia. Also in January 2020, Arrival announced a partnership with UPS, which placed an order for up to 20,000 Arrival delivery vans.  Arrival stated that the deal with UPS represented hundreds of millions of dollars in revenue and that the "initial 10,000 vehicles [would be]…rolled out in the UK, Europe and North America from 2020-2024 worth hundreds of millions of euros each year." UPS would have the option to order an additional 10,000 vehicles that were "built using Arrival's new method of assembly using low capital, low footprint microfactories located to serve local communities and profitable from thousands of units." Given that Arrival and UPS had been "working very closely for several years to get us to this stage" Arrival and UPS were "really at this point now where we're going to be deploying these on the streets in different countries, different cities so that we can really deliver to more customers with zero tailpipe emission solutions." Commenting on the UPS deal, Defendant Ableson stated "our whole system is set up to deliver bespoke vehicles in smaller volumes.  It's the perfect match between what UPS needs and what we can develop."

92.     On October 14, 2020 Arrival announced that it would open its first U.S. microfactory in Rock Hill, South Carolina in the second quarter of 2021 and begin delivering vehicles by the end of 2021. Arrival also announced an investment from BlackRock of $118 million.

93.     These announcements signaled to investors that Arrival was poised for commercial sales and that its microfactory model functioned effectively. Defendant Rugoboor confirmed this impression in an October 2020 interview stating, "we like to talk about things that we've done; show things we've done." He further boasted that Arrival's accomplishments "shows our technology is mature." Defendant Sverdlov likewise characterized the Company's operation in "stealth mode" as a time during which Arrival perfected its microfactory model: "for the first five years of our history, we worked in stealth to create our New Methods and Product." Defendant Sverdlov further represented that Arrival was now ready to "deliver."

94.     Indeed, analysts and market commentators noted these accomplishments. A Forbes article described how "the startup came out of semi-stealth with a bang early this year when Hyundai and Kia bought a 100 million euro ($110 million) stake. That boosted its valuation to more than $3 billion. Soon after UPS, which is also an investor, said it would buy up to 10,000 Arrival electric delivery vans for its fleet…"

95.     One online electric vehicle publication described how Arrival's incredible technology enabled its profitability:

> According to data published by Arrival, microfactories producing vehicles based on the innovative "skateboard" platform are able to respond literally to individual orders. ***It takes just 4 hours to assemble one vehicle*** with the weight, load capacity and shape selected by the customer. ***And the assembly line is operated by only one man***. The innovative production concept enables the completion of orders overnight and at the same time reduces production costs in a quantifiable way. In this system, it takes only 3 months to implement the production of a new vehicle model and the ***return on investment may be achieved after several thousand cars***

*have been assembled. And that is the secret of Arrival's spectacular career* and the reason why so many invest willingly in this company.[2]

96.    Arrival's announcement of the Rock Hill microfactory and Defendants' statements to several media publications coincided with Arrival's and CIIG's advanced stages of planning Arrival's IPO pursuant to the proposed Business Combination.

**D.  Arrival and CIIG Announce the Proposed Business Combination**

97.    On November 18, 2020 Arrival and CIIG announced the Business Combination that would result in Arrival's IPO. The joint press release represented that Arrival's "transformative microfactories" can be deployed anywhere in the world within six months, and made clear that Arrival's business model was based on its "cell-based assembly method" which in turn relied on its "proprietary hardware, software and robotics technologies."

The press release stated, in relevant part:

> •    Arrival is producing EVs competitive in price with fossil fuel alternatives and substantially lower than comparable EVs
>
> •    Arrival has developed a new method of designing and producing zero-emission vehicles using its *proprietary hardware, software and robotics technologies and low cost Microfactories*[3]
>
> •    Arrival has signed contracts with total order value up to US $1.2 billion and *its first products are planned for production in Q4 2021*
>
> ***
>
> Company Highlights
>
> Arrival is challenging the 100 year old automotive production process, *by producing its EVs in low CapEx, low footprint Microfactories*. Its operations *utilize Arrival's in-house proprietary technologies and advanced cell-based assembly method* to bring down the cost of EVs and accelerate mass adoption globally.

---

[2] *Why are couriers switching to electric cars*, Tom Mulawka, July 27, 2020, https://www.3dbinpacking.com/en/blog/couriers-switching-to-electric-cars/.
[3] All emphasis is added.

32

Arrival's initial focus is on the commercial vehicle market, which is undergoing a seismic shift towards electrification in line with global public policy. *Arrival believes that it is well positioned to capitalize on this market opportunity with its technology driven approach to a traditionally underserved market. The result is its best-in-class products with an exceptional user experience that are priced competitively with fossil-fuel vehicles and have a substantially lower total cost of ownership ("TCO") than both fossil fuel and electric variants*.

*Arrival's transformative Microfactories can be deployed anywhere in the world within six months*, *<u>using existing warehouses</u>* close to areas of demand. *These Microfactories are designed to produce any vehicle from Arrival's portfolio customized for the cities and regions they serve. <u>The vehicles are designed specifically for Microfactory assembly using Arrival's proprietary in-house developed components, software and sustainable composite materials.</u>* Arrival's vertical integration and new method of production break the rule of economies of scale and create *strong unit economics for the whole Arrival product portfolio, which Arrival expects will enable profitability for the business by 2023.*

Arrival's strategy to reach industry-transforming flexibility and scalability is based on the utilization of Microfactories, as opposed to giant, capital-intensive legacy factories. "*With Arrival's products our clients are not forced to compromise between being green and being cost efficient. Our focus on the whole EV ecosystem, <u>new methods of design and production and our enabling technologies are the key to driving down the cost of EVs</u>* and accelerating the transition to zero-emission transportation globally," said Denis Sverdlov, Founder and CEO of Arrival. "CIIG's leadership team has invaluable experience building businesses globally across a wide range of industries. We are excited to partner with them as we begin our journey to being a publicly-listed company and delivering our products to customers and cities around the world."

"Arrival's bold, game-changing approach to the production of electric vehicles made the company the clear winner in our search for a partner," said Peter Cuneo, Chairman and CEO of CIIG. "Operating in stealth mode for five years, Denis and his visionary team have rewritten the rules of the game for the auto industry. *Arrival's development of exceptional products using its pioneering technology and software alongside its groundbreaking new method of production can create an incredibly low TCO for customers which we believe stands them apart from everyone else in the electric vehicle industry*. We look excitedly to the future and to our partnership with Arrival's talented leadership team."

98.    Arrival and CIIG also hosted an investor conference call announcing the proposed Business Combination.[4] On the call, Defendant P. Cuneo discussed the Business combination, touting Arrival's "technology-driven, purpose-built electric vehicle," representing that "***vehicle production is right around the corner***":

Arrival has entered into a business combination agreement with CIIG Merger Corp., with the combined company continuing as a public, NASDAQ-listed company with an implied enterprise value of approximately $5.4 billion at closing. The pro forma enterprise value of the combined company will represent a 0.4 multiple of Arrival's 2024 pro forma expected revenue of $14.1 billion.

***

Arrival has a unique history worth noting. The company was formed about five years ago when Denis Sverdlov saw an opportunity to revolutionise the auto industry. He assembled a team focused on this task and they reimagined what was possible. ***Looking at every single element of the vehicle development process, they were able to design a technology-driven, purpose-built electric vehicle from the ground up***…They were essentially operating in stealth mode. ***Their vision is now being realized*** as the curtain goes up to reveal a company unlike any other."

***

…***Vehicle production is right around the corner, and is expected to commence in the second half of 2021. They are one of the first to achieve price competitiveness and lower Total Cost of Ownership compared to fossil fuel vehicles.*** Their vertically integrated approach to technology strategically positions them with a moat of valuable intellectual property. ***Their Microfactories, their proprietary software, their hardware and their robotics platforms position them to achieve industry leading profitability and CapEx levels***.

99.    On the call Defendant Sverdlov addressed investors, touting Arrival as a leader in the EV industry with the ability to offer "best in class products at the right price," and "***build vehicles at any scale and anywhere***:"

If you follow the pack you will end up with the same issues the industry has grappled with for the last few decades, compromised products that cannot keep up with the latest technology, prohibitive costs for manufacturing and low margins. ***Our way to resolve these problems is with a completely new method. As you will hear today, we are well on our way to achieving this goal with unique mature***

---

[4] A transcript of the call is attached as an exhibit to CIIG's 8-K of the same date filed with the SEC.

34

*technology, best in class products at the right price, solid traction on sales, and a profitable business profile.* This transaction will enable us to continue to scale the business and expand our global reach.

\*\*\*

Our Microfactory approach departs from the commonly accepted rule of scale in the automotive industry. *We believe Arrival can build vehicles at any scale and anywhere and still achieve highly desirable unit economics*. We believe Arrival has been able to attract the best talent from a variety of industries. We've brought them together to create the technologies and systems that make this possible. *Arrival has developed its own proprietary components, software and sustainable composite materials. We believe these enabling technologies coupled with our pioneering Microfactory production strategy,* enable the assembly of vehicles with an elevated user experience at a price competitive to fossil-fuel vehicles. We expect these vehicles to provide a lower cost of ownership than both fossil fuel and electric equivalents. We have designed all our technologies to be built within these Microfactories, utilizing a broad and deep IP portfolio which is very difficult to copy. We believe Arrival is a world leader in the technology for designing and producing vehicles. *As Peter mentioned, Arrival has been in stealth mode for almost five years, during which time we have built a team of over 1,200 people and designed multiple vehicle platforms*. We've developed and patented a wide range of in-house technologies that enable cost competitive, highly customized, best-in-class commercial vehicles for customers and cities around the world. *We are deeply engaged with global leaders in the transportation industry, such that we have approximately $1.2 billion in orders.*

100.    On the call, Defendant Rugoobur spoke more specifically about the production capacity and costs for each microfactory:

*Digging a bit deeper, we have sized the annual capacity of each Microfactory to 1,000 buses or 10,000 commercial vans*. Our model shows that ten of our Microfactories can produce the same number of annual units as a traditional OEM commercial vehicle factory -100 thousand vans in this case – but doing it in one-tenth of the space and at less than half the CapEx*. Put another way, one Microfactory costs $45 million to build and is expected to generate $100 million of margin annually. We expect to become cash flow positive with just three Microfactories, which equates to 30,000 vehicles. By the end of 2024, we plan to have 31 Microfactories located around the world* to serve expected demand. When combined with our rapid product US Installation Manager and US Maintenance Manager at Arrival from June 2021 to August 2022 *while maintaining profitability and high margins.*

35

101.    Defendant Holbrow then discussed Arrival's production and financial model, affirming that vehicle production would begin in 2021 and that Arrival would realize $1 billion in revenue in 2022:

> We expect that our Microfactory approach and the tremendous demand that we are seeing across our products will result in substantial revenue growth over the next 4 years. Anchored by our over $1 billion dollar UPS order and by substantial interest in our electric buses, *we expect to begin commercial vehicle production in 2021. We have modeled roughly $1 billion dollars worth of revenue in 2022, growing to $5.1 billion dollars in 2023 and to over $14 billion dollars in 2024.*
>
> Due to our low-cost design and manufacturing model, as Denis and Avinash indicated earlier, *we believe we can get to cash flow positive results with 3 Microfactories up and running*. This is primarily a result of our expected strong gross margins for each of our vehicles – 38 percent for our buses and 21– 34 percent for our vans, depending on size and configuration.
>
> *So, in 2022, we believe we will be EBITDA positive with 4 Microfactories established by year end. 2023 obviously sees a strong revenue ramp, and we expect that our high margin model will result in over $1 billion dollars in EBITDA. At the end of 2023, we expect to have 11 Microfactories in service. Finally, in 2024, we expect to scale meaningfully with 31 Microfactories in operation by year end.*

102.    The 8-K also contained Arrival's "Investor Presentation" as an exhibit (which Arrival filed pursuant to Rule 425 and incorporated by reference into the Registration Statement) (the "Prospectus"). In the Prospectus Defendants reiterated Arrival's "Investment highlights," stating "Arrival is revolutionizing the electric vehicle industry."

> -Four vehicle designs expected in market by 2023, with *start of production for first vehicle planned for Q4 2021*
>
> -$1.2 Billion in orders
>
> -Unit economics enable price competitiveness and lower total cost of ownership to fossil fuel equivalents
>
> *-Game changing Microfactories enable flexible low capex production*
>
> -Vertically integrated

-Arrival expects industry leading profitability enabled by proprietary hardware, software *and robotics platforms*

103.    The Prospectus also highlighted Arrival's product pipeline: "Electric bus: 2021; Electric van: 2022; Large electric van: 2022; small vehicle platform: 2023." The presentation further touted Arrival's "industry changing microfactory approach" as "flexible, scalable and local to customers," highlighting Arrival's "materially lower" operational expenditure and capital expenditure compared to traditional OEMs as well as its ability to deploy a microfactory "in areas of demand within six months of setup time." Further, the Prospectus highlighted the status of its microfactories as "*ready*" with the Bicester plant "*fully integrated*."



104.    In a section of the Prospectus titled "financials and transaction overview," Arrival touted its "Industry leading financial profile" and "projected revenue distribution," which included "early projected profitability even at low volumes," "low CapEx requirements for cell-based microfactories" *projected vehicle volumes of 4,400 vans in 2022, 5,200 large vans in 2022 and*

*__1,000 buses in 2022__*, with revenues and gross profit of $14.1 billion and $3.7 billion, respectively

by 2024:



38



105.    In the Prospectus Arrival also compared its "industry changing approach" to that of traditional OEMs with respect to production volume, factory size, CapEx and OpEx, and time required to open a new factory:

106.    Following this announcement, the price of CIIG shares skyrocketed. CIIG shares increased from a close of $10.75 per share on November 17, 2020 to $27.17 per share on November 24, 2020.

**E.  Arrival's Files its Registration Statement**

107.    On December 15, 2020 Arrival filed a preliminary Registration Statement on SEC Form F-4, which Arrival amended on January 21, February 16, and February 25, 2021. The Registration Statement incorporated the December 14, 2020 Preliminary Proxy Statement for Special Meeting of CIIG Merger Corp. and Prospectus for Ordinary Shares and Warrants of Arrival Group Subject to Completion, signed by Defendant P. Cuneo ("Proxy Statement"). Arrival also published an updated analyst presentation which was filed with the SEC pursuant to Rule 425 and used in analyst and investor meetings to solicit investments in Arrival. The presentation included detailed information concerning Arrival's production timelines and highlighted that Arrival was "ready for mass production."

40

108.    For example, the presentation included details concerning Arrival's supposedly "high margin vehicles, with unrivalled unit economics," and included specifications for each of its vehicle's "range" or efficiency (i.e., the distance the vehicle can travel on a fully charged battery), payload (or weight), and start of production as follows:

109.    Arrival also touted the supposedly "superior total cost of ownership" for both the Arrival van and bus, representing that the TCO for Arrival's vans represented a 17% to 28% discount to diesel and competitor EVs, respectively, and that the Arrival bus had a TCO representing a 47% to 50% "improvement" over diesel and competitor EVs, respectively:

41



110.    Arrival also highlighted its vehicles "unit" economics, representing that its "in-house Plug & Play components" led to a 20% reduction in supplier margins, were specifically engineered for automated microfactory assembly, had been proven through 2-3 years of "on-road testing," were "meeting cost targets" and "automotive-grade requirements," and were "ready for mass production":



111.    Arrival also repeated the Company's production timelines, with the "delivery of prototypes [to UPS] started in 2020," bus production beginning by the fourth quarter of 2021, and van production starting in the third quarter of 2022.

112.    Arrival's Registration Statement also described in detail its microfactory model which relied upon technology cells, advanced mechanical robots and complex robotic assembly:

42

*Microfactories*

*Arrival has developed an industry-changing approach to manufacturing with its proprietary microfactory concept. Microfactories change the way vehicles are produced in numerous ways. Instead of using the traditional linear assembly line that operates at one speed with stations in a specific order, Arrival has designed its microfactories using technology cells*. The order in which a vehicle moves through the technology cells is determined by microfactory software and the order the technology cells are used can be changed dynamically from one vehicle to the next. Furthermore, the technology cells can be reconfigured, enabling each microfactory to build multiple vehicle types.

*Each technology cell performs specific tasks relating to the production of an electric vehicle. Linking the technology cells are autonomous mobile robots ("AMRs"), which are controlled by software designed and developed in-house by Arrival. Parts delivery and vehicle movement between the technology cells is accomplished with these AMRs.* Arrival has worked in partnership with Comau for the design and simulation of the microfactories. Our electric vehicles have been designed for our microfactory production and utilize Arrival's in-house plug-and-play modular components, proprietary modular skateboard, and proprietary composite materials. Collectively, our proprietary technology represents up to 70% of the Arrival Van's total bill of materials.

Each microfactory is designed to provide several competitive advantages for Arrival including lower capital investment and operating costs as well as efficient scalability. The size of each microfactory will be approximately 200,000 square feet and will be able to manufacture 10,000 vans per year or 1,000 buses per year assuming two shifts per day. Each microfactory will be staffed with approximately 250 employees. Arrival anticipates each microfactory will take approximately six months to complete. This reduced timing compared to a traditional OEM manufacturing facility is enabled by the absence of metal stamping and there being no requirement for a paint shop. Arrival can therefore outfit existing warehouses and avoid lengthy permitting approvals generally associated with paint shops.

The capital investment required for each microfactory is estimated to be approximately $45-$50 million while the annual operating expenses per microfactory are estimated to be approximately $12 million. When comparing to a traditional OEM assembly plant's volume of 100,000 vans/year, Arrival estimates the cost structure aggregated across ten of its van microfactories would result in an approximate 50% savings in capital investment and approximately 50% savings in annual operating expenses compared to the cost structure of a traditional OEM facility.

Arrival believes each microfactory can achieve an annual gross margin of $100 million per year, assuming either 10,000 vans or 1,000 buses are manufactured and sold per year. Arrival believes the efficiency in its microfactory cost structure positions Arrival to be free cash flow positive, after allowing for its

global overhead expenses, once Arrival reaches full production and sales for three currently planned microfactories.

Arrival's microfactories are highly scalable and can be deployed locally in major metropolitan cities worldwide. Arrival can locate its microfactories close to its customers. The flexibility of Arrival's microfactories will also enable it to design and develop purpose-built electric vehicles for its customers. The presence of Arrival's microfactories in numerous communities worldwide will support local job creation and also create taxable income for local governments and municipalities.

113.    Arrival's Registration Statement further explained how its "proprietary in-house software architecture enables the functionality of the robots and AMRs:"

### Proprietary In-House Software Architecture

***A core enabler to Arrival's competitive positioning is its proprietary in-house software architecture***. Arrival's software team consists of more than 500 software engineers. Its software engineer to mechanical engineer ratio is 1:1, which it believes compares favorably to an estimated traditional OEM ratio of approximately 1:100. Arrival believes its centralized software architecture has entered into the 5th generation of development, which it believes positions it as one of the leading software-centric electric vehicle manufacturers. Arrival's hardware and software architecture are decoupled and provide it the ability to harmonize its system infrastructure across its plug-and-play modular components. Arrival's software architecture has been designed utilizing cloud-based connectivity. Each of Arrival's electric vehicles is supported by OTA upgradable plug-and-play modular components. Additionally, Arrival's software architecture has been designed to support open API's, which provide its fleet customers the ability to integrate and connect Arrival's electric vehicles into its own software platforms. Arrival's in-house software architecture also includes autonomous-ready capabilities.

*Internal Tools.* As part of Arrival's proprietary in-house software architecture, it has developed software applications to improve its design and development capabilities both for its electric vehicles and for operations inside of its microfactories. This software allows Arrival to design and manufacture purpose-built electric vehicles that provide solutions to meet its customers' local needs and specific requirements. ***Arrival's proprietary in-house software architecture also enables the functionality of the robots and the AMRs operating in its microfactories. Arrival believes having control over its design and manufacturing software positions it to continuously improve the performance of its electric vehicles and the efficiency of its microfactory production processes.***

\*\*\*

44

114.    The Registration Statement also contained a graphic of Arrival's microfactory technology cell with robot arms and a protoype AMR. The caption underneath the photo stated "this photo shows a microfactory technology cell with four robot arms installed in the R&D lab. In the foreground is a prototype AMR."



**F.  The SEC Declares the Registration Statement Effective; Arrival Assures Investors the Microfactories Operate "Exactly the Way We Planned;" Arrival Shares Begin Trading**

115.    On March 1, 2021 Arrival issued a press release announcing that the SEC declared the Registration Statement effective.  Arrival reiterated that it would begin "commercial Bus and Van models…production at the end of this year and beginning of 2022 respectively."

116.    On March 12, 2021 Cowen, Arrival's financial advisor in connection with the IPO hosted an investor presentation.  During the presentation Defendant Ableson explained that Arrival developed its microfactory model over the course of several years and had confirmed the capability of the microfactory's production output through digital simulation that Arrival conducted with the assistance of a top company experienced in factory automation. When an analyst asked about

Arrival's "level of confidence" that the microfactories will "actually be able to produce 1,000 buses and 10,000 vans in each facility, Defendant Ableson confirmed that the microfactories could in fact deliver:

> Obviously, the Microfactory is not something we dreamed up here in the last couple of months. We've been working for several years on this concept. As we developed the layouts, we worked with a – one of the leading companies in factory automation in the traditional automotive industry. ***We've run a whole number of digital simulations of the factory, where we model the operations in each cell, the throughput of that cell to make sure that we can deliver, to your point, the capacity numbers*** that our business plan reflects.

117.    Not only did Ableson represent that the microfactories would deliver consistent with the timeline in the Registration Statement, he characterized Arrival's timeline as conservative given that Arrival had installed the production equipment and was running the machinery, "just to do that final check, but we're doing that well in advance of actually our start of production date." Ableson further reassured investors, "we're in a very good position as far as the development of the microfactory process and how it's going."

118.    Defendant Sverdlov similarly represented that "we're very confident that the factory will work exactly the way we planned" given that Arrival had validated its microfactory model:

> The vehicles must be designed for Microfactories, and that's a very important element, because ***we're doing this design of our vehicles already for a long time. So, it was adopted in the way that it should be like, and that it can be assembled by Microfactories. We have a software which actually runs the simulation***. So, every time we design the parts, before we say that this part is ready, we do like a simulation to be sure that Microfactory can assemble that.
>
> So, we have a digital theme of our Microfactories, so where we test before we release the parts ***[to show] that the factory actually can do the operation***. And this is fundamental difference, because the normal cycle is that products first are like designed and then the process engineers start to work with them to adopt like a factory for the product. We do an opposite thing. ***We adopt product for the factory, and that's why we're very confident that the factory will work exactly the way we planned.***

46

119.    Defendant Rugoboor, responding to an analyst's question about concerns related to the "margin side of production" or any "pinch points or concerns about throughput," highlighted the purported simplicity of Arrival's manufacturing process and its extensive development history to reassure investors that nothing stood in the way of Arrival's ability to produce vehicles consistent with its IPO timeline and production numbers:

> It takes a ton of engineering and innovation to simplify the product. And I think this is the critical point. If you go – do a teardown of an Arrival vehicle, it will look extremely simple and to get to that point takes a ton of engineering *and the company's been at this for the last six years….. [W]e already have for example the composites running, the composites pilot line going, right. So the components we've been using for the last two years with folks on the road*. Not to say production is not – not tough, it's tough, production is tough. *But the complexity of an Arrival vehicle compared to, I would say any other vehicle out there as far as we know, you know it's an order of magnitude more simple and less complex*.

120.    Defendant Sverdlov confirmed, "we don't see any roadblocks which stops us from doing this [achieving Arrival's reported margins]. We don't have any nasty surprises let's say on this journey."

121.    On March 20, 2021 CIIG shareholders approved the Business Combination. On March 25, 2021 shares of Arrival began trading on the Nasdaq. The same day, Defendant Ableson provided a statement to Reuters telling investors "[w]hat you'll start to see now is the footprint start to expand pretty dramatically. Echoing this, Defendant Rugoobur stated "[w]hat we're going to see is basically a microfactory in every major city in the world…You'll see the rollout expand pretty rapidly."

122.    Analysts heeded Defendants representations. For example, on April 5, 2021 Cowen initiated coverage of Arrival following its IPO, rating it "outperform" with a price target of $28.50 per share. Cowen analysts Jeffrey Osborne, Thomas Boyes, Emily Riccio and Jeffrey Rossetti lauded Arrival's microfactories as a "critical component in lower production costs, stating "*Arrival*

47

*has spent almost five years <u>perfecting</u> its microfactory approach*, which not only leverages the company's <u>***highly automated***</u> *"technology cell" approach*, but also high degree of vertical integration, proprietary composite materials, and plug and play components.  A microfactory can be stood up in around 6 months, occupy 1/10 the footprint of a traditional automotive facility and produce 10,000 trucks or 1,000 buses annually on just two shifts. On a comparative basis these factories can be constructed for 50% of the capex and operated for around half the opex a year.

123.    Likewise, Wolfe Research reported that it met with Arrival management and focused on microfactories, prototypes and composite technology and came away from the meeting with "increased confidence in the outlook for ARVL's vans and buses and differentiated manufacturing process."  Wolfe Research's March 7, 2021 report characterized Arrival as "one of the best positioned EV players to quickly gain share and ramp up sales and profitability," with "unique cost advantages," and "a strong revenue ramp" as Arrival "expands its microfactory footprint from one location this year to 31 in 2024."

**G. Unbeknownst to Investors, Arrival's Microfactory "Model" Was Just That: Arrival's AMR's Were Non-Functional and Its "Technology Cells" Were Non-Operational**

124.    As Arrival consistently told investors, its entire business model, including its production outlook, cost metrics and profitability rested on its "microfactory" model approach to building electric vehicles which was premised upon "technology cells." The technology cells, in turn, consisted of clusters of robots, with Arrival's proprietary Advanced Mechanical Robots (AMRs) moving the vehicles between the cells. Further, Arrival's "proprietary in-house software," which Arrival described as "a core enabler to Arrival's competitive positioning" "enabled the functionality of the robots and the AMR's operating in the microfactories."  Analysts and industry experts noted that Arrival's business model hinged on the ability of its robots to work.  As Cowen

48

analyst Jeffrey Osborne stated "***the million-dollar question is do the robots work at the pace and cost structure that has been laid out*** [ ].'"

125.    In truth, according to former Arrival employees, Arrival was nowhere near ready to commercially produce vehicles at any point during the Class Period because its AMRs were not functional, it had not installed any technology cells in its first microfactory, and it was "still figuring out" its own technology. Further, while Arrival was telling the market that it was slated to produce over 10,000 vehicles in 2022, internally the Company was hoping to be able to produce just one vehicle by the end of the year.

126.    Confidential Witness 1 ("CW1") is a former Lead Robotics Engineer at Arrival. CW1 worked as Lead Robotics Engineer in London from February 2020 until July 2022. CW1 reported directly to Arrival's Chief of Product for Robotics and now Vice President of Mobile Robotics Napo Montano (who is prominently featured in Arrival's YouTube videos and interviews alongside the Executive Defendants). Montano, who began working with Defendant Sverdlov at Arrival in 2017, directly reported to Sverdlov.

127.    CW1 explained that within Arrival's robotics group there were traditional manufacturing robots, which were robotic arms that were stationary, and mobile robotics (i.e. Arrival's "AMR's"), the robots that were intended to move around the microfactory. CW1 further explained that there was one team of robotics engineers working on the AMRs in St. Petersburg, Russia and one team of robotics engineers working on the AMRs located in London, and that both teams reported to Napo Montano who was based in London. CW1 went on to explain that the team in Russia and the team in London did not collaborate.

128.    CW1 stated that CW1 attended all meetings of the Robotics Team, which Montano headed. CW1 stated that at no time during CW1's tenure at Arrival was Arrival as far along in

production-readiness as it represented to investors. For example, CW1 stated that at first Arrival determined that it would require a certain number of robots for each operational microfactory, but that Arrival realized that it would need triple that number of robots for each microfactory. Not only would tripling the number of robots per microfactory materially increase the CapEx for each microfactory, but Arrival's need to procure these robots would delay its projected production timelines.

