# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Arrival SA, et al. Securities Litigation | **CASE No.: 1:22-cv-00172-NRM-PK**<br><br><br>CLASS ACTION |

**PLAINTIFFS' [PROPOSED] SUR-REPLY IN RESPONSE TO THE ARRIVAL DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

*Introduction*

The Arrival Defendants[1] ("Defendants") assert that a recent district court opinion interpreting *Frutarom* forecloses claims by SPAC investors that are based on statements made before a SPAC merger closes.[2] *In re CarLotz, Inc. Sec. Litig.*, 2023 WL 2744064, at \*1 (S.D.N.Y. Mar. 31, 2023) (interpreting *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022) ("*Frutarom II*")). Defendants are incorrect. *Frutarom II* reiterates controlling law that a cause of action under §10(b) of the Securities Exchange Act of 1934 is available to plaintiffs who "dealt in the **_security_** to which the prospectus, representation, or omission relates." *Id.* at 85 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975)).

The Complaint alleges that various Defendants issued various false and misleading statements to investors who purchased "Arrival Securities" both before and after the de-SPAC Business Combination closed. But regardless of whether investors purchased: 1) publicly traded securities of Arrival prior to the Business Combination, and thus purchased "Arrival Securities" when they were shares of CIIG (and then exchanged them for shares in the combined company), *or* 2) purchased Arrival Securities after the Business Combination; *all of* the Arrival Defendants' statements about *all* of the securities at issue, related, essentially, to one thing: the combined Company's business prospects.

The Complaint alleges that all Class Period investors (whether they purchased CIIG common stock prior to the official Business Combination or purchased Arrival common stock after the

---

[1] All capitalized terms have the meanings ascribed to them in Plaintiffs' Second Amended Class Action Complaint ("Complaint") and the glossary contained in Plaintiffs' Memorandum of Law in Opposition to the Arrival Defendants' Motion to Dismiss unless otherwise stated. Importantly, as stated in the glossary, the Arrival Defendants includes CIIG, (the SPAC) and Peter Cuneo.

[2] *See* Reply Memorandum of Law in Further Support of Certain Defendants' Motion to Dismiss the Second Amended Class Action Complaint, Dkt. No. 107-37 ("Reply") at p. 29. *See also* Arrival Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Dismiss ("Opp.") Dkt. No. 107-1 at fn. 24 (asserting that claims on behalf of CIIG shareholders prior to the Business Combination fail "because those individuals did not purchase Arrival shares.")

1

Business Combination) "dealt in the *security*" that the false and misleading statements CIIG, P. Cuneo, and Arrival and its officers and directors made in CIIG's and Arrival's pre and post Business Combination SEC filings "concern or relate." Consistent with *Frutarom*, all of the Arrival Defendants' alleged misrepresentations related to the "security" in which Class Period investors dealt because all of the alleged misstatements "concern or relate" to the combined Company's business prospects. Accordingly, *all of* the Arrival Defendants are liable for their misstatements pursuant to black letter law, irrespective of *Frutarom* and *Carlotz*, both of which are distinguishable.

Here, Defendants made false statements prior to the close of the Business Combination in CIIG and Arrival Group's SEC filings and press releases that directly relate to investors'- like Plaintiff Fiorellino who purchased CIIG common stock prior to the close of the Business Combination- decision to approve the Business Combination between CIIG and Arrival. These Class Period investors have standing to sue CIIG, Arrival, and the Individual Defendants who made the alleged false statements because these statements "concern or relate" to the "security at issue" whose value is directly tied to the combined company's business prospects. Likewise, Class Period investors who purchased shares of Arrival Securities after the Business Combination closed have standing to sue Defendants for the statements they made prior to the-Business Combination because those statements also "relate[]" to the securities they purchased. 421 U.S. at 747.[3]

To be sure, the Second Circuit withdrew the original *Frutarom* opinion ("*Frutarom I*") precisely to prevent the result in *CarLotz*. In *Frutarom II* the Second Circuit clarified that challenged statements need not be specifically about the *issuer* of a security to give rise to standing; rather, the statements need only relate to the *securities* purchased. *Frutarom II*, 54 F.4th at 84

---

[3] After the Business Combination closed the Combined Company and the Executive Defendants continued to make false statements. Defendants do not assert that *Frutarom* or *CarLotz* in any way implicates those statements.

(interpreting *Blue Chip Stamps* as conferring standing upon "purchasers or sellers of securities about which a misstatement was made."). Accordingly, the *CarLotz* opinion's focus on whether the challenged statements were about the *issuer* of the securities is misplaced.

### A. All the Pre-Business Combination Challenged Statements are Actionable under the Purchaser-Seller Rule and *Frutarom*

The Complaint alleges that Defendants (CIIG, Arrival, and certain Individual Defendants) made false statements prior to the close of the Business Combination. These "pre-merger" statements include: 1) CIIG's November 18, 2020 8-K, CIIG and Arrival's conference call and Investor Presentation/Prospectus (*e.g.* ¶¶223-236) (attached as exhibits to CIIG's November 18, 2020 8-K) and 2) the December (and February) Registration Statements and CIIG Proxy Statement/Prospectus incorporated by reference therein (*e.g.* ¶¶4, 59, 63, 240-255).

*Frutarom II* holds that "*Blue Chip Stamps*…continues to govern our analysis of statutory standing for Section 10(b) claims." 54 F.4th at 86. Referred to as the "purchaser-seller" rule, *Blue Chip Stamps* held that to allege standing for §10(b) claims, investors must have "dealt in the security to which the prospectus…relates." 421 U.S. at 747. Here, Defendants' statements prior to the close of the Business Combination relate to CIIG common stock and securities in the combined company (Arrival SA) after the Business Combination.[4] For example, the November 18, 2020 Prospectus (attached to CIIG's 8-K announcing the Proposed Business Combination) stated that it was prepared to "assist interested parties in making their own evaluation with respect to a potential a potential business combination" between CIIG and Arrival.[5] Defendants' pre-Business

---

[4] Arrival Defendants incorrectly assert that Plaintiffs do not bring Section 10(b) claims on behalf of CIIG shareholders before the Business Combination. As Plaintiffs explained in their opposition, this semantic argument ignores the allegations in the Complaint, that Plaintiffs Fiorellino purchased CIIG common stock prior to the Business Combination and exchanged these shares for Arrival common stock after the Business Combination closed. ¶42. The first paragraph of the Complaint references "Arrival Securities" ¶1 but in context, the Complaint's allegations make clear that "Arrival Securities" refers to CIIG common stock (pre-merger shares) and Arrival common stock (post-merger shares).

