# EXHIBIT 1

2022 WL 19403712 (S.D.N.Y.) (Trial Motion, Memorandum and Affidavit)
United States District Court, S.D. New York.

In re CARLOTZ, LITIGATION INC. SECURITIES.

No. 1:21-cv-05906-RA.
August 22, 2022.

**Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint**

Kim E. Miller (Km-6996), 250 Park Avenue, 7th Floor, New York, NY 10177, Telephone: (212) 696-3730, Facsimile: (504) 455-1498, E-Mail: kim.miller@ksfcounsel.com, -and-, Lewis S. Kahn, 1100 Poydras Street, Suite 3200, New Orleans, LA 70163, Telephone: (504) 455-1400, Facsimile: (504) 455-1498, E-Mail: lewis.kahn@ksfcounsel.com, Lead Counsel for Lead Plaintiff David Berger, Additional Plaintiff Craig Bailey, and the Class.

## TABLE OF CONTENTS

| | |
|---|---|
| INTRODUCTION | 1 |
| ARGUMENT | 3 |
| I. RULE 12(b)(6) LEGAL STANDARD | 3 |
| II. FACTUAL OVERVIEW | 3 |
| A. The Complaint's Alleged Facts | 3 |
| B. Defendants Improperly Create Their Own Factual Universe | 8 |
| 1. Materials Properly Considered | 8 |
| 2. Defendants' "Background" Section Is Improper on a Rule 12(b)(6) Motion and Should be Disregarded | 10 |
| III. PLAINTIFFS HAVE STANDING FOR EACH CLAIM ALLEGED | 12 |
| A. Section 11 and 12(a) Standing | 12 |
| B. Section 10(b) Standing | 17 |
| IV. PLAINTIFFS ADEQUATELY ALLEGE SECURITIES ACT CLAFMS | 18 |
| A. Elements and Pleading Standard for Section 11 and 12 Claims | 18 |
| B. Plaintiffs Sufficiently Allege Material Misstatements and Omissions in CarLotz' Registration Statement | 19 |
| 1. Statements about CarLotz' "Deep Pool" of Sourcing Partners | 20 |
| 2. Statements about CarLotz' Business Model | 22 |
| 3. Statements about CarLotz' "Best in Class" Unit Economics | 25 |

4. Statements About CarLotz' High Levels of Inventory ........................................................................................ 26

C. Defendants had a Duty to Disclose Negative Trends Pursuant to Item 303 ........................................................ 27

V. PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT CLAFMS ............................................................ 27

A. Elements and Pleading Standard for Section 10(b) Claims ................................................................................. 27

B. Plaintiffs Adequately Allege Materially False or Misleading Statements and Omissions Under Section 10(b) ............................................................................................................................................................................. 28

C. Plaintiffs Successfully Plead Scienter for their Section 10(b) Claims ................................................................ 31

D. Plaintiffs Adequately Demonstrate Loss Causation ............................................................................................ 36

VI. DEFENDANTS' BOILERPLATE ARGUMENTS FAIL ................................................................................. 38

A. Plaintiffs' Claims are not "Fraud by Hindsight" ................................................................................................ 38

B. Defendants' Statements Are Not Puffery ............................................................................................................ 41

C. Defendants Misstate and Misapply the Standard for Opinion Statements ........................................................ 43

D. Defendants' Statements are Not Protected by Safe Harbor ................................................................................ 44

E. Defendants' Attacks on the Confidential Witnesses are Meritless ..................................................................... 47

VII. PLAINTIFFS SUCCESSFULLY PLEAD CONTROL LIABILITY CLAIMS ............................................. 48

VIII. LEAVE TO AMEND ...................................................................................................................................... 48

CONCLUSION ........................................................................................................................................................ 49

## TABLE OF AUTHORITIES

### Cases

*Abramson v. NewLink Genetics Corp.,* 965 F.3d 165 (2d Cir. 2020) ...... 37, 42, 43

*Ashcroft v. Iqbal,* 556 U.S. 662(2009) ................................................. 3

*Basic Inc. v. Levinson,* 485 U.S. 224(1988) ......................................... 20

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723(1975) ................. 17

*Boluka Garment Co. v. Canaan Inc.,* 547 F. Supp. 3d 439 (S.D.N.Y. 2021) ....................................................................................................... 36

*Bond v. Clover Health Invs., Corp.,* No. 3:21-cv-00096, 2022 U.S. Dist. LEXIS 34417 (M.D. Tenn. Feb. 28, 2022) ..................................... 18

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.,* No. 4:19-cv-957, ... 18

**In re CARLOTZ, LITIGATION INC. SECURITIES., 2022 WL 19403712 (2022)**

2021 U.S. Dist. LEXIS 71757 (S.D. Tex. Apr. 14, 2021) ......................

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.,* 450 F. Supp. 3d 379 (S.D.N.Y. 2020) ........................ 12

*City of Providence v. Aeropostale, Inc.,* 2013 U.S. Dist. LEXIS 44948 (S.D.N.Y. Mar. 25, 2013) ........................ 45

*Cohen v. Flushing Hosp. & Med. Ctr., Local 1199,* 68 F.3d 64 (2d Cir. 1995) ........................ 9

*Deas v. Alba Carting & Demolition Inc.,* No. 17-cv-3947, 2018 U.S. Dist. LEXIS 245772 (S.D.N.Y. Jan. 22, 2018) ........................ 11

*Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.,* No. 21-3382, 2022 U.S. Dist. LEXIS 102937 (E.D. Pa. June 9, 2022) ........................ 24

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.,* 413 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................ 28

*Dura Pharms., Inc. v. Broudo,* 544 U.S. 336(2005) ........................ 37

*Employees' Ret. Sys. v. Blanford,* 794 F.3d 297 (2d Cir. 2015) ........................ 22

*Fellman v. Electro Optical Sys. Corp.,* No. 98-cv-6403, 2000 U.S. Dist. LEXIS 5324 (S.D.N.Y. Apr. 25, 2000) ........................ 13

*Friedman v. Endo Int'l PLC,* No. 16-cv-3912, 2018 U.S. Dist. LEXIS 6737 (S.D.N.Y. Jan. 16, 2018) ........................ 24

*Gentry v. Kaltner,* No. 17-CV-8654, 2020 U.S. Dist. LEXIS 54182 (S.D.N.Y. Mar. 25, 2020) ........................ 9

*Goel v. Bunge, Ltd.,* 820 F.3d 554 (2d Cir. 2016) ........................ 8

*Herman & Maclean v. Huddleston,* 459 U.S. 375(1983) ........................ 18, 19, 28

*Interpublic Grp. of Cos. v. Fratarcangelo,* 2002 U.S. Dist. LEXIS 22989 (S.D.N.Y. Nov. 26, 2002) ........................ 30

*In re Am. Int'l Gp., Inc.,* 741 F. Supp. 2d 511 (S.D.N.Y. 2010) ........................ 32

*In re Bear Stearns Cos., Inc. Sec, Derivative, & ERISA Litig.,* 763 F. Supp. 2d 423 (S.D.N.Y. 2011) ........................ 39

*In re CINAR Corp. Sec. Litig.,* 186 F. Supp. 2d 279 (E.D.N.Y. 2002) ........................ 19

*In re Delcath Sys., Inc. Sec. Litig.,* 36 F. Supp. 3d 320, (S.D.N.Y. 2014) ........................ 48

*In re Facebook, Inc.,* 986 F. Supp. 2d 487 (S.D.N.Y. 2013) ........................ 20

*In re GE Sec. Litig.,* 844 Fed. Appx. 385 (2d Cir. 2021) ........................ 43

**In re CARLOTZ, LITIGATION INC. SECURITIES., 2022 WL 19403712 (2022)**

*In re Giant Interactive Grp., Inc. Sec. Litig.,* 643 F. Supp. 2d 562 (S.D.N.Y. 2009) .................................................................... 36

*In re Glob. Brokerage, Inc.,* No. 1:17-cv-00916, 2019 U.S. Dist. LEXIS 54506 (S.D.N.Y. Mar. 28, 2019) ................................ 8

*In re Glob. Crossing, Ltd. Sec. Litig.,* 313 F. Supp. 2d 189 (S.D.N.Y. 2003) ...................................................................... 12

*In re Lihua Int'l Sec. Litig.,* No. 14-cv-5037, 2016 U.S. Dist. LEXIS 44252 (S.D.N.Y. Mar. 31, 2016) ........................................ 3

*In re Longtop Fin. Techs. Ltd. Sec. Litig.,* 910F. Supp. 2d 561 (S.D.N.Y. 2012) ................................................................. 32

*In re Moody's Corp. Sec. Litig.,* 599 F. Supp. 2d 493 (S.D.N.Y. 2009) ..................................................................................... 41

*In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347 (2d Cir. 2010) ...................................................................... 12, 18, 25

*In re Multiplan Corp. Stockholders Litig.,* 268 A.3d 784 (Del. Del. Ch. 2022) ........................................................................ 14

*In re Pareteum Sec. Litig.,* 2021 U.S. Dist. LEXIS 151106 (S.D.N.Y. Aug. 11, 2021) ............................................... 12, 15, 16, 39

*In re Petrobras Sec. Litig.,* 116F. Supp. 3d 368 (S.D.N.Y. 2015) ............. 41, 42

*In re Refco, Inc. Sec. Litig.,* 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ......... 32

*In re Salix Pharm., Ltd.,* No. 14-cv-8925, 2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22, 2016) ......................................... 42

*In re Stillwater Capital Partners Inc.,* 858 F. Supp. 2d 277 (S.D.N.Y. 2012) ................................................................... 35

*In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256 (3d Cir. 2006) ...................................................................... 16

*In re Synchrony Fin. Sec. Litig.,* No. 3:18-cv-1818, 2022 U.S. Dist. LEXIS 24717 (D. Conn. Feb. 11, 2022) ................................. 20

*In re Tufin Software Techs. Ltd. Sec. Litig.,* No. 1:20-cv-5646, 2022 U.S. Dist. LEXIS 34053 (S.D.N.Y. Feb. 25, 2022) ................... 48

*In re Tufin Software Techs. Ltd. Secs. Litig.,* 2022 U.S. Dist. LEXIS 34053 (S.D.N.Y. Feb. 25, 2022) ......................................... 19

*In re Vale S.A. Sec. Litig.,* No. 19-cv-526, 2020 U.S. Dist. LEXIS 91150 (E.D.N.Y. May 20, 2020) ........................................ 46

*In re Vivendi, S.A., Securities Litig.,* 838 F.3d 223 (2d Cir. 2016) .......... 37, 45, 46

**In re CARLOTZ, LITIGATION INC. SECURITIES., 2022 WL 19403712 (2022)**

*In re Weight Watchers Int'l Inc. Sec. Litig.,* F. Supp. 3d 224 (S.D.N.Y. 2020.............................................................................. 48

*In re WRT Energy Sec. Li tig.,* No. 96-cv-3610, 2005 U.S. Dist. LEXIS 18701 (S.D.N.Y. Aug. 30, 2005).................................. 36

*Ind. Pub. Ret. Sys. v. SAIC, Inc.,* 818 F.3d 85(2d Cir. 2016) ................... 27

*Laurel Shipping LLC v. Ridgebury Kilo LLC,* 560 F. Supp. 3d 802 (S.D.N.Y. 2021) ......................................................................... 48

*Lawrence v. Cohn,* 3 25 F.3d 141 (2d Cir. 2003)................................ 17

*Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706 (2d Cir. 2011) ................. 18, 19, 27

*Moloney v. Ollie's Bargain Outlet Holdings, Inc.,* 518 F. Supp. 3d 772 (S.D.N.Y. 2021) ................................................................ 35

*Masel v. Villarreal,* 924 F.3d 734 (5th Cir. 2019) .............................. 39

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.,* No. 19-cv-7536, 2021 U.S. Dist. LEXIS 61182 (S.D.N.Y. Mar. 30, 2021).... 17

*Meyer v. JinkoSolar Holdings Co.,* 761 F.3d 245 (2d Cir. 2014) ............. 25, 31

*Meysam Moradpour v. Velodyne Lidar, Inc.,* No. 21-cv-01486, 2022 U.S. Dist. LEXIS 117273 (N.D. Cal. July 1, 2022)............................ 18

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.,* No. 3:09-cv-01740, 2013 U.S. Dist. LEXIS 40788 (D. Conn. Mar. 23, 2013)........................................................................... 46

*Nguyen v. New Link Genetics Corp.,* 297 F. Supp. 3d 472 (S.D.N.Y. 2018) ............................................................................ 34

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.,* 367 F. Supp. 3d 16 (S.D.N.Y. 2019) ................................................. 36

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175(2015) ....................................................... 43

*Pac. Iv. Mgmt. Co. v. Mayer Brown LLP,* 603 F.3d 144 (2d Cir. 2010) ................................................................................ 28

*Panther Partners Inc. v. Ikanos Communs., Inc.,* 681 F.3d 114 (2d Cir. 2012) ...................................................................... 27

*Pinter v. Dahl,* 486 U.S. 622(1988) ............................................. 15

*Pirani v. Slack Techs., Inc.,* 13 F.4th 940 (9th Cir. 2021) .................... 15

*Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876 (2d Cir. 1972) ... 14

*Rombach v. Chang,* 355 F.3d 164 (2d Cir. 2004) ............................. 19

In re CARLOTZ, LITIGATION INC. SECURITIES., 2022 WL 19403712 (2022)

*Roth v. Jennings,* 489 F.3d 499 (2d Cir. 2007) ................................................ 9, 10

*Set Capital LLC v. Credit Suisse Grp. AG,* 996 F.3d 64 (2d Cir. 2021) ........................................................................................... 47

*Setzer v. Omega Healthcare Inv'rs, Inc.,* 968 F.3d 204 (2d Cir. 2020) .. 32

*Silvercreek Mgmt. v. Citigroup, Inc.,* 248 F. Supp. 3d 428 (S.D.N.Y. 2017) ................................................ 19

*Speakes v. Taro Pharm. Indus.,* No. 16-cv-08318, 2018 U.S. Dist. LEXIS 163281 (S.D.N.Y. Sep. 24, 2018)................................................ 22

*Stratte-McClure v. Stanley,* 2013 U.S. Dist. LEXIS 10387 (S.D.N.Y. Jan. 18, 2013)................................................ 37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308(2007) ........... 31

*Tung v. Bristol-Myers Squibb Co.,* 412 F.Supp.3d 453 (S.D.N.Y. 2019) ................................................ 34

*United Hous. Found., Inc. v. Forman,* 421 U.S. 837(1975) ...................... 16

*Wachovia Equity Sec. Litig. v. Wachovia Corp.,* 753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................ 12

*Wallace v. Intralinks,* No. 11-cv-8861, 2013 U.S. Dist. LEXIS 65958 (S.D.N.Y. May 8, 2013)................................................ 37

**Statutes and Rules**

15 U.S.C. § 77k(a) ................................................ 18

15 U.S.C. § 78u-4(b) ................................................ 28

17 C.F.R. § 229.303(a)(3)(ii) ................................................ 27

**Other Authorities**

Debate in Senate to Override President's Veto, 141 Cong. Rec. S190602................................................ 45

Harald Halbhuber, *Economic Substance in SPAC Regulation,* 40 Yale J. on Reg. Bulletin 44, 46 (2022)................................................ 14

Lead Plaintiff David Berger and additional Plaintiff Craig Bailey (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Second Amended Complaint (Dkt. No. 67).[1]

## INTRODUCTION

Despite Defendants' extensive efforts to distort and complicate Plaintiffs' claims (including an overlength 51-page brief with an 11-page fact section that only cites the Complaint ***three times***, and instead cites hundreds of additional pages of tables,

declarations, and exhibits, many of which are referenced nowhere in Plaintiff's pleading), the Complaint presents a simple, straight-forward case for liability under Sections 11 and 10(b). Plainly put, Defendants described a profitable, scalable, low-risk business model in CarLotz' going public documents--but, unbeknownst to investors, operated their company in an entirely different, far riskier way.

Defendants routinely touted CarLotz' "asset light" consignment-to-retail business model, flat-fee contract structure where the customer would pay for all reconditioning costs, "superior unit economics," "deep pool of sourcing partners," "virtually unlimited" supply of vehicles, and "historically high" inventory as features that differentiated their business from the competition. In truth, at the time these statements were made, the Company sourced 60% of its inventory from just one corporate partner, with whom it had a profit-sharing (not flat-fee) arrangement where Carlotz was responsible for paying all shipping and reconditioning costs. And although that partner's vehicles did, in fact, create "historically high" inventory levels at CarLotz, the Company was unable to process this inventory, resulting in what CarLotz later referred to as a "log jam." CarLotz was forced to sell these vehicles with "aggressive pricing," leading to far *inferior,* not superior, unit economics when compared to the competition. When this poor performance caused the partner to stop supplying CarLotz with vehicles, the Company was forced to acquire large quantities of vehicles at auction--just like any other used car dealer.

With Section 11 claims, as long as Plaintiffs plead the falsity of statements in the registration statement, liability is virtually absolute. Faced with this low bar, Defendants lean heavily into a standing argument that "[a] merger, whether for a de-SPAC or otherwise, is not an IPO," "cannot form the basis of a Section 11 claim," and criticize Plaintiffs' application of the Securities Act to SPAC transactions as "novel" and "unsupported." Def. Br. at 48-49. This argument, however, rings hollow given that defense counsel's firm, Freshfields Bruckhaus Deringer US LLP, wrote an open letter to the SEC less than three months ago (8 days before filing their Motion here) that endorses Plaintiffs' legal position. *See* Miller Decl. Ex. 1 at 14. The letter, written in response to the SEC's recent proposed rules to specifically address disclosure requirements for SPAC transactions, explains that "De-SPAC Gatekeepers Already Exist," including that "[t]he SPAC and its directors and officers are required to sign any registration statement utilized in de-SPAC transactions and *incur Section 11 liability* for the disclosure provided to investors in the registration statement." *Id.*

But regardless of how Section 11 applies to the de-SPAC transaction, Plaintiffs adequately allege an additional cause of action under Section 10(b) of the Exchange Act, because, among other things, the Company later admitted in its belated financial reports for the quarter ending the day after the Prospectus was filed, that all these negative concealed facts were known by the CarLotz at the time of the misrepresentations. It was a classic bait and switch. Unable to escape that reality, Defendants attempt a legal magic trick that turns a later company admission into impermissible "fraud by hindsight." Not only does the maneuver fail as a matter of law and basic common sense, it also dismantles Defendants' loss causation arguments, because Defendants concede that CarLotz' later admissions revealed precisely what Plaintiffs allege Defendants misrepresented throughout the Class Period.

For these reasons, and the others discussed herein, Defendants' motion to dismiss should be denied in full.


## ARGUMENT


### I. RULE 12(b)(6) LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Lihua Int'l Sec. Litig.,* No. 14-cv-5037, 2016 U.S. Dist. LEXIS 44252, at *21 (S.D.N.Y. Mar. 31, 2016) (Abrams, J.) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "In making this determination, courts must accept as true the facts in a complaint." *Id.*


### II. FACTUAL OVERVIEW


#### A. The Complaint's Alleged Facts

CarLotz purports to be a consignment-to-retail used vehicle marketplace which operates both online and at a series of retail "hubs" around the country. ¶¶3, 50. By consigning vehicles, compared to the traditional model of purchasing and re-selling, CarLotz claimed to operate an "asset-light" company - in other words, it did not own its inventory. ¶¶3, 93. Instead, it claimed to source vehicles through individual consumers as well as a "deep pool" of corporate partners, including fleet leasing companies, rental car companies, banks, wholesalers, and original equipment manufacturers ("OEM's). *Id.* CarLotz would either sell the consigned vehicle for a fee or, if the vehicle could not be sold within a contractual "consignment period," return it to the partner. ¶3. CarLotz claimed their method would net the seller several thousand dollars more than selling the vehicle to a dealership or at auction, and, since CarLotz did not have capital tied up in inventory, the business model would be very low risk. *Id.*

In the latter half of 2020, CarLotz took steps to effectuate a quick and lucrative merger with a special-purpose acquisition company ("SPAC"), Acamar Partners Acquisition Corp. ¶¶4, 81-91. Acamar conducted extremely limited due diligence on CarLotz in order to close the merger before running up to the deadline at which time the SPAC would dissolve, and its funds would have to be returned to shareholders. *Id.* Defendants Bor, Stoltz, and Polak, as well as other CarLotz executives, collected large stock grants and cash bonuses upon the closing of the merger. ¶¶4, 217-220. The Acamar Individual Defendants also received monetary benefits from merger, and two of the directors were given seats on the Board of Directors for the newly combined company. ¶4.

Starting with the announcement of the prospective merger on October 22, 2020, the beginning of the Class Period, and continuing through the next few months, the CarLotz Defendants conducted a series of investor presentations to drum up shareholder support for the merger. ¶¶5, 92-96, 110-48. In these presentations, Defendant Bor made a number of material misstatements and omissions. *Id.* He touted CarLotz' "capital efficient" and "asset light" business model, stating that it had "virtually no dollars at risk"; claimed that, due to its flat fee agreement with customers, "our unit economics are superior to our peers"; touted that "60%" of the Company's total inventory was "consigned corporate inventory" made up of a "deep pool" of corporate sourcing partners; and explained that, in response to increased demand for used cars due to the Covid-19 pandemic, "our inventories are at historically high levels," such that the pandemic was "net-net," a "slight positive for us." *Id.*

In reality, at the time these statements were made, CarLotz struggled to find corporate consigning partners. ¶6. In fact, according to former employees working for CarLotz during the Class Period, "not a lot of people were consigning" vehicles at all, which caused the Company to make up for the inventory shortfall by purchasing vehicles for resale - deviating from its publicly conveyed "asset light" business plan. ¶¶6, 63. While these inventory and sourcing issues existed prior to 2020, the Covid-19 pandemic created increased demand for used vehicles, causing corporate and consumer used vehicle sellers to derive more profits from selling at auction rather than through CarLotz' consignment model. ¶¶6, 65-80.

On December 30, 2020, Acamar published a Form 424B3 Prospectus with the SEC (the "Prospectus") containing details about its merger with CarLotz. ¶¶7, 99. The Prospectus reiterated many of the same misstatements and omissions as the aforementioned investor presentations, materially misrepresenting the current state of CarLotz' business, reiterating that "60% of our total inventory originat[es] from our growing partnerships with corporate vehicle partners," and emphasizing the lack of risk in its "asset light" business model. ¶¶7, 149-164. On the back of these material misrepresentations and omissions, shareholders voted to approve the de-SPAC business combination, and on January 21, 2021, CarLotz merged with Acamar. ¶¶7, 101. The new entity was named CarLotz, Inc., and it traded on the NASDAQ exchange under the symbol "LOTZ" with warrants trading under the symbol "LOTZW". Buoyed by Defendants' false and misleading statements and omissions, the initial stock price was over $12 per share. *Id.*

On March 15, 2021, the Company released its financial results for the fourth quarter ("4Q:2020") and year ended December 31, 2020,[2] *one day after the filing of the Prospectus,* revealing that CarLotz' business was drastically different from what Defendants had represented in pre-merger statements. ¶¶8, 180-90. Rather than 60% of CarLotz' total inventory deriving from a "deep pool" of corporate partners, as the Company previously represented, CarLotz revealed that only "one of our corporate partners has accounted for over 60% of our vehicles sourced." *Id.* Moreover, instead of the low-risk fee model the Company had underscored whereby "any reconditioning dollars are passed through to our seller," CarLotz explained that it had an "alternative fee arrangement" with this key partner, according to which "we [CarLotz] are responsible for the expenses we have incurred with respect to the vehicle, including shipping costs and any refurbishment costs we have incurred." *Id.* Even worse, CarLotz revealed that it "took too many of their units" and could not effectively process its inventory of vehicles, creating a "log jam" that resulted in lower-than-expected gross profit, and "lower retail unit

profitability" for 4Q:2020. *Id.* In other words, at the very same time that Defendants hyped CarLotz' high inventory levels, its "rapidly scalable" model, and "top half of the class" unit profitability during the lead-up to the shareholder vote, CarLotz, by the Company's own admission, was experiencing (and indeed, because the Prospectus was filed just one day before the end of 4Q:2020), *had already experienced* a "log jam" crisis that had negatively impacted its financial condition. *Id.*

Given the disparity between how Defendants described the state of CarLotz' business leading up to the shareholder vote and the revelation of the Company's actual business performance as of that time, the disclosure caught investors by surprise. On the news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume. ¶¶9, 190.

Analysts asked for "a deeper explanation of the inventory hangover" and further elaboration regarding the Company's plan to ensure inventory issues would be better managed in the future. ¶¶10, 186. The CarLotz Defendants assured investors that they were "selling cars like crazy right now," and that "[t]oday our inventory, as I mentioned, is lower than the peaks we saw earlier this year, uh, which is reflective of the sales momentum that we've seen over the last few weeks." ¶¶10, 189. Moreover, the CarLotz Defendants set GPU guidance for the next quarter, which would end in only two weeks' time, at $1,300 - $1,500, just below the GPU for 4Q:2020, and assured investors that GPU was on track to bounce back in the latter half of the year to $1,800 to $2,000. ¶¶10, 185.

But on May 10, 2021, when CarLotz released its first quarter 2021 ("1Q:2021") financial report, the Company revealed that the situation had not, in fact, improved. ¶¶11, 193. CarLotz revealed that it continued to source 60% of its total vehicles from the single corporate sourcing partner, and continued to have issues processing its inventory, forcing the Company to purge its inventory with "aggressive pricing," which in turn led to an over $1.1 million loss on wholesale vehicles and a much lower than expected GPU. ¶¶11, 193-98. Moreover, GPU for the quarter was only $1,182, far below what the CarLotz Defendants had previously indicated at the time the quarter was nearly over. ¶¶11, 194. The market was again surprised the revelation, and the Company's stock price fell $0.94, or 14%, to close at $5.57 per share on May 11, 2021, on heavy trading volume. ¶¶12, 199.

Undeterred, the CarLotz Defendants once again assured investors that the Company was turning the corner, explaining that "[w]e are seeing good progress with our sourcing partners," "we have a lot of levers to pull when it comes to inventory," and that CarLotz was "seeing significant improvement in GPU," leading the Company to maintain its guidance. ¶¶13, 105, 196.