129.    CW1 stated that in addition to the fact that Arrival needed more AMRs, the existing AMRs were "just not working" in a remotely consistent or reliable manner. CW1 bluntly stated that the reality was that Arrival employees were manually performing much of the work that Arrival had intended the robots to perform.

130.    CW1 further explained that in the robotics profession a robot is first built, then it undergoes testing, then the robotics engineers update the robot's design to make it work better. CW1 stated that at Arrival, engineers would build the robot but would then be instructed to add features to the robot, which would require the engineers to redesign the robot entirely. For example, CW1 explained, there were a variety of problems with the robots, especially with the software, that made the robots unreliable and therefore the software for the robots was reprogrammed and updated "all the time." CW1 explained that when CW1 began working at Arrival in February 2020, Arrival was just finishing its third version of the mobile robot called EP3, which stands for "engineering prototype 3." But by the time CW1 left Arrival in July 2022, CW1 explained that robotic engineers were developing EP5, the fifth version of the mobile robot. However, CW1 explained that EP5 was not even undergoing real-world testing by that time- it was only at the stage where it was undergoing lab testing.  In other words, Arrival never had, and to this day does not have, production ready AMRs.  Because the AMRs- which Arrival boasted as "the technology

50

that underpins" its microfactory production process- were constantly undergoing design changes, and were never production ready, Arrival's statements concerning its production timelines were untrue.

131.    Confidential Witness 2 ("CW2") is the former Vice President of Special Projects at Arrival. CW2 worked at Arrival as VP of Special Projects from February 2021 until May 2022. CW2 reported directly to Defendant Sverdlov. CW2 has a degree in Industrial Design and explained that Defendant Sverdlov hired CW2 to oversee what Sverdlov called "Project 100," Arrival's effort to find future uses for Arrival's technology. CW2 explained that Project 100 was the Company's effort to develop 100 new concepts for Arrival's mobility "platform," whether "by land, sea, or air." CW2 stated that Defendant Sverdlov wanted to use Project 100 as "proof-of-concept" that the microfactory could be used to develop a myriad of different vehicles.  Defendant Sverdlov charged CW2 with bringing in outside designers on a contract basis to work on Project 100 since Arrival's internal design team was too overwhelmed with existing projects.

132.    CW2 explained that throughout CW2's tenure at Arrival, CW2 visited the Bicester, UK microfactory approximately ten times. CW2 stated that CW2 visited the Bicester microfactory approximately once per month during the tenure of CW2's employment at Arrival. CW2 stated that CW2's first visit to the Bicester microfactory was in April 2021 and CW2's final visit was in March 2022.

133.    CW2 stated that during these visits to Arrival's Bicester microfactory an Arrival "subject matter expert" employed at the Bicester microfactory conducted tours to explain to CW2 what CW2 was looking at. CW2 stated that based on CW2's numerous visits to the Bicester microfactory, it was obvious that Arrival was not ready for full-scale production, as it had told investors. CW2 explained that it took Arrival several years to develop a product prototype. CW2

further explained that while Arrival had been able to develop prototype vans and buses, Arrival was still "figuring out" its own technology. CW2 explained that contrary to Arrival's vision that its technology would enable Arrival to assemble vehicles on an automated basis, when CW2 toured the Bicester microfactory CW2 witnessed employees doing much of the vehicle prototype assembly by hand.

134.    Confidential Witness 4 ("CW4") the US Installation Manager and US Maintenance Manager at Arrival from June 2021 to August 2022 confirmed that the robots in the Bicester microfactory could not "communicate" with each other as Arrival intended them to, and as was necessary for the robots to perform production tasks.

135.    CW2 explained that a functioning and assembled microfactory would consist of seven technology cells, with each cell being approximately the size of a tennis court and consisting of five to six robotic arms operating within each cell.

136.    Contrary to Defendants' representations, CW2 explained that CW2 did not witness much progress taking place at the Bicester microfactory throughout the course of CW2's visits. CW2 expounded on this, stating that during the bulk of CW2's visits, *none* of the technology cells were assembled or operational. CW2 stated that it was not until CW2's final two visits to the Bicester microfactory- both of which took place after the Class Period- in 2022 (with the last one being in March 2022) that *two* of the seven technology cells were assembled and able to operate. CW2 explained that even by CW2's final visit in March 2022 Arrival had not yet built five of the seven technology cells in the Bicester microfactory.

137.    CW2 stated that by the end of the Class Period (November 2021) CW2 anticipated that CW2 would be laid off because Arrival was low on capital and was therefore unable to enter into contracts with designers. CW2 stated that Defendant Sverdlov contacted CW2 in April 2022

52

and explained that Arrival had to focus all of its capital and efforts on "getting the van out the door" and that Arrival would be letting go of all employees who were not working directly on the van. CW2 stated that all the concepts CW2 developed in connection with "Project 100" remained drawings on paper. CW2 also stated that, after "months and months" of Arrival terminating the designers CW2 had recruited, Arrival still had not paid them.

138.    Confidential Witness 3 ("CW3") provided further insight into Arrival's vehicle testing and assembly process and its AMRs. CW3 oversaw product testing for Arrival in its Banbury, England Research and Development facility from August 2018 through March 2020. From August 2018 through February 2019 CW3 was Lead Vehicle Test & Development Engineer and from February 2019 through March 2020 CW3 was Head of Product Validation. CW3 reported directly to Defendant Sverdlov and worked directly with Defendant Sverdlov throughout CW3's tenure at Arrival. CW3 explained that CW3 frequently had one-on-one conversations with Defendant Svedlov, had "many, many personal conversations," with Sverdlov, and reported that Sverdlov was "very switched on." CW3 explained that Defendant Sverdlov "talked about things that most CEOs did not know about. He was involved at a very unusual level" with the day-to-day operations at Arrival. CW3 explained that CW3 was aware of Defendant Sverdlov's intense involvement with day-to-day operations at Arrival from the many personal conversations CW1 had with Defendant Sverdlov.

139.    CW3 stated that CW3's team was in the same facility as the Company's assembly operation and that CW3's job involved testing, or "validating" all vehicles under development at Arrival, at each stage of their development, to make sure the vehicles operated correctly and safely. CW3 further explained that CW3 and CW3's team tested both the software and hardware of the vehicles, which took place at Arrival sights around the world. CW3 stated that CW3 frequently

53

became frustrated with the constant delays in receiving assembled models for testing, explaining that CW3 often learned that a particular model CW3 was supposed to test was delayed during last-minute spontaneous meetings where Defendant Sverdlov would say "we're making changes."

140.    CW3 explained that CW3 worked in the building where Arrival assembled vehicles and therefore saw the vehicles daily. CW3 stated that CW3's physical proximity to the assembly operation meant that CW3 was able to observe exactly how vehicle assembly took place. Importantly, CW3 explained that any vehicle that Arrival assembled for validation (testing) prior to mass production had to be built using the same processes that would be used in mass production. Accordingly, CW3 explained, given that Arrival intended to use robots in production, Arrival needed to use those same robots in the development process and for assembling the vehicles to be validated.

141.    CW3 recalled that Arrival was not using AMRs to assemble vehicles at any point during CW3's tenure at Arrival. CW3 further explained that occasionally Arrival would try to have a robot assemble a small part of a vehicle but that these parts never made it into the vehicle. CW3 further stated that during the entirety of CW3's tenure at Arrival employees were solely assembling Arrival's vehicles manually.

142.    CW3 stated that because the robots were not functioning as Arrival envisioned and because humans were building the Arrival prototypes, Arrival was unable to validate the prototypes. CW3 explained that even if Arrival employees signed off and reported the vehicles as "validated," the validation was not adequate because the vehicle was not being built as Arrival intended it to be built for mass production. CW3 explained that if Arrival builds a vehicle validation cannot be used to "sign off" on a vehicle design "without the vehicle being built the

way it's supposed to be built." In other words, if Arrival builds a vehicle manually, only the hand-built model is "validated."

143. CW3 also explained how Arrival attempted to conceal the fact that its purported robotic assembly process was non-existent. CW3 stated that groups of investors and other visitors toured the assembly area in Arrival's Banbury facility frequently. Defendants Sverdlov and Rugoobur also participated in showing investors around during certain of these "tours." CW3 explained that sometimes visitors would ask what was going on with the assembly, noticing the fact that robots were not assembling vehicles, as Arrival represented. CW3 stated that in response to these inquiries "they spun it," to hide the fact that the AMRs did not work. CW3 stated that Defendant Sverdlov or Defendant Rugoobor or another Arrival senior manager conducting the tour would provide the inquiring visitors with some excuse or rationale for why it was that the assembly at that particular time was being performed by hand. CW3 stated that they provided these excuses to conceal the fact that robots were not, in fact, assembling Arrival's vehicles.

### H. Arrival's Microfactory Model Was Based on the False Premise that a Standard Warehouse can Support a Microfactory

144. While Arrival told investors that a microfactory could be "deployed anywhere in the world within six months using existing warehouses;" that Arrival could simply "outfit" a "standard warehouse" avoiding "lengthy permitting approvals;" and that the number of microfactories Arrival would deploy would grow exponentially because Arrival could "drop them rapidly in parallel," in truth, standard warehouses could not support Arrival's microfactory approach to production.

145. CW4 (defined above) served in the dual position of US Installation Manager and US Maintenance Manager at Arrival from June 2021 to August 2022. CW4 reported directly to both Arrival's Vice President of Operations and Arrival's US Plant Manager. CW4 was

55

responsible for getting the existing US microfactory locations manufacturing ready. This included the Rock Hill, South Carolina bus microfactory and the Charlotte, North Carolina microfactory (which CW4 explained included two buildings intended to manufacture vans). CW4 was responsible for purchasing and overseeing the installation of all equipment necessary to manufacture Arrival's vehicles, including conveyors and robotics. CW4 was also responsible for making sure that the actual factory buildings were properly outfitted for production, which included ensuring that the building was properly equipped with the high-voltage power necessary to support Arrival's production method, and that it had the necessary fixtures and tool holders.

146.    CW4 explained that the Rock Hill, South Carolina and Charlotte, North Carolina warehouses did not have the proper structural foundations to support the equipment required to build Arrival's vehicles. CW4 stated that both the Rock Hill and Charlotte locations required significant foundation work to install rebar (i.e. steel bar used in concrete construction to improve the tensile strength of concrete) and then pour concrete for additional support. CW4 noted that it is common knowledge in the automotive and engineering industries that factory floors that carry heavy equipment require additional structural support. CW4 also explained that once the floor foundations were completed, additional work on the floors would be required. Arrival would have to install "base plates" or "spreader plates" in the factory. These plates could not just be placed on the floor, they would have to be bolted in.

147.    CW4 stated that the new foundation in the Rock Hill microfactory cost $2.7 million and the new foundation in the Charlotte microfactory cost $3.5 million. Because all of Arrival's microfactories would be the same size (approximately 200,000 square feet) and because standard warehouses were not equipped with the structural strength to support Arrival's production method,

56

each warehouse Arrival leased for a microfactory would require this additional expenditure, which Arrival did not factor into the CapEx provided in the Registration Statement.

148.    CW4 also stated that in addition to foundation work, existing warehouses did not have the high-voltage electrical power necessary to operate production in a microfactory.  Arrival likewise did not factor this additional expenditure into the CapEx in the Registration Statement, an expenditure which would be required not only for Rock Hill and Charlotte but for all future microfactories.

**I.    Arrival's Production Timelines and Capacity Were Not Based in Reality and Were a "Joke:" Arrival's Simulation Model Showed Maximum Production Capacity Per Microfactory as _Less Than Half_ the Number Arrival Promised Investors, _and_ Arrival Could Not Timely Obtain Essential Equipment Needed for the Start of Production**

149.    CW4 stated that the vehicle production numbers Arrival provided to investors were completely unrealistic.

150.    First, CW4 stated that while Arrival represented to investors that a microfactory could produce 10,000 vans per year, Arrival's simulation model demonstrated that a microfactory was capable of producing only 4,500 vans per year. Simulation modeling is the process of creating and analyzing a digital prototype of a physical model to predict its performance in the real world. Defendants consistently reassured investors that the production capacity it provided investors in the Registration Statement was "tracking the simulation model."

151.    CW4 explained that a combination of factors prevented Arrival from producing 10,000 vans per year. CW4 explained that the simulation model demonstrated that there was an insufficient amount of storage for the parts to manufacture at a pace of 10,000 vans per year (which Arrival's factories did not have) and that the simulation model showed that the robots (assuming they worked correctly) could not move around the space in the microfactory at the pace that would be required to achieve production of 10,000 vans per year.

152.    Second, CW4 stated that while Arrival represented to investors that it would start production in the Rock Hill bus factory in 2021, Arrival did not even begin the foundation work in Rock Hill necessary to fortify the floors for installation of production equipment until September or October of 2021. CW4 stated that because a number of other equipment installations would be necessary before starting production (including installing base plates and high-voltage electrical equipment which required high voltage switch gear that Arrival did not even order and would take 30-40 weeks to arrive) there was no conceivable way the Rock Hill microfactory could be ready for the start of production in the fourth quarter of 2021, as Arrival told investors.

153.    As to Charlotte, CW4 stated that while Arrival managed to pour the concrete for the Charlotte microfactory during CW4's tenure, neither the Charlotte microfactory nor the Rock Hill microfactory had the necessary base plates bolted into the floor by the time CW4 left Arrival in August 2022.

154.    Third, CW4 stated that because Arrival's microfactories did not have the high voltage electrical equipment necessary to operate production CW4 had to order this equipment and had to get approval from management to do so. CW4 stated that the lead time to purchase high-voltage switch gear was 30 to 40 weeks. CW4 stated that at the time CW4 left Arrival in August 2022, Arrival still had not ordered (or installed) high-voltage electrical equipment in the microfactories.

155.    In addition to the electrical equipment, CW4 stated that Arrival still had not ordered key production equipment, much of which had long lead times, by August 2022. CW4 stated that that, for example, Arrival had not yet ordered transformers and robotic equipment, which had 30-week to 40-week lead times. Arrival did not order this equipment at any point during CW4's tenure at Arrival or before, and still had not ordered it by the time CW4 left the Company in August 2022.

156.     CW4 explained that a company called Comau, which supplies and installs control panels to automotive manufacturers, was to supply Arrival with the control panels for the robots in its microfactories. CW4 stated that a representative from Comau visited the Rock Hill microfactory but that at no point during CW4's tenure at Arrival (or at any point before), did Arrival order these necessary control panels from Comau. CW4 confirmed that Arrival still had not ordered these control panels at the time CW4 left Arrival in August 2022.

157.     CW4 stated that in November 2021 his boss (Arrival's VP of Operations) told CW4 that Arrival was instructing all employees to shift from any work on the bus to putting all efforts on the van. CW4 stated that all activity at Rock Hill ceased. CW4 also stated that from that time on there was very little activity in Charlotte and that CW4 did not receive approval to order the items needed for the Charlotte microfactory.

158.     CW4 stated that the city of Rock Hill, South Carolina gave money to Arrival based on Arrival's promise to Rock Hill that it would create jobs in the area, and believes that Rock Hill may file a lawsuit against Arrival based on its false promises.

### J.   Arrival's Composite Materials Were Ill-Suited to Produce Arrival's Vehicles

159.     While Arrival consistently touted its "lower cost composite" materials as a key factor in Arrival's revolutionary approach to production and its ability to offer customers electric vehicles with a lower total cost of ownership while achieving a high profit margin, CW4 stated that Arrival was "still trying to determine" if its composite material was going to "work for the product."

160.     CW4 explained that Arrival intended to use thermoplastic material which was like a giant roll of fabric that would be cut and laid over a mold. The thermoplastic would then be heated and vacuumed down, to form the shape of the vehicle. CW4 explained that during this

59

process color could be weaved into the thermoplastic, which would eliminate the need for stamping and painting as well as eliminate the need to have factory space devoted to the painting process.

161.    CW4 stated that Arrival was never able to get the surface of the thermoplastic smooth enough, and that it "looked horrible." CW4 explained that Arrival did not want the vehicle to look this way when driven on the road. CW4 stated that the molds Arrival had been using were made of carbon fiber but they didn't work properly and that Arrival determined that it should procure new molds made of metal instead. CW4 explained that Arrival hoped the metal molds would be capable of heating the thermoplastic to a high enough temperature to get the molds smooth enough.  However, CW4 stated that the lead time to order the molds was two years.  CW4 stated that because of the two-year lead time to procure appropriate molds CW4 could not fathom how Arrival issued guidance to investors promising production of vehicles in the near future. CW4 stated that because of this two-year lead time just to obtain molds- "essential" production equipment- CW4 regarded Arrival's production guidance as a "joke."

162.    CW4 further stated that CW4 participated in conference calls with Defendant Ableson and CW4's boss (Arrival's VP of Operations) where they discussed the need to order these molds as well as the 2-year lead time for the molds. Accordingly, CW4 stated that Ableson was "well aware of the challenges with the molds."

163.    Additionally, at no point during the Class Period did Arrival procure the production tools necessary to produce its vehicles. Confidential Witness 5 ("CW5") CW5 worked at Arrival as a Global Commodity Lead from March 2021 until August 2022. CW5 reported to Arrival's Head of Global Procurement who is based in the UK. While CW5 was based on North Carolina, CW5 worked remotely, and his job functions covered Arrival's global operations. CW5 stated that CW5 procured parts for the prototype phases of all four of Arrival's vehicles during CW5's tenure

at Arrival. CW5 stated that CW5 was responsible for procuring both tools used for production of Arrival's vehicles, as well as the parts for vehicles themselves (e.g., handles and windshield wipers) and was responsible for procuring approximately 250 different production tools and vehicle parts.

164.    CW5 explained that production tools used in the prototype phase cannot be used for final production of saleable vehicles. CW5 explained that Arrival's protype tools were made of silicon or aluminum molds which were not durable for mass production. Instead, CW5 explained, production tools typically must be made of steel. CW5 stated that Arrival required bespoke tools for production of saleable vehicles.

165.    CW5 explained that the custom production tools Arrival required typically had 25-week to 30-week lead times. CW5 stated that suppliers would make the tools and the tools then had to go through a regulatory process called "PPAP," (production part approval process) to confirm that each of the tools met the specifications Arrival provided to its supplier. CW5 reiterated that Arrival could not produce a sellable vehicle using prototype tools and that Arrival had to have each of the bespoke production tools in its possession prior to starting production.

166.    CW5 stated that Arrival's purchase of production tools was staggered, but that even by the time CW5 left Arrival in August 2022 Arrival had still not ordered production tools which had lead times of 25-30 weeks and which were essential to Arrival beginning production of the van, bus, or any other of its vehicles. Accordingly, CW5 stated that because of the lead times required to procure Arrival's bespoke production tools and the fact that Arrival at no time had a full set of production tools for any of its microfactories, Arrival's statements concerning its production timelines were untrue.

61

167.    Further, CW5 confirmed that Arrival's top-level executives were aware of both the long lead times for ordering the parts as well as information concerning parts that Arrival had yet to procure. CW5 stated that Arrival kept files concerning parts containing information about procuring the item and details about lead times. CW5 stated that CW5 reviewed the files for the 250 parts CW5 was responsible for on a weekly basis in weekly meetings CW5 had with his manager. CW5 stated that after reviewing the information with CW5's manager, the manager took the information to Arrival's upper-level management.

168.    In addition to not having production tools, CW5, echoing CW4's account, stated that Arrival had yet to procure metal molds for production and that the lead time for procuring the molds was two years, making Arrival's statements concerning its production timelines untrue.

### K. Following Arrival's IPO, Arrival Continues to Represent that Arrival's Production Equipment Was Operating Effectively and that It was On Track to Deliver in Accordance With Its Business Plan

169.    On April 30, 2021 Arrival filed is annual report on SEC Form 20-F. The 20-F reiterated the production timelines set forth in the Registration Statement.:

> Arrival currently has three microfactories in active development, one in Rock Hill, South Carolina, USA, one in Meadow Oak, North Carolina, USA, and one in Bicester UK. These microfactories are expected to start production in the fourth quarter of 2021 and the third quarter of 2022 respectively. Arrival plans to have four microfactories in operation by the end of 2022, 11 by the end of 2023 and 31 by the end of 2024.

170.    On May 13, 2021 Arrival issued a press release announcing its First Quarter 2021 update providing "Business Highlights" which included:

- Announced its second U.S. Microfactory will be built in Charlotte, North Carolina. Producing electric delivery vans in Q3 2022, the Microfactory is expected to bring more than 250 new jobs to Charlotte.

- Announced its first European Van Microfactory located in Madrid, Spain.

62

- *CapEx projection of $50 million for a Microfactory on track, with the majority of production equipment for the first two microfactories either delivered or on order*.

- UPS commenced in-depot testing of an Arrival vehicle.

- Confirmed Van public road trials will begin with key customers this summer.

- Announced Bus public road trials with First Bus, one of the UK's largest transport operators, will begin this fall.

171.    On May 14, 2021 Arrival held its first investor conference call following its IPO ("Q1 2021 Investor Call"). On the call, Defendant Holbrow represented that Arrival had "validated" the business plan set forth in the Registration Statement, stating "as we start equipping these factories ahead of production, *we've been able to further validate our business plan assumptions on capital and operational expenditure and on vehicle production volumes. Indications are the- all these assumptions are tracking in line with the expectations we set out in our initial business plan last year*."

172.    On the call, Cowen analyst Jeffrey Osborn asked Defendant Ableson to "give us some comments on the robots in your pre-production facility in the UK and level of comfort with the throughput expectation that you originally laid out in the SPAC merger deck." In response, Ableson confirmed that the production equipment was operating not just in Arrival's research and development facility but in the actual production factory, and that the Company had "very high confidence" in their production forecast based upon the robotic cells in the Bicester microfactory:

> *I want to be clear that some of the video you saw was production equipment that's now being installed in our actual microfactory in Bicester in the U.K. So we have production equipment operating in the production environment*. So it's not just being done in R&D facilities at this point. *To get specifically to your question on capacity and throughput, we've done extensive modeling of all of the processes and the systems in the microfactory. So we have very high confidence in that. And the work that we've done so far with the actual robotic cells in Bicester confirm that analysis to this point.*

173. Ableson assured: "We've started to install equipment that we're using to confirm the results of the production process analyses we've already completed. To this point, ***our actual results are exactly in line with what we've expected***."

174. When an analyst attempted to drill down on the degree to which Arrival had validated its production process to ensure that it could actually fulfill the vehicle orders it touted, Sverdlov assured that Arrival had installed production cells in the microfactory and that those production cells were able to perform a majority of vehicle production operations:

Analyst:

First, when you talk about the build-out of the first plant site, Mike, you've mentioned that so far, it's tracking the simulation model. ***So how much- what percent of the assembly line is actually finished***? And then when do you think- not so much job one, but kind of the first end-to-end validation of the production process should be coming."

Defendant Sverdlov:

..[J]ust one important angle is that we need to remind you that, like our method of assembly is not converted lines, ***so it's not operations in sequence. So it means that we don't need to build all factories before we know all the operations.  So we have a few cells installed and already commissioned, and those cells are capable do a majority of operations within the vehicle***. So it means that as we said, like our method allows us to go in earlier- much earlier than wait and see when all equipment going to be installed.

175. Additionally, in discussing Arrival's competitive advantages and ability to price its vehicles below competitors, Sverdlov highlighted that Arrival was unique in its ability to assemble buses robotically: "***And another important point is that we are robotically assembling buses as well. So it means that there are not many companies in the world who are assembling buses using robotics***. And this is another reason why, like, we can price our buses better than other players."

64

176. Arrival and the Executive Defendants continued to reassure investors that everything was proceeding exactly in line with information set forth in the Registration Statement concerning expenditures and the vehicle production timeline. For example, on a May 27, 2021 conference call with investors Wolfe research hosted, Defendant Ableson assured investors that "Rock Hill will begin production as Avinash [Rugoobur] said at the end of this year." And in a June 9, 2021 investor conference UBS hosted Defendant Rugoobur reiterated the representations in the Registration Statement that "a Microfactory is a low footprint, low CapEx and rapidly scalable production model that allows us to…produce vehicles and make each Microfactory profitable in much lower volumes compared to the traditional industry…*we have a level of technologies that enable this to actually happen*." Ableson assured, "we're where we need to be on the CapEx" and "we will be installing and commissioning equipment in the Rock Hill Microfactory in South Carolina in the second half of this year. *So everything is proceeding according to plan*, and we're looking forward to getting the Bus into production, as Avinash [Rugoobur] said in Q4 of this year."

177. Then, in July 2021, Arrival represented that it could "absolutely" fulfill UPS's $1.2 billion order for 10,000 vans. On July 30, 2021 Arrival's Head of Product, Patrick Bion was interviewed by Robert Llewelyn, the host of the "Fully Charged Show," an EV focused YouTube channel.  In the interview published on YouTube, Llewelyn asked Bion about UPS's $1.2 billion order to purchase 10,000 electric vans from Arrival. Llewelyn bluntly asked to Bion: "*You think you have the capability of manufacturing those here…you can fulfill those orders?*" Bion responded, unequivocally stating "***Absolutely***."

178. Also in the summer of 2021 Arrival announced two sales partnerships which further gave investors the impression that Arrival would deliver according to the plan set forth in the

Registration Statement. On July 15, 2021 Arrival announced a partnership with a company called LeasePlan for 3,000 vans.[5] Importantly, the press release stated that "the partnership is based on an initial order of 3,000 vans, with the sales agreement expected to be finalized in Q3 2021." Arrival's Registration Statement stated that the time from sales agreement to delivery of product would "potentially" span "several months." Arrival's partnership with LeasePlan thus signaled to investors that Arrival would, at the very least, be able to deliver 3,000 vans to LeasePlan within "several months" of the 2021 third quarter. The press release quoted Defendant Rugoboor as stating that the partnership with LeasePlan "shows Arrival's method is truly game changing and [that it] *can roll out in multiple locations rapidly*. With this new partnership, Arrival will be able to deepen and expand our presence globally, working with LeasePlan to bring the best possible products to its customers and in turn helping them to achieve their own sustainability goals."

179.    Similarly, on July 22, 2021 Arrival issued a press release announcing a partnership with the Anaheim Transportation Network (ATN) whereby Arrival would serve as the vehicle producer for ATN's transition to an entirely electric bus fleet. Arrival's press release quoted Defendant Ableson as stating "We are so pleased that ATN has chosen Arrival to support its transition to an entirely electric bus fleet and have been impressed with its commitment to sustainability…Our first order from a U.S. transit operator is just the beginning, and we look forward to bringing the US produced Arrival Bus to cities and people all over the USA."

180.    On August 12, 2021 Arrival reported its financial results for the Second Quarter of 2021. In its press release filed with the SEC on Form 6-K Arrival provided "Business Highlights"

---

[5] LeasePlan purchases, funds, and manages new vehicles for customers and has approximately 1.9 million vehicles under management in over 30 countries.

including "***Bicester microfactory progressing ahead of plan*** with composite production lines installed; Microfactory capex forecasts continue to be on ***track as per original targets***."

181.    The same day, Arrival held its investor conference call ("Q2 2021 Investor Call"). On the call, Defendant Sverdlov represented that Arrival had "strong evidence that our new method works" and that Arrival's "main activities" were "on track:"

> *Our main activities, like sales, microfactories, procurement are all on track. We have very strong evidence that our new method works* and our customers require more brands of our products. Based on that, we have expanded our R&D and accelerated CapEx for our microfactories. Just an example, 1 of the biggest challenges we faced was to develop new materials in the production process for body parts. Our first production line of body parts started to work and has already produced more than 500 composite panels at Bicester factory.