[5] https://www.sec.gov/Archives/edgar/data/1789760/000119312520296650/d91730dex992.htm

Combination statements also relate to the Arrival securities purchased after the Business Combination closed. For example, the Prospectus explicitly states: "this document, which forms part of a registration statement on Form F-4 with the [SEC] by Holdco,[6] constitutes a prospectus of Holdco under Section 5 of the Securities Act, *with respect to Holdco Ordinary Shares to be issued to the CIIG stockholders if the Business Combination described herein is consummated*."[7]

## B. *Frutarom I* Was Amended to Prevent the Result in *Carlotz*

*Frutarom I*, the panel's earlier opinion, required that "plaintiffs [] bought or sold **a security of the issuer about which a misstatement was made** in order to have standing to sue under Section 10(b)." *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, Case No. 21-1076, Dkt. No. 121-1 (2d Cir. Sept. 30, 2022) ("Original Opinion") at 8 (emphasis added). When the plaintiffs sought a rehearing *en banc*, a group of securities laws scholars filed an amicus brief ("Securities Scholars Brief"). They explained that the language that the plaintiffs must have bought "a security **of the issuer** about which a misstatement was made" could have serious unintended consequences, including with respect to SPACs like Arrival:

> [A] misrepresentation may "relate" to important classes of securities that are not "issued" by the company "about which a misstatement was made" but whose value is nonetheless a function of that company's prospects. Examples include options and other derivatives, **securities of SPACs** …"

*See* Declaration of Sara Fuks ("Fuks Decl."), Ex. 2 (Securities Scholars Brief), at 6. The Securities Scholars Brief explained the implications: if the Original Opinion ***did*** release all SPACs, it would

---

[6] According to the Registration Statement and Proxy Statement, "Holdco" means "Arrival Group, a joint stock company governed by the laws of the Grand Duchy of Luxembourg…"

[7] Registration Statement also stated that forward-looking statements may include "the Combined Company's financial performance following the Business Combination." https://www.sec.gov/Archives/edgar/data/1835059/000119312520317249/d59484df4.htm at p. 62.

4

be issuing get-out-of-jail free cards to more than half of the new public listings in 2020. *Id.* at 9. After the Securities Scholars filed their brief, the panel withdrew the Original Opinion. *Frutarom II* replaced the references to "the issuer" with "the security." *See* Fuks Decl., Ex. 1 (redline showing changes from *Frutarom I* to *Frutarom II*). The Second Circuit then denied rehearing *en banc*.

*Frutarom II* preserves standing for investors who did not purchase the issuer's security. The result here is that post-merger Arrival investors, who did not purchase CIIG (*i.e.* the pre-merger issuer's) shares, nonetheless have standing to pursue claims for pre-merger statements because those statements relate to the securities they purchased. And because *Frutarom II* replaces references to "the issuer" with "the security" it removes any doubt that investors who purchased SPAC securities before the merger have standing to sue over statements that nominally concern the target. After Defendants announced the Business Combination, a share of CIIG stock was simply the equivalent of the right to receive a share of Arrival after the Business Combination closed. And while post-Business Combination investors did not purchase securities of the *issuer* of the securities at the time misleading pre-merger misstatements were made, they have standing because those statements are "about" and "relate to" securities they purchased after the Business Combination. Under *Frutarom II* and *Blue Chip Stamps*, the focus of *CarLotz* on whether the challenged statements are about the "issuer" of the securities purchased is wholly misplaced.

## C.  *Frutarom II and CarLotz are Distinguishable on their Facts*

In *Frutarom II*, the plaintiffs bought shares of International Flavors & Fragrances, Inc. ("Acquiror") after it had announced plans to acquire Frutarom Industries Ltd. ("Target"). 54 F.4th at 84. The Target was a large company whose shares traded on the London Stock Exchange. *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, *2 (S.D.N.Y.

Mar. 30, 2021). As a result, the Target made regular public reports about its operations for its own shareholders' benefit. The plaintiffs, purchasers of shares in the Acquiror, sued the Target because *its* statements to *its* shareholders were incorporated into certain statements the Acquiror made to its own shareholders. The lower court dismissed the §10(b) claim against the Acquiror not on standing grounds, but for failure to allege scienter. *Id*. at *29-*30 (failure to plead scienter as to Acquiror and dismissing for lack of standing as to Target). The plaintiffs pursued their appeal only against the Target. Thus, in *Frutarom II*, most of the statements the plaintiffs challenged were addressed to the Target's existing public shareholders. When they were speaking to the Target's investors, the Targets' officers' statements were naturally about the Target, and the Target alone. Indeed, the Target needed *its* shareholders to approve the merger; the Acquiror did not. The Second Circuit found that the Acquiror's incidental use of the Target's statements did not give the Acquiror's shareholders standing to sue the Target for statements that the Target made to its own shareholders.

In contrast, here, the pre-merger documents containing the challenged statements were addressed to CIIG shareholders. Likewise, the documents containing the challenged statements were issued for the express purpose of creating publicly traded post-merger Arrival shares. When Defendants made statements prior to the Business Combination they had two audiences: CIIG investors, whose votes they were soliciting, and investors considering whether to buy post-merger Arrival shares once the merger closed. Similarly, after Defendants announced the Business Combination, CIIG securities related to only one substantive matter: Arrival and its EVs. Moreover, in *Frutarom*, the Acquiror was itself a large publicly-traded company; the acquisition would comprise only a small portion of its total business. The Acquiror's investors would not pay undue attention to the Target's statements. In contrast, CIIG's sole business was its combination

with Arrival. There was nothing else for investors to consider. Thus, unlike in *Frutarom II*, pre-merger statements about Arrival were also about CIIG.

In *CarLotz*, the plaintiffs apparently conceded that the pre-merger statements were about pre-merger CarLotz (the target) and no other company. *CarLotz*, 2023 WL 2744064, at *4. Instead, they argued incorrectly that there was no difference between pre-merger CarLotz and post-merger CarLotz. The court rejected their argument because it did not address *Frutarom* on its terms. The *CarLotz* plaintiffs raised the immense public policy costs that the defendants' argument would effectively give SPACs a license to lie. Though it seemed disturbed, the court read the Second Circuit's opinion as having rejected the concerns. The court was wrong. As set forth above, the Second Circuit withdrew *Frutarom I* precisely because it might deprive SPAC investors (among others) of a cause of action. The *CarLotz* court also credited the concurrence's assertion that the majority was making policy rather than following existing law. The conclusion was unwarranted; not only did the majority disagree that it was making new policy, but not even the concurrence suggested that the majority was making new policy ***about SPACs***.

Accordingly, Plaintiffs respectfully request that the Court reject Defendants' reliance on *Frutarom II* and *Carlotz* and deny Defendants' motion to dismiss in its entirety.

Dated:  July 10, 2023                                Respectfully submitted,


                                                    _/s/ Sara Fuks_
                                                    Sara Fuks
                                                    Laurence Rosen
                                                    Phillip Kim
                                                    **THE ROSEN LAW FIRM, P.A.**
                                                    275 Madison Avenue, 40th Floor
                                                    New York, NY 10016
                                                    Tel: (212) 686-1060

sfuks@rosenlegal.com
lrosen@rosenlegal.com
pkim@rosenlegal.com

*Lead Counsel for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Arrival SA, et al. Securities Litigation | **CASE No.: 1:22-cv-00172-NRM-PK**<br><br><br>CLASS ACTION |

**DECLARATION OF SARA FUKS IN SUPPORT OF PLAINTIFFS' SUR-REPLY IN RESPONSE TO THE ARRIVAL DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

I, Sara Fuks, declare under penalty of perjury as follows:

1.      I am a partner at the Rosen Law Firm, PA, Lead Counsel for Lead Plaintiff Mostaco Corp. and named plaintiff Salvatore Fiorellino ("Plaintiffs") in the above-captioned action. I respectfully submit this declaration in support of Plaintiffs' Sur-Reply in Response to the Arrival Defendants' Reply in Support of their Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of a redline showing the changes made between the original decision in *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022) issued on September 30, 2022, ("*Frutarom I*") and the amended decision issued on November 30, 2022 ("*Frutarom II*").