But just 16 days later, on May 26, 2021, before market open, CarLotz announced that - due, in part, to market conditions CarLotz admitted to knowing about from before the time the Prospectus was filed - the partner from whom CarLotz sourced "more than 60% of the cars sold" during 4Q:2020 and 1Q:2021 had "paused" its relationship with CarLotz. The Company also revised its 2021 GPU guidance, lowering it by several hundred dollars. ¶¶14, 200-02. This announcement caused the stock price to decline precipitously, closing at just $4.51 on May 26, 2021, a decline of approximately 13.5%. ¶¶14, 203.

According to Confidential Witness ("CW") 5, Defendant Bor directly addressed these stock drops with employees during a companywide address, admitting that "investors don't trust us," because, in part, CarLotz owned (*i.e.,* did not consign) far more inventory than they publicly represented. ¶¶15, 209.

In the Company's November 8, 2021 earnings call in connection with CarLotz' third quarter 2021 ("3Q:2021") results, Defendant Bor conceded he needed to "elaborate on sourcing, given its importance to our business model," acknowledging that CarLotz had resorted to "auction sourcing," rather than consignment sources, which were the Company's so-called "traditional sources" that CarLotz had falsely touted as the Company's "key differentiator" and driver of the Company's "asset-light" business model. ¶17.

## B. Defendants Improperly Create Their Own Factual Universe

### 1. Materials Properly Considered

"Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in

evidence, a court adjudicating such a motion may review only a narrow universe of materials." *Goel v. Bunge, Ltd.,* 820 F.3d 554, 559 (2d Cir. 2016) (vacating the judgment of a District Court due to its reliance on materials outside the pleadings). When deciding a motion to dismiss based on Rule 12(b)(6), in addition to facts pled in the complaint, "courts may consider any written instrument attached to the complaint as an exhibit or any statement or documents incorporated in the complaint by reference." *In re Glob. Brokerage, Inc.,* No. 1:17-cv-00916, 2019 U.S. Dist. LEXIS 54506, at *24 (S.D.N.Y. Mar. 28, 2019) (Abrams, J.). In securities fraud cases, Courts may also examine SEC filings and public records, but "only to determine what the documents stated," and "*not to prove the truth of their contents.*" *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007) (emphasis in original).

Disregarding these well-established rules, Defendants submitted 650+ pages of exhibits to the court, including a number of documents that were neither attached to the complaint nor referenced therein:
• Public disclosures by companies other than CarLotz (Def. Exs. 29-36);

• A Nasdaq Equity Corporate Actions Alert dated January 21, 2021 (Def. Ex. 20);

• Analyst reports not cited in the Complaint, published by institutions which the Complaint alleges had a relationship with Carlotz management (Def. Exs. 37, 39, 40);

• News articles not cited in the Complaint (Def. Exs. 41, 42);

• Data from Manheim, which Defendants claim is admissible because it was cited in an analyst report, even though neither the analyst report nor the data was referred to in the Complaint (Def. Ex. 43, *see* Def. Br. at 13 n. 12).

The Court may not take judicial notice of these documents at this stage of the litigation without turning the motion to dismiss into a motion for summary judgment. *See, e.g., Cohen v. Flushing Hosp. & Med. Ctr., Local 1199,* 68 F.3d 64, 67 n.1 (2d Cir. 1995) ("[Defendant] presented materials beyond the pleadings ... which the district court did not exclude. Under these circumstances, the district court was required to treat the motion as one for summary judgment.") Nor may the Court take notice of the purported "facts" submitted in the declaration of Defendants' counsel, many of which are wholly irrelevant to whether the Complaint sufficiently states a claim for violation of securities laws. *See, e.g., Gentry v. Kaltner,* No. 17-cv-8654-KMK, 2020 U.S. Dist. LEXIS 54182, at *18 (S.D.N.Y. Mar. 25, 2020) (declining to take judicial notice of a declaration submitted in support of defendants' motion to dismiss).

While the Court may take judicial notice of the various SEC filings submitted by Defendants for the purpose of determining whether Defendants made the alleged misstatements or omitted certain information necessary to make the statements not misleading (*see Roth,* 489 F.3d at 509 ("[w]hen a complaint alleges, for example, that a document filed with the SEC failed to disclose certain facts, it is appropriate for the court... to examine the document to see whether or not those facts were disclosed"), it may not consider these documents for the truth of the matters asserted therein. To do so would defy logic, as the very basis of Plaintiffs' claims in this Action is that these documents contained misleading information.

### 2. Defendants' "Background" Section Is Improper on a Rule 12(b)(6) Motion and Should be Disregarded

Defendants also submitted an 11-page long background statement which only cites the Complaint *three times,* instead relying completely on the external documents discussed in the section above. This background statement asks the Court to take notice of numerous documents for the truth of the matters stated therein, sometimes citing the very statements Plaintiffs allege to be false and misleading as undisputable facts. And several statements are not supported by any citation at all.[3] The narrative replete with editorialized language[4] and subjective statements about what Carlotz or Defendant Bor "believed."[5]

Defendants also take extreme liberties with their descriptions of exhibits, especially with regards to an investor presentation deck (Def. Ex. 4), an iteration of which accompanied many of the interviews in which Defendant Bor made allegedly false and misleading statements. For example, they claim that slides 11 and 22 of the investor presentation (Def. Ex. 4 at pp. 23, 34) demonstrate that CarLotz "obviously did own some vehicles and planned to do so in the future." Def. Br. at 6. However, neither slide contains any discussion of CarLotz' future plans with regards to inventory. In the same presentation, Defendants

say that Defendant Bor discussed "CarLotz's actual and projected unit economics, noting that, *for the periods presented on the slides,* CarLotz had the second-highest retail GPU." Def. Br. at 6 (emphasis added). However, the transcript of the presentation demonstrated that Defendant Bor made no mention whatsoever of time periods, instead stating: "Our gross profit per unit is at the top of our industry and, when combined with our lower customer acquisition cost, results in a superior contribution margin per unit." Def. Ex. 3 at 16. Similarly, Defendants claim that slide 30 of the Investor Presentation "mak[es] clear that the Company's competitively sourced inventory at new hubs could be as high as 86% in the initial post-opening months." Def. Br. at 7. In truth, however, the slide shows that, while CarLotz' target for the initial post-opening *month* (singular) was 86% competitively sourced, this would drop rapidly in the following months, and by six months post-opening, 77% would be wow-competitively sourced. Def. Ex. 4 at 42.

As Defendants' background section relies almost exclusively on documents for which judicial notice is inappropriate, and contains a number of subjective and objectively false statements, the Court should disregard this narrative in its entirety, and instead "accept all allegations in the complaint as true and draw all inferences in the [Plaintiffs'] favor." *Deas v. Alba Carting & Demolition Inc.,* No. 17-cv-3947, 2018 U.S. Dist. LEXIS 245772, at *9 (S.D.N.Y. Jan. 22, 2018)(Abrams, J.).

### III. PLAINTIFFS HAVE STANDING FOR EACH CLAIM ALLEGED

Understanding the strength of Plaintiffs' allegations on the merits, Defendants attempt to sidestep the claims entirely by arguing that Plaintiffs do not have - and, by logical extension of their arguments, nobody ever has - standing to assert them. Yet, as John Coates, Acting Director of the SEC Division of Corporation Finance, has made clear, "[A] de-SPAC transaction gives no one a free pass for material misstatements or omissions." Miller Decl. Ex. 2 at 2. As discussed below, Sections 11 and 12 of the Securities Act of 1933 and Section 10(b) of the Securities and Exchange Act of 1934 apply to Defendants' de-SPAC transaction, and Plaintiffs, based on their transactions, are perfectly situated to bring a cause of action under those statutes.

### A. Section 11 and 12(a) Standing

"[T]o have standing to assert a section 11 claim, plaintiffs must be able to trace their shares to an allegedly misleading registration statement." *In re Glob. Crossing, Ltd. Sec. Litig.,* 313 F. Supp. 2d 189, 206 (S.D.N.Y. 2003). "At the pleading stage, a plaintiff's general allegations that securities were purchased pursuant or traceable to a false registration statement sufficiently state a claim." *In re Pareteum Sec. Litig.,* 2021 U.S. Dist. LEXIS 151106, at *55 (S.D.N.Y. Aug. 11, 2021); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.,* 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020) (same). "Section 12(a)(2) provides a similar cause of action where the securities at issue were sold," like here, "using prospectuses or oral communications containing material misstatements or omissions." *Wachovia Equity Sec. Litig. v. Wachovia Corp.,* 753 F. Supp. 2d 326, 367 (S.D.N.Y. 2011). The only difference for purposes of standing is that Section 12 only applies to initial offerings, and not "aftermarket" purchases. *In re Morgan Stanley Info. Fund. Sec. Litig.,* 592 F.3d, 358 (2d Cir. 2010).

Here, Plaintiff Bailey purchased shares of Acamar after the filing of the registration statement, which contained false and misleading statements, as described below in Section IV.B, but before the consummation of the de-SPAC business combination.[6] ¶233. Like the other investors in Acamar, he had the option of redeeming those shares for cash or investing in the new post-merger entity. ¶25. However, based on the false and misleading statements in the registration statement, Mr. Bailey chose to not redeem his shares, and instead became an investor in CarLotz, Inc. *Id.*; ¶269. Functionally, Mr. Bailey purchased CarLotz shares in CarLotz' initial public offering using his Acamar shares.[7] And because Mr. Bailey's CarLotz shares and his decision to invest in CarLotz were directly tied to the registration statement, Mr. Bailey has standing to sue under Section 11 and 12(a).

While Defendants argue that applying the Securities Act to de-SPAC transactions is a "novel" and "unsupported" theory, Plaintiffs' interpretation of the statute is reinforced by the SEC, legal commentators, existing case law, and, ironically, by Freshfields, the law firm representing Defendants in this action.

In response to a sharp increase in SPAC business combinations, SEC Director Coates made a public statement in April 2021

regarding the application of federal securities laws to such transactions. Coates explained that it is "commonly understood that it is the de-SPAC--and not the initial offering by the SPAC--that is the transaction in which a private operating company itself 'goes public,' *i.e.,* engages in its initial public offering." Miller Decl. Ex. 2 at 2-3. In other words, the SEC treats "the de-SPAC transaction as the 'real IPO'" for securities law purposes. *Id.* Accordingly, "any material misstatement in or omission from an effective Securities Act registration statement as part of a de-SPAC business combination is subject to Securities Act Section 11." *Id.* This position has been adopted by the SEC in recent proposed rules, the explanation to which notes that under the current framework, "SPAC investors may be protected by the application of Section 11 and Section 12(a)(2) of the Securities Act for material misstatements or omissions made in connection with SPAC transactions involving the filing of a registration statement."[8,9]

The SEC's position makes both legal and economic sense, because, in essence, SPACs are glorified escrow agents--until the time comes to either redeem their shares or invest in the target company, shareholders "have merely parked their cash." *See* Harald Halbhuber, *Economic Substance in SPAC Regulation,* 40 Yale J. on Reg. Bulletin 44, 46 (2022); *see also In re Multiplan Corp. Stockholders Litig,* 268 A.3d 784, 802 (Del. Del. Ch. 2022) ("public stockholders' funds held in trust did not belong to [the SPAC] until those stockholders opted not to redeem but to invest in the post-merger combined entity."). Thus, the actual "purchase" of the stock does not occur until the shareholder has committed to the investment in the combined entity and foregone the ability to redeem their shares for cash. *See Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 891 (2d Cir. 1972) ("the time of a 'purchase or sale' of securities ... is to be determined as the time when the parties to the transaction are committed to one another."). Potential investors in the post-de-SPAC company rely on proxy, prospectus, and registration statements to make the decision whether to invest in the newly public company in the same way investors rely on these materials in a traditional IPO--the documents give the public a snapshot of the company and explain why, in essence, it is worthy of their investment. Thus, the makers of those statements should be equally liable when they are materially false or misleading.

While the Second Circuit has not squarely addressed the application of Sections 11 and 12 to SPACs, the current legal landscape supports it. As a general matter, the Supreme Court has acknowledged that "it is proper for a court to consider policy considerations in construing terms in the federal securities Acts"; that "Congress had broad remedial goals in enacting the securities laws and providing civil remedies"; and "[a]ccordingly, the Court itself has construed securities law provisions not technically and restrictively, but flexibly to effectuate their remedial purposes." *Pinter v. Dahl,* 486 U.S. 622, 653 (1988) (cleaned up). Defendants' restrictive argument that "a pre-offering purchase cannot form the basis of a Section 11 claim," Def. Br. at 49, is simply wrong.

In *Pareteum,* Judge Hellerstein held that plaintiffs had standing to pursue a Section 11 claim where, similar to here, plaintiffs purchased stock of an acquired company, iPass, which then turned into Pareteum stock after the merger. 2021 U.S. Dist. LEXIS 151106, at *55. And Defendants' insistence that "[a] merger, whether for a de-SPAC or otherwise, is not an IPO," Def. Br. at 49, does not mean Section 11 cannot apply. Courts have applied Section 11 to direct listings, *see, e.g., Pirani v. Slack Techs., Inc.,* 13 F.4th 940, 947 (9th Cir. 2021)[10], and, of course, secondary offerings, *see, e.g., Pareteum,* 2021 U.S. Dist. LEXIS 151106 at *55; *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 274 n.7 (3d Cir. 2006), neither of which are IPOs.