182.    Defendant Sverdlov further cited Arrival's "new method of design using microfactories" and "next-generation robotics" as making Arrival a "high-margin business:"

> I would like to use this opportunity to remind that Arrival is a very unique company. *We have invented a new method of design and produce vehicles using microfactories*. And this is something which has never been done before…
>
> We have managed to create best-in-class vehicles, *we call them devices on wheels*. They will have competitive pricing with up to 50% lower cost of operations*. This radical new method to design electric vehicles using microfactories allows us to avoid stamping, welding and painting. Our microfactories are rapidly scalable and low CapEx*. We are vertically integrated and have developed on house tech with a very strong IT portfolio.
>
> We witnessed strong demand for our products, and we continue to grow our team. Now we have over 2,200 full-time employees. *All this will make a high-margin business enabled by hardware, software and next-generation robotics, making us 1 of the largest and fastest growing EV companies globally.*

183.    Similarly, Defendant Ableson provided a detailed explanation of Arrival's AMR's the "technology that underpins [Arrival's] microfactory process":

> *I also wanted to speak briefly on an additional Arrival developed technology that underpins our microfactory process, Autonomous Mobile Robots or AMRs. We've developed these robots to replace the conveyers and automated guided vehicles used in the traditional assembly plants.*

67

*In the microfactory, AMRs will carry both parts and vehicles through the assembly process. These robots operate autonomously in the microfactory*. They don't follow a predetermined path or a wire in the floor. Each AMR incorporates 2 ladder units and 4 cameras that allows it to accurately map its surrounding. As you can see in the video, they can move in any direction. *We'll also be able to virtually connect 2 or more AMRs in order to coordinate their movement.* We'll use this operating mode to move objects that are either too large or too heavy to be handled by a single AMR.

*The software to control these robots has also been developed in Arrival and is part of our microfactory software system. The AMRs will first be deployed in our van microfactories. From the above examples, I hope you can see that we're making substantial progress in validating our microfactory processes.* Believe me, we're just as proud of what's going on inside our microfactories as we are of our vehicles on the road.

184.    Additionally, Defendant Ableson gave detailed information about the progress of equipment installation in the microfactory as purported proof that Arrival was on track with respect to its CapEx per microfactory and that it was successfully validating its microfactory production processes:

I'd also like to give you a few updates on the progress we're making in developing our microfactories. Our Rock Hill, South Carolina bus microfactory *has over 80% of production equipment ordered or delivered. Equipment installation is expected to be complete in Q4 2021. Our Bicester U.K. van microfactory has over 75% of production equipment ordered or delivered with equipment installation expected to be complete in Q1 of 2022. Our equipment CapEx remains on track to be $50 million or less per microfactory. With the vast majority of equipment ordered, we're now very confident we'll meet this objective…*

185.    When analyst Jeffery Osborne asked Defendant Ableson whether there was "any change in your thinking on the throughput" of 10,000 vans and 1,000 buses per year, Defendant Ableson confirmed: *No, no changes at all, Jeff.* We still anticipate 10,000 vans a year on 2 shifts and 1,000 buses per year on 2 shifts.

186.    Then, just two months before Arrival's complete retraction of its production and financial outlook, Arrival and the Executive Defendants amplified their assurances that Arrival

would deliver on plan, that it was not facing any major challenges, and it was "in a very healthy place for the starting point of production with where our CapEx and our OpEx is tracking."

187.    At a September 7, 2021 investor conference Deutsche Bank hosted, when an analyst asked Defendant Rugoboor "what still needs to get done to ensure that the first batch of production starts on time," Defendant Rugoobur responded, *"[w]e're already well along in developing the process. So from here, it is a ramp up on the factory side."*

**Edison Yu**

And for the, I guess for the 2Q ramp up. What still needs to get done. Is it to just testing validation building out?

**Defendant Rugoobur:**

Yeah. So on the plant side, *we already ordered or had delivered 80% of the equipment for Rock Hill*. We've announced that we intend to have all installed in the fourth quarter of this year. *And then, from that point into Q2 of next year. It's just continuing to run the equipment and getting up to the production rate of production quality. So, we think we've allowed plenty of time with the production it's a production equipment to get that done on the van side. We've actually pulled ahead, a lot of the production equipment in the Bicester UK plant*. We already have the production composite process running. We've made over 500 panels, we have the production -- HVBM battery, module process running. We've created over 1,400 battery modules, with production equipment. We've got the textile process running in Bicester where we run a number of processes and assemblies, including the chassis structure for the -- van. *So we're all -- already running a substantial number of the production processes, and let me emphasize again, these processes are used across the product.*

So the – we're manufacturing, is the same one used in the van and the bus, the composite panel process is exactly the same between van and bus. In fact, we've already made bus panels in the van plan because it is the same process. So, [ ] and you'll see this in some of the videos online. *We're already well along in developing the process. So from here, it is a ramp up on the factory side.*

188.    Defendant Ableson responded to an inquiry concerning Arrival's ability to fulfill its orders- including its order for 10,000 vans from UPS:

Edison Yu:

69

Understood and I guess *operationally so you obviously have some very big orders out there. What's I guess the progress and I guess in fulfilling.* For example, that the UPS one, what kind of timeline are we looking at for, I think the UK buses. Any sort of color on how those things are ramping?

Defendant Ableson:

So on the UPS side, we've already had our prototype vans both at UPS depots and at proving grounds with UPS drivers for evaluation*. So we're moving along very well with UPS*. They've been a great partner for a number of years, as far as our van development. On the bus side as mentioned earlier, we are building buses for trials here, in fact, we've started building that set up, prototype vehicles, they will be used on proving -- again here in Q4 with our potential bus customers and then they'll move to public road trials in Q1 of next year.  Once, we have all of the certifications in place. So, you'll see them on public road trials, early next year. Similarly, you'll start seeing the vans on public roads later this year, early next year.

189.    Then, on September 9, 2021 Defendants Ableson and Rugoobur fielded questions from Cowen analyst Jeffrey Osborne at Cowen's 14th Annual Global Transportation & Sustainability Conference, emphasizing the fact that Arrival had "been at this six years" as evidence of the maturity of Arrival's technology and confirmation that the microfactory process worked and would deliver saleable vehicles consistent with the production volume and CapEx and OpEx Arrival set forth in its IPO Registration Statement.

Jeffrey Osborne:

I was wondering on the production side, just because that seems to be where the greatest level of differentiation is, can you just touch on now that 75% 80% of the first two microfactories, equipment been ordered. *How you feel about if these things are on time and on budget?* I think you in the past, you talked about being able to do these things in six months. Certainly, you've articulated the first two facilities well elongated relative to six months, but just given you've never done this before, *I wanted to get a sense of how the teething pains is gone for the first two and maybe any lessons learned for additional facilities*?

Defendant Ableson:

All right. I'll speak to that. First to your point, yes, once a warehouse is ready for equipment installation we can get that in production in approximately six months. We have done a lot of work around that target and feel pretty confident in that. *But to your point with these first couple of microfactories, we're taking longer,*

70

*because we want to install the equipment earlier than absolutely necessary and run the processes well ahead of time.*

***

…We said in our last quarterly update to your point we always had this target of $50 million, for the factory equipment inside of the microfactory. *And we are highly confident we're going to hit that target now, given the amount of equipment we've already ordered*

190.    Defendant Rugoboor added, *"We're very much tracking where we need to be with the microfactories. And then, I think it's also important to note, if you look at where we are tracking on CapEx, we're right where we need to be."* Defendant Rugoboor further assured investors that Arrival would be able to rapidly scale given Arrival's success in validating the microfactory model, stating, "the second important point is the ability for microfactories to just scale rapidly. You mentioned the six-month thing Jeff, and I think it's crucial because the microfactories are essentially a blueprint. *And because of the size and shape and scale, you can basically drop them rapidly in parallel.*

191.    Defendant Ableson also reassured investors, in response to their "number one question" that Arrival's robotic assembly process was ready to deliver:

Jeffrey Osborne

Got it. I just wanted to confirm that. It's a questioning. ***I frequently get the number one question I get from investors is do the robots work,*** investors have been burned by Elon Musk and the (inaudible) dreadnought the machine that builds the machines, et cetera. First of all, I think of the 2,200 employees correct me if I am wrong what is it 700, 800 are software engineers, for you folks it's a large percentage.

**

Defendant Ableson:

And Avinash touched on this in his introductory remarks. You can't take a vehicle that was designed for the traditional process and suddenly build it in a microfactory. *And as Avinash said, we've been at this six years and we've been very much developing the product in conjunction with the process. The microfactory is not an idea that we just came up with a few months ago*. It's been an integral part of

71

our development here for several years. And so as I say, one of many attributes that make our product different, is the fact that they are designed for microfactory assembly and that includes both the composite panel technology that we've developed, which is a key enabler for the microfactory approach, because it eliminates press shops and paint shops, but also includes our components that we've developed in house, *because designing them in such a way that they are easily manipulated, and assembled by robots was a fundamental design criteria we put on the product guys, as they were working on this.*

*So I know there have been companies in the past that maybe didn't deliver to all their aspirations on automation. As I said, we're already operating quite a large percentage of our production equipment already and have very high confidence that our process is going to deliver.*

192.    Defendant Rugoboor added, "…I think Musk even said taking this existing vehicle and trying to automate that process 100% is extremely difficult [ ] start from scratch and design with that in mind it's still challenging *but we've been at this for now for six years…*"

193.    On September 30, 2021 Defendant Rugoboor addressed investors at the Bank of America European Autos and Future Car Conference responding to the question of how Arrival distinguished itself from its competitors. Defendant Rugoboor emphasized Arrival's technology cell approach, with was dependent on the use of Arrival's software-driven AMRs:

So, but when I think of where Arrival is relative to the competition, *we've been at this since day one in how do you produce vehicles in microfactories, lower cost. That vertical integration, that strong IP portfolio.* We haven't seen anybody yet really redesign from the ground up even the production approach like Arrival's taken. Most folks are either go and acquire plants, especially new entrants or are partnered with someone who already has that asset base. And when that happens, it forces the design and the vehicle down a very particular part, right? So, we own -- hopefully, we've all seen a typical automotive plant with a single-speed conveyor belt. Every time you want to make a change, you're adding significant CapEx for tooling.

*I think it's important now to understand that if you take the lid off the microfactory, you're not seeing conveyor belts at all, right, you're not seeing that approach at all. What you're seeing is technology cells[ph] and a technology cell is a group of robots that perform an operation and we have some pretty exciting YouTube videos on the tech cell but also the autonomous mobile robots that we've*

72

_**designed in-house.**_ So, essentially in a microfactory, if you think of these cells that I laid out in this warehouse -- in a standard warehouse really, _**the tech cell each performs an operation and the autonomous robots guidances the part into that cell, operation is done and then you're moving the parts to another cell another operation and so on and so forth.**_

It gives us a few advantages. One, we can optimize that whole system using AIML, right? _**We write the code for the robots, the off-the-shelf robots, we rewrite the code. We have designed the autonomous mobile robots. You can basically create a learning algorithm to optimize the microfactory over time.**_

**L.      The Relevant Truth is Revealed**

194.    On November 8, 2021, after the close of trading, Arrival reported its third quarter 2021 results on a Form 6-K filed with the SEC.  In it, Arrival retracted its previous 2022 outlook regarding microfactory rollout, revenue, and vehicle volumes, stating in relevant part:

Updates 2022 and Long-term Outlook:

> Arrival previously provided long-term forecasts in connection with its merger with the CIIG special purpose acquisition company. Since then Arrival has invested more to further develop its platforms, and to secure components and batteries for production. As a result Arrival has revised its Microfactory rollout, and now expects _**significantly lower vehicle volumes and revenue in 2022**_. Future growth is dependent on the number of Microfactories the Company can deploy, which is a function of its access to capital. _**As a result Arrival's previous long-term forecasts from the merger should no longer be relied upon**_.

> Bus and Van production volumes in 2022 are expected to be modest because 2022 is the first year the Company is starting production and it is now expecting a more conservative ramp in each of its first three Microfactories.

> _**Arrival expects to start each Microfactory on one shift and does not expect them to reach full capacity until early 2023.**_ Furthermore due to capital constraints Arrival has moved its fourth Microfactory to 2023. Revenue is expected to start to be recognized in the second half of 2022 and will be weighted towards the fourth quarter. These expectations are dependent upon the successful completion of certification of Arrival's vehicles.

> Arrival continues to expect Van Microfactories to produce 10,000 vehicles per year when they reach full capacity on two shifts and the Company's future volume mix to be even more weighted toward Van as it continues to see strong interest in this platform.

73

Furthermore, Arrival disclosed that it is incurring several categories of additional costs, stating:

Other Company Costs

- In order to de-risk start of production and enable Arrival to scale, the Company is incurring additional costs, including: 1) a decision to assemble battery modules and bring logistics in-house, *which is adding Capex and Opex*; 2) pre-payments to LG Energy Systems to secure battery cell line capacity for the next several years; and 3) higher Selling, General and Administrative expenses as Arrival scales sales, finance and legal.

- In addition, Arrival is experiencing industry-wide increases in the expected cost of raw materials including aluminum and petrochemicals

- ***Arrival also expects higher working capital <u>in its first factories</u> to ensure the Company has the necessary components and parts to start production of its vehicles***

195.    During the Earnings Call following the release of the third quarter results ("3Q 2021 Earnings Call"), Arrival's Chief Financial Officer, John Wozniak relayed the dramatic departure from previous plans, stating in relevant part:

We are also experiencing price increases in certain raw materials, including aluminum and petrochemicals. Because we are investing more in our platforms, we have revised our microfactory investments for next year. We now plan three Microfactories in 2022, Rockhill, Bicester and Charlotte and have moved our fourth microfactory to 2023. We continue to expect van Microfactories to produce 10,000 vehicles per year at full capacity on two shifts. ***Though, we are expecting a more conservative production ramp next year, as we start each microfactory on one shift <u>and are not planning to reach full capacity until early in 2023.</u>***

***As a result, we expect both vehicle volumes and revenue to be modest next year***. Revenue is expected to start in the second half of 2022 and be weighted towards the fourth quarter. ***As Denis mentioned, beyond 2022, revenue growth will be dependent on the number of Microfactories we can deploy, which is a function of the timing and availability of capital. The quantum in timing of which is uncertain at this time***. Given this and the rapidly changing nature of our business, ***<u>we no longer believe prior long-term financial forecast should be relied upon.</u>***

196.    Defendants additionally disclosed that even the existing microfactories that had been partially developed would require substantial expenditures beyond those Defendants previously represented to investors. Defendant Ableson disclosed that "Capex for Bicester [was]…expected to be approximately $75 million.  This represented an increase of 50% above the $50 million Defendants represented in the Registration Statement. Incredibly, less than two months earlier Ableson told investors at Cowen's transportation conference that as to the $50 million CapEx target for Bicester, Arrival was *"highly confident we're going to hit that target now, given the amount of equipment we've already ordered*." Further, CFO Wozniak disclosed that Defendants expected "long-term production and assembly OpEx of approximately $15 million per microfactory," compared to the $12 million OpEx per microfactory Defendants represented in the Registration Statement.

197.    Given Defendants' shocking reversal, analysts on Arrival's 3Q 2021 Earnings Call questioned Defendants' sudden and unexplained departure from the timeline that Defendants had consistently reassured investors of for nearly a year. Wolfe analyst Rod Avraham Lache queried: "I was hoping you can maybe elaborate a little bit more about, firstly, *what has led to the slower ramp. I didn't quite understand that.* And maybe what kind of volumes do you expect to hit at your—maybe your exit rate from next year."

198.    In responding, Defendant Sverdlov all but admitted that Defendants' prior assurances to investors that Arrival was not making any changes to the timeline and finances set forth in the IPO Registration Statement were false. Referring to the information contained in the IPO Registration Statement Sverdlov stated, "*So first of all, what is important is that the document which we were referring before it was—we were creating this is the middle of 2019. So it's actually like 2 years ago.*"  Defendant Sverdlov continued:

And of course, during those 2 years, we've learned a lot about like the process and other things. So that's the important point here. And the second part of the point is that, look, we obviously want to produce as much as possible. And we're putting the capital in -- for the parts like to procure and like receive all those parts available for us like to produce as many products as we want -- as possible. But because we're just starting those operations like the first time*, so instead of pushing the quality -- quantity, we want to kind of focus on the perfection of the process* and do it -- first, we want to kind of do everything perfectly and then like scale after that. So that's like a major reason why we've taken a bit more conservative view on 2022. I would not call it as slowdown, I would say. It's just more *careful, I would say, approach to the start of production.*

199.    Defendants were unable to point to any internal or external causes for Arrival's dramatic revocation of its promised timeline and finances. Arrival's CFO John Wozniak stated, "Next year, we're just taking a more conservative view of our initial ramp because, *__as Denis mentioned, we want to make sure we get it right. That's absolutely the most important point that we have year, is it's about getting it right,__* so that we're in a good position to scale." Wozniak's admission that Arrival was still in the process of making sure that they "get it right" flatly contradicts Defendants' previous statements assuring investors that because Arrival had "been on this challenge already for 6 years," that Arrival was "right where we need to be," that were "[no] challenges" nor "any major roadblocks left" that Arrival was "in a healthy place for the starting of production with where our CapEx and our OpEx is trackingh" and that that "from here, it is a ramp up on the factory side."

200.    On this news, the price of Arrival common stock dropped from a closing price of $17.79 per share on November 8, 2021 to close at $12.88 per share on November 9, 2021, representing a 27.6% decline.

201.    Analysts downgraded Arrival, remarking that Arrival's reversal was not the result of anything unforeseen but was instead a matter of Defendants being "more realistic." As Wolfe Research noted in a November 9, 2021 report:

the slope of the production ramp for Rock Hill, Bicester and Charlotte will be quite a bit slower than conveyed in their original 2020 investor deck (their original deck suggested that they could produce > 10K vehicles in 2022; we now believe their production will only produce a few thousand vehicles next year). ***We do not believe this is due to any unforeseen technical hurdles…ARVL has…become more realistic about what their ramp will look like.***

202.    Wolfe research also noted the drastic increases in Arrival's CapEx and OpEx, and that Arrival could burn €600 million over the next five quarters which "will be perceived as problematic (by Investors), as this company only had €381 MM cash as of Sept. 30.  Accordingly, Wolfe Research lowered its 12-month price target on Arrival from $37 to $23 per share, and lowered its assumption that Arrival would build 31 microfactories by 2025 to 9 microfactories.

203.    Approximately one week later, on November 17, 2021 Arrival announced: (i) a $200 million offering of green convertible senior notes due 2026, intended to finance the development of green vehicles and (ii) a "Follow-on-Offering" of 25 million Arrival ordinary shares. Between the convertible notes offering and the Follow-on-Offering Defendants disclosed Arrival sought the raise as much as $618.7 million in financing.

204.    On November 18, 2021, after the close of trading, Arrival announced that it "upsized" its convertible notes offering to $275 million, with an option to purchase an additional $45 million.  Arrival also announced that it had "upsized" its Follow-on-Offering from the previously announced 25 million Arrival shares to 32.37 million ordinary shares at a public offering price of $9.50 per share.

205.    In total, between the upsized convertible notes offering and the upsized Follow-On-Offering, Arrival sought to raise as much as $673,682,492 in financing.  These offerings revealed to investors that Arrival was burning cash at a much higher rate than it previously disclosed, and was in dire need for additional capital to fund its operations.

206.    On this news, the price of Arrival shares dropped 20%, declining from a closing price of $13.25 per share on November 16, 2021 to $10.50 per share on November 19, 2021.

207.    As of the close of trading on September 9, 2022, the last trading day before this Complaint was filed, Arrival's shares closed at a price of $1.09 per share.  This represents a 95% decline in the price of Arrival's shares at the time the Registration Statement became effective, and a 96% decline from the $28.52 per share offering price per unit set forth in the Registration Statement.

**M. Post Class Period Events Confirm that Defendants' Statements Were False When Made**

208.    On May 16, 2022 analysts from Wolfe Research issued a report indicating that Defendants' statements that Arrival was "ready" for mass production (which Arrival first made in the IPO Registration Statement) were false when made.  In the report, analysts stated that during a tour of Arrival's Bicester facility "we did not observe the level of manufacturing installation/readiness that we typically see at a conventional auto plant 3-4 months ahead of SOP [Start of Production]."  Additionally, contrary Arrival's statements in its May 10, 2022 earnings release that "all robotic technology for vehicle assembly had been installed in Bicester," Wolfe's research report noted that based on observations made during the subsequent visit, most robotic equipment was "*still awaiting installation.*"  And, as CW1 corroborated, analysts from Cowen who visited Arrival's Bicester microfactory in March 2022 observed that the manufacturing technology cells "were not operational during our visit."

209.    On April 27, 2022 Arrival filed its annual report for the fiscal year ended December 31, 2021 with the SEC on Form 20-F ("2021 20-F") in which Arrival disclosed that management, under the supervision of Defendant Sverdlov as CEO, as well as Arrival's auditor, KPMG, identified deficiencies that represented material weaknesses in Arrival's internal control over

financial reporting. Arrival's 20-F stated that these material weaknesses include, among others: failure to design and maintain an effective control environment commensurate with Arrival's financial reporting requirements, failure to conduct an effective risk assessment process that successfully identified the risks of misstatement, lack of enough professionals with an appropriate level of accounting knowledge, and failure to design and maintain effective controls over information technology (IT).

210. On July 12, 2022 Arrival announced that it would be undergoing a "reorganization" "in response to the challenging economic environment as it focuses on its next major milestone-starting production on the Arrival Van in Q3 2022." Arrival's plans include a "realignment" of the Company that would "enable it to deliver business priorities until late 2023 primarily utilizing the $500mm cash on hand." Arrival would reduce spending by 30% and lay off at least 30% of Arrival's employees.

211. On August 4, 2022 the Financial Times issued an article citing three sources disclosing that Arrival would shelve its bus and car projects to focus solely on the Arrival van. Indeed, as CW1 stated Defendant Sverdlov told CW1 privately in April 2022, Arrival had to place everything on hold and drastically reduce its spending, firing all staff that that did not work on the van, in an attempt to get the van "out the door."

212. Then, on August 11, 2022 Arrival reported its Second Quarter 2022 financial results. In its press release attached to Arrival's 6-K filed with the SEC Arrival announced "strategic decisions" that would allow it to start production in Bicester in the third quarter of 2022. Arrival further revised its 2022 financial outlook, disclosing that "we've made recent strategic decisions that will allow us to start production this quarter in Bicester (UK) deliver our first vehicles to UPS this year, and start production in Charlotte (US) in 2023 with an optimized

factory." Arrival further revised its 2022 outlook, ***announcing it would be producing a total of only 20 vehicles for the year and have no revenue,*** a far cry from its promise of $1 billion in revenues in 2022 and production of over 10,000 vehicles:

> Arrival continues to expect to start production in Bicester this quarter. The Company expects a slow and deliberate ramp in Bicester to ensure the vehicles it produces meet the Company's quality targets. Some of the vans produced this year will go into an Arrival fleet for customer demos and trials and approximately ***20 vehicles*** are expected to be delivered to customers in Q4 2022. Given delivery times and customer acceptance requirements, ***the Company does not anticipate revenue this year.***

213.   Arrival also confirmed that it would stop work on both the bus and the car. Additionally, Arrival announced that it would have an ATM (at-the-market) equity offering of $300 million which the Company said would allow it to start production in Bicester and deliver its very first vehicle to UPS.

214.   In Arrival's earnings call the same day, analyst Steven Fisher asked Defendant Sverdlov what caused Arrival to reduce delivery expectations from 400-600 vehicles to only 20. Defendant Sverdlov vaguely offered that the downgrade in production was a result of the need to "preserve cash" and supply chain issues, callously adding that "materially as a company, there is no big difference between, I would say, like 400 vehicles or like 20 because the number is small anyway."

215.   As for the Arrival bus, which Defendants previously promised would start production in Charlotte in the fourth quarter of 2021, Rugoobur stated on Arrival's Q2 2022 earnings call "I would like to emphasize that our mission to bring a certified bus and van to public roads this year is still being accomplished." In support of his statement, Rugoboor tactlessly offered that Arrival bus was "already operating on public roads ***as a shuttle between Arrival sites***."

80

*SECURITIES EXCHANGE ACT CLAIMS*

216.    All of the preceding allegations in the Complaint are repeated and realleged herein as they are applicable to Plaintiffs' claims under Section 10(b), 20(a) and 14(a) of the Securities Exchange Act of 1934.

217.    The following allegations in this Securities Exchange Act Section (¶¶ 218 through ¶¶ 355) apply only to claims under the Securities Exchange Act of 1934 and do not apply to any of Plaintiffs claims under §§11, 12 or 15 of the Securities Act.

**VI.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS**

**A. Statements Leading up to the Business Combination/IPO**

218.    On November 18, 2020 Arrival and CIIG announced the Business Combination that would result in Arrival's IPO. The press release represented that Arrival's "transformative microfactories" can be deployed anywhere in the world within six months and made clear that Arrival's business model was based on its "cell-based assembly method" which in turn relied on its "proprietary hardware, software and robotics technologies." The press release stated, in relevant part:

•    *Arrival is producing EVs competitive in price with fossil fuel alternatives and substantially lower than comparable EVs*

•    Arrival has developed a new method of designing and producing zero-emission vehicles using its *proprietary hardware, software and robotics technologies and low cost Microfactories*

•    Arrival has signed contracts with total order value up to US $1.2 billion and *its first products are planned for production in Q4 2021*

***

Company Highlights

81

Arrival is challenging the 100 year old automotive production process, *by producing its EVs in low CapEx, low footprint Microfactories*. Its operations *utilize Arrival's in-house proprietary technologies and advanced cell-based assembly method* to bring down the cost of EVs and accelerate mass adoption globally.

Arrival's initial focus is on the commercial vehicle market, which is undergoing a seismic shift towards electrification in line with global public policy. Arrival believes that it is well positioned to capitalize on this market opportunity with its technology driven approach to a traditionally underserved market. The result is its best-in-class products with an exceptional user experience that are priced competitively with fossil-fuel vehicles and have a substantially lower total cost of ownership ("TCO") than both fossil fuel and electric variants.

*Arrival's transformative Microfactories can be deployed anywhere in the world within six months, using existing warehouses* close to areas of demand. *These Microfactories are designed to produce any vehicle from Arrival's portfolio customized for the cities and regions they serve. The vehicles are designed specifically for Microfactory assembly using Arrival's proprietary in-house developed components, software and sustainable composite materials.*
Arrival's vertical integration and new method of production break the rule of economies of scale and create *strong unit economics for the whole Arrival product portfolio, which Arrival expects will enable profitability for the business by 2023.*

Arrival's strategy to reach industry-transforming flexibility and scalability is based on the utilization of Microfactories, as opposed to giant, capital-intensive legacy factories. "With Arrival's products our clients are not forced to compromise between being green and being cost efficient. *Our focus on the whole EV ecosystem, new methods of design and production and our enabling technologies are the key to driving down the cost of EVs* and accelerating the transition to zero-emission transportation globally," said Denis Sverdlov, Founder and CEO of Arrival. "CIIG's leadership team has invaluable experience building businesses globally across a wide range of industries. We are excited to partner with them as we begin our journey to being a publicly-listed company and delivering our products to customers and cities around the world."

"Arrival's bold, game-changing approach to the production of electric vehicles made the company the clear winner in our search for a partner," said Peter Cuneo, Chairman and CEO of CIIG. "Operating in stealth mode for five years, Denis and his visionary team have rewritten the rules of the game for the auto industry. *Arrival's development of exceptional products using its pioneering technology and software alongside its groundbreaking new method of production can create an incredibly low TCO for customers which we believe stands them apart from everyone else in the electric vehicle industry*. We look excitedly to the future and to our partnership with Arrival's talented leadership team."

219.    The above statements in bold and italics were false and materially misleading when made and omitted to disclose material information necessary to make the statement not misleading.