3.      Attached as **Exhibit 2** is the Brief for *Amici Curiae* Securities Law Scholars in Support of Plaintiffs-Appellants in *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, Case No. 21-1076, filed in the United States Court of Appeals for the Second Circuit.

I hereby declare under penalty of perjury that the foregoing is true and correct.

1

Dated: July 10, 2023                    */s/Sara Fuks*
                                        Sara Fuks

New York, New York

2

# EXHIBIT 1

21-1076
*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*

# United States Court of Appeals
# for the Second Circuit

August Term 2021
Argued: February 10, 2022
Decided: September 30, 2022
Amended: November 30, 2022

No. 21-1076

MENORA MIVTACHIM INSURANCE LTD., MENORA MIVTACHIM AND THE
FEDERATION OF ENGINEERS PROVIDENT FUND MANAGEMENT LTD.,
CLAL INSURANCE COMPANY LTD., MENORA MIVTACHIM PENSIONS
AND GEMEL LTD., CLAL PENSION AND PROVIDENT LTD., ATUDOT
PENSION FUND FOR EMPLOYEES AND INDEPENDENT WORKERS,

*Plaintiffs-Appellants,*

v.

FRUTAROM INDUSTRIES LTD., ORI YEHUDAI, ARI ROSENTHAL, ALON
GRANOT, GUY GILL,

*Defendants-Appellees.[1]*

on Appeal from the united states District court
for the Southern District of New York
Before: PARK, NARDINI, and PEREZ, *Circuit Judges.*

International Flavors & Fragrances Inc. ("IFF"), a U.S.-based seller of

---

1 The Clerk of Court is respectfully directed to amend the caption
accordingly.

flavoring and fragrance products, acquired Frutarom Industries Ltd. ("Frutarom"), an Israeli firm in the same industry. Leading up to the merger, Frutarom allegedly made material misstatements about its compliance with anti-bribery laws and the source of its business growth. Plaintiffs, who bought stock in IFF, sued Frutarom, alleging that those misstatements violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. We conclude that Plaintiffs lack statutory standing to sue. Under the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities ~~issued by the company~~ about which a misstatement was made. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975). Plaintiffs here lack standing to sue based on alleged misstatements ~~that~~about Frutarom ~~made about itself~~ because they never bought or sold shares of Frutarom. **AFFIRMED**.

Judge Perez concurs in a separate opinion.

> JEREMY A. LIEBERMAN (Emma Gilmore, Marc I. Gross, Villi A. Shteyn, *on the brief),* Pomerantz LLP, New York, NY, *for Plaintiffs-Appellants.*
>
> ROGER A. COOPER (Lisa Vicens, Thomas S. Kessler, *on the brief),* Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendant-Appellee Frutarom Industries Ltd.*
>
> BRUCE G. VANYO, Katten Muchin Rosenman LLP, New York, NY (Jonathan A. Rotenberg, Thomas M. Artaki, Katten Muchin Rosenman LLP, New York, NY; Eric T. Werlinger, Katten Muchin Rosenman LLP, Washington, DC, *on the brief), for Defendants-Appellees Ori Yehudai, Ari Rosenthal, Alon Granot, and Guy Gill.*

21-1076
*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*

PARK, *Circuit Judge:*

International Flavors & Fragrances Inc. ("IFF"), a U.S.-based seller of

flavoring and fragrance products, acquired Frutarom Industries Ltd. ("Frutarom"), an Israeli firm in the same industry. Leading up to the merger, Frutarom allegedly made material misstatements about its compliance with anti-bribery laws and the source of its business growth. Plaintiffs, who bought stock in IFF, sued Frutarom, alleging that those misstatements violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. We conclude that Plaintiffs lack statutory standing to sue. Under the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities ~~issued by the company~~ about which a misstatement was made. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975). Plaintiffs here lack standing to sue based on alleged misstatements ~~that~~about Frutarom ~~made about itself~~ because they never bought or sold shares of Frutarom. We thus affirm the district court's dismissal of the complaint.

## I. BACKGROUND

A.      <u>Factual Background</u>[2-3]

Plaintiffs are a putative class of investors who acquired IFF securities between May 7, 2018 and August 12, 2019. They allege

---

[2] The following facts are taken from Plaintiffs' Amended Complaint, Joint App'x at 20-102. In reviewing the district court's decision on a motion to dismiss, we accept these facts as true and draw all reasonable inferences in Plaintiffs' favor. *See Lively v. WAFRA Inv. Advisory Grp., Inc.,* 6 F.4th 293, 299 n.1 (2d Cir. 2021).

~~Joint App'x at 20-102. In reviewing the district court's decision on a~~

that from 2002 to 2018, Frutarom's executives engaged in a "long-running bribery scheme" by which they bribed key employees of important clients in order to "generate continued and increased business with the customer[s]." Compl. ^ 10, 66. They also bribed customs officials and quality assurance officials in Russia and Ukraine in order to import Frutarom products into those countries and to pass local certifications of product fitness.

On May 7, 2018, Frutarom and IFF announced an anticipated merger. Plaintiffs allege that leading up to the consummation of the merger, Frutarom made materially misleading statements about its compliance with anti-bribery laws and the sources of its business growth, most of which were incorporated into IFF's Form S-4 Registration Statement. For instance, Plaintiffs allege that Frutarom falsely stated that since December 31, 2014, Frutarom had not "violated the [Foreign Corrupt Practices Act], the U.K. Bribery Act 2010, the [Organisation for Economic Co-operation and Development] Convention on Combating Bribery of Foreign Public Officials in International Business Transactions or any other applicable Law relating to anti-corruption or anti-bribery." *Id.* ^ 146. Plaintiffs also allege that Frutarom misled investors by attributing its financial growth in 2016 and 2017 to factors such as "organic growth," "acquisitions," and "positive currency effects" while failing to mention growth due to the bribery scheme. *Id.* ^ 136-37.

IFF's acquisition of Frutarom closed in October 2018, after which Frutarom became a wholly-owned subsidiary of IFF. On ~~4 5~~

August 5, 2019, IFF acknowledged that Frutarom had "made improper payments to representatives of a number of customers" in Russia and Ukraine.

---

~~motion to dismiss, we accept these facts as true and draw all reasonable inferences in Plaintiffs' favor. *See Lively v. WAFRA Inv. Advisory Grp., Inc., 5 F.4th 293, 299 n.1 (2d Cir. 2021).*~~

*Id.* ^ 211. The following day, IFF's share price dropped nearly 16%.