Aside from the legal authority and the SEC's support of Plaintiffs' position, it's hard to even take Defendants' arguments seriously when the same firm that wrote their brief recently expressed the opposite view in a publicly available letter to the SEC, encouraging the agency not to adopt the recent proposed rules in which underwriters would face the same liability in de-SPAC transactions as they would in a traditional IPO. To support its position, Freshfields wrote that "'De-SPAC Gatekeepers Already Exist," including that "[t]he SPAC and its directors and officers are required to sign any registration statement utilized in de-SPAC transactions and *incur Section 11 liability* for the disclosure provided to investors in the registration statement." Miller Decl. Ex. 1 at 14. And to the extent Defendants argue that Plaintiffs are "misleadingly suggest[ing]" that the SEC supports Plaintiffs' position, Def. Br. at 49 n.62, Freshfields' letter openly acknowledges "the SEC's motivation to make the de-SPAC process and the traditional IPO more equivalent to each other...." Miller Decl. Ex. 1 at 25.[11]

As the Supreme Court has explained, when interpreting securities laws, "form should be disregarded for substance and the emphasis should be on economic reality." *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 848 (1975). Although an increasing number of companies are using de-SPAC combinations in lieu of traditional IPOs, the economic reality of the

transactions is the same: they take a private company public through an initial offering. Defendants' position is that there is a legal loophole for avoiding liability under Sections 11 and 12 by using these de-SPAC transactions; the SEC has made clear that there isn't one.

### B. Section 10(b) Standing

Defendants' next argument, that "Plaintiffs lack [Section 10(b)] standing to sue on any pre-Merger statement," fares no better. Def. Br. at 15.[12,13]

It is well settled law that the only requirement for standing to bring Section 10(b) claims is that "the plaintiff must be an actual purchaser or seller of a security." *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir. 2003) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, (1975)). Here, the transcript of each of the pre-merger investment presentations described in the Complaint was filed with the SEC by CarLotz Inc. (f/k/a/ Acamar Partners Acquisition Corp.), almost all under the heading: "This filing relates to a proposed business combination involving Acamar Partners Acquisition Corp. and CarLotz, Inc."[14] In reliance on these pre-merger statements, as well as post-merger statements where Defendants continued the same misleading narrative, Plaintiffs Berger and Bailey purchased shares in the Company which issued these statements: Acamar Partners Acquisition Corp. ("ACAM," pre-merger) and CarLotz, Inc. ("LOTZ," post-merger).[15] Nothing more is required.

In fact, multiple courts have denied motions to dismiss 10(b) and 20(a) claims for statements made by officers of a target company with regards to a SPAC merger, even when those statements were made before the merger was effectuated--just like Defendant Bor's statements in this case. *See Meysam Moradpour v. Velodyne Lidar, Inc.,* No. 21-cv-01486-SI, 2022 U.S. Dist. LEXIS 117273, at *56 (N.D. Cal. July 1, 2022); *Bond v. Clover Health Invs., Corp.,* No. 3:21-cv-00096, 2022 U.S. Dist. LEXIS 34417, at *91 (M.D. Tenn. Feb. 28, 2022); *Camelot Event Driven Fund v. AltaMesa Res., Inc.,* No. 4:19-CV-957, 2021 U.S. Dist. LEXIS 71757, at *36 (S.D. Tex. Apr. 14, 2021).

### IV. PLAINTIFFS ADEQUATELY ALLEGE SECURITIES ACT CLAIMS

### A. Elements and Pleading Standard for Section 11 and 12 Claims

Section 11 places a "relatively minimal burden on a plaintiff." *Herman & Maclean v. Huddleston,* 459 U.S. 375, 382 (1983). "Section 11 of the Securities Act imposes liability on issuers and other signatories of a registration statement that, upon becoming effective, 'contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."' *Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 715 (2d Cir. 2011) (quoting 15 U.S.C. § 77k(a)), "So long as a plaintiff establishes one of the three bases for liability under these provisions--(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading, *see In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347, 360 (2d Cir. 2010)--then, in a Section 11 case, 'the general rule [is] that an issuer's liability ... is absolute."' *Id.* at 715-16; *see also Herman & Maclean,* 459 U.S. at 382 ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements."). Thus, Plaintiffs need only allege falsity to survive a motion to dismiss Securities Act claims arising under Sections 11 and 12.

"Rule 8(a)'s pleading standard--not Rule 9(b)'s--applies" to claims under Sections 11 and 12, because "'[f]raud is not an element or a requisite to a [Securities Act] claim."' *In re Tufin Software Techs. Ltd. Secs. Litig.,* 2022 U.S. Dist. LEXIS 34053, at *9-10 (S.D.N.Y. Feb. 25, 2022) (quoting *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir. 2004)). Defendants' argument that Plaintiffs' Section 11 claims are governed by the heightened requirements imposed by Rule 9(b) because Plaintiffs also allege Section 10(b) claims has been repeatedly rejected by courts where, as here, "Plaintiffs expressly disclaim any allegations that could be construed as alleging fraud or intentional misconduct with respect to Plaintiffs' Securities Act Claims." ¶229; *see Silvercreek Mgmt. v. Citigroup, Inc.,* 248 F. Supp. 3d 428, 448 (S.D.N.Y. 2017) ("Where a plaintiff expressly disclaims allegations of fraud and affirmatively alleges negligence, this is generally sufficient to relieve the plaintiff of Rule 9(b)'s requirements."); *see also In re CINAR Corp. Sec. Litig.,* 186 F. Supp. 2d 279, 307 (E.D.N.Y. 2002)

("the notion that a complaint could be dismissed for failing to properly allege something that is not even an element of the claim is troubling to say the least."). Thus, "this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a)." *Litwin,* 634 F.3d at 715. Nevertheless, even if this Court finds that Rule 9(b) does apply, Plaintiffs have adequately pled both material misstatements and omissions in the CarLotz Registration Statement.[16]

### B. Plaintiffs Sufficiently Allege Material Misstatements and Omissions in CarLotz' Registration Statement

The Complaint adequately alleges that, in violation of Sections 11 and 12(a)(2), Defendants made a number of materially false and misleading statements in their Registration Statement. ¶¶149-164, 235-237. In the securities context, materiality is determined by whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988). Because the materiality inquiry involves mixed questions of law and fact, alleged misstatements are not properly dismissed for lack of materiality "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re Synchrony Fin. Sec. Litig.,* No. 3:18-cv-1818-VAB, 2022 U.S. Dist. LEXIS 24717, at *15 (D. Conn. Feb. 11, 2022). Here, reasonable investors could certainly have found the truth about the misleading statements and omissions in the Registration Statement to alter the "total mix" of information, especially because sophisticated analysts expressed confusion when the truth was revealed. *See* ¶¶186, 195.

### 1. Statements about CarLotz' "Deep Pool" of Sourcing Partners[17]

Over and over again in the Registration Statement and in the investor presentations leading up to the de-SPAC merger, Defendants repeated that CarLotz had a "deep pool" of sourcing partners which provided a "virtually unlimited" supply of vehicles. *See, e.g.,* ¶¶ 120, 121, 138, 147, 155; *see also* ¶ 116 ("***CarLotz serves many of the largest corporate vehicle remarketers*** in banking, rental, fleet management, OEM and other markets."); ¶ 11 ("90% of CarLotz' vehicles non-competitively sourced and ***60% sourced from its corporate vehicle sourcing partner***."); ¶ 132 ("***Sixty percent of our inventory, as I mentioned, is consigned from our corporate vehicle sourcing partners.*** And these are some of the names you see below, some of the largest fleet management businesses in the world: ARI, LeasePlan, Rental businesses, car-buying services, banks, third party remarketers, floor planning businesses.") (emphasis added). These statements were often accompanied by a slide showing a number of companies purported to be CarLotz "Sourcing Partners":

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
¶¶120, 132, 138.

Any investor would understand these statements to mean that, at the time they were made, CarLotz had well established relationships with *multiple* sourcing partners, and that the vehicles obtained from some amalgamation of these partners comprised 60% of CarLotz' total inventory. However, during Q4:2020, which ended *only one day after the prospectus was filed,* Defendants later revealed that they obtained 60% of their inventory from only *one* partner.[18] In other words, at the very same time Defendants issued the prospectus and gave presentations to investors promoting that 60% of CarLotz' inventory came from a "deep pool of sourcing partners," in reality, they had only one. Indeed, CWl, who was hired to develop a program where CarLotz acquired cars from commercial sources, stated that the Company had a hard time attracting such partners because they preferred to sell their vehicles quickly at auction, rather than letting them "sit" with CarLotz for uncertain durations before they were sold. ¶54. At the time CWl left the company, just a few months before the Class Period,[19] he had "only brought in 'perhaps 50 vehicles' through these commercial sources." *Id.*

Moreover, while CarLotz represented to investors that it generally charged consigners a flat fee ("most of our clients are on a flat fee model, so whether you're selling a $4,500 car or a $90,000 car, our fee is the same..." ¶175), it had an alternative fee-sharing arrangement with the 60% sourcing partner. ¶148. Unless CarLotz could get top dollar for the vehicles sourced under this agreement, its GPU would be far lower than the flat fee model. *Id.*

Defendant Bor himself explained the materiality of these statements: "[I]t's important to have a wide pool of inventory because frankly, any one of these clients, ***if they were our only client***, would have very homogenous inventory. It's important for us to be able to pick and choose from these clients' pool of inventory to create the greatest inventory mix that will move the fastest." ¶ 168. Additionally, investors would have considered the fact that CarLotz had only one partner to be a lot riskier, because, if that partner discontinued its relationship with CarLotz, the Company would need to obtain a much higher percentage of its vehicles at auction. This is exactly what ended up happening: in Q2: 2021, after CarLotz' corporate sourcing partner "paused" its relationship with the Company, CarLotz was forced to source 80% of its overall inventory from auctions. ¶64.

### 2. Statements about CarLotz' Business Model

Throughout the Class Period, CarLotz repeatedly billed itself as "the industry's only consignment-to-retail" used vehicle marketplace, which allowed the company to be "asset light"--meaning it had "limited capital risk." *See* ¶¶111; 119; 128; 136; 143; 147; 152. These factors, CarLotz claimed, differentiated the Company from its competitors in the used vehicle market, including publicly traded companies like Vroom and Carvana. *Id.* A reasonable investor, upon hearing these comments, would assume: <u>first</u> that the majority of CarLotz' business was, in fact, consignment-to-retail; and <u>second</u>, that CarLotz' business model was low risk because it had very little capital tied up in inventory. Both assumptions would be false.

While a portion of CarLotz' business was consignment-to-retail, if consigned cars could not be sold within a window of time (known as "aging out"), they were generally not returned to the customer, as one would expect from a traditional consignment model. ¶57. Instead, CarLotz purchased the vehicles and sold them at increasingly lower prices--sometimes at retail, sometimes at wholesale (*i.e.,* at auction) for a far lower price. ¶¶57-59. For example, CarLotz was not able to timely process many of the vehicles obtained from its 60% sourcing partner in Q4:2020. ¶75. Instead of returning these vehicles, CarLotz purchased a number of them and sold them with "aggressive pricing." ¶95. During a companywide address, Defendant Bor directly addressed the materiality of these facts to investors, admitting that "investors don't trust us," because, in part, CarLotz owned (*i.e.,* did not consign) far more inventory than they publicly represented. ¶15.

This also meant that CarLotz had much more capital at risk than it led investors to believe. Defendants repeatedly stated that they did not pay shipping and reconditioning costs: "With our consignment model any reconditioning dollars are passed through to our seller. And so we're not afraid to sell vehicles that might require more reconditioning to make perfect, because ultimately it's a cost borne by our seller." ¶128; *see also* ¶¶136, 143. However, CarLotz later revealed that, under its agreement with its 60% sourcing partner, an agreement that was in place during Q4:2020, it was responsible for paying shipping and reconditioning expenses, creating significantly more risk than the idealistic consignment model touted by Defendants. ¶197. And these risks eventually materialized--because it had invested in these vehicles, CarLotz was forced to purchase the vehicles and sell them with "aggressive pricing" in order to avoid significant losses. *Id.*[20]

Defendants' argument that it is "black letter law" that statements about a company's business model are inactionable, citing *Friedman v. Endo Int'l PLC,* is off-base. The actual quote from that case (which involved solely omissions and not misstatements) states, "a company has no such duty to disclose changes to its business plans -- unless the company had 'hyped' a specific plan." No. 16-cv-3912-JMF, 2018 U.S. Dist. LEXIS 6737, at *21 (S.D.N.Y. Jan. 16, 2018). Here, Defendants repeatedly hyped CarLotz' consignment model as one of the key factors that differentiated it from competitors and one of the core reasons why investors should choose to invest in CarLotz over more established players like Vroom or Carvana. In fact, the court in *Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.,* No. 21-3382, 2022 U.S. Dist. LEXIS 102937, at *9 (E.D. Pa. June 9, 2022), a recent securities case also involving a SPAC transaction, held plaintiffs adequately alleged false statements, finding it misleading where the company emphasized that its business model was a "meaningful differentiator relative to our competitors."