82

**First**, the statement that Arrival "is" producing electric vehicles was false because the only vehicles Arrival had produced were prototypes. **Second**, Arrival was not using an "advanced cell based assembly method" because it had not even installed a single technology cell in any microfactory. **Third**, Arrival's microfactories could not be "deployed anywhere in the world within six months using existing warehouses" because Arrival was aware that a traditional warehouse was not suited to be a microfactory because it did not have the structural integrity to support Arrival's production method, nor did it have the necessary electrical capacity. In truth, preparing a traditional factory for Arrival's production method would require millions of dollars in additional expenditures to perform the foundation and electrical work, and would require obtaining permits to perform, which would mean that it would take far longer than six months to complete a microfactory. **Fourth**, Arrival's "strong unit economics" and "profitability for the business by 2023" were based upon a series of false assumptions, *e.g.*, that Arrival could produce 10,000 vans per year when in fact its simulation model demonstrated it could produce at most 4,500; that CapEx would be $50 million per microfactory when it would be materially higher given that each microfactory would require triple the number of robots and additional CapEx for foundation and electrical work; and that Arrival could start production on time when in truth the molds it needed for production had two year lead times and Arrival had still not ordered them. **Fifth**, Arrival's "enabling technologies" "*in-house developed components, software and sustainable composite materials*" did not allow a microfactory to produce "any vehicle from Arrival's portfolio" because Arrival's AMRs did not work reliably or consistently and did not communicate with each other as necessary to perform production tasks. In truth, Arrival had not produced any vehicles using its AMRs and Arrival employees had performed the bulk of any production work manually. As for Arrival's "composite materials" Arrival was not sure whether

83

they would "work for production" because the molds Arrival was using to make vehicles with fabric (rather than metal and paint) made the vehicles look "horrible" and not fit for sale.

220.    Arrival and CIIG also hosted an investor conference call announcing the Business Combination.  The transcript of the call is annexed as an exhibit to CIIG's 8-K filed with the SEC announcing the Business Combination. On the call, Defendant P. Cuneo discussed the Business combination, touting Arrival's "technology-driven, purpose-built electric vehicle," representing that "*vehicle production is right around the corner*":

> Arrival has entered into a business combination agreement with CIIG Merger Corp., with the combined company continuing as a public, NASDAQ-listed company with an implied enterprise value of approximately $5.4 billion at closing. The pro forma enterprise value of the combined company will represent a 0.4 multiple of Arrival's *2024 pro forma expected revenue of $14.1 billion*.
>
> ***
>
> Arrival has a unique history worth noting. The company was formed about five years ago when Denis Sverdlov saw an opportunity to revolutionise the auto industry. He assembled a team focused on this task and they reimagined what was possible. *Looking at every single element of the vehicle development process, they were able to design a technology-driven, purpose-built electric vehicle from the ground up*…They were essentially operating in stealth mode.  Their vision is now being realized as the curtain goes up to reveal a company unlike any other."
>
> ***
>
> …*Vehicle production is right around the corner, and is expected to commence in the second half of 2021. They are one of the first to achieve price competitiveness and lower Total Cost of Ownership compared to fossil fuel vehicles.* Their vertically integrated approach to technology strategically positions them with a moat of valuable intellectual property. *Their Microfactories, their proprietary software, their hardware and their robotics platforms position them to achieve industry leading profitability and CapEx levels*.

221.    On the call Defendant Sverdlov addressed investors touting Arrival as a leader in the EV industry with the ability to offer "best in class products at the right price," and "*build vehicles at any scale and anywhere:*"

> If you follow the pack you will end up with the same issues the industry has grappled with for the last few decades, compromised products that cannot keep up

84

with the latest technology, prohibitive costs for manufacturing and low margins. ***Our way to resolve these problems is with a completely new method. As you will hear today, <u>we are well on our way to achieving this goal</u> with unique <u>mature technology</u>, best in class products at the right price, solid traction on sales, and a profitable business profile.*** This transaction will enable us to continue to scale the business and expand our global reach.

***

Our Microfactory approach departs from the commonly accepted rule of scale in the automotive industry. ***We believe Arrival can build vehicles at any scale and anywhere and still achieve highly desirable unit economics***. We believe Arrival has been able to attract the best talent from a variety of industries. We've brought them together to create the technologies and systems that make this possible. ***Arrival has developed its own proprietary components, software and sustainable composite materials. We believe these enabling technologies coupled with our pioneering Microfactory production strategy,*** enable the assembly of vehicles with an elevated user experience at a price competitive to fossil-fuel vehicles. We expect these vehicles to provide a lower cost of ownership than both fossil fuel and electric equivalents. We have designed all our technologies to be built within these Microfactories, utilizing a broad and deep IP portfolio which is very difficult to copy. We believe Arrival is a world leader in the technology for designing and producing vehicles. ***As Peter mentioned, Arrival has been in stealth mode for almost five years, during which time we have built a team of over 1,200 people and designed multiple vehicle platforms***. We've developed and patented a wide range of in-house technologies that enable cost competitive, highly customized, best-in-class commercial vehicles for customers and cities around the world. ***We are deeply engaged with global leaders in the transportation industry, such that we have approximately $1.2 billion in orders.***

222.    The above statements were false and materially misleading when made and omitted to disclose material information necessary to make the statement not misleading. **<u>First</u>**, production was not "right around the corner" and was not "expected to commence in the second half of 2021" because Arrival would not even have the production molds necessary to begin production by the second half of 2021, Arrival had not installed a single technology cell in any microfactory, and Arrival's AMRs did not work. **<u>Second</u>**, Arrival's "completely new method" of production, "enabling technologies" and "microfactory production strategy" did not enable the assembly of Arrival's vehicles because its AMRs did not work reliably and consistently and Arrival could not

85

program the AMRs to communicate with each other as necessary to produce Arrival's vehicles. Instead, Arrival employees manually performed the bulk of any production work. For the same reasons, Arrival's technology was not "mature." **Third**, Arrival had no reasonable basis to state that it expected $14.1 billion in revenue in 2024 because Arrival based its expectation on counterfactual assumptions, *e.g.,* Arrival's ability to produce 10,000 vans per year when the simulation models showed it could produce less than half that, the ability of Arrival's AMRs to build vehicles, and unrealistic CapEx and OpEx that did not factor in costs to equip microfactories with appropriate foundation and electrical capabilities. For the same reasons, the statement that Arrival could "build vehicles at any scale and anywhere and still achieve highly desirable unit economics" was false.

223.    In a video presentation Defendant Ableson told investors that "A microfactory is a much simpler process as compared to a legacy automotive manufacturing plant. A typical automotive assembly plant takes literally years to contract, we can do that whole thing in six months or less. So maybe it's one 6th the amount of time and maybe one 10th the capex of that."

224.    Defendant Ableson's statement was false and materially misleading and omitted to disclose material information necessary to make the statement not misleading because it was based upon the counterfactual assumption that existing warehouses were suited to become microfactories. In truth, preparing a traditional factory for Arrival's production method would require millions of dollars in additional expenditures to perform the foundation and electrical work that would require obtaining permits to perform, which would mean that it would take far longer than six months to complete a microfactory.

225.    On the call, Defendant Rugoobur spoke more specifically about the production capacity and costs for each microfactory:

86

*Digging a bit deeper, we have sized the annual capacity of each Microfactory to 1,000 buses or 10,000 commercial vans*. Our model shows that ten of our Microfactories can produce the same number of annual units as a traditional OEM commercial vehicle factory -100 thousand vans in this case – but doing it in one-tenth of the space and at less than half the CapEx*. Put another way, one Microfactory costs $45 million to build and is expected to generate $100 million of margin annually. We expect to become cash flow positive with just three Microfactories, which equates to 30,000 vehicles. By the end of 2024, we plan to have 31 Microfactories located around the world* to serve expected demand. When combined with our rapid product *development we expect to build mobility solutions that serve local needs at any volumes while maintaining profitability and high margins.*

226.    Defendant Rugoboor's above statement was false and materially misleading and omitted to disclose material information necessary to make the statement not misleading because Arrival's simulation model demonstrated that at microfactory was capable of producing 4,500 vans per year. Additionally, Defendant Rugoboor's statements concerning microfactory CapEx and annual margin were false and misleading for the reasons set forth in ¶221 above.

227.    Defendant Holbrow then discussed Arrival's production and financial model, affirming that vehicle production would begin in 2021 and that Arrival would realize $1 billion in revenue in 2022:

We expect that our Microfactory approach and the tremendous demand that we are seeing across our products will result in substantial revenue growth over the next 4 years. Anchored by our over $1 billion dollar UPS order and by substantial interest in our electric buses, *we expect to begin commercial vehicle production in 2021. We have modeled roughly $1 billion dollars worth of revenue in 2022, growing to $5.1 billion dollars in 2023 and to over $14 billion dollars in 2024.*

Due to our low-cost design and manufacturing model, as Denis and Avinash indicated earlier, *we believe we can get to cash flow positive results with 3 Microfactories up and running*. This is primarily a result of our expected strong gross margins for each of our vehicles – 38 percent for our buses and 21– 34 percent for our vans, depending on size and configuration.

*So, in 2022, we believe we will be EBITDA positive with 4 Microfactories established by year end*. *2023 obviously sees a strong revenue ramp, and we expect that our high margin model will result in over $1 billion dollars in EBITDA*. *At the end of 2023, we expect to have 11 Microfactories in service.*

87

*Finally, in 2024, we expect to scale meaningfully with 31 Microfactories in operation by year end.*

228.    Defendant Holbrow's statements were false and materially misleading when made because they were based on assumptions that were knowingly false and/or lacked a reasonable basis. **First**, Arrival's projected revenues and EBIDTA were based on the assumption that Arrival could produce 10,000 vans per year, when in fact the simulation model showed Arrival could produce less than half that volume, even assuming all of Arrival's technology worked perfectly. **Second**, Arrival could not produce the vehicle volumes supporting Arrival's revenue and EBITDA projections because by 2022 Arrival still would not even have the molds necessary to begin production. **Third**, Arrival's AMRs did not work reliably and consistently, and without functioning AMRs Arrival could not produce vehicles according to its microfactory method and could not scale.

229.    The 8-K also contained Arrival's "Investor Presentation" as an exhibit which repeated the same false and misleading production and financial projections highlighted in the conference call and press release. In the presentation, Defendants reiterated Arrival's "Investment highlights," stating "Arrival is revolutionizing the electric vehicle industry."

-Four vehicle designs expected in market by 2023, *with start of production for first vehicle planned for Q4 2021*

-$1.2 Billion in orders

-Unit economics enable price competitiveness and lower total cost of ownership to fossil fuel equivalents

-Game changing Microfactories enable *flexible low capex production*

-Vertically integrated

-Arrival expects industry leading profitability enabled by proprietary hardware, software *and robotics platforms*

88

230.    The presentation also highlighted Arrival's product pipeline: "Electric bus: 2021; Electric van: 2022; Large electric van: 2022; small vehicle platform: 2023." The presentation further touted Arrival's "industry changing microfactory approach" as "flexible, scalable and local to customers," highlighting Arrival's "materially lower" operational expenditure and capital expenditure compared to traditional OEMs as well as its ability to deploy a microfactory "in areas of demand within six months of setup time." Further, Defendants' presentation highlighted the status of its microfactories as "*ready*" with the Bicester plant "fully *integrated*."

231.    The above statements were false and materially misleading when made and omitted to state materially facts necessary to make them not misleading. **First**, Arrival would not start production in the fourth quarter of 2021 because it would not have the necessary production molds by then. **Second**, Arrival omitted to disclose that its "robotics platforms" were not functioning. **Third**, a microfactory could not be deployed "within six months" because existing warehouses were not suited to support Arrival's microfactory production method and would require more than six months to obtain permits to and perform foundation and electrical work to make a traditional factory suitable for use as a microfactory.

**B. Registration Statement**

232.    On December 15, 2020 Arrival filed a preliminary Registration Statement on SEC Form F-4, which Arrival amended on January 21, February 16, and February 25, 2021. The Registration Statement incorporated the December 14, 2020 Proxy Statement. Arrival also published an updated analyst presentation which was filed with the SEC pursuant to Rule 425. The Registration Statement and presentation contained false and materially misleading statements and omissions of material fact concerning: 1) Arrival's financial profile and the revenues and costs associated with Arrival's microfactory model; 2) Arrival's production timelines; 3) the status of

Arrival's microfactories; 4) the ability of Arrival's microfactories to scale rapidly; and 5) Arrival's technology.

### 1. The Prospective Financial and Production Information in Arrival's Registration Statement Was False and Materially Misleading and Based on Knowingly Incorrect Assumptions

233. The Association of International Certified Professional Accountants ("AICPA") published guidance to assist management in the preparation of financial forecasts and projections. According to the AICPA Guide on Prospective Financial Information published on July 15, 2021 ("AICPA Guide"), assumptions are the essence of developing prospective financial information and are the single most important determinant of such information.

234. The accuracy of the assumptions determines the accuracy of the prospective financial information. AICPA Guide 6.34. The AICPA Guide states that assumptions should be reasonable and suitably supported, and that the level of support for assumptions should be persuasive. *Id.* 6.36. Further, prospective financial information presents important statements of future financial results, and management with the highest level of authority is ultimately responsible for the prospective financial information. *Id.* 6.49.

235. Arrival's Registration Statement states as follows with respect to the assumptions underlying its prospective financial information:

*The Arrival prospective financial information was prepared using a number of assumptions, including the following assumptions <u>that Arrival's management believed to be material</u>:*

- *projected revenue is based on a variety of operational assumptions, including, the <u>development and commercialization</u> of Arrival's vehicles, the <u>roll out of Arrival's microfactory manufacturing locations</u>, the <u>production capacity of Arrival's microfactories</u>, the selection of Arrival's products by customers in the commercial van and bus industry, growth in the various markets Arrival is targeting, average selling prices and resulting sales of vehicles;*

90

- projected gross profit is driven by the mix of products produced and sold in combination with corresponding costs, including material and component costs, assembly costs, manufacturing costs, and costs related to product warranties. Many of these costs are forecasted to vary significantly as Arrival commences production in its microfactories;

- other key assumptions impacting profitability projections include costs of research and development in Arrival's vehicle programs, vehicle component programs, manufacturing programs, and associated software development costs, including the cost of headcount, prototype vehicles, tooling and other third- party engineering. Further assumptions are made with regard to Arrival's sales and general administration expenditures, including the costs related to its office locations, headcount and third-party service providers, but excluding costs associated with public company operations and compliance; and

- capital expenditure is based on a number of assumptions regarding the expenditure required to build Arrival's microfactories, including the cost of initial set up of factory facilities and the cost of manufacturing and assembly equipment.

***In making the foregoing assumptions, Arrival's management relied on a number of factors, including:***

- its experience in the automotive industry;

- its experience in the period since the inception of the company and current pricing estimates for prototype vehicles and vehicle components as well as the projected costs for first factory locations that are already in development;

- ***its best estimates of the timing for the development and commercialization of its vehicles and overall vehicle development process;***

- its best estimates of current and future customers purchasing Arrival's vehicles; and

- third-party forecasts for industry growth.

236.    Arrival's Registration Statement contained the following summarized prospective financial information for Arrival for 2021-2024 and vehicle production forecast for Arrival for 2022-2024:

| | Forecast Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| *(USD in millions)* | **2020E** | **2021E** | **2022E** | **2023E** | **2024E** |
| Revenue | — | — | 1,009 | 5,099 | 14,135 |
| Gross Profit | — | (1) | 223 | 1,363 | 3,762 |
| EBITDA (1) | (74) | (101) | 60 | 1,115 | 3,243 |
| Capital expenditure | (108) | (197) | (469) | (939) | (1,843) |

| *(EUR in millions)* | | | | | |
|---|---|---|---|---|---|
| Revenue | — | — | 851 | 4,298 | 11,915 |
| Gross Profit | — | (0) | 188 | 1,148 | 3,171 |
| EBITDA (1) | (62) | (85) | 51 | 940 | 2,73 |
| Capital expenditure | (91) | (166) | (395) | (792) | (1,554) |

(1) Earnings before interest, tax, depreciation and amortization.

| | Forecast Year Ended December 31, | | |
|---|---|---|---|
| | **2022E** | **2023E** | **2024E** |
| Van | 4,420 | 31,200 | 136,520 |
| Bus | 1,048 | 5,980 | 11,276 |
| Large van | 5,220 | 15,600 | 31,480 |
| Small vehicle platform | — | 15,600 | 78,720 |

237. Additionally, the Registration Statement repeatedly emphasized that Arrival was positioned to succeed because Arrival's microfactory model meant "***Lower capital investment and greater profitability***" for Arrival compared to its competitors:

> Numerous factors contribute to Arrival' expectation that it will achieve lower capital investment requirements across its owned and controlled ecosystem while also positioning Arrival to achieve greater profitability relative to other OEMs. At comparable annual production volumes, ***the capital investment for Arrival's microfactories is estimated to be 50% less than a traditional OEM production facility***…

238. The Registration Statement further stated that Arrival's microfactories required only $45-50 million of CapEx and $12 million of OpEx annually, per microfactory:

> ***The capital investment required for each microfactory is estimated to be approximately $45-$50 million while the annual operating expense per microfactory are estimated to be approximately $12 million***. When comparing to a traditional OEM assembly plant's volume of 10,000 vans/year Arrival estimates the cost structure aggregated across ten of its van microfactories would result in an approximate ***50% savings in capital investment and 50% savings in annual operating expenses compare to the cost structure of a traditional OEM facility.***
>
> ***Arrival believes each microfactory can achieve an annual gross margin of $100 million per year***…

92

239.    Arrival's gross profit guidance of $3.8 billion and EBITDA guidance of $3.2 billion for 2024 as set forth in the Table above are consistent with Arrival's assumption of establishing 31 microfactories by 2024 and $100 million "gross margin" per microfactory, with a CapEx per microfactory of $45-$50 million and an OpEx per microfactory of $12 million.

240.    Arrival lacked a reasonable basis to issue the prospective financial guidance set forth above, which was false and materially misleading when made because the assumptions Arrival used to generate this information were knowingly false. **First**, Arrival's projected profits for 2023 and 2024 were based on the assumption that Arrival could produce 10,000 vans per year, when in fact its simulation models showed Arrival could produce less than half that volume, even assuming all of Arrival's technology worked perfectly. **Second**, Arrival could not possibly produce over 10,000 vehicles in 2022 because it would take Arrival two years just to receive the molds necessary to start production. **Third**, Arrival's AMRs did not work reliably and consistently, and without functioning AMRs Arrival could not produce the above vehicle volumes.

241.    Further Arrival's modeled CapEx and OpEx were false and materially misleading for the following additional reasons: 1) traditional warehouses were not suitable for use as microfactories because they did not have the necessary structural foundation or electrical capacity, and performing the additional foundation and electric work in each warehouse materially increased the CapEx for any given microfactory; 2) each microfactory would require triple the number of robots Arrival initially contemplated, which would materially increase the CapEx for any given microfactory.  Accordingly, Arrival's financial model lacked a reasonable basis.

### 2. The Statements in the Registration Statement Concerning Arrival's Production Timeline Were False and Materially Misleading

242.    The Registration Statement included the "Development Timelines for Arrival's vehicles:

93

Arrival has four vehicle programs under development: the Arrival Bus, Arrival Van, large van and small vehicle platform. Arrival expects to commence production of its Arrival Bus by the end of 2021 with sales expected to begin in early 2022. The Arrival Van is scheduled to start production and sales in the third quarter of 2022.

243.    The Registration Statement further touted "significant progress" at the Rock Hill, South Carolina facility as supporting Arrival's development timelines stating that the "Arrival plant in Rock Hill, South Carolina lease is complete and currently being set up for bus production in 2021.

244.    Additionally the Registration Statement represented that Arrival had "two microfactories currently being commissioned," i.e., (i) Arrival's Van Factory in Bicester, which would "begin operations…in the first quarter of 2022, with the start of production in the third quarter of 2022," and (ii) Arrival's Bus Factory in Rock Hill, South Carolina which was "expected to begin operations…in the second quarter of 2021, with the start of production in the fourth quarter of 2021." The Registration Statement represented that Arrival "plans on establishing 31 microfactories by 2024" and included the vehicle production figures for its microfactories in 2022, 2023 and 2024, which showed that in 2022 alone Arrival would produce 10,688 vehicles:

|  | Forecast Year Ended December 31, | | |
|---|---|---|---|
|  | 2022E | 2023E | 2024E |
| Van | 4,420 | 31,200 | 136,520 |
| Bus | 1,048 | 5,980 | 11,276 |
| Large van | 5,220 | 15,600 | 31,480 |
| Small vehicle platform | — | 15,600 | 78,720 |

245.    The Registration Statement also represented that "..[E]ach microfactory…will be able to manufacture 10,000 vans per year or 1,000 buses per year."

94

246.    The above statements were false and materially misleading when made and omitted material facts necessary to make the statements not misleading. **First**, Arrival had not made "significant progress" at the Rock Hill facility, and Rock Hill was not "currently being commissioned" because Arrival had not even begun the foundation work on the facility, a prerequisite to installing any production equipment, and did not order any electrical equipment which would take 30-40 weeks just to arrive. **Second**, Arrival was aware of the foregoing obstacles to production: 1) It would take two years to obtain the molds necessary for production, which Arrival had not yet ordered (and were not ordered even as of the end of the Class Period), therefore making it impossible for Arrival to start production in Rock Hill in the fourth quarter of 2021 or in Bicester in the third quarter of 2022 (both less than two years away from the date of the Registration Statement) and; 2) Arrival's simulation model- which assumed that production went perfectly from a mechanical standpoint- demonstrated that Arrival could produce at most 4,500 vans per year in a given microfactory, contradicting the production numbers set forth above. Arrival's Additionally, Arrival omitted to disclose that its AMR's were not working consistently or reliably and were not communicating with each other as necessary for production.

### 3. The Statements in the Registration Statement Concerning the Status of Arrival's Microfactories and the Ability of Arrival's Microfactories to Scale Rapidly Were False and Misleading

247.    The Registration Statement highlighted Arrival's ability to rapidly deploy and scale microfactories while doing so with low expenditures:

> *Scale*
> *A key attribute to the implementation of microfactories is Arrival's ability to scale globally. Arrival estimates its microfactories can be fully operational within six months of leasing an appropriate warehouse. Arrival believes there is an abundance of warehouses that are suitable to be microfactories. the low expected level of capital investment per microfactory also allows Arrival to deploy microfactories in numerous metropolitan communities with less capital than required for a traditional OEM facility*. Arrival believes the deployment of its microfactories into local communities will be well-accepted by governments and

municipalities based on its ability to offer local jobs and to pay local taxes. Arrival believes that every city with over one million inhabitants has sufficient vehicle demand to support at least one microfactory. Globally, Arrival estimated that there are more than 500 cities with a population of more than one million.

\*\*\*

Each microfactory is designed to provide several competitive advantages for Arrival including lower capital investment and operating costs as well as efficient scalability. The size of each microfactory will be approximately 200,000 square feet *and will be able to manufacture 10,000 vans per year or 1,000 buses per year assuming two shifts per day*. Each microfactory will be staffed with approximately 250 employees. *Each microfactory will take approximately six months to complete.* This reduced timing compared to a traditional OEM manufacturing facility is enabled by the absence of metal stamping and there being no requirement for a paint shop. *Arrival can therefore outfit existing warehouses and avoid lengthy permitting approvals generally associated with paint shops*.

248.    The above statements in bold and italics were false and materially misleading and omitted material facts necessary to make it not misleading.  **First**, Arrival was aware that a traditional warehouse was not "suitable to be [a] microfactor[y]" because it did not have the structural integrity to support Arrival's production method, nor did it have the necessary electrical capacity. In truth, preparing a traditional factory for Arrival's production method would require millions of dollars in additional expenditures to perform the foundation and electrical work that would require permits, which would mean that it would take far longer than six months to complete a microfactory. **Second**, Arrival could not scale its microfactories globally in a rapid manner because it had yet to install even one technology cell in even one microfactory, its AMR's could not function reliably and consistently as necessary to produce vehicles, and it had not determined whether it could even produce vehicles through use of its "cost-saving" composite materials because the molds it was using to make vehicles with fabric made the vehicles look "horrible" and not fit for sale.  In other words, because Arrival was far from being able to prove up its production method in even *one* microfactory, it had no basis to claim that it could scale microfactories rapidly.

96

**Third**, Arrival would not be able to manufacture 10,000 vans per year because its simulation model showed the maximum production capacity per microfactory was only 4,500 vans per year.

### 4. Statements in The Registration Statement Concerning Arrival's Technology and AMRs Were False and Materially Misleading

249.    Arrival's Registration Statement represented the following concerning its proprietary technology and AMRs and its in-house software that controlled the AMRs:

*Microfactories*

Arrival has developed an industry-changing approach to manufacturing with its proprietary microfactory concept. Microfactories change the way vehicles are produced in numerous ways. Instead of using the traditional linear assembly line that operates at one speed with stations in a specific order, Arrival has designed its microfactories using technology cells. The order in which a vehicle moves through the technology cells is determined by microfactory software and the order the technology cells are used can be changed dynamically from one vehicle to the next. Furthermore, the technology cells can be reconfigured, enabling each microfactory to build multiple vehicle types.

***Each technology cell performs specific tasks relating to the production of an electric vehicle. Linking the technology cells are autonomous mobile robots ("AMRs"), which are controlled by software designed and developed in-house by Arrival. Parts delivery and vehicle movement between the technology cells is accomplished with these AMRs***

\*\*\*

*Proprietary In-House Software Architecture*

***A core enabler to Arrival's competitive positioning is its proprietary in-house software architecture***. Arrival's software team consists of more than 500 software engineers. Its software engineer to mechanical engineer ratio is 1:1, which it believes compares favorably to an estimated traditional OEM ratio of approximately 1:100. Arrival believes its centralized software architecture has entered into the 5th generation of development, which it believes positions it as one of the leading software-centric electric vehicle manufacturers….

*Internal Tools.* As part of Arrival's proprietary in-house software architecture, it has developed software applications to improve its design and development capabilities both for its electric vehicles and for operations inside of its microfactories. This software allows Arrival to design and manufacture purpose-built electric vehicles that provide solutions to meet its customers' local needs and specific requirements. ***Arrival's proprietary in-house software architecture also***

*enables the functionality of the robots and the AMRs operating in its microfactories.*

250.    The foregoing statements in bold and italics were false and materially misleading because Arrival omitted to disclose that it was unable to get its AMRs to work reliably or consistently and could not program the AMRs to communicate with each other as is necessary to produce Arrival's vehicles, and that Arrival had not actually built any vehicles using its AMRs. In truth, Arrival had not assembled even one technology cell and Arrival employees manually performed the bulk of any production work.

**C.  Additional Statements Prior to the Business Combination/IPO Closing**

251.    On March 1, 2021 Arrival issued a press release announcing the SEC declared the Registration Statement effective.  Arrival reiterated that it would begin "commercial Bus and Van models…production at the end of this year and beginning of 2022 respectively."

252.    On March 12, 2021 Cowen, Arrival's financial advisor in connection with the IPO hosted an investor presentation.  During the presentation Defendant Ableson explained that Arrival developed its microfactory model over the course of several years and had confirmed the capability of the microfactory's production output through digital simulation that Arrival conducted with the assistance of a top company experienced in factory automation. When an analyst asked about Arrival's "level of confidence" that the microfactories will "actually be able to produce 1,000 buses and 10,000 vans in each facility, Defendant Ableson confirmed that the microfactories could in fact deliver:

> *Obviously, the Microfactory is not something we dreamed up here in the last couple of months. We've been working for several years on this concept*.  As we developed the layouts, we worked with a – one of the leading companies in factory automation in the traditional automotive industry. *We've run a whole number of digital simulations of the factory, where we model the operations in each cell, the throughput of that cell to make sure that we can deliver, to your point, the capacity numbers that our business plan reflects.*

98

253.    Not only did Ableson represent that the microfactories would deliver according to the timeline in the Registration Statement, he characterized Arrival's timeline as conservative given that Arrival had installed the production equipment and was running the machinery, "just to do that final check, but we're doing that well in advance of actually our start of production date." Ableson further reassured investors, "we're in a very good position as far as the development of the microfactory process and how it's going."

254.    Defendant Ableson's statements were false and materially misleading when made and omitted material information necessary to make them not misleading because: 1) Arrival's "digital simulation" showed that Arrival could produce, *at most,* 4,500 vans per year in any given facility; and 2) Arrival had not installed a single technology cell in any microfactory and its AMRs were not functioning consistently or reliably.