B.    Procedural History

Plaintiffs sued IFF and two of its officers as well as Frutarom and five of its officers. Plaintiffs alleged that Defendants' materially misleading misstatements violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a); and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.[6]

The district court granted Defendants' motion to dismiss for failure to state a claim, finding that the complaint "fail[ed] to allege with the requisite particularity that Frutarom's misconduct continued into the Class Period" and concluding that, in any case, the allegedly false statements and omissions of material fact were not actionable or material. Spec. App'x at 23-24. The district court also concluded that "plaintiffs lack statutory standing under Section 10(b) to bring claims against the Frutarom defendants for statements made about Frutarom." *Id.* at 78. Plaintiffs pursue their appeal against only Frutarom and four of its officers. *See* Appellants' Br. at 3.

## II.   DISCUSSION

### A.    A. Standard of Review

"We review a district court's dismissal of a complaint under [Federal Rule of Civil Procedure] 12(b)(6) de novo." *Tongue v. Sanofi,* 816 F.3d 199, 209 (2d Cir. 2016).

### B.    B. The Purchaser-Seller Rule

Neither Section 10(b) of the Exchange Act nor Rule 10b-5 provides an express private right of action, but the Supreme Court has long held that

---

[6] Plaintiffs also asserted a claim under the Israeli Securities Law of 1968. The district court declined to exercise supplemental jurisdiction over the claim, and Plaintiffs do not challenge that decision on appeal.

one is implied. *See, e.g., Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n.9 (1971). Recognizing the advantages of limitations to this judicially created private right of action, the Court in *Blue Chip Stamps* adopted the rule from *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir. 1952), which limited the class of plaintiffs who could sue under Rule 10b-5 to those who purchased or sold the securities ~~of an issuer~~ about which a material misstatement was made. *See Blue Chip Stamps,* 421 U.S. at 730 (noting that the *Birnbaum* rule limited "the plaintiff class for purposes of a private damage action under § 10(b) and Rule 10b-5 . . . to actual purchasers and sellers of securities"); *see also id.* at 742 (explaining that the *Birnbaum* rule "permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the stock in question"); *id.* at 747 ("The virtue of the *Birnbaum* rule, simply stated, in this situation, is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates.").

The Court observed in *Blue Chip Stamps* that "[a]vailable evidence from the texts of the [Securities Act of 1933 and the Exchange

Act] . . . supports the result reached by the *Birnbaum* court."[37] *Id.* at [8] 733. It also noted the fact that the purchaser-seller rule had gained widespread acceptance across the country and that Congress had "fail[ed] to reject *Birnbaum*'s reasonable interpretation of the wording of § 10(b)" despite two attempts to amend the statute. *Id.* at 732-33; *see also id.* at 731-32 ("[V]irtually all lower federal courts facing the issue in the hundreds of reported cases presenting this question over the past quarter century have reaffirmed *Birnbaum*'s conclusion that the plaintiff class for purposes of §

---

[7] The Court noted, for example, that "[t]he wording of § 10(b) directed at fraud 'in connection with the purchase or sale' of securities stands in contrast with the parallel antifraud provision of the [Securities] Act, § 17(a) . . . reaching fraud 'in the offer or sale' of securities." *Blue Chip Stamps,* 421 U.S. at 733-34 (citing 15 U.S.C. §§ 77q, 78j(b)). It also observed that "[t]he principal express nonderivative private civil remedies, created by Congress contemporaneously with the passage of § 10(b), for violations of various provisions of the [Securities Act and the Exchange Act] are by their terms expressly limited to purchasers or sellers of securities." *Id.* at 735-36. In light of that observation, it concluded, "It would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." *Id.* at 736.

[8] The Court noted, for example, that "[t]he wording of § 10(b) directed at fraud 'in connection with the purchase or sale' of securities stands in contrast with the parallel antifraud provision of the [Securities] Act, § 17(a) . . . reaching fraud 'in the offer or sale' of securities." *Blue Chip Stamps,* 421 U.S. at 733-34 (citing 15 U.S.C. §§ 77q, 78j(b)). It also observed that "[t]he principal express nonderivative private civil remedies, created by Congress contemporaneously with the passage of § 10(b), for violations of various provisions of the [Securities Act and the Exchange Act] are by their terms expressly limited to purchasers or sellers of securities." *Id.* at 735-36. In light of that observation, it concluded, "It would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." *Id.* at 736.

10(b) and Rule 10b-5 private damage actions is limited to purchasers and sellers of securities.").

The Court expressed concern about "the danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b-5." *Id.* at 740. And it warned against an "endless case-by-case erosion" of the purchaser-seller rule by creating exceptions, concluding that "such a shifting and highly fact-oriented disposition" of statutory standing is not a "satisfactory basis for a rule of liability imposed on the conduct of business transactions." *Id.* at 755.

We have followed the purchaser-seller rule since first articulating it in our 1952 *Birnbaum* decision. *See, e.g., Abrahamson v. Fleschner,* 568 F.2d 862, 868 (2d Cir. 1977), *abrogated on other grounds by Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11 (1979); *Lawrence v. Cohn,* 325 F.3d 141, 152-54 (2d Cir. 2003); *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.,* 369 F.3d 27, 34 (2d Cir. 2004). And *Blue Chip Stamps,* which embraced *Birnbaum* nearly five decades ago, continues to govern our analysis of statutory standing for Section 10(b) claims.

C.     Application

The purchaser-seller rule requires plaintiffs to have bought or sold ~~a~~the security ~~of the issuer~~ about which a misstatement was made in order to have standing to sue under Section 10(b). Plaintiffs here lack statutory standing to sue Frutarom based on alleged misstatements ~~that the company made~~ about ~~itself~~Frutarom because they bought shares of IFF, not Frutarom.

As IFF shareholders, Plaintiffs argue that they have standing because there was a sufficiently "direct relationship" between Frutarom's misstatements about itself and the price of IFF's shares. Appellants' Br. at 18.

This argument is meritless.

First, judicially created private rights of action should be construed narrowly. *Cf. Alexander v. Sandoval,* 532 U.S. 275, 287 (2001) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for ~~federal tribunals." (citation omitted)).[4] Plaintiffs urge us to read~~ [9]

federal tribunals." (citation omitted)).[4] Plaintiffs urge us to read Section 10(b) "flexibly to effectuate its remedial purposes." *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151 (1972) (quoting *SEC v. Cap. Gains Rsch. Bureau,* 375 U.S. 180, 195 (1963)).[5] *Blue Chip Stamps,* however, recognized the need to limit this judicially created private right of action. *See* 421 U.S. at 749 ("We are dealing with a private cause of action which has been judicially found to exist, and which will have to be judicially delimited one way or another . . . ."). And the Supreme Court has emphasized that "in analyzing . . . Rule 10b-5 . . . we must give narrow dimensions to a right of action Congress did not authorize." *Janus Cap. Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011) (cleaned up); *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.,* 552 U.S. 148, 165 (2008) ("Concerns with the judicial creation of a private cause of action caution against its expansion. . . . Though it remains the law, the § 10(b) private right should not be extended beyond its present boundaries."). We thus apply the purchaser-seller rule as adopted by

---

~~167 (2008) ("This conclusion is consistent with the narrow dimensions we must give to a right of action Congress did not authorize . . . .").~~

the Supreme Court in *Blue Chip Stamps.* [10] [11]