Defendants also argue their statements regarding the consignment business model were not material because investors should have known CarLotz "obviously did own some vehicles and planned to do so in the future." Def. Br. at 6, 19. However, it well established in this circuit that "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Meyer v. JinkoSolar Holdings Co.,* 761 F.3d 245, 250 (2d Cir. 2014) (citing *In re Morgan Stanley,* 592 F.3d at 366). Taken together and in context, a reasonable investor would

have assumed that CarLotz did use primarily a consignment model and had very little capital tied up in inventory. In fact, in the March 15, 2021, earnings call, Sharon Zackfia of William Blair asked for "a deeper explanation of the inventory hangover," stating she was confused, "*given the consignment model* as to kind of what happened in the fourth quarter and how that inventory is bleeding into potentially the first quarter and second quarter." ¶ 186 (emphasis added).

### 3. Statements about CarLotz' "Best in Class" Unit Economics

As Karen Short of Barclays Capital stated in CarLotz' May 10, 2021 investor call, "I don't mean to beat a dead horse here, but *people care about GPU*." ¶195 (emphasis added). As such, a reasonable investor would have given particular import to Defendants' numerous statements that CarLotz had "best-in-class" and "superior" unit economics (¶¶119, 126, 134, 157), especially when accompanied by the following slide:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

¶123. In truth, however, CarLotz did not consistently have a GPU anywhere close to the top half of the class. ¶124. The slide showed GPU from one *unaudited* quarter of CarLotz' sales, excluded vehicles sold wholesale (skewing CarLotz' GPU higher when compared to competitors), and was not representative of CarLotz' usual past performance, and certainly was not indicative of its current performance. *Id.* At the time these statements were being made, CarLotz was sourcing 60% of its inventory from a partner with whom it had a fee-sharing arrangement, under which GPU would be much lower than in a flat-fee arrangement. The Company later revealed it had taken too much inventory in Q4:2020, creating "a log jam that resulted in slower processing and higher days to sell." ¶ 184. This log jam, Defendant Stoltz explained, had led to a GPU that was "softer than [] expected" for the quarter, which ended the day after the prospectus was filed. *Id.* In other words, while Defendants were touting CarLotz' "top of the class" GPU, they omitted mentioning a number of factors which drove the GPU for the fourth quarter far lower than its competitors.

### 4. Statements About CarLotz' High Levels of Inventory

Defendant Bor made a number of positive statements about the high levels of inventory CarLotz took during Q4:2020, telling investors that this inventory would *positively* affect CarLotz' future. *See, e.g.,* ¶¶130 ("we have more inventory than we've ever had ... and that's gearing up for a very strong future here"); 145 ("our inventories are at historically high levels. We've got a ton of great cars, we're gaining share."). However, he omitted that, at the same time he was making these statements, the Company was struggling to process the excess inventory, causing a "log jam." ¶75. This log jam caused CarLotz's GPU for the quarter to fall far below investor expectations, especially in light of the aforementioned assurances that the Company had "best in class" unit economics. *Id.* Bor also omitted that the majority of this inventory was coming from only one partner. Tl81. Eventually, CarLotz' inability to process the high levels of inventory in a timely way also led the 60% sourcing partner to "pause" its relationship with CarLotz in May 2021. ¶ 107.

### C. Defendants had a Duty to Disclose Negative Trends Pursuant to Item 303

Pursuant to Item 303 of SEC Regulation S-K, a Registration Statement must "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations." *Litwin,* 634 F.3d at 716 (citing 17 C.F.R § 229.303(a)(3)(H)). The Second Circuit has clarified that Item 303 "imposes a disclosure duty where a trend event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Id.* (internal quotation marks omitted); *see also Panther Partners Inc. v. Ikanos Communs., Inc.,* 681 F.3d 114, 121 (2d Cir. 2012) (finding Item 303 required disclosure when a tech company knew "its chips were defective and were causing network failures."); *Ind. Pub. Ret. Sys. v. SAIC, Inc.,* 818 F.3d 85, 95-96 (2d Cir. 2016) (finding Item 303 required disclosure when a company learned it had been overbilling clients). Here, the Complaint plausibly alleges that CarLotz management knew that, for months leading up to the filing of the registration statement, the Company had been sourcing 60% of its vehicles from only one corporate

sourcing partner, and that this trend was reasonably likely to have material effects on both the Company's financial condition (particularly its GPU) and results of operation (as the partner could cancel the relationship at any time, forcing CarLotz to purchase an increasing number of vehicles at auction). As such, pursuant to Item 303, the Company was required to disclose this fact in the Registration Statement.

### V. PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT CLAIMS

#### A. Elements and Pleading Standard for Section 10(b) Claims

Unlike Section 11 claims, which only require pleading falsity, Section 10(b) requires a plaintiff to allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Iv. Mgmt. Co. v. Mayer Brown LLP,* 603 F.3d 144, 151 (2d Cir. 2010). And, where Section 11 only requires the plaintiff to meet the requires of Rule 8, Section 10(b) claims must also satisfy Rule 9(b) and the particularity requirements of the PSLRA, 15 U.S.C. § 78u-4(b). *See DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.,* 413 F. Supp. 3d 187, 205 (S.D.N.Y. 2019).

#### B. Plaintiffs Adequately Allege Materially False or Misleading Statements and Omissions Under Section 10(b)

For the same reasons described above, the materially misleading statements and omissions in Defendants' Registration statement satisfy the falsity inquiry of Section 10(b). *See Herman & Maclean,* 459 U.S. at 382-83 ("we see no reason to carve out an exception to § 10(b) for fraud occurring in a registration statement just because the same conduct may also be actionable under § 11.").

Additionally, the Complaint sufficiently pleads Section 10(b) falsity for a number of statements made after the Registration Statement became effective. Acamar and Old CarLotz gave an additional pre-merger investor presentation at the 2021 ICR Conference on January 13, 2021, in which they used a substantially similar set of slides as the ones described above and made substantially similar statements about CarLotz' consignment-to-retail model, "best in class" GPU, "deep pool" of sourcing partners, high levels of inventory, and reconditioning costs being borne the seller. ¶¶165-174. These statements were materially misleading for the same reasons as the other investor presentations described above.

Then, on January 22, 2021, the day after the merger completed and the Company began trading on the NASDAQ as LOTZ, Defendant Bor appeared for an interview on CNBC, where he once again touted CarLotz' consignment-to-retail business model. ¶175. Bor also hyped the benefits of CarLotz' flat fee model, claiming "most of our clients are on a flat fee model, so whether you're selling a $4,500 car or a $90,000 car, our fee is the same" and, in response to an interviewer question about the effects of the Covid-19 pandemic, "because of our flat fee model, pricing doesn't necessarily impact us like it does the rest of the industry ... it really doesn't matter what part of the economic cycle we're in." ¶¶175, 177. At the time Bor made this statement, however, CarLotz was sourcing 60% of its vehicles from one partner, with whom it had a profit-sharing--not flat fee--agreement. ¶178. This meant that the Company's GPU *was* significantly affected by pricing, just like every other used car dealer in the United States. Moreover, in Q4:2021, which ended nearly a month before this interview, CarLotz was unable to process many of the vehicles it took from this partner, forcing it to de4ist, purchase, and sell the vehicles at wholesale, practices not aligned with its touted "consignment-to-retail" model. ¶¶187, 189. Fluctuations in pricing also affected CarLotz because, when prices rose and the gap between retail and wholesale prices closed, CarLotz' business model became less attractive to potential sourcing partners--which eventually forced CarLotz to purchase more vehicles at auction, causing its GPU to plummet. ¶ 178.

Beginning on March 15, 2021, the truth about Defendants' misleading statements was revealed through a series of partial corrective disclosures. However, at the same time, Defendants continued making materially false or misleading statements to investors about CarLotz' business. For example, on March 15, 2021, CarLotz filed a press release on form 8-K, signed by Defendant Polak, that revealed Old CarLotz' 4Q:2020 and full year 2020 financial results. ¶ 180. This 8-K revealed for the first time that CarLotz was sourcing 60% of its vehicles from only one sourcing partner, but it also stated: "If a corporate

vehicle sourcing partner from which we are sourcing a significant portion of our vehicles was to cease or significantly reduce making vehicles available to us, we would likely need to increase our sourcing of vehicles from *other vehicle sourcing partners* potentially on less favorable terms and conditions." ¶ 181. This statement was materially misleading because it implied that CarLotz had other vehicle sourcing partners waiting in the wings to step up and consign cars to CarLotz. It did not. In truth, if CarLotz could not obtain vehicles from corporate consigners, it would be forced to purchase large quantities of vehicles wholesale in order to stock its retail hubs, a strategy which, according to Plaintiffs' CWs, Defendants had already begun relying on at the time this statement was made. ¶¶63, 183. This information would have been particularly material to investors because CarLotz earned a far lower GPU on vehicles obtained at auction. ¶80.

In an investor call this same day, Defendant Stoltz stated that, despite CarLotz' inventory problems, the Company expected retail GPU for Ql :2021 (a quarter that was only two weeks from closing) to be between $1,300 and $1,500. ¶185. However, this guidance was materially false and misleading because, *prior to the time* Defendant Stoltz made this statement, CarLotz had sold its excess inventory from 4Q:2020 "with aggressive pricing rather than absorbing, shipping and reconditioning costs on vehicles returned to the client," which led to a Q1:2021 GPU of just $1, 182--far lower than even the lowest end of the guidance. While Defendants correctly state that securities laws do not require Defendants to be "clairvoyant" (Def. Br. at 44, collecting cases), "a projection is actionable if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact." *Interpublic Grp. of Cos. v. Fratarcangelo,* 2002 U.S. Dist. LEXIS 22989, at *36 (S.D.N.Y. Nov. 26, 2002) (internal citation omitted). This is not a case of looking ahead--it's a case of fraudulently representing the Company's situation *at the time* the statement was made.

Additionally, in the March 15 8-K and Earnings Call, Defendants continued to omit material information, for example, that de-listed inventory had been sold with "aggressive pricing," the potential ongoing effect of the "log jam" situation on CarLotz' GPU, and how the situation affected CarLotz' relationship with its largest sourcing partner (even though an analyst specifically asked "is there any kind of ramifications from what happened with [] the log jam in the fourth quarter to the[] longer term potential with this partner?"). ¶¶188, 191. Once Defendants spoke about the log jam situation, they had a "duty to tell the whole truth." *Meyer,* 761 F.3d at 250. They did not.

Defendants revealed more of the truth in their May 10, 2021 10-Q and Earnings Call, namely, that their retail GPU for Q1:2021 was only $1,182 because they had sold the excess inventory from Q4:2020 with "aggressive pricing." ¶¶ 193, 194. However, Defendants continued to mislead investors about their sourcing struggles: Stoltz assured investors that the Company was "seeing good progress with our sourcing partners on commitments they can make to us over the next several months," and Defendant Bor assured investors that future access to inventory would not be an issue, and that CarLotz had "a lot of levers to pull when it comes to inventory." ¶ 196. These statements were materially false or misleading because, due to CarLotz' failure to process inventory timely and for a profit over wholesale, the partner from whom the Company sourced 60% of its inventory had decided to pause the relationship--a decision CarLotz announced just two weeks after this earnings call. ¶ 196. CarLotz did not have "a lot of levers" to pull after this, they had only one lever--buy cars at auction, just like any other used car dealership.

### C. Plaintiffs Successfully Plead Scienter for their Section 10(b) Claims

To plead the "strong inference" of scienter required by the PSLRA (*see* 15 U.S.C. § 78u-4(b)(2)), Plaintiffs' allegations regarding Defendants' state of mind must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007). However, "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* Rather, it need only be "at least as compelling" (i.e., in "equipoise") as any opposing inference of scienter. *Id.*

In this Circuit, plaintiffs can satisfy the scienter requirement by either "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Inv'rs, Inc.,* 968 F.3d 204, 212 (2d Cir. 2020) (citation omitted). "Plaintiffs can plead conscious misbehavior or recklessness by alleging defendants' knowledge of facts or access to information contradicting their public statements." *In re Am. Int'l Gp., Inc.,* 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010). Likewise, "scienter may be found where there are 'specific allegations of various reasonably available facts, or "red flags," that should

have put the officers on notice' that the public statements were false." *In re Refco, Inc. Sec. Litig.,* 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007). Contrary to the approach taken by Defendants, whereby they dissect each fact in isolation to conclude that a singular fact does not sufficiently plead scienter, "[t]he inquiry is holistic, *i.e.* the allegations going to scienter are to be evaluated collectively." *In re Longtop Fin. Techs. Ltd. Sec. Litig,* 910 F. Supp. 2d 561, 572 (S.D.N.Y. 2012). Here, taken collectively, the facts in the Complaint illustrate both recklessness and a motive defraud, and are sufficient to support a strong inference of scienter.