255.    Defendant Sverdlov similarly represented that "we're very confident that the factory will work exactly the way we planned" given that Arrival had validated its microfactory model:

> The vehicles must be designed for Microfactories, and that's a very important element, because ***we're doing this design of our vehicles already for a long time. So, it was adopted in the way that it should be like, and that it can be assembled by Microfactories***. ***We have a software which actually runs the simulation***. So, every time we design the parts, before we say that this part is ready, we do like a simulation to be sure that Microfactory can assemble that.

> So, we have a digital theme of our Microfactories, so where we test before we release the parts [to show] that the factory actually can do the operation. And this is fundamental difference, because the normal cycle is that products first are like designed and then the process engineers start to work with them to adopt like a factory for the product. We do an opposite thing. ***We adopt product for the factory, and that's why we're very confident that the factory will work exactly the way we planned.***

256.    Defendant Rugoboor, responding to an analyst's question about concerns related to the "margin side of production or any "pinch points or concerns about throughput," highlighted the purported simplicity of Arrival's manufacturing process and its extensive development history to reassure investors that nothing stood in the way of Arrival's ability to produce vehicles consistent with its IPO timeline and production numbers:

> It takes a ton of engineering and innovation to simplify the product.  And I think this is the critical point.  If you go – do a teardown of an Arrival vehicle, it will look extremely simple and to get to that point takes a ton of engineering and the company's been at for the last six years….. [*W]e already have for example the composites running, the composites pilot line going, right*.  So the components we've been using for the last two years with folks on the road.  Not to say production is not – not tough, it's tough, production is tough.  But the complexity of an Arrival vehicle compared to, I would say any other vehicle out there as far as we know, you know it's an order of magnitude more simple and less complex.

257.    Defendant Sverdlov confirmed, "*we don't see any roadblocks which stops us from doing this [achieving Arrival's reported margins]. We don't have any nasty surprises let's say on this journey*."

258.    Defendant Sverdlov's and Rugoboor's above statements were false and materially misleading when made an omitted material information necessary to make them not misleading because: 1) Arrival's digital simulation did not support its throughput of 10,000 vans per year, and showed at most 4,500, 2) Arrival's composite materials were ill-suited to production and Arrival was "still trying to determine" if its composite material was going to "work for the product," and Arrival needed new molds to achieve production quality thermoplastic which Arrival had not yet ordered and would take 2 years to arrive, and 3) Arrival's AMRs did not work reliably or consistently.

259.    On March 20, 2021 CIIG shareholders approved the Business Combination.  On March 25, 2021 shares of Arrival began trading on the Nasdaq. The same day, Defendant Ableson

100

provided a statement to *Reuters* telling investors "[w]hat you'll start to see now is the footprint start to expand pretty dramatically. Echoing this, Defendant Rugoobor stated "[w]hat we're going to see is basically a microfactory in every major city in the world…***You'll see the rollout expand pretty rapidly.***"

260.    Analysts heeded Defendants representations. For example, on April 5, 2021 Cowen initiated coverage of Arrival following its IPO, rating it "outperform" with a price target of $28.50 per share. Cowen analysts Jeffrey Osborne, Thomas Boyes, Emily Riccio and Jeffrey Rossetti lauded Arrival's microfactories as a "critical component in lower production costs, stating "***Arrival has spent almost five years*** <u>***perfecting***</u> ***its microfactory approach***, which not only leverages the company's <u>***highly automated***</u> ***"technology cell" approach***, but also high degree of vertical integration, proprietary composite materials, and plug and play components. A microfactory can be stood up in around 6 months, occupy 1/10 the footprint of a traditional automotive facility ***and produce 10,000 trucks*** or 1,000 buses annually on just two shifts. On a comparative basis these factories can be constructed for 50% of the capex and operated for around half the opex a year.

261.    Defendants are responsible for the misleading statements contained in Cowen's report because Defendants provided the false and materially misleading information upon which Cowen relied in issuing its report.

**D.  2020 20-F**

262.    On April 30, 2021, Arrival filed its Annual Report on SEC Form 20-F, as amended on May 27 and August 11, 2021, signed by Defendant Sverdlov ("2020 Annual Report"). In it, Arrival reiterated the same statements it provided in its Registration Statement, including claims regarding: (i) Arrival's proprietary technology which was purportedly going to allow Arrival to achieve greater profitability relative to traditional auto makers as well as other electric vehicle

101

makers; (ii) its proprietary microfactory concepts and its timeline for their deployment and production capacity; and (iii) vehicle development timeline and sales process.

263.    The statements in Arrival's 2020 20-F were false and materially misleading and omitted material information necessary to make them not misleading for the reasons stated in ¶¶ 240-41, 246, 248 and 250 above.

264.    Appended as Exhibits 13.1 and 13.2 to the 2020 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein Defendants Sverdlov and Holbrow certified that the 2020-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading… and fairly presents, in all material respects, the financial condition and results of operations of the Company."

265.    Defendant Sverdlov's and Holbrow's SOX certifications were false when made because Arrival's 2020 20-F contained several material misstatements and omissions Arrival's and did not accurately present Arrival's financial condition and operating results for the reasons set forth in ¶¶240-41-, 246, 248 and 250 above.

**E.  1Q 2021 Investor Conference Call and Earnings Release**

266.    On May 13, 2021 Arrival issued a press release announcing its First Quarter 2021 update providing "Business Highlights" which included:

- Announced its second U.S. Microfactory will be built in Charlotte, North Carolina. Producing electric delivery vans in Q3 2022, the Microfactory is expected to bring more than 250 new jobs to Charlotte.

- Announced its first European Van Microfactory located in Madrid, Spain.

- *CapEx projection of $50 million for a Microfactory on track, with the majority of production equipment for the first two microfactories either delivered or on order.*

102

| Deleted: | 239- |
| Deleted: | , 245, 247 |
| Deleted: | 249 |

| Deleted: | 239-40, 245, 247 |
| Deleted: | 249 |

- UPS commenced in-depot testing of an Arrival vehicle.

- Confirmed Van public road trials will begin with key customers this summer. Announced Bus public road trials with First Bus, one of the UK's largest transport operators, will begin this fall.

267. The above statement in bold and italics was false and materially misleading and omitted material information necessary to make it not misleading. **First**, Arrival had neither ordered "a majority of the production equipment for the first two microfactories," nor had it been delivered, because as CW5 stated, Arrival had not yet ordered necessary production tools for any microfactory and only had prototype tools, and as CW4 stated Arrival had not ordered the high voltage electrical equipment in Rock Hill necessary to operate production, which had a 30-40 week lead time, and had also not yet ordered transformers, robotic equipment and control panels. As both CW4 and CW5 stated Arrival also had not yet ordered production molds which had a lead time of two years. **Second**, Arrival's CapEx projection of $50 million for a Microfactory was not on track. Instead, Arrival's initial CapEx projection had to be materially increased to allow for triple the number of robots per microfactory and significant construction and electrical work.

268. On May 14, 2021 Arrival held its first investor conference call following its IPO ("Q1 2021 Investor Call"). On the call, Defendant Holbrow represented that Arrival had "validated" the business plan set forth in the Registration Statement, stating "as we start equipping these factories ahead of production, *we've been able to further validate our business plan assumptions on* _capital and operational expenditure_ *and on* _vehicle production volumes_. *Indications are the- all these assumptions are tracking in line with the expectations we set out in our initial business plan last year*."

269. Defendant Holbrow's above statement in bold and italics was false and materially misleading and omitted material information necessary to make it not misleading when made

103

because: 1) Arrival's true capital and operational expenditures were inconsistent with those in Arrival's initial business plan because Arrival's initial business plan did not include the material additional CapEx necessary to order triple the number of robots per microfactory and perform the construction and electrical work necessary and 2) Arrival's digital simulation showed that its maximum van production volume was 4,500 vans per microfactory per year.

270.    On the call, Cowen analyst Jeffrey Osborn asked Defendant Ableson to "give us some comments on the robots in your pre-production facility in the UK and level of comfort with the throughput expectation that you originally laid out in the SPAC merger deck."  In response, Ableson confirmed that the production equipment was operating not just in Arrival's research and development facility but in the actual production factory, and that the Company had "very high confidence" in their production forecast based upon the robotic cells in the Bicester microfactory:

> *I want to be clear that some of the video you saw was production equipment that's now being installed in our actual microfactory in Bicester in the U.K. So we have production equipment operating in the production environment*. So it's not just being done in R&D facilities at this point. *To get specifically to your question on capacity and throughput, we've done extensive modeling of all of the processes and the systems in the microfactory. So we have very high confidence in that. And the work that we've done so far with the actual robotic cells in Bicester confirm that analysis to this point.*

271.    Ableson assured: "We've started to install equipment that we're using to confirm the results of the production process analyses we've already completed. To this point, *our actual results are exactly in line with what we've expected*."

272.    When an analyst attempted to drill down on the degree to which Arrival had validated its production process to ensure that it could actually fulfill the vehicle orders it touted, Sverdlov assured that Arrival had installed production cells in the microfactory and that those production cells were able to perform a majority of vehicle production operations:

Analyst:

First, when you talk about the build-out of the first plant site, Mike, you've mentioned that so far, it's tracking the simulation model. *So how much- what percent of the assembly line is actually finished*? And then when do you think- not so much job one, but kind of the first end-to-end validation of the production process should be coming."

Defendant Sverdlov:

..[J]ust one important angle is that we need to remind you that, like our method of assembly is not converted lines, *so it's not operations in sequence. So it means that we don't need to build all factories before we know all the operations. <u>So we have a few cells installed and already commissioned, and those cells are capable do a majority of operations within the vehicle</u>*. So it means that as we said, like our method allows us to go in earlier- much earlier than wait and see when all equipment going to be installed.

273.    Additionally, in discussing Arrival's competitive advantages and ability to price its vehicles below competitors, Sverdlov highlighted that Arrival was unique in its ability to assemble buses robotically: "***And another important point is that we are robotically assembling buses as well. So it means that there are not many companies in the world who are assembling buses using robotics***. And this is another reason why, like, we can price our buses better than other players."

274.    Arrival and the Executive Defendants continued to reassure investors that everything was proceeding exactly in line with information set forth in the Registration Statement concerning expenditures and the vehicle production timeline. For example, on a May 27, 2021 conference with investors Wolfe research hosted, Defendant Ableson assured investors that "Rock Hill will begin production as Avinash [Rugoobur] said at the end of this year." And in a June 9, 2021 investor conference UBS hosted Defendant Rugoobur reiterated the representations in the Registration Statement that "a Microfactory is a low footprint, low CapEx and rapidly scalable production model that allows us to…produce vehicles and make each Microfactory profitable in

105

much lower volumes compared to the traditional industry…*we have a level of technologies that enable this to actually happen*." Ableson assured, "we're where we need to be on the CapEx" and "we will be installing and commissioning equipment in the Rock Hill Microfactory in South Carolina in the second half of this year. *So everything is proceeding according to plan*, and we're looking forward to getting the Bus in to production, as Avinash [Rugoobur] said in Q4 of this year."

275.    The above statements were false and materially misleading when made and omitted material facts necessary to make them not misleading because: 1) at this point Arrival had not yet installed a single technology cell in Bicester or any microfactory; 2) Arrival's "robotic cells" were not "capable to do a majority of the operations," Arrival did not "have a level of technologies that enable this to actually happen" and Arrival was not "assembling buses using robotics" because its AMRs did not function reliably and consistently and Arrival employees performed the bulk of any production work; 3) Arrival would not be "installing and commissioning equipment in Rock Hill in the second half of this year' and would not get the "bus into production" in "Q4 of this year" because Arrival had not even begun the foundation work in Rock Hill, a prerequisite for installation of any production equipment, by this time, and also had not ordered necessary production equipment that had a lead time of 30-40 weeks to Arrive, meaning that Arrival could not possibly hope to begin production in Rock Hill in the fourth quarter. For these reasons and others and stated herein, everything was not "proceeding according to plan."

F.  **June 2021 Prospectus; July Media Interview and Press Releases**

276.    On June 17, 2021 Arrival filed a Prospectus on SEC Form 424B3 in connection with the issuance of: (i) 12,937493 Ordinary Shares that may be issued upon the exercise of warrants to purchase Ordinary Shares at an exercise price of $11.50 per share and (ii) 7,175,000

106

Ordinary Shares that may be issued upon the exercise of warrants issued to CIIG Management LLC and its transferees to purchase Ordinary Shares at an exercise produce of $11.50. The Prospectus also related to the offer and sale from time to time of certain "Selling Securityholders," of up to 573,798,878 Arrival Ordinary Shares. Among the Selling Securityholders were Kinetik S.à.r.l. (owned and controlled by Defendant Sverdlov) (463,275,682 shares), Defendant Sverdlov (818,639 shares), Defendant Rugoobor (491,184 shares), Defendant Holbrow (491,184 shares), Defendant Ableson (163,378 shares), Defendant P. Cuneo (1,874,680 shares), Defendant O'Hara (25,000 shares), Defendant Horvath (130,983 shares) and Arrival Head of Mobile Robotics Giuseppe Montano (163,738 shares).

277.    In the Prospectus, Arrival touted its proprietary technology as purportedly allowing Arrival to achieve significantly greater profitability than traditional auto makers and electric vehicle makers, stating in relevant part:

> Numerous factors contribute to Arrival's expectation that it will achieve lower capital investment requirements across its owned and controlled ecosystem while also positioning Arrival to achieve greater profitability relative to other OEMs. At comparable annual production volumes, the capital investment for Arrival's microfactories is estimated to be 50% less than a traditional OEM production facility. A primary driver of these cost savings is the use of Arrival's proprietary composite materials that do not require capital intensive metal stamping plants, welding facilities or paint shops. Arrival's expectation is to achieve market-leading profitability within the electric vehicle industry due to the lower operating expenditures associated with its microfactories, lower procurement costs associated with its in-house plug-and-play modular components and proprietary composite materials as well as the utilization of its proprietary in-house software architecture that reduces its manual labor expenses within the microfactories. Arrival estimates that its operational expense saving associated with its microfactories to be approximately 50% when compared to a traditional OEM facility with a similar production capacity. These savings, when combined with other operational and procurement savings, position Arrival to achieve double-digit margins on a per vehicle basis. Arrival believes this level of profitability to be industry leading.

278.    Furthermore, Arrival represented that it planned on achieving profitability once production and sales of its vehicles commenced, "which is expected with respect to the Arrival

Bus in Q4 2021, the Arrival small van in Q3 2022 and the Arrival large van in Q4 2022." Arrival reiterated these deployment timelines elsewhere in the Prospectus, reiterating that "Arrival plant in Rock Hill, South Carolina is complete and currently being set up for bus production in 2021."

279. The above statements were false and materially misleading when made and omitted material facts necessary to make them not misleading for the reasons stated in ¶¶240-41-, 246, 248 and 250 above.

280. On the same day, June 17, 2021, Arrival participated in a Deutsche Bank Global Auto Industry Virtual Conference (the "Deutsche Bank Conference"). During the Deutsche Bank Conference, Deutsche Bank analyst Emmanuel Rosner asked whether Arrival "was on track to begin production in the fourth quarter in the U.S." In response, Defendant Ableson gave the following evasive answer:

> So I'll take that one. We've got approximately 70% of the equipment for the Rock Hill, South Carolina plant, where we intend to start production of the bus, and 70% of equipment is on order. It's starting to arrive, and obviously, through the rest of the year, then, we'll be installing the equipment and commissioning the equipment in preparation for starting [ph] production.

281. Picking up on the vagueness of Defendant Ableson's answer, Rosner reiterated his question, and the following exchange took place:

> **[Deutsche Bank Analyst]:** "Okay, great. So that's a yes? . . . .
>
> **Ableson:**     "The plant is- the plant is moving along very well."
>
> **Sverdlov:**    "*Yes.*"

282. Then, when an analyst asked "how are [the microfactories] progressing,", Defendant Sverdlov gave an equally evasive answer, stating as follows:

> If your supply chain doesn't work in -- just in time more [ph] than other things, so it's all makes impact on your ability to produce. Our environment is certainly different. So microfactories is very small factory which can be controlled and we don't need to be like in materials (inaudible), and so on [ph].

Deleted: 239-

Deleted: , 245, 247

Deleted: 249

*So I will say it this way. When first [ph] factory starts to work, this moment, which we call zero to one, it means that we [ph] already in the mode when everything works [ph]. Putting other factories in the same mode is quite straightforward process.*

I would even compare it trouble with something like McDonald's. I mean, so you have the restaurant which you have framework and the blueprints, and other stuff, opening the new one is quite straightforward thing [ph] how to do that. So that's the way how we see our model.

So our main focus right now is to enable the first factories in different geographies, because we hire people, we train them, we can follow [ph] the documentation, we bring components, *so when it works, scalability is not the problem*. We don't see it as challenge. So after that, we can open many, many factories [ph].

*And then, we have the answer that the current business plan, which we were presenting before, it means that we will have 31 microfactories by the end of 2024, so -- and we are keeping our guidance on that. So we're [ph] –*

283.    In addition to reassuring the investors of Arrival's anticipated timeline for microfactories deployment, Defendant Sverdlov reconfirmed that the four models of Arrival vehicles are scheduled "by the end of 2023. So the first one is going to be bus Q4 this year, and then van and another one [ph] is scheduled for 2023 [ph]."

284.    The above statements were false and materially misleading when made and omitted material facts necessary to make them not misleading because Arrival had not ordered 70% of the equipment for Rock Hill and could not possibly start production in Rock Hill in the fourth quarter of 2021 because Arrival had not even begun the foundation work in Rock Hill, had yet to order transformers and robotic equipment which had lead times of 30-40 weeks, and needed new metal molds which had not been ordered and had 2 year lead times .  Additionally, Arrival's "current business plan" of "31 microfactories by the end of 2024" was a work of fiction, as stated herein. Further, Defendant Sverdlov's evasive answer that "when it works scalability is not the problem" concealed the fact that "it," i.e. Arrival's microfactory model did not in fact "work."

285.    Then, in July 2021, Arrival represented that it could "absolutely" fulfill UPS's $1.2 billion order for 10,000 vans. On July 30, 2021 Arrival's Head of Product, Patrick Bion was

109

interviewed by Robert Llewelyn, the host of the "Fully Charged Show" an EV focused YouTube channel. In the interview published on YouTube, Llewelyn asked Bion about UPS's $1.2 billion order to purchase 10,000 electric vans from Arrival. Llewelyn bluntly asked to Bion: "***You think you have the capability of manufacturing those here…you can fulfill those orders***?" Bion responded, unequivocally stating "***Absolutely***."

286.    The above statement was false and materially misleading because there was no conceivable way that Arrival could fulfill an order for 10,000 electric vans. Indeed, Arrival's internal expectation was to be able to produce *just one vehicle* by the end of 2022.

287.    Also in the summer of 2021, Arrival announced two sales partnerships which further gave investors the impression that Arrival would deliver according to the plan set forth in the Registration Statement. On July 15, 2021 Arrival announced a partnership with a company called LeasePlan for 3,000 vans.[6] Importantly, the press release stated that "the partnership is based on an initial order of 3,000 vans, *with the sales agreement expected to be finalized in Q3 2021*." Arrival's Registration Statement stated that the time from sales agreement to delivery of product would "potentially" span "several months." Arrival's partnership with LeasePlan thus signaled to investors that Arrival would, at the very least, be able to deliver 3,000 vans to LeasePlan within several months of the 2021 third quarter. The press release quoted Defendant Rugoboor as stating that the partnership with LeasePlan "shows Arrival's method is truly game changing and [that it] ***can roll out in multiple locations rapidly***. With this new partnership, Arrival will be able to deepen and expand our presence globally, working with LeasePlan to bring the best possible products to its customers and in turn helping them to achieve their own sustainability goals."

---

[6] LeasePlan purchases, funds, and manages new vehicles for customers and has approximately 1.9 million vehicles under management in over 30 countries.

288.    Similarly, on July 22, 2021 Arrival issued a press release announcing a partnership with the Anaheim Transportation Network (ATN) whereby Arrival would serve as the vehicle producer for ATN's transition to an entirely electric bus fleet. Arrival's press release quoted Defendant Ableson as stating "We are so pleased that ATN has chosen Arrival to support its transition to an entirely electric bus fleet and have been impressed with its commitment to sustainability…Our first order from a U.S. transit operator is just the beginning, and we look forward to bringing the US produced Arrival Bus to cities and people all over the USA."

**G.  2Q 2021 Investor Conference Call and Earnings Release**

289.    On August 12, 2021 Arrival reported its financial results for the Second Quarter of 2021.  In its press release filed with the SEC on Form 6-K Arrival provided "Business Highlights" including "***Bicester microfactory progressing ahead of plan*** with composite production lines installed; Microfactory capex forecasts continue to be on ***track as per original targets***."

290.    The same day, Arrival held its investor conference call ("Q2 2021 Investor Call"). On the call, Defendant Sverdlov represented that Arrival had "strong evidence that our new method works" and that Arrival's "main activities" were "on track:"

> ***Our main activities, like sales, microfactories, procurement are all on track. We have very strong evidence that our new method works*** and our customers require more brands of our products.

291.    Defendant Sverdlov further cited Arrival's "new method of design using microfactories" and "next-generation robotics" as making Arrival a "high-margin business:"

> I would like to use this opportunity to remind that Arrival is a very unique company. ***We have invented a new method of design and produce vehicles using microfactories***. And this is something which has never been done before…
>
> We have managed to create best-in-class vehicles, ***we call them devices on wheels***. They will have competitive pricing with up to 50% lower cost of operations. This radical new method to design electric vehicles using microfactories allows us to avoid stamping, welding and painting. ***Our microfactories are rapidly scalable and***

111

*low CapEx.* We are vertically integrated and have developed on house tech with a very strong IT portfolio.

We witnessed strong demand for our products, and we continue to grow our team. Now we have over 2,200 full-time employees. ***All this will make a high-margin business enabled by hardware, software <u>and next-generation robotics</u>, making us 1 of the largest and fastest growing EV companies globally.***

292.    Similarly, Defendant Ableson provided a detailed explanation of Arrival's AMR's

the "technology that underpins [Arrival's] microfactory process":

> *I also wanted to speak briefly on an additional Arrival developed technology that underpins our microfactory process, Autonomous Mobile Robots or AMRs. We've developed these robots to replace the conveyers and automated guided vehicles used in the traditional assembly plants.*
>
> *In the microfactory, AMRs will carry both parts and vehicles through the assembly process. <u>These robots operate autonomously in the microfactory</u>.* They don't follow a predetermined path or a wire in the floor. Each AMR incorporates 2 ladder units and 4 cameras that allows it to accurately map its surrounding. As you can see in the video, they can move in any direction. *We'll also be able to virtually connect 2 or more AMRs in order to coordinate their movement.* We'll use this operating mode to move objects that are either too large or too heavy to be handled by a single AMR.
>
> <u>***The software to control these robots has also been developed in Arrival and is part of our microfactory software system.***</u> ***The AMRs will first be deployed in our van microfactories. From the above examples, I hope you can see that we're making substantial progress in validating our microfactory processes.*** Believe me, we're just as proud of what's going on inside our microfactories as we are of our vehicles on the road.

293.    Additionally, Defendant Ableson gave detailed information about the progress of

equipment installation in the microfactory as purported proof that Arrival was on track with respect

to its CapEx per microfactory and that it was successfully validating its microfactory production

processes:

> I'd also like to give you a few updates on the progress we're making in developing our microfactories. Our Rock Hill, South Carolina bus microfactory ***has over 80% of production equipment ordered or delivered. Equipment installation is expected to be complete in Q4 2021. Our Bicester U.K. van microfactory has over 75% of production equipment ordered or delivered with equipment installation expected***

112

*to be complete in Q1 of 2022. Our equipment CapEx remains on track to be $50 million or less per microfactory. With the vast majority of equipment ordered, we're now very confident we'll meet this objective…*

294.    When analyst Jeffery Osborne asked Defendant Ableson whether there was "any change in your thinking on the throughput" of 10,000 vans and 1,000 buses per year, Defendant Ableson confirmed: ***No, no changes at all, Jeff.*** We still anticipate 10,000 vans a year on 2 shifts and 1,000 buses per year on 2 shifts.

295.    The above statements in the 2Q 2021 Earnings conference call and earnings release were false and materially misleading when made and omitted material facts necessary to make them not misleading.  **First**, Arrival's AMRs did not work in a remotely reliable or consistent manner, were not communicating with each other as necessary for production and Arrival employees were manually performing much of the work that Arrival had intended the robots to perform. **Second**, Arrival's Bicester microfactory was not proceeding ahead of plan because Arrival had yet to install a single technology cell in it or any other microfactory. **Third**, Arrival's CapEx was not on track to be $50 million per microfactory because: (1) the floors in traditional warehouses were not strong enough to support Arrival's microfactory production model, and Arrival did not factor in the material costs necessary to structurally fortify an existing warehouse into its projected CapEx; (2) traditional warehouses were not equipped with the necessary electrical components to support Arrival's microfactory production model, and Arrival did not factor the material costs necessary for electrically equipping a microfactory into its projected CapEx and (3) because Arrival was building and testing robots simultaneously, an Arrival microfactory would require three times the number of robots than initially planned, the material costs of which Arrival did not factor into its CapEx.  **Fourth**, Arrival had not yet ordered a majority of the necessary production equipment for Rock Hill, including production molds, robotic

113

equipment, production tools used both to produce the vehicles and to equip the vehicles, and high voltage electrical equipment, among other things. Even if Arrival ordered such equipment the next day it still would not arrive in time to start production in Rock Hill in the fourth quarter of 2021 given the lead times for delivery. **Fifth**, Defendants were aware that an Arrival microfactory could not produce 10,000 vans per year because the simulation model demonstrated that maximum production per microfactory assuming everything went perfectly from a mechanical standpoint was 4,500 vans per year.

**H.  September 2021 Investor Conferences**

296.    Just two months before Arrival's complete retraction of its production and financial outlook, Arrival and the Executive Defendants amplified their assurances that Arrival would deliver on plan, that it was not facing any major challenges, and it was "in a very healthy place for the starting point of production with where our CapEx and our OpEx is tracking." At a September 7, 2021 investor conference Deutsche Bank hosted, when an analyst asked Defendant Rugoboor "what still needs to get done to ensure that the first batch of production starts on time," Defendant Rugoobur responded, "*[w]e're already well along in developing the process. So from here, it is a ramp up on the factory side.*"

**Edison Yu**

And for the, I guess for the 2Q ramp up. What still needs to get done. Is it to just testing validation building out?

**Defendant Rugoobur**:

Yeah. So on the plant side, we already ordered or had delivered 80% of the equipment for Rock Hill. We've announced that we intend to have all installed in the fourth quarter of this year. *And then, from that point into Q2 of next year. It's just continuing to run the equipment and getting up to the production rate of production quality. So, we think we've allowed plenty of time with the production it's a production equipment to get that done on the van side. We've actually pulled ahead, a lot of the production equipment in the Bicester UK plant*. We already

114

have the production composite process running. We've made over 500 panels, we have the production -- HVBM battery, module process running. We've created over 1,400 battery modules, with production equipment. We've got the textile process running in Bicester where we run a number of processes and assemblies, including the chassis structure for the -- van. ***So we're all -- already running a substantial number of the production processes, and let me emphasize again, these processes are used across the product.***

So the – we're manufacturing, is the same one used in the van and the bus, the composite panel process is exactly the same between van and bus. In fact, we've already made bus panels in the in the van plan because it is the same process. So, investor and you'll see this in some of the videos online. ***We're already well along in developing the process. So from here, it is a ramp up on the factory side.***

297.    Defendant Rugoobur's above statement was false and materially misleading when made and omitted material facts necessary to make them not misleading for the reasons set forth in ¶294 above.

298.    Then, on September 9, 2021 Defendants Ableson and Rugoobur fielded questions from Cowen analyst Jeffrey Osborne at Cowen's 14th Annual Global Transportation & Sustainability Conference, emphasizing the fact that Arrival had "been at this six years" as evidence of the maturity of Arrival's technology and confirmation that the microfactory process worked and would deliver saleable vehicles consistent with the production volume and CapEx and Opex Arrival set forth in its IPO Registration Statement.