Second, adopting Plaintiffs' "direct relationship" test for standing would begin exactly the "endless case-by-case erosion" of the purchaser-seller rule about which *Blue Chip Stamps* warned. 421 U.S. at 755. Under Plaintiffs' "direct relationship" test, standing would be a "shifting and highly fact-oriented" inquiry, *id.,* requiring courts to determine whether there was a sufficiently direct link [12] between one company's misstatements and another company's stock price. For example, Plaintiffs point to joint press releases, IFF's SEC filings and investor presentations, and investment bank reports about IFF's acquisition of Frutarom to show a direct relationship between Frutarom's misstatements and IFF's stock. *See* Appellants' Br. at 2427. But *Blue Chip Stamps* cautioned against adding further uncertainty to Section 10(b)'s "rule of liability imposed on the conduct of business transactions." 421 U.S. at 755; *see also Fin. Sec. Assurance, Inc. v. Stephens, Inc.,* 500 F.3d 1276, 1283 (11th Cir. 2007) (concluding that the purchaser-seller requirement entails a "formal" and not a "functional" inquiry because "the Court deliberately endorsed a standing rule that would not be subject to 'endless

---

[10]*See also, e.g., Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 140 S. Ct. 1009, 1015 (2020) (referencing *Sandoval* and *Blue Chip Stamps* in narrowly construing a judicially created private cause of action in the civil rights context); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.,* 552 U.S. 148, 167 (2008) ("This conclusion is consistent with the narrow dimensions we must give to a right of action Congress did not authorize . . . .").

[11] Plaintiffs also argue that Section 10(b)'s language prohibiting "any person" from making material misstatements entitles them to have standing to sue Frutarom. 15 U.S.C. § 78j. But this language speaks only to who may *be sued* under the statute, not who may *bring suit*.

[12] ~~Plaintiffs also argue that Section 10(b)'s language prohibiting "any person" from making material misstatements entitles them to have standing to sue Frutarom. 15 U.S.C. § 78j. But this language speaks only to who may *be sued* under the statute, not who may *bring suit*.~~

case-by-case erosion' by courts employing a functional analysis to every new group of potential plaintiffs" (quoting *Blue Chip Stamps,* 421 U.S. at 755)).

Third, Plaintiffs' reliance on dicta in *Nortel* is misplaced. In *Nortel,* JDS Uniphase Corporation ("JDS") sold one of its business units to its largest customer, Nortel Networks Corporation ("Nortel") in exchange for Nortel stock. 369 F.3d at 29. Plaintiffs, who were JDS shareholders, sued Nortel for allegedly misleading statements it made about itself leading up to the transaction. *Id.* at 29-30. We held that plaintiffs lacked standing because "[stockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Id.* at 34.

Notwithstanding the holding of the case, Plaintiffs argue that *Nortel* would have found standing if there had been a sufficiently "direct relationship" between Nortel's statements and JDS's stock price. They point to dicta noting that because "a merger creates a far more significant relationship between two companies than does the sale of a business unit," "a potential merger might require a different outcome."[6][13] *Id.* But we said that was "a question that we leave for another day and about which we express no opinion." *Id.* For the reasons explained above, we now answer that question by holding that purchasers of a security of an acquiring company do not have

---

[13]    This dicta appears only in the context of distinguishing *Nortel* from another case, *Semerenko v. Cendant Corp.,* 223 F.3d 165 (3d Cir. 2000). *Nortel* rejected *Cendant* as persuasive authority, so Plaintiffs' attempt to invoke *Cendant* to argue that other courts have allowed plaintiffs in their circumstances to sue is unavailing. In any event, as we noted in *Nortel, Cendant* did not discuss standing. *See Nortel,* 369 F.3d at 33 ("[T]he opinion [in *Cendant]* never explicitly addressed the standing requirement of Rule 10b-5, and this limits its persuasiveness. . . . [W]e do not agree with the plaintiffs that it presents a compelling argument in favor of standing.").

standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies.[7][14]

Nor does our subsequent decision *In re NYSE Specialists Securities Litigation,* 503 F.3d 89 (2d Cir. 2007) *("NYSE Specialists"),* change this result. In that case, we clarified that *Nortel* did not preclude purchasers of a stock from suing "underwriters, brokers, bankers, and non-issuer sellers"" under Rule 10b-5. *Id.* at 102. That [15] [16] is entirely consistent with the purchaser-seller rule: Plaintiffs may be able to sue entities other than the issuer of a security if those entities made material misstatements about the ~~issuer~~security, as long as the plaintiffs purchased or sold the securities ~~of the issuer~~ about which the misstatements were made.[17][8]

---

[14] The concurrence states that our opinion "create[s] new law" and urges that we should simply apply *Nortel.* Concurrence at 1. We respectfully disagree. The "direct relationship" test in *Nortel* is dicta and, more importantly, is inconsistent with *Blue Chip Stamps,* as explained below. *See infra* at 12.

[15] ~~This dicta appears only in the context of distinguishing *Nortel* from another case, *Semerenko v. Cendant Corp.,* 223 F.3d 165 (3d Cir. 2000). *Nortel* rejected *Cendant* as persuasive authority, so Plaintiffs' attempt to invoke *Cendant* to argue that other courts have allowed plaintiffs in their circumstances to sue is unavailing. In any event, as we noted in *Nortel, Cendant* did not discuss standing. *See Nortel,* 369 F.3d at 33 ("[T]he opinion [in *Cendant]* never explicitly addressed the standing requirement of Rule 10b-5, and this limits its persuasiveness. . . . [W]e do not agree with the plaintiffs that it presents a compelling argument in favor of standing.").~~

[16] ~~The concurrence states that our opinion "create[s] new law" and urges that we should simply apply *Nortel.* Concurrence at 4. We respectfully disagree. The "direct relationship" test in *Nortel* is dicta and, more importantly, is inconsistent with *Blue Chip Stamps,* as explained below. *See infra* at 12.~~

[17] ~~*NYSE Specialists* cast the *Nortel* Court as holding that the~~

In short, Section 10(b) standing does not depend on the significance or directness of the relationship between two companies. Rather, the question is whether the plaintiff bought or sold ~~shares of~~ the ~~company~~securities about which the misstatements were made. *See Nortel,* 369 F.3d at 32 (stating that the plaintiffs' argument that they had standing was "entirely at odds with the purchaser-seller requirement in *Blue Chip Stamps* that 'limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates.'" (quoting *Blue Chip Stamps,* 421 U.S. at 747)). Our conclusion follows directly from our decision in *Nortel.* In both cases, a company whose stock the plaintiffs did not purchase made material misstatements about itself that negatively impacted another company's stock, which plaintiffs did purchase. The fact that this case involved a merger instead of the sale of a business unit and that [18]

IFF incorporated some of Frutarom's misstatements in its SEC filings and investor presentations does not change the analysis here. Plaintiffs did not purchase the securities ~~of the issuer~~ about which misstatements were made, so they did not have standing to sue under Section 10(b) or Rule 10b-5.[19]

---

~~connection between Nortel's false statements and plaintiffs' purchase of JDS stock was "too remote to sustain an action under Rule 10b-5." *NYSE Specialists,* 503 F.3d at 102. But *NYSE Specialists* did not purport to answer the question left open in *Nortel.*~~

[18] *NYSE Specialists* cast the *Nortel* Court as holding that the connection between Nortel's false statements and plaintiffs' purchase of JDS stock was "too remote to sustain an action under Rule 10b-5." *NYSE Specialists,* 503 F.3d at 102. But *NYSE Specialists* did not purport to answer the question left open in *Nortel.*

[19]Of course, this does not mean that a target company and its officers are free to make material misstatements or omissions as long as the company is acquired. In appropriate circumstances, the acquiring company or its shareholders may have claims against the target company and its officers

## III. CONCLUSION

For the reasons set forth above, the district court's judgment is affirmed.