To start, the Complaint readily pleads that Defendants had access to available facts that should have put them on notice that their public statements were false when made. For example, when Defendant Bor made a number of statements during the fourth quarter of 2020 (first in a series of investor presentations, then in the December 30, 2020 Registrations Statement, which was filed just one day before the quarter closed, then in an additional investor presentation and an interview several weeks later), Defendant Bor knew, by his own admission when they publicly announced the quarterly results months later, contemporaneous facts that made these statements materially false and misleading. Specifically, starting in 3Q:2020, one sourcing partner--not a "deep pool"--provided 60% of inventory CarLotz sourced in 4Q:2020; that CarLotz had paid reconditioning and shipping fees on the inventory it obtained from this sourcing partner, with whom it had a profit sharing (not flat fee) agreement; and that CarLotz had taken too much inventory from this partner, causing a "log jam" of inventory. ¶213.[21] Indeed, Bor openly spoke about the Company having record high inventory, but characterized it as a good thing leading up to the merger; only afterwards did he characterize it as a "log jam." Put another way, because these negative conditions had already occurred at the time, Bor either made these statements knowing they were false, or was at the very least reckless by embarking on a series of investor presentations to some of the country's top analysts without verifying that the most basic information in his pitch--for example, that Carlotz had more than one sourcing partner--was accurate.

The very nature of the SPAC transaction also supports the inference of scienter for pre-merger misrepresentations. If the proposed merger between Acamar, a "blank check" company, and CarLotz did not receive sufficient investor support in the form of votes in favor of the transaction, all Acamar shares would be cashed out and returned to investors, and CarLotz would not go public. ¶82. Accordingly, Defendants had an incentive to both misleadingly tout CarLotz and conceal negative information about the Company in order to solicit the necessary votes to approve the merger. Defendants Bor, Stoltz, and Polak also had personal financial motives to make false and misleading statements in the pre-merger investor presentations and Registration Statement, namely, upon the closure of the merger, they received large cash and stock bonuses and a significant salary raise. Such "motives to obtain outsized bonuses may certainly be considered as part of the calculus in assessing whether there is a strong inference of scienter." *Nguyen v. New Link Genetics Corp.,* 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) (discussing bonuses which were "tied to a specific goal" and "amount[ed] to nearly 60% and 49% of [defendants'] base salaries."). As in *NewLink,* Defendant Bor's bonus and salary raise was tied to a specific goal (completion of the de-SPAC merger) and was particularly large (his salary nearly doubled, his $450,000 bonus was over $100,000 more than his total salary for 2019, and he received 11.5 million units of stock and options for the new CarLotz entity). ¶218. Defendants Stoltz and Polak also received large bonuses and salary raises contingent on the closing of the de-SPAC merger.[22] ¶¶219, 220.

Defendants claim that Defendants' lack of stock sales due to a six-month "lockup"[23] where executives were prohibited from selling CarLotz stock is "fatal" to Plaintiffs' allegations of scienter, relying on *Tung v. Bristol-Myers Squibb Co.* for the proposition that "it is well-settled that the absence of stock sales 'substantially undermines' any inference of scienter," Def. Br. at 37, however, *Tung* creates no such bright line rule--it merely makes the straightforward observation that an absence of stock sales disproves the theory that defendants were "motivated by an intent to engage in insider trading." 412 F.Supp.3d 453, 459 (S.D.N.Y. 2019). Numerous courts have found that corporate defendants may be motivated by factors other than insider trading, for example, "[t]he desire to avoid impending liquidation" is motivation for officers to complete a

The Complaint also adequately pleads that, when CarLotz implied in its March 15, 2021 press release that it had various other sourcing partners to whom it could turn to in the absence of the 60% partner, Defendants knew or recklessly disregarded the fact that the Company did not, in fact, have other sourcing partners, and as such, would need to acquire cars wholesale to make up for the deficit--something they had already started doing when the statement was made. ¶226. Similarly, in the March 15, 2021 Earnings Call, when Defendant Stoltz stated that he expected first quarter GPU to be between $1,300 and $1,500, the fact that the quarter, during which CarLotz had employed an "aggressive pricing" strategy to clear excess inventory, was only two weeks from being over strongly indicates he knew this guidance was too high.[24] And the fact that CarLotz required 30-90 days' notice from its sourcing partners supports the inference that Bor and Stoltz knew, at

the time they made their May 10, 2021 statements assuring investors that CarLotz was "seeing good progress" with its sourcing partners and had "a lot of levers to pull when it comes to inventory," that CarLotz was on the brink of losing its largest sourcing partner.

Further, as one of the original founders of the business, Defendant Bor purported to have "intimate knowledge of CarLotz," a fact further supported by the statements of the Confidential Witnesses. ¶222; *see Moloney v. Ollie's Bargain Outlet Holdings, Inc.,* 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) ("evidence of a hands-on management style may support an inference of scienter."). Likewise, the fact that Ms. Polak was hired as CCO specifically for her expertise in wholesale vehicle services suggests that she would have intimate knowledge of CarLotz' wholesale business (¶¶224-226), and the fact that Defendant Stoltz was hired specifically as a step to correct material weaknesses in CarLotz' pre-merger financial reporting suggests he would take particular care to ensure CarLotz' post-merger financial reporting was accurate (¶223).

Finally, the inference of scienter is "buttressed" by the "core operations theory," under which "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.,* 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019). Here, each of the alleged misstatements and omissions relates to CarLotz' core operations, namely, the buying, selling, and consigning of used cars.

When taken collectively, Plaintiffs' allegations of actual knowledge, the motives - including personal financial motives - to misleadingly hype the Company and conceal negative aspects of the business to push the merger through its shareholder vote, an admittedly "hands on" management team that knew these misleading details of the Company's business and customers, and misrepresentations relating to the core operations of the Company, support a strong inference that Defendants knowingly, or at least recklessly, misled investors.

### D. Plaintiffs Adequately Demonstrate Loss Causation[25]

In the Second Circuit, "with respect to loss causation, a plaintiff only needs to meet the standards of Rule 8 notice pleading, and 'provide [the] defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Stratte-McClure v. Stanley,* 2013 U.S. Dist. LEXIS 10387, at *9-10 (S.D.N.Y. Jan. 18, 2013) (quoting *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347 (2005)); *see also Wallace v. Intralinks,* No. 11-cv-8861, 2013 U.S. Dist. LEXIS 65958, at *26 (S.D.N.Y. May 8, 2013). Generally, plaintiffs sufficiently plead loss causation when they allege that their share's 'price fell significantly after the truth became known' through an express, corrective disclosure or 'through events constructively disclosing the fraud' like the 'materialization of [the] risk' concealed." *Abramson v. NewLink Genetics Corp.,* 965 F.3d 165, 180 (2d Cir. 2020) (quoting *In re Vivendi, S.A., Securities Litig.,* 838 F.3d 223, 262 (2d Cir. 2016)). At this early stage of the proceedings, the Second Circuit does "not require 'conclusive proof of the causal link between the fraud and Plaintiffs' loss." *NewLink,* 965 F.3d at 180.

Plaintiffs adequately allege that a series of partial disclosures revealed the underlying truth concealed by Defendants' materially false and misleading statements and omissions, after each of which the artificial inflation caused by the misrepresentations and omissions came out CarLotz' stock and the price of LOTZ stock declined causing harm to investors. *See* ¶¶ 179-203.

First, on March 15, 2021, Defendants revealed previously misrepresented and concealed information about CarLotz' operations in the fourth quarter, 2020 (a quarter that ended that ended only one day after the registration statement became effective), including: (1) CarLotz had sourced 60% of its vehicles for the quarter from only one sourcing partner not the "deep pool" it had touted to investors; (2) CarLotz had taken too much inventory during the quarter, and these "historically high" inventory levels, far from being a positive for the Company, caused a "log jam"; (3) the "log jam" had delayed processing times, which negatively affected CarLotz' GPU for the quarter; and (4) CarLotz had to "delist" and "take wholesale losses" on many of these vehicles. ¶¶181, 184, 187. On this news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume. ¶ 190.

Second, on May 10, 2021, CarLotz revealed that it continued to source 60% of its vehicles from only one sourcing partner in 1Q:2021, reaffirming that the Company did not, in fact, have a "deep pool" of sourcing partners. ¶193. CarLotz also revealed that its GPU was only $1,182, far short of the $1,300-$1,500 guidance that it set on March 15, *just two weeks* before the

conclusion of the quarter. ¶194. Additionally, Defendants revealed that CarLotz had taken over $1 million in losses for the quarter because they sold vehicles wholesale instead of just returning them to their sourcing partner (as one would expect with a consignment model), because returning the vehicles would mean taking a greater loss on the capital CarLotz had invested in shipping and reconditioning costs for those vehicles (even though it had told investors that CarLotz did not cover these costs). ¶197. On this news, the Company's stock price fell by $0.94, or about 14%, to close at $5.57 per share on May 11, 2021, on unusually heavy trading volume. ¶199.

Third, on <u>May 26, 2021</u>, just 16 days later, Defendants revealed that the 60% sourcing partner had "paused consignments to the Company." ¶201. This revelation directly contradicted statements on May 10 that the Company was "seeing good progress with our sourcing partners" and that "we have a lot of levers to pull when it comes to inventory," revealing them to be false ¶196. On this news, the Company's stock price fell by $0.70, or 13.4%, to close at $4.51 per share on May 26, 2021, on unusually heavy trading volume. ¶203.

These allegations more than suffice under Rule 8.

## VI. DEFENDANTS' BOILERPLATE ARGUMENTS FAIL

### A. Plaintiffs' Claims are not "Fraud by Hindsight"

Defendants' repeated "fraud by hindsight" argument, a favorite incantation by securities fraud defendants on motion to dismiss, is baseless. Def. Br. at 1, 16-18, 42. Fraud by hindsight "refers to allegations that assert no more than that because something eventually went wrong, defendants must have known about the problem earlier," *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,* 763 F. Supp. 2d 423, 518 (S.D.N.Y. 2011) (citation omitted). This case has nothing to do with fraud by hindsight, as the touchstone of Plaintiffs' allegations is that Defendants later admitted (by belatedly disclosing results of a quarter that had all but closed at the time of the Prospectus) that were that all the alleged statements were misleading *at the time they were made.* ¶8. Defendants argue that *any* evidence from after a statement is made (*even an admission*), which is used to support the falsity of that statement at the time it was made, amounts to fraud by hindsight. Def. Br. at 16, 18, 42. Initially, "fraud-by-hindsight issues arise in the context of the scienter factor, not the misrepresentation factor." *Masel v. Villarreal,* 924 F.3d 734, 750 (5th Cir. 2019). Nevertheless, this argument, which would suggest a later guilty plea to criminal fraud also cannot be used to support securities claims, makes no sense and is contrary to well settled law, especially in the securities context, where subsequent events (such as restatements of financial statements and terminations of executives) are frequently used to support allegations. *See, e.g., Pareteum,* 2021 U.S. Dist. LEXIS 151106, at *50.

Here, the Registration Statement became effective on December 30, 2020, one day before the end of the fourth quarter of 2020. On March 15, 2021, Defendants filed an 8-K with financial results for "Old CarLotz" for Q4:2020, results which investors found disappointing to say the least. ¶¶180-181. This 8-K revealed for the first time that the Company had sourced 60% of the vehicles it obtained in the quarter from only one sourcing partner and continued to do so during the first quarter. *Id.* CarLotz also held a conference call on this day, in which Defendant Bor revealed that the excess inventory CarLotz had obtained from their sourcing partner in 3Q:2020 and 4Q:2020 had "created a log jam that resulted in slower processing and higher days to sell." ¶ 184. Defendant Stoltz explained that, due to this log jam of excess inventory, GPU for 4Q:2020 was "softer than we expected." *Id.* In other words, these events, which had a severe negative effect on CarLotz' business, had *already happened* at the time the Registration Statement was filed, meaning the misstatements and omissions in the Registration Statement were misleading *when made.*

The same is true of the post-Registration Statements. At the 2021 ICR Conference on January 13, 2021, Defendants made substantially similar statements and used a substantially similar set of slides as in their pre-registration statement investor presentations. ¶¶165-174. At this point, the fourth quarter had been over for several weeks, once again, meaning that the Q4:2020 events which Defendants described had already happened. Defendant Bor also gave an interview on CNBC January 22, 2021, the day after the merger, in which he discussed in depth CarLotz' flat fee model. ¶¶175-178. However, for nearly a quarter and a half at that point, CarLotz had sourced the majority of its vehicles pursuant to a profit-sharing agreement, not a flat fee arrangement. *Id.* Thus, once again, these statements were misleading *when made.*

While the March 15, 2021 conference call, which took place just *two weeks* before the end of Q1:2021, corrected some of Defendants' prior misleading statements, Defendants continued to mislead the market. For example, Defendant Stoltz claimed that the Company expected Q1:2021 GPU to be between $1300 and $1500. However, Defendants later revealed that, during the first quarter, they had begun selling excess inventory with "aggressive pricing" in order to avoid taking losses on the shipping and reconditioning costs they had sunk into the vehicles. This pricing led to a Q1:2021 GPU of just $1,182--significantly below even the lowest end of the expectation Defendant Stoltz shared with investors. ¶ 194. Once again, these events had *already happened* at the time of the March 15 conference call, making Defendants' statements misleading *when made.*

Similarly, in the May 10, 2021 investor call, Stoltz and Bor both assured investors that future access to inventory would not be an issue, and that CarLotz had "a lot of levers to pull when it comes to inventory." ¶196. Then, just two weeks later, CarLotz announced that its 60% sourcing partner would be "pausing" the relationship with CarLotz, which the Company anticipated would cause "challenges in obtaining our expected inventory levels." ¶201. The Company also lowered its guidance for full year GPU, guidance which it had affirmed in the conference call just days earlier. ¶202. As Defendants had previously claimed that sourcing partners had to give "30 to 90 days' notice" before cancelling their agreements, CarLotz knew at the time of the earnings call that the partner would be cancelling the agreement in the coming days.[26] Once again, Defendants' statements were misleading *when made.*

## B. Defendants' Statements Are Not Puffery

Defendants' attempt, without explanation, to characterize nearly all alleged misstatements as inactionable "corporate optimism" and "'too general' to be relied upon," falls flat. Def. Br. at

26. "[C]ourts have identified declaration of intention, hope, or projections of future earnings as the hallmarks of inactionable puffery." *In re Moody's Corp. Sec. Litig.,* 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009). "[W]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.,* 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).