Jeffrey Osborne:

I was wondering on the production side, just because that seems to be where the greatest level of differentiation is, can you just touch on now that 75% 80% of the first two microfactories, equipment been ordered. ***How you feel about if these things are on time and on budget?*** I think you in the past, you talked about being able to do these things in six months. Certainly, you've articulated the first two facilities well elongated relative to six months, but just given you've never done this before, ***I wanted to get a sense of how the teething pains is gone for the first two and maybe any lessons learned for additional facilities***?

Defendant Ableson:

All right. I'll speak to that. First to your point, yes, once a warehouse is ready for equipment installation we can get that in production in approximately six months. We have done a lot of work around that target and feel pretty confident in that. ***But to your point with these first couple of microfactories, we're taking longer, because we want to install the equipment earlier than absolutely necessary and run the processes well ahead of time.***

*\*\*\**

…We said in our last quarterly update to your point we always had this target of $50 million, for the factory equipment inside of the microfactory. ***And we are highly confident we're going to hit that target now, given the amount of equipment we've already ordered***

299.    Defendant Rugoboor added, "***We're very much tracking where we need to be with the microfactories. And then, I think it's also important to note, if you look at where we are tracking on CapEx, we're right where we need to be***." Defendant Rugoboor further assured investors that Arrival would be able to rapidly scale given Arrival's success of validating the microfactory model, stating, "the second important point is the ability for microfactories to just scale rapidly. You mentioned the six-month thing Jeff, and I think it's crucial because the microfactories are essentially a blueprint. ***And because of the size and shape and scale, you can basically drop them rapidly in parallel***.

300.    Defendant Ableson also reassured investors, in response to their "number one question" that Arrival's robotic assembly process was ready to deliver:

Jeffrey Osborne

Got it. I just wanted to confirm that. It's a questioning. ***I frequently get the number one question I get from investors is do the robots work,*** investors have been burned by Elon Musk and the (inaudible) dreadnought the machine that builds the machines, et cetera. First of all, I think of the 2,200 employees correct me if I am wrong what is it 700, 800 are software engineers, for you folks it's a large percentage.

*\*\**

Defendant Ableson:

116

And Avinash touched on this in his introductory remarks. You can't take a vehicle that was designed for the traditional process and suddenly build it in a microfactory. ***And as Avinash said, we've been at this six years and we've been very much developing the product in conjunction with the process. The microfactory is not an idea that we just came up with a few months ago***. It's been an integral part of our development here for several years. And so as I say, one of many attributes that make our product different, is the fact that they are designed for microfactory assembly and that includes ***both the composite panel technology that we've developed, which is a key enabler for the microfactory approach***, because it eliminates press shops and paint shops, but also includes our components that we've developed in house**, *because designing them in such a way that they are easily manipulated, and assembled by robots was a fundamental design criteria we put on the product guys,* as they were working on this.**

***So I know there have been companies in the past that maybe didn't deliver to all their aspirations on automation. As I said, we're already operating quite a large percentage of our production equipment already and have very high confidence that our process is going to deliver.***

301.    Defendant Rugoboor added, "…I think Musk even said taking this existing vehicle and trying to automate that process 100% is extremely difficult [ ] start from scratch and design with that in mind it's still challenging ***but we've been at this for now for six years***…"

302.    The above statements were false and materially misleading when made and omitted material facts necessary to make them not misleading because: 1) Arrival's AMRs did not function in a remotely reliable and consistent manner, 2) Arrival still had not installed a single technology cell in any microfactory and was not "operating quite a large percentage of our production equipment," 3) microfactories could not be "drop[ped]" "rapidly in parallel" because existing warehouses were not suited to Arrival's microfactory production method, 4) Arrival's "composite panel technology" was not a "key enabler for the microfactory approach" because Arrival was not sure its composite material would "work for the product" since Arrival could not get the panels to look smooth enough, 4) Arrival had yet to order key production equipment for any microfactory

117

and 5) Arrival was not "tracking on CapEx." Indeed, just two months later Arrival announced that its CapEx was 50% higher than the amount stated above.

303.    On September 30, 2021 Defendant Rugoboor addressed investors at the Bank of America European Autos and Future Car Conference addressing the question of how Arrival distinguished itself from its competitors. Defendant Rugoboor emphasized Arrival's technology cell approach with was dependent on the use of Arrival's software-driven AMRs:

> So, but when I think of where Arrival is relative to the competition, *we've been at this since day one in how do you produce vehicles in microfactories, lower cost. That vertical integration, that strong IP portfolio*. We haven't seen anybody yet really redesign from the ground up even the production approach like Arrival's taken. Most folks are either go and acquire plants, especially new entrants or are partnered with someone who already has that asset base. And when that happens, it forces the design and the vehicle down a very particular part, right? So, we own -- hopefully, we've all seen a typical automotive plant with a single-speed conveyor belt. Every time you want to make a change, you're adding significant CapEx for tooling.
>
> *I think it's important now to understand that if you take the lid off the microfactory, you're not seeing conveyor belts at all, right, you're not seeing that approach at all. What you're seeing is technology cells[ph] and a technology cell is a group of robots that perform an operation and we have some pretty exciting YouTube videos on the tech cell but also the autonomous mobile robots that we've designed in-house*. So, essentially in a microfactory, if you think of these cells that I laid out in this warehouse -- in a standard warehouse really, *the tech cell each performs an operation and the autonomous robots guidances the part into that cell, operation is done and then you're moving the parts to another cell another operation and so on and so forth*.
>
> It gives us a few advantages. One, we can optimize that whole system using AIML, right? *We write the code for the robots, the off-the-shelf robots, we rewrite the code. We have designed the autonomous mobile robots. You can basically create a learning algorithm to optimize the microfactory over time.*

304.    Defendant Rugoboor's above statement was false and materially misleading when made and omitted material information necessary to make the statements not misleading because Arrival's AMRs were not working in a remotely consistent and reliable manner and Arrival

118

employees were manually performing much of the work that Arrival had intended the robots to perform.

## VII.    ALLEGATIONS OF LOSS CAUSATION

305.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

306.    Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions. This course of wrongful conduct caused the price of Arrival securities to be artificially inflated. But for Defendants' misrepresentations and/or omissions, Plaintiffs and the other members of the Class would not have purchased Arrival securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, the price of Arrival shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of Arrival securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e. damages, under the Exchange Act. The timing and magnitude of the decline in the prices of the Company's shares negates any inference that the economic losses and damages suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to defendants' wrongful conduct. The truth about the material misrepresentations and/or omissions was partially revealed to the public on or around November 8, 2021 and November 17-19, 2021.

307.    On November 8, 2021, after the close of trading, Arrival reported its third quarter 2021 results on a Form 6-K filed with the SEC.  In it, Arrival revised its 2022 outlook regarding microfactory rollout, revenue, and vehicle volumes, stating in relevant part:

Updates 2022 and Long-term Outlook:

119

Arrival previously provided long-term forecasts in connection with its merger with the CIIG special purpose acquisition company. Since then Arrival has invested more to further develop its platforms, and to secure components and batteries for production. As a result Arrival has revised its Microfactory rollout, and now expects *significantly lower vehicle volumes and revenue in 2022*. Future growth is dependent on the number of Microfactories the Company can deploy, which is a function of its access to capital. *As a result Arrival's previous long-term forecasts from the merger should no longer be relied upon*.

Bus and Van production volumes in 2022 are expected to be modest because 2022 is the first year the Company is starting production and it is now expecting a more conservative ramp in each of its first three Microfactories.

*Arrival expects to start each Microfactory on one shift and does not expect them to reach full capacity until early 2023.* Furthermore due to capital constraints Arrival has moved its fourth Microfactory to 2023. Revenue is expected to start to be recognized in the second half of 2022 and will be weighted towards the fourth quarter. These expectations are dependent upon the successful completion of certification of Arrival's vehicles.

Arrival continues to expect Van Microfactories to produce 10,000 vehicles per year when they reach full capacity on two shifts and the Company's future volume mix to be even more weighted toward Van as it continues to see strong interest in this platform.

308.    Furthermore, Arrival disclosed that it is incurring several categories of additional costs, stating:

Other Company Costs

- In order to de-risk start of production and enable Arrival to scale, the Company is incurring additional costs, including: 1) a decision to assemble battery modules and bring logistics in-house, *which is adding Capex and Opex*; 2) pre-payments to LG Energy Systems to secure battery cell line capacity for the next several years; and 3) higher Selling, General and Administrative expenses as Arrival scales sales, finance and legal.

- In addition, Arrival is experiencing industry-wide increases in the expected cost of raw materials including aluminum and petrochemicals

- *Arrival also expects higher working capital <u>in its first factories</u> to ensure the Company has the necessary components and parts to start production of its vehicles*

120

309.    During the Earnings Call following the release of the third quarter results, Arrival's Chief Financial Officer, John Wozniak relayed the dramatic departure from previous plans, stating in relevant part:

> We are also experiencing price increases in certain raw materials, including aluminum and petrochemicals. Because we are investing more in our platforms, we have revised our microfactory investments for next year. We now plan three Microfactories in 2022, Rockhill, Bicester and Charlotte and have moved our fourth microfactory to 2023. We continue to expect van Microfactories to produce 10,000 vehicles per year at full capacity on two shifts. ***Though, we are expecting a more conservative production ramp next year, as we start each microfactory on one shift <u>and are not planning to reach full capacity until early in 2023.</u>***
>
> ***As a result, we expect both vehicle volumes and revenue to be modest next year.*** Revenue is expected to start in the second half of 2022 and be weighted towards the fourth quarter. ***As Denis mentioned, beyond 2022, revenue growth will be dependent on the number of Microfactories we can deploy, which is a function of the timing and availability of capital. The quantum in timing of which is uncertain at this time.*** Given this and the rapidly changing nature of our business, ***<u>we no longer believe prior long-term financial forecast should be relied upon.</u>***

310.    Defendants additionally disclosed that even the existing microfactories that had been partially developed would require substantial expenditures beyond those Defendants previously represented to investors. Defendant Ableson disclosed that "Capex for Bicester [was]…expected to be approximately $75 million. This represented an increase of 50% above the $50 million Defendants represented in the Registration Statement. Further, CFO Wozniak disclosed that Defendants expected "long-term production and assembly OpEx of approximately $15 million per microfactory," compared to the $12 million OpEx per microfactory Defendants represented in the Registration Statement.

311.    On this news, the price of Arrival common stock dropped from a closing price of $17.79 per share on November 8, 2021 to close at $12.88 per share on November 9, 2021, representing a 27.6% decline.

121

312.    Approximately one week later, Arrival announced: (i) a $200 million offering of green convertible senior notes due 2026, intended to finance the development of green vehicles and (ii) a "Follow-on-Offering" of 25 million Arrival ordinary shares. Between the convertible notes offering and the Follow-on-Offering Defendants disclosed Arrival sought the raise as much as $618.7 million in financings.

313.    On November 18, 2021, after the close of trading, Arrival announced that it "upsized" its convertible notes offering to $275 million, with an option to purchase an additional $45 million.  Arrival also announced that it had "upsized" its Follow-on-Offering from the previously announced 25 million Arrival shares to 32.37 million ordinary shares at a public offering price of $9.50 per share.

314.    In total, between the upsized convertible notes offering and the upsized Follow-On-Offering, Arrival sought to raise as much as $673,682,492 in financing.  These offerings revealed to investors that Arrival was burning cash at a much higher rate than it disclosed, and was in dire need for additional capital to fund its operations.  On this news, the price of Arrival shares dropped 20%, declining from a closing price of $13.25 per share on November 16, 2021 to $10.50 per share on November 19, 2021.

315.    As of the close of trading on September 9, 2022, the last trading day before this Complaint was filed, Arrival Ordinary Shares traded at a price of $1.09 per share, an over 95% decline from the market price at the time the Registration Statement became effective, and an over 96% decline from the $28.52 per share maximum offering price per unit set forth in the Registration Statement.

## VIII.  ADDITIONAL ALLEGATIONS OF THE EXCHANGE ACT DEFENDANTS' SCIENTER

122

316.    In addition to the facts discussed above, the following facts further support a strong inference that, throughout the Class Period, the Exchange Act Defendants knowingly or with deliberate recklessness made false or misleading statements and omitted material information as alleged herein.

**A.  The Exchange Act Defendants' Fraud Concerned a Core Arrival Operation**

317.    Arrival's microfactory method of producing electric vehicles was Arrival's core and only operation, as was each of the aspects of production described herein. For example, Arrival's self-described "game-changing proprietary microfactories," depended on the use of its software and AI, which would in turn drive its robotic assembly process. The importance of Arrival's technology cell approach and use of AMRs in driving its business model and enabling profitability cannot be overstated. As Arrival stated in the Registration Statement, its "industry-changing approach to manufacturing with its proprietary microfactory concept" was premised on technology cells; "linking the technology cells are autonomous mobile robots ('AMRs') which are controlled by software designed and developed in-house by Arrival…Arrival will rely on complex robotic assembly and component manufacturing for its production." Arrival also attributed its cost savings to its proprietary composite materials which would eliminate the need for paint and metal stamping.

318.    Arrival's projected profits of $1 billion in 2022 and CapEx and OpEx per microfactory of $50 million and $12 million respectively, as well as its ability to set up a microfactory within only six months compared to the three years required for traditional OEMs was premised on it's the ability to manufacture EVs using robotic assembly and software-driven AMRs, to use existing warehouses to set up microfactories, and to eliminate the need to use metal and paint and instead use composite material to produce electric vehicles.

123

**B.    The Exchange Act Defendants Were Motivated to Mislead Investors to Profit on Sales of their Arrival Shares at Artificially Inflated Prices**

319.    The Exchange Act Defendants held Arrival shares worth billions of dollars after Arrival's Registration Statement became effective. The date the Registration Statement became effective Arrival's shares closed at $22.93, making the Executive Defendants' holdings in Arrival worth the following amounts: P. Cuneo: $133,495,593.80 (5,821,875 shares); Kinetik S.à.r.l, owned by Defendant Sverdlov: $10,622,911,388 (463,275,682 shares); Defendant Sverdlov (individually): $18,771,392.27 (818,639 shares); Defendant Rugoobur: $11,262,849.12 (491,184 shares); Defendant Ableson: $5,631,447.49 (245,593 shares); Defendant Holbrow: $2,252,574.41 (98,237 shares).

320.    The Exchange Act Defendants registered their shares for resale in connection with Arrival's June 17, 2021 Prospectus. The Exchange Act Defendants were motivated to mislead investors and to complete the IPO so that they could resell their Arrival shares at prices artificially inflated by Defendants' false and materially misleading statements and omissions alleged herein.

321.    Pursuant to the Lock-Up Agreement, the lock up on the sale of Arrival shares by insiders could be removed before one year after the IPO, if Arrival's share price exceeded $12.00/share for twenty trading days in any consecutive 30-day period, in which case the lock-up would be removed 150 days after the date of the IPO (August 24, 2021). Each of the Exchange Act Defendants was therefore motivated to inflate Arrival's share price to allow them to sell their shares and realize millions in profits. Arrival's share price did exceed $12.00 per share for twenty consecutive days immediately following the IPO and the lock-up therefore expired on August 21, 2021. Defendants were therefore motivated inflate Arrival's share price to effectuate the Business Combination and maintain Arrival's share price above $12.00 per share following the IPO so that they could sell their shares to the public market.

124

322.    In addition, as to CIIG, CIIG Management and Kinetik, the Lock-Up Agreement states that the "Lock-Up Period only applies to such Ordinary Shares which were previously the 6,468,750 shares of Class B common stock of CIIG, and does not apply to (i) any Ordinary Shares underlying any of the 7,175,000 private placement warrants issued to the Founder[7] and Class B Holders, (ii) any Ordinary Shares that were previously shares of Class A common stock of CIIG, (iii) any Ordinary shares underlying the public warrants of CIIG, (iv) any Ordinary Shares acquired through a PIPE transaction or (v) any Ordinary Shares acquired in the open market." The Lock-Up Agreement additionally states that "the New Holders Lock-up Period and Kinetik Lock-Up Period shall not apply to (i) any Ordinary Shares that were previously shares of Class A common stock of CIIG, (ii) any Ordinary shares underlying the warrants of CIIG or Holdco, or (iii) any Ordinary Shares acquired in the open market."  Accordingly, certain of CIIG, CIIG Management's and Kinetik's shares were not subject to lock-up at all.

323.    Indeed, Defendant Kinetik sold over 2 million Arrival shares between October 31, 2021 and December 31, 2021. After the Business Combination Kinetik held 463,275,682 shares. According to Arrival's Form 20-F for the fiscal year ended December 31, 2021 Kinetik held 461,275,382 Arrival shares, indicating that Kinetik sold 2,000,300 Arrival shares. Accordingly, given Arrival's share prices between October 31, 2021 and December 31, 2021 Kinetik made a profit of between $35,985,397 and $13,742,061 selling Arrival shares, which are now worth just a little over a dollar, at artificially inflated prices.

324.    Defendant P. Cuneo sold 1,193,334 Arrival shares between the date the lock-up on his shares expired and October 31, 2021. According to Arrival's June 17, 2021 Prospectus filed with the SEC, as of May 31, 2021 P. Cuneo held 1,874,680 Arrival shares.  According to Arrival's

---

[7] Defined in the lock-up agreement at CIIG and CIIG Management.

November 17, 2021 Prospectus filed with the SEC, as of October 31, 2021 P. Cuneo held 681,346 Arrival shares, indicating that P. Cuneo sold 1,193,334 shares. Given Arrival's share prices between August 24, 2021 when the lock-up expired and October 31, 2021 P. Cuneo made a profit of between $12,458,406.96 and $19,892,877.78 selling Arrival shares, which are now worth just a little over a dollar, at artificially inflated prices.

**B. Information from CWs Supports a Strong Inference of the Exchange Act Defendants' Scienter**

325.    Statements from former Arrival employees demonstrate that the highest levels at the Company knew that Arrival's production timelines and financial profile were unattainable, that Arrival's AMR's did not function, that Arrival could not use existing warehouses to support microfactories, that Arrival did not have the necessary production tools and could not obtain them in time for Arrival's promised start of production, and that Arrival's composite material might not be suitable for vehicle production.

326.    As set forth above, information from several CWs demonstrates, among other things, that:

a.    Arrival's AMRs did not work reliably and consistently, and that employees performed much of the production work manually;

b.    Arrival's simulation model showed that at most Arrival could produce 4,500 vans per year;

c.    Arrival lacked necessary production tools, including molds needed to being production which had a lead time of 2 years;

d.    Arrival had not installed any technology cells in its microfactory;

126

e.    Existing warehouses were ill-suited for Arrival's microfactory method of production and that getting warehouses outfitted would require substantial additional expenditures which Arrival had not built into its financial model.

**C.  The Exchange Act Defendants' Scienter is Imputed to Arrival**

327.    By virtue of their high-level positions as the most senior officers of the Company, participation in and awareness of Arrival's day-to-day operations, and control over the issuance of the false or misleading statements alleged above in Section VI, the knowledge or deliberate recklessness of the Exchange Act Defendants concerning their materially false or misleading statements and omissions is imputed to Arrival. In addition, the knowledge or deliberate recklessness of other senior employees and managers is also imputed to Arrival. Accordingly, by the date of Arrival's IPO, Arrival's knew about or deliberately recklessly disregarded the information alleged in V, above.

**IX.    PRESUMPTION OF RELIANCE**

328.    At all relevant times, the market for Arrival's common stock was an efficient market for the following reasons, among others:

- Arrival's common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

- As a regulated issuer, Arrival filed periodic public reports with the SEC and the Nasdaq;

- Arrival regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-

127

ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Arrival was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

329. As a result of the foregoing, the market for Arrival's common stock promptly digested current information regarding Arrival from all publicly available sources and reflected such information in the price of Arrival's common stock. Under these circumstances, all purchasers and acquirers of Arrival's common stock during the Class Period suffered similar injury through their purchase or acquisition of Arrival's common stock at artificially inflated prices and the presumption of reliance applies.

330. Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon the Exchange Act Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased or otherwise acquired Arrival common stock at artificially inflated prices if the Exchange Act Defendants had disclosed all material information as required. Thus, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972).

**X.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE**

331.   The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and materially misleading statements alleged herein.

332.   None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

333.   To the extent that any of the false and materially misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

334.   To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Exchange Act Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Rivian who actually knew that such statement was false when made.

335.   Moreover, to the extent that any Exchange Act Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

**XI.     CAUSES OF ACTION UNDER THE EXCHANGE ACT**

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Arrival, CIIG, the Executive Defendants and P. Cuneo**

Deleted: and

336.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

337.    This Count is asserted against Arrival, CIIG, the Executive Defendants and P. Cuneo (the "Section 10(b) Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

**Deleted:** and

338.    During the Class Period, the Section 10(b) Defendants, individually and in concert, at relevant times, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

339.    The Section 10(b) Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they, at relevant times: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

340.    The Section 10(b) Defendants acted with scienter at relevant times in that they knew that the public documents and statements issued or disseminated in the name of the Company were false and materially misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts

130

of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

341.    The Section 10(b) Defendants who were senior officers and directors of Arrival at relevant times, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

342.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Section 10(b) Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

343.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Section 10(b) Defendants' misleading statements and by the material adverse information which the Section 10(b) Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

344.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

131

345.    By reason of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act Against the Executive Defendants, Kinetik, CIIG Management and P. Cuneo**

346.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

347.    The Defendants named herein (the "Section 20(a) Defendants") participated in the operation and management of Arrival and CIIG, and conducted and participated, directly and indirectly, in the conduct of Arrival and CIIG's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

348.    As officers and directors of a publicly owned company, the Section 20(a) Defendants had a duty to disseminate accurate and truthful information with respect to Arrival's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

349.    Because of their positions of control and authority as senior officers and directors, the Section 20(a) Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Arrival disseminated in the marketplace during the Class Period. Throughout the Class Period, at relevant times, the Section 20(a) Defendants exercised their power and authority to cause Arrival and CIIG to engage in the wrongful acts complained of herein. The Section 20(a) Defendants therefore, were controlling persons of Arrival within the

132

meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Arrival's securities.

350.    The Section 20(a) Defendants, therefore, acted as controlling persons of Arrival. By reason of their senior management positions and positions as directors of Arrival, the Section 20(a) Defendants had the power to direct the actions of, and exercised the same to cause, Arrival to engage in the unlawful acts and conduct complained of herein. The Section 20(a) Defendants exercised control over the general operations of Arrival and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

351.    By reason of the above conduct, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Arrival.

**COUNT III**

**Violation of Section 14(a) of the Exchange Act and Rule 14a-9
Against Arrival, the Executive Defendants, the Director
Defendants, CIIG, CIIG Management, and the Individual
CIIG Management Defendants**

352.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

353.    The claims set forth herein do not sound in fraud and are based on negligent conduct by the Defendants named herein (the "Section 14 Defendants").

354.    The Defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that through Defendants' negligence contained statements which, at the time and in the light of the circumstances under which they were made, were false

133

and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

355.    Plaintiffs and other members of the Class were misled by the Section 14 Defendants' false and misleading statements and omissions, were denied the opportunity to make an informed decision in voting on the Business Combination, and approved the Business Combination without having been advised of material facts. Accordingly, Plaintiffs and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, suffered damages when the Company's stock price decreased, and were prevented from benefitting from a value-maximizing transaction.

### SECURITIES ACT CLAIMS

356.    The claims alleged in this Section are based on principles of negligence and strict liability. Only the allegations in paragraphs 68 through 215 above are realleged in this Section pertaining to the Securities Act claims and only such paragraphs apply to the Securities Act Claims.

357.    None of the preceding allegations in the Complaint in paragraphs 216 through 355 that are set forth in the Class's claims under Sections 10(b), 20(a) and 14(a) of the Securities Exchange Act of 1934 apply to these Securities Act claims.

### XII.    SECURITIES ACT DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT

358.    In this part of the Complaint, Plaintiffs assert a series of strict-liability and negligence claims under Sections 11, 15 and 12(a)(2) of the Securities Act on behalf of all persons or entities who purchased or otherwise acquired Arrival common stock in or traceable to the Business Combination/IPO and pursuant to the Registration Statement.

359.    Each of the Defendants is statutorily liable under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement (including the

**Deleted:** 67

**Deleted:** 214

**Deleted:** 215

**Deleted:** 354

accompanying prospectus). Plaintiffs also assert claims against Arrival, CIIG, P. Cuneo and the Executive Defendants as statutory sellers under the Securities Act. Additionally, Plaintiffs assert control person liability under Section 15 of the Securities Act against the Executive Defendants, the Director Defendants, Kinetik, CIIG Management and P. Cuneo.

**Deleted:** and the additional

**Deleted:** Defendants.

360.    The Securities Act claims are based on the fact that the Registration Statement, Prospectus and IPO Materials contained untrue statements of material fact and omitted material facts about the Company's business and operations, including misrepresentations and omissions regarding, among other things, 1) Arrival's financial profile and the revenues and costs associated with Arrival's microfactory model; 2) Arrival's production timelines; 3) the status of Arrival's microfactories; 4) the ability of Arrival's microfactories to scale rapidly; and 5) Arrival's technology.

361.    Indeed, at the time of the Business Combination/IPO based on Arrival's microfactory production method, an Arrival microfactory would require a materially higher amount of CapEx to set up because of foundation and electrical work and would take longer than six months to set up, Arrival's simulation model showed that a microfactory could not produce the volume of vehicles set forth in the Registration Statement, Arrival's AMR and robotic technology was not working properly and vehicle assembly to date had been performed manually, and Arrival had not yet ordered essential production equipment and therefore could not start production on the timeline Arrival represented in the Registration Statement.

362.    As described below, the Securities Act claims against the Securities Act Defendants are premised upon the undisclosed facts set forth above, and others, which, rendered materially untrue and incomplete the statements contained in the Registration Statement.

363.    The Securities Act claims against the Executive, Underwriter, Director Defendants and P. Cuneo are also premised upon their negligent failure to conduct a reasonable due- diligence investigation into the accuracy and completeness of the representations contained in the Registration Statement. Had the Executive, Underwriter, Director Defendants and P. Cuneo not acted negligently, and had they conducted reasonable due-diligence investigations before the Business Combination/IPO, they would have uncovered that the Registration Statement contained untrue statements of fact and omitted material facts.

364.    Plaintiffs' Securities Act claims are not based on any knowing or deliberately reckless misconduct on the part of the Defendants. Thus, for purposes of Counts IV-VI below, Plaintiffs' claims do not sound in fraud, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these nonfraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.

### A.  Summary of Allegations Pertaining to the Business Combination/IPO

365.    On November 18, 2020 Arrival and CIIG announced the Business Combination that would result in Arrival's IPO and hosted an investor conference call announcing the proposed Business Combination.  The 8-K also contained Arrival's "Investor Presentation" (which Arrival filed pursuant to Rule 425 and incorporated by reference into the Registration Statement) (the "Prospectus").  The foregoing contained representations touting Arrival's "proprietary hardware, software and robotics technologies and low cost microfactories," stated that "Arrival's transformative microfactories can be deployed anywhere in the world within six months using existing warehouses, represented that "vehicle production is right around the corner." The foregoing also provided investors with specific information about the production capacity and costs for each microfactory and Arrival's production and financial model. (*See* ¶¶97-¶¶106).

136

**Deleted:** and CIIG Individual

**Deleted:** and CIIG Individual

**Deleted:** 96-¶¶105

366.    On December 15, 2020 Arrival filed a preliminary Registration Statement on SEC Form F-4, which Arrival amended on January 21, February 16, and February 25, 2021. The Registration Statement incorporated the December 14, 2020 Preliminary Proxy Statement for Special Meeting of CIIG Merger Corp. and Prospectus for Ordinary Shares and Warrants of Arrival Group Subject to Completion, signed by Defendant P. Cuneo ("Proxy Statement"). Arrival also published an updated analyst presentation which was filed with the SEC pursuant to Rule 425 and used in analyst and investor meetings to solicit investments in Arrival. The presentation included detailed information concerning Arrival's production timelines and highlighted that Arrival was "ready for mass production." The Registration Statement contained detailed information concerning the start of production, described in detail Arrival's microfactory model, and explained how Arrival's "proprietary in-house software architecture enables the functionality of the robots and AMRs," among other things (*See* ¶¶107-¶¶114).