---

under state law. *See, e.g., Capax Discovery, Inc. v. AEP RSD Invs., LLC,* 285 F. Supp. 3d 579, 586-89, 593-95 (W.D.N.Y. 2018); *Chase v. Columbia Nat'l Corp.,* 832 F. Supp. 654, 660-63 (S.D.N.Y. 1993). Here, the amended complaint alleges that IFF and Frutarom sued Defendant Yehudai in Israel for making false statements that were "the same or substantially similar to the false representations Plaintiffs allege in [their] complaint." Joint App'x at 26. Shareholders of the target company may also be able to bring claims against the officers or the target company itself, if it continues to exist as a separate legal entity. *See, e.g., In re Stillwater Cap. Partners Inc. Litig.,* 853 F. Supp. 2d 441, 458-59 (S.D.N.Y. 2012) (allowing investors in a target company to sue the target company and its directors under Rule 10b- 5 for failure to disclose material facts related to a completed merger). And nothing about the statutory standing of private plaintiffs forecloses the SEC from pursuing enforcement actions. *See* 15 U.S.C. § 78u(d)(3) (giving the SEC authority to bring an action to impose civil penalties).

[4]      *See also, e.g., Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 140 S. Ct. 1009, 1015 (2020) (referencing *Sandoval* and *Blue Chip Stamps* in narrowly construing a judicially created private cause of action in the civil rights context); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.,* 552 U.S. 148,

# EXHIBIT 2

# 21-1076

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

MENORA MIVTACHIM INSURANCE LTD., MENORA MIVTACHIM AND THE FEDERATION OF ENGINEERS PROVIDENT FUND MANAGEMENT LTD., CLAL INSURANCE COMPANY LTD., MENORA MIVTACHIM PENSIONS AND GEMEL LTD., CLAL PENSION AND PROVIDENT LTD., ATUDOT PENSION FUND FOR EMPLOYEES AND INDEPENDENT WORKERS,

*Plaintiffs-Appellants,*

—against—

FRUTAROM INDUSTRIES LTD, ORI YEHUDAI, ARI ROSENTHAL, ALON GRANOT, GUY GILL,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICI CURIAE* SECURITIES LAW SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLANTS

CAROL C. VILLEGAS
JAKE BISSELL-LINSK
LABATON SUCHAROW, LLP
140 Broadway, 34th Floor
New York, New York 10005
(212) 907-0700

ERNEST A. YOUNG
    *Counsel of Record*
3208 Fox Terrace Drive
Apex, North Carolina 27502
(919) 360-7718

*Counsel for Amici Curiae Securities Law Scholars*

TABLE OF CONTENTS

Table of Authorities ................................................................................................ i

Interest of *Amici* ...................................................................................................1

Argument...............................................................................................................2

I.      The panel decision improperly created an additional "statutory
        standing" rule beyond the requirements of the implied right of action
        under Rule 10b-5. ......................................................................................3

II.     The panel's new rule would exempt large and well-established
        categories of securities transactions from scrutiny under Rule 10b-5. ..........6

Conclusion ...........................................................................................................11

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) ...............................................................................9

*In re Adobe Sys., Inc. Sec. Litig.*,
139 F.R.D. 150 (N.D. Cal. 1991)........................................................................7

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,
821 F.3d 352 (2d Cir. 2016) ..............................................................................3

*In re Ames Dep't Stores Inc. Stock Litig.*,
991 F.2d 953 (2d Cir. 1993) ..............................................................................4

*In re Arakis Energy Corp. Sec. Litig.*,
No. 95–CV–3431 (ARR), 1999 WL 1021819
(E.D.N.Y. Apr. 27, 1999) ..................................................................................7

*In re Barclays Liquidity Cross and High Frequency Trading Litig.*,
390 F. Supp.3d 432 (S.D.N.Y. 2019) .................................................................3

*Birnbaum v. Newport Steel Corp.*,
193 F.2d 461 (2d Cir. 1952) ..............................................................................2

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975)..........................................................................2, 4, 6, 7

*Chadbourne & Parke LLP v. Troice*,
571 U.S. 377 (2014)....................................................................................4, 5

*Deutschman v. Beneficial Corp.*,
841 F.2d 502 (3d Cir. 1988) ..............................................................................7

*Lexmark Int'l, Inc. v Static Control Components, Inc.*,
572 U.S. 118 (2014).........................................................................................3

*Morrison v. Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010).........................................................................................9

ii

*In re NYSE Specialists Sec. Litig.*,
    503 F.3d 89 (2d Cir. 2007) (Sotomayor, J.) .......................................................6

*Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004) .................................................................3, 5, 6

*In re Oxford Health Plans, Inc. Sec. Lit.*,
    199 F.R.D. 119 (S.D.N.Y. 2001) .......................................................8

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977).......................................................4

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007).......................................................7

*SEC v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968) (en banc) .......................................................5, 6

*Semerenko v. Cendant Corp.*,
    223 F.3d 135 (3d Cir. 2000) .......................................................6

**Statutes & Rules**

15 U.S.C. § 78c(a)(10) .......................................................7

Fed. R. App. P. Rule 29.1(b).......................................................1

Fed. R. App. P. 29(4)(E) .......................................................1

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 .......................................................*passim*

**Other Authorities**

Max H. Bazerman & Paresh Patel, SPACs: What You Need to Know, Harvard Bus. Rev., July-August 2021 .......................................................10

BNY Mellon, *The Year Ahead: The Depository Receipts Market in 2021*.......................................................9

Chicago Board of Options Exchange, *U.S. Options Market Volume Summary*, at https://www.cboe.com/us/options/market_statistics/ (visited Oct. 20, 2022) .......................................................8

Ann Lipton, *In Connection With*, Business Law Prof Blog, Oct. 8, 2022 .................................................................................................................... 10

*See* Tom Zanki, *SPACs Could Face More Litigation Risks Under SEC Proposal*, Law360, Oct. 4, 2022 ....................................................................... 10

U.S. Securities and Exchange Commission, *Derivatives*, at https://www.investor.gov/introduction-investing/investing-basics/glossary/derivatives#:~:text=Financial%20instruments%20 whose%20performance%20is,movement%20of%20the%20underl ying%20stock (last visited Oct. 20, 2022) ......................................................... 8

## INTEREST OF *AMICI*

*Amici Curiae* are scholars who teach and write about securities law.[1] They have an interest and expertise concerning the scope of protections for investors under the national securities laws. This brief is offered to assist the Court in defining that scope.

James Cox is the Brainerd Currie Professor at Duke Law School.

Donald Langevoort is the Thomas Aquinas Reynolds Professor at Georgetown University Law Center.