Here, Defendants' examples of purported puffery statements are not "couch[ed]...in language of optimism or hope," nor are they "vague" or "'non-specific' pronouncements that were incapable of 'objective verification.'" *Moody's,* 599 F. Supp. 2d at 509. In fact, many of these statements, including that "CarLotz had a 'deep pool' of consigning partners and 'virtually unlimited' opportunity to penetrate a fragmented market," that "CarLotz's unit economics are 'superior,' 'best-in-class,' and 'at the top' of its industry," and that the Company was seeing "very strong demand" and had a "tremendous amount of inventory," were accompanied by slides that had figures and concrete examples to illustrate. *See, e.g.,* ¶¶120, 121, 123, 132, 138, 168.

Furthermore, the misstatements and omissions were made predominantly in the context of investor conferences for the purpose of introducing the business to the public and garnering investor support for the de-SPAC merger and the newly combined company. The Second Circuit has found that statements made in such presentations are especially material to investors. *See NewLink,* 965 F.3d at 177 (When biotech company CEO made misstatements at "an important conference for biotech investors," "[i]nvestors in attendance reasonably ... would have credited his statement as researched and intentional, part of a well-prepared professional presentation."). And the fact that Defendants repeated these statements over and over again draws them away from the realm of puffery. *See Petrobras,* 116F. Supp. 34 at381 ("While some of the alleged statements, viewed in isolation, may be mere puffery, nonetheless, when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company.").

Importantly, this Court need not even determine whether a hypothetical reasonable investor could have relied on these statements, because sophisticated market professionals *did* rely on Defendants' statements. Sharon Zackfia of William Blair stated that she was confused, "given the consignment model," how the "inventory hangover" during the fourth quarter could have happened, and how it was possible for the effects to "bleed[] into potentially the first quarter and second quarter." ¶ 186. The fact that a sophisticated analyst found Defendants' statements to be material weighs heavily against them being mere

puffery. *In re Salix Pharm., Ltd.,* No. 14-cv-8925-KMW, 2016 U.S. Dist. LEXIS 54202, at *38 n.10 (S.D.N.Y. Apr. 22, 2016) (rejecting puffery argument because "Defendants' statements could and did mislead a number of reasonable investors, as evidenced by the comments of analysts following the quarterly conference calls.")

### C. Defendants Misstate and Misapply the Standard for Opinion Statements

Defendants' position that that, with regards to statements of opinion, the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund* requires that statements be "both 'objectively false' and 'disbelieved' by Defendants at the time they were made," is completely wrong. Def. Br. at 27. *Omnicare* holds the opposite: that opinion statements are actionable *even when* "sincerely held," if (1) the supporting facts underlying the opinion are untrue, or (2) the statement "omits material facts ... [that] conflict with what a reasonable investor would take from it." 575 U.S. 175, 185-89 (2015); *see also NewLink,* 965 F.3d. at 175-76 (holding opinion statements actionable, even if honestly believed, if "plaintiffs can allege that a statement of opinion contained one or more embedded factual statements that can be proven false," or "plaintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false.").

As a result, the Second Circuit in *NewLink* held that "*Omnicare* reduced the significance of district courts' classification of statements as those of fact or opinion." *id.*; *see also In re GE Sec. Litig.,* 844 Fed. Appx. 385, 388 (2d Cir. 2021) (noting that the Second Circuit has "recognized that the hard line between a statement of fact and one of opinion, which we relied on more heavily in the past, has been softened," because "'when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow.'").

As an initial matter, a number of the purported statements of opinion were not phrased subjectively, but rather as objectively verifiable facts, for example, "CarLotz has 'best-in-class unit economics' and GPU 'at the top' of its industry"; "CarLotz sells consigned vehicles 'in a reasonable amount of time'"; "'we have a very different business model,' 'unique consignment model'"; CarLotz had "a lot of levers to pull when it comes to inventory.'" Def. Br. at 27.

But even where there is some semblance of opinion, the statements contain embedded facts that could be proven false. For example, CarLotz did not have "best in class" unit economics or a GPU "at the top" of its industry. *See, e.g.,* ¶ 19. Other purported opinion statements omit critical context. For example, the statement that CarLotz sold consigned vehicles "in a reasonable amount of time," fails to mention that a number of companies chose to sell their cars at auction rather than consigning with CarLotz, because they did not consider the amount of time it took to be "reasonable." ¶117. Moreover, during Q4:20, when the statement was made, CarLotz was experiencing a "log jam" because it was not able to process vehicles in a reasonable period of time. *See* ¶75 ("[i]t took a long time for the inventory to hit our website..."). Defendants do not--and cannot--argue otherwise.

### D. Defendants' Statements are Not Protected by Safe Harbor

To the extent that any of the alleged statements in the Registration Statement are forward-looking, they are not protected by the safe harbor provision of the PSLRA. According to the SEC, because the Safe Harbor does not apply to a traditional IPO, and a de-SPAC transaction is the functional equivalent, the Safe Harbor does not apply to de-SPACs. Miller Decl. Ex. 2 at 2.[27] Director Coates cites the legislative intent behind the safe-harbor provision, namely, that it is "only available to companies with an established track record" and "does not apply to a new company, but only applies to seasoned issuers." *Id.* (citing Debate in Senate to Override President's Veto, 141 Cong. Rec. S190602). Nevertheless, even if the Safe Harbor were to apply, or to the extent the bespeaks caution doctrine applies to the Registration Statement, Defendants still cannot avail themselves of either protection.

First and foremost, many of the statements Defendants claim to be forward looking are actually statements of past or present condition, which are not protected by the safe harbor provision. *See City of Providence v. Aeropostale, Inc.,* 2013 U.S. Dist. LEXIS 44948, at *32 (S.D.N.Y. Mar. 25, 2013) (the safe-harbor provision does not "apply to statements of current or historical fact."). For example, the statement: "CarLotz' unique and differentiated value proposition ... together with its asset

light business model, which limits the inventory risk and financial burden on the company ... offer a very attractive way to participate in the ... used vehicle market" is entirely in the *present* tense. ¶ 152, Def. Br. at 28. Defendants also claim that CarLotz' statements about its sourcing partners are forward looking (Def. Br. at 28); however, these statements are also all phrased in the present or past tense, for example: "You'll see some logos below... There's a deep pool of sourcing partners that we pull from." Tl68. Additionally, some of the statements Defendants claim to be forward looking are mixed statements of past and future, for example, "we believe we are poised to return to industry4eading growth." ¶150, Def. Br. at 28. By use of the words "return" and "are poised," Defendants imply that CarLotz, on the one hand, had experienced "industry leading growth" in the past, and on the other hand, was on course to "industry leading growth" presently--both false. *See, e.g.,* ¶127. "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *In re Vivendi,* 838 F.3d at 246.

To the extent that Defendants' statements are forward looking, they were also not accompanied by meaningful cautionary language. To invoke the safe-harbor provision, "cautionary language must be substantive, specific, and accompany the forward-looking statement." *In re Vale S.A. Sec. Litig.,* No. 19-cv-526, 2020 U.S. Dist. LEXIS 91150, at *42-43 (E.D.N.Y. May 20, 2020). The standard is even more strict for oral forward-looking statements, which "must be accompanied by a cautionary statement (1) identifying the particular oral statement as forward-looking, (2) stating that the 'actual results might differ materially from those projected in the forward-looking statement,' and (3) identifying a readily available written document or portion thereof that identifies factors that 'could cause actual results to materially differ from those in the forward-looking statement.'" *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.,* No. 3:09-cv-01740-VLB, 2013 U.S. Dist. LEXIS 40788, at *48 (D. Conn. Mar. 23, 2013).

As the transcripts show, none of the oral statements made by Defendant Bor in investor presentations and media appearances were identified as "forward-looking statements" when made, nor did they contain the requisite "actual results might differ" language or point presentation participants to readily available written documents. Further, the March 15, 2021 8-K only contained a boilerplate risk statement that CarLotz may be affected by "the impact of the ongoing Covid-19 pandemic on our business and general business and economic conditions and our ability to successfully execute our geographic expansion plans." *See* Miller Decl. Ex. 4 at 7. The Earnings Call on the same day merely pointed listeners to the language in the 8-K. Def. Ex. 22 at 5. Such statements are not adequately cautionary. *See In re Vivendi,* 838 F.3d at 247 (To claim protection under the safe harbor provision, "defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information. Vague disclaimers are inadequate.") (internal citation omitted).

Additionally, a "warning that identifies a potential risk, but implies that no such problems were on the horizon even if a precipice was in sight, would not qualify as a 'meaningful cautionary statement' for purposes of safe harbor." *Set Capital LLC v. Credit Suisse Grp. AG,* 996 F.3d 64, 85 n.92 (2d Cir. 2021) (internal citation omitted). While the Registration Statement contained a section identifying potential risks, these statements did not adequately warn investors that many of the risks were not merely hypothetical; rather, they described scenarios that the Company was *currently* experiencing. For example, the statement: "*if* we are unable to operate our processing centers efficiently, we *could* experience ... delays in listing our inventory, additional expenses and loss of potential and existing corporate vehicle sourcing partners ... which *may* materially and adversely affect our business" cannot be considered adequate cautionary language because, at the time the warning was given, CarLotz *was* already unable to operate its processing centers efficiently, which *was* causing a delay in listing its inventory that *was* materially and adversely affecting the Company's business. ¶¶159-160. Moreover, there were a number of salient risks the business was facing for which no warning was given at all, for example, the risk that CarLotz would need to sell excess inventory at very low prices in order to avoid losses on shipping and reconditioning costs it had sunk into the vehicles, which would materially affect CarLotz' GPU. ¶163. As such, Defendants cannot claim safe harbor protection.

## E. Defendants' Attacks on the Confidential Witnesses are Meritless

Defendants attack Plaintiffs' reliance on confidential witnesses, stating: "none of the CWs were in a position to have firsthand knowledge of the Company's operations, projections or results, let alone information showing that the CarLotz Individual Defendants knew that the Challenged Statements were false when made." Def. Br. at 41. As one of the cases cited by Defendants, *In re Weight Watchers Int'l Inc. Sec. Litig.,* makes clear, courts generally credit statements of confidential witnesses when a Complaint adequately describes the source's "position[] and/or job responsibilities are described

sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." F. Supp. 3d 224, 246 (S.D.N.Y. 2020). In this case, Plaintiffs described in detail each of the CW's job titles, responsibilities, supervisors, and other specific facts that only an insider would know (for example, that CarLotz' customer call center was about 50 feet away from Defendant Bor's office), indicating a substantial likelihood that they actually knew the facts alleged. ¶¶45-49. The facts alleged by the CWs strongly support Plaintiffs' claims that Defendants' statements during the Class Period were false or misleading, and, as in *Weight Watchers,* should be credited by the Court.

### VII. PLAINTIFFS SUCCESSFULLY PLEAD CONTROL LIABILITY CLAIMS

When plaintiffs adequately plead Section 11 and Section 12(a)(2) claims, and defendants do not contest that they are control persons (which they do not in this case), Section 15 claims are adequately pled. *See In re Tufin Software Techs. Ltd. Sec. Litig.,* No. 1:20-cv-5646-GHW, 2022 U.S. Dist. LEXIS 34053, at *30-31 (S.D.N.Y. Feb. 25, 2022). Thus, Defendants' motion to dismiss the Section 15 claims should be denied. Similarly, because Plaintiffs adequately pleaded primary violations of Section 10(b) and adequately alleged a control person violation, and Defendants' only argument for dismissal of the Section 20(a) claims is lack of a primary violation, the motion to dismiss the Section 20(a) claims should be denied as well. *See In re Delcath Sys., Inc. Sec. Litig.,* 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014).

### VIII. LEAVE TO AMEND

In the event the Court grants Defendants' Motion, Plaintiff respectfully requests leave to amend. Even if a complaint has previously been amended, "a court should freely grant leave to amend when justice so requires." *Laurel Shipping LLC v. Ridgebury Kilo LLC,* 560 F. Supp. 3d 802, 809 (S.D.N.Y. 2021) (Abrams, J.) (granting plaintiff request to amend the complaint a third time when "pleading additional facts" could potentially "cure the deficiencies in its Complaint.").