**Deleted:** 106-¶¶113

367.    On March 1, 2021 Arrival announced that the SEC declared the Registration Statement effective, and on March 12, 2021 Cowen hosted an IPO presentation wherein the Executive Defendants confirmed that based on "digital simulations" of the factory Arrival could deliver vehicle production in accordance with its business plan and assured investors that nothing stood int the way of Arrival's ability to produce vehicles consistent with its IPO timeline and production numbers. (*See* ¶¶115-¶¶120).

**Deleted:** 114-¶¶119

368.    On March 20, 2021 CIIG shareholders approved the Business Combination. On March 25, 2021 shares of Arrival began trading on the Nasdaq.  The same day, Defendant Ableson provided a statement to Reuters telling investors "[w]hat you'll start to see now is the footprint start to expand pretty dramatically."  Echoing this, Defendant Rugoobur stated "[w]hat we're going to see is basically a microfactory in every major city in the world…You'll see the rollout expand

pretty rapidly." Analysts heeded Defendants representations, expressing confidence in Arrival. (*See* ¶¶121-¶¶123).

**Deleted:** 120-¶¶122

369.   Unbeknownst to investors, Arrival's AMR's were non-functional and its technology cells were non-operational.  In truth, according to former Arrival employees, Arrival was nowhere near ready to commercially produce vehicles at any point during the Class Period because its AMRs were not functional, it had not installed any technology cells in its first microfactory, and it was "still figuring out" its own technology. For example, CW1 explained that Arrival's AMR's were "just not working" in a remotely consistent or reliable manner and that Arrival actually needed triple the number of robots for each microfactory than it initially planned. Further, Arrival's robots were constantly undergoing design changes and were never production ready.  CW2 explained that contrary to Arrival's vision that its technology would enable Arrival to assemble vehicles on an automated basis, when CW2 toured the Bicester microfactory CW2 witnessed employees doing much of the vehicle prototype assembly by hand. In addition, Arrival had not installed any technology cells during the Class Period. CW4 confirmed that the robots in Bicester could not "communicate" with each other as Arrival intended them to, as was necessary for the robots to perform production tasks. CW3 stated that because the robots were not functioning as Arrival envisioned and because humans were building the Arrival prototypes, Arrival was unable to validate the prototypes. CW3 further stated that Arrival tried to hide the fact that robots were not assembling vehicles from investors and others who toured Arrival's Banbury facility. (*See* ¶¶124-¶¶143).

**Deleted:** 123-¶¶142

370.   Additionally, Arrival's microfactory model was based on the false premise that a standard warehouse can support a microfactory.  CW4 stated that traditional warehouses (including the Rock Hill, South Carolina and Charlotte, North Carolina warehouses) do not have the proper

structural foundations or high-voltage electrical equipment required to build Arrival's vehicles and that costly additional work must be performed which Arrival did not factor into its CapEx. (*See* ¶¶144-¶¶148).

371.    Further, Arrival's production timelines and capacity were not based in reality and were a "joke."  While Arrival represented to investors that a microfactory could produce 10,000 vans per year, Arrival's simulation model demonstrated that a microfactory was capable of producing only 4,500 vans per year (*See* ¶¶149-¶¶151). And while Arrival represented to investors that it would start production in the Rock Hill bus factory in 2021, Arrival did not even begin the foundation work in Rock Hill necessary to fortify the floors for installation of production equipment until September or October of 2021. CW4 stated that because a number of other equipment installations would be necessary before starting production (including installing base plates and high-voltage electrical equipment which required high voltage switch gear that Arrival did not even order and would take 30-40 weeks to arrive) there was no conceivable way the Rock Hill microfactory could be ready for the start of production in the fourth quarter of 2021, as Arrival told investors. In addition to the electrical equipment, CW4 stated that Arrival still had not ordered key production equipment, much of which had long lead times, by August 2022. (*See* ¶¶152-¶¶158).

372.    In addition, the composite materials that Arrival touted were in truth ill-suited to produce Arrival's vehicles.  the molds Arrival had been using were made of carbon fiber but they didn't work properly and that Arrival determined that it should procure new molds made of metal instead.  The lead times to order the molds was two years.  CW4 stated that because of this two-year lead time just to obtain molds- "essential" production equipment- CW4 regarded Arrival's production guidance as a "joke." (*See* ¶¶159-¶¶161).

139

**Deleted:** 143-¶¶147

**Deleted:** 148-¶¶150

**Deleted:** 151-¶¶157

**Deleted:** 158-¶¶160

373. And, at no point during the Class Period did Arrival procure the production tools necessary to produce its vehicles. CW5 stated that Arrival's purchase of production tools was staggered, but that even by the time CW5 left Arrival in August 2022 Arrival had still not ordered production tools which had lead times of 25-30 weeks and which were essential to Arrival beginning production of the van, bus, or any other of its vehicles. (*See* ¶¶161-¶¶168).

**Deleted:** 160-¶¶167

374. Following Arrival's IPO, Arrival continued to confirm and reiterate the representations contained in the Registration Statement and IPO materials. (*See* ¶¶169-¶¶193).

**Deleted:** 168-¶¶192

375. On November 8, 2021, after the close of trading, Arrival reported its third quarter 2021 results on a Form 6-K filed with the SEC. In it, Arrival revised its 2022 outlook regarding microfactory rollout, revenue, and vehicle volumes, stating in relevant part:

Updates 2022 and Long-term Outlook:

Arrival previously provided long-term forecasts in connection with its merger with the CIIG special purpose acquisition company. Since then Arrival has invested more to further develop its platforms, and to secure components and batteries for production. As a result Arrival has revised its Microfactory rollout, and now expects *significantly lower vehicle volumes and revenue in 2022*. Future growth is dependent on the number of Microfactories the Company can deploy, which is a function of its access to capital. *As a result Arrival's previous long-term forecasts from the merger should no longer be relied upon*.

Bus and Van production volumes in 2022 are expected to be modest because 2022 is the first year the Company is starting production and it is now expecting a more conservative ramp in each of its first three Microfactories.

*Arrival expects to start each Microfactory on one shift and does not expect them to reach full capacity until early 2023.* Furthermore due to capital constraints Arrival has moved its fourth Microfactory to 2023. Revenue is expected to start to be recognized in the second half of 2022 and will be weighted towards the fourth quarter. These expectations are dependent upon the successful completion of certification of Arrival's vehicles.

Arrival continues to expect Van Microfactories to produce 10,000 vehicles per year when they reach full capacity on two shifts and the Company's future volume mix to be even more weighted toward Van as it continues to see strong interest in this platform.

140

376.    Furthermore, Arrival disclosed that it is incurring several categories of additional costs, stating:

Other Company Costs

- In order to de-risk start of production and enable Arrival to scale, the Company is incurring additional costs, including: 1) a decision to assemble battery modules and bring logistics in-house, ***which is adding Capex and Opex***; 2) pre-payments to LG Energy Systems to secure battery cell line capacity for the next several years; and 3) higher Selling, General and Administrative expenses as Arrival scales sales, finance and legal.

- In addition, Arrival is experiencing industry-wide increases in the expected cost of raw materials including aluminum and petrochemicals

- ***Arrival also expects higher working capital <u>in its first factories</u> to ensure the Company has the necessary components and parts to start production of its vehicles***

377.    During the Earnings Call following the release of the third quarter results, Arrival's Chief Financial Officer, John Wozniak relayed the dramatic departure from previous plans, stating in relevant part:

We are also experiencing price increases in certain raw materials, including aluminum and petrochemicals. Because we are investing more in our platforms, we have revised our microfactory investments for next year. We now plan three Microfactories in 2022, Rockhill, Bicester and Charlotte and have moved our fourth microfactory to 2023. We continue to expect van Microfactories to produce 10,000 vehicles per year at full capacity on two shifts. ***Though, we are expecting a more conservative production ramp next year, as we start each microfactory on one shift <u>and are not planning to reach full capacity until early in 2023.</u>***

***As a result, we expect both vehicle volumes and revenue to be modest next year***. Revenue is expected to start in the second half of 2022 and be weighted towards the fourth quarter. ***As Denis mentioned, beyond 2022, revenue growth will be dependent on the number of Microfactories we can deploy, which is a function of the timing and availability of capital. The quantum in timing of which is uncertain at this time***. Given this and the rapidly changing nature of our business, ***<u>we no longer believe prior long-term financial forecast should be relied upon.</u>***

378.    Defendants additionally disclosed that even the existing microfactories that had been partially developed would require substantial expenditures beyond those Defendants previously represented to investors. Defendant Ableson disclosed that "Capex for Bicester [was]…expected to be approximately $75 million.  This represented an increase of 50% above the $50 million Defendants represented in the Registration Statement. Further, CFO Wozniak disclosed that Defendants expected "long-term production and assembly OpEx of approximately $15 million per microfactory," compared to the $12 million OpEx per microfactory Defendants represented in the Registration Statement.

379.    On this news, the price of Arrival common stock dropped from a closing price of $17.79 per share on November 8, 2021 to close at $12.88 per share on November 9, 2021, representing a 27.6% decline.

380.    Approximately one week later, Arrival announced: (i) a $200 million offering of green convertible senior notes due 2026, intended to finance the development of green vehicles and (ii) a "Follow-on-Offering" of 25 million Arrival ordinary shares. Between the convertible notes offering and the Follow-on-Offering Defendants disclosed Arrival sought the raise as much as $618.7 million in financings.

381.    On November 18, 2021, after the close of trading, Arrival announced that it "upsized" its convertible notes offering to $275 million, with an option to purchase an additional $45 million. Arrival also announced that it had "upsized" its Follow-on-Offering from the previously announced 25 million Arrival shares to 32.37 million ordinary shares at a public offering price of $9.50 per share.

382.    In total, between the upsized convertible notes offering and the upsized Follow-On-Offering, Arrival sought to raise as much as $673,682,492 in financing. These offerings revealed

to investors that Arrival was burning cash at a much higher rate than it disclosed, and was in dire need for additional capital to fund its operations. On this news, the price of Arrival shares dropped 20%, declining from a closing price of $13.25 per share on November 16, 2021 to $10.50 per share on November 19, 2021.

383.    On July 12, 2022 Arrival announced that it would be undergoing a "reorganization" "in response to the challenging economic environment as it focuses on its next major milestone-starting production on the Arrival Van in Q3 2022." Arrival's plans include a "realignment" of the Company that would "enable it to deliver business priorities until late 2023 primarily utilizing the $500mm cash on hand." Arrival would reduce spending by 30% and lay off at least 30% of Arrival's employees.

384.    On August 4, 2022 the Financial Times issued an article citing three sources disclosing that Arrival would shelve its bus and car projects to focus solely on the Arrival van.

385.    Then, on August 11, 2022 Arrival reported its Second Quarter 2022 financial results. In its press release attached to Arrival's 6-K filed with the SEC Arrival announced "strategic decisions" that would allow it to start production in Bicester in the third quarter of 2022. Arrival further revised its 2022 financial outlook, disclosing that "we've made recent strategic decisions that will allow us to start production this quarter in Bicester (UK) deliver our first vehicles to UPS this year, and start production in Charlotte (US) in 2023 with an optimized factory." Arrival further revised its 2022 outlook, ***announcing it would be producing a total of only 20 vehicles for the year and have no revenue.***

386.    As of September 9, 2022, the last trading day before the date this Complaint was filed, Arrival shares closed at $1.09 per share, about 4% of their value compared to the $28.52 per share offering price per unit set forth in the Registration Statement.

143

**XIII.** **THE REGISTRATION STATEMENT AND IPO COMMUNICATIONS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT AND OMISSIONS IN VIOLATION OF SECTION 11 OF THE SECURITIES ACT**

**A.** **Statements Leading up to the Business Combination/IPO**

387.    On November 18, 2020 Arrival and CIIG announced the Business Combination that would result in Arrival's IPO. The press release represented that Arrival's "transformative microfactories" can be deployed anywhere in the world within six months and made clear that Arrival's business model was based on its "cell-based assembly method" which in turn relied on its "proprietary hardware, software and robotics technologies." The press release stated, in relevant part:

• *Arrival is producing EVs competitive in price with fossil fuel alternatives and substantially lower than comparable EVs*

• Arrival has developed a new method of designing and producing zero-emission vehicles using its *proprietary hardware, software and robotics technologies and low cost Microfactories*

• Arrival has signed contracts with total order value up to US $1.2 billion and *its first products are planned for production in Q4 2021*

\*\*\*

Company Highlights

Arrival is challenging the 100 year old automotive production process, *by producing its EVs in low CapEx, low footprint Microfactories*. Its operations *utilize Arrival's in-house proprietary technologies and advanced cell-based assembly method* to bring down the cost of EVs and accelerate mass adoption globally.

Arrival's initial focus is on the commercial vehicle market, which is undergoing a seismic shift towards electrification in line with global public policy. Arrival believes that it is well positioned to capitalize on this market opportunity with its technology driven approach to a traditionally underserved market. The result is its best-in-class products with an exceptional user experience that are priced competitively with fossil-fuel vehicles and have a substantially lower total cost of ownership ("TCO") than both fossil fuel and electric variants.

*Arrival's transformative Microfactories can be deployed anywhere in the world within six months, using existing warehouses* close to areas of demand. *These Microfactories are designed to produce any vehicle from Arrival's portfolio customized for the cities*

144

*and regions they serve. The vehicles are designed specifically for Microfactory assembly using Arrival's proprietary in-house developed components, software and sustainable composite materials.*
Arrival's vertical integration and new method of production break the rule of economies of scale and create *strong unit economics for the whole Arrival product portfolio, which Arrival expects will enable profitability for the business by 2023.*

Arrival's strategy to reach industry-transforming flexibility and scalability is based on the utilization of Microfactories, as opposed to giant, capital-intensive legacy factories. "With Arrival's products our clients are not forced to compromise between being green and being cost efficient. *Our focus on the whole EV ecosystem, new methods of design and production and our enabling technologies are the key to driving down the cost of EVs* and accelerating the transition to zero-emission transportation globally," said Denis Sverdlov, Founder and CEO of Arrival. "CIIG's leadership team has invaluable experience building businesses globally across a wide range of industries. We are excited to partner with them as we begin our journey to being a publicly-listed company and delivering our products to customers and cities around the world."

"Arrival's bold, game-changing approach to the production of electric vehicles made the company the clear winner in our search for a partner," said Peter Cuneo, Chairman and CEO of CIIG. "Operating in stealth mode for five years, Denis and his visionary team have rewritten the rules of the game for the auto industry. *Arrival's development of exceptional products using its pioneering technology and software alongside its groundbreaking new method of production can create an incredibly low TCO for customers which we believe stands them apart from everyone else in the electric vehicle industry.* We look excitedly to the future and to our partnership with Arrival's talented leadership team."

388.    The above statements in bold and italics were false and materially misleading when made and omitted to disclose material information necessary to make the statement not misleading. **First**, the statement that Arrival "is" producing electric vehicles was false because the only vehicles Arrival had produced were prototypes. **Second**, Arrival was not using an "advanced cell based assembly method" because it had not even installed a single technology cell in any microfactory. **Third**, Arrival's microfactories could not be "deployed anywhere in the world within six months using existing warehouses" because Arrival was aware that a traditional warehouse was not suited to be a microfactory because it did not have the structural integrity to support Arrival's production method, nor did it have the necessary electrical capacity. In truth, preparing a traditional factory for Arrival's production method would require millions of dollars

145

in additional expenditures to perform the foundation and electrical work, and would require obtaining permits to perform, which would mean that it would take far longer than six months to complete a microfactory.  **Fourth**, Arrival's "strong unit economics" and "profitability for the business by 2023" were based upon a series of false assumptions, *e.g.*, that Arrival could produce 10,000 vans per year when in fact its simulation model demonstrated it could produce at most 4,500; that CapEx would be $50 million per microfactory when it would be materially higher given that each microfactory would require triple the number of robots and additional CapEx for foundation and electrical work; and that Arrival could start production on time when in truth the molds it needed for production had two year lead times and Arrival had still not ordered them. **Fifth**, Arrival's "enabling technologies" and "in-house developed components, software and sustainable composite materials" did not allow a microfactory to produce "any vehicle from Arrival's portfolio" because Arrival's AMRs did not work reliably or consistently and did not communicate with each other as necessary to perform production tasks.  In truth, Arrival had not produced any vehicles using its AMRs and Arrival employees had performed the bulk of any production work manually.  As for Arrival's "composite materials" Arrival was not sure whether they would "work for production" because the molds Arrival was using to make vehicles with fabric (rather than metal and paint) made the vehicles look "horrible" and not fit for sale.

389.    Arrival and CIIG also hosted an investor conference call announcing the Business Combination.  The transcript of the call is annexed as an exhibit to CIIG's 8-K filed with the SEC announcing the Business Combination. On the call, Defendant P. Cuneo discussed the Business combination, touting Arrival's "technology-driven, purpose-built electric vehicle," representing that "*vehicle production is right around the corner*":

> Arrival has entered into a business combination agreement with CIIG Merger Corp., with the combined company continuing as a public, NASDAQ-listed

146

company with an implied enterprise value of approximately $5.4 billion at closing. The pro forma enterprise value of the combined company will represent a 0.4 multiple of Arrival's *2024 pro forma expected revenue of $14.1 billion*.

\*\*\*

Arrival has a unique history worth noting. The company was formed about five years ago when Denis Sverdlov saw an opportunity to revolutionise the auto industry. He assembled a team focused on this task and they reimagined what was possible. ***Looking at every single element of the vehicle development process, they were able to design a technology-driven, purpose-built electric vehicle from the ground up***…They were essentially operating in stealth mode. Their vision is now being realized as the curtain goes up to reveal a company unlike any other."

\*\*\*

…***Vehicle production is right around the corner, and is expected to commence in the second half of 2021***. ***They are one of the first to achieve price competitiveness and lower Total Cost of Ownership compared to fossil fuel vehicles.*** Their vertically integrated approach to technology strategically positions them with a moat of valuable intellectual property. ***Their Microfactories, their proprietary software, their hardware and their robotics platforms position them to achieve industry leading profitability and CapEx levels***.

390.    On the call Defendant Sverdlov addressed investors touting Arrival as a leader in the EV industry with the ability to offer "best in class products at the right price," and "***build vehicles <u>at any scale</u> and anywhere***:"

If you follow the pack you will end up with the same issues the industry has grappled with for the last few decades, compromised products that cannot keep up with the latest technology, prohibitive costs for manufacturing and low margins. ***Our way to resolve these problems is with a completely new method. As you will hear today, <u>we are well on our way to achieving this goal with unique mature technology</u>, best in class products at the right price, solid traction on sales, and a profitable business profile.*** This transaction will enable us to continue to scale the business and expand our global reach.

\*\*\*

Our Microfactory approach departs from the commonly accepted rule of scale in the automotive industry. ***We believe Arrival can build vehicles at any scale and anywhere and still achieve highly desirable unit economics***. We believe Arrival has been able to attract the best talent from a variety of industries. We've brought them together to create the technologies and systems that make this possible. ***Arrival has developed its own proprietary components, software and sustainable composite materials. We believe these enabling technologies coupled with our***

147

*pioneering Microfactory production strategy,* enable the assembly of vehicles with an elevated user experience at a price competitive to fossil-fuel vehicles. We expect these vehicles to provide a lower cost of ownership than both fossil fuel and electric equivalents. We have designed all our technologies to be built within these Microfactories, utilizing a broad and deep IP portfolio which is very difficult to copy. We believe Arrival is a world leader in the technology for designing and producing vehicles. *As Peter mentioned, Arrival has been in stealth mode for almost five years, during which time we have built a team of over 1,200 people and designed multiple vehicle platforms*. We've developed and patented a wide range of in-house technologies that enable cost competitive, highly customized, best-in-class commercial vehicles for customers and cities around the world. *We are deeply engaged with global leaders in the transportation industry, such that we have approximately $1.2 billion in orders.*

391.    The above statements were false and materially misleading when made and omitted to disclose material information necessary to make the statement not misleading. **First**, production was not "right around the corner" and was not "expected to commence in the second half of 2021" because Arrival would not even have the production molds necessary to begin production by the second half of 2021, Arrival had not installed a single technology cell in any microfactory, Arrival's AMRs did not work. **Second**, Arrival's "completely new method" of production, "enabling technologies" and "microfactory production strategy" did not enable the assembly of Arrival's vehicles because its AMRs did not work reliably and consistently and Arrival could not program the AMRs to communicate with each other as necessary to produce Arrival's vehicles. Instead, Arrival employees manually performed the bulk of any production work. For the same reasons, Arrival's technology was not "mature." **Third**, Arrival had no reasonable basis to state that it expected $14.1 billion in revenue in 2024 because Arrival based its expectation on counterfactual assumptions, *e.g.,* Arrival's ability to produce 10,000 vans per year when the simulation models showed it could produce less than half that, the ability of Arrival's AMRs to build vehicles, and unrealistic CapEx and OpEx that did not factor in costs to equip microfactories with appropriate foundation and electrical capabilities.  For the same reasons, the statement that

148

Arrival could "build vehicles at any scale and anywhere and still achieve highly desirable unit economics" was false.

392. In a video presentation Defendant Ableson told investors that "A microfactory is a much simpler process as compared to a legacy automotive manufacturing plant. A typical automotive assembly plant takes literally years to contract, we can do that whole thing in six months or less. So maybe it's one 6th the amount of time and maybe one 10th the capex of that."

393. Defendant Ableson's statement was false and materially misleading and omitted to disclose material information necessary to make the statement not misleading because it was based upon the counterfactual assumption that existing warehouses were suited to become microfactories. In truth, preparing a traditional factory for Arrival's production method would require millions of dollars in additional expenditures to perform the foundation and electrical work that would require obtaining permits to perform, which would mean that it would take far longer than six months to complete a microfactory.

394. On the call, Defendant Rugoobur spoke more specifically about the production capacity and costs for each microfactory:

> *Digging a bit deeper, we have sized the annual capacity of each Microfactory to 1,000 buses or 10,000 commercial vans*. Our model shows that ten of our Microfactories can produce the same number of annual units as a traditional OEM commercial vehicle factory -100 thousand vans in this case – but doing it in one-tenth of the space and at less than half the CapEx*. Put another way, one Microfactory costs $45 million to build and is expected to generate $100 million of margin annually. We expect to become cash flow positive with just three Microfactories, which equates to 30,000 vehicles. By the end of 2024, we plan to have 31 Microfactories located around the world* to serve expected demand. When combined with our rapid product *development we expect to build mobility solutions that serve local needs at any volumes while maintaining profitability and high margins.*

395. Defendant Rugoboor's above statement was false and materially misleading and omitted to disclose material information necessary to make the statement not misleading because

149

Arrival's simulation model demonstrated that at microfactory was capable of producting 4,500 vans per year. Additionally, Defendant Rugoboor's statements concerning microfactory CapEx and annual margin were false and misleading for the reasons set forth in ¶388 above.

| | Deleted: 387 |

396.    Defendant Holbrow then discussed Arrival's production and financial model, affirming that vehicle production would begin in 2021 and that Arrival would realize $1 billion in revenue in 2022:

> We expect that our Microfactory approach and the tremendous demand that we are seeing across our products will result in substantial revenue growth over the next 4 years. Anchored by our over $1 billion dollar UPS order and by substantial interest in our electric buses, *we expect to begin commercial vehicle production in 2021. We have modeled roughly $1 billion dollars worth of revenue in 2022, growing to $5.1 billion dollars in 2023 and to over $14 billion dollars in 2024.*
>
> Due to our low-cost design and manufacturing model, as Denis and Avinash indicated earlier, *we believe we can get to cash flow positive results with 3 Microfactories up and running*. This is primarily a result of our expected strong gross margins for each of our vehicles – 38 percent for our buses and 21– 34 percent for our vans, depending on size and configuration.
>
> *So, in 2022, we believe we will be EBITDA positive with 4 Microfactories established by year end. 2023 obviously sees a strong revenue ramp, and we expect that our high margin model will result in over $1 billion dollars in EBITDA. At the end of 2023, we expect to have 11 Microfactories in service. Finally, in 2024, we expect to scale meaningfully with 31 Microfactories in operation by year end.*

397.    Defendant Holbrow's statements were false and materially misleading when made because they were based on assumptions that were knowingly false and/or lacked a reasonable basis. **First**, Arrival's projected revenues and EBIDTA were based on the assumption that Arrival could produce 10,000 vans per year, when in fact the simulation model showed Arrival could produce less than half that volume, even assuming all of Arrival's technology worked perfectly. **Second**, Arrival could not produce the vehicle volumes supporting Arrival's revenue and EBITDA projections because by 2022 Arrival still would not even have the molds necessary to begin

150

production. **Third**, Arrival's AMRs did not work reliably and consistently, and without functioning AMRs Arrival could not produce vehicles according to its microfactory method and could not scale.

398.    The 8-K also contained Arrival's "Investor Presentation" as an exhibit which repeated the same false and misleading production and financial projections highlighted in the conference call and press release. In the presentation, Defendants reiterated Arrival's "Investment highlights," stating "Arrival is revolutionizing the electric vehicle industry."

-Four vehicle designs expected in market by 2023, *with start of production for first vehicle planned for Q4 2021*
-$1.2 Billion in orders

-Unit economics enable price competitiveness and lower total cost of ownership to fossil fuel equivalents

-Game changing Microfactories enable *flexible low capex production*

-Vertically integrated

-Arrival expects industry leading profitability enabled by proprietary hardware, software *and robotics platforms*

399.    The presentation also highlighted Arrival's product pipeline: "Electric bus: 2021; Electric van: 2022; Large electric van: 2022; small vehicle platform: 2023." The presentation further touted Arrival's "industry changing microfactory approach" as "flexible, scalable and local to customers," highlighting Arrival's "materially lower" operational expenditure and capital expenditure compared to traditional OEMs as well as its ability to deploy a microfactory "in areas of demand within six months of setup time." Further, Defendants' presentation highlighted the status of its microfactories as "*ready*" with the Bicester plant "fully *integrated*."

400.    The above statements were false and materially misleading when made and omitted to state materially facts necessary to make them not misleading. **First**, Arrival would not start

151

production in the fourth quarter of 2021 because it would not have the necessary production molds by then. **Second**, Arrival omitted to disclose that its "robotics platforms" were not functioning. **Third**, a microfactory could not be deployed "within six months" because existing warehouses were not suited to support Arrival's microfactory production method and would require more than six months to obtain permits to and perform foundation and electrical work to make a traditional factory suitable for use as a microfactory.

### B. Registration Statement

401.    On December 15, 2020 Arrival filed a preliminary Registration Statement on SEC Form F-4, which Arrival amended on January 21, February 16, and February 25, 2021. The Registration Statement incorporated the December 14, 2020 Proxy Statement. Arrival also published an updated analyst presentation which was filed with the SEC pursuant to Rule 425. The Registration Statement and presentation contained false and materially misleading statements and omissions of material fact concerning: 1) Arrival's financial profile and the revenues and costs associated with Arrival's microfactory model; 2) Arrival's production timelines; 3) the status of Arrival's microfactories; 4) the ability of Arrival's microfactories to scale rapidly; and 5) Arrival's technology.

### 1. The Prospective Financial and Production Information in Arrival's Registration Statement Was False and Materially Misleading and Based on Knowingly Incorrect Assumptions

402.    The Association of International Certified Professional Accountants ("AICPA") published guidance to assist management in the preparation of financial forecasts and projections. According to the AICPA Guide on Prospective Financial Information published on July 15, 2021 ("AICPA Guide"), assumptions are the essence of developing prospective financial information and are the single most important determinant of such information.

152

403.    The accuracy of the assumptions determines the accuracy of the prospective financial information. AICPA Guide 6.34.  The AICPA Guide states that assumptions should be reasonable and suitably supported, and that the level of support for assumptions should be persuasive.  *Id.* 6.36. Further, prospective financial information presents important statements of future financial results, and management with the highest level of authority is ultimately responsible for the prospective financial information.  *Id.* 6.49.