Frank Partnoy is Adrian A. Kragen Professor at UC Berkeley School of Law.

Joel Seligman is President Emeritus and University Professor at the University of Rochester.

James Spindler holds the Mark L. Hart, Jr., Endowed Chair at the University of Texas School of Law.

Randall Thomas holds the John S. Beasley Chair at Vanderbilt Law School.

Urska Velikonja is Anne Fleming Research Professor at Georgetown University Law Center.

*Amici* join this brief solely in their individual capacities.

---

[1] This brief is filed with the consent of the Parties. Pursuant to Fed. R. App. P. 29(4)(E) and Local Circuit Rule 29.1(b), counsel for *Amici* affirm that no counsel for a Party authored this brief in whole or in part, nor did any person or entity, other than *Amici* or their counsel, make a monetary contribution to this brief's preparation or submission.

**ARGUMENT**

The panel decision here adopted a bright-line rule requiring "plaintiffs to have bought or sold a security of the issuer about which a misstatement was made in order to have standing to sue under Section 10(b)." Dkt. No. 129 ("Op.") at 8. This is a new requirement. It does not appear in *Blue Chip* or this Court's decision in *Birnbaum*, in both of which plaintiffs had not purchased or sold *any* security.[2] Moreover, it contradicts controlling Supreme Court and Circuit precedent, which clarify that statutory standing is simply a question of whether the plaintiff has a cause of action on the merits. Section 10(b) and Rule 10b-5 require only that a misrepresentation be made "in connection with" the plaintiff's purchase or sale of a security. The panel's decision overstepped the judicial role by adding a new element to those imposed by Congress and the SEC.

The panel's new requirement appears to create a broad and unanticipated exception to Section 10(b)'s coverage applicable to important categories of securities, such as SPACs and derivatives. That exception demonstrates why the panel's rule is overly categorical as framed and mistaken in its assumption that an entity's misrepresentations about its own business can defraud only purchasers of securities issued by that entity.

---

[2] *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952).

**I.    The panel decision improperly created an additional "statutory standing" rule beyond the requirements of the Rule 10b-5 right of action.**

The panel erred by treating statutory standing as a freestanding, judge-made requirement beyond the established elements of a cause of action under Section 10(b) and Rule 10b-5. In so doing, the panel relied on *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004), which sharply distinguished the "standing" inquiry from the "in connection with" requirement of Rule 10b-5. *See id.* at 33, 34; Op. at 11 n.6 (making the same distinction). But this Court decided *Nortel* before the Supreme Court's decision in *Lexmark International, Inc. v Static Control Components, Inc.*, 572 U.S. 118 (2014). That decision, this Court has acknowledged, "clarified . . . that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark*, 572 U.S. at 128).[3]

The point now is not to correct the panel's terminology but rather to establish that the *only* limits on who can sue under Rule 10b-5 are those established within the elements of the cause of action itself. The panel made no effort to connect its

---

[3] *See also In re Barclays Liquidity Cross and High Frequency Trading Litig.*, 390 F. Supp.3d 432, 446-47 & n.9 (S.D.N.Y. 2019) (discussing the purchaser-seller rule, post-*Lexmark*, as limiting the scope of the Rule 10b-5 cause of action).

holding with the language of Section 10(b) and Rule 10b-5, which limit actionable fraud to that which takes place "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Although judicially-implied, this cause of action is a function of Congress's intent in the 1933 and 1934 Acts and their interpretation by the SEC in Rule 10b-5. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977). As Justice Powell observed in *Blue Chip*, "[t]he critical phrase in both the statute and the Rule is 'in connection with the purchase or sale of any security.'" 421 U.S. at 756 (Powell, J., concurring). That was the phrase that the Court interpreted in *Blue Chip*, and as such it defines the class of plaintiffs that may sue under Rule 10b-5. *See id.* at 733-34 (majority opinion).

Both the Supreme Court and this Circuit have defined "in connection with" as largely synonymous with the "materiality" element of a securities fraud cause of action. *See Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals . . . to buy or to sell a 'covered security.'");[4] *In re Ames Dep't*

---

[4] *Chadbourne & Parke* construed the Securities Litigation Uniform Standard Act but noted that "we read the [SLUSA] in light of and consistent with . . . the Securities Exchange Act of 1934 and the Securities Act of 1933." 571 U.S. at 389.

*Stores Inc. Stock Litig.*, 991 F.2d 953, 965 (2d Cir. 1993).[5] The Court has "consistently 'espoused a broad interpretation' of 'in connection with' in the context of §10(b) and Rule 10b-5." *Chadbourne & Parke*, 571 U.S. at 392 (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85-86 (2006)).

The panel thus erred in grafting an additional element—that the fraudulent statement must have been made about the particular security the plaintiff bought, rather than simply material to the plaintiff's purchase—onto the Rule 10b-5 cause of action. *See* Concurrence, Dkt. No. 122 at 4 (recognizing the panel "created new law"). Although the panel invoked principles of judicial restraint to narrow an implied right of action, it betrayed those principles by adding requirements not authorized by the text of §10(b) or Rule 10b-5. Materiality and loss causation elements further limit who can recover for securities fraud. But statutory standing affords no license to craft new limits on the class of potential plaintiffs.

Efforts to construct additional hurdles have sewn confusion within this Circuit and other circuits. *Nortel* denied standing to persons who "purchased the security of

---

[5] *See also SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968) (en banc) ("[I]t seems clear from the legislative purpose Congress expressed in the Act, and the legislative history of Section 10(b) that Congress when it used the phrase 'in connection with the purchase or sale of any security' intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and in connection therewith, so relying, cause them to purchase or sell a corporation's securities.").

a company other than the one that made the misstatement," 369 F.3d at 28, only to have this Court walk that rule back in *In re NYSE Specialists Securities Litigation*, 503 F.3d 89, 102 (2d Cir. 2007) (Sotomayor, J.). Similarly, the panel here rejected the Third Circuit's reasoning in *Cendant*, Op. at 11 n.6, but the *Cendant* court justifiably thought it was relying on *this Circuit*'s precedent in cases like *Ames Department Stores* and *Texas Gulf Sulphur*. *See Semerenko v. Cendant Corp.,* 223 F.3d 135, 175-76 (3d Cir. 2000). *En banc* review is warranted to reject the panel's new element in Rule 10b-5 cases and restore this circuit's prior interpretation of the "in connection with" requirement.

## II. Applied literally, the panel's rule would exempt large, well-established categories of securities transactions from scrutiny under Rule 10b-5.

*Blue Chip* said the virtue of the purchaser-seller rule "is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission *relates*." 421 U.S. at 747 (emphasis added). The panel's decision significantly narrows this to "plaintiffs [who] have bought or sold a security *of the issuer* about which a misstatement was made." Op. at 8 (emphasis added). This change would have significant unintended consequences. That is because a misrepresentation may "relate" to important classes of securities that are not "issued" by the company "about which a misstatement was made" but whose value is nonetheless a function of that company's prospects. Examples include options and other derivatives, securities of SPACs, and American depository shares or receipts

6

("ADS"). The panel's decision threatens to strip purchasers and sellers of these securities from protection under Rule 10b-5, contrary to settled law.