Further, a number of events have occurred after the filing of the Second Amended Complaint which would further strengthen the allegations pled within. CarLotz replaced Defendant Bor as CEO,[28] it announced it would be closing 50% of its retail stores due to sourcing issues;[29] and a member of CarLotz' board of directors resigned.[30] If the Court finds that the facts alleged in the Complaint do not support Plaintiffs' claims, Plaintiffs should be given leave to amend their pleading to include these and potentially other additional facts.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint should be denied in full.

DATED: August 22, 2022

Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*

Kim E. Miller (KM-6996)

250 Park Avenue, 7th Floor

New York, NY 10177

Telephone: (212) 696-3730

Facsimile: (504) 455-1498

E-Mail: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn

1100 Poydras Street, Suite 3200

New Orleans, LA 70163

Telephone: (504) 455-1400

Facsimile: (504) 455-1498

E-Mail: lewis.kahn@ksfcounsel.com

*Lead Counsel for Lead Plaintiff David Berger, Additional Plaintiff Craig Bailey, and the Class*

**Footnotes**

1       All "¶____" references contained herein are to the Second Amended Complaint (the "Complaint") (Dkt. No. 54), and all undefined terms herein have the same meaning assigned in the Complaint. References to "Def. Br. at_____" are to Defendants' memorandum of law in support of their motion to dismiss (Dkt. No. 68) and references to "Def. Ex. _____" are to the Exhibits attached to the Declaration of Mary Eaton (Dkt. No. 69). All page citations in Defendants' exhibits are to the page number in the ECF-generated header, not the documents' internal pagination.

2       CarLotz' fiscal quarters coincide with the calendar year, such that the fiscal 2020 ended on December 31, 2020.

3       For example, "the retail channel [was] more financially attractive for commercial and consumer sellers alike." (Def. Br. at 4); "It was never the case ... that CarLotz sourced vehicles exclusively on consignment." (*Id.* at 6).

4       For example, "[t]his swift and profound market disruption could not have come at a worse time for CarLotz..." (*Id.* at 13); "CarLotz had little choice but to..." (*Id.* at 14); "[the chip shortage] unexpectedly caused wholesale prices to rise..." (*Id.* at 12).

5       For example, "what it *believed* was a highly scalable model..." (*Id.* at 6); "CarLotz also planned to invest in increased processing capacity, which it *believed* would yield cost savings and operational efficiencies and reduce days to sell." (*Id.*); **"[b]*elieving*** that inventory shortages were largely behind it..." (*Id.* at 7); **"[b]*elieving*** these stresses were temporary..." (*Id.* at 11); "Mr. Bor *believed* 'the age-unit issue will largely be behind us shortly...'" (*Id.* at 12) (all emphasis added).

6       Defendants claim Plaintiffs' certificates (Dkt. Nos. 47-1 and 47-2) are deficient because Plaintiffs did not submit

revised certificates with the Second Amended Complaint. Defendants do not cite a case to support this argument, as it has been repeatedly rejected by courts. *See, e.g., Fellman v. Electro Optical Sys. Corp.,* 98 Civ. 6403 (LBS), 2000 U.S. Dist. LEXIS 5324, at *41 (S.D.N.Y. Apr. 25, 2000) ("Plaintiffs clearly have the better of this argument. On its face, the statute requires the class representatives to submit such a certification 'with the complaint.' No mention is made of the need to file an additional certification with an amended complaint."

7      Defendants' argument that Plaintiff Bailey only acquired Acamar shares pursuant to Acamar's 2019 IPO registration statement--issued when Acamar had not yet chosen a merger target--wholly ignores that Bailey acquired the CarLotz shares pursuant to an exercised option to reinvest his Acamar shares in CarLotz.

8      *See* Proposed Rules Regarding Special Purpose Acquisition Companies, Shell Companies, and Projections, 87 Fed. Reg. 29458, 29507 (March 30, 2022), available at https://www.govinfo.gov/content/pkg/FR-2022-05-13/pdf/2022-07189.pdf

9      Defendants' argument that Coates' statements do "not address standing and traceability requirements," Def. Br. at 49 n. 62, is hardly persuasive given that the SEC's recent proposed rules acknowledge private Section 11 and Section 12(a)(2) actions applicable to de-SPAC transactions, and under Defendants' interpretation of the law, no investor (pre-or post- merger) would ever have standing to assert such claims. Moreover, by accepting the application of Section 12(a)(2) to de-SPACs, the SEC implicitly rejects Defendants argument that stock acquisitions in de-SPAC transactions, like Mr. Bailey's, are "secondary market purchases." Def. Br. at 49.

10     The Ninth Circuit in *Slack* also affirmed the district court's holding that Plaintiffs had standing to bring Section 12(a)(2) claims, despite the transaction not being a traditional IPO. *Id.* at 949-50.

11     Notably, while Defendants insist that that a de-SPAC merger is "not an IPO," the Freshfields letter repeatedly distinguishes a de-SPAC transaction as simply not a "traditional IPO." *See generally* Miller Decl. Ex. 1.

12     Defendants infer that the only people who would have standing to bring Section 10(b) claims with regards to the pre-merger misstatements and omissions are stockholders in "Old CarLotz." Def. Br. at 16. This makes no sense, as Old CarLotz, like the target companies of most SPAC transactions, was a private company, whose shares were predominantly owned by a small group of "major stockholders"--one of which was Defendant Bor himself. *See* December 30, 2020 Prospectus (Miller Decl. Ex. 3). If Defendants' interpretation were correct, companies could openly lie about the SPAC target company in public filings with the SEC in order to drum up support for the merger, and no investor relying on those false statements would ever have standing to bring claims under Sections 10(b), 11, or 12(a)(2) against companies for pre-merger statements in SPAC transactions.

13     Defendants make no argument that Plaintiffs lack 10(b) standing for post-merger statements and omissions, nor could they.

14     *See* Def. Exs. 6 (transcript of Gabelli Automotive Symposium interview); 9 (transcript of a CarLotz video presentation at the Barclays Global Automotive conference); 10 (transcript of interview at Wells Fargo TMT

Summit); 15 (transcript of interview with Yahoo! Finance Live); 18 (transcript of interview at the 2021 ICR Conference).

15  These facts differentiate the case at hand from *Menora Mivtachim Ins. Ltd. v. Int 7 Flavors & Fragrances Inc.,* No. 19-cv-7536, 2021 U.S. Dist. LEXIS 61182 (S.D.N.Y. Mar. 30, 2021). In that case, the Court narrowly found that Plaintiffs, who owned shares of a parent company in a traditional (non-SPAC) merger, did not have standing to pursue claims against a target company for historical statements made by the target company that had no relation whatsoever to the merger (they were in regards to kickbacks received by the target company beginning over 20 years before the merger, conduct which the Court did not find continued during the class period, *see Id.* at \*24). *Id.* at \*79-80. However, the opinion implied that the outcome may have been different if Plaintiffs had some "type of a direct investment interest in" the target company. *Id.* at 79. Notably, the Court never found that plaintiffs did not have standing to sue the parent company.

16  The "Registration Statement" encompasses the December 30, 2020, Registration Statement/Proxy/Prospectus, all exhibits thereto, and all materials incorporated therein, including the statements filed on Form 425 up until the time the registration statement became effective.

17  For ease of analysis, Plaintiffs have grouped the alleged misstatements and omissions into categories. However, the misstatements in this case are strongly interconnected, and as such, should not be analyzed in isolation, but rather be "taken together and in context." *In re Facebook, Inc.,* 986 F. Supp. 2d 487, 518 (S.D.N.Y. 2013).

18  Defendants state in a footnote that "Plaintiffs appear to assume that the Company had but one corporate consigning partner" but "plead no facts to support their assumption." Def. Br. at 45 n. 55. However, this is simple math - CarLotz said in investor presentations it received 60% of its inventory from corporate sourcing partners (¶¶ 111, 132), and then later revealed that in Q4:2020 it received 60% of its inventory from one corporate sourcing partner. At this stage, the most plausible inference is CarLotz had only one corporate partner in Q4:2020.

19  Contrary to Defendants' assertions, *see* Def. Br. at 22, the fact that CW1 left CarLotz shortly before the start of the Class Period does not make his observations irrelevant. *See, e.g., Speakes v. Taro Pharm. Indus.,* No. 16-cv-08318, 2018 U.S. Dist. LEXIS 163281, at \*31 (S.D.N.Y. Sep. 24, 2018) ("[T]hat one of the confidential witnesses left [the company] a mere three months before the Class Period does not, in light of the totality of the allegations here, undermine the utility of that witness' observations."); *Employees' Ret. Sys. v. Blanford,* 794 F.3d 297, 307 (2d Cir. 2015) ("the Second Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.").

20  Defendants make the argument that these statements were not misleading because "shipping and reconditioning costs on sold or returned vehicles were 'costs of sales' reflected on the Company's income statement." Def. Br. at 20. Regardless of the accounting ultimately used, the fact remains-CarLotz *was* responsible for the shipping and reconditioning costs for the majority of the vehicles obtained in Q4:2020, and these dollars were at risk because the Company could not timely process the inventory. Thus, to repeatedly state that shipping and reconditioning costs were "borne by our seller" was materially misleading.

21    Moreover, due to the length of time it took to process the inventory and the fees spent on shipping and reconditioning costs, Bor also knew that CarLotz was selling many of these vehicles at far lower prices than originally anticipated, and would continue to do so in future quarters, which would negatively impact CarLotz' GPU. *Id.*

22    Defendants attempt to argue that "[n]either Ms. Polak nor Mr. Stoltz received cash bonuses contingent upon the closing of the Merger" (Def. Br. at 39 fn 42); however, the very documents they cite to state that the agreements were governing "the services of Executive *following* the closing of the transactions contemplated by the Merger Agreement," would become "[e]ffective on the Closing Date (as defined in the Merger Agreement)" and that these agreements would "supersede" Stoltz and Polak's prior employment agreements. Def. Ex. 14 at 7, 19 (emphasis added).

23    This is yet another attempt by Defendants to shield SPACs from securities liability. A SPAC will often require its sponsors and executives of the target company to agree to similar lock-up provisions. *See* 1 Securities Practice Guide § 7.04 (2022). If stock sales were a requirement, it would practically grant those who make misleading statements in a SPAC transaction immunity from Section 10(b) liability. merger. *In re Stillwater Capital Partners Inc.,* 858 F. Supp. 2d 277, 288 (S.D.N.Y. 2012).

24    Despite Defendants' arguments to the contrary, Courts in this District have found allegations of temporal proximity can "support an inference of scienter." *In re Pareteum Sec. Litig.,* 2021 U.S. Dist. LEXIS 151106 at *49 (*citing In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.,* 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) and *S.E.C. v. More,* 416 F. Supp. 3d 306, 324 (S.D.N.Y. 2019)).

25    In a footnote on the last page of their brief, Defendants argue a lack of loss causation with regards to Plaintiffs' Section 11 and Section 12 claims. *See* Def. Br. at 50, n. 66. "[L]oss causation is not an element of a claim under either Section 11 or 12"; however, defendants may raise lack of loss causation as an affirmative defense when "it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses." *In re Giant Interactive Grp., Inc. Sec. Litig.,* 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009). In other words, "the Court at the Rule 12(b)(6) stage must infer that the decline in value was the result of the misstatements, unless the defendant offers evidence to the contrary. *In re WRT Energy Sec. Litig.,* 2005 U.S. Dist. LEXIS 18701, at *6 (S.D.N.Y. Aug. 30, 2005). "Because analyzing causation can be a fact-intensive inquiry, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion." *Boluka Garment Co. v. Canaan Inc.,* 547 F. Supp. 3d 439, 447 (S.D.N.Y. 2021) (internal quotation marks omitted). Nevertheless, as explained in this section, Plaintiffs adequately allege loss causation.

26    Defendants claim no notice would have been needed because the partner was "pausing," not "cancelling" the agreement. The question of whether CarLotz contractually differentiated between partners pausing and cancelling their agreements is one for a later stage of the litigation. When there are opposing inferences which can be gleaned from the facts at the motion-to-dismiss stage, however, "the Court must draw all reasonable inferences in Plaintiffs' favor." *See Yi v. GTV Media Grp. Inc.,* 2021 U.S. Dist. LEXIS 147995, at *9 (S.D.N.Y. Aug. 6, 2021).

27    *See also* Proposed Rules, 87 Fed. Reg. at 29482 "For purposes of the PSLRA, we see no reason to treat forward looking statements made in connection with de-SPAC transactions differently than forward-looking statements made in traditional initial public offerings, in that both instances involve private issuers entering the public U.S. securities markets for the first time."

**In re CARLOTZ, LITIGATION INC. SECURITIES., 2022 WL 19403712 (2022)**

28      https://investors.carlotz.com/news-releases/news-release-details/carlotz-announces-ceo-transition-0

29      https://investors.carlotz.com/news-releases/news-release-details/carlotz-closes-50-its-stores-strategicallY-focus-path

30      https://investors.carlotz.com/news-releases/news-release-details/carlotz-announces-changes-its-board-directors

---

**End of Document**                                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.