404.    Arrival's Registration Statement states as follows with respect to the assumptions underlying its prospective financial information:

***The Arrival prospective financial information was prepared using a number of assumptions, including the following assumptions <u>that Arrival's management believed to be material</u>***:

- ***projected revenue is based on a variety of operational assumptions, including, the <u>development and commercialization</u> of Arrival's vehicles, the <u>roll out of Arrival's microfactory manufacturing locations</u>, the <u>production capacity of Arrival's microfactories</u>,*** the selection of Arrival's products by customers in the commercial van and bus industry, growth in the various markets Arrival is targeting, average selling prices and resulting sales of vehicles;

- projected gross profit is driven by the mix of products produced and sold in combination with corresponding costs, including material and component costs, assembly costs, manufacturing costs, and costs related to product warranties. Many of these costs are forecasted to vary significantly as Arrival commences production in its microfactories;

- other key assumptions impacting profitability projections include costs of research and development in Arrival's vehicle programs, vehicle component programs, manufacturing programs, and associated software development costs, including the cost of headcount, prototype vehicles, tooling and other third- party engineering. Further assumptions are made with regard to Arrival's sales and general administration expenditures, including the costs related to its office locations, headcount and third-party service providers, but excluding costs associated with public company operations and compliance; and

- capital expenditure is based on a number of assumptions regarding the expenditure required to build Arrival's microfactories, including the cost of initial set up of factory facilities and the cost of manufacturing and assembly equipment.

***In making the foregoing assumptions, Arrival's management relied on a number of factors, including:***

153

- its experience in the automotive industry;

- its experience in the period since the inception of the company and current pricing estimates for prototype vehicles and vehicle components as well as the projected costs for first factory locations that are already in development;

- *its best estimates of the timing for the development and commercialization of its vehicles and overall vehicle development process;*

- its best estimates of current and future customers purchasing Arrival's vehicles; and

- third-party forecasts for industry growth.

405.    Arrival's Registration Statement contained the following summarized prospective financial information for Arrival for 2021-2024 and vehicle production forecast for Arrival for 2022-2024:

| (USD in millions) | 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|
| Revenue | — | — | 1,009 | 5,099 | 14,135 |
| Gross Profit | — | (1) | 223 | 1,363 | 3,762 |
| EBITDA (1) | (74) | (101) | 60 | 1,115 | 3,243 |
| Capital expenditure | (108) | (197) | (469) | (939) | (1,843) |
| (EUR in millions) | | | | | |
| Revenue | — | — | 851 | 4,298 | 11,915 |
| Gross Profit | — | (0) | 188 | 1,148 | 3,171 |
| EBITDA (1) | (62) | (85) | 51 | 940 | 2,73 |
| Capital expenditure | (91) | (166) | (395) | (792) | (1,554) |

(Forecast Year Ended December 31,)

(1) Earnings before interest, tax, depreciation and amortization.

| | 2022E | 2023E | 2024E |
|---|---|---|---|
| Van | 4,420 | 31,200 | 136,520 |
| Bus | 1,048 | 5,980 | 11,276 |
| Large van | 5,220 | 15,600 | 31,480 |
| Small vehicle platform | — | 15,600 | 78,720 |

(Forecast Year Ended December 31,)

154

406.    Additionally, the Registration Statement repeatedly emphasized that Arrival was positioned to succeed because Arrival's microfactory model meant "***Lower capital investment and greater profitability***" for Arrival compared to its competitors:

> Numerous factors contribute to Arrival' expectation that it will achieve lower capital investment requirements across its owned and controlled ecosystem while also positioning Arrival to achieve greater profitability relative to other OEMs. At comparable annual production volumes, ***the capital investment for Arrival's microfactories is estimated to be 50% less than a traditional OEM production facility***…

407.    The Registration Statement further stated that Arrival's microfactories required only $45-50 million of CapEx and $12 million of OpEx annually, per microfactory:

> ***The capital investment required for each microfactory is estimated to be approximately $45-$50 million while the annual operating expense per microfactory are estimated to be approximately $12 million***. When comparing to a traditional OEM assembly plant's volume of 10,000 vans/year Arrival estimate the cost structure aggregated across ten of its van microfactories would result in an approximate ***50% savings in capital investment and 50% savings in annual operating expenses compare to the cost structure of a traditional OEM facility.***
>
> ***Arrival believes each microfactory can achieve an annual gross margin of $100 million per year***…

408.    Arrival's gross profit guidance of $3.8 billion and EBITDA guidance of $3.2 billion for 2024 as set forth in the Table above are consistent with Arrival's assumption of establishing 31 microfactories by 2024 and $100 million "gross margin" per microfactory, with a CapEx per microfactory of $45-$50 million and an OpEx per microfactory of $12 million.

409.    Arrival lacked a reasonable basis to issue the prospective financial guidance set forth above, which was false and materially misleading when made because the assumptions Arrival used to generate this information were knowingly false. **First**, Arrival's projected profits for 2023 and 2024 were based on the assumption that Arrival could produce 10,000 vans per year, when in fact its simulation models showed Arrival could produce less than half that volume, even

155

assuming all of Arrival's technology worked perfectly. **Second**, Arrival could not possibly produce over 10,000 vehicles in 2022 because it would take Arrival two years just to receive the molds necessary to start production. **Third**, Arrival's AMRs did not work reliably and consistently, and without functioning AMRs Arrival could not produce the above vehicle volumes.

410.    Further Arrival's modeled CapEx and OpEx were false and misleading for the following additional reasons: 1) because traditional warehouses were not suitable for use as microfactories because they did not have the necessary structural foundation or electrical capacity, and performing the additional foundation and electric work in each warehouse materially increased the CapEx for any given microfactory; 2) each microfactory would require triple the number of robots Arrival initially contemplated, which would materially increase the CapEx for any given microfactory.  Accordingly, Arrival's financial model lacked a reasonable basis.

**2. The Statements in the Registration Statement Concerning Arrival's Production Timeline Were False and Materially Misleading**

411.    The Registration Statement included the "Development Timelines for Arrival's vehicles:

> Arrival has four vehicle programs under development: the Arrival Bus, Arrival Van, large van and small vehicle platform. Arrival expects to commence production of its Arrival Bus by the end of 2021 with sales expected to begin in early 2022. The Arrival Van is scheduled to start production and sales in the third quarter of 2022.

412.    The Registration Statement further touted "significant progress" at the Rock Hill, South Carolina facility as supporting Arrival's development timelines stating that the "Arrival plant in Rock Hill, South Carolina lease is complete and currently being set up for bus production in 2021.

413.    Additionally the Registration Statement represented that Arrival had "two microfactories currently being commissioned," i.e., (i) Arrival's Van Factory in Bicester, which

156

would "begin operations…in the first quarter of 2022, with the start of production in the third quarter of 2022," and (ii) Arrival's Bus Factory in Rock Hill, South Carolina which was "expected to begin operations…in the second quarter of 2021, with the start of production in the fourth quarter of 2021." The Registration Statement represented that Arrival "plans on establishing 31 microfactories by 2024" and included the vehicle production figures for its microfactories in 2022, 2023 and 2024, which showed that in 2022 alone Arrival would produce 10,688 vehicles:

| | Forecast Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022E | 2023E | 2024E |
| Van | 4,420 | 31,200 | 136,520 |
| Bus | 1,048 | 5,980 | 11,276 |
| Large van | 5,220 | 15,600 | 31,480 |
| Small vehicle platform | — | 15,600 | 78,720 |

414.    The Registration Statement also represented that "..[E]ach microfactory…will be able to manufacture 10,000 vans per year or 1,000 buses per year."

415.    The above statements were false and materially misleading when made and omitted material facts necessary to make the statements not misleading. **First**, Arrival had not made "significant progress" at the Rock Hill facility, and Rock Hill was not "currently being commissioned" because Arrival had not even begun the foundation work on the facility, a prerequisite to installing any production equipment, and did not order any electrical equipment which would take 30-40 weeks just to arrive. **Second**, Arrival was aware of the foregoing obstacles to production: 1) It would take two years to obtain the molds necessary for production, which Arrival had not yet ordered (and did not order even as of the end of the Class Period), therefore making it impossible for Arrival to start production in Rock Hill in the fourth quarter of 2021 or in Bicester in the third quarter of 2022 (both less than two years away from the date of the

157

Registration Statement) and; 2) Arrival's simulation model- which assumed that production went perfectly from a mechanical standpoint- demonstrated that Arrival could produce at most 4,500 vans per year in a given microfactory, contradicting the production numbers set forth above. Arrival's Additionally, Arrival omitted to disclose that its AMR's were not working consistently or reliably and were not communicating with each other as necessary for production.

> **3. The Statements in the Registration Statement Concerning the Status of Arrival's Microfactories and the Ability of Arrival's Microfactories to Scale Rapidly Were False and Misleading**

416.    The Registration Statement highlighted Arrival's ability to rapidly deploy and scale microfactories while doing so with low expenditures:

> *Scale*
> *A key attribute to the implementation of microfactories is Arrival's ability to scale globally. Arrival estimates its microfactories can be fully operational within six months of leasing an appropriate warehouse. Arrival believes there is an abundance of warehouses that are suitable to be microfactories. the low expected level of capital investment per microfactory also allows Arrival to deploy microfactories in numerous metropolitan communities with less capital than required for a traditional OEM facility*. Arrival believes the deployment of its microfactories into local communities will be well-accepted by governments and municipalities based on its ability to offer local jobs and to pay local taxes. Arrival believes that every city with over one million inhabitants has sufficient vehicle demand to support at least one microfactory. Globally, Arrival estimated that there are more than 500 cities with a population of more than one million.
>
> ***
>
> Each microfactory is designed to provide several competitive advantages for Arrival including lower capital investment and operating costs as well as efficient scalability. The size of each microfactory will be approximately 200,000 square feet and will be able to manufacture 10,000 vans per year or 1,000 buses per year assuming two shifts per day. Each microfactory will be staffed with approximately 250 employees. ***Each microfactory will take approximately six months to complete.*** This reduced timing compared to a traditional OEM manufacturing facility is enabled by the absence of metal stamping and there being no requirement for a paint shop. ***Arrival can therefore outfit existing warehouses and avoid lengthy permitting approvals generally associated with paint shops***.

158

417.    The above statements in bold and italics were false and materially misleading and omitted material facts necessary to make it not misleading.  **First**, Arrival was aware that a traditional warehouse was not "suitable to be [a] microfactor[y]" because it did not have the structural integrity to support Arrival's production method, nor did it have the necessary electrical capacity. In truth, preparing a traditional factory for Arrival's production method would require millions of dollars in additional expenditures to perform the foundation and electrical work that would require permits, which would mean that it would take far longer than six months to complete a microfactory. **Second**, Arrival could not scale its microfactories globally in a rapid manner because it had yet to install even one technology cell in even one microfactory, its AMR's could not function reliably and consistently as necessary to produce vehicles, and it had not determined whether it could even produce vehicles through use of its "cost-saving" composite materials because the molds it was using to make vehicles with fabric made the vehicles look "horrible" and not fit for sale.  In other words, because Arrival was far from being able to prove up its production method in even *one* microfactory, it had no basis to claim that it could scale microfactories rapidly. **Third**, Arrival would not be able to manufacture 10,000 vans per year because its simulation model showed the maximum production capacity per microfactory was only 4,500 vans per year.

### 4.  Statements in The Registration Statement Concerning Arrival's Technology and AMRs Were False and Materially Misleading

418.    Arrival's Registration Statement represented the following concerning its proprietary technology and AMRs and its in-house software that controlled the AMRs:

*Microfactories*

Arrival has developed an industry-changing approach to manufacturing with its proprietary microfactory concept. Microfactories change the way vehicles are produced in numerous ways. Instead of using the traditional linear assembly line that operates at one speed with stations in a specific order, Arrival has designed its microfactories using technology cells. The order in which a vehicle moves through

the technology cells is determined by microfactory software and the order the technology cells are used can be changed dynamically from one vehicle to the next. Furthermore, the technology cells can be reconfigured, enabling each microfactory to build multiple vehicle types.

*Each technology cell performs specific tasks relating to the production of an electric vehicle. Linking the technology cells are autonomous mobile robots ("AMRs"), which are controlled by software designed and developed in-house by Arrival. Parts delivery and vehicle movement between the technology cells is accomplished with these AMRs*

***

*Proprietary In-House Software Architecture*

*A core enabler to Arrival's competitive positioning is its proprietary in-house software architecture*. Arrival's software team consists of more than 500 software engineers. Its software engineer to mechanical engineer ratio is 1:1, which it believes compares favorably to an estimated traditional OEM ratio of approximately 1:100. Arrival believes its centralized software architecture has entered into the 5th generation of development, which it believes positions it as one of the leading software-centric electric vehicle manufacturers….

*Internal Tools.* As part of Arrival's proprietary in-house software architecture, it has developed software applications to improve its design and development capabilities both for its electric vehicles and for operations inside of its microfactories. This software allows Arrival to design and manufacture purpose-built electric vehicles that provide solutions to meet its customers' local needs and specific requirements. *Arrival's proprietary in-house software architecture also enables the functionality of the robots and the AMRs operating in its microfactories.*

The foregoing statements in bold and italics were false and materially misleading because Arrival omitted to disclose that it was unable to get its AMRs to work reliably or consistently and could not program the AMRs to communicate with each other as necessary to produce Arrival's vehicles, and that Arrival had not actually built any vehicles using its AMRs. In truth, Arrival had not assembled even one technology cell and Arrival employees manually performed the bulk of any production work.

**C. Additional Statements Prior to the Business Combination/IPO Closing**

160

419.   On March 1, 2021 Arrival issued a press release announcing the SEC declared the Registration Statement effective.  Arrival reiterated that it would begin "commercial Bus and Van models…production at the end of this year and beginning of 2022 respectively."

420.   On March 12, 2021 Cowen, Arrival's financial advisor in connection with the IPO hosted an investor presentation.  During the presentation Defendant Ableson explained that Arrival developed its microfactory model over the course of several years and had confirmed the capability of the microfactory's production output through digital simulation that Arrival conducted with the assistance of a top company experienced in factory automation. When an analyst asked about Arrival's "level of confidence" that the microfactories will "actually be able to produce 1,000 buses and 10,000 vans in each facility, Defendant Ableson confirmed that the microfactories could in fact deliver:

> ***Obviously, the Microfactory is not something we dreamed up here in the last couple of months. We've been working for several years on this concept***.  As we developed the layouts, we worked with a – one of the leading companies in factory automation in the traditional automotive industry. ***We've run a whole number of digital simulations of the factory, where we model the operations in each cell, the throughput of that cell to make sure that we can deliver, to your point, the capacity numbers that our business plan reflects.***

421.   Not only did Ableson represent that the microfactories would deliver the according to the timeline in the Registration Statement, he characterized Arrival's timeline as conservative given that Arrival had installed the production equipment and was running the machinery, "just to do that final check, but we're doing that well in advance of actually our start of production date." Ableson further reassured investors, "we're in a very good position as far as the development of the microfactory process and how it's going."

422.   Defendant Ableson's statements were false and materially misleading when made and omitted material information necessary to make them not misleading because: 1) Arrival's

161

"digital simulation" showed that Arrival could produce, *at most,* 4,500 vans per year in any given facility; and 2) Arrival had not installed a single technology cell in any microfactory and its AMRs were not functioning consistently or reliably.

423.    Defendant Sverdlov similarly represented that "we're very confident that the factory will work exactly the way we planned" given that Arrival had validated its microfactory model:

> The vehicles must be designed for Microfactories, and that's a very important element, because ***we're doing this design of our vehicles already for a long time. So, it was adopted in the way that it should be like, and that it can be assembled by Microfactories***. ***We have a software which actually runs the simulation***. So, every time we design the parts, before we say that this part is ready, we do like a simulation to be sure that Microfactory can assemble that.
>
> So, we have a digital theme of our Microfactories, so where we test before we release the parts [to show] that the factory actually can do the operation. And this is fundamental difference, because the normal cycle is that products first are like designed and then the process engineers start to work with them to adopt like a factory for the product. We do an opposite thing. ***We adopt product for the factory, and that's why we're very confident that the factory will work exactly the way we planned.***

424.    Defendant Rugoboor, responding to an analyst's question about concerns related to the "margin side of production or any "pinch points or concerns about throughput," highlighted the purported simplicity of Arrival's manufacturing process and its extensive development history to reassure investors that nothing stood in the way of Arrival's ability to produce vehicles consistent with its IPO timeline and production numbers:

> It takes a ton of engineering and innovation to simplify the product. And I think this is the critical point. If you go – do a teardown of an Arrival vehicle, it will look extremely simple and to get to that point takes a ton of engineering and the company's been at for the last six years….. [***W]e already have for example the composites running, the composites pilot line going, right***. So the components we've been using for the last two years with folks on the road. Not to say production is not – not tough, it's tough, production is tough. But the complexity of an Arrival vehicle compared to, I would say any other vehicle out there as far as we know, you know it's an order of magnitude more simple and less complex.

162

425. Defendant Sverdlov confirmed, "***we don't see any roadblocks which stops us from doing this [achieving Arrival's reported margins]. We don't have any nasty surprises let's say on this journey***."

426. Defendant Sverdlov's and Rugoboor's above statements were false and materially misleading when made an omitted material information necessary to make them not misleading because: 1) Arrival's digital simulation did not support its throughput of 10,000 vans per year, and showed at most 4,500, 2) Arrival's composite materials were ill-suited to production and Arrival was "still trying to determine" if its composite material was going to "work for the product," and Arrival needed new molds to achieve production quality thermoplastic which Arrival had not yet ordered and would take 2 years to arrive, and 3) Arrival's AMRs did not work reliably or consistently.

427. On March 20, 2021 CIIG shareholders approved the Business Combination. On March 25, 2021 shares of Arrival began trading on the Nasdaq. The same day, Defendant Ableson provided a statement to *Reuters* telling investors "[w]hat you'll start to see now is the footprint start to expand pretty dramatically. Echoing this, Defendant Rugoobur stated "[w]hat we're going to see is basically a microfactory in every major city in the world…***You'll see the rollout expand pretty rapidly.***"

428. Analysts heeded Defendants representations. For example, on April 5, 2021 Cowen initiated coverage of Arrival following its IPO, rating it "outperform" with a price target of $28.50 per share. Cowen analysts Jeffrey Osborne, Thomas Boyes, Emily Riccio and Jeffrey Rossetti lauded Arrival's microfactories as a "critical component in lower production costs, stating "***Arrival has spent almost five years <u>perfecting</u> its microfactory approach***, which not only leverages the company's <u>***highly automated "technology cell" approach***</u>, but also high degree of vertical

163

integration, proprietary composite materials, and plug and play components.  A microfactory can be stood up in around 6 months, occupy 1/10 the footprint of a traditional automotive facility and produce 10,000 trucks or 1,000 buses annually on just two shifts. On a comparative basis these factories can be constructed for 50% of the capex and operated for around half the opex a year.

**D.      Defendants Had a Duty to Disclose the Omitted Facts**

429.    Defendants omitted to disclose in the IPO materials that: (1) its robotics platforms were not functioning as necessary for production; (2) Arrival would not start production in the fourth quarter of 2021 because it would not have the necessary production molds by then, (3) a microfactory could not be deployed "within six months" because existing warehouses were not suited to support Arrival's microfactory production method and would require more than six months to obtain permits to and perform foundation and electrical work to make a traditional factory suitable for use as a microfactory; (4) Arrival's "digital simulation" showed that Arrival could produce, *at most,* 4,500 vans per year in any given facility; and 2) Arrival had not installed a single technology cell in any microfactory.

430.    Defendants had a duty under Item 408 of Regulation C to disclose the above omitted facts in Arrival's Registration Statement. Item 408 of Regulation C creates a duty for registrants to supply non-misleading registration statements. It states: "In addition to the information expressly required to be included in a registration statement, there shall be added such further information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §230.408.

431.    Arrival had a duty under Item 408 to disclose the omitted facts set forth above. Arrival's concealment of these omitted facts rendered the lengthy disclosures in the Registration

164

Statement of risk factors related to Arrival's business misleading in light of the circumstances under which they were made.

## XIV.  THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

432.    The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and materially misleading statements alleged herein.

433.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

434.    To the extent that any of the false and materially misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

435.    To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Securities Act Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Arrival who actually knew that such statement was false when made.

436.    Moreover, to the extent that any Securities Act Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized.

## XV.    CAUSES OF ACTION UNDER THE SECURITIES ACT

## COUNT IV

**Violation of Section 11 of the Securities Act**
**Against Arrival, CIIG, the Executive Defendants, the Director Defendants, P. Cuneo, the Underwriter Defendants and Kinetik**

437.    Plaintiffs incorporate by reference the allegations in the paragraphs in Sections XII-XIV by reference. This claim is premised on the remedies available under Section 11 of the Securities Act and does not assert that Defendants acted with fraudulent intent.

438.    The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted facts required to be stated therein.

439.    Plaintiff Salvatore Fiorellino acquired Arrival Ordinary Shares pursuant to the Registration Statement.

440.    Arrival is the registrant for the Arrival Ordinary Shares registered through the Registration Statement and is strictly liable to Plaintiffs and the Class for the misstatements and omissions contained in the Registration Statement.

441.    Each of the Defendants named in this Count is responsible for and is liable for the contents and dissemination of the Registration Statement.

442.    As a result of their roles at Arrival and their direct access to information contradicting the statements in the Registration Statement, the Executive Defendants reasonably should have known of the untrue and misleading statements of material fact contained in the Registration Statement.

443.    The Director Defendants, CIIG and P. Cuneo likewise had access to internal reports and information which, had they conducted reasonable due diligence, would have put them on

166

**Deleted:** Securities Act

**Deleted:** Against All

**Deleted:** the CIIG Individual Defendants

notice of the untrue and misleading statements of material fact contained in the Registration Statement.

444.    The Underwriter Defendants were obligated to conduct an adequate due diligence investigation, and their negligent failure to do so was a substantial factor leading to the harm complained of in this Count.

445.    Together, the defendants named in this Count caused the Registration Statement to be filed with the SEC and to be declared effective, resulting in the issuance of Arrival Ordinary Shares.

446.    None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and did not omit any material facts required to be stated in the Registration Statement or facts that were necessary to make the statements made in the Registration Statement not false or misleading. By reason of the conduct alleged in this Count, each Defendant named in this Count violated Section 11 of the Securities Act.

447.    Plaintiff Fiorellino and the Class have sustained damages as a result of the Securities Act violations alleged in this Count.

448.    At the time of Plaintiff's purchases or acquisitions of Arrival shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged in this Count and could not have reasonably discovered those facts.

449.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the complaint filed in this action is based and the time that complaint was filed. Less than three years have elapsed between the time that the securities

167

upon which this claim is brought were bona fide offered to the public and the time complaint was filed.

**COUNT V**

**Violation of Section 12(a)(2) of the Securities Act**
**Against Arrival, CIIG, P. Cuneo and the Executive Defendants**

450.    Plaintiffs incorporate by reference the allegations in the paragraphs in Sections XII-XIV by reference.

451.    This Count is brought under Section 12(a)(2) of the Securities Act on behalf of named plaintiff Fiorellino against Defendants Arrival, CIIG, P. Cuneo and the Executive Defendants (the "Statutory Seller Defendants") on behalf of all persons who acquired Arrival shares pursuant to Registration Statement and the Prospectus or oral communications set forth in ¶¶387-¶¶425 above.

452.    By means of the Registration Statement, Prospectus and oral communications set forth above, the Statutory Seller Defendants offered, promoted, and sold Arrival shares in the Business Combination/IPO and therefore are liable under Section 12(a)(2) of the Securities Act for the untrue statements of material fact and omissions of material fact in the Registration Statement, Prospectus and related oral communications.

453.    The Statutory Seller Defendants failed to conduct a reasonable investigation and did not possess a reasonable basis for the belief that the statements contained in the Registration Statement and Prospectus were true and without omissions of material fact.

454.    By reason of the conduct alleged in this Count, the Statutory Seller Defendants, violated Section 12(a)(2) of the Securities Act.

**Deleted:** 386-¶¶424

455.    Additional plaintiff Fiorellino and other Class members who purchased Arrival shares that were issued pursuant or traceable to the Registration Statement have sustained damages because the value of their Arrival shares has declined precipitously.

456.    Additional plaintiff Fiorellino, individually and on behalf of the Class who purchased Arrival shares from the Statutory Sellers that were issued pursuant to the Registration Statement seeks the remedies available under Section 12(a)(2) of the Securities Act for the Statutory Sellers' violations.

457.    At the time of their purchases of Arrival shares additional Plaintiff Fiorellino and the Class were without knowledge of the wrongful conduct alleged in this Count and could not have reasonably discovered those facts more than one year before the filing of the complaint in this action. The complaint was filed within three years of the time that the Statutory Sellers first sold Arrival shares to the investing public.

**COUNT VI**

**Violation of Section 15 of the Securities Act**
**Against the Executive and Director Defendants, CIIG Management and Kinetik**

458.    Plaintiffs incorporate by reference the allegations in the paragraphs in Sections XII-XIV by reference. This claim is premised on the remedies available under Section 15 of the Securities Act and does not assert that the Executive or Director Defendants, CIIG Management or Kinetik acted with fraudulent intent.

459.    This Count is brought under Section 15 of the Securities Act against the Executive and Director Defendants, CIIG Management and Kinetik.

460.    Each of the Executive and Director Defendants was a control person of Arrival by virtue of his or her position as a director or senior officer of Arrival.

169

461.    Kinetik was a control person of Arrival by virtue of its 76.4% ownership stake in Arrival at the time of the IPO.

462.    The Executive and Director Defendants and Kinetik oversaw all operations at Arrival and Arrival could not have completed the IPO without these defendants signing or authorizing their signatures on the Registration Statement.

463.    CIIG Management was a control person of CIIG as the creator of CIIG. CIIG Management was able to, and did, influence, directly and indirectly, the contents of the IPO Communications.

464.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that this Complaint was filed. Less than three years has elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## XVI.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

465.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who: (1) purchased or otherwise acquired the publicly traded securities of Arrival between November 18, 2020 and November 19, 2021, both dates inclusive (the "Class Period") and who held such shares on November 8, 2021 and/or November 18, 2021, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (2) held common stock of CIIG as of February 16, 2021, eligible to vote at CIIG's special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act, and/or; (3) purchased or otherwise acquired Arrival Ordinary Shares pursuant or traceable to the

Company's registration statement and prospectus issued in connection with the March 24, 2021 business combination, seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act (collectively, the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

466.    The members of the Class are so numerous that joinder of all members is impracticable. Arrival Ordinary Shares are actively traded on the Nasdaq. CIIG stock prior to the IPO was likewise actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class because over 657 million ordinary shares of Arrival were outstanding as of December 31, 2021. Record owners and other members of the Class may be identified from records maintained by Arrival or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

467.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

468.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

469.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether Defendants violated the Securities Act of 1933 Act, or whether the Section 10(b), 14(a) and 20(a) Defendants violated the Securities Exchange Act of 1934;

b.    whether the Registration Statement contained untrue statements of material fact or omitted material information required to be stated therein;

c.    whether the Registration Statement omitted material facts necessary in order to make the statements made therein not misleading;

d.    whether the Defendants made false or misleading statements of material fact during the Class Period;

e.    whether the Section 10(b) Defendants knew or recklessly disregarded that their statements were false and misleading during the Class Period;

f.    whether the price of Arrival stock was artificially inflated;

g.    whether the market for Arrival stock was efficient; and

h.    the extent of damage sustained by Class members, and the appropriate measure of damages.

470.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

172

b.      Awarding compensatory damages and equitable relief in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: February 13, 2023

**Deleted:** September 12, 2022

**THE ROSEN LAW FIRM, P.A.**

*/s/ Sara Fuks*
Laurence Rosen
Phillip Kim
Sara Fuks
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
lrosen@rosenlegal.com
pkim@rosenlegal.com
sfuks@rosenlegal.com

*Lead Counsel for Plaintiffs and the Putative Class*

173