In an option contract, "a seller agrees to sell or a purchaser agrees to buy a security at a fixed price on or before a fixed date in the future." *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988).[6] Representations about the value of the underlying stock plainly "relate" to an option contract, because "the market value of an option contract is responsive to changes in the market price of the underlying stock." *Id.*[7] *Blue Chip* made clear that "holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b-5." 421 U.S. at 751.[8] As Judge Gibbons explained decades ago, the purchaser-seller rule "confined section 10(b) liability to members of the precise class for the protection of which the 1934 Act was enacted: participants in the national securities markets. Options traders are participants in those markets." *Deutschman*, 841 F.2d at 507.[9]

---

[6] Congress included options in the statutory definition of a security in 1982. *See* 15 U.S.C. § 78c(a)(10).

[7] *See id.* at 504 (observing that "misstating material facts to the public" can "caus[e] a distortion in the market price of the underlying security, and in the necessarily related market price of the option contract").

[8] *See also In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1330 (N.D. Ga. 2007) (option sellers rely "on the integrity of the price of the underlying stock"); *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 155 (N.D. Cal. 1991) (same).

[9] *See also In re Arakis Energy Corp. Sec. Litig.*, No. 95–CV–3431 (ARR), 1999 WL 1021819, at *3 (E.D.N.Y. Apr. 27, 1999) (adopting Judge Gibbons's

7

The panel decision contradicts this settled law, because an option is typically a private arrangement among investors and *not* "a security of the issuer about which a misstatement was made." This would exclude from fraud protections an options market currently valued at $13 trillion.[10] Similarly, the panel's new rule threatens to strip anti-fraud protection from a vast range of derivatives purchasers. Misrepresentations about a stock may "relate to" purchases of derivative instruments, because the performance of the underlying stock drives the derivatives' value.[11] But options and derivatives seem to fall outside the panel's new standing rule because they are not securities issued by the issuer of the underlying stock.

Similarly, ADS are securities issued by a depository to trade domestically as a stand-in for foreign issued securities. ADS are issued by a U.S. market-maker, not the foreign company itself. This Court and the Supreme Court have addressed large

---

analysis in *Deutschmann* upholding standing of options purchasers under Section 10(b)) (citing and collecting cases); *In re Oxford Health Plans, Inc. Sec. Lit.,* 199 F.R.D. 119, 123–24 (S.D.N.Y. 2001) (holding that options traders were adequate class representatives in a §10(b) suit).

[10] *See* Chicago Board of Options Exchange, *U.S. Options Market Volume Summary*, at https://www.cboe.com/us/options/market_statistics/ (visited Oct. 20, 2022).

[11] U.S. Securities and Exchange Commission, *Derivatives*, at https://www.investor.gov/introduction-investing/investing-basics/glossary/derivatives#:~:text=Financial%20instruments%20whose%20performance%20is,movement%20of%20the%20underlying%20stock (last visited Oct. 20, 2022) ("Derivatives" are "[f]inancial instruments whose performance is derived, at least in part, from the performance of an underlying asset, security or index").

8

ADS transactions without questioning ADS holders' standing to sue under Section 10(b) and Rule 10b-5.[12] The market for ADS is massive, with $1.3 trillion in assets under management in 2021.[13] However, the panel's rule, taken literally, would exclude purchasers of ADS, even though these securities' value is driven by information about the underlying company's business.

The panel's rule could similarly exempt special purpose acquisition companies ("SPACs"). SPACs issue securities to investors but exist solely for the purpose of merging with another company. Because the SPAC has no operations of its own, the value of its shares is solely a function of its prospect of merging with a company that investors expect to be profitable. A misrepresentation concerning the target company would thus plainly relate to—and be "in connection with"—the purchase or sale of securities issued by the SPAC. A share in the SPAC, however, is equally plainly not "a security of the issuer about which a misstatement was made," as the panel's opinion requires. Op. at 8.

Foreclosing SPAC investors from bringing Rule 10b-5 actions could have disastrous consequences. In 2020, 247 SPACs were created with $80 billion

---

[12] *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012).

[13] *See* BNY Mellon, *The Year Ahead: The Depository Receipts Market in 2021*, April 2021, https://www.bnymellon.com/us/en/insights/all-insights/the-year-ahead-the-dr-market-in-2021.html.

invested, "account[ing] for more than 50% of new publicly listed U.S. companies."[14] Regulators have become increasingly concerned about "regulatory arbitrage" in the SPAC market producing widespread opportunities for fraud.[15] Excluding SPAC investors from remedies under Rule 10b-5 would exacerbate this problem and undercut the impact of proposals to require more disclosures in the SPAC process.[16]

These examples show that misrepresentations will often "relate" to, or occur "in connection with," purchases or sales of more than one kind of security. So, too, with mergers. Frutarom's statements about its business were also statements about IFF, because IFF was acquiring Frutarom, and investors in IFF would look to Frutarom's prospects to evaluate the impact of the transaction on IFF's business. That is why, of course, IFF was required to include information about Frutarom in its S4 registration statement for IFF's own securities.[17] Up to now, federal securities law has been flexible enough to accommodate the economic reality of these

---

[14] Max H. Bazerman & Paresh Patel, SPACs: What You Need to Know, Harvard Bus. Rev., July-August 2021, https://hbr.org/2021/07/spacs-what-you-need-to-know.

[15] *See* Tom Zanki, *SPACs Could Face More Litigation Risks Under SEC Proposal*, Law360, Oct. 4, 2022, https://www.law360.com/articles/1479481.

[16] *See* Zanki, *supra* (discussing SEC proposals for enhanced disclosure requirements).

[17] *See* Ann Lipton, *In Connection With*, Business Law Prof Blog, Oct. 8, 2022, https://lawprofessors.typepad.com/business_law/2022/10/in-connection-with.html ("[F]irst, let's just point out the incongruence of treating statements in a prospectus for the sale of the acquirer's stock as not being about the acquirer.").

transactions and protect their participants from fraud. The panel's new rule withdrawing that protection would upset pervasive and settled expectations, with no-doubt-unintended consequences for securities markets that are hard to predict. This Court should grant *en banc* review to restore that crucial flexibility and preserve those expectations.

### CONCLUSION

The petition for rehearing *en banc* should be granted.

Respectfully submitted,

DATED: October 21, 2022

/s/ *Ernest A. Young*

Carol C. Villegas
Jake Bissell-Linsk
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700

Ernest A. Young
*Counsel of Record*
3208 Fox Terrace Dr.
Apex, NC 27502
(919) 360-7718

*Counsel for Amici Curiae Securities Law Scholars*

11

## CERTIFICATE OF SERVICE

I hereby certify, on the 26th day of October 2022, the foregoing brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system.  Notice of this filing and its viewing and downloading are thereby provided to all counsel of record by cooperation of the CM/ECF system.

Dated: October 26, 2022

/s/ Ernest A. Young
Ernest A. Young
Counsel of Record
3208 Fox Terrace Dr.
Apex, NC 27502
Tel: (919) 360-7718

Carol C. Villegas
Jake Bissell-Linsk
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
JBissell-Linsk@labaton.com

*Counsel for Amici Curiae*