**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 210, 229, 230, 232, 239, 240, and 249**

**[Release Nos. 33-11265; 34-99418; IC-35096; File No. S7-13-22]**

**RIN 3235-AM90**

**Special Purpose Acquisition Companies, Shell Companies, and Projections**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rules; guidance.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is adopting rules intended to enhance investor protections in initial public offerings by special purpose acquisition companies (commonly known as SPACs) and in subsequent business combination transactions between SPACs and private operating companies (commonly known as de-SPAC transactions). Specifically, we are adopting disclosure requirements with respect to, among other things, compensation paid to sponsors, conflicts of interest, dilution, and the determination, if any, of the board of directors (or similar governing body) of a SPAC regarding whether a de-SPAC transaction is advisable and in the best interests of the SPAC and its shareholders. We are adopting rules that require a minimum dissemination period for the distribution of security holder communication materials in connection with de-SPAC transactions. We are adopting rules that require the re-determination of smaller reporting company ("SRC") status in connection with de-SPAC transactions. We are also adopting rules that address the scope of the safe harbor for forward-looking statements under the Private Securities Litigation Reform Act of 1995. Further, we are adopting a rule that would deem any business combination transaction involving a reporting shell company, including a SPAC, to be a sale of securities to the reporting shell company's shareholders and are adopting amendments to a number of financial statement

requirements applicable to transactions involving shell companies.  In addition, we are providing guidance on the status of potential underwriters in de-SPAC transactions and adopting updates to our guidance regarding the use of projections in Commission filings as well as requiring additional disclosure regarding projections when used in connection with business combination transactions involving SPACs.  Finally, we are providing guidance for SPACs to consider when analyzing their status under the Investment Company Act of 1940.

**DATES:** *Effective date*: The final rules are effective on [INSERT DATE 125 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

*Compliance date*: The compliance date for the final rules, other than 17 CFR 229.1610, is the effective date.  The compliance date for 17 CFR 229.1610 is [INSERT DATE 490 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

**FOR FURTHER INFORMATION CONTACT:** Mark Saltzburg, Office of Rulemaking, Division of Corporation Finance, at (202) 551-3430; with respect to 17 CFR 230.145a (Rule 145a under the Securities Act of 1933), the Office of Chief Counsel, Division of Corporation Finance, at (202) 551-3500; with respect to 17 CFR 210.15-01 (Rule 15-01 of Regulation S-X), Ryan Milne, Office of Chief Accountant, Division of Corporation Finance, at (202) 551-3400; with respect to amendments relating to projections disclosure and tender offer rules, Daniel Duchovny, Office of Mergers & Acquisitions, Division of Corporation Finance, at (202) 551-3440; and with respect to guidance under the Investment Company Act of 1940, Rochelle Kauffman Plesset, Seth Davis, or Taylor Evenson, Senior Counsels; or Lisa Reid Ragen, Branch Chief, Chief Counsel's Office, Division of Investment Management, at (202) 551-6825; U.S. Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549.

**SUPPLEMENTARY INFORMATION:** The Commission is adopting new 17 CFR 210.15-01, new 17 CFR 229.1601 through 229.1610, and new 17 CFR 230.145a under the Securities Act of 1933. We are also adopting amendments to:

| Commission Reference | | CFR Citation (17 CFR) |
|---|---|---|
| Securities Act of 1933 | | |
| | Rule 405 | § 230.405 |
| | Form S-1 | § 239.11 |
| | Form F-1 | § 239.31 |
| | Form S-4 | § 239.25 |
| | Form F-4 | § 239.34 |
| Securities Exchange Act of 1934 | | |
| | Rule 12b-2 | § 240.12b-2 |
| | Rule 14a-6 | § 240.14a-6 |
| | Rule 14c-2 | § 240.14c-2 |
| | Schedule 14A | § 240.14a-101 |
| | Schedule TO | § 240.14d-100 |
| | Form 20-F | § 249.220f |
| | Form 8-K | § 249.308 |
| Regulation S-K | | §§ 229.10 through 229.1406 |
| | Item 10 | § 229.10 |
| | Item 601 | § 229.601 |
| Regulation S-T | | §§ 232.10 through 232.903 |
| | Rule 405 | § 232.405 |
| Regulation S-X | | §§ 210.1-01 through 210.13.02 |
| | Rule 1-02 | § 210.1-02 |
| | Rule 3-01 | § 210.3-01 |
| | Rule 3-05 | § 210.3-05 |
| | Rule 3-14 | § 210.3-14 |
| | Rule 8-02 | § 210.8-02 |
| | Rule 10-01 | § 210.10-01 |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 8
II.   NEW SUBPART 1600 OF REGULATION S-K ............................................... 23
      A. Definitions........................................................................................................ 24
      1.    Proposed Definition: "De-SPAC Transaction"............................................. 24
      2.    Comments: Definition of "De-SPAC Transaction" ...................................... 24
      3.    Final Definition: "De-SPAC Transaction".................................................... 25
      4.    Proposed Definition: "Special Purpose Acquisition Company (SPAC)" ...... 26
      5.    Comments: Definition of "Special Purpose Acquisition Company (SPAC)"................ 27
      6.    Final Definition: "Special Purpose Acquisition Company (SPAC)" ............ 28
      7.    Proposed Definition: "SPAC Sponsor".......................................................... 35
      8.    Comments: Definition of "SPAC Sponsor"................................................... 35
      9.    Final Definition: "SPAC Sponsor" ................................................................ 36
      10.   Proposed Definition: "Target Company"....................................................... 39
      11.   Comments: Definition of "Target Company" ................................................ 39
      12.   Final Definition: "Target Company"............................................................. 40
      B. Sponsors ........................................................................................................... 40
      1.    Proposed Rules ............................................................................................... 40
      2.    Comments........................................................................................................ 42
      3.    Final Rules...................................................................................................... 47
      C. Conflicts of Interest......................................................................................... 59
      1.    Proposed Rules ............................................................................................... 59
      2.    Comments........................................................................................................ 61
      3.    Final Rules...................................................................................................... 64
      D. Dilution ............................................................................................................ 72
      1.    Proposed Rules ............................................................................................... 72
      2.    Comments........................................................................................................ 76
      3.    Final Rules...................................................................................................... 86
      E. Prospectus Cover Page and Prospectus Summary Disclosure ....................... 118
      1.    Proposed Rules ............................................................................................... 118
      2.    Comments........................................................................................................ 120
      3.    Final Rules...................................................................................................... 121
      F. De-SPAC Transactions: Background, Reasons, Terms, and Effects............... 126
      1.    Proposed Item 1605........................................................................................ 126
      2.    Comments: Item 1605 .................................................................................... 127
      3.    Final Item 1605 .............................................................................................. 129
      G. Board Determination about the De-SPAC Transaction; Reports, Opinions, Appraisals,
      and Negotiations.................................................................................................. 132
      1.    Proposed Item 1606(a) ................................................................................... 132
      2.    Comments: Item 1606(a)................................................................................ 133
      3.    Final Item 1606(a).......................................................................................... 136
      4.    Proposed Item 1606(b) ................................................................................... 141
      5.    Comments: Item 1606(b) ................................................................................ 141
      6.    Final Item 1606(b).......................................................................................... 143
      7.    Proposed Items 1606(c) through (e)............................................................... 146
      8.    Comments: Items 1606(c) through (e) ........................................................... 146

4

9.   Final Items 1606(c) through (e) ............................................................. 147
10.  Proposed Item 1607............................................................................... 149
11.  Comments: Item 1607 ........................................................................... 150
12.  Final Item 1607 ..................................................................................... 152
H. Tender Offer Filing Obligations ................................................................. 157
1.   Proposed Item 1608............................................................................... 157
2.   Comments: Item 1608 ........................................................................... 158
3.   Final Item 1608 ..................................................................................... 159
I.  Structured Data Requirement...................................................................... 162
1.   Proposed Item 1610............................................................................... 162
2.   Comments................................................................................................ 162
3.   Final Item 1610 and Tagging Compliance Date ................................... 163
III.  DISCLOSURES AND LIABILITY IN DE-SPAC TRANSACTIONS............................ 167
A. Non-Financial Disclosures in De-SPAC Disclosure Documents ................ 167
1.   Proposed Rules....................................................................................... 167
2.   Comments................................................................................................ 169
3.   Final Rules.............................................................................................. 170
B. Minimum Dissemination Period ................................................................. 173
1.   Proposed Rules....................................................................................... 173
2.   Comments................................................................................................ 173
3.   Final Rules.............................................................................................. 175
C. Private Operating Company as Co-Registrant............................................ 180
1.   Proposed Rules....................................................................................... 180
2.   Comments................................................................................................ 181
3.   Final Rules.............................................................................................. 190
D. Re-Determination of Smaller Reporting Company (SRC) Status ............... 211
1.   Proposed Rules....................................................................................... 211
2.   Comments................................................................................................ 213
3.   Final Rules and Guidance ..................................................................... 220
E. PSLRA Safe Harbor.................................................................................... 232
1.   Proposed Rules....................................................................................... 232
2.   Comments................................................................................................ 235
3.   Final Rules.............................................................................................. 256
F. Underwriter Status and Liability in Securities Transactions ..................... 279
1.   Proposed Rule ........................................................................................ 279
2.   Comments................................................................................................ 279
3.   Declining to Adopt Proposed Rule 140a, and Commission Guidance on Underwriter Status in De-SPAC Transactions ................................................... 282
IV.  BUSINESS COMBINATIONS INVOLVING SHELL COMPANIES............................ 289
A. Shell Company Business Combinations and the Securities Act of 1933........ 290
1.   Proposed Rule ........................................................................................ 290
2.   Comments................................................................................................ 291
3.   Final Rule ............................................................................................... 294
B. Financial Statement Requirements in Business Combination Transactions Involving Shell Companies .............................................................................. 309
1.   Proposed Rule 15-01(a), Rule 1-02(d), and Form Instructions: Audit Requirements . 310

2. Comments: Rule 15-01(a), Rule 1-02(d), and Form Instructions: Audit Requirements ...... 311
3. Final Rule 15-01(a), Rule 1-02(d), and Form Instructions: Audit Requirements ........ 312
4. Proposed Rule 15-01(b): Number of Years of Financial Statements ........................... 315
5. Comments: Rule 15-01(b): Number of Years of Financial Statements ...................... 316
6. Final Rule 15-01(b): Number of Years of Financial Statements ............................... 316
7. Proposed Rule 15-01(c): Age of Financial Statements ................................................ 317
8. Comments: Rule 15-01(c): Age of Financial Statements.............................................. 318
9. Final Rule 15-01(c): Age of Financial Statements...................................................... 318
10. Proposed Rules: 15-01(d), 1-02(w)(1), 3-05(b)(4)(ii), 3-14(b)(3)(ii): Acquisition of a Business or Real Estate Operation by a Predecessor ..................................................... 320
11. Comments: Rule 15-01(d), 1-02(w)(1), 3-05(b)(4)(ii), 3-14(b)(3)(ii): Acquisition of a Business or Real Estate Operation by a Predecessor ..................................................... 324
12. Final Rules 15-01(d), 1-02(w)(1), 3-05(b)(4)(ii), 3-14(b)(3)(ii): Acquisition of a Business or Real Estate Operation by a Predecessor ..................................................... 325
13. Proposed Rule 15-01(e): Financial Statements of a Shell Company Registrant after the Combination with Predecessor.................................................................................. 329
14. Comments: Rule 15-01(e): Financial Statements of a Shell Company Registrant after the Combination with Predecessor.......................................................................... 330
15. Final Rule 15-01(e): Financial Statements of a Shell Company Registrant after the Combination with Predecessor.................................................................................. 331
16. Proposed Rule 11-01(d) ................................................................................................ 333
17. Comments: Rule 11-01(d).............................................................................................. 335
18. Decline to Adopt Rule 11-01(d)..................................................................................... 337
19. Proposed Item 2.01(f) of Form 8-K .............................................................................. 339
20. Comments: Item 2.01(f) of Form 8-K............................................................................ 339
21. Final Item 2.01(f) of Form 8-K ..................................................................................... 340
22. Proposed Rules 3-01, 8-02, 10-01(a)(1): Balance Sheets of Predecessors .................. 341
23. Comments: Rules 3-01, 8-02, 10-01(a)(1): Balance Sheets of Predecessors............... 341
24. Final Rules 3-01, 8-02, 10-01(a))(1): Balance Sheets of Predecessors........................ 341
25. Other Shell Company Matters........................................................................................ 342
V. ENHANCED PROJECTIONS DISCLOSURE ....................................................................... 344
A. Proposed Items 10(b) and 1609 of Regulation S-K ......................................................... 344
1. Proposed Rules.............................................................................................................. 344
2. Comments...................................................................................................................... 346
3. Final Rules.................................................................................................................... 351
VI. THE STATUS OF SPACS UNDER THE INVESTMENT COMPANY ACT................... 360
A. Background ......................................................................................................................... 360
B. SPAC Activities.................................................................................................................. 365
1. The Nature of SPAC Assets and Income ...................................................................... 365
2. Management Activities .................................................................................................. 366
3. Duration......................................................................................................................... 368
4. Holding Out................................................................................................................... 370
5. Merging with an Investment Company.......................................................................... 370
C. Conclusion .......................................................................................................................... 371
VII. OTHER MATTERS ............................................................................................................... 371

VIII.    ECONOMIC ANALYSIS..................................................................................... 371
   A. Baseline and Affected Parties ..................................................................... 377
   1.    SPAC Initial Public Offerings.................................................................. 377
   2.    De-SPAC Transactions ........................................................................... 385
   3.    Blank Check Companies .......................................................................... 394
   4.    Shell Company Business Combinations ................................................... 395
   B. Benefits and Costs of the Adopted Rules ..................................................... 396
   1.    Disclosure-Related Rules ....................................................................... 396
   2.    Liability-Related Rules ........................................................................... 454
   3.    Shell Company-Related Rules ................................................................. 467
   4.    Enhanced Projections Disclosure (Amendments to Item 10(b) of Regulation S-K).... 479
   C. Effects on Efficiency, Competition, and Capital Formation........................... 481
   1.    Efficiency ............................................................................................... 481
   2.    Competition............................................................................................ 482
   3.    Capital Formation.................................................................................. 483
   D. Reasonable Alternatives .............................................................................. 485
   1.    Disclosure-Related Rules ....................................................................... 485
   2.    PSLRA Safe Harbor Guidance................................................................ 493
   3.    Expanding Disclosure in Reporting Shell Company Business Combinations............. 493
   4.    Enhanced Projections Disclosure ........................................................... 495
IX.    PAPERWORK REDUCTION ACT ............................................................... 495
   A. Summary of the Collections of Information ................................................. 495
   B. Estimates of the Effects of the Final Rules on the Collections of Information .............. 497
   C. Incremental and Aggregate Burden and Cost Estimates................................ 502
   1.    Current Inventory Update to Reflect $600 Per Hour Rather than $400 Per Hour Outside Professional Costs Rate......................................................... 502
   2.    PRA Burden and Cost Estimates Resulting from the Final Rules .............. 504
X.    FINAL REGULATORY FLEXIBILITY ANALYSIS ....................................... 511
   A. Need for, and Objectives of, the Final Rules ............................................... 511
   B. Significant Issues Raised by Public Comments............................................ 513
   C. Small Entities Subject to the Final Rules..................................................... 513
   D. Projected Reporting, Recordkeeping, and Other Compliance Requirements................. 515
   E. Duplicative, Overlapping or Conflicting Federal Rules ................................ 515
   F. Agency Action to Minimize Effect on Small Entities ................................... 516
STATUTORY AUTHORITY ............................................................................... 519

## I.  INTRODUCTION

Special purpose acquisition companies, or SPACs, first began to emerge in the 1990s as an alternative to blank check companies after blank check companies began to be regulated more strictly pursuant to 17 CFR 230.419 ("Rule 419")[1] under the Securities Act of 1933 ("Securities Act"),[2] a rule the Commission adopted following the enactment of the Securities Enforcement Remedies and Penny Stock Reform Act of 1990 ("Penny Stock Reform Act").[3]  SPACs are shell companies[4] organized and managed by a sponsor for the purpose of merging with or acquiring one or more unidentified private operating companies, commonly known as a de-SPAC transaction, within a certain time frame.[5]  The de-SPAC transaction is a hybrid transaction that contains elements of both an initial public offering ("IPO") and a merger and acquisition ("M&A") transaction.[6]  While structured as an M&A transaction, the de-SPAC transaction also

---

[1]     Title 17 section 230.419(a)(2) under the Securities Act of 1933 defines the term "blank check company" as a development stage company that has no specific business plan or purpose or that has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies and that is issuing "penny stock," as defined in 17 CFR 240.3a51-1 ("Rule 3a51-1") under the Securities Exchange Act of 1934.

[2]     15 U.S.C. 77a *et seq.*

[3]     Pub. L. 101-429, 104 Stat. 931 (Oct. 15, 1990). *See Blank Check Offerings*, Release No. 33-6932 (Apr. 13, 1992) [57 FR 18037 (Apr. 28, 1992)].  A SPAC is not a "blank check company" because, given that it raises more than $5 million in a firm commitment underwritten initial public offering, it is not selling "penny stock." *See Penny Stock Definition for Purposes of Blank Check Rule*, Release No. 33-7024 (Oct. 25, 1993) [58 FR 58099 (Oct. 29, 1993)].  To that end, SPACs often have provisions in their governing instruments that prohibit them from being "penny stock" issuers.

[4]     The term "shell company" is defined in Securities Act Rule 405 and Exchange Act Rule 12b-2 as a registrant, other than an asset-backed issuer, that has: (1) no or nominal operations; and (2) either: (i) no or nominal assets; (ii) assets consisting solely of cash and cash equivalents; or (iii) assets consisting of any amount of cash and cash equivalents and nominal other assets.

[5]     The descriptions included in this release of common features and fees currently seen in SPACs and SPAC transaction structures are based, in part, on reviews by the Commission staff of SPAC filings with the Commission.  Based on review by the Commission staff of SPAC filings, in the majority of transactions, SPACs typically combine with private operating companies.  In some cases, however, SPACs may combine with other public companies. *See, e.g.*, Bailey Lipschultz, *Re-SPACs Gain Steam as Arrival Finds New Sponsor*, Bloomberg News (Apr. 10, 2023), *available at* https://news.bloomberglaw.com/mergers-and-acquisitions/re-spacs-gain-steam-as-arrival-shares-sink-new-sponsor-steps-up.

[6]     We use the terms "initial public offering" or "IPO" to refer to a securities offering registered under the Securities Act by an issuer that was not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934 immediately prior to the registration.

is the functional equivalent of the private target company's IPO, because it results in the target company becoming part of a combined company that is a reporting company and provides the private target company with access to cash proceeds that the SPAC had previously raised from the public. As part of this process, the shareholders of the SPAC go from owning shares in a shell company to owning shares in a combined company that conducts the business of the private target. As a result, the de-SPAC transaction implicates disclosure and liability concerns associated with both IPOs and M&A transactions. Additionally, parties involved in the SPAC process, such as the SPAC sponsor, may have incentives to consummate a de-SPAC transaction that are not present in a traditional IPO or M&A transaction. Further, as discussed in the Proposing Release,[7] the shareholders and management of a private operating company may believe there to be certain advantages of combining with a SPAC compared with conducting an underwritten IPO.

To have the necessary context for the concerns unique to SPACs and de-SPAC transactions, it is critical to understand the structure and lifecycle of a SPAC. Once formed, a SPAC will conduct its IPO in the form of a firm commitment underwritten IPO of $5 million or more in units consisting of redeemable shares and of warrants. The underwriting fees for a SPAC IPO typically approximate 5% to 5.5% of the offering proceeds, and a significant portion of those fees (around 3% of the IPO proceeds) are conditioned on the completion of a de-SPAC transaction.[8] The SPAC sponsor is usually compensated through a "promote" or "founder's

---

[7]    *Special Purpose Acquisition Companies, Shell Companies, and Projections*, Release No. 33-11048 (Mar. 30, 2022) [87 FR 29458 (May 13, 2022)] ("Proposing Release"), at 29461, nn.22–25 and accompanying text. *See infra* Section VIII.A.1.ii.

[8]    *See infra* Section VIII.A.9.xii.

shares"—i.e., discounted SPAC shares received prior to the SPAC's IPO that generally only have value if a de-SPAC transaction occurs.[9]

Following its IPO, a SPAC places all or substantially all of the IPO proceeds into a trust or escrow account. The SPAC typically registers its shares and warrants under Section 12(b) of the Securities Exchange Act of 1934 ("Exchange Act")[10] and lists the units (typically consisting of a common share and a fraction of a warrant) for trading on a national securities exchange.[11]

Next, the SPAC seeks to identify a target company for a de-SPAC transaction within the time frame specified in its governing documents.[12] If the SPAC does not complete a de-SPAC transaction within that time frame, it may seek an extension (often requiring approval from its shareholders) or dissolve and liquidate.[13] If the SPAC enters into a business combination agreement with a target company, the SPAC files a Form 8-K (or Form 6-K if the SPAC is a foreign private issuer ("FPI") that reports on Form 20-F)[14] announcing the transaction that

---

[9]    The sponsor's compensation usually amounts to around 20% of the total shares of a SPAC after its IPO.

[10]   15 U.S.C. 78a *et seq.*

[11]   The shares and warrants usually begin trading as a unit, with a unit frequently consisting of a common share and a fraction of a warrant, and are traded separately after a certain period. The warrants often become exercisable at a price that is higher (often $11.50) than the IPO price for common shares (which is often $10) upon the later of the passage of a certain time period following the SPAC's IPO (often one year) or a certain time period following the completion of a de-SPAC transaction (often 30 days). Many warrants have limitations on their potential upside as a result of the right of the issuer to call the warrant under certain conditions, which commonly include a condition that the underlying common stock have traded at or above a certain price (often $18) for a specified period of time. The redemption price in those call situations can vary based on the specific warrant agreement provisions, so investors commonly pay close attention to those pricing provisions.

[12]   The governing documents often provide for a time frame of 24 months, but it can be as long as 36 months. Exchange listing rules generally require a SPAC to complete a business combination within three years (or such shorter period specified in its registration statement or applicable governing documents). *See, e.g.*, NYSE Listed Company Manual Section 102.06 and Nasdaq Listing Rule IM-5101-2.

[13]   SPAC shareholders typically also have a redemption right in connection with any votes to extend the duration of the SPAC.

[14]   *See* definition of "foreign private issuer," *infra* note 442.

includes certain information on the material terms of the business combination agreement.[15]  The parties structure the de-SPAC transaction in different forms that may have tax or other regulatory advantages.[16]  Prior to the closing of the de-SPAC transaction, the shareholders of the SPAC typically have the opportunity to either: (1) require the SPAC to redeem their shares prior to the de-SPAC transaction[17] and receive a pro rata share of the amount in the IPO proceeds and related assets subject to the trust or escrow arrangements (including interest thereon and commonly less amounts released to pay income and franchise taxes), or (2) remain a shareholder of the surviving company after the business combination.[18]  To offset shareholder redemptions or to fund larger de-SPAC transactions, SPACs often conduct additional private capital-raising transactions, typically in the form of private investment in public equity (PIPE) transactions.[19]

Regardless of its form, a de-SPAC transaction often is accompanied by the need to attain shareholder approval for certain items (e.g., amendments to the governing documents of the SPAC, or authorization of additional securities for issuance), and, in such cases, a SPAC

---

[15]  A SPAC is required to file a Form 8-K that provides certain disclosures regarding the business combination agreement if the agreement is a material definitive agreement not made in the ordinary course of business.  *See* Item 1.01 of Form 8-K.

[16]  Three examples of common de-SPAC transaction structures are: (i) the SPAC is the surviving company in a merger and the target company merges into the SPAC, (ii) the target company is the surviving company in a merger and the SPAC merges into the target company, and (iii) a new holding company is created and the SPAC and target company merge into that new holding company.  The holding company structure referred to in (iii) above includes "double-dummy" structure transactions.

[17]  Until they become exercisable, warrants issued by the SPAC do not typically provide a right to require the redemption of the warrant by any party.

[18]  De-SPAC transactions often result in the former SPAC shareholders owning a minority interest in the combined company.  According to one study of the 47 de-SPAC transactions that occurred between Jan. 2019 and June 2020, SPAC shareholders, including the SPAC sponsor, held a median of 35% of the combined company after a de-SPAC transaction and the sponsor alone held a median of 12% of the combined company.  Michael Klausner, Michael Ohlrogge & Emily Ruan, *A Sober Look at SPACs*, 39 Yale J. Reg., 228, 239–240 (2022).

[19]  The parties to a de-SPAC transaction often negotiate a minimum cash condition pursuant to which a SPAC must have a specified minimum amount of cash at the closing of the de-SPAC transaction, which could include funds in the trust or escrow account, the proceeds from PIPE transactions, and other sources.  When a SPAC conducts a PIPE transaction in connection with a de-SPAC transaction, the post-business combination company generally files a Securities Act registration statement following the de-SPAC transaction to register the resale of the securities purchased in the PIPE transaction.

provides its shareholders with a proxy statement on Schedule 14A or an information statement on Schedule 14C.[20]  If the SPAC, the target company, or a holding company[21] must register the offer and sale of its securities to be issued in the de-SPAC transaction, the entity typically files a registration statement on Form S-4 or F-4 to do so.[22]  If no registration statement or proxy or information statement is required, the SPAC may disseminate a tender offer statement (i.e., a Schedule TO) for the redemption offer to its security holders with information about the target company.[23]

---

[20]   17 CFR 240.14a-2 under the Exchange Act; Exchange Act Rule 14c-2.  17 CFR 240.3a12-3(b) under the Exchange Act provides an exemption from the proxy and information statement rules for FPIs, providing that "[s]ecurities registered by a foreign private issuer, as defined in Rule 3b-4…, shall be exempt from sections 14(a), 14(b), 14(c), 14(f) and 16 of the Act."

[21]   In certain de-SPAC structures, a holding company is formed to acquire both the private operating company and the SPAC.

[22]   As noted above, SPACs currently use a variety of legal structures to effect de-SPAC transactions, and the particular transaction structure and the consideration used can affect (1) the Commission filings required for the transaction, (2) the entity that will have a continuing Exchange Act reporting obligation following the transaction, and (3) the disclosures provided in connection with the transaction.

[23]   The Commission has promulgated rules under the Exchange Act setting forth filing, disclosure, and dissemination requirements in connection with tender offers.  *See, e.g.*, 17 CFR 240.14d-1 through 240.14d-103 under the Exchange Act, 17 CFR 240.14e-1 through 240.14e-8 ("Regulation 14E") under the Exchange Act, and 17 CFR 240.13e-4 ("Rule 13e-4") under the Exchange Act.  When an issuer conducts a tender offer, the issuer may be required to file and disseminate a Schedule TO pursuant to Rule 13e-4.  Because the redemption rights in a SPAC context generally have indicia of a tender offer, such as a limited period of time for the SPAC security holders to request redemption of their securities, SPACs will generally file a Schedule TO in circumstances where, in connection with a de-SPAC transaction, the parties are neither soliciting votes or consents nor registering the offer or sale of securities.  The Commission staff has not objected if a SPAC does not comply with the tender offer rules when the SPAC files a required Schedule 14A or 14C in connection with the approval of a de-SPAC transaction or an extension of the timeframe to complete a de-SPAC transaction and conducts the solicitation in accordance with Regulation 14A or 14C, as the Federal proxy rules mandate substantially similar disclosures and applicable procedural protections as required by the tender offer rules.  However, this staff position does not apply to a SPAC that does not file a required Schedule 14A or 14C in connection with the de-SPAC transaction or an extension.  In these circumstances, SPACs have generally filed and disseminated Schedules TO, and the staff has taken the position that the Schedule TO should include the same financial and other information as is required in Schedule 14A or 14C for a de-SPAC transaction.  *See infra* Section II.H for a discussion of Item 1608 of Regulation S-K that we are adopting in this release and Section IV.A for a discussion of Rule 145a under the Securities Act that we are adopting in this release, which will affect when a SPAC may be required to file a registration statement in connection with a de-SPAC transaction.  For exchange-listed SPACs, exchange rules may require a SPAC to file tender offer documents with the Commission in some circumstances.  *See, e.g.*, Nasdaq Listing Rule IM-5101-2; NYSE Listed Company Manual Section 102.06.  The staff position discussed in this footnote and any other staff guidance or statements referenced in this release, including staff legal bulletins, staff compliance and disclosure interpretations, and the Division of Corporation Finance's Financial Reporting Manual ("FRM"), represent the

Finally, after the completion of the de-SPAC transaction, the combined company must file a Form 8-K within four business days that includes information about the target company equivalent to the information that a new reporting company would be required to provide when filing a Form 10 under the Exchange Act.[24]

In recent years, the U.S. securities market experienced a significant increase in the number of SPAC IPOs, as shown in Table 1[25] below.

---

views of Commission staff and are not a rule, regulation, or statement of the Commission. The Commission has neither approved nor disapproved the views reflected in these staff positions or the content of these staff statements and, like all staff positions or statements, they have no legal force or effect, do not alter or amend applicable law, and create no new or additional obligations for any person.

[24] Form 10 is the long-form registration statement to register a class of securities under Section 12(b) or 12(g) of the Exchange Act. *See* Items 2.01(f), 5.01(a)(8), and 9.01(c) of Form 8-K. If the shell company is an FPI then a Form 20-F should be filed no later than four business days after the consummation of the acquisition that includes all of the information for the target company that Form 20-F requires for registration of securities. By the time the Form 8-K with Form 10 information is filed, the securities of the combined company have often already begun trading on a national securities exchange with a new ticker symbol because the securities of the SPAC generally trade on an exchange until the consummation of the de-SPAC transaction and the securities of the combined company generally commence trading on the following business day.

[25] Estimates of SPAC IPO and IPO data in Table 1 are based on SPAC Analytics, *SPAC and US IPO Activity*, *available at* https://www.spacanalytics.com. Estimates of de-SPAC transactions in Table 1 are based on data from Dealogic for SPACs registered with the SEC and where year is based on M&A Completion Date.

**Table 1. Number of SPAC IPOs in the U.S. Securities Market from 2012–2023**

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Offerings | | | | | | | | | | | | |
| SPAC IPOs | 9 | 10 | 12 | 20 | 13 | 34 | 46 | 59 | 248 | 613 | 86 | 31 |
| IPOs (including SPAC IPOs) | 147 | 220 | 258 | 173 | 111 | 189 | 225 | 213 | 450 | 968 | 118 | 72 |
| Percentage from SPACs | 6% | 5% | 5% | 12% | 12% | 18% | 20% | 28% | 55% | 63% | 73% | 43% |
| Total Proceeds (in billions of dollars) | | | | | | | | | | | | |
| SPAC IPOs | 0.5 | 1.4 | 1.8 | 3.9 | 3.5 | 10.0 | 10.8 | 13.6 | 83.4 | 162.5 | 13.4 | 3.8 |
| IPOs (including SPAC IPOs) | 50.1 | 70.8 | 93.0 | 39.2 | 25.8 | 50.3 | 63.9 | 72.2 | 179.4 | 334.7 | 22.9 | 25.1 |
| Percentage from SPACs | 1% | 2% | 2% | 10% | 14% | 20% | 17% | 19% | 46% | 49% | 59% | 15% |
| Number of Completed De-SPAC Transactions | 6 | 11 | 5 | 10 | 9 | 13 | 23 | 28 | 64 | 199 | 101 | 89 |

As shown above in Table 1, SPAC IPOs represent a significant share of the U.S. IPO market in recent years.  While we recognize that, like overall IPO activity, the SPAC IPO market has declined recently, SPAC IPOs nonetheless constituted over half of all U.S. IPOs respectively in 2020, 2021, and 2022, and constituted 43% of all U.S. IPOs in 2023.[26]  The number of de-SPAC transactions has also been significant relative to the number of non-SPAC U.S. IPOs.

A similar trend has occurred when considering total proceeds for SPAC IPOs as a percentage of total proceeds raised in all U.S. IPOs over this period.  SPAC IPO proceeds represented 46%, 49%, and 59% of total proceeds raised in all U.S. IPOs respectively in 2020, 2021, and 2022.  This percentage declined to 15% in 2023.[27]

---

[26]    *Id.*

[27]    *Id.*

During the years of increase in SPAC IPOs, many market observers raised concerns about various aspects of the SPAC structure and the hybrid nature of the de-SPAC transaction.[28] Among other things, commentators expressed concerns about SPAC sponsor compensation and other costs that can have a dilutive effect on a SPAC's shareholders,[29] potential conflicts of interest in the SPAC structure and de-SPAC transactions (e.g., the SPAC sponsors' compensation being contingent on the completion of the de-SPAC transaction could lead sponsors to enter into de-SPAC transactions that are unfavorable to unaffiliated shareholders),[30] and SPAC governing documents and stock exchange listing rules under which SPAC shareholders can vote in favor of a proposed de-SPAC transaction yet redeem their shares prior to the closing of the transaction.[31]

---

[28] For example, in May 2021, the Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets of the House Financial Services Committee held a hearing on "Going Public: SPACs, Direct Listings, Public Offerings, and the Need for Investor Protections," which included testimony on, among other things, misaligned incentives in the SPAC structure, disclosure issues with respect to SPACs, and the use of projections in de-SPAC transactions. A webcast of the hearing is available at https://financialservices.house.gov/events/eventsingle.aspx?EventID=407753. In addition, as discussed in the Proposing Release, the Commission's Investor Advisory Committee issued recommendations and expressed certain concerns regarding SPACs. *See* Proposing Release, *supra* note 7, at 29462, nn.36–38 and accompanying text.

[29] *See* Testimony of Stephen Deane, CFA Institute, before the Investor Protection, Entrepreneurship, and Capital Markets Subcommittee of the U.S. House Committee on Financial Services, May 24, 2021 ("Deane Testimony"), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba16-wstate-deanes-20210524.pdf; *see also* Amrith Ramkumar, *SPAC Insiders Can Make Millions Even When the Company They Take Public Struggles*, Wall St. J. (Apr. 25, 2021).

[30] *See, e.g.*, Klausner, Ohlrogge & Ruan, *supra* note 18; Usha Rodrigues & Michael A. Stegemoller, *Redeeming SPACs* (2021), U. of Ga. Sch. Of L. Legal Stud. Res. Paper No. 2021-09, *available at* https://ssrn.com/abstract=3906196 or http://dx.doi.org/10.2139/ssrn.3906196 (in the Proposing Release, a working paper of this article was cited as Usha R. Rodrigues and Michael Stegemoller, *SPACs: Insider IPOs* (SSRN Working Paper, 2021), with the short form citation "Rodrigues and Stegemoller"); Minmo Gahng, Jay R. Ritter & Donghang Zhang, *SPACs* (2023), The Review of Financial Studies, 36(9), *available at* https://ssrn.com/abstract=3775847 or http://dx.doi.org/10.2139/ssrn.3775847; letter dated Feb. 16, 2021, from Americans for Financial Reform and Consumer Federation of America to the House Financial Services Committee ("AFR Letter"); Deane Testimony; Testimony of Andrew Park, Americans for Financial Reform, before the Investor Protection, Entrepreneurship, and Capital Markets Subcommittee of the U.S. House Committee on Financial Services, May 24, 2021 ("Park Testimony"), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba16-wstate-parka-20210524.pdf.

[31] *See* Mira Ganor, *The Case for Non-Binary, Contingent, Shareholder Action*, 23 U. Pa. J. Bus. L. 390 (2021); Rodrigues & Stegemoller, *supra* note 30. We note that exchange listing rules only explicitly require that, when

Some commentators have expressed concerns regarding the adequacy of the disclosures provided to investors in SPAC IPOs and de-SPAC transactions[32] in terms of explaining the potential risks and effects for investors related to these transactions and the potential benefits for the SPAC sponsor and other affiliates of the SPAC.[33]  For example, even though the de-SPAC transaction essentially serves as the IPO of the target company in the form of an M&A transaction, investors may not receive the same information about the target company as they would in a registration statement for a traditional IPO, because a filing for an M&A transaction has different disclosure requirements.[34]

---

a shareholder vote on a business combination is held, the public shareholders voting against a business combination have a right to redeem shares.  *See, e.g.*, Nasdaq Listing Rule IM-5101-2 (stating, in part, that "public Shareholders voting against a business combination must have the right to convert their shares of common stock into a pro rata share of the aggregate amount then in the deposit account (net of taxes payable and amounts distributed to management for working capital purposes) if the business combination is approved and consummated").  In April 2022, the Commission's Investor Advocate issued a recommendation to the NYSE and Nasdaq that their respective listing standards should prohibit consummation of a business combination when public SPAC shareholders exercise their conversion rights for a majority of the shares.  *See* Memorandum, dated April 21, 2022, from Rick A. Fleming, Investor Advocate, U.S. Securities and Exchange Commission, to Adena T. Friedman, President & Chief Executive Officer, and John Zecca, EVP & Global Chief Legal and Regulatory Officer, Nasdaq, Inc., *available at* https://www.sec.gov/about/offices/investorad/recommendation-of-the-investor-advocate-nasdaq-spac-listing-standards-042122.pdf; and Memorandum, dated April 21, 2022, from Rick A. Fleming, Investor Advocate, U.S. Securities and Exchange Commission, to Lynn Martin, President, and Jaime L. Klima, Chief Regulatory Officer, The NYSE Group, Inc., *available at* https://www.sec.gov/about/offices/investorad/recommendation-of-the-investor-advocate-nyse-spac-listing-standards-042122.pdf.

[32]   Throughout this release, when we discuss "SPAC transactions," we are referencing both SPAC IPOs and de-SPAC transactions.

[33]   *See, e.g.*, AFR Letter; Testimony of Professor Usha R. Rodrigues, University of Georgia School of Law, before the Investor Protection, Entrepreneurship, and Capital Markets Subcommittee of the U.S. House Committee on Financial Services, May 24, 2021 ("Rodrigues Testimony"), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba16-wstate-rodriguesu-20210524.pdf.  A number of recent SEC actions have highlighted disclosures about the private operating company that are allegedly materially misleading, among other things.  *See, e.g.*, *In the Matter of Momentus, Inc., Stable Road Acquisition Corp., SRC-NI Holdings, LLC, and Brian Kabot*, Release No. 33-10955, 34-92391 (July 13, 2021) (settled order); *In the Matter of Nikola Corp.*, Release No. 33-11018, 34-93838 (Dec. 21, 2021) (settled order); *SEC v. Akazoo S.A.*, Case No. 1:20-cv-08101 (S.D.N.Y. filed Sept. 30, 2020); *SEC v. Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D.N.Y. filed June 18, 2019).

[34]   For example, a traditional IPO requires a more comprehensive description of the business of a prospective registrant than is required of a private target operating company in an M&A transaction.  *Compare* Item 11(a) of Form S-1, *with* Item 17(b)(1) of Form S-4, *and* Item 14(b)(3) of Schedule 14A.  Additionally, a description of property and material legal proceedings is required for a prospective registrant in a traditional IPO, but these

There are also additional disclosure and liability concerns that stem from the hybrid nature of the de-SPAC transaction.  For example, some commentators have criticized the use of projections in de-SPAC transactions that, in their view, have appeared to be unreasonable, unfounded, or potentially misleading, particularly where the target company is an early stage company with no or limited sales, products, and/or operations; and have expressed concern that some SPACs have taken the position that the Private Securities Litigation Reform Act of 1995 ("PSLRA")[35] safe harbor applies to forward-looking statements made by SPACs in connection with de-SPAC transactions.[36]  The target company also is often not required to sign a registration statement filed for a de-SPAC transaction (except in transaction structures where the target company survives the de-SPAC transaction) and, by extension, would not take on Section 11 liability even though, similar to a traditional IPO, reliable information about the business of the target company is critical to investors when deciding whether to approve the transaction and to invest in the combined company through their redemption decision.  Finally, commentators have noted that, unlike a traditional IPO, a registered de-SPAC transaction lacks a named underwriter that would typically perform traditional gatekeeping functions, such as due diligence on the target company, and would be subject to liability under Section 11 of the Securities Act for the registration statement.[37]

---

disclosure requirements do not apply to a private target operating company in an M&A transaction.  *See* Item 11(b)-(c) of Form S-1.

[35]  Pub. L. No. 104-67, 109 Stat. 737 (1995).

[36]  *See, e.g.*, Michael Dambra, Omri Even-Tov & Kimberlyn George, *Should SPAC Forecasts Be Sacked?* (SSRN Working Paper, 2022), *available at* https://www.utah-wac.org/2022/Papers/even-tov_UWAC.pdf; AFR Letter; Park Testimony; Rodrigues & Stegemoller, *supra* note 30; *see also* Heather Somerville & Eliot Brown, *SPAC Startups Made Lofty Promises.  They Aren't Working Out.*, Wall St. J., Feb. 25, 2022.

[37]  *See* AFR Letter; Deane Testimony; Rodrigues Testimony.  For a general discussion of the role of gatekeepers in securities markets, *see also* John C. Coffee Jr., *Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms*, 84 B. U. L. Rev. 301 (2004); John C. Coffee, Jr., *Gatekeepers: The Professions and Corporate Governance* (2006).

In response to a number of these and other concerns, the Commission staff provided guidance relating to SPACs on five occasions between December 2020 and April 2021.[38] Then, in March 2022, the Commission proposed new rules and rule amendments to enhance existing disclosure requirements and investor protections in SPAC IPOs and in de-SPAC transactions.[39] On July 13, 2022, the U.S. Securities and Exchange Commission Small Business Capital Formation Advisory Committee ("Small Business Capital Formation Advisory Committee") issued recommendations related to this proposal.[40]

---

[38] *See CF Disclosure Guidance: Topic No. 11—Special Purpose Acquisition Companies* (Division of Corporation Finance, Dec. 22, 2020); *Staff Statement on Select Issues Pertaining to Special Purpose Acquisition Companies* (Division of Corporation Finance, Mar. 31, 2021); *Public Statement on Financial Reporting and Auditing Considerations of Companies Merging with SPACs* (Office of Chief Accountant, Mar. 31, 2021); *Public Statement on SPACs, IPOs and Liability Risk under the Securities Laws* (Division of Corporation Finance, Apr. 8, 2021); *Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs")* (Division of Corporation Finance and Office of Chief Accountant, Apr. 12, 2021).

[39] In this release, unless otherwise indicated, comment letters cited refer to comment letters received in response to the Proposing Release, and are available at https://www.sec.gov/comments/s7-13-22/s71322.htm. On March 30, 2022, the Commission published the Proposing Release on its website. The comment period for the Proposing Release was open for 30 days from publication in the *Federal Register* and ended on June 13, 2022. Four commenters stated that the comment period was inadequate and/or recommended extending the comment period. *See* letters from Christopher Iacovella, Chief Executive Officer, American Securities Association (June 7, 2022) ("American Securities Association"); Jennifer Schulp, Director of Financial Regulation Studies, Center for Monetary and Financial Alternatives, Cato Institute (June 13, 2022) ("Cato Institute"); Bobby Franklin, President & CEO, National Venture Capital Association (June 13, 2022); Rod Miller, Chair, Securities Regulation Committee, New York City Bar Association (June 13, 2022) ("NYC Bar"). In Oct. 2022, the Commission reopened the comment period for the Proposing Release and other rulemakings because certain comments on the Proposing Release and other rulemakings were potentially affected by a technological error in the Commission's internet comment form. *See Resubmission of Comments and Reopening of Comment Periods for Several Rulemaking Releases Due to a Technological Error in Receiving Certain Comments*, Release No. 33-11117 (Oct. 7, 2022) [87 FR 63016 (Oct. 18, 2022)] ("Reopening Release"). The Reopening Release was published on the Commission's website on Oct. 7, 2022, and in the *Federal Register* on Oct. 18, 2022, and the reopened comment period ended on Nov. 1, 2022. We have considered all comments received since Mar. 30, 2022, and do not believe an additional extension of the comment period is necessary.

[40] The Small Business Capital Formation Advisory Committee recommendations on the Proposing Release are available at https://www.sec.gov/spotlight/sbcfac/sbcfac-spac-recommendation-050622.pdf. The Small Business Capital Formation Advisory Committee made the following five recommendations, in summary: (1) SPACs should remain a viable path for companies to pursue as a means of getting access to public market capital and the committee is concerned the proposed rules, as written, might render SPACs unusable as an alternative to IPOs, (2) the committee is generally supportive of improving disclosures for SPACs, particularly in the period of time between the announcement of the merger and the closing of the de-SPAC transaction, (3) the Commission should clearly identify which participants would have underwriter liability and participants should be held accountable to the same extent they would be in traditional IPOs, (4) projections in de-SPAC transactions should be covered by the liability safe harbor provisions of the PSLRA, because management

18

While we recognize that the number of SPAC IPOs has declined since 2021, the investor protection concerns regarding SPACs and the hybrid nature of the de-SPAC transaction identified in the Proposing Release do not depend on market fluctuations.  In addition, as noted above, notwithstanding the recent decline, SPAC transactions have become a much larger part of the U.S. securities markets over the last decade and could continue to grow as macroeconomic and other factors change.  Accordingly, after considering comments received on the proposal, we are adopting final rules that will provide for greater transparency and more robust investor protections in SPAC IPOs and de-SPAC transactions.  The final rules will enhance the completeness, usefulness, and comparability of the disclosures provided by SPACs and target companies at the SPAC IPO and de-SPAC transaction stages and will provide other important protections for investors in this market, all of which may promote market efficiency.  Further, given that the de-SPAC transaction essentially is an IPO of the target company in the form of an M&A transaction, the final rules also will ensure that investors receive similar information about the target company and similar protections as in a traditional IPO in connection with the de-SPAC transaction.  The final rules also will provide investors with information about, and

projections are an important part of the rationale for companies in determining whether to engage in a merger with a SPAC and they are necessary when financial intermediaries provide fairness opinions related to de-SPAC transactions, and (5) the Commission should expand or eliminate the 18 month and 24 month timelines provided in the Investment Company Act safe harbor for SPACs, because the requirement to engage in a de-SPAC transaction within 18 months after a SPAC IPO and complete a de-SPAC transaction within 24 months could incentivize SPAC sponsors to engage in riskier acquisitions to complete the merger process within artificially short periods.  With respect to the Small Business Capital Formation Advisory Committee's first recommendation—that SPACs remain a viable path to access public market capital—we do not believe the final rules will vitiate this access or render SPACs unusable as an alternative to IPOs.  On the contrary, we believe the final rules will support the SPAC market by enhancing SPAC disclosures and enhancing investor protection in ways that help investor decision-making and increase investor confidence that they have the necessary information to invest in the SPAC market.  With respect to the Small Business Capital Formation Advisory Committee's second recommendation— supporting improved disclosures for SPACs, particularly in the period of time between the announcement of the merger and the closing of the de-SPAC transaction—we believe the final rules collectively will enhance such disclosure.  We address the other specific recommendations of the Small Business Capital Formation Advisory Committee in the specific sections of this release related to those recommendations.

protections with respect to, the M&A elements of de-SPAC transactions, particularly regarding the transaction approval process and conflicts of interest.

To these ends, we are adopting new Subpart 1600 of Regulation S-K that sets forth specialized disclosure requirements for SPAC IPOs and de-SPAC transactions. New Subpart 1600 contains provisions that, among other things:

- Require additional disclosures about the SPAC sponsor, potential conflicts of interest, and dilution;

- Require certain disclosures on the prospectus outside front cover page and in the prospectus summary of registration statements filed in connection with SPAC IPOs and de-SPAC transactions; and

- Require additional disclosures regarding de-SPAC transactions, including (1) if the law of the jurisdiction in which the SPAC is organized requires its board of directors (or similar governing body) to determine whether the de-SPAC transaction is advisable and in the best interests of the SPAC and its shareholders, or otherwise make any comparable determination, disclosure of that determination, and (2) if the SPAC or SPAC sponsor has received any outside report, opinion, or appraisal materially relating to the de-SPAC transaction, certain disclosures concerning the report, opinion, or appraisal.

In addition, we are adopting amendments to provide procedural protections and to align the disclosures provided to investors, as well as the legal obligations of companies, in de-SPAC transactions more closely with those in traditional IPOs. Specifically, we are adopting final rules that:

20

- Amend the registration statement forms and schedules filed in connection with de-SPAC transactions to require additional disclosures about the target company;

- Provide that a target company in a registered de-SPAC transaction is a co-registrant on the registration statement used for the de-SPAC transaction such that the target company will be subject to liability under Section 11 of the Securities Act;

- Make the PSLRA safe harbor unavailable to SPACs (including with respect to projections of target companies seeking to access the public markets through a de-SPAC transaction), by defining "blank check company" to encompass SPACs (and other companies that would be blank check companies but for the fact that they do not sell penny stock); and

- Require re-determination of SRC status following a de-SPAC transaction.

We also are providing guidance regarding potential underwriter status under Section 2(a)(11) of the Securities Act in de-SPAC transactions.

In addition, to provide reporting shell company shareholders, including SPAC shareholders, with more consistent Securities Act liability protections regardless of transaction structure, we are adopting new Rule 145a that will specify that any business combination of a reporting shell company, other than a business combination related shell company, involving another entity that is not a shell company involves a sale of securities to the reporting shell company's shareholders.[41]  We are also adopting new Article 15 of Regulation S-X, as well as related amendments, to more closely align the financial statement reporting requirements in

---

[41]  Throughout this release, for readability, we use "shell company" in lieu of the phrase "shell company, other than a business combination related shell company."  The term "business combination related shell company" is defined in Securities Act Rule 405 and Exchange Act Rule 12b-2.  We similarly use "reporting shell company" in lieu of the phrase "reporting shell company, other than a business combination related shell company" throughout this release.

business combinations involving a shell company and a target company with those in traditional IPOs.

With respect to effectiveness and compliance with the final rules, in response to commenters,[42] we have set an extended effective date for the new rules (i.e., [INSERT DATE 125 DAYS AFTER PUBLICATION IN THE *FEDERAL REGISTER*], which is 125 days after the date of publication of this release in the *Federal Register*). This extended period before the final rules are effective will provide sufficient time for an initial public filing to be made under the existing rules for any transactions that are currently pending or planned. Any filings made on or after the effective date must comply with the final rules.

We are also issuing guidance regarding the status of SPACs under the Investment Company Act of 1940 ("Investment Company Act").[43] We have decided not to adopt proposed Rule 3a-10 under the Investment Company Act which would have provided a safe harbor from the definition of investment company under Section 3(a)(1)(A) to SPACs that complied with the rule's conditions. Whether a SPAC is an investment company as defined in the Investment Company Act is a question of facts and circumstances. Given the individualized nature of this analysis, and because, depending on the facts and circumstances, a SPAC could be an investment company at any stage of its operations such that a specific duration limitation may not be appropriate, we have decided not to adopt proposed Rule 3a-10. We are, however, providing guidance as to the type of activities that would likely raise serious questions about a SPAC's status as an investment company under the Investment Company Act.

---

[42] Some commenters indicated that some or all of the new rules should not apply to existing SPACs and/or should apply only prospectively. *See, e.g.*, letters from American Securities Association; Cato Institute; Freshfields Bruckhaus Deringer US LLP (June 13, 2022) ("Freshfields"); Don Nguyen (Apr. 20, 2022); Nicholas Wilson (June 9, 2022).

[43] 15 U.S.C. 80a-1 *et seq.*

## II.  NEW SUBPART 1600 OF REGULATION S-K

The Commission is adopting final rules to add new Subpart 1600 to Regulation S-K.  The new Subpart sets forth disclosure requirements applicable to SPACs regarding, among other things, the sponsor, potential conflicts of interest, and dilution and requires certain disclosures on the prospectus cover page and in the prospectus summary.[44]  The Commission is also adopting final rules to amend a number of forms and schedules used by SPACs for IPOs and de-SPAC transactions to require the information set forth in Subpart 1600.[45]  To the extent that the disclosure requirements in Subpart 1600 address the same subject matter as the existing disclosure requirements of the forms or schedules, the requirements of Subpart 1600 are controlling.[46]

---

[44]  The requirements in new Subpart 1600 will codify and standardize some of the disclosures already commonly provided by SPACs.

[45]  *See* the amendments to Forms S-1, F-1, S-4, F-4 and 8-K, and Schedules 14A and TO.  While the Commission did not propose amendments to Schedule 14C, the disclosure required by Subpart 1600 will be required in Schedule 14C pursuant to Item 1 of Schedule 14C, which states that a Schedule 14C must include the information called for by all of the items of Schedule 14A, with limited exceptions, to the extent each item would be applicable to any matter to be acted upon at a shareholder meeting if proxies were to be solicited in connection with the meeting.  If the securities to be issued in a de-SPAC transaction are registered on a form other than Form S-4 or F-4, such as Form S-1 or F-1 the requirements of Form S-4 or F-4 that the Commission is adopting, as applicable, in regard to de-SPAC transactions would apply in that context. Also, in both Form S-4 and Form F-4, we made technical changes from the proposal to clarify that the new Regulation S-K Item 1600 series of disclosures should be located in the prospectus part of these forms.  As a result Form S-4 provides: "If securities to be registered on this Form will be issued in a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), then the disclosure provisions of Items 1603 through 1607 and 1609 of Regulation S-K (17 CFR 229.1603 through 229.1607 and 229.1609) apply in addition to the provisions of this Form and disclosure thereunder must be provided in the prospectus, and the structured data provisions of Item 1610 of Regulation S-K (17 CFR 229.1610) apply to those disclosures."  We made similar changes to Form F-4.  For purposes of consistency across forms and schedules, we made similar changes as well to Schedule 14A and Schedule TO, although there is no requirement in these forms to locate the disclosure in the prospectus portion of these schedules.  In both Schedule 14A and Schedule TO, we made technical changes from the proposal to clarify that Item 1604(a) does not apply since these disclosure documents do not include an outside front cover page similar to a prospectus and Item 1604(b) disclosure should be included in the front part of the disclosure document instead of the prospectus summary referred to in Item 1604(b).

[46]  General Instruction L.1. to Form S-4; General Instruction I.1. to Form F-4; Item 14(f)(1) to Schedule 14A; General Instruction L to Schedule TO.

### A. Definitions

*1. Proposed Definition: "De-SPAC Transaction"*

The Commission proposed to define the term "de-SPAC transaction" as a business combination such as a merger, consolidation, exchange of securities, acquisition of assets, or similar transaction involving a SPAC and one or more target companies (contemporaneously, in the case of more than one target company).[47]

*2. Comments: Definition of "De-SPAC Transaction"*

One commenter recommended we add the term "reorganization" to the non-exhaustive list of transactions set out in the proposed definition of de-SPAC transaction.[48]

One commenter recommended the definition of de-SPAC transaction refer to "initial business combination" not "business combination."[49]  Another commenter recommended the definition be named "initial business combination" instead of "de-SPAC transaction."[50]

In response to a request for comment,[51] one commenter said there was no need to tie the definition of de-SPAC transaction to transactions that are permitted under exchange listing standards, particularly if the definition of SPAC includes non-listed shell companies.[52]

---

[47]  Proposed Item 1601(a).

[48]  Letter from Jay Knight, Chair of the Committee on Federal Regulation of Securities of the Section of Business Law of the American Bar Association (June 17, 2022) ("ABA").

[49]  Letter from ABA.

[50]  Letter from Kirkland & Ellis LLP (June 15, 2022) ("Kirkland & Ellis").

[51]  Proposing Release, *supra* note 7, at 29466 (request for comment number 2) ("Should we define 'de-SPAC transaction' as proposed?  Should the scope of the proposed definition instead be tied to de-SPAC transactions that are permitted under exchange listing standards?").

[52]  Letter from Vinson & Elkins (June 13, 2022) ("Vinson & Elkins").

24

3.  *Final Definition: "De-SPAC Transaction"*

After considering the comments received, we are adopting the definition of de-SPAC transaction as proposed with a modification discussed below.[53]  Under the final rules, the term de-SPAC transaction means a business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or similar transaction, involving a special purpose acquisition company and one or more target companies (contemporaneously, in the case of more than one target company).

We agree with one commenter's recommendation[54] to add the term "reorganization" to the non-exhaustive list of transactions set out in the definition of de-SPAC transaction.  It is our understanding some transactions commonly considered to be de-SPAC transactions may be considered reorganizations.  Hence, we have added the suggested term to the final definition.

A few commenters suggested the definition of de-SPAC transaction should use the phrase "initial business combination."[55]  We recognize the phrase "initial business combination" may be used interchangeably with "business combination" or "de-SPAC transaction" in the marketplace today, but we believe the simpler proposed term "business combination" used in the body of the de-SPAC transaction definition will be clearer to market participants.  One of these commenters suggested the term "initial business combination" should be used because "[s]ubsequent acquisitions by the former SPAC after Closing should not be considered a De-SPAC

---

[53]   Item 1601(a) of Regulation S-K.

[54]   Letter from ABA.

[55]   Letters from ABA; Kirkland & Ellis.

Transaction."[56]  We note that a company that is no longer a SPAC would not be subject to the disclosure items in Subpart 1600 of Regulation S-K.[57]

We agree with the commenter who said there was no need to tie the definition of de-SPAC transaction to transactions that are permitted under exchange listing standards, particularly if the definition of SPAC includes non-listed shell companies.[58]  A narrower definition may inappropriately exclude transactions that should be included, such as those involving over-the-counter-traded SPACs.  We continue to believe, as indicated in the Proposing Release,[59] that the definition of de-SPAC transaction should include less common transactions that may or may not be permitted under exchange listing rules but for which the enhanced disclosure and procedural requirements in the final rules may be appropriate because they raise the same investor protection concerns.[60]

### 4.  Proposed Definition: "Special Purpose Acquisition Company (SPAC)"

The Commission proposed Item 1601 to define the term "special purpose acquisition company (SPAC)" to mean a company that has indicated that its business plan is to (1)  register a primary offering of securities that is not subject to the requirements of Rule 419;[61] (2) complete a de-SPAC transaction within a specified time frame; and (3) return all remaining proceeds from

---

[56]    Letter from ABA.

[57]    *See also infra* note 94 and accompanying text concerning SPAC status after a de-SPAC transaction.

[58]    Letter from Vinson & Elkins.

[59]    Proposing Release, *supra* note 7, at 29466.

[60]    In adopting this definition of de-SPAC transaction, we do not intend to indicate that such transactions are or should be permitted under the exchanges' SPAC listing rules or that exchange listing requirements should not apply to SPACs seeking an exchange listing.

[61]    Blank check companies subject to Rule 419 must comply with a comprehensive set of disclosure and investor protection requirements under the rule and will not be subject to the requirements applicable to SPACs under the proposed rules.

the registered offering and any concurrent offerings to its shareholders if the company does not complete a de-SPAC transaction within the specified time frame.[62]

### 5. *Comments: Definition of "Special Purpose Acquisition Company (SPAC)"*

One commenter indicated they saw no need for a definition of the term "SPAC," as the commenter saw "no reason why the Proposed Rules should not apply to all shell companies, other than business combination shell companies, inclusive of blank check companies" and also indicated the proposed definitions of "SPAC" and "de-SPAC transaction" were circular, stating, "The proposed definition of 'de-SPAC transaction' should be revised to eliminate the reference to 'a special purpose acquisition company' in order to eliminate circularity."[63]

A few commenters did not support including the requirement that a SPAC "return all remaining proceeds from the registered offering and any concurrent offerings to its shareholders" in the proposed SPAC definition.[64]  One of these commenters said this aspect of the definition is "unnecessary and should be eliminated or revised to only refer to the plan to return proceeds from the registered offering" because "SPACs often hold a modest amount of working capital outside of their trust accounts that they use to fund operating expenses."[65]  According to the commenter, "[i]f a shell company had such cash remaining at the point when the public shareholders exercise their redemption rights, it would be inappropriate to exclude such shell company from the [p]roposed [r]ules based solely on retaining such cash."[66]  Another

---

[62]  Proposed Item 1601(b).

[63]  Letter from Vinson & Elkins (noting that "as proposed, a special purpose acquisition company has a business plan to complete a de-SPAC transaction, and a de-SPAC transaction involves a special purpose acquisition company.").

[64]  Letters from ABA, Vinson & Elkins.

[65]  Letter from Vinson & Elkins.

[66]  *Id.*

commenter recommended that we change this aspect of the definition to use the phrase "redeem the equity securities issued in the registered offering if the company does not complete a de-SPAC transaction within the specified time frame."[67]

One commenter recommended we narrow the definition of SPAC to only "a blank check company as defined in § 230.419(a)(2)."[68] Another commenter, who opposed defining "SPAC," noted that the proposed definition "is not limited to companies listed on a national securities exchange" and "would include shell companies traded in over-the-counter markets, which are not what would generally be considered to be 'SPACs.'"[69] That commenter noted that a "logical distinction could be drawn based on exchange listing, rather than on whether the offering is by a blank check company and therefor subject to Rule 419."[70] The same commenter recommended that, if we adopt a new definition, we clarify that a company "ceases to be a SPAC for purposes of the rules after consummation of a de-SPAC transaction."[71]

In response to requests for comment,[72] one commenter said that "it is clear what entities are SPACs, without the need for additional boxes to check."[73]

6. *Final Definition: "Special Purpose Acquisition Company (SPAC)"*

After considering the comments received, we are adopting the definition of special purpose acquisition company (or SPAC) as proposed, with certain modifications discussed

---

[67]    Letter from ABA.

[68]    Letter from ABA.

[69]    Letter from Vinson & Elkins.

[70]    *Id.*

[71]    *Id.*

[72]    Proposing Release, *supra* note 7, at 29466 (request for comment number 6) ("For example, should we amend Form S-1, Form F-1, Form S-4, and/or Form F-4 to add to the registration statement cover page of these forms a check box for issuers to indicate whether they are special purpose acquisition companies?").

[73]    Letter from Vinson & Elkins.

below.[74]  Under the final rules, the term *special purpose acquisition company (SPAC)* means a company that has: (1) indicated that its business plan is to: (i) conduct a primary offering of securities that is not subject to the requirements of § 230.419 (Rule 419 under the Securities Act); (ii) complete a business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or similar transaction, with one or more target companies within a specified time frame; and (iii) return proceeds from the offering and any concurrent offering (if such offering or concurrent offering intends to raise proceeds) to its security holders if the company does not complete a business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or similar transaction, with one or more target companies within the specified time frame; or (2) represented that it pursues or will pursue a special purpose acquisition company strategy.

One commenter did not see a need for a new defined term "SPAC,"[75] because, in the commenter's view, enhanced disclosures should apply to all shell companies (other than business combination shell companies) and not only to those companies defined as SPACs.[76]  Several of the rules being adopted in this release will enhance disclosures for investors in non-SPAC shell companies.[77]  However, the proposed individual disclosure items in the Item 1600 series of Regulation S-K were largely tailored to SPAC transactions.  For the reasons we discuss in this release below in connection with the specific rules we are adopting, we believe it is appropriate at this time to apply enhanced disclosure in connection with companies meeting the definition of SPAC.  However, we will continue to consider whether enhanced disclosure in other shell

---

[74]  Item 1601(b) of Regulation S-K.

[75]  Letter from Vinson & Elkins.  *See supra* note 63 and accompanying text.

[76]  Letter from Vinson & Elkins.

[77]  *See* Rule 145a and definitions of "blank check company" in Securities Act Rule 405 and Exchange Act Rule 12b-2.

company transactions, such as reverse mergers with public shell companies, would be appropriate or necessary in the future.[78]

This commenter further observed there was circularity in the proposed definitions of "SPAC" and "de-SPAC transaction."[79] We agree the final rules should eliminate this circularity. Although the commenter made the suggestion to revise the definition of "de-SPAC transaction" rather than addressing the issue by revising the definition of "SPAC," we believe it would be clearer to avoid circularity by revising the definition of "SPAC." We have replaced the term "de-SPAC transaction" in the definition of "SPAC" with "business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or similar transaction, with one or more target companies."

Several comments focused on the aspect of the proposed SPAC definition regarding the return of proceeds and suggested that special purpose acquisition companies may not return "all remaining proceeds."[80] We agree with commenters that the proposed term "return all remaining proceeds" could inappropriately exclude companies that take some portion of cash out of trust for anticipated expenses and therefore do not return "all" proceeds at the time of redemption.[81] To avoid excluding such companies, we have revised the definition to use the term "return proceeds" instead of "return all remaining proceeds." We have also added a parenthetical

---

[78] According to data provided by The Deal during the years when it tracked this data, the number of reverse mergers not involving SPACs was as follows by year: (a) 48 in 2017, (b) 48 in 2018, (c) 28 in 2019, and (d) 17 in 2020. The Deal staff indicated to the Commission staff they stopped tracking the data after 2020 because of the small number of reverse mergers.

[79] Letter from Vinson & Elkins. *See supra* note 63 and accompanying text.

[80] Letters from ABA, Vinson & Elkins. *See supra* notes 64, 65, and 66 and accompanying text.

[81] *See, e.g.*, letters from ABA ("In addition, SPACs are permitted to withdraw interest to pay income and franchise taxes, and, upon liquidation, pay certain liquidation costs…."); Goodwin Procter LLP (June 14, 2022) ("Goodwin") ("SPACs are permitted to withdraw interest to pay income and franchise taxes and, upon liquidation, pay certain liquidation costs…."); White & Case LLP (June 17, 2022) ("White & Case") ("In addition, SPACs are permitted to withdraw interest to pay income and franchise taxes, and, upon liquidation, pay certain liquidation costs, which would reduce overall returns.").

reference "(if such offering or concurrent offering intends to raise proceeds)" that qualifies the term "offering and any concurrent offering" to account for the fact there may be some SPAC offerings that do not raise proceeds.

We do not believe it is necessary to revise the definition to refer only to the plan to return proceeds from the primary offering, rather than the primary offering and any concurrent offering. We understand SPACs typically place proceeds of concurrent offerings in trust and return these proceeds if the SPAC does not complete a de-SPAC transaction within the specified time frame.[82]

We are not adopting the recommendation that we should replace the terms related to the return of proceeds with alternative terms related to the redemption of equity securities. We continue to believe, as the Commission indicated in the Proposing Release, that the definition should not include certain criteria, including the issuance of redeemable securities, that could result in an overly narrow definition by including transactional terms that have not applied to every SPAC offering in the past or that could change as the SPAC market continues to evolve.[83]

One commenter recommended we narrow the definition of SPAC to only "a blank check company as defined in § 230.419(a)(2)."[84] The Rule 419 definition of "blank check company" includes a requirement that the company is issuing penny stock.[85] The proposed definition of SPAC reflects the fact that special purpose acquisition company structures often are designed to

---

[82]    *See* NYSE Listed Company Manual Section 102.06 and Nasdaq Listing Rule IM-5101-2 (providing for the placement of concurrent offering proceeds in trust).

[83]    Proposing Release, *supra* note 7, at 29466.

[84]    Letter from ABA.

[85]    *See supra* notes 1 and 61 (discussion of Securities Act Rule 419). As discussed in Section III.E *infra*, in the final rules, we are not amending the definition of "blank check company" in Rule 419 as proposed but are adopting a definition of "blank check company" in Securities Act Rule 405 that is exclusively for purposes of the safe harbor created by the PSLRA for forward-looking statements.

avoid issuing penny stock but continue to pose disclosure and other investor protection concerns.[86]  Special purpose acquisition companies frequently do not issue penny stock and, therefore, would not meet the definition in *§ 230.419(a)(2)*.  Thus, the inclusion of the suggested criterion would inappropriately exclude many or all special purpose acquisition companies from the SPAC definition.

Another commenter indicated the SPAC definition should draw a distinction based on exchange listing, which would exclude shell companies traded in over-the-counter markets.  In the commenter's view, shell companies traded in over-the-counter markets are not generally considered to be SPACs.[87]  While companies commonly considered to be SPACs often list on a national securities exchange, we do not believe the SPAC definition should be limited to such listed entities.  While carving out companies traded over-the-counter might leave out only a few (or zero) companies today, prevailing structures may further evolve over time just as they have evolved over time in the past,[88] and we believe investors in those over-the-counter companies engaged in the same kinds of business as exchange-traded companies should have the same investor protections provided by the rules we are adopting.[89]

Furthermore, we are adding a new clause to the definition that provides that the term special purpose acquisition company also includes a company that has represented it pursues or

---

[86] Proposing Release, *supra* note 7, at 29465.

[87] Letter from Vinson & Elkins.

[88] *See, e.g.*, Table 2 in Section VIII (Economic Analysis) (statistics on over-the-counter SPACs for over a three-decade period).

[89] Prior to exchange-rule changes permitting listing, shells commonly referred to as SPACs were not exchange-listed.  *See* Securities Exchange Act Release Nos. 58228 (July 25, 2008), 73 FR 44794 (July 31, 2008) (Order Granting Approval to Proposed Rule Change, as modified by Amendment No. 1, to Adopt Additional Initial Listing Standards to list Securities of Special Purpose Acquisition Companies) (NASDAQ-2008-013); 57785 (May 6, 2008), 73 FR 27597 (May 13, 2008) (Order Approving Proposed Rule Change to Adopt New Initial and Continued Listing Standards to List Securities of Special Purpose Acquisition Companies) (SR-NYSE-2008-17).  According to data from SPACInsider, in the years 2020 through 2022, there were zero SPAC IPOs in the over-the-counter market (i.e., that were not listed on an exchange in connection with the IPO).

will pursue a special purpose acquisition company strategy.[90]  In the Proposing Release, the

Commission asked if the proposed definition provides a workable approach to determining

which issuers would be subject to the requirements of proposed Subpart 1600.[91]  In addition, the

Commission asked whether there were any potential opportunities for regulatory arbitrage in

shell company or SPAC transactions that the Commission should consider addressing.[92]  After

further consideration of these regulatory arbitrage concerns, we have revised the final rule to

include new paragraph (2) to Item 1601(b) concerning pursuit of a special purpose acquisition

company strategy.  Variations on common SPAC structures could cause some companies to fall

technically outside one of the three prongs of paragraph (1) of the final SPAC definition.  When

companies make representations they pursue or will pursue a special purpose acquisition

company strategy, they may be indistinguishable to investors from companies that meet the other

components of the definition.  As a result, we believe investors in such companies should benefit

from the enhanced disclosures applicable to SPACs.  Therefore, even where a company

technically does not meet one of the three prongs in paragraph (1) of the final definition of

SPAC, if it represents, directly or indirectly, that it pursues or will pursue a SPAC strategy, then

pursuant to paragraph (2) of the final definition of SPAC, the company would meet the definition

of a SPAC.

---

[90]  As a result of this change, the three prongs contained in the proposed definition (that had paragraph numbers (1), (2), and (3)) will be renumbered as paragraphs (1)(i), (1)(ii), and (1)(iii) and the clause regarding pursuit of a SPAC strategy will be numbered as paragraph (2).  We have also added a parenthetical reference to the acronym "(SPAC)" in the body of the definition in the final rule as well as in the name of the defined term "special purpose acquisition company (SPAC)" to add incremental clarity that the acronym also refers to the defined term.

[91]  Proposing Release, *supra* note 7, at 29466 (request for comment number 1).

[92]  Proposing Release, *supra* note 7, at 29490 (request for comment number 102).

Similarly, to avoid the risk that certain varieties of SPACs may fall outside the definition because of minor technical distinctions from the prongs of the definition, we have changed the proposed term "register a primary offering" to "conduct a primary offering" to account for evolving SPAC structures that may not conduct a registered offering.  We do not believe it would be appropriate for companies in de-SPAC transactions to avoid the disclosure (or any other) requirements of these final rules only because the initial SPAC transaction was not registered.  As noted in the Proposing Release,[93] we intend this definition to be sufficiently broad to take into account potential variations in the SPAC structure and the possibility that SPACs may continue to evolve.  This adjustment to the definition will ensure that appropriate disclosures are provided at the de-SPAC stage regardless of the structure of the initial SPAC transaction.  In the final definition, we have also made a corresponding revision to change the proposed term "registered offering" to "offering."

One commenter recommended we clarify that a company ceases to be a SPAC upon consummation of a de-SPAC transaction.[94]  For the avoidance of doubt, we are providing guidance that, if a company that meets the SPAC definition has completed a de-SPAC transaction or, in the case of one or more target companies, contemporaneous de-SPAC transactions, then the company no longer meets the definition of a SPAC and that such companies are not required to comply with the enhanced disclosures under Regulation S-K applicable to SPACs in registration statements they file in later periods after the completion of such de-SPAC transactions.

---

[93]    Proposing Release, *supra* note 7, at 29465.

[94]    Letter from Vinson & Elkins.

We are not requiring a check box on form cover pages indicating SPAC status as the enhanced disclosure provided by registrants pursuant to the Item 1600 series of Regulation S-K will make clear the registrant is a SPAC.[95]

### 7.  Proposed Definition: "SPAC Sponsor"

The Commission proposed to define the term "SPAC sponsor" as the entity and/or person(s) primarily responsible for organizing, directing or managing the business and affairs of a SPAC, other than in their capacities as directors or officers of the SPAC as applicable.[96]

### 8.  Comments: Definition of "SPAC Sponsor"

One commenter said the proposal "should be revised to eliminate the need for a defined term 'SPAC sponsor'" and, "[i]nstead, the rules should require disclosure regarding the SPAC's directors, officers and affiliates."[97]  This commenter also said "the definition's exclusion of directors and officers in their capacities as such would result in there being no 'sponsor' for many SPACs."  This commenter also said the proposal "blur[red] the lines between the roles and responsibilities of the SPAC sponsor and that of the SPAC board and officers."

Another commenter recommended an alternative definition of "SPAC sponsor": "the entity and/or person(s) that (1) own all or a portion of the privately placed common equity securities of the special purpose acquisition company and (2) are primarily responsible for directing and managing the business and affairs of a special purpose acquisition company other than in their capacities as (i) directors or officers of the special purpose acquisition company or (ii) third-party service providers to the special purpose acquisition company, as applicable."[98]

---

[95]  See also Section III.C (discussing co-registration on Forms S-4 and F-4 and the requirement to identify the target company as a registrant on the registration statement cover page).

[96]  Proposed Item 1601(c).

[97]  Letter from Vinson & Elkins.

[98]  Letter from ABA.

The commenter said that "the 'SPAC sponsor' should be the entity or persons who have both ownership of [s]ponsor shares and responsibility for directing and managing the SPAC."  The commenter said that their suggested definition will "identify the entity or persons that are currently identified as [s]ponsors in registration statements for the SPAC."[99]

*9.  Final Definition: "SPAC Sponsor"*

After considering the comments received, we are adopting the definition of SPAC sponsor as proposed with certain modifications discussed below.[100]  Under the final rules, the term SPAC sponsor means any entity and/or person primarily responsible for organizing, directing, or managing the business and affairs of a special purpose acquisition company, excluding, if an entity is a SPAC sponsor, officers and directors of the special purpose acquisition company who are not affiliates of any such entity that is a SPAC sponsor.

The definition is designed to be sufficiently broad that appropriate entities or persons will be subject to the enhanced disclosure requirements applicable to SPAC sponsors.[101]  Although a sponsor of a SPAC may perform a variety of functions within the SPAC's structure, we intend for the SPAC sponsor definition to encompass activities that, based on the staff's experience reviewing SPAC filings and public commentary, are commonly understood to be sponsors of SPACs or with persons referred to as sponsors in current registration statements.

We do not believe it would provide investors with adequate information to tie the SPAC sponsor definition to persons with particular titles, because the definition and corresponding disclosure requirements are intended to capture all parties who perform certain activities that result in such parties having key substantive influence over the SPAC.  The suggestion to replace

---

[99]    Letter from ABA.

[100]    Item 1601(c) of Regulation S-K.

[101]    *See, e.g.*, Item 1603 (regarding SPAC sponsors).

"SPAC sponsor" with "directors, officers, and affiliates of the SPAC" would require disclosure from directors and officers not commonly considered to be sponsors today and, as indicated by the Commission in the Proposing Release, would overlap unnecessarily with current required disclosure concerning directors and officers.[102]  Also, "directors, officers, and affiliates of the SPAC" may not include external management companies and their principals that should be included in the definition on the basis of their activities.  While State law may provide that directors manage the business and affairs of a corporation and may not provide that any one director has any more authority than any other director,[103] the phrase "primarily responsible" in the definition of SPAC sponsor is not limited to solely directors or solely directors and officers. Other persons, such as third-party management companies and their affiliates, frequently are primarily responsible for the organization, direction, or management of the business and affairs of SPACs today and would be SPAC sponsors under the definition we are adopting.

One commenter recommended an alternative definition of SPAC sponsor that featured, among other things, carve-outs from that alternative definition for directors and officers of the SPAC and for third-party service providers.[104]  This commenter also suggested that the proposed definition's exclusion of directors and officers in their capacities as such would result in a null set of SPAC sponsors.[105]  Having considered this comment, we have made changes to the final definition.  We are not adopting the proposed term "other than in their capacities as directors or

---

[102]  *See* Proposing Release, *supra* note 7, at 29466, n.58 ("In regard to natural persons, we are proposing to exclude from the scope of the definition of 'SPAC sponsor' the activities performed by natural persons in their capacities as directors and/or officers of the SPAC to avoid overlap with existing disclosure requirements relating to directors and officers.").

[103]  *See, e.g.*, DGCL Section 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.").

[104]  Letter from ABA.  *See supra* note 98 and accompanying text.

[105]  *Id.*

officers," because it could be unclear under the proposed definition whether any action taken on behalf of the SPAC by a director or officer of a SPAC is "other than in that person's capacity as an officer or director."  As the commenter noted, this could result in no such persons being considered SPAC sponsors.  To address such potential ambiguities, in the final rule, we have changed the term "other than in their capacities as directors or officers of the special purpose acquisition company as applicable" to "excluding, if an entity is a SPAC sponsor, officers and directors of the special purpose acquisition company who are not affiliates of any such entity that is a SPAC sponsor."  Based on the staff's experience, we understand that a SPAC sponsor entity is typically involved in the SPAC.  However, if the SPAC sponsor is not an entity, then we want to make sure the appropriate persons are captured within the SPAC sponsor definition.  An officer or director of the SPAC that is an affiliate of an entity that is a SPAC sponsor would also be a SPAC sponsor under the final definition.  For example, in the case of a hypothetical SPAC where a third-party management company is a SPAC sponsor and a person is a director of both the SPAC and this third-party management company, then this person would also be a SPAC sponsor.

We are not adopting the suggestion to exclude "third-party service providers" from the definition of SPAC sponsor.[106]  As discussed above, some third-party service providers will be "SPAC sponsors" under the definition where they are "primarily responsible for organizing, directing, or managing the business and affairs" of the SPAC.  Other third-party service providers, however, will not fall within the definition of SPAC sponsor where they are not "primarily responsible" for organizing, directing, or managing the business and affairs of a SPAC.  For example, external legal counsel that only assists in the formation of a SPAC by

---

[106]  Letter from ABA.  *See supra* note 98 and accompanying text.

drafting its certificate of incorporation and bylaws on behalf of a client would not be "primarily responsible" for "organizing…the business and affairs of a SPAC."[107]  Other third-party service providers may perform similar administrative or ministerial activities for a SPAC or provide outside legal or accounting advice neither of which would cause them to be "primarily responsible" for organizing, directing, or managing the business and affairs of the SPAC and thus they would not be SPAC sponsors.

*10. Proposed Definition: "Target Company"*

The Commission proposed to define the term "target company" as an operating company, business, or assets.[108]

*11. Comments: Definition of "Target Company"*

One commenter asserted that "the concept of 'assets' being a 'target company' yields anomalous results under certain proposed rules (such as requiring assets to sign a registration statement) and the concept of a 'business' may be vague (as a business may be a product line, rather than an entity that could sign a registration statement)."[109]  Another commenter suggested "deleting the term 'assets' from the definition or clarifying that a target company includes assets where the acquisition of such assets is intended to constitute the SPAC's initial business combination."[110]

---

[107]  Item 1601(c).

[108]  Proposed Item 1601(d).

[109]  Letter from Vinson & Elkins.

[110]  Letter from Freshfields ("We believe there are circumstances where a SPAC may acquire some assets (such as cash) but would not yet have completed its acquisition of a target company.").

*12. Final Definition: "Target Company"*

After considering the comments received, we are adopting the definition of target company as proposed.[111]  Under the final rules, the term target company means an operating company, business or assets.

To address commenters' concerns about the use of the terms "assets" and "business" in the definition of target company,[112] we have revised certain registration statement form instructions, as discussed in more detail below.[113]  We believe these changes address the commenters' concerns.  Therefore, we do not believe it is necessary to make changes to the proposed definition of "target company."  In addition, although an asset purchase transaction may be a different form of transaction for the purposes of other legal requirements, including State law, we do not believe a SPAC combination with a target company taking the form of an asset purchase should be excluded from the definition of de-SPAC transaction merely for this reason.

## B. Sponsors

*1. Proposed Rules*

The Commission proposed Item1603(a) to require additional disclosure about the SPAC sponsor, its affiliates, and promoters[114] in registration statements and schedules filed in

---

[111]  Item 1601(d) of Regulation S-K.

[112]  Letters from Freshfields, Vinson & Elkins.  *See supra* notes 65 and 66 and accompanying text.

[113]  *See infra* Section III.C.

[114]  The term "promoter" is defined in Securities Act Rule 405 and Exchange Act Rule 12b-2.

connection with SPAC registered offerings and de-SPAC transactions,[115] including disclosure of the following:

- The experience, material roles, and responsibilities of these parties, as well as any agreement, arrangement, or understanding (1) between the SPAC sponsor and the SPAC, its executive officers, directors, or affiliates, with respect to determining whether to proceed with a de-SPAC transaction and (2) between the SPAC sponsor and unaffiliated security holders of the SPAC regarding the redemption of outstanding securities;

- The controlling persons of the SPAC sponsor and any persons who have direct and indirect material interests in the SPAC sponsor and the nature and amount of their interests, as well as an organizational chart that shows the relationship between the SPAC, the SPAC sponsor, and the SPAC sponsor's affiliates;

- Tabular disclosure of the material terms of any lock-up agreements with the SPAC sponsor and its affiliates; and

- The nature and amounts of all compensation that has or will be awarded to, earned by, or paid to the SPAC sponsor, its affiliates, and any promoters for all services rendered in all capacities to the SPAC and its affiliates, as well as the nature and amounts of any reimbursements to be paid to the SPAC sponsor, its affiliates, and any promoters upon the completion of a de-SPAC transaction.[116]

---

[115]   *See* (a) proposed General Instruction VIII to Form S-1, (b) proposed General Instruction I.1 to Form S-4, (c) proposed General Instruction VII to Form F-1, (d) proposed General Instruction I.1 to Form F-4. (e) proposed Item 14(f)(1) of Schedule 14A, and (f) proposed General Instruction K to Schedule TO.

[116]   In the Proposing Release, the Commission stated that this would include, for example, fees and reimbursements in connection with lease, consulting, support services, and management agreements with entities affiliated with the sponsor, as well as reimbursements for out-of-pocket expenses incurred in performing due diligence or in identifying potential business combination candidates.  Proposing Release, *supra* note 7, at 29467, n.64.

41

*2.   Comments*

Broadly categorized, commenters on proposed Item 1603(a) or generally on the types of SPAC sponsor issues covered by proposed Item 1603(a) focused on six areas: (1) general comments that expressed support for the proposals, (2) promoter requirements, (3) compensation, (4) transfers of SPAC ownership, (5) interests in the SPAC sponsor and the organizational chart requirement, and (6) agreements.

*i.   General Comments*

A number of commenters generally supported the proposed enhanced disclosure requirements regarding SPAC sponsors.[117]  Commenters cited a number of benefits to investors as the reasons for their support, including the following five benefits: (a) placing investors in a better position to evaluate the merits of SPAC and de-SPAC transactions,[118] (b) illuminating financial incentives of SPAC sponsors that may affect de-SPAC transaction outcomes,[119] (c) providing compensation information that may promote more informed investment decisions,[120] (d) providing SPAC sponsor ownership interest information that may affect investor ability to

---

[117]   Letters from ABA; Stephen W. Hall, Legal Director and Securities Specialist, and Scott Farnin, Legal Counsel, Better Markets (June 13, 2022) ("Better Markets); Michael Ryan, Chief Executive Officer, Bullet Point Network, LP (June 13, 2022) ("Bullet Point Network"); Charles Pieper (May 13, 2022) ("Charles Pieper"); John L. Thornton, Co-Chair, Hal S. Scott, President, and R. Glenn Hubbard, Committee on Capital Markets Regulation (June 13, 2022) ("Committee on Capital Markets Regulation"); Paul Andrews, Managing Director, Research, Advocacy and Standards, CFA Institute (May 31, 2022) ("CFA Institute"); Glenn Davis, Deputy Director, Council of Institutional Investors (June 9, 2022) ("CII"); Dylan Bruce, Financial Services Counsel, Consumer Federation of America (June 13, 2022) ("Consumer Federation"); Elizabeth Warren, United States Senator (July 8, 2022) ("Senator Elizabeth Warren"); Kerrie Waring, Chief Executive Officer, International Corporate Governance Network (June 13, 2022) ("ICGN"); Melanie Senter Lubin, President, North American Securities Administrators Association, Inc. (June 13, 2022) ("NASAA"); Paul A. Swegle, Kinsel Law Offices (Apr. 9, 2022) ("Paul Swegle").

[118]   Letter from Committee on Capital Markets Regulation.

[119]   Letter from CII.

[120]   Letter from Consumer Federation.

vote on de-SPAC transactions,[121] and (e) providing information about SPAC sponsor experience that may help investors assess the SPAC sponsor's ability to find a target company.[122]

Also, several commenters suggested that proposed Item 1603(a) would codify, to an extent, existing disclosure practices.[123]

### ii. Promoters

Some commenters said Item 1603 should not apply to "promoters."[124]  One commenter asserted that application to the SPAC sponsor and its affiliates would include all significant participants in the SPAC and thus the "promoter" provision would not significantly benefit investors.[125]  Another commenter said that "disclosure regarding a promoter of the SPAC's initial public offering that will have no involvement with the de-SPAC transaction would be immaterial to investors."[126]

### iii. Compensation

A number of commenters suggested that the proposed disclosure requirements regarding sponsor compensation would provide useful information to investors.[127]  A few commenters expressed the view that sponsor compensation is already sufficiently disclosed.[128]

---

[121]  Letter from ICGN.

[122]  Letters from ICGN, NASAA.

[123]  Letters from ABA, NASAA, Vinson & Elkins.

[124]  Letters from Freshfields, Vinson & Elkins.

[125]  Letter from Freshfields (stating that "the proposed rules also already require disclosure of all persons who have direct and indirect material interests in the SPAC sponsor and the amount and nature of their interests" and that "this should encompass the most relevant entities and persons").

[126]  Letter from Vinson & Elkins.

[127]  Letters from Better Markets, Charles Pieper, Committee on Capital Markets Regulation, CFA Institute, Consumer Federation, Senator Elizabeth Warren, ICGN, NASAA.

[128]  Letters from Samir Kapadia, Director, and Bobby Cunningham, Director, SPAC Association (June 13, 2022) ("SPAC Association"); Vinson & Elkins (expressing the view that sponsor compensation and reimbursement is already disclosed under existing disclosure requirements and the material terms of lock-up agreements are already sufficiently disclosed as a matter of industry practice).

One commenter said the SPAC sponsor "20 percent promote is fully and fairly disclosed and has been for decades."[129]  Another commenter said they "believe the sponsor's compensation and reimbursement are already sufficiently disclosed in response to existing disclosure requirements and that incremental disclosure requirements are thus not merited."[130]

One commenter that did not support the additional proposed disclosure requirements stated that, if the Commission were nonetheless to impose new requirements, "the reference to 'compensation' should be revised to refer instead to all equity and rights to cash held by the SPAC directors and officers and their affiliates, as certain equity interests may be purchased for value (i.e., not be 'compensation') and reimbursement of advances or repayment of loans would not be compensation."[131]  Another commenter said "sponsor compensation comes almost entirely in the form of capital gains associated with securities issued in the 'promote' resulting from stock price increases after the de-SPAC transaction, and quantifying such compensation may involve speculation or be subject to criticism as incomplete."[132]

Another commenter said that, "in addressing non-equity compensation and reimbursements, proposed Item 1603(a)(6) should explain its requirement to identify other compensation and reimbursements that are material, individually or in the aggregate and that the required disclosure may be qualitative and not quantitative, except where amounts are above a

---

[129]  Letter from SPAC Association.  We understand that the term SPAC sponsor "promote" typically refers to the acquisition by the SPAC sponsor of a significant percentage of the shares of the SPAC, typically 20%.  We observe the term used to connote a meaning of "special compensation," but it does not involve a preferred return, such as in real estate private equity investment structures that also use this terminology.

[130]  Letter from Vinson & Elkins.

[131]  Letter from Vinson & Elkins.

[132]  Letter from Loeb & Loeb LLP (June 13, 2022) ("Loeb & Loeb").

specified de minimis threshold, similar to the approach taken in certain respects under the existing compensation disclosure framework in Item 402 of Regulation S-K."[133]

### iv. Transfer of SPAC Ownership

Several commenters recommended we adopt requirements to disclose transfers of SPAC securities by the SPAC sponsor and others.  One commenter recommended, in response to request for comment,[134] adding a sentence at the end of Item 1603(a)(6) that states: "Disclose any arrangements under which the SPAC sponsor, its affiliates and any promoters have transferred ownership of any securities in the SPAC to other parties in exchange for compensation or other benefit to the sponsor, its affiliates, any promoters, or to the SPAC."[135] The commenter said that "SPAC sponsors at times sell off a portion of their promote or other securities to a 'risk-capital syndicate' as a way of cashing out early on a portion of the compensation they receive for their work on the SPAC" and that "the amount of interest that a sponsor retains in securities of the SPAC is material for investors seeking to evaluate the incentive of the sponsor in pursuing a SPAC merger."[136]  Another commenter suggested expanding current Forms 3 and 4 director and officer reporting requirements to cover SPAC sponsors and their transactions in SPAC securities after the de-SPAC transaction.[137]  Similarly,

---

[133]  Letter from ABA.

[134]  Proposing Release, *supra* note 7, at 29467 (request for comment number 9) ("Should we require more or less information about the sponsor's compensation and reimbursements?").

[135]  Letter from Michael Klausner, Stanford Law School, and Michael Ohlrogge, NYU School of Law (June 13, 2022) ("Michael Klausner and Michael Ohlrogge"), included as an attachment to a letter from Michael Ohlrogge, NYU School of Law (June 13, 2022).

[136]  *Id.*

[137]  Letter from Paul Swegle.

another commenter recommended disclosure of post-de-SPAC transaction transfers, noting "this reporting could be time limited, for example to two years" following the de-SPAC transaction.[138]

### v.    Interest in SPAC Sponsor and Organizational Chart

One commenter said that the proposed approach departs from the traditional approach to beneficial ownership reporting and recommended that this item should clarify that "an indirect economic interest in less than 10% of a SPAC's founder shares or warrants through ownership of equity interests in a [SPAC] [s]ponsor should not, in and of itself and absent other factors, be considered a direct or indirect material interest in the [SPAC] [s]ponsor."[139]  Another commenter said the identity of natural persons controlling the sponsor is already disclosed in response to existing Item 403 of Regulation S-K.[140]

### vi.  Agreements

One commenter recommended that the Commission should revise proposed Item 1603(a)(8) to "specify that if a SPAC, the SPAC sponsor, or any affiliated party enters into an agreement regarding the redemption of outstanding securities of the SPAC after the date of the merger registration statement or proxy, that the SPAC be required to issue a proxy amendment or similar filing prior to the redemption deadline to inform SPAC shareholders of the new agreement."[141]

Another commenter said the material terms of lock-up agreements are already disclosed as a matter of industry practice and that requiring additional disclosure would "go beyond the disclosure requirements applicable to lock-up agreements that are entered into in connection with

---

[138]    Letter from NASAA.

[139]    Letter from ABA.

[140]    Letter from Vinson & Elkins.

[141]    Letter from Michael Klausner and Michael Ohlrogge.

a traditional IPO."[142]  Regarding proposed requirements to disclose any exceptions to relevant lock-up agreements, one commenter recommended excluding exceptions that are not material or are customary.[143]  This commenter noted that frequently these exceptions provide that the transferee agree to the lock-up agreement as a condition of the transfer.[144]

### 3.  Final Rules

After considering the comments received, we are adopting Item 1603(a) as proposed with certain modifications we discuss below.  Additionally, for clarity and consistency throughout Item 1603, we have replaced the term "executive officers" with the term "officers."

### i.  General Discussion

Item 1603(a)'s disclosure requirements will provide a SPAC's prospective investors and existing shareholders with detailed information relating to the SPAC sponsor that could be important in understanding and analyzing a SPAC, including how the rights and interests of the SPAC sponsor, its affiliates, and any promoters may differ from, or may conflict with, those of public shareholders.[145]  Given that a SPAC does not conduct an operating business, information about the background and experience of the SPAC sponsor is important in assessing a SPAC's prospects for success and may be a relevant factor in the market value of a SPAC's securities.[146]

---

[142]  Letter from Vinson & Elkins.

[143]  Letter from Freshfields ("Exceptions to lockups that are customary and not significant or material [include]: transfers to affiliates, transfers to family members, gifts and other charitable donations, transfers by will or inheritance, transfers upon dissolution of a marriage, and in-kind distributions to an entity's members and partners").

[144]  Letter from Freshfields.

[145]  Item 1603(a) will operate in addition to existing disclosure requirements that may be applicable to a SPAC's arrangements with SPAC sponsors such as Item 701 of Regulation S-K, which requires disclosure about, among other things, the terms of any private securities transactions between a SPAC and SPAC sponsors within the past three years, and Item 404 of Regulation S-K, which requires disclosure about certain related party transactions.

[146]  *See, e.g.*, Chen Lin, Fangzhou Lu, Roni Michaely, and Shihua Qin, *SPAC IPOs and Sponsor Network Centrality* (SSRN Working Paper, 2021); Andrea Pawliczek, A. Nicole Skinner, and Sarah L.C. Zechman, *Signing Blank*

Corresponding disclosure with respect to SPAC sponsor affiliates and promoters will also provide investors with important information, because the SPAC sponsor's affiliates and any promoters of the SPAC may also carry out activities similar to those of a SPAC sponsor. Furthermore, the enhanced disclosure regarding the SPAC sponsor's compensation and the SPAC sponsor's agreements, arrangements, or understandings may be helpful to a SPAC's prospective investors and existing shareholders in considering whether to acquire or redeem the SPAC's securities and in evaluating the potential risks and merits of a proposed de-SPAC transaction, because it could highlight additional motivations for completing a de-SPAC transaction.

Several commenters suggested that proposed Item 1603(a) would codify, to an extent, existing disclosure practices.[147] We agree that the requirements in Item 1603 to provide detailed disclosure about the SPAC sponsor, the SPAC sponsor's experience, and its rights and interests will codify existing disclosure practices. This will help ensure that issuers provide consistent and comprehensive information across transactions, so that investors can make more informed investment and voting decisions.

### i. Promoters

We are retaining the applicability of Item 1603 to promoters.[148] We disagree with the commenters who asserted that Item 1603 should not apply to "promoters" and that the disclosure regarding a promoter would not significantly benefit investors or would be immaterial to

---

*Checks: The Roles of Reputation and Disclosure in the Face of Limited Information* (SSRN Working Paper, 2021).

[147] Letters from ABA, NASAA, Vinson & Elkins.

[148] The proposal's disclosure requirements related to "promoters" included the following proposed items: (1) Item 1603(a)(3) (promoter's experience), (2) Item 1603(a)(4) (promoter's role), (3) Items 1602(b)(6), 1603(a)(6), and 1604(a)(3) (promoter's compensation), and (4) Items 1602(a)(5), 1602(b)(7), 1603(b)(1), 1604(a)(4), and 1604(b)(3) (promoter conflicts of interest).

investors.[149]  Certain persons are explicitly included as a "promoter" under Securities Act Rule 405 and Exchange Act Rule 12b-2.[150]  There may be facts and circumstances involving a SPAC where a person may be considered either a "promoter," "SPAC sponsor," "officer," or "director" or may be more than one of these.  As with a SPAC sponsor, the promoter's background and experience, compensation, and conflicts of interest are material information for investors in the SPAC IPO (particularly given the absence of an operating business) and any de-SPAC transaction.  Such information will enable investors to better understand promoter incentives and activities.[151]  A registrant is not required to repeat the same disclosure twice merely because a person fits in two categories (for example, both a "promoter" and a "SPAC sponsor").

Additionally, in the final rules, we have made technical changes to ensure consistent reference to "SPAC sponsor, its affiliates, and promoters" among disclosure requirements relating to the cover page, summary, and body sections of the prospectus.[152]

### ii.  Compensation

We are adopting the SPAC sponsor compensation disclosure largely as proposed with certain modifications in response to comments.  We disagree with the commenter who suggested

---

[149]  Letters from Freshfields, Vinson & Elkins.  *See supra* notes 124, 125, and 126 and accompanying text.

[150]  Securities Act Rule 405 provides: The term promoter includes: (i) Any person who, acting alone or in conjunction with one or more other persons, directly or indirectly takes initiative in founding and organizing the business or enterprise of an issuer; or (ii) Any person who, in connection with the founding and organizing of the business or enterprise of an issuer, directly or indirectly receives in consideration of services or property, or both services and property, 10 percent or more of any class of securities of the issuer or 10 percent or more of the proceeds from the sale of any class of such securities.  However, a person who receives such securities or proceeds either solely as underwriting commissions or solely in consideration of property shall not be deemed a promoter within the meaning of this paragraph if such person does not otherwise take part in founding and organizing the enterprise.  Exchange Act Rule 12b-2 contains similar provisions.

[151]  Item 1603 also applies to disclosure in de-SPAC transactions.  *See, e.g.*, instructions to Form S-4 and F-4.

[152]  See Items 1602(a)(3) (adding term "promoter" in cover page requirements to be consistent with Item 1602(b)(6) prospectus summary requirements), 1602(b)(6), 1603(a)(6), 1604(a)(3), 1604(b)(4) (adding the term "promoter" to summary prospectus requirements to be consistent with cover page requirements in Item 1604(a)(3)), and 1604(c)(1) (adding the terms "its affiliates, and promoters" to prospectus body requirements to be consistent with cover page and summary requirements in Items 1604(a)(3) and 1604(b)(4)).

49

that—because sponsor compensation and reimbursement are already disclosed under existing disclosure requirements and current market practice provides for similar disclosure as to the material terms of lock-up agreements—the proposed additional disclosure requirements should not be adopted.[153]  On the contrary, we believe compliance with the final rules will be minimally burdensome where disclosure of this information is already market practice and will create a uniform and transparent regime across-the-board, maintaining a minimum standard of disclosure across transactions, even if market practice were to change in the future.

We agree with comments that returns based on the price appreciation from the "promote" stake owned by the SPAC sponsor may be a significant source of potential remuneration to the SPAC sponsor that investors would want to know about in making their investment and voting decisions.[154]  As a result, we have added terms explicitly requiring disclosure of the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities.[155]  For example, where a SPAC sponsor purchased a 20 percent ownership interest in the SPAC, this interest and the purchase price would be required to be disclosed under the revised provision and would not be excluded on the basis of not being "compensation."

---

[153]  Letter from Vinson & Elkins.  *See also* letter from SPAC Association (asserting that "the SPAC 20% promote is fully and fairly disclosed and has been for decades").  *See supra* notes 128, 129, and 130 and accompanying text.

[154]  Letters from Loeb & Loeb, Vinson & Elkins.  *See supra* notes 131 and 132 and accompanying text.

[155]  *See* Items 1602(a)(3), 1602(b)(6), 1603(a)(6), 1604(a)(3), 1604(b)(4), and 1604(c)(1).  For the avoidance of doubt, in Items 1602(a)(3), 1602(b)(6), 1603(a)(6), and 1604(a)(3), disclosure should be provided with respect to each person who is one of the types of named persons in those items; registrants may provide totals of those individual disclosures but the disclosure of a single lump sum covering all  types of persons named in those items would be insufficient by itself.

Pursuant to these changes, any mechanisms, such as an anti-dilution provision,[156] to keep the SPAC sponsor ownership at a certain level (or similar mechanisms for affiliates or promoters) and any potential cancellation of shares issued or to be issued to the SPAC sponsor (or its affiliates or promoters) or increase in shares issued to the SPAC sponsor (or its affiliates or promoters) will be required to be disclosed since these features would affect shares issued or to be issued to those parties.  The approach taken in the final rules will address the concerns over speculation related to quantifying compensation expressed by one commenter,[157] because these contractual terms are known at the time of the IPO and therefore do not require any speculation about possible stock price changes after the de-SPAC transaction.

Regarding the comments concerning reimbursement of advances and repayment of loans,[158] we do not believe it is necessary to modify the proposed term "reimbursement."  The term is not limited to specific types of reimbursements.  Any funds outlaid by the SPAC sponsor that are later returned to the SPAC sponsor would constitute a "reimbursement" under the rule, notwithstanding that the return of the funds to the SPAC sponsor may also include other amounts (such as accrued interest).

We are not adopting another commenter's recommendation that required disclosure be qualitative rather than quantitative unless the amounts are above a specified de minimis

---

[156]  *See, e.g.*, Clifford Chance, *Guide to Special Purpose Acquisition Companies* 5 (Sept. 2021), *available at* https://www.cliffordchance.com/content/dam/cliffordchance/briefings/2021/09/guide-to-special-purpose-acquisition-companies.pdf ("However, if additional public shares or equity-linked securities are issued in connection with the de-SPAC transaction, the exchange ratio for the founder shares will typically be adjusted to maintain the 20% promote for the sponsors."); Michael Klausner, Michael Ohlrogge & Harald Halbhuber, *Net Cash Per Share: The Key to Disclosing SPAC Dilution*, 40 Yale J. on Reg. 18, 28 (2022) (stating that "[s]ome SPACs also provide 'anti-dilution' protection to sponsors by giving them the right to an additional 20% of newly raised PIPE equity at the time of a merger" and stating that typically "sponsors waive their right to some or all these additional shares, though in some cases they do so in exchange for additional shares.").

[157]  Letter from Loeb & Loeb.  *See supra* note 132 and accompanying text.

[158]  Letter from Vinson & Elkins.  *See supra* note 131 and accompanying text.

threshold.[159]  Because de minimis thresholds for several categories of compensation could be significant on an aggregate basis, if quantitative disclosure were only required above a certain de minimis threshold, investors may not receive the complete set of compensation information they need to evaluate the structure of the SPAC in which they may invest.  We would not object, however, to the registrant disclosing de minimis reimbursements (such as for perquisites that are de minimis) by providing an aggregate total of those de minimis reimbursements by category rather than on an item-by-item basis.  We view such disclosure as consistent with the requirement in Item 1603(a)(6) to disclose the reimbursements' "nature."

### iii.  Transfer of SPAC Ownership

In response to several commenters' recommendation to disclose transfers of SPAC securities by the SPAC sponsor and others, we are modifying Item 1603(a)(6) to require such disclosure.[160]  We agree that disclosure of share transfers by a SPAC sponsor, its affiliates, and promoters would provide important information to investors seeking to evaluate the incentives of these parties.  We believe it would also be important for investors to know if the SPAC ownership level of these parties has changed because of cancellation of the securities.[161] Accordingly, in the final rule, we have revised proposed Item 1603(a)(6) to add the requirement: "Disclose any circumstances or arrangements under which the SPAC sponsor, its affiliates, and promoters, directly or indirectly, have transferred or could transfer ownership of securities of the SPAC, or that have resulted or could result in the surrender or cancellation of such securities." With respect to indirect transfers, for example, if there was a transfer of ownership interests in

---

[159]  Letter from ABA.  *See supra* note 133 and accompanying text.

[160]  Letters from Michael Klausner and Michael Ohlrogge, NASAA, Paul Swegle.  *See supra* notes 135, 136, 137, and 138 and accompanying text.

[161]  Certain earn-out provisions entered into in connection with a de-SPAC transaction may involve cancellation of securities if certain targets are not met.

the SPAC sponsor or ownership interests in a holding company that owns interests in the SPAC sponsor, then disclosure would be required under this item.[162]

At this time, we are not making any changes to add requirements to disclose transfers after the de-SPAC transaction occurs, because we believe, for most SPACs, SPAC sponsors will already have Form 3 and 4 reporting obligations.[163]

### iv. *Interest in SPAC Sponsor and Organizational Chart*

We are adopting Item 1603(a)(7) as proposed except that we are not adopting the proposal to provide an organizational chart.

One commenter said that "proposed Item 1603(a)(7) should clarify that…an indirect economic interest in less than 10% of a SPAC's founder shares or warrants through ownership of equity interests in a Sponsor should not, in and of itself and absent other factors, be considered a direct or indirect material interest in the Sponsor."[164]  We do not believe that the disclosures of material interests in the SPAC sponsor should be based on a bright-line absolute percentage of ownership, whether based on percentage ownership of shares of the SPAC or based on percentage ownership of shares of the SPAC sponsor.  As a general matter, we note that registrants regularly apply materiality standards that are not tied to absolute percentages in connection with their disclosure under the federal securities laws.  We believe a bright-line standard would not be appropriate here because the percentage of ownership of a SPAC sponsor

---

[162]  In addition, in final Item 1603(a)(6) we replaced "has or will be" with "has been or will be," and replaced "rendered" with "rendered or to be rendered," for clarity.

[163]  See 17 CFR 240.16a-2 under the Exchange Act (Among others, any person who is the beneficial owner, directly or indirectly, of more than 10% of any class of equity securities registered pursuant to Exchange Act Section 12 and any director or officer of the issuer of such securities shall be subject to the provisions of Exchange Act Section 16); Exchange Act Section 16(a).  SPAC sponsors also may have beneficial ownership reporting obligations pursuant to Sections 13(d) and 13(g) of the Exchange Act and rules thereunder.

[164]  Letter from ABA.

that is material could differ from SPAC sponsor to SPAC sponsor. Also, we note that percentage ownership is not the only way in which a material interest in the SPAC sponsor may be present.[165] For example, where a person has a voting interest but no economic interest in the SPAC sponsor, the required disclosure would need to be provided with respect to such voting interest.

Related to our consideration of this comment, however, we have determined not to adopt the proposed organizational chart requirement in Item 1603(a)(7). The proposed organizational chart requirement would have required graphical display of levels of ownership that are above the level of direct ownership of the SPAC sponsor (i.e., tracing "upstream" through layers of interest-holders to the ultimate interest-holder). It also would have required graphical display of levels of ownership of companies other than the SPAC sponsor (but that would be under common control with the SPAC sponsor) that are below these interest-holders (i.e., tracing "downstream" through layers of affiliated controlled persons). We believe, in this context at this time, particularly with respect to institutions with an interest in the SPAC sponsor that may have complex company organizational structures, the complexity of the upstream and downstream tiers of ownership discussed above may be difficult to prepare graphically. As a result, we are not adopting the organizational chart requirement.

Another commenter said the identity of natural persons controlling the sponsor is already disclosed in response to existing Item 403 of Regulation S-K.[166] Item 403 requires security ownership information concerning certain beneficial owners and management, but new Item

---

[165] *See, e.g.*, definition of "control" in Rule 405 (The term control…means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.).

[166] Letter from Vinson & Elkins.

54

1603(a) will elicit additional information because of its requirements concerning background, experience, and roles, among other things.  Also, while current Item 403(a) requires identifying any person who is known to be the beneficial owner of more than five percent of any class of the SPAC's voting securities, new Item 1603(a)(7) adds a requirement to name controlling persons of the SPAC sponsor.  Furthermore, to the extent portions of Item 1603(a) may overlap with Item 403 as they may pertain to specific registrant facts and circumstances, registrants are not required to provide duplicative disclosure.  Therefore, we do not expect that any partial overlap— depending on specific registrant facts and circumstances—in disclosure that could be required under the final rule with disclosure required under Item 403 would impose significant additional burdens on registrants.

> ### v. *Agreements*

We are adopting Items 1603(a)(8) and 1603(a)(9), concerning agreements, as proposed. Final Item 1603(a)(8) provides that the registrant must describe any agreement, arrangement, or understanding, including any payments, between the SPAC sponsor and unaffiliated security holders of the special purpose acquisition company regarding the redemption of outstanding securities of the special purpose acquisition company.  One commenter recommended that the Commission should revise proposed Item 1603(a)(8) to "specify that if a SPAC, the SPAC sponsor, or any affiliated party enters into an agreement regarding the redemption of outstanding securities of the SPAC after the date of the merger registration statement or proxy, that the SPAC be required to issue a proxy amendment or similar filing prior to the redemption deadline to inform SPAC shareholders of the new agreement."[167]  We do not believe it is necessary to revise the item in the manner suggested to capture events that follow the filing of a proxy statement in

---

[167]  Letter from Michael Klausner and Michael Ohlrogge.

connection with a de-SPAC transaction, as we believe registrant obligations to amend such filings under current law, including to ensure disclosure are not misleading, are sufficient.[168]

Final Item 1603(a)(9) provides that the registrant must disclose, in a tabular format to the extent practicable, the material terms of any agreement, arrangement, or understanding regarding restrictions on whether and when the SPAC sponsor and its affiliates may sell securities of the special purpose acquisition company, including: the date(s) on which the agreement, arrangement, or understanding may expire; the natural persons and entities subject to such an agreement, arrangement, or understanding; any exceptions under such an agreement, arrangement, or understanding; and any terms that would result in an earlier expiration of such an agreement, arrangement, or understanding.

In response to the commenter who stated that the required additional disclosure would go beyond the disclosure requirements applicable to lock-up agreements entered into in connection with a traditional IPO,[169] we believe that, based on Commission staff experience reviewing filings, registrants in IPOs currently provide information that is analogous to the Item 1603(a)(9) required information. To the extent Item 1603(a)(9) may incrementally require more disclosure compared to IPOs, we believe this is appropriate because investors in SPACs often focus heavily on the nature of the SPAC sponsor's interest in the SPAC and because agreements, arrangements, or understandings regarding restrictions on whether and when the SPAC sponsor and its affiliates may sell securities of the SPAC often can be more complex than lock-up

---

[168]   *See* 17 CFR 240.14a-9 ("Rule 14a-9").  *See also* 17 CFR 240.14a-6(h).

[169]   Letter from Vinson & Elkins.  *See supra* note 142 and accompanying text.

agreements in IPOs.  For example, SPAC lock-up agreements often include provisions that depend on certain levels of stock price appreciation.[170]

With respect to the suggestion to exclude from this disclosure customary exceptions to lock-up agreements,[171] we are concerned that almost all, if not all, exceptions found in any lock-up agreement could be determined to be customary by a registrant, which would mean they would not be disclosed to investors under the suggested approach.  Further, even where lock-up agreements are filed as an exhibit,[172] exceptions to SPAC lock-up agreements considered "customary" by industry participants may be difficult for a reasonable investor to understand, and therefore narrative disclosure in the body of the filing may help investors understand these terms.[173]

In addition, we believe each such exception to a lock-up agreement is important to investors because exceptions to restrictions on transfer in lock-up agreements can result in the

---

[170]  *See, e.g.*, Connie Loizos, *The Year of the Disappearing Lock-up*, TechCrunch (Jan. 4, 2022) ("many related deals contain language that restricts sponsors from selling shares for a year from the day the deal is completed, but there are much faster ways out.  According to one popular provision, if a SPAC's shares trade slightly above their initial pricing for more than 20 days in a 30-day period, the lockup provision vanishes."), *available at* https://techcrunch.com/2022/01/04/the-year-of-the-disappearing-lock-up/; *Lock-Up Periods: Regular IPOS V/S SPACS IPOS*, Legal Scale (Sept. 21, 2022), *available at* https://www.legalscale.com/lock-up-periods-regular-ipos-v-s-spacs-ipos/; Ran Ben-Tzur, Itka Safir, *Terms of IPO Lock-Up Agreements for Technology Companies Shift as Direct Listings and SPACs Gain Traction* (2020), *available at* https://www.fenwick.com/insights/publications/terms-of-ipo-lock-up-agreements-for-technology-companies-shift-as-direct-listings-and-spacs-gain-traction (out of 80 traditional IPO-companies surveyed, four (i.e., 5%) used Price-based lock-up releases).

[171]  Letter from Freshfields.  *See supra* notes 143 and 144 and accompanying text.

[172]  *See* 17 CFR 229.601(a) and 17 CFR 229.601(b)(10)(ii)(A) of Regulation S-K (requiring the filing of any contract to which directors, officers, promoters, voting trustees, security holders named in the registration statement or report are parties, with certain exceptions).  *See also* requirements for registrant to furnish exhibits required by Item 601 of Regulation S-K in: Form S-1, Item 16; Form F-1, Item 8 Form S-4, Item 21(a); Form F-4, Item 21.

[173]  When we use the term "narrative" disclosure here, we do not mean that solely qualitative information should be provided.  Depending on the facts and circumstances, quantitative information may be required in connection with these lock-up disclosures.  Depending on the facts and circumstances, one example of such quantitative disclosure could be where the exception to the lock-up depends on application of a formula involving a financial measure.

sale of a significant amount of shares that could affect the trading price of the SPAC or of the post-de-SPAC transaction combined company.[174]  In addition, in connection with disclosure in a SPAC IPO, to the extent that an investor may have invested in the SPAC based in part on the experience and expertise of the SPAC sponsor and its affiliates, we believe the disclosure about exceptions to lock-up agreements could be important to these investors in understanding the extent to which the interests of the SPAC sponsor and investor are aligned.[175]  Similarly, this information is important in connection with disclosure in a de-SPAC transaction.  For example, this information remains important in connection with a de-SPAC transaction where the SPAC sponsor will have a continuing management role at the post-de-SPAC transaction combined company.  Also, for example, even where the SPAC sponsor may not have a continuing management role, this information is important where the SPAC sponsor may have the ability to express views that influence the current management of the post-de-SPAC transaction combined company—potentially due to the size of the SPAC sponsor's ownership stake in the combined company or the value of the SPAC sponsor's ongoing counsel based on the SPAC sponsor's expertise.  In each of these examples, we believe the disclosure about exceptions to lock-up agreements will be important because it will help the investor understand the extent to which the interests of the SPAC sponsor and investor are aligned.

---

[174] *See, e.g.*, Cooley LLP, *Blog: 10 Key Considerations for Going Public with a SPAC* (Aug. 3, 2020), *available at* https://www.jdsupra.com/legalnews/blog-10-key-considerations-for-going-80315/ ("Most SPAC sponsors will be subject to a 1-year lock-up, which can create staggered releases of shares into the market after the combination and may at times try to push the target company holders to also have a 1-year lockup to align interests.  Companies should be thoughtful, in discussions with their financial advisors, on how additional shares will come into the market and implications for the public company's trading volatility.").

[175] With respect to lock-up agreements generally, *see* Alon Brav & Paul Gompers, *The Role of Lockups in Initial Public Offerings*,  16 The Rev. of Fin. Studies 1 (2003), *available at* https://doi.org/10.1093/rfs/16.1.0001 (finding lockup agreements serve as a commitment device to address moral hazard concerns).

While one commenter suggested that current market practice is for transferees who receive shares pursuant to an exception from a lock-up to agree to the lock-up as a condition of the transfer,[176] we do not believe this means information about exceptions to lock-up agreements will not be important to investors.  If the SPAC sponsor or affiliates may divest their ownership of the SPAC, this may affect investor evaluation of the SPAC and the incentives of the SPAC sponsor, regardless of whether a transferee is also subject to transfer restrictions.  Investors may consider the potential amounts of shares that could be transferred to be an important factor that could affect the market valuation of the issuer.  Moreover, based on the Commission staff's experience, some registrants today already discuss each exception in detail, while others discuss the exceptions in general terms.

## C.  Conflicts of Interest

### 1.  *Proposed Rules*

SPAC sponsors and others may have material potential or actual conflicts with the interests of investors that could have adverse effects on those investors.  The Commission proposed conflicts of interest disclosure requirements in certain items in proposed Item 1602, 1603, 1604, and 1605 in connection with SPAC registered offerings other than de-SPAC transactions, such as IPO transactions, and in connection with de-SPAC transactions, described in more detail below.

The Commission proposed Items 1602(a)(5) and 1602(b)(7), which apply to registered offerings other than de-SPAC transactions, to require that some of these conflicts of interest disclosure requirements appear on the prospectus front cover page and in the prospectus

---

[176]   Letter from Freshfields.  *See supra* note 144 and accompanying text.

summary, respectively.[177]  The Commission also proposed prospectus cover page and prospectus summary conflict of interest disclosure requirements in connection with de-SPAC transactions in proposed Items 1604(a)(4) and 1604(b)(3).[178]

The Commission proposed that Item 1603 (including 1603(b) regarding conflicts of interest) apply to de-SPAC transactions, as well as other registered offerings, including SPAC IPOs.[179]  Proposed Item 1603(b) would require disclosure of any actual or potential material conflict of interest between (1) the SPAC sponsor or its affiliates or the SPAC's officers, directors, or promoters, and (2) unaffiliated security holders.  This proposed item included any conflict of interest with respect to determining whether to proceed with a de-SPAC transaction and any conflict of interest arising from the manner in which a SPAC compensates the SPAC sponsor or the SPAC's executive officers and directors or the manner in which the SPAC sponsor compensates its own executive officers and directors.  In addition, the Commission proposed Item 1603(c) to require disclosure regarding the fiduciary duties each officer and director of a SPAC owes to other companies.

Furthermore, in connection with de-SPAC transactions, the Commission proposed Item 1605(d) to require disclosure of any material interests in the de-SPAC transaction or any related financing transaction held by the SPAC sponsor and the SPAC's officers and directors, including

---

[177]  *See also* proposed General Instruction VIII to Form S-1, proposed General Instruction VII to Form F-1.

[178]  *See also* proposed General Instruction I.1 to Form S-4, proposed General Instruction I.1 to Form F-4, proposed Item 14(f)(1) of Schedule 14A, and proposed General Instruction K to Schedule TO.

[179]  *See* (a) proposed General Instruction VIII to Form S-1, (b) proposed General Instruction I.1 to Form S-4, (c) proposed General Instruction VII to Form F-1, (d) proposed General Instruction I.1 to Form F-4. (e) proposed Item 14(f)(1) of Schedule 14A, and (f) proposed General Instruction K to Schedule TO.

fiduciary or contractual obligations to other entities as well as any interest in, or affiliation with, the target company.[180]

### 2. Comments

Broadly categorized, commenters on the conflicts of interest proposals focused on four areas: (1) general comments, including those with general expressions of support for or opposition to the proposals, (2) SPAC and target company officer and director conflicts of interest, (3) de-SPAC conflicts of interest, (4) addition of disclosure of "break-even" thresholds, and (5) additional responses to Commission requests for comment.

A number of commenters generally supported the proposed enhanced disclosure requirements in regard to conflicts of interest and fiduciary duties.[181]

Several commenters suggested that the proposed disclosure requirements would codify, to an extent, existing disclosure practices.[182]  Some commenters suggested that proposed disclosure requirements about conflicts of interest and fiduciary duties would provide useful information to investors.[183]

One commenter said that "in requiring disclosure of known actual or potential material conflicts of interest, proposed Item 1603(b) should clarify that a knowledge-based standard is the appropriate standard in determining whether disclosure is required under this item."[184]

---

[180]  *See also* proposed General Instruction I.1 to Form S-4, proposed General Instruction I.1 to Form F-4, proposed Item 14(f)(1) of Schedule 14A, and proposed General Instruction K to Schedule TO.

[181]  Letters from ABA, Better Markets, Bullet Point Network, CFA Institute, CII, Committee on Capital Markets Regulation, Consumer Federation, ICGN, NASAA, Paul Swegle, Public Citizen (June 10, 2022) ("Public Citizen").

[182]  Letters from ABA, NASAA, Vinson & Elkins.

[183]  Letters from Better Markets, CFA Institute, CII, Committee on Capital Markets Regulation, Consumer Federation, ICGN, NASAA.

[184]  Letter from ABA.

Another commenter recommended "that disclosures should include the names of all sponsors and their financial arrangements with SPACs" and "information on the nature of the claims the investors have on the SPAC if no de-SPAC transaction takes place" during the applicable period or they choose to exit before the de-SPAC is completed.[185]

A few commenters discussed issues related to potential SPAC and target company officer and director conflicts of interest.[186]  One of these commenters recommended that "there should be mandatory disclosures of conflicts of interest among SPAC directors, SPAC officers, target company directors and target company officers."[187]  Another of these commenters recommended that "proposed Item 1603(c) should be limited to those situations where the fiduciary duties of an officer or director owed to other companies might reasonably be expected to present a potential conflict with respect to a potential de-SPAC transaction or the SPAC's ability to pursue de-SPAC transaction opportunities."[188]

Some commenters viewed proposed Item 1605, including proposed Item 1605(d) concerning conflicts of interest in connection with de-SPAC transactions, as redundant with current rules.[189]  One of these commenters said these disclosures are "duplicative of those already prescribed in the existing regulatory schemes for proxy materials and registration statements filed in connection with de-SPAC transactions."[190]  In lieu of adopting proposed Item 1605, the commenter recommended a "uniform methodology to address conflicts of interest arising from business combinations in general by revising Items 1004(a)(2) and 1013(b) of

---

[185]    Letter from ICGN.

[186]    Letters from ABA, CII.

[187]    Letter from CII.

[188]    Letter from ABA.

[189]    Letters from ABA, Vinson & Elkins.

[190]    Letter from ABA.

Regulation M-A and Item 403 of Regulation S-K to incorporate the provisions of proposed Item 1605."[191]  The other commenter opposed the adoption of new disclosure requirements with "respect to material interests in a prospective de-SPAC transaction or any related financing transaction held by the sponsor and the SPAC's officers and directors," because this "would be redundant with the existing requirements of Schedule 14A Item 5."[192]

Some commenters recommended that certain additional disclosures should be required. One commenter on the proposal said that registrants "should also provide, in an easily understandable, tabular format…the break-even points for non-redeeming investors under different scenarios, the break-even point for the sponsor, the ownership distribution for non-redeeming investors, the effects of outstanding warrants and sponsor shares, and the resulting ownership of the target company for non-redeeming shareholders and alternative investors."[193] Another commenter said that registrants should provide a break-even average share price for the sponsor, which would inform investors and, in the commenter's opinion, the target company.[194] The commenter said "this will be a simple numerical representation of the effective cost basis of the sponsor and can be used to ascertain the extent to which a sponsor's position differs from that of other investors."[195]  One commenter stated that "SPACs should disclose the minimum post-merger share value at which proceeding with the SPAC merger will yield a higher return to the SPAC sponsor than liquidating the SPAC."[196]

---

[191]  Letter from ABA.

[192]  Letter from Vinson & Elkins.

[193]  Letter from NASAA.

[194]  Letter from Jonathan Kornblatt, CMT, Fintech Institutional Advisory (June 12, 2022) ("Jonathan Kornblatt").

[195]  Letter from Jonathan Kornblatt.

[196]  Letter from Michael Klausner and Michael Ohlrogge.

A few commenters responded to requests for comment in the proposal related to whether we should also require a description of any policies and procedures used to minimize potential or actual conflicts of interest.[197]  One commenter said that "a requirement for disclosure of policies and procedures or assessment and management of conflicts of interest would result in incremental boilerplate disclosures."[198]  Another commenter said it would be "superfluous to require a description of any policies and procedures used or to be used to minimize potential or actual conflicts of interest in addition to what proposed Item 1603 has already prescribed."[199]

One commenter responded to requests for comment related to whether SPACs should be required to provide additional disclosure regarding material conflicts of interest in Exchange Act reports following their IPOs.[200]  The commenter said that, "regarding disclosure in Exchange Act reports following the SPAC IPO and the Form 8-K announcing the signing of the de-SPAC transaction, additional disclosure should be required only where the conflict of interest is material and has not been previously disclosed."[201]

### 3.  Final Rules

We are adopting Items 1602(a)(5), 1602(b)(7), 1603(b), 1604(a)(4), 1604(b)(3), and 1605(d) substantially as proposed, except for the changes discussed below.  Having considered comments received, we are adopting the final rules to provide information to investors about the material potential or actual conflicts that SPAC sponsors and others covered by the final rules may have with the interests of investors.  These conflicts could influence the actions of the

---

[197]  Proposing Release, *supra* note 7, at 29468 (request for comment number 17).

[198]  Letter from Vinson & Elkins.

[199]  Letter from ABA.

[200]  Proposing Release, *supra* note 7, at 29468 (request for comment number 18).

[201]  Letter from Vinson & Elkins.

SPAC to the detriment of its unaffiliated security holders.  The potential conflicts of interest of SPAC sponsors and others may be particularly relevant for investors to the extent that they arise when a SPAC and its management are deciding whether to engage in a de-SPAC transaction. The SPAC sponsor's compensation structure creates incentives to complete a de-SPAC transaction.  These incentives may induce a SPAC sponsor and others to compel the SPAC to complete the de-SPAC transaction on unfavorable terms to avoid liquidation of the SPAC at the expiry of this period.

There are numerous situations that could give rise to these potential conflicts.  For example, SPAC sponsors or their affiliates may have a potential conflict of interest stemming from the nature of the SPAC sponsor's compensation or security ownership (particularly where the security owned is purchased at disparate prices, often substantially lower than the price paid by public security holders).  This type of potential conflict of interest may present significant financial incentives to pursue a de-SPAC transaction even in the absence of attractive target company transaction opportunities.[202]

SPAC sponsors and their affiliates may also sponsor multiple SPACs, which may result in decisions regarding the allocation of these persons' time and target company acquisition opportunities that may adversely affect SPAC security holders.  Alternatively (or in addition), SPAC sponsors and their affiliates may owe employment, contractual, or fiduciary duties to other companies than the SPAC, which, among other things, may affect the ability of the SPAC to execute a de-SPAC transaction or may affect the terms to which a SPAC agrees in any ultimate de-SPAC transaction.  In these situations, the SPAC sponsor and others covered by the

---

[202] *See, e.g.*, Usha Rodrigues & Mike Stegemoller, *Exit, Voice, and Reputation: The Evolution of SPACs*, 37 Del. J. Corp. L. 849, 896 (2013) (stating that "sponsors were expected to put more and more of their own money at risk (in the form of private placements), setting themselves up for substantial losses if no acquisition occurred" as the SPAC form evolved).

final rules may not only be incentivized to take actions that benefit other entities, but they may be compelled by these other duties to do so, potentially at the expense of the SPAC and its security holders.  In addition, SPAC sponsors and their affiliates may seek to enter a de-SPAC transaction with a target company they are affiliated with when superior target company transaction opportunities may be available.

The final rules will provide investors with a more complete understanding of the conflicts of interest related to an investment in a SPAC, including in situations like the examples above. Investors will have improved information concerning interests of the SPAC sponsor and others covered by the final rule that could reduce the value of their investment or that could result in opportunities potentially available to the SPAC not being realized.  In this way, the final rules will allow investors to analyze risks associated with potential conflicts of interest regarding a SPAC more accurately.

We are not including a knowledge qualifier in conflicts of interest disclosure, as suggested by one commenter,[203] because we expect the SPAC and its officers and directors will be in a position to know their own conflicts and that the SPAC may obtain similar information from the SPAC sponsor, its affiliates, and promoters (who will be in a position to know their own conflicts) by virtue of the relationship between the SPAC and the SPAC sponsor and between the SPAC and any promoters.[204]  In addition, we note that registrants can rely on 17 CFR 230.409 and 17 CFR 240.12b-21 with respect to information unknown or not reasonably available.

---

[203]  Letter from ABA.  *See supra* note 184 and accompanying text.

[204]  Similarly, current Item 404 regarding conflicts of interest does not contain such knowledge qualifier.

Another commenter recommended the conflicts of interest disclosures should include: names of all sponsors and their financial arrangements with SPACs; claims investors have on the SPAC if no de-SPAC transaction takes place; and claims investors have on the SPAC if investors exit before the de-SPAC transaction.[205]  We note that all of those items were included in the proposal, and we are adopting them as proposed.[206]

A few commenters discussed issues related to potential SPAC and target company officer and director conflicts of interest.[207]  One of these commenters recommended the conflicts of interest disclosures cover SPAC officers, SPAC directors, target company officers, and target company directors.[208]  In considering the comment, we observed that proposed Item 1604 was inconsistent with proposed Items 1603(b) and 1605(d) by not covering SPAC officers and directors.  We do not believe there are any special factors warranting such a difference.  As a result, we have modified the language in Item 1604 to require disclosure regarding SPAC officers and directors as in the other adopted items.  This change to Items 1604(a)(4)(cover page) and 1604(b)(3) (prospectus summary) will ensure the benefits of the rule that we discuss generally above will apply to these rules as well.[209]  With respect to target company officers and directors, we believe that disclosure of their conflicts of interest is consistent with co-registration requirements in connection with the final amendments to registration forms and with final Rule

---

[205]  Letter from ICGN.  *See supra* note 185 and accompanying text.

[206]  *See, e.g.*, proposed Items: 1603(a)(1) (names of sponsors), 1603(a)(5–6) (agreements and compensation), and 1602(b)(3–4) (redemption rights and plans in the event no de-SPAC transaction is consummated).

[207]  Letters from ABA, CII.

[208]  Letter from CII.  *See supra* note 187 and accompanying text.

[209]  We are also making related minor changes for clarity in Items 1604(a)(4) and 1604(b) to change the term "or its affiliates" to ", SPAC affiliates."  In Item 1604(b) and in a number of other places in the final rules, we also eliminated the term "shall" (e.g., by replacing it with the word "must") consistent with relevant plain English guidance.

67

145a.[210]  As discussed in connection with those requirements, since the de-SPAC transaction is in substance an offering by the target company, the conflicts of interest of target company officers and directors may be important to investor investment, redemption, and voting decisions. Thus, we have amended Items 1603(b), 1604(a)(4) (prospectus cover page), 1604(b)(3) (prospectus summary), and 1605(d) to require this disclosure.[211]  We would not expect registrants to provide duplicative disclosure merely because a person falls into more than one of the categories of persons covered by the final rules.[212]

One commenter recommended that we limit Item 1603(c) disclosure to those situations where officer or director fiduciary duties owed to other companies might reasonably be expected to present a potential conflict with a SPAC's de-SPAC transaction opportunities.[213]  We do not agree with this recommendation, because we do not believe conflicts will only arise in situations where there are fiduciary duties owed to other companies that are expected to present a potential conflict with a SPAC's de-SPAC transaction opportunities.  For example, a director's obligations to other companies may compete with his or her attention to the SPAC.  Because we believe this information is material to investors, we are not making any changes to the proposal in this respect in the final rules we are adopting.

---

[210]  *See infra* Sections III.C and IV.A.

[211]  In addition, in final Item 1603(b) we replaced "with respect to" with "that may arise" (in the phrase "any material conflict of interest that may arise in determining whether to proceed with a de-SPAC transaction") for clarity and consistency with Item 1602(b)(7).  In final Item 1603(b) we also revised the phrase "the manner in which the special purpose acquisition company compensates a SPAC sponsor, officers, or directors" by replacing the term "and" with "or," because the requirements of Item 1603(b) should apply disjunctively where any of the named persons has a relevant material conflict of interest.

[212]  For example, if the SPAC hypothetically happened to share officers or directors with the target company, the same disclosure (that was relevant for both the SPAC and target company) for the same individual person would not need to be provided once for the person as a SPAC official and a second time for the person as a target company official.  The SPAC and target should be mindful, though, that different disclosures about conflicts arising under each role may be required.

[213]  Letter from ABA.  *See supra* note 188 and accompanying text.

Some commenters expressed the view that proposed Item 1605, including proposed Item 1605(d) concerning conflicts of interest in connection with de-SPAC transactions, would be redundant with current rules.[214]  The Commission is not making changes in the final rules we are adopting in response to these comments.  Given the unique qualities of de-SPAC transactions, we believe registrants will benefit from the centralization of the SPAC-related requirements in the Item 1600 series of Regulation S-K rather than in a different location as suggested.[215] Regarding any potential for redundancy with other Commission rules, if there are facts and circumstances that may result in required disclosure under a current rule being the same as under any of the rules we are adopting, registrants will not be required to repeat disclosures (except where the applicable rule may require, such as by calling for the disclosure in a specific location such as the prospectus cover page or prospectus summary).

Some commenters recommended we adopt certain requirements (in addition to those proposed) involving "break-even" disclosure.[216]  With respect to disclosure of a SPAC sponsor's "break-even" price per share, one commenter said this would help investors "ascertain the extent to which a sponsor's position differs from that of other investors."[217]  We believe that the other conflicts of interest disclosures required by the final rules will provide sufficient information to allow investors to understand the potential differences in incentives between them and a SPAC sponsor, and as a result we are not adopting the suggested "break-even" disclosure.

---

[214]  Letters from ABA, Vinson & Elkins.  *See supra* notes 189, 190, 191, and 192 and accompanying text.

[215]  The Commission adopted a similar approach in rules regarding limited partnership roll-up transactions.  *See* 17 CFR 229.900 through 17 CFR 229.915.

[216]  Letters from Jonathan Kornblatt, Michael Klausner and Michael Ohlrogge, NASAA.  *See supra* notes 193, 194, 195, and 196 and accompanying text.

[217]  Letter from Jonathan Kornblatt.

We are not requiring registrants to provide "break-even" price per share disclosure regarding non-redeeming investors as suggested by commenters because each investor would already know the basis at which they acquired the shares of the SPAC and the SPAC may not know this information for many of its investors, who could have acquired the shares at a variety of prices through the public market.  We are likewise not requiring disclosure suggested by commenters that would provide a price at which the SPAC sponsor would recoup their investments in the SPAC.  We believe such disclosure could be confusing for investors, as many SPAC sponsors may consider such amounts as sunk costs, which they do not consider when deciding whether to proceed with a de-SPAC transaction.  As a commenter notes,[218] SPAC sponsors may be incentivized to proceed with de-SPAC transactions below the initial SPAC share price; however, that is largely because SPAC sponsors lack redemption rights.  Generally, SPAC shareholders would seek de-SPAC transactions that result in share prices that exceed their redemption value.  SPAC sponsor decisions to proceed with a transaction may be driven by the SPAC sponsor's expectation of their future deal flow and potential legal or reputational concerns among other factors.  The "break-even" disclosure suggested by commenters would not take into account these factors.  Moreover, none of these factors can be easily quantified, and the ones that can be quantified would be burdensome to produce and potentially difficult for investors to analyze and assess (given the difficulty in reliably quantifying those factors), and also would not be easily comparable across different SPACs (given the SPAC-specific and SPAC sponsor-specific nature of those factors).  The rules as adopted will improve investors' ability to

---

[218]    *See* letter from Michael Klausner and Michael Ohlrogge ("If a sponsor has committed to make no new investments in the SPAC at the time of its merger, then any post-merger share value greater than $0 will be preferable to the sponsor than receiving nothing in a liquidation.  If, however, the sponsor commits to purchase new securities in the SPAC at the time of the SPAC merger, then the share value at which a merger will be a better deal for a sponsor than a liquidation will be above $0.").

70

understand the SPAC sponsor's conflicts of interest, and we are concerned that adding a disclosure that takes into account difficult-to-quantify factors like the ones discussed above would detract from the disclosures that we are adopting.

In the final rules, we are not requiring a description of policies and procedures used to minimize potential or actual conflicts of interest.  We believe the other disclosures we are adopting regarding conflicts of interest, including new Item 1603, will appropriately address investor protection concerns in this regard.  We are also not making any changes that would expand the Series 1600 of Regulation S-K disclosures regarding conflicts of interest beyond registration statements, proxy statements, information statements, and tender offer statements as proposed to other Exchange Act reports (such as to Forms 10-Q, 10-K or 8-K).[219]

Finally, we are making additional minor or technical changes in the final rules.  First, we are making a change to the description of persons against whose interests the conflicts must be compared against from "unaffiliated security holders" to "unaffiliated security holders of the SPAC" in Items 1603(b), 1604(a)(4) (prospectus cover page), and 1604(b)(3) (prospectus summary).  This change will avoid any potential ambiguity or confusion regarding whether target company officers and directors must compare their interests to security holders of the target company or security holders of the SPAC.

Second, we are making a technical change in final Item 1605(d) to use "or" instead of "and" each time in the phrase "held by the SPAC sponsor and the special purpose acquisition company's officers…and directors."  This change makes clear the disclosure should apply with respect to each named person and not only where all such persons share the same interest.

---

[219]  *See* letter from Vinson & Elkins, *supra* note 201 and accompanying text, and Proposing Release, *supra* note 7, at 29468 (request for comment number 18).

Third, we have made certain technical changes in some of the final rules regarding conflicts of interest to clarify the sets of persons being compared.[220]

Fourth, in final Item 1603(b), we are changing each reference to "the SPAC sponsor" to "any SPAC sponsor" because there can be more than one such sponsor.

Fifth, we have revised the phrase "State whether there may be actual or potential conflicts of interest…" in proposed Item 1602(a)(5) to add a materiality qualifier such that the phrase in final Item 1602(a)(5) provides "State whether there may be actual or potential material conflicts of interest…."  This change makes prospectus cover page disclosure requirements under Item 1602(a)(5) consistent with the similar provisions of Item 1603(b), which require disclosure in the body of the disclosure document.  We believe both provisions should contain the same materiality qualifier, because the provisions are related since Item 1602(a)(5) requires the registrant to provide a cross-reference to related disclosures in the prospectus, which includes disclosures made under Item 1603(b).

**D.  Dilution**

*1.  Proposed Rules*

Information about dilution conveys important information to investors about factors that may affect the value of a security holder's interest in a SPAC.  Dilution in current Commission

---

[220]  In final Items 1602(a)(5) and 1602(b)(7), we have revised the punctuation and conjunctions compared to the proposal to clarify the two sets of persons that are to be compared in connection with the required potential or actual conflict of interest disclosure by changing the proposed phrase "between the SPAC sponsor or its affiliates or promoters and purchasers in the offering" to "between the SPAC sponsor, its affiliates, or promoters; and purchasers in the offering."  To clarify the two sets of persons to be compared in Item 1604(a)(4), we have added the words ", on one hand," before the first set of persons and the words ", on the other hand," before the second set of persons.  For clarity and consistency throughout Item 1603, we have also revised the term "executive officer(s)" in each place where it is used in Items 1603(b) and 1603(c) to refer to "officer(s)."

filings is typically measured by calculating changes in net tangible book value per share.[221] There are a number of potential sources of dilution in common SPAC structures, including: (a) shareholder redemptions, (b) SPAC sponsor compensation, (c) underwriting fees, (d) warrants, (e) convertible securities, and (f) PIPE financings.

The Commission proposed several new rules that would require additional information about SPAC dilution in connection with registered offerings by SPACs, including IPOs, and in connection with de-SPAC transactions.[222]  With respect to registered offerings by SPACs (including IPOs) other than de-SPAC transactions, the Commission proposed Items 1602(a)(3), 1602(a)(4), 1602(b)(6), and 1602(c).[223]  With respect to de-SPAC transactions, the Commission proposed Items 1604(a)(3), 1604(b)(4), 1604(b)(5), 1604(b)(6), and 1604(c).[224]  Each of these proposed disclosure requirements is addressed in more detail below.

First, with respect to SPAC IPOs, in Item 1602(a)(3), the Commission proposed that the prospectus outside front cover page include, among other things, disclosure of whether compensation of the SPAC sponsor and its affiliates may result in a material dilution of the

---

[221]  *See* Item 506 of Regulation S-K.  Under Item 506, a company is required to provide disclosure regarding dilution when (1) the company is not subject to the reporting requirements of the Exchange Act and is registering an offering of common equity securities where there is substantial disparity between the public offering price and the effective cash cost to officers, directors, promoters, and affiliated persons of common equity acquired by them in transactions during the past five years, or which they have the right to acquire; or (2) the company is registering an offering of common equity securities and the company has had losses in each of its last three fiscal years and there is a material dilution of the purchasers' equity interest.  In the first instance, a company must provide a comparison of the public contribution under the proposed public offering and the effective cash contribution of such persons.  In both instances, Item 506 requires disclosure of the net tangible book value per share before and after the distribution; the amount of the increase in such net tangible book value per share attributable to the cash payments made by purchasers of the shares being offered; and the amount of the immediate dilution from the public offering price which will be absorbed by such purchasers.

[222]  See proposed Items 1602(a)(3), 1602(a)(4), 1602(b)(6), 1602(c), 1604(a)(3), 1604(b)(4), 1604(b)(5), 1604(b)(6), and 1604(c) of Regulation S-K.

[223]  *See* proposed General Instruction VIII to Form S-1 and proposed General Instruction VII to Form F-1.

[224]  *See* (a) proposed General Instruction VIII to Form S-1, (b) proposed General Instruction I.1 to Form S-4, (c) proposed General Instruction VII to Form F-1, (d) proposed General Instruction I.1 to Form F-4, (e) proposed Item 14(f)(1) of Schedule 14A, and (f) proposed General Instruction K to Schedule TO.

purchasers' equity interests.  Also, the Commission proposed Item 1602(a)(4) to require on the outside front cover page of the prospectus, disclosure in the tabular format specified below the "estimated remaining pro forma net tangible book value per share at quartile intervals up to the maximum redemption threshold," consistent with the methodologies and assumptions used in the disclosure provided pursuant to Item 506 of Regulation S-K:

| Remaining Pro Forma Net Tangible Book Value per Share | | | | |
|---|---|---|---|---|
| Offering Price of _____ | 25% of Maximum Redemption | 50% of Maximum Redemption | 75% of Maximum Redemption | Maximum Redemption |
| | | | | |

Instruction 1 to Item 1602(a)(4) provided that, if the offering includes an over-allotment option, separate rows must be included in the tabular disclosure showing remaining pro forma net tangible book value per share with and without the exercise of the over-allotment option.[225]

In addition, in Item 1602(b)(6) the Commission proposed that for SPAC IPOs, the summary prospectus include, among other things, disclosure of the extent to which compensation of the SPAC sponsor, its affiliates, and promoters may result in a material dilution of the purchasers' equity interests.  In addition to the prospectus cover page and prospectus summary requirements for SPAC IPOs, the Commission also proposed Item 1602(c) regarding dilution.  This proposed item would require, in addition to the disclosure required by § 229.506 (Item 506

---

[225]    In this context, the Commission considers the term over-allotment option to be interchangeable with the term "greenshoe option."  For a general description of the nature of a "greenshoe" or "over-allotment option," *see, e.g.*, Patrick M. Corrigan, *Footloose with Green Shoes: Can Underwriters Profit from IPO Underpricing?*, 38 Yale J. on Reg. 908, 917–918 (2021)  ("Underwriting agreements in firm commitment offerings also give underwriters the right, but not the obligation, to purchase an additional amount of shares [('Option Shares')] at the same price as the underwriter is obligated to purchase the [specified number of shares set out in the underwriting agreement ('Firm Shares')]….Underwriters typically have 30 days following the execution of the underwriting agreement to exercise their option.  The closing for the Option Shares may occur on the same closing date as for the Firm Shares, or on a later date.  In modern IPOs, the size of the green shoe option is virtually always 15% of the Firm Shares, an amount that constitutes the maximum permissible under FINRA rules.") (footnotes omitted).

of Regulation S-K), a description of material potential sources of future dilution following the registered offering by the special purpose acquisition company.  This proposed item also would require disclosure in tabular format of the amount of future dilution from the public offering price that will be absorbed by purchasers of the securities being offered, to the extent known and quantifiable.

The other dilution provisions proposed by the Commission related to de-SPAC transactions.  The Commission proposed Item 1604(a)(3) to require on the outside front cover page of the prospectus, among other things, disclosure of whether compensation of the SPAC sponsor, its affiliates, and promoters may result in a material dilution of the equity interests of non-redeeming shareholders who hold the securities until the consummation of the de-SPAC transaction.  Proposed Item 1604(a)(3) also required the provision of a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

Three additional proposed rules with respect to de-SPAC transactions, Items 1604(b)(4) through 1604(b)(6), each required prospectus summary disclosure.  First, proposed Item 1604(b)(4) required, among other things, tabular disclosure of whether compensation of the SPAC sponsor and its affiliates has resulted or may result in a material dilution of the equity interests of unaffiliated security holders of the special purpose acquisition company.  Second, proposed Item 1605(b)(5) required, among other things, disclosure of the dilutive impact, if any, of any financing transactions that have occurred or will occur in connection with the consummation of the de-SPAC transaction on unaffiliated security holders.  Third, proposed Item 1604(b)(6) required disclosure of the rights of security holders to redeem the outstanding

75

securities of the special purpose acquisition company and the potential impact of redemptions on the value of the securities owned by non-redeeming shareholders.

For de-SPAC transactions, the Commission also proposed Item 1604(c) to require a description of each material potential source of future dilution that non-redeeming shareholders may experience by electing not to tender their shares in connection with the de-SPAC transaction.  Under Item 1604(c), proposed Item 1604(c)(1) required the provision of a sensitivity analysis disclosure in tabular format that expresses the amount of potential dilution under a range of reasonably likely redemption levels.  Proposed Item 1604(c)(1) also required, at each redemption level in the sensitivity analysis, quantification of the dilutive impact on non-redeeming shareholders of each source of dilution, such as the amount of compensation paid or to be paid to the SPAC sponsor, the terms of outstanding warrants and convertible securities, and underwriting and other fees.  Additionally, proposed Item 1602(c)(2) required a description of the model, methods, assumptions, estimates, and parameters necessary to understand the sensitivity analysis disclosure.

*2. Comments*

A number of commenters generally supported some or all of the proposed enhanced dilution disclosure requirements.[226]  Several of these commenters suggested that proposed

---

[226] Letters from Better Markets ("The disclosures should assist shareholders in understanding…potential sources of dilution of their shares…."), Bullet Point Network ("We also agree with the SEC's proposal to add sensitivity tables to show the dilution across a range of redemption scenarios…."), CFA Institute ("we encourage a rapid implementation of the Proposed Rules on improving disclosures, transparency of dilution…."), CII ("We generally agree…on the need to…bring greater clarity to dilution under various SPAC share redemption scenarios…."), Committee on Capital Markets Regulation ("In particular, the Committee supports the proposed enhanced disclosures regarding…dilution…."), Consumer Federation, ICGN ("Finally, the disclosure around dilution concerns…are also critical components for investor decision-making."), PricewaterhouseCoopers LLP (June 10, 2022) ("PwC") ("We believe the proposed disclosure changes will lead to greater transparency and clarity in important areas (e.g., actual or potential conflicts/misalignments of interests or actual or potential sources of dilution).").

dilution disclosure requirements would provide useful information to investors.[227]  Other commenters, however, generally opposed or raised concerns regarding some or all of the proposed enhanced dilution disclosure requirements.[228]  Several of these commenters expressed views that the proposed disclosure requirements regarding dilution would not be helpful to investors.[229]  Specific comments on various aspects of the proposal are described below.

Several commenters addressed issues related to levels of redemption in connection with proposed SPAC dilution disclosure.  One commenter said that the "quantitative disclosure currently required under S-K Item 506 at IPO is not helpful for investors, as the output is largely driven by the maximum redemption scenario which can differ based on (i) different provisions of the SPAC's constituent documents…and (ii) the interpretation of those constituent documents."[230]  In lieu of disclosure using the methodology in existing Item 506 as was proposed, this commenter said that "SPACs should present the per share amount of cash (or securities) in trust, under a range of hypothetical redemption scenarios and after giving effect to sponsor equity, underwriter compensation and IPO expenses."  To promote comparability, this

---

[227]  *See, e.g.*, Consumer Federation ("more detailed information on the potential impact of dilution on the value of SPAC shares could help investors better understand the various sources of dilution and the extent to which their investments might drop in value, which they could then factor into their decision making."), NASAA ("NASAA believes that some of the most important de-SPAC disclosures proposed are those concerning the potential for dilution and the potential impacts to returns from sponsor compensation, 'promote' shares, underwriting fees and warrants.").

[228]  Letters from ABA; Freshfields; Loeb & Loeb; Michael Klausner, Stanford Law School, Michael Ohlrogge, NYU School of Law, and Harald Halbhuber, NYU School of Law (June 13, 2022) ("Michael Klausner, Michael Ohlrogge, and Harald Halbhuber"); Letter from Christopher J. Capuzzi, Daniel L. Forman, Adam M. Harris, David B. Hennes, Carl P. Marcellino, and Paul D. Tropp, Ropes & Gray LLP (June 13, 2022) ("Ropes & Gray"); White & Case.

[229]  *See, e.g.*, Letters from ABA ("Generally, proposed Items 1602(a)(4), 1602(c) and 1604(c) require disclosures and the application of financial analysis tools that we do not believe are grounded in methodologies used by investors or financial experts in valuing a common share…."), Ropes & Gray ("We respectfully submit that the information called for by these proposed rules would not provide investors or analysts with meaningful information in valuing SPAC shares at the time of a SPAC IPO."), White & Case ("We submit that proposed Items 1602(a)(4) and 1602(c) of Regulation S-K should not be adopted…such proposed disclosure would not provide any useful information to investors and would produce inherently misleading disclosure.").

[230]  Letter from Vinson & Elkins.

77

commenter also suggested that "the hypothetical redemption scenarios include a maximum of 100% of the public shares (regardless of any provisions of the SPAC's constituent documents that might theoretically limit redemptions) less any shares subject to a binding commitment to not be redeemed."

Another commenter, who expressed the general view that "proposed Items 1602(a)(4) and 1602(c) of Regulation S-K should not be adopted," said that "it is unclear whether a maximum redemption threshold for purposes of proposed Item 1602(a)(4) should require or call for anything other than the redemption of 100% of the SPAC's public shares."[231]  This commenter also said that "a maximum redemption scenario for a SPAC would vary across different de-SPAC transactions" because of the various ways the redemption level is impacted, including by the SPACs' governing documents, listing requirements, and negotiated conditions in the de-SPAC transaction.[232]  The commenter observed that "some de-SPAC transactions are structured such that certain funding mechanisms, such as backstop, forward purchase or PIPE arrangements, apply only in the event of certain redemption thresholds, further complicating the ability to make the assumptions required by proposed Item 1602(a)(4)."[233]  As a result, this commenter asserted that "any purported maximum redemption scenario disclosed at the time of IPO cannot be based on reasonable assumptions given the inherent lack of specifics available at the time of the IPO for a prospective de-SPAC transaction."[234]

The same commenter said that "a SPAC may actually become subject to a maximum redemption scenario that is lower than the quartile intervals required to be presented by proposed

---

[231]  Letter from White & Case.

[232]  *Id.*

[233]  *Id.*

[234]  *Id.*

Item 1602(a)(4)."[235]  One commenter recommended the Commission require dilution disclosure at a 90% redemption level, stating it "could be particularly useful to investors if recent redemption activity is indicative of future activity."[236]

Commenters raised concerns that dilution disclosure would be characterized by uncertainty, be based on hypothetical assumptions, or depend on unknown variables.[237]  One commenter said that the proposed disclosure under Items 1602(a)(4) and 1602(c) would require "dilution disclosure informed by purely hypothetical assumptions" and that "lengthy and detailed caveats regarding the assumptions would be needed."[238]  As a result of these concerns, the commenter concluded that "proposed Items 1602(a)(4) and 1602(c) of Regulation S-K would only confuse and mislead investors."[239]  Other commenters noted that dilution disclosure at the IPO stage would depend on unknown variables,[240] which one of these commenters said will mean the disclosure is not meaningful.[241]  One of these commenters suggested that "tabular disclosure and sensitivity analyses in SPAC IPO registration statements should be limited to the sources of dilution in existence or contracted at the time of the IPO."[242]

---

[235]  Letter from White & Case.

[236]  Letter from CII, *citing* Joanna Makris, *SPAC Market Review 2022* as "finding February 2022 redemption rate of 89%" *available at* https://www.boardroomalpha.com/spac-market-review-march-2022/.

[237]  Letters from Freshfields, Vinson & Elkins, White & Case.

[238]  Letter from White & Case.

[239]  Letter from White & Case.

[240]  Letters from Freshfields, Vinson & Elkins (stating that the specifics of the transaction that are unknown include: "will there be a PIPE financing, at what per share valuation, will the PIPE issuance include warrants, will there be convertible equity or debt issued, what will transaction expenses be, are there convertible or derivative securities of the target that will be assumed," and "Most importantly, the value of the target company is not known at the time of the IPO.").

[241]  Letter from Freshfields (stating that they did not think the dilution table on the cover of the SPAC's IPO prospectus "will be meaningful because the SPAC does not yet know the amount of equity to be issued in a PIPE (if any) or to the target company's stockholders (if any) or the extent to which the SPAC sponsor's promote will be renegotiated in connection with the actual de-SPAC transaction.").

[242]  Letter from Vinson & Elkins.

Several commenters expressed concerns that the proposed dilution disclosure would not provide meaningful information to investors.[243]  One of these commenters said that "proposed Items 1602(c) and 1604(c) are ambiguous as to what is required to be considered as dilution and how that dilution is to be measured and presented."[244]  This commenter said they do not believe current Item 506 disclosures are useful to investors and do not believe investors will find the similar disclosures proposed to be required by Items 1602(a)(4), 1602(c) and 1604(c) to be any more useful.  One commenter said, "the proposed additional dilution disclosure to be included in an IPO prospectus (proposed Item 1602) would just capture in one place information already being disclosed with perhaps some new caveats about potential for dilutive financings and accordingly not result in a better informed investor."[245]

The Commission proposed that the calculation of pro forma net tangible book value be done consistent with the methodologies and assumptions used in the disclosure provided pursuant to Item 506 of Regulation S-K.  One commenter said that "[Item 506] presentation is not meaningful to investors and in some instances the presentation may actually show that there is a decrease in net tangible book value from the offering after giving effect to the redeemable shares."[246]

Another commenter said that, without an identified de-SPAC target or structured de-SPAC transaction, the limited information at the time of the SPAC IPO used to calculate the

---

243  Letters from ABA, Ropes & Gray ("information called for by the proposed rules would not provide investors or analysts with meaningful information in valuing SPAC shares at the time of a SPAC IPO."), Vinson & Elkins, White & Case.

244  Letter from ABA.

245  Letter from Loeb & Loeb.

246  Letter from Vinson & Elkins.

proposed Item 1602(a)(4) disclosures would produce "an absurd result." [247]  The commenter expressed the view that the disclosure provided based on this limited information would not be useful because "all of a SPAC's shares sold to public investors in the SPAC's IPO (the public shares) are required to be classified as temporary equity upon the completion of the IPO," which would mean that "the calculation of pro forma net tangible book value per share in accordance with U.S. GAAP inevitably produces a deficit and remains the same constant figure across any assumed redemption thresholds."[248]

Another commenter said that "proposed Item 1602(a)(4) would require disclosure of the estimated remaining pro forma net tangible book value per share at specified redemption levels consistent with the methodologies in Item 506 of Regulation S-K" but noted that "Item 506 does not provide a definition for net tangible book value," and, as a result, the commenter has "observed diversity in such calculations."[249]  The commenter recommended "that the Commission include a definition of net tangible book value in the final rule to enhance the usefulness and comparability of the dilution disclosures for investors in SPAC transactions and other registered securities offerings as applicable."[250]

One commenter recommended that the Commission give "illustrative examples and calculations" of the dilution disclosure to ensure "robust, transparent, and consistent dilution disclosures."[251]  Another commenter said they "agree with the proposal to add sensitivity tables to show the dilution across a range of redemption scenarios and would suggest the SEC provide a

---

[247]  Letter from White & Case.

[248]  *Id.*

[249]  Letter from Ernst & Young LLP (June 13, 2023) ("Ernst & Young").

[250]  *Id.*

[251]  Letter from PwC.

format to standardize that disclosure."[252]   One commenter recommended that "sensitivity analyses should only be required for sources of dilution, such as warrants, where the dilutive impact varies based on changing equity values or other variables."[253]

In response to a request for comment asking whether we should require disclosure of net cash per share (in addition to, or in lieu of the proposed dilution disclosures),[254] several commenters recommended we require net cash per share disclosure.[255]   One commenter said that, in lieu of the proposed dilution disclosure, "SPACs should present the per share amount of cash (or securities) in trust, under a range of hypothetical redemption scenarios and after giving effect to sponsor equity, underwriter compensation and IPO expenses."[256]   Another commenter said that "the actual net cash per share for non-redeeming shareholders under different redemption scenarios should be displayed in an easily understandable, tabular format."[257]

A different commenter said they "support clear disclosure of net cash per share after taking into account all sources of dilution and dissipation of cash, under various redemption scenarios."[258]   This commenter said that reductions in net cash may be attributable to a variety of sources, including: (a) sponsor compensation and investment terms, (b) share redemption, (c) exercise of warrants, fractional warrants and convertible securities, (d) PIPE financing, and (e)

---

[252]   Letter from Bullet Point Network.

[253]   Letter from Vinson & Elkins.

[254]   *See* Proposing Release, *supra* note 7, at 29470 (request for comment number 20) ("Should we require other information either in addition to, or in lieu of, the proposed dilution disclosure, such as disclosure of the cumulative amount of dilution that non-redeeming shareholders may experience or the amount of net cash underlying each share at the time of a de-SPAC transaction? If so, should we require that this disclosure be presented in a tabular format?").

[255]   Letters from CII; Michael Klausner, Michael Ohlrogge, and Harald Halbhuber; NASAA; Vinson & Elkins.

[256]   Letters from Vinson & Elkins.

[257]   Letter from NASAA.

[258]   Letter from CII.

underwriting fees.[259]  The commenter also said that "[g]iven the complexity and contingencies involved in the de-SPAC process, investors…need clear information about potential consequences to inform their understanding of the true cost of the business combination."[260]

One group of commenters said that "the final rules for SPAC mergers should require SPACs to prominently disclose the amount of net cash underlying each share at the time of a de-SPAC transaction," including on the cover page of the registration statement.[261]  These commenters also said, with respect to the proposed Item 1604(c) requirement to describe "each material potential source of future dilution" for non-redeeming SPAC shareholders, that the dilution concept included in the provision reflects a concept of dilution that is focused on "ownership dilution," not the kind of dilution (and dissipation of cash) that reduces the net cash underlying a SPAC share.[262]  These commenters concluded that, as proposed, none of the disclosures in Item 1604(c) of Regulation S-K would inform investors about the net cash

---

[259]  *Id.*

[260]  *Id.*

[261]  Letter from Michael Klausner, Michael Ohlrogge, and Harald Halbhuber (providing that net cash per share should include: "each material source of future dilution and dissipation of cash that non-redeeming shareholders may experience by electing not to tender their shares in connection with the de-SPAC transactions and quantify its impact on the net cash underlying a share").

[262]  Letter from Michael Klausner, Michael Ohlrogge, and Harald Halbhuber, *citing* Klausner, Ohlrogge & Halhubber, *Net Cash Per Share: The Key to Disclosing SPAC Dilution* (NYU Law and Economics Research Paper No. 22-14, Mar. 28, 2022, last revised Sept. 17, 2022) *available at* https://ssrn.com/abstract=4047180 (retrieved from SSRN Elsevier database) (*see supra* note 156).  For treatment of warrants in connection with this net cash per share formula, *see id.* at 27 ("All warrants should be valued using standard accounting methodologies as of the day before the merger's announcement, and their aggregate value should be subtracted from total cash.  This is consistent with most SPACs' accounting treatment of warrants as a liability.  To ensure comparability across different SPACs, however, we propose subtracting the value of the warrants even when they are structured to avoid liability treatment under GAAP." (footnotes omitted); *id.* at 27, n.32 ("Alternatively, SPACs could be required to disclose the value of warrants at the time their proxy statement is filed.  This would reflect the market's valuation of the warrants' dilution."); *but see* Klausner, Ohlrogge & Ruan, *supra* note 18 at 233, n.11 (2022) ("The concept of net cash per share is central to our analysis.  We define that term to be cash in the SPAC minus underwriting fees and other fees incurred in connection with a SPAC's merger minus the value of warrants as of the day before the announcement of the merger, divided by shares issued in the SPAC's IPO plus shares issued to shares issued to PIPE investors.  We follow the SEC's treatment of warrants as liabilities.  *If we treat warrants as equity of the same value in the denominator of net cash per share, the results would not be significantly different.*  For the few SPACs that have convertible debt, we treat the conversion feature as a warrant." (emphasis added)).

83

underlying a SPAC share.  These commenters also provided a formula for the calculation of net cash per share: (a) total cash (consisting of the sum of cash from SPAC public shareholders plus cash from PIPEs or forward purchase agreements minus cash expenses minus the value of warrants minus the value of other equity derivatives), divided by (b) total shares (consisting of public shares plus founder shares plus PIPE or forward purchase agreement shares plus other shares plus shares issuable under rights).[263]  Another commenter supported using this calculation of net cash per share after taking into account all sources of dilution and dissipated cash under 25%, 50%, 75%, 90%, and 100% redemption scenarios.[264]

One commenter said they "read proposed Item 1604(c)(1) as requiring a determination of the enterprise valuation that will result in a stockholder's 'interest per share' (calculated by reference to a pro forma closing date balance sheet…)…being at least equal to the $10 price per share paid in the IPO."[265]  The commenter said "this is the equivalent of requiring a traditional IPO to include in its Item 506 dilution section alternative price ranges, the midpoint of which would not result in dilution to IPO investors," which the commenter said "we can safely assume would be materially different from the proposed cover page range due to the significant disconnect between market prices and net book value per share."[266]  The commenter said "if misunderstood by the reader, this proposed disclosure also has the dangerous potential to lead a SPAC shareholder to view the disclosure as a guarantee that the stock will not trade down in the aftermarket."[267]

---

[263]  *Id.*

[264]  Letter from CII.

[265]  Letter from Loeb & Loeb.

[266]  *Id.*

[267]  *Id.*

One commenter on the proposal said that "[f]or de-SPAC transactions, the most meaningful information would be the expected value per share, using the agreed equity value of the target company plus net cash proceeds from the de-SPAC transaction under a range of hypothetical redemption scenarios."[268]  The commenter said, "Given that SPAC warrants are almost uniformly out of the money at the agreed per share equity value used in the de-SPAC transaction (typically the $10 IPO per unit price), conveying the potential dilutive effect of the warrants can be handled in many different ways."  The commenter suggested disclosing "the percentage ownership of the surviving company at various hypothetical share increments above $10 per share, utilizing the treasury share method."[269]

One commenter recommended that the Commission should consider requiring that intermediaries provide information about "the sponsor, actual and potential conflicts of interest, [and] how much a non-redeeming SPAC investor's interest will be diluted" in a separate "Key Risks and Conflicts form" that is detached from the prospectus, so that the disclosure receives more investor attention and focus.[270]

---

[268]  Letter from Vinson & Elkins.

[269]  Letter from Vinson & Elkins.  Regarding the treasury stock method for warrants, *see, e.g.*, Donald E. Kieso, Jerry J. Weygandt, Terry D. Warfield, *Intermediate Accounting, Volume 2*, 17 (2019) ("The treasury stock method applies to written call options and equivalents and assumes that: 1. the options and warrants or equivalents are exercised at the beginning of the year (or on the date of issue if it is later), and 2. the proceeds are used to purchase common shares for the treasury at the average market price during the year.  If the exercise price is lower than the average market price, then the proceeds from exercise are not sufficient to buy back all the shares.  This would result in more shares being issued than purchased and will therefore be dilutive.  The excess number of the shares (incremental number) to be issued over the number of shares that would be purchased is added to the weighted average number of shares outstanding in calculating [per share ratios].  Note that no adjustment is made to the numerator.").

[270]  Letter from CFA Institute.

One commenter said that disclosures about "any lock-up periods or earnout provisions for sponsors or underwriters would be of significant interest to investors and should be required if part of the SPAC offering."[271]

### 3. Final Rules

#### i. Overview of Final Rules and Changes from Proposal

After considering the comments received, regarding dilution disclosure in SPAC registered offerings (such as SPAC IPOs) other than de-SPAC transactions, we are adopting Items 1602(a)(3), 1602(a)(4), 1602(b)(6), and 1602(c) as proposed, except for certain modifications we discuss below. Regarding de-SPAC transactions, we are also adopting Items 1604(a)(3), 1604(b)(4), 1604(b)(5), 1604(b)(6), and 1604(c) as proposed, except for certain modifications we discuss below. Each of these provisions is discussed in detail below.

#### a. Overview of Final Item 1602 Dilution Disclosure (IPOs and Non-De-SPAC Transaction Registered Offerings) and Changes from Proposal

##### 1. Item 1602(a)

Final Item 1602(a)(3) requires, on the outside front cover page of the prospectus in plain English, a statement of the amount of the compensation received or to be received by the SPAC sponsor, its affiliates, and promoters, the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities, and whether this compensation and securities issuance may result in a material dilution of the purchasers' equity interests. Final Item 1602(a)(3) also requires the provision of a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus. Final Item 1602(a)(3) is different from the proposal only with

---

[271] Letter from NASAA.

respect to changes made regarding SPAC sponsors and securities issuances discussed above in Section II.B.

Final Item 1602(a)(4) requires, with respect to SPAC IPOs, on the outside front cover page of the prospectus in plain English, disclosure in the tabular format specified at quartile intervals based on percentages of the maximum redemption threshold: the offering price; as of the most recent balance sheet date filed, the net tangible book value per share, as adjusted, as if the offering and assumed redemption levels have occurred and to give effect to material probable or consummated transactions (other than the completion of a de-SPAC transaction); and the difference between the offering price and such net tangible book value per share, as adjusted.

Final Table 1 to Paragraph (a)(4) provides:

| Net Tangible Book Value Per Share, as Adjusted | | | | |
|---|---|---|---|---|
| Offering Price of _____ | 25% of Maximum Redemption | 50% of Maximum Redemption | 75% of Maximum Redemption | Maximum Redemption |
| | | | | |

Final Instruction 1 to Item 1602(a)(4) provides, if the offering includes an over-allotment option, separate rows in the tabular disclosure must be included showing the information required by paragraph (a)(4) with and without the exercise of the over-allotment option.

Final Item 1602(a)(4) includes several changes compared to the proposal. First, we have clarified in the final rule how to calculate the required dilution information. In response to the proposal, some commenters generally sought clarification, such as illustrative examples, calculations, or definitions, in connection with the dilution calculation.[272] We believe the changes in the final rules will be simpler for registrants to follow and comply with because they

---

[272] *See* letters from PwC, Ernst & Young, *supra* notes 249 and 251.

provide clear steps regarding how the dilution disclosure should be determined.  In addition, we have deleted proposed references to calculating dilution "consistent with the methodologies and assumptions used in the disclosure provided pursuant to § 229.506 (Item 506 of Regulation S-K)."  These references to Item 506 are not necessary given the changes made to clarify how to calculate the required dilution information.  This change also ensures that redeemable common stock is not treated as temporary equity for purposes of the calculation in a way that could undermine the meaningfulness of the dilution disclosure as we discuss in more detail below in response to comments.  Relatedly, we are revising Item 6 of Form S-1 to state that the registrant must "Provide the information required by Item 506 of Regulation S-K (§229.506 of this chapter), unless the registrant is a special purpose acquisition company (as defined in Item 1601 of Regulation S-K)," because the requirements of Item 1602(a)(4) are intended to supplant the requirements of Item 506 for SPACs.

In addition, we have deleted proposed references in Item 1602(a)(4) to "estimated remaining pro forma net tangible book value per share" as the name for the dilution measurement and instead refer to "net tangible book value per share, as adjusted."  We were concerned that references to "estimated remaining pro forma net tangible book value per share" could be ambiguous and that registrants could misinterpret the term to require estimation of what the net tangible assets of a combined company might be in any ultimate de-SPAC transaction. The deletion of this term and its replacement with the new term helps clarify that registrants should not include any estimates of the assets of any ultimate target company in this calculation.

In addition, in final Item 1602(a)(4), we have replaced the proposed phrase "at quartile intervals up to the maximum redemption threshold" with "at quartile intervals based on percentages of the maximum redemption threshold."  We believe registrants could mistakenly

interpret the proposed terms to require quartile intervals based on the total number of shares issued in the offering for the three redemption levels in the table other than the maximum redemption level.  We believe this change will eliminate that potential for misinterpretation.

2.  Item 1602(b)

Final Item 1602(b)(6) requires the prospectus summary to include in plain English in a tabular format, the nature and amount of the compensation received or to be received by the SPAC sponsor, its affiliates, and promoters, the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities, and, outside of the table, the extent to which this compensation and securities issuance may result in a material dilution of the purchasers' equity interests.  Final Item 1602(b)(6) is different from the proposal only with respect to changes made regarding SPAC sponsors and securities issuances discussed above in Section II.B.

3.  Item 1602(c)

Final Item 1602(c) requires disclosure in a tabular format for the same quartile intervals as in Item 1602(a)(4): the offering price; net tangible book value per share, as adjusted, determined in the same manner as in Item 1602(a)(4); and the difference between the offering price and such net tangible book value per share, as adjusted.  Final Item 1602(c) also requires that the tabular disclosure must show: the nature and amounts of each source of dilution used to determine net tangible book value per share, as adjusted; and the number of shares used to determine net tangible book value per share, as adjusted; and any adjustments to the number of shares used to determine the per share component of net tangible book value per share, as adjusted.  Final Item 1602(c) also requires a description of each material potential source of future dilution following the registered offering by the special purpose acquisition company,

89

including sources not included in the table with respect to the determination of net tangible book value per share, as adjusted.  Final Item 1602(c) also requires a description of the model, methods, assumptions, estimates, and parameters necessary to understand the tabular disclosure.

Final Item 1602(c) contains several changes from the proposal.  We have clarified in the final rule that Item 1602(c) dilution should be calculated in the same way as in Item 1602(a)(4) and have deleted references in proposed Item 1602(c) to Item 506 of Regulation S-K, consistent with changes discussed above made to final Item 1602(a)(4) in this respect.  In addition, we have clarified that the table in Item 1602(c) should show the nature and amounts of each source of dilution and the number of shares used in the calculation in order to eliminate any ambiguity and the potential that registrants could misinterpret the item to mean that the table merely needs to show the final dilution information and not the line items that went into its calculation.

With respect to the proposed requirement to describe material potential sources of future dilution, the final rules specify that the description should be located outside the table.  The final rules also state that the description of each material potential source of future dilution outside of the table should include "sources not included in the table with respect to the determination of net tangible book value per share, as adjusted."  We are making this change to clarify that the disclosure outside of the table is not to be merely duplicative of the sources of dilution used for the calculation of the measure of dilution within the table.  Without these changes, the item could have been misinterpreted by registrants to require only disclosure of the same sources of dilution used in the tabular calculation of dilution, only in a non-tabular format.  Depending on a SPAC's specific facts and circumstances, the non-tabular disclosure of "each material potential source of future dilution" under Item 1602(c) may need to discuss a broader set of items than "material

probable or consummated transactions" that are included for purposes of calculating the tabular dilution measure.[273]

We have also clarified that underlying factors such as assumptions that are necessary to understand the table must be described in order to eliminate any ambiguity under the proposal that no such information is required beyond the numbers in the dilution table.  This clarification also makes final Item 1602(c) consistent with final Item 1604(c), which contained a proposed provision to this effect (that we are adopting as discussed in detail below).

> b.  *Overview of Final Item 1604 Dilution Disclosure (De-SPAC Transactions) and Changes from Proposal*

> 1.  Item 1604(a)

Final Item 1604(a)(3) requires, on the outside front cover page of the prospectus in plain English, a statement of the amount of the compensation received or to be received by the SPAC sponsor, its affiliates, and promoters in connection with the de-SPAC transaction or any related financing transaction; the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities in connection with the de-SPAC transaction or any related financing transaction; and whether this compensation and securities issuance may result in a material dilution of the equity interests of non-redeeming shareholders who hold the securities until the consummation of the de-SPAC transaction.  Final Item 1604(a)(3) also requires the provision of a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

---

[273] Depending on the facts and circumstances, both qualitative and quantitative information may be required in the disclosures made outside of the table.

Final Item 1604(a)(3) is different from the proposal only with respect to changes made regarding SPAC sponsors and securities issuances discussed above in Section II.B.

2.   Item 1604(b)

Final Item 1604(b)(4) requires that the prospectus summary must include in plain English, in a tabular format, the terms and amount of the compensation received or to be received by the SPAC sponsor, its affiliates, and promoters in connection with the de-SPAC transaction or any related financing transaction, the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities in connection with the de-SPAC transaction or any related financing transaction; and, outside of the table, the extent to which that compensation and securities issuance has resulted or may result in a material dilution of the equity interests of non-redeeming shareholders of the special purpose acquisition company.

In final Item 1604(b)(4), we revised to clarify that certain disclosure should appear outside of the table (rather than within it).  It also makes the item consistent with Item 1602(b)(6) in requiring disclosure of the extent of the material dilution not merely whether or not there is such material dilution.  Also, in the final rule, we have replaced the term "unaffiliated security holders" with "non-redeeming shareholders" to ensure consistency of usage throughout Item 1604.  In addition, this change eliminates any ambiguity that might have caused some registrants to believe they need to subtract affiliated shares from the denominator of the net tangible book value per share calculation, which the proposal did not intend.  We also made changes to final Item 1604(b)(4) as compared to the proposal with respect to SPAC sponsors, promoters, and securities issuances discussed above in Section II.B.

92

Final Item 1604(b)(5) requires the prospectus summary to include a brief description in plain English of the material terms of any material financing transactions that have occurred or will occur in connection with the consummation of the de-SPAC transaction, the anticipated use of proceeds from these financing transactions and the dilutive impact, if any, of these financing transactions on non-redeeming shareholders.  The sole change from the proposal is that, in final Item 1604(b)(5), we have revised the term "unaffiliated security holders" to "non-redeeming shareholders" for the same reasons as discussed above regarding Item 1604(b)(4).[274]

Final Item 1604(b)(6) requires the prospectus summary to include a brief description in plain English of the rights of security holders to redeem the outstanding securities of the special purpose acquisition company and the potential dilutive impact of redemptions on non-redeeming shareholders.  We made one change to final Item 1604(b)(6) compared to the proposal to clarify the disclosure required.  Final 1604(b)(6) contains the phrase "potential dilutive impact of redemptions on non-redeeming shareholders" instead of the proposed phrase "impact of redemptions on the value of the securities owned by non-redeeming shareholders."  We believe this clarification will eliminate ambiguity and the potential that registrants could misinterpret the item to require undertaking valuations under different scenarios of the securities owned by non-redeeming shareholders.

3.  Item 1604(c)

We received comments that indicated that we should provide a definition of net tangible book value or provide examples to enhance the comparability of the disclosures.[275]  In consideration of these comments, we have revised Item 1604(c) to more clearly set forth the

---

[274] In addition, in final Item 1603(b)(5) we added the word "material" before the words "financing transactions" for consistency with final Item 1604(a)(2).

[275] *See* letters from PwC, Ernst & Young, *supra* notes 249 and 251.

93

dilution disclosures and calculations it requires and to align this dilution calculation with the dilution calculation under Items 1602(a)(4) and 1602(c), although, as we discuss herein, there are technical differences between the adjustments under Items 1602(a)(4) and 1602(c) versus adjustments under Item 1604(c).

Final Item 1604(c) requires disclosure in a tabular format that includes intervals representing selected potential redemption levels that may occur across a reasonably likely range of outcomes of: the offering price disclosed pursuant to Item 1602(a)(4) in the initial registered offering by the SPAC; as of the most recent balance sheet date filed, the net tangible book value per share, as adjusted, as if the selected redemption levels have occurred and to give effect to, while excluding the de-SPAC transaction itself, material probable or consummated transactions, and other material effects on the SPAC's net tangible book value per share from the de-SPAC transaction; and the difference between such offering price and such net tangible book value per share, as adjusted.  Final Item 1604(c) also requires that the tabular disclosure must show: the nature and amounts of each source of dilution used to determine net tangible book value per share, as adjusted; the number of shares used to determine net tangible book value per share, as adjusted; and any adjustments to the number of shares used to determine the per share component of net tangible book value per share, as adjusted.

Final Item 1604(c) also requires, outside of the table, a description of each material potential source of future dilution that non-redeeming shareholders may experience by electing not to tender their shares in connection with the de-SPAC transaction, including sources not included in the table with respect to the determination of net tangible book value per share, as

94

adjusted.[276]  Final Rule 1604(c)(1) requires, with respect to each redemption level, a statement of the company valuation at or above which the potential dilution results in the amount of the non-redeeming shareholders' interest per share being at least the IPO price per share of common stock.  Final Item 1604(c)(2) requires the provision of a description of the model, methods, assumptions, estimates, and parameters necessary to understand the tabular disclosure.

Final Items 1604(c), 1604(c)(1), and 1604(c)(2) contain certain changes from the proposal.  We believe the changes in the final rules will be simpler for registrants to follow and comply with because they provide clear steps regarding how the dilution disclosure should be determined.  In addition, in clarifying how to calculate the required dilution, final Item 1604(c) also ensures that redeemable common stock is not treated as temporary equity for purpose of the calculation in a way that could undermine the meaningfulness of the dilution disclosure.  As part of these clarifications, we have deleted the proposed provision in Item 1604(c)(1) that would have required "sensitivity analysis disclosure in tabular format that expresses the amount of potential dilution under a range of reasonably likely redemption levels."  We were concerned the meaning of that proposed provision could be unclear to registrants, particularly its references to "sensitivity analysis."  We believe there was potential for some registrants to interpret the proposed provision merely to mean a range of redemption levels must be analyzed, while other registrants could interpret the provision to mean that a range of redemption levels must be analyzed and also that a sensitivity analysis must be conducted that reflects a range of assumptions for the range of redemption levels.

---

[276]   In final Item 1604(c) we moved the phrase "that non-redeeming shareholders may experience by electing not to tender their shares in connection with the de-SPAC transaction" from the end of the relevant sentence to instead follow the words "future dilution" for clarity.

We also have deleted the following language of proposed Item 1604(c)(1): "At each redemption level in the sensitivity analysis, quantify the dilutive impact on non-redeeming shareholders of each source of dilution, such as the amount of compensation paid or to be paid to the SPAC sponsor, the terms of outstanding warrants and convertible securities, and underwriting and other fees."  We were concerned that the references in that proposed provision to certain sources of potential dilution could confuse registrants about how to calculate dilution and could produce inconsistent interpretations across different registrants.

Final Item 1604(c) accomplishes the same goal as these deleted provisions in proposed Item 1604(c)(1) by requiring disclosure "in a tabular format that includes intervals representing selected potential redemption levels that may occur across a reasonably likely range of outcomes."  We believe the final rule will make it clear that the item does not prescribe the redemption levels for which dilution information must be provided (in contrast to Items 1602(a)(4) and 1602(c)).

Under Item 1604(c), registrants should not select redemption levels that are not possible. For example, registrants should not select levels that, combined with any other funding (such as PIPEs) in connection with the de-SPAC transaction, would result in the SPAC having cash that is lower than any minimum cash condition in the agreements related to the de-SPAC transaction. Registrants are not required to select exactly four levels for Item 1604(c) (which they are required to do in Items 1602(a)(4) and 1602(c)) but should ensure the redemption levels reasonably inform investors of a range of potential outcomes.[277]

---

[277] While there may be exceptions depending on specific facts and circumstances, the presentation of fewer than four levels of redemption is unlikely to constitute a sufficient range of outcomes to inform investors.  As discussed above, there is no requirement in Item 1604(c) to select four redemption levels as there is in Items 1602(a)(4) and 1602(c), but registrants who seek to provide less than four redemption levels pursuant to Item 1604(c) should ensure such presentation is appropriate and tailored to the unique circumstances of the relevant de-SPAC transaction warranting such a presentation.

Furthermore, we have clarified that the table in final Item 1604(c) should show the nature and amounts of each source of dilution and the number of shares used in the calculation in order to eliminate any ambiguity and the potential that registrants could misinterpret the item to mean that the table needs to show only the final dilution information and not the line items that went into its calculation.

In addition, with respect to the proposed requirement to describe material potential sources of future dilution, the final rule specifies that the description should be located outside of the table.  The final rule also states that each material potential source of future dilution outside of the table should include "sources not included in the table with respect to the determination of net tangible book value per share, as adjusted."  We are making this change to clarify that the disclosure outside of the table is not merely duplicative of the sources of dilution used for the calculation of the measure of dilution within the table.  Without these changes, the item could have been misinterpreted by registrants to require disclosure of the same sources of dilution used in the tabular calculation of dilution, only in a non-tabular format.  Depending on a SPAC's specific facts and circumstances, the non-tabular disclosure of "each material potential source of future dilution" under Item 1604(c) may need to discuss a broader set of items than "material probable or consummated transactions" that are included for purposes of calculating the tabular dilution measure.

Finally, to reflect the deletion discussed above of the proposed provision in Item 1604(c)(1) regarding "sensitivity analysis," we have inserted in final Item 1604(c)(2) the words "necessary to understand the tabular disclosure" instead of the proposed words "necessary to understand the sensitivity analysis disclosure."

ii. *Value of SPAC Dilution Information to Investors as a General Matter and under the Final Rules*

In adopting the final rules, we agree with the commenters that expressed the view that the dilution disclosures will provide helpful information to investors.  There are a number of potential sources of dilution in common SPAC structures, including: (a) shareholder redemptions, (b) SPAC sponsor compensation, (c) underwriting fees, (d) warrants, (e) convertible securities, and (f) PIPE financings.  The enhanced dilution disclosure required by the final rules will enable investors in a SPAC IPO and subsequent purchasers of SPAC shares to better understand the potential impact upon them of the various dilutive events that may occur over the lifespan of the SPAC.[278]

Dilution disclosure in Commission filings has evolved over time.[279]  Today, Commission dilution disclosure requirements remain important, including with respect to SPACs.  The Commission disagrees with the views expressed by some commenters that dilution disclosure would not be meaningful for investors' investment decision-making or for valuation purposes at the IPO stage or de-SPAC transaction stage.[280]  Investors may use dilution information differently depending on the type of registrant, such as whether the issuer is an operating

---

[278]   In this regard, we note that the initial purchasers in SPAC IPOs often resell or redeem their shares prior to the completion of the de-SPAC transaction.  *See, e.g.*, Benjamin Mullin and Amrith Ramkumar, *BuzzFeed Suffers Wave of SPAC Investor Withdrawals Before Going Public*, Wall St. J., Dec. 2, 2021.  *See also* Klausner, Ohlrogge & Ruan, *supra* note 18.

[279]   *See Guides for Preparation and Filing of Registration Statements*, Release No. 33-4666 (Feb. 7, 1964), 29 FR 2490, 2492 (Feb. 15, 1964); *Guides for the Preparation and Filing of Registration Statements*, Release No. 33-4936 (Dec. 9, 1968), 33 FR 18617, 18619; *Contents of Prospectuses and to Guides for Preparation and Filing of Registration Statements*, Release No. 33-5278 (Aug. 8, 1972), 37 FR 15985, 15986 (Aug. 9, 1972); *Proposed Revision of Regulation S-K and Guides for the Preparation and Filing of Registration Statements and Reports*, Release No. 33-6276 (Dec. 23, 1980), 46 FR 78, 82–83 (Jan. 2, 1981); *Adoption of an Integrated Disclosure System*, Release No. 33-6383 (Mar. 19, 1982), 47 FR 11380, 11390 (Mar. 16, 1982).

[280]   Letters from ABA, Ropes & Gray, Vinson & Elkins, White & Case.  *See supra* notes 243 and 244 and accompanying text.

company or a shell company, such as a SPAC.  For example, with an operating company some "value investors" may compare the offering price to net tangible book value.[281]  For a SPAC, however, this specific comparison may be less meaningful than with an operating company because SPACs typically have limited assets at the time of the IPO and the offering price is typically fixed at $10 per share.  In addition, with an operating company, some "value investors" may compare the debt of the issuer to the net tangible book value.  For a SPAC, however, this specific comparison may be less meaningful than with an operating company, because SPACs typically have limited debt at the time of the IPO and have limited assets.  Furthermore, with an operating company, some investors may seek to determine a value for the issuer taking into account return on net tangible assets or by using a value calculated by multiplying a market average price-to-net-tangible-book-value-per-share ratio times the issuer's net tangible book value per share.  For a SPAC, however, these specific methods may be less meaningful than with an operating company because of the limited assets of the SPAC and limited, if any, net income at the time of the IPO.

Dilution disclosure is important to SPAC investors for two reasons at both the IPO and de-SPAC transaction stages: (1) it provides investors a way of understanding the impact of the disparity in price paid by insiders and the price paid by investors for shares, and (2) it enables investor comparisons to other SPACs.  Additionally, at the de-SPAC transaction stage, dilution disclosure is important to SPAC investors for a third reason: it helps investors evaluate the

---

[281]  *See, e.g.*, Klausner, Ohlrogge & Halbhuber, *supra* note 156 at 19 (2022) ("Disclosure of net cash per share at the time of a SPAC's merger is necessary to allow shareholders to make an informed decision as to whether to redeem their shares (for roughly $10 per share) or to invest in a proposed merger….One would expect the amount of net cash invested in a target to be closely related to the value of post-merger shares that SPAC shareholders receive in exchange.  Our research bears this relationship out empirically, showing that the lower the net cash per share that a SPAC delivers, the lower the post-merger share price will be." (footnotes omitted)).  As discussed below in the section "Net Cash Per Share Disclosure Recommendations," we agree with comments that suggested net cash per share information is important to investors, but we believe the net tangible book value per share calculation, which we discuss in more detail below, would substantially convey such information.

economics of the de-SPAC transaction, which can inform their investing and voting decisions. We discuss these three reasons in more detail as follows.

First, the difference in per share net tangible book value, as adjusted, as compared to the $10 offering price, demonstrates to investors how the typically lower-priced SPAC sponsor promote stake affects these investors' claims on the tangible assets of the company.  Similarly, at the de-SPAC transaction stage, when certain other transactions may become probable, the net tangible book value per share, as adjusted, will convey to investors a better understanding of the dilution that these other transactions may produce.  Relatedly, net tangible book value per share, as adjusted, provides information to investors on dilution (in the sense of diminution in percentage ownership) resulting from the SPAC sponsor promote, because an increase in common shares in the denominator reduces net tangible book value per share, as adjusted.

Second, investors may focus on the relative dilution in a particular SPAC offering as compared to other SPAC offerings.  For example, some types of investors may be more focused on finding SPACs with the highest net tangible book values per share compared to the $10 offering price and less focused on other qualitative factors about the SPAC.

Third, as discussed above, SPAC shares can be redeemed at an agreed upon price.  Some commentators have emphasized that it is important for investors to have information at the de-SPAC transaction stage that enables investors to value these shares on a basis other than the stated agreement price.[282]  The dilution information will help investors to evaluate the economics

---

[282]  *See, e.g.*, Klausner, Ohlrogge & Halbhuber, *supra* note 156 at 19 (2022) ("Disclosure of net cash per share at the time of a SPAC's merger is necessary to allow shareholders to make an informed decision as to whether to redeem their shares (for roughly $10 per share) or to invest in a proposed merger….One would expect the amount of net cash invested in a target to be closely related to the value of post-merger shares that SPAC shareholders receive in exchange.  Our research bears this relationship out empirically, showing that the lower the net cash per share that a SPAC delivers, the lower the post-merger share price will be." (footnotes omitted)). As discussed below in the section "Net Cash Per Share Disclosure Recommendations," we agree with comments that suggested net cash per share information is important to investors, but we believe the net

of the business combination transaction, assisting their investment and voting decision-making. Investors' redemption decisions are also likely informed by the market price of the SPAC shares, just as owners of stock options base their exercise decisions, in part, on the value of the underlying stock.

While dilution information is important to SPAC investors for the reasons discussed above, we acknowledge that SPAC investors may use dilution information differently than investors in an operating company. For example, with an operating company some "value investors" may compare the offering price to net tangible book value.[283] For a SPAC, however, this specific comparison may be less meaningful than with an operating company because SPACs typically have limited assets at the time of the IPO and the offering price is typically fixed at $10 per share. In addition, with an operating company, some "value investors" may compare the debt of the issuer to the net tangible book value.[284] For a SPAC, however, this specific comparison may be less meaningful than with an operating company, because SPACs typically have limited debt at the time of the IPO and have limited assets. Furthermore, with an operating company, some investors may seek to determine a value for the issuer that takes into

---

tangible book value per share calculation, which we discuss in more detail below, would substantially convey such information.

[283] *See, e.g.*, Richard Phalon, Forbes Greatest Investment Stories 3 (2004) ("In his last years, Ben Graham," the co-author with David Dodd of *Security Analysis* (1934), "distilled six decades of experience into ten criteria that would help the intelligent investor pick value stocks…The Ten:…[4.] A stock price down to two-thirds of tangible book value per share.").

[284] *See, e.g.*, *ibid.* ("Ben Graham distilled six decades of experience into ten criteria…[6.] Total debt less than tangible book value.").[285] *See, e.g.*, Todd A. Finkle, Warren Buffett, Investor and Entrepreneur, (2023) ("To assess a company's potential as an investment vehicles," the investors discussed in the book "are looking for a set of specific ratios that indicate potential for yielding high returns…Most of [these investors'] investments are in companies that earn 'more than 20 percent' of what [one of the investors] calls the 'net tangible equity capital or net tangible assets' required to run their businesses…The formula for returns on a company's net tangible assets is as follows: Return on Net Tangible Assets = Net Income/Net Tangible Assets.").

account return on net tangible assets[285] or by using a value calculated by multiplying a market average price-to-net-tangible-book-value-per-share ratio times the issuer's net tangible book value per share.  For a SPAC, however, these specific methods may be less meaningful than with an operating company because of the limited assets of the SPAC and limited, if any, net income at the time of the IPO.[286]

We disagree with comments that suggested market practice of disclosing dilution information obviates the need for the proposed rules regarding dilution.[287]  The final rules will help standardize dilution disclosures across registrants and provide a minimum transparent floor for disclosure, even if market practices change.  To the extent potential future registrants may otherwise have provided these disclosures based on market convention or other reasons, such registrants are not likely to incur additional costs in preparing this disclosure.

Some commenters suggested current dilution disclosure under Item 506 produces—and the proposed dilution disclosure would produce—results that are flawed or are calculated using varying methods by registrants.[288]  We acknowledge the concerns expressed by these commenters that using a method of calculating Item 506's measure of net tangible book value

---

[285]  *See, e.g.*, Todd A. Finkle, Warren Buffett, Investor and Entrepreneur, (2023) ("To assess a company's potential as an investment vehicles," the investors discussed in the book "are looking for a set of specific ratios that indicate potential for yielding high returns…Most of [these investors'] investments are in companies that earn 'more than 20 percent' of what [one of the investors] calls the 'net tangible equity capital or net tangible assets' required to run their businesses…The formula for returns on a company's net tangible assets is as follows: Return on Net Tangible Assets = Net Income/Net Tangible Assets.").

[286]  *See, e.g.*, Mario Massari, Gianfranco Gianfrate, & Laura Zanetti, The Valuation of Financial Companies: Tools and Techniques, Section 5.3.1 Market Multiples 126–127 (2014), David Frykman, Jakob Tolleryd, The Financial Times Guide to Corporate Valuation 58–59 (2012) (book-value based multiples work "best with a company with a lot of tangible assets like factories, hardware commodities, mines, etc. and that derives its revenue and cash flow from those assets.  Examples of such companies today are banks, real estate and investment companies….When calculating the P/BV ratio for a company in distress, usually intangible assets are removed from the book value since they most probably have no resale value.  That ratio is sometimes referred to as price/tangible book value….").

[287]  Letter from Loeb & Loeb.  *See supra* note 245 and accompanying text.

[288]  Letters from Ernst & Young, Vinson & Elkins, White & Case.  *See supra* notes 246, 247, 248, 249, and 250 and accompanying text.

that substantively excludes the redeemable common stock classified as temporary equity may result in dilution disclosure that is less meaningful to an investor.  For example, in a SPAC IPO, this calculation could produce negative net tangible book value per share despite the proceeds raised in the offering.

> ### iii. Discussion and Examples Regarding the Calculation of Net Tangible Book Value Per Share, As Adjusted, in SPAC IPOs (Items 1602(a)(4) and (c)) and in De-SPAC Transactions (Item 1604(c))

> #### a. Dilution Disclosure under Items 1602(a)(4) and (c) and 1604(c) Generally

After considering the comments, we have made changes (as described above) in the final rules to clarify the calculation of net tangible book value per share, as adjusted, as the measure of dilution in Items 1602(a)(4), 1602(c), and 1604(c).  Without these revisions, there would be a risk that some disclosure, even under the new rules, could present results that are not meaningful to investors, such as negative net tangible book value per share in some transactions.  In addition, we believe the changes in the final rules will be simpler for registrants to follow and comply with because they provide clear steps regarding how to determine dilution.

> #### b. SPAC IPO Dilution Disclosure: Comparison of Items 1602(a)(4) and 1602(c)

Final Item 1602(a)(4) and Item 1602(c) are similar in that they require the disclosure of net tangible book value per share, as adjusted, shown in a tabular format.  These items, however, have four key differences.  First, Item 1602(a)(4) tabular disclosure must be provided on the prospectus cover, while Item 1602(c) disclosure must be provided in the prospectus body.  Second, unlike Item 1602(c), registrants providing the Item 1602(a)(4) tabular disclosure do not need to show individual line-items for each source of dilution used to determine net tangible book value per share, as adjusted, in the table; for Item 1602(a)(4), they may simply show net

tangible book value per share, as adjusted, in the table for the required quartiles.  Third, Item

1602(c) also contains the following requirement that Item 1602(a)(4) does not contain—to

describe, outside of the table, each material potential source of future dilution following the

registered offering by the special purpose acquisition company, including sources not included in

the table with respect to the determination of net tangible book value per share, as adjusted.

Fourth, unlike Item 1602(a)(4), Item 1602(c) requires the provision of a description of the model,

methods, assumptions, estimates, and parameters necessary to understand the tabular disclosure.

With respect to the requirement in final Item 1602(c) to describe each material potential

source of future dilution (including those not shown in the table), these material potential sources

of future dilution under final Item 1602(c) are to be disclosed outside of the table.  These sources

may not be the same as transactions that must be shown in the dilution table required by Item

1602(c).  This non-tabular disclosure of "each material potential source of future dilution" in

Item 1602(c) potentially may need to discuss a broader set of items than "material probable or

consummated transactions," although this would depend on a SPAC's specific facts and

circumstances.

#### c.  De-SPAC Dilution Disclosure under Item 1604(c), Including Examples of Adjustments

Dilution disclosure is also required in final Item 1604(c) in connection with de-SPAC

transactions.  An objective of the dilution disclosure required by Item 1604(c) is to depict the

amount of net assets that the SPAC will contribute to the post-combination entity, as also noted

by some commenters.[289]  In order to accomplish this objective of depicting the amount of net

---

[289]  *See accord* Klausner, Ohlrogge &, and Halbhuber, *supra* note 156 at 21, n.10 ("A post-merger calculation, which we explain below is an incorrect way to measure dilution, would include all shares outstanding of the combined post-merger company, including shares issued to shareholders of the target.").  In addition, inclusion

assets that the SPAC will contribute to the post-combination entity, final Item 1604(c) requires three adjustments of the SPAC's net tangible book value per share as of the most recent balance sheet filed.  The first adjustment is for the redemption of the SPAC's shares.  This adjustment is important because both the amount of net tangible assets in the numerator (for example, cash or securities held through the trust account) and the number of shares in the denominator will vary, depending on the redemption level.  The second adjustment is to give effect to material probable or consummated transactions other than consummation of the de-SPAC transaction itself.  This adjustment is also important because these transactions may affect the amount of net tangible assets in the numerator and the number of shares in the denominator.  Examples of transactions that could be material probable or consummated transactions include funding backstops, forward purchases, or PIPE financings.  We generally expect the term "probable or consummated transactions" to be applied in the net tangible book value per share, as adjusted, calculation, similar to its application in Article 11 of Regulation S-X,[290] which requires pro forma financial information that incorporates the effects of "probable or consummated transactions."[291]  The third adjustment is for inclusion of other material effects of the de-SPAC transaction on the

---

of these shares in the denominator is inconsistent with the numerator calculation as it excludes the de-SPAC transaction itself.

[290]   17 CFR 210.11.  While we expect "probable or consummated transactions" to generally be applied similarly between the net tangible book value per share, as adjusted, calculation and Article 11 of Regulation S-X, we observe that the contexts of each disclosure are different and do not foreclose the possibility that different treatments of a transaction may arise depending on the particular circumstances.

[290]   17 CFR 210.11.  While we expect "probable or consummated transactions" to generally be applied similarly between the net tangible book value per share, as adjusted, calculation and Article 11 of Regulation S-X, we observe that the contexts of each disclosure are different and do not foreclose the possibility that different treatments of a transaction may arise depending on the particular circumstances.

[291]   *See, e.g.*, 17 CFR 210.11-01(a)(8) ("Consummation of other transactions has occurred or is probable for which disclosure of pro forma financial information would be material to investors.")  Notwithstanding this similarity with Article 11 of Regulation S-X, a company should not title or describe "net tangible book value per share, as adjusted" as a "pro forma" measure, which could mislead investors since target company assets are not included in the calculation.

SPAC's net tangible book value per share but not the de-SPAC transaction itself.  A consummation of the de-SPAC transaction could have material effects on the amount of net tangible book value that the SPAC contributes to the post-combination entity that do not stem from the types of transactions identified in the second adjustment discussed above.  Two examples of such other effects would be the issuance of shares contingent on consummation of the de-SPAC transaction as compensation to a SPAC sponsor and the expected incurrence of transaction expenses to consummate the de-SPAC transaction.

Further, to ensure "net tangible book value per share, as adjusted" depicts the amount of net assets that the SPAC will contribute to the post-combination entity, calculation of the measure excludes the effect of the consummation of the de-SPAC transaction itself.  Thus, target company assets should not be included in net tangible book value per share, as adjusted and, in de-SPAC transactions where the consideration paid for the target company is securities of the SPAC, the SPAC should not include those securities paid as consideration in the denominator of the net tangible book value per share, as adjusted, calculation.[292]

### iv.  Discussion of Comments

#### a.  Warrants

We are not adopting one commenter's recommendation that dilution from warrants should be conveyed using the treasury share method.[293]  A treasury share method approach

---

[292]  *See accord* Klausner, Ohlrogge & Halbhuber, *supra* note 156 at 21, n.10 ("A post-merger calculation, which we explain below is an incorrect way to measure dilution, would include all shares outstanding of the combined post-merger company, including shares issued to shareholders of the target.").  In addition, inclusion of these shares in the denominator is inconsistent with the numerator calculation as it excludes the de-SPAC transaction itself.  Also, as a result of our approach of excluding target company assets, we have not adopted a commenter suggestion that would have included the value of the target company.  *See* letter from Vinson & Elkins, *supra* note 268 and accompanying text (expressing the view that the most meaningful information would be a per share value of the target company plus net cash).

[293]  Letter from Vinson & Elkins.  *See supra* note 269 and accompanying text.

106

would involve calculating the difference between the strike price of a warrant and the trading price of the shares of the post-de-SPAC transaction combined company.[294]  At the time of the dilution disclosure, those trading prices are not known.  The commenter suggested using "various hypothetical share increments above $10 per share," which is the typical SPAC IPO offering price.[295]  We do not believe that conveying the dilutive effect of warrants using that approach would be appropriate in connection with the dilution disclosure requirements we are adopting, because the hypothetical prices used in the calculation may not be realistic.  Further, we believe there is sufficient disclosure about the terms of the warrants[296] that would enable an investor to conduct such analysis on the strike price of a warrant using assumptions of trading prices of shares.

The same commenter recommended that "sensitivity analyses should only be required for sources of dilution, such as warrants, where the dilutive impact varies based on changing equity values or other variables."[297]  As discussed above, final Item 1604(c) does not include the proposed provisions related to sensitivity analysis that concerned the commenter.  For Items 1602(a)(4), 1602(c), and 1604(c), with respect to classification of warrants on an unadjusted basis, as either a liability or equity, registrants should follow applicable GAAP.[298]  This classification may affect the calculation of net tangible book value per share, as adjusted, because a liability-classified warrant would increase liabilities thereby reducing net tangible book value, while an equity-classified warrant would not do so, unless the effect of its exercise is

---

[294]   *See* Kieso, Weygandt, & Warfield (discussing the treasury stock method), *supra* note 269.

[295]   *Id.*

[296]   *See, e.g.*, final Item 1604(c), Item 1602(b)(3), Item 1603(a)(6), Item 1604(b)(5), and Item1604(c).

[297]   Letter from Vinson & Elkins.

[298]   *See* Financial Accounting Standards Board Accounting Standards Codification 815-40 and International Financial Reporting Standard IAS 32, *Financial Instruments: Presentation*.

included in the calculation.  Whether to adjust net tangible book value per share to give effect to the exercise of a warrant is a judgment based on facts and circumstances, including whether the effect of the exercise would be consistent with the objective of the disclosure—to depict the amount of net assets the SPAC will contribute to the post-combination entity.  When the exercise of the warrant is not contingent on the consummation of the de-SPAC transaction, then adjustment that includes the effect of the warrant's exercise in net tangible book value per share, as adjusted, generally would not be appropriate because those warrants will remain outstanding after the de-SPAC transaction.

As discussed above, the non-tabular disclosure of "each material potential source of future dilution" under Item 1604(c) potentially may need to discuss a broader set of items than "material probable or consummated transactions," although this would depend on a SPAC's specific facts and circumstances.  Thus, whether or not a registrant has made an adjustment for warrants in net tangible book value per share, as adjusted, the registrant may need to describe how the warrants are a material potential source of future dilution.

### b. Redemptions

We are not adopting a commenter's suggestion to include a redemption scenario that would reflect "100% of the public shares (regardless of any provisions in the SPAC's governing documents that might theoretically limit redemptions)."[299]  While we acknowledge that the suggested approach would permit an identical comparison across SPACs at the 100% redemption level, as the commenter noted, we believe that suggested approach would be less meaningful to investors than the maximum redemption level approach we are adopting in the final rules, because that suggested approach would not take into account the governing documents and so

---

[299]  Letter from Vinson & Elkins.  *See supra* note 230 and accompanying text.

would present a scenario that may not in fact occur in practice. We agree that comparability is an important goal as there may be certain investors who focus on the relative dilution in a particular SPAC offering as compared to other SPAC offerings. However, that comparability across SPACs should be balanced with the need to disclose information tailored to the registrant. The requirement in Items 1602(a)(4) and 1602(c) of the final rules to provide a maximum redemption level (instead of redemption based on 100% of securities sold) and other redemption levels as a percentage of this maximum will provide more issuer-specific information than absolute 25%, 50%, 75%, and 100% levels.[300] While the rules we are adopting will not necessarily provide comparability at identical percentages across SPACs, we believe investors nevertheless may make valuable comparisons across SPACs when looking at the dilution information supplied at each of the prescribed intervals in the rule.[301]

The same commenter expressed the view that current dilution disclosure under Item 506 of Regulation S-K is unhelpful for IPO-stage investors, as the output is driven by the maximum redemption scenario which can differ based on (i) different provisions of the SPAC's constituent documents and (ii) the interpretation of those constituent documents.[302] We believe the dilution information requirements related to IPOs in Item 1602 that we are adopting will provide more

---

[300]  Item 1604(c) allows more discretion over issuer-specific dilution information by requiring a range of reasonably likely redemption levels rather than the fixed percentages established by the table in Item 1602(a)(4).

[301]  If the offering sizes across the SPACs being compared are similar and the restrictions on maximum redemptions in the governing documents of the SPACs being compared are similar, the percentages presented in the table may be close to identical across the relevant set of SPACs examined. Also, where the size of the offering is large and the restriction on redemption is small by comparison, the various 25, 50, and 75 percentages of maximum redemption may closely approximate 25, 50, and 75 absolute percentages of securities sold in the offering. For example, if the offering raises $1 billion and the redemption restriction is $5 million, then the maximum redemption level would be 99.5% ($995 million divided by $1 billion) and 75% of the maximum redemption level would be 74.625% (.75 times .995). *See also* Table 1 (Number of SPAC IPOs in the U.S. Securities Market from 2012-2023) in Section I (providing data, including total capital raised per year and the number of offerings per year, from which an average offering size per year may be calculated).

[302]  Letter from Vinson & Elkins. *See supra* note 230 and accompanying text.

109

helpful information to investors than current market practice under Item 506 with respect to SPACs, where, in the experience of the Commission staff, some registrants have focused solely on a maximum redemption scenario.  Item 1602 as adopted will provide a greater range of redemption scenario dilution information to investors.  Further, the Commission does not believe that different interpretations of a SPAC's governing documents will make a SPAC unable to provide the required dilution information at the maximum redemption level for two reasons.  First, a SPAC will know how to interpret its own governance documents.  In addition, in the experience of the Commission staff, many SPACs use similar, well-established governing document provisions that set their maximum redemption level at a level to avoid the SPAC being an issuer of penny stock.[303]  We do not anticipate these standardized provisions will involve difficult interpretive issues.

One commenter said that "a SPAC may actually become subject to a maximum redemption scenario that is lower than the quartile intervals required to be presented by proposed Item 1602(a)(4)."[304]  As discussed above in the description of the dilution rules we proposed, the redemption levels required by Item 1602(a)(4) are "25% of maximum redemption," "50% of maximum redemption," and "75% of maximum redemption" and thus are relative to the maximum redemption level and are not an absolute percentage.  To clarify for investors the percentage used, registrants may add information to the table headers.  For example, where the maximum redemption is 97.5%, a registrant could add "25% of Maximum Redemption (24.375%)."  For greater clarity, in final Item 1602(a)(4), we have replaced the proposed terms "at quartile intervals up to the maximum redemption threshold" with the terms "at quartile

---

[303]   *See* Rule 419 (Offerings by blank check companies); Rule 3a51-1 (definition of "penny stock").

[304]   Letter from White & Case.

intervals based on percentages of the maximum redemption threshold," because we believe registrants could mistakenly interpret the proposed terms to require quartile intervals based on the total number of shares issued in the offering for the three redemption levels in the table other than the maximum redemption level.

One commenter recommended the Commission require dilution disclosure at a 90% redemption level.[305] We do not believe it is necessary to make such changes to the final rules. We believe the four redemption thresholds proposed will give investors a reasonable picture of the potential range of dilution outcomes pursuant to Items 1602(a)(4) and 1602(c). For Item 1604(c) in connection with de-SPAC transactions, we believe providing a prescriptive level of 90% would be inconsistent with the requirement to provide SPAC-specific reasonably likely redemption levels.

### c. Assumptions

Commenters raised concerns that dilution disclosure would be characterized by uncertainty, be based on hypothetical assumptions, or depend on unknown variables.[306] As discussed above, we have made changes to final Items 1602(a)(4), 1602(c), and 1604(c) to clarify how registrants should calculate dilution. Where registrants are making adjustments consistent with "net tangible book value per share, as adjusted" or are making assumptions in connection with other dilution disclosures required under the final rules, we believe registrants should be able to provide the required dilution information based on reasonable assumptions. We do not believe that dilution disclosure would mislead investors, as suggested by one commenter, or that such assumptions would need to be presented with lengthy and detailed

---

[305] Letter from CII. *See supra* note 236 and accompanying text.

[306] Letters from Freshfields, Vinson & Elkins, White & Case. *See supra* notes 237, 238, and 240 and accompanying text.

111

caveats.[307]  On the contrary, we believe investors will understand that assumptions being made in connection with required dilution disclosure do not mean the dilution has occurred or is certain to occur.  The final rules require a description of the assumptions necessary to understand the tabular disclosure,[308] and, in providing that disclosure, registrants may highlight that these are assumptions in order to make that point clearer for investors.  While we do not believe that the assumptions necessarily need lengthy and detailed caveats,[309] if there are facts and circumstances in which a registrant believes a lengthy or detailed discussion is needed, we believe that would be appropriate to allow investors to understand the accompanying tabular disclosure.

### d.  Net Cash Per Share Disclosure

We are not adding an explicit net cash per share disclosure requirement as several commenters recommended that we require.[310]  One group of commenters said net cash per share disclosure should be provided on the cover page of the registration statement.[311]  These commenters expressed the view that the dilution concept included in the proposal reflects a concept of dilution that is focused on "ownership dilution," not the kind of dilution (and dissipation of cash) that reduces the net cash underlying a SPAC share.[312]

---

[307]  Letter from White & Case.  *See supra* note 238 and accompanying text.

[308]  See final Items 1602(c) and 1604(c)(2).

[309]  In this respect, as noted above, we disagree with the comment that "lengthy and detailed caveats" would be "need[ed]."  *See* letter from White & Case, *supra* note 238 and accompanying text.

[310]  Letters from CII; Michael Klausner, Michael Ohlrogge, and Harald Halbhuber; NASAA; Vinson & Elkins.  *See supra* notes 254 through 264 and accompanying text.

[311]  Letter from Michael Klausner, Michael Ohlrogge, and Harald Halbhuber.  *See supra* note 261 and accompanying text.

[312]  Letter from Michael Klausner, Michael Ohlrogge, and Harald Halbhuber.  *See supra* note 262 and accompanying text.  These commenters also provided a formula for the calculation of net cash per share: (a) Total cash (consisting of the sum of cash from SPAC public shareholders plus cash from PIPEs or forward purchase agreements minus cash expenses minus the value of warrants minus the value of other equity derivatives), divided by (b) Total shares (consisting of public shares plus founder shares plus PIPE or forward purchase agreement shares plus other shares plus shares issuable under rights).  *See id.*

We do not agree with that group of commenters that the proposal was limited to dilution focused solely on reduction in the percentage ownership of a shareholder out of total shares deemed to be issued and outstanding. We agree this form of dilution described by commenters is an element of the denominator in the net tangible book value per share, as adjusted, calculation, but the numerator of the net tangible book value per share, as adjusted, calculation will capture and convey other information—such as existing cash (prior to the relevant transaction, e.g., IPO or de-SPAC transaction), cash raised in securities issuances, and cash paid out to holders of redeemable securities—of the same type that these commenters focus on in recommending disclosure of net cash per share.[313]

Because we believe substantially all the information that would be conveyed to an investor by a net cash per share measure will be conveyed by the required "net tangible book value per share, as adjusted," we are not adding an explicit net cash per share disclosure requirement.[314] But shareholders who seek to calculate "net cash per share" at different levels of

---

[313]   When calculating return on net tangible book value per share, some investors may exclude non-operating assets, such as cash among others, in order limit the measure to those returns on net tangible book value per share that are sustainable. *See, e.g.*, Gary R. Trugman, Understanding Business Valuation (2018) (recommending an analyst calculating return on net tangible assets "remove any items on the balance sheet that may be attributable to non-operating assets or liabilities."). However, for the avoidance of doubt on the part of registrants, this is not appropriate for a registrant with respect to the calculation on net tangible book value per share, as adjusted, in connection with dilution disclosure, which should include non-operating tangible assets such as cash among others.

[314]   The calculations of net tangible book value per share, as adjusted, in final Items 1602(a)(4), 1602(c), and 1604(c), take into account similar elements as the cash component of net cash per share, such as the inclusion of cash held by the SPAC and securities purchased by the SPAC, as well as the removal of expenses and warrant liabilities. Net cash per share has aspects that make it less useful for investors than net tangible book value per share, as adjusted. First, with respect to the net cash per share calculation, "net cash" in the numerator is reduced by the value of the equity-classified awards, which would be inconsistent with GAAP. We do not believe this is appropriate and have not taken this approach with respect to net tangible book value per share, as adjusted (as discussed above). Second, the net cash per share calculation includes all shares issuable by rights, regardless of any conditions on such issuance, whereas net tangible book value per share, as adjusted, would only make an adjustment to include such shares where a criterion for making an adjustment is met (as discussed above).

redemption should have the information to perform this calculation based on the disclosure provided in connection with net tangible book value per share, as adjusted.

### e. Cover Page

Regarding comments that recommended that de-SPAC transaction dilution information be presented on the prospectus cover page,[315] the Commission believes it is sufficient to require the tabular disclosure in the prospectus body in Item 1604(c).[316] At the de-SPAC stage, there will be more registrant-specific information included in the dilution disclosure, as the registrant will have more information about potential causes of dilution (such as expected redemption levels and financings that will accompany the de-SPAC transaction). Due to this, these disclosures may not be as easily presentable in a straightforward way on the cover page. Item 1604(a)(3), however, will require the registrant to state on the prospectus cover page whether SPAC sponsor compensation and ownership may result in a material dilution of the equity interests of non-redeeming shareholders who hold the securities until the consummation of the de-SPAC transaction and to provide a cross-reference highlighted by prominent type to the location of related disclosures in the prospectus.

### f. Interest Per Share Disclosure

We disagree in part with the commenter who suggested that the final sentence of proposed Item 1604(c)(1) required a determination of the enterprise valuation that will result in a shareholder's "interest per share" calculated by reference to a pro forma closing date balance

---

[315] Letter from Michael Klausner, Michael Ohlrogge, and Harald Halbhuber.

[316] As discussed above, in combined proxy statements and registration statements in connection with de-SPAC transactions, the cover page of the prospectus may be further back in the document.

114

sheet being at least equal to the $10 price per share paid in the IPO.[317]  The use of the term "valuation" in Item 1604(c)(1) would not require, as suggested by the commenter, an "enterprise valuation" (which typically values the sum of the equity and debt of a company minus cash).[318] We agree, however, with the general point suggested by the commenter that a registrant's preparation of Item 1604(c)(1) disclosure could be assisted by reference to, among other potential sources, a pro forma balance sheet.  But we believe this would be the case only where such pro forma balance sheet contains the number of total shares (calculated consistent with Item 1604(c)), because the amount of shares is a critical component of the calculation required to provide disclosure under this item.  The pro forma balance sheet may not be capable of serving as the sole source of this information, because it may show total shares only for certain redemption levels, such as zero redemptions and maximum redemptions; hence, it may not provide the total share number "with respect to each redemption level" as required by Item 1604(c)(1).

To further clarify, we provide the following basic example of disclosure under Item 1604(c)(1).  A hypothetical SPAC issued shares in an IPO at $10 per share.  After giving effect to the IPO, the issued and outstanding shares of the SPAC are 20,000,000, for a total market capitalization of $200,000,000.  In connection with the de-SPAC transaction, the SPAC issues 65,000,000 shares to the target company's shareholders and issues 15,000,000 shares in a private placement for a total of 100,000,000 outstanding shares.  Two (out of several) redemption levels

---

[317]  Letter from Loeb & Loeb, *supra* notes 265, 266, and 267 and accompanying text.  *See also* proposed Item 1604(c)(1) ("For each redemption level in the sensitivity analysis, state the company valuation at or above which the potential dilution results in the amount of the non-redeeming shareholders' interest per share being at least the initial public offering price per share of common stock.").

[318]  *See, e.g.*, Jeffrey C. Hooke, *Security Analysis on Wall Street: A Comprehensive Guide to Today's Valuation Methods* 234 (1998) (showing key valuation data of publicly traded stocks using enterprise value defined as (1) market value of equity, plus (2) outstanding debt, minus (3) cash on hand).

the SPAC has chosen to use for the disclosure required by Item 1604(c) are zero redemptions and 5,000,000 shares redeemed (5% of the total shares).  Where redemptions are zero, for purposes of Item 1604(c)(1), the SPAC would have 100,000,000 total shares after giving effect to the de-SPAC transaction and related financing.  Where redemptions are zero, the company valuation at or above which the non-redeeming shareholders' interest per share would be at least the IPO price per share ($10 in this example) would be calculated as: $10 (per share IPO price) times 100,000,000 shares, or $1,000,000,000.  Where 5,000,000 shares are redeemed (5% of the total shares), the SPAC would have 95,000,000 total shares after giving effect to the de-SPAC transaction and related financing.  At this redemption level, the company valuation at or above which the non-redeeming shareholders' interest per share would be at least the IPO price per share ($10 in this example) would be calculated as: $10 (per share IPO price) times 95,000,000 shares, or $950,000,000.  For the remaining redemption levels, the registrant would provide the required disclosure in a similar manner.

With respect to the commenter's concern that some investors may misunderstand disclosure under the item and view it as a guarantee that the stock will not trade down in the aftermarket,[319] we do not believe investors are likely to misunderstand disclosure under Item 1604(c)(1) in that manner.  As discussed above, we believe it will be clear to investors that the various valuation figures provided at each of the redemption levels are not guarantees about movements in or levels of future market trading prices of the post-de-SPAC transaction combined company.  In addition, to the extent a registrant has a concern about investor confusion regarding the disclosure required under Item 1604(c)(1), such a registrant could provide additional disclosure discussing this issue, such as, for example, explicitly stating that the

---

[319]   Letter from Loeb & Loeb.  *See supra* note 267 and accompanying text.

required disclosure is not a guarantee that the trading price of the combined company will not be below the IPO price nor is the disclosure a guarantee the company valuation will attain one of the stated levels of valuation.

Another commenter recommended that the Commission consider requiring that intermediaries provide information about "the sponsor, actual and potential conflicts of interest, [and] how much a non-redeeming SPAC investor's interest will be diluted" in a separate "Key Risks and Conflicts form" that is detached from the prospectus, so that the disclosure receives more investor attention and focus.[320]  We believe that the disclosure we are requiring in this release will receive an appropriate level of investor attention and focus and that no further amendments are needed in this regard.

### g.  *Lock-Up and Earnout Provisions*

One commenter said that "any lock-up periods or earnout provisions for sponsors or underwriters would be of significant interest to investors and should be required if part of the SPAC offering."[321]  We are not making any changes in response to this comment because the final rules already will require such disclosure.  Where there are earnout provisions for SPAC sponsors, the registrant would need to disclose these pursuant to Items 1602 and 1604 regarding compensation of SPAC sponsors and ownership of SPAC securities by SPAC sponsors.  Also, where there are lock-ups for SPAC sponsors, the registrant would need to disclose these pursuant to Item 1603(a)(9) regarding the material terms of any agreement, arrangement, or understanding regarding restrictions on whether and when the SPAC sponsor and its affiliates may sell

---

[320]  Letter from CFA Institute.

[321]  Letter from NASAA.

117

securities of the SPAC.  In connection with underwriters, plan of distribution information is required by Forms S-1 and F-1.[322]

### E.  Prospectus Cover Page and Prospectus Summary Disclosure

#### 1.  Proposed Rules

##### i.  Proposed Prospectus Cover Page Disclosure

For registered offerings (including IPOs) by SPACs other than de-SPAC transactions, the Commission proposed Item 1602(a) to require information on the prospectus outside front cover page in plain English about, among other things: (1) the time frame for the SPAC to consummate a de-SPAC transaction, (2) redemptions, (3) SPAC sponsor compensation, (4) dilution (including simplified tabular disclosure), and (5) conflicts of interest.

For de-SPAC transactions, the Commission proposed Item 1604(a) to require that SPACs include information on the prospectus outside front cover page in plain English about, among other things: (1) the fairness of the de-SPAC transaction, (2) material financing transactions, (3) SPAC sponsor compensation and dilution, and (4) conflicts of interest.

##### ii.  Proposed Prospectus Summary Disclosure

For registered offerings (including IPOs) by SPACs other than de-SPAC transactions, the Commission proposed Item 1602(b) to require in the prospectus summary a brief description in plain English about, among other things: (1) how the SPAC will identify and evaluate potential business combination candidates and whether it will solicit shareholder approval for the de-SPAC transaction, (2) the material terms of the trust or escrow account and the amount or percentage of the gross offering proceeds that the special purpose acquisition company will place

---

[322]   See Item 8 of Form S-1 (incorporating Item 508 of Regulation S-K (Plan of Distribution)) and Item 4 of Form F-1 (requiring the furnishing of information pursuant to Part 1, Item 9.B (Plan of Distribution) of Form 20-F).

in the trust or escrow account, (3) the material terms of the securities being offered, including redemption rights, and whether the securities are the same class as those held by the SPAC sponsor and its affiliates, (4) the period of time in which the SPAC intends to consummate a de-SPAC transaction, (5) any plans to seek additional financings and how the terms of additional financings may impact unaffiliated security holders, (6) in a tabular format, compensation of the SPAC sponsor, its affiliates, and promoters, and the extent to which this compensation may result in a material dilution of the purchasers' equity interests, and (7) any material actual or potential conflicts of interest between the SPAC sponsor or its affiliates or promoters and purchasers in the offering, including those that may arise in determining whether to pursue a de-SPAC transaction.

For de-SPAC transactions, the Commission proposed Item 1604(b) to require in the prospectus summary a brief description in plain English about, among other things: (1) the background and material terms of the de-SPAC transaction, (2) whether the SPAC reasonably believes that the de-SPAC transaction is fair or unfair to unaffiliated security holders, the bases for such belief, and whether the SPAC or the SPAC sponsor has received any report, opinion, or appraisal from an outside party concerning the fairness of the de-SPAC transaction, (3) any material actual or potential conflicts of interest between the SPAC sponsor or its affiliates or promoters and unaffiliated security holders in connection with the de-SPAC transaction, (4) in a tabular format, the terms and amount of the compensation received or to be received by the SPAC sponsor and its affiliates in connection with the de-SPAC transaction or any related financing transaction, and whether that compensation has resulted or may result in a material dilution of the equity interests of unaffiliated security holders of the special purpose acquisition company, (5) the material terms of any financing transactions that have occurred or will occur in

119

connection with the consummation of the de-SPAC transaction, the anticipated use of proceeds from these financing transactions and the dilutive impact, if any, of these financing transactions on unaffiliated security holders, and (6) the rights of security holders to redeem the outstanding securities of the SPAC and the potential impact of redemptions on the value of the securities owned by non-redeeming shareholders.

### 2. Comments

Several commenters generally supported the proposed prospectus cover page and prospectus summary disclosure requirements.[323]  One of these commenters expressed the view that these requirements would assist shareholders in understanding: (a) the compensation structures for SPAC sponsors, (b) conflicts in the relationship between SPAC sponsor, underwriter, and shareholder, (c) potential sources of dilution, and (d) whether or not any fairness opinions were obtained from third parties in connection with the de-SPAC transaction.[324]  The commenter suggested this understanding would better equip investors to evaluate the wisdom of placing their money at risk in a SPAC, would closely align the information provided in SPAC IPOs with the information provided to investors in traditional IPOs, and would help to narrow the information asymmetries in the SPAC IPO model.

Several commenters suggested the proposed prospectus cover page requirements would produce cover page disclosure that will be dense and longer than one page.[325]

---

[323]  Letters from ABA (expressing support for proposed Items 1602 and 1604 but also expressing concern regarding the length and density of prospectus cover page and determining fairness in de-SPAC transactions), Better Markets, CFA Institute.

[324]  Letter from Better Markets.

[325]  *See, e.g.*, letters from ABA, Loeb & Loeb, Ropes & Gray, Vinson & Elkins.  *See also* Item 501 of Regulation S-K (one-page limit for prospectus cover page).

One commenter said "requiring disclosure to be included at least three times in the document (e.g., on the cover page, in the summary, and in the body of the document where the same information often appears multiple times) seems excessive and potentially distracting to investors."[326]  This commenter also expressed the view that the Commission should not require disclosure of "'any plans to seek additional financing and how such additional financing might impact shareholders' in IPO registration statements."[327]  The commenter said that, at the time of the IPO, this disclosure would be "purely hypothetical," and would lead to "boilerplate" disclosures that would "distract" investors from other more useful and material information.[328]  The commenter, however, said that, "if the SPAC already has commitments for additional financing at the time of the IPO (e.g., a forward purchase agreement or a backstop commitment), the material terms of such financings and potential impact on shareholders or on the de-SPAC transaction should be disclosed."[329]

*3.  Final Rules*

After considering the comments received, we are adopting Items 1602(a), 1602(b), 1604(a), and 1604(b) as proposed with certain modifications discussed below.[330]

We agree with the commenter who expressed the view that investors will benefit from these provisions, including by better understanding factors including compensation, conflicts of

---

[326]  Letter from Vinson & Elkins.

[327]  *Id.*

[328]  *Id.*

[329]  *Id.*

[330]  In certain rules, a cover page requirement may be similar to but not identical with a prospectus summary requirement. We note that the cover page disclosure for Item 1602(a)(3) (exclusive of securities issuance disclosure) is not required to contain the same level of detail as required in the tabular disclosure in the prospectus summary under Item 1603(b)(6), which should contain line items for each compensation item. Disclosure under Item 1603(a)(6) should provide a similar level of detail as under Item 1602(b)(6), except in non-tabular format.

interest, and dilution.[331]  Under the final rules, the key disclosures concerning SPAC offerings and de-SPAC transactions will be highlighted on the cover page and in the prospectus summary in an easily readable and understandable form.  The disclosure under these items also will enable investors to better parse complex aspects of SPAC transactions.  As a result, we believe investors will be better able to identify and assess important aspects of the transactions that may affect their investment and voting decisions.  Although in current market practice, many SPACs already disclose similar information on prospectus cover pages,[332] the final rules we are adopting will standardize this information across all registration statements filed by SPACs for IPOs and for de-SPAC transactions.  In addition, investors may benefit from comparing this information not only across other SPAC transactions but by comparing it to investments contemplated in securities of non-SPACs where those registrants provide similar disclosure under current market practice.

Several commenters suggested the proposed prospectus cover page requirements would produce cover page disclosure that will be dense and longer than one page.[333]  While we recognize that the new cover page requirements will increase the amount of information included on the prospectus outside front cover page, we believe these requirements will be a limited incremental increase compared to current prospectus outside front cover page disclosure and we do not believe that this incremental increase will undermine the overall clarity of the cover page disclosure.  Also, we continue to believe outside front cover page prominence of the required

---

[331]  Letter from Better Markets.  *See supra* note 324 and accompanying text.

[332]  Item 501(b) of Regulation S-K sets forth disclosure requirements for the outside front cover page of prospectuses, such as the name of the registrant, title and amount of securities being offered, and the offering price of the securities.

[333]  *See, e.g.*, letters from ABA, Loeb & Loeb, Ropes & Gray, Vinson & Elkins.  *See also* Item 501 of Regulation S-K (one-page limit for prospectus cover page).

information serves the key purpose of alerting investors to the importance of the information. We believe registrants will be able to fit the required dilution information in tabular form on the outside front cover page just as they currently fit required information on the securities offering price, underwriting fees, and net proceeds in tabular form on the outside front cover page.  Based on Commission staff's experience with current outside front cover page disclosure and staff's consideration of how outside front cover page disclosure will appear under the final rules, we believe there will be space to add this additional table and other new disclosure required by the final rules without making the outside front cover page cramped or difficult to read.  We also do not believe these requirements will compel registrants to abandon non-required elements that often appear on the outside front cover page such as company artwork and logos, use of large fonts for service provider names, and aesthetic use of empty space.

One commenter on the proposal said requiring cover page, prospectus summary, and body of the document disclosures seems excessive and potentially distracting to investors.[334]  We disagree and believe the enhanced disclosures in each of the three locations will serve a valuable purpose for investors.[335]  The cover page provides the first alerts to investors about information that is important for their investment and voting decisions.  In the prospectus summary, we believe the additional disclosures will reduce information processing costs, including for less financially sophisticated investors or investors with limited time to analyze the prospectus, by providing information in plain English about important SPAC features in a concise format.

---

[334]   Letter from Vinson & Elkins.  *See supra* note 326 and accompanying text.

[335]   Staff experience in reviewing current SPAC filings is that some SPACs repeat disclosure numerous times in current registration statements even where not required by current rules; we infer from this market practice that some issuers may believe such repetition is helpful to investors in understanding important facts that may not be well understood through an isolated reference.  The final rules we are adopting are not inconsistent with that current market practice.

Finally, the prospectus body contains the detailed information needed for more comprehensive investor understanding.

One commenter expressed the view that prospectus summary disclosure related to additional financings (other than committed financings) at the IPO stage would be hypothetical and boilerplate and would distract investors from more useful information.[336]  We agree that, if financing agreements have been entered into, then they must be disclosed.  To this end, Item 1602(b)(5) requires disclosure of these agreements and how their terms may impact unaffiliated security holders.  However, under final Item 1602(b)(5), as proposed, even if no such agreements have been entered at the time that Item 1602(b)(5) is applicable, registrants are required to generally describe any plans to seek additional financings and how the terms of additional financings may affect unaffiliated security holders even if the actual, specific terms of any financing agreements (should they ultimately be entered) may not be known.[337]  The disclosure of these plans will alert investors to the potential aspects of the overall de-SPAC transaction structure, including those that impact future dilution, which will help investors make informed investment and voting decisions.  As with dilution disclosure in SPAC IPOs that we discuss in Section II.D.3 above (where commenters raised similar concerns), even where a registrant has not committed to a transaction or will not have consummated a transaction, registrants should be able to use reasonable assumptions about potential financing needs to provide the required disclosure.  We disagree with the view that this prospectus summary information would be a distraction to investors from other important information.  On the contrary, as we discuss

---

[336]  Letter from Vinson & Elkins.  *See supra* notes 328 and 329 and accompanying text.

[337]  Final Item 1602(b) provides that the disclosure required thereunder in the prospectus summary must be in the form of a "brief description."  We expect that the level of detail of the disclosure under final Item 1602(b)(5) of "[a]ny plans to seek additional financings" will reflect the level of development of such plans.  A registrant is only required to disclose plans that are known to the registrant to be "plans to seek additional financings."

generally above, we believe the prospectus summary disclosure regarding additional financing plans will highlight key issues for investors and the summary format will help them process the information, particularly when comparing potential investments in different SPACs.  We do not believe investors will misconstrue this information to mean the additional financing is certain to occur.  Registrants may highlight this lack of certainty in their disclosure if they have concerns their investors will misconstrue the information.[338]  We do not expect the additional financing prospectus summary disclosures will be boilerplate, as the additional financing disclosure will need to be tailored to the plans of the SPAC.

In final Item 1602(a)(5), we replaced the proposed term "SPAC sponsor or its affiliates or promoters and purchasers in the offering" with the term "SPAC sponsor, its affiliates, or promoters; and purchasers in the offering."  We made the same changes to final Item 1602(b)(7).[339]  Both the changes to Items 1602(a)(5) and 1602(b)(7) were made to clarify that the interests of each of the listed persons should be assessed against the interests of "purchasers in the offering."[340]

In final Items 1604(a)(1) and 1604(b)(2), we made revisions to reflect changes we are making to Items 1606 and 1607 that are discussed in Section II.G.[341]

In final Item 1604(a)(4), following the phrase "State whether, in connection with the de-SPAC transaction, there may be any actual or potential material conflict of interest," we added

---

[338]  In connection with similar issues in the context of Item 1602(c) disclosure of "each material potential source of future dilution," we discuss above in Section II.D.3.iii that registrants may warn investors that the disclosure about such potential sources should not be misconstrued as indications certain events are certain to occur in the future.

[339]  In addition, in final Item 1602(b)(7), 1604(a)(4), and 1604(b)(3) we moved "material" after "actual or potential" for consistency throughout new Subpart 1600.

[340]  In addition, in final Item 1602(b)(5) we replaced the proposed term "impact" with the term "affect" for clarity.

[341]  *See* final Items 1604(a)(1) and 1604(b)(2).

the phrase "including any material conflict of interest that may arise in determining whether to proceed with a de-SPAC transaction and any material conflict of interest arising from the manner in which the special purpose acquisition company compensates a SPAC sponsor, officers, and directors or the manner in which a SPAC sponsor compensates its officers and directors." This change makes Item 1604(a)(4) required cover page disclosure congruent with Item 1603(b) (non-cover page) disclosure. In de-SPAC transactions, the cover page disclosure under Item 1604(a)(4) should provide a cross reference to, among other things, the description of these actual or potential material conflicts of interest under Item 1603(b).

We also made a number of other changes to the final rules related to prospectus cover page and prospectus summary disclosure that are discussed above in other sections of this release.[342]

### F. De-SPAC Transactions: Background, Reasons, Terms, and Effects

#### 1. Proposed Item 1605

The Commission proposed Item 1605 of Regulation S-K to require disclosure of the background, material terms, and effects of the de-SPAC transaction, including:

- A summary of the background of the de-SPAC transaction, including, but not limited to, a description of any contacts, negotiations, or transactions that have occurred concerning the de-SPAC transaction;

---

[342] *See* (a) Section II.B (Sponsors) discussion of final Items 1602(a)(3), 1602(b)(6), 1604(a)(3), 1604(b)(4), and 1604(b)(5); (b) Section II.C (Conflicts of Interest) discussion of final Items 1602(a)(5), 1604(a)(4), 1604(b)(3), and 1602(b)(7); and (c) Section II.D (Dilution) discussion of final Items 1602(a)(4), 1604(b)(4), and 1604(b)(5). In addition to the changes to final Item 1604(b)(3) discussed in other sections of this release, we have moved the language "in connection with the de-SPAC transaction" from the end of the item to the beginning of the item and made punctuation and paragraph numbering changes to clarify the comparison of interests must be between each of "the SPAC sponsor, SPAC officers, SPAC directors, SPAC affiliates or promoters, target company officers, or target company directors" and "unaffiliated security holders of the SPAC."

126

- A brief description of any related financing transaction, including any payments from the SPAC sponsor to investors in connection with the financing transaction;

- The reasons for engaging in the particular de-SPAC transaction and for the structure and timing of the de-SPAC transaction and any related financing transaction;

- An explanation of any material differences in the rights of security holders of the post-business combination company as a result of the de-SPAC transaction;

- Disclosure regarding the accounting treatment and the Federal income tax consequences of the de-SPAC transaction, if material;

- Any material interests in the de-SPAC transaction or any related financing transaction held by the SPAC sponsor and the special purpose acquisition company's officers and directors, including fiduciary or contractual obligations to other entities as well as any interest in, or affiliation with, the target company; and

- A statement whether or not security holders are entitled to any redemption or appraisal rights, a summary of such redemption or appraisal rights, and, if there are no redemption or appraisal rights available for security holders who object to the de-SPAC transaction, a brief outline of any other rights that may be available to security holders.

2. *Comments: Item 1605*

One commenter stated that proposed Item 1605 would provide useful information to investors.[343]   Some commenters, however, opposed proposed Item 1605, stating it would be

---

[343]   Letter from Committee on Capital Markets Regulation.

duplicative of existing disclosure requirements.[344]  One of these commenters said that, in lieu of adopting Item 1605, they "recommend a more uniform methodology to address conflicts of interest arising from business combinations in general by revising Items 1004(a)(2) and 1013(b) of Regulation M-A and Item 403 of Regulation S-K to incorporate the provisions of proposed Item 1605 taking into consideration that many issues addressed in proposed Item 1605 may arise and be applicable to business combinations that are not effected by a SPAC or a blind pool."[345]

One commenter recommended that we revise proposed Item 1605(b)(2), with respect to descriptions of related financings.[346]  The commenter said, "PIPE investors often buy into SPAC deals on discounted terms compared to the terms offered to public shareholders in a SPAC."  The commenter said "the discount that PIPE investors receive is in the form of additional derivative securities, guarantees, or other complex financial arrangements and it is difficult for public investors to know the effective price per share at which PIPE investors are buying."[347]  The commenter recommended that we revise proposed Item 1605(b)(2) to state: "A brief description of related financing transactions, including the effective price per share at which investors are buying, after accounting for the value of any securities or guarantees they receive from the SPAC, SPAC sponsor or affiliate of either in connection with the financing transaction."[348]

---

[344]  Letters from ABA ("To eliminate duplication, we recommend against adoption of Item 1605"), Vinson & Elkins ("The SEC should not adopt a new disclosure requirement with respect to material interests in a prospective de-SPAC transaction or any related financing transaction held by the sponsor and the SPAC's officers and directors, as proposed").

[345]  Letter from ABA (specifically suggesting "revising Items 1004(a)(2) and 1013(b) of Regulation M-A and Item 403 of Regulation S-K to incorporate the provisions of proposed Item 1605 taking into consideration that many issues addressed in proposed Item 1605 may arise and be applicable to business combinations that are not effected by a SPAC or a blind pool").

[346]  Letter from Michael Klausner and Michael Ohlrogge.

[347]  *Id.* ("For instance, if a PIPE investor buys a share for $10, but also receives a free warrant worth $1.50, then the PIPE investor is in effect paying $8.50 for the share.").

[348]  *Id.*

*3. Final Item 1605*

After considering the comments received, we are adopting Item 1605 as proposed, with several modifications discussed below.

By providing a specialized disclosure rule tailored to de-SPAC transactions, the Item 1605 disclosure requirements will provide investors with information necessary to evaluate the reasons for a de-SPAC transaction and for choosing a particular structure and financing for the transaction. These requirements will also help promote consistent disclosure, allowing for greater comparability of these disclosures across de-SPAC transactions.

Given the unique qualities of de-SPAC transactions, we believe registrants will benefit from the centralization of the SPAC-related requirements in the Item 1600 series of Regulation S-K. If there are facts and circumstances that may result in required disclosure under a current rule being the same as under any of the rules we are adopting, registrants are not required to repeat disclosures, except where the applicable rule may so require (such as by calling for the disclosure in a specific location such as the prospectus cover page or prospectus summary). We are not adopting the recommendation that we adopt a more uniform methodology to address conflicts of interest arising from business combinations in general,[349] because it is beyond the scope of our proposals concerning conflicts of interest and Item 1605, both of which are focused on SPACs.

We are not revising Item 1605(b)(2) to provide more specificity on the types of securities or guarantees received from the SPAC, as suggested by one commenter. We are adopting Item 1605(b)(2) as proposed to require the disclosure of material terms of the de-SPAC transaction, including a brief description of any related financing transaction, including any payments from

---

[349] Letter from ABA. *See supra* note 345 and accompanying text.

the SPAC sponsor to investors in connection with the financing transaction.  In most, if not all, cases, Item 1605(b)(2) will require the registrant to disclose the price paid by PIPE investors and other benefits such as derivative securities that are acquired by PIPE purchasers (in addition to SPAC shares), because these are likely to be material terms.  One commenter recommended we require "A brief description of related financing transactions, including the effective price per share at which investors are buying, after accounting for the value of any securities or guarantees they receive from the SPAC, SPAC sponsor or affiliate of either in connection with the financing transaction."[350]  We are not revising the item to adopt this recommendation because we believe it would be difficult for registrants to calculate accurately or would result in inconsistent methodologies among registrants, or both, with respect to how registrants would convert various features, rights, or contractual provisions attendant to related financing transactions into amounts used to adjust actual transaction values to achieve the suggested effective price; we believe the resulting disclosure characterized by these issues could mislead investors or undermine the ability of investors to make comparisons across SPACs or both.

We have made a number of modifications in final Item 1605 as compared to the proposal. First, in Item 1605(a), we have replaced the term "Furnish" with the term "Provide" in the sentence "Furnish a summary of the background of the de-SPAC transaction" to make it clear that we intend this disclosure to be filed.  This change will also make Item 1605(a) consistent with the other items in Item 1605 in this respect.

Second, in Item 1605(b)(5) and 1605(b)(6), we have deleted the phrase ", if material" to align the phrasing with the existing disclosure requirements in Item 4 of Form S-4[351] as it was

---

[350]   Letter from Michael Klausner and Michael Ohlrogge.  *See supra* notes 347 and 348 and accompanying text.

[351]   *See* disclosure requirements in (a)(5) and (a)(6) under Item 4 of Form S-4.

our intent to capture the same information at the same threshold and we did not intend for the phrasing to imply that the accounting treatment or Federal income tax consequences may not be material disclosure in a business combination transaction.[352]

Third, as discussed above in Section II.C of this release regarding conflicts of interest, we are revising Item 1605(d) to address interests of target company officers and directors.  Thus, in final Item 1605(d), we have added the phrase "; or held by the target company's officers or directors that consist of any interest in, or affiliation with, the SPAC sponsor or the special purpose acquisition company."

Fourth, in final Item 1605(d), we have revised the phrase "held by the SPAC sponsor and the special purpose acquisition company's officers and directors" by replacing the term "and" with "or" in each instance, because the requirements of Item 1605(d) should apply disjunctively where any of the named persons has a material interest in the de-SPAC transaction or any related financing (and not be limited to only those situations where every named person has such an interest).

Fifth, we revised Items 1605(b)(3), 1605(b)(4), and 1605(b)(6) to clarify that these requirements will require disclosure with respect to the SPAC, target company, and/or security holders of the SPAC or target company.  These changes eliminate potential ambiguity that could have caused registrants to inappropriately interpret the items as not including disclosure with respect to those persons in connection with de-SPAC transactions.  Accordingly, as adopted:

---

[352]   In addition, in final Item 1605(b)(4) we deleted the phrase "after the completion of the de-SPAC transaction" for clarity and to avoid redundancy with the immediately preceding words "as a result of the de-SPAC transaction."

● final Item 1605(b)(3) requires: "A reasonably detailed discussion of the reasons of the SPAC and the target company for engaging in the de-SPAC transaction and reasons of the SPAC for the structure and timing of the de-SPAC transaction and any related financing transaction;"

● final Item 1605(b)(4) requires: "An explanation of any material differences in the rights of SPAC and target company security holders as compared with security holders of the combined company as a result of the de-SPAC transaction;" and

● final Item 1605(b)(6) requires: "The Federal income tax consequences of the de-SPAC transaction to the SPAC, the target company, and their respective security holders."

**G. Board Determination about the De-SPAC Transaction; Reports, Opinions, Appraisals, and Negotiations**

*1. Proposed Item 1606(a)*

The Commission proposed Item 1606(a) to address concerns regarding potential conflicts of interest and misaligned incentives in connection with the SPAC's decision to proceed with a particular de-SPAC transaction and to assist investors in assessing the fairness of a particular de-SPAC transaction to unaffiliated investors.  Specifically, the Commission proposed Item 1606(a) to require a statement from a SPAC as to whether it reasonably believes that the de-SPAC transaction and any related financing transactions are fair or unfair to the SPAC's unaffiliated

security holders, as well as disclosures regarding whether any director voted against or abstained from voting on, approval of the de-SPAC transaction or any related financing transaction.

    *2.  Comments: Item 1606(a)*

Commenters expressed differing views on proposed Item 1606(a).  Some commenters supported the proposed requirement.[353]

Other commenters opposed proposed Item 1606(a).[354]  Some of these commenters expressed the view that modeling rules applicable to de-SPAC transactions after the going private rules is inappropriate because the underlying affiliate relationships present in a going private transaction are not present in a de-SPAC transaction.[355]  Some commenters observed that a fairness determination is not required or provided in an IPO and thus should not be required in a de-SPAC transaction.[356]

One commenter said proposed Items 1606 and 1607 would represent a "dramatic shift to de-SPAC transactions processes and disclosures," because, in part, SPAC boards have not historically made a recommendation to shareholders regarding whether or not to redeem shares at the time of the business combination and fairness opinions obtained in connection with de-SPAC transactions are typically limited to whether the transaction is fair to the SPAC, not

---

[353] Letters from Better Markets; Marcie Frost, Chief Executive Officer, California Public Employees' Retirement System (June 9, 2022) ("CalPERS"); Committee on Capital Markets Regulation; Consumer Federation; Professor Holger Spamann (June 12, 2022) ("Holger Spamann"); NASAA; Public Citizen.

[354] Letters from ABA; Andrew Tuch, Professor of Law, Washington University in St. Louis (June 13, 2022) ("Andrew Tuch"); Cato Institute; CFA Institute; Davis Polk & Wardwell LLP (June 13, 2022) ("Davis Polk"); Freshfields; Goodwin; Alfredo Ortiz, President & CEO, Job Creators Network (June 13, 2022) ("Job Creators Network"); Jonathan Kornblatt; Kirkland & Ellis; Loeb & Loeb; NYC Bar; Paul Swegle; Ropes & Gray; Skadden Arps Slate Meagher & Flom LLP (June 13, 2022) ("Skadden"); White & Case.

[355] Letters from Andrew Tuch, Freshfields, Kirkland & Ellis, Loeb & Loeb, Skadden.

[356] Letters from ABA, Cato Institute, CFA Institute, Davis Polk, Freshfields, Kirkland & Ellis, NYC Bar, Ropes & Gray, Skadden, White & Case.

whether the transaction is fair to any particular class of shareholders.[357] This commenter observed, "By opining on whether the de-SPAC transaction and related financings are fair to unaffiliated stockholders, as opposed to the SPAC itself, the SPAC board and any fairness opinion provider would essentially be making a recommendation regarding whether or not to redeem shares."[358]

Several commenters expressed the view that requiring disclosure of a fairness determination would result in increased liability and litigation risk in de-SPAC transactions[359] and in fewer de-SPAC transactions.[360] A few commenters indicated that financial advisors may refuse to provide fairness opinions due to concerns about the potential liability related to delivery of a fairness opinion, in which case the SPAC board of directors would decide not to proceed with an otherwise favorable de-SPAC transaction due to the board's concerns about its own liability.[361]

Other commenters expressed the view that proposed Items 1606 and 1607 would effectively require de-SPAC transactions to be "substantively fair," which, in the view of these commenters, would exceed the Commission's authority.[362] One of these commenters expressed that imposing a substantive obligation on the SPAC board of directors to undertake an analysis of the fairness of the de-SPAC transaction is an issue that is the exclusive province of State law.[363]

---

[357] Letter from Ropes & Gray.

[358] *Id.*

[359] Letters from Cato Institute, CFA Institute, Freshfields, Goodwin, Jonathan Kornblatt, White & Case.

[360] Letters from Davis Polk, Goodwin, Job Creators Network, Jonathan Kornblatt, Skadden, White & Case.

[361] Letters from ABA, Goodwin.

[362] Letters from ABA, Goodwin, NYC Bar, White & Case.

[363] Letter from NYC Bar.

One commenter stated that, while the disclosure in proposed Item 1606(a) would be new, "in light of the fiduciary duties applicable to SPACs and their directors and officers," the disclosure in proposed Items 1606(a) and (b) "would likely be redundant with the standard disclosure of the SPAC board's reasons for approval of the de-SPAC transaction."[364]

Several commenters expressed concern that the proposed fairness determination disclosure requirement would likely or effectively require a SPAC to obtain a fairness opinion from a financial advisor[365] and raised concern about the cost of obtaining a fairness opinion.[366] One of those commenters also expressed concern that the perceived requirement, under proposed Items 1606(a) and 1607, to obtain a fairness opinion could increase the need to include projections in the de-SPAC transaction disclosure documents in support of a SPAC sponsor's fairness determination.[367]

Another commenter indicated that proposed Item 1606 (and Item 1607) would be burdensome and, to address that burden, suggested that proposed Item 1606 should not apply to de-SPAC transactions generally but only to those de-SPAC transactions that raise risks of "severe conflicts of interest."[368]

Some commenters also said they prefer that any fairness determination be made as to the de-SPAC transaction as a whole (instead of the de-SPAC transaction and any related financing

---

[364] Letter from Vinson & Elkins.

[365] Letters from ABA, Andrew Tuch, Cato Institute, Davis Polk, Freshfields, Job Creators Network, Jonathan Kornblatt, Paul Swegle.

[366] Letters from ABA, Cato Institute, Davis Polk, Freshfields, Goodwin, Jonathan Kornblatt, Paul Swegle, Ropes & Gray, Skadden.

[367] Letter from Cato Institute (indicating that disclosure of projections would raise potential liability for SPACs as a result of the amendments to the PSLRA safe harbor).

[368] Letter from Andrew Tuch ("In short, the Proposed Rules would subject de-SPACs to more onerous regulation than either going-private transactions subject to Rule 13e-3 or traditional IPOs. A way to address this is to apply Items 1606 and 1607 more selectively, to those de-SPACs raising heightened risks of self-dealing by SPAC fiduciaries, or perhaps not to apply these particular provisions at all.").

transaction separately)[369] and with respect to all of a SPAC's shareholders (instead of to its unaffiliated shareholders).[370]  One of those commenters also suggested that a fairness determination should not include related financings because financial advisors providing a fairness opinion do not traditionally include such financing within the scope of the opinion.[371]

### 3. Final Item 1606(a)

We continue to believe that SPACs and the hybrid nature of de-SPAC transactions present potential conflicts of interest and misaligned incentives that are not present in other types of business combination transactions.  As a result, we believe that it is appropriate for shareholders to have more complete information regarding the SPAC's decision to proceed with a particular de-SPAC transaction.  Many commenters that supported proposed Item 1606(a) expressed similar views.[372]  At the same time, we acknowledge that many commenters raised significant concerns with the proposed disclosure requirement.[373]  Some commenters expressed concerns that the proposed rule could be interpreted to require a fairness opinion,[374] even if not explicitly required, and concerns about the cost to obtain such an opinion.[375]  Some commenters also expressed concerns about imposing requirements in connection with the de-SPAC transaction process of going public that do not exist in the traditional IPO process, such as

---

[369]  Letters from ABA, Davis Polk, Freshfields, Goodwin, Ropes & Gray, Skadden, White & Case.

[370]  Letters from ABA, Goodwin.

[371]  Letter from Davis Polk.

[372]  Letters from Better Markets, CalPERS, Committee on Capital Markets Regulation, Consumer Federation, Holger Spamann, NASAA, Public Citizen.  *See supra* note 353 and accompanying text.

[373]  Letters from ABA, Andrew Touch, Cato Institute, CFA Institute, Davis Polk, Freshfields, Goodwin, Job Creators Network, Jonathan Kornblatt, Kirkland & Ellis, Loeb & Loeb, NYC Bar, Paul Swegle, Ropes & Gray, Skadden, White & Case.  *See supra* note 354 and accompanying text.

[374]  Letters from ABA, Andrew Tuch, Cato Institute, Davis Polk, Freshfields, Job Creators Network, Jonathan Kornblatt, Paul Swegle.  *See supra* note 365 and accompanying text.

[375]  Letters from ABA, Cato Institute, Davis Polk, Freshfields, Goodwin, Jonathan Kornblatt, Paul Swegle, Ropes & Gray, Skadden.  *See supra* note 366 and accompanying text.

requiring a fairness determination.[376]  Regarding these concerns, while we acknowledge that disclosures regarding the board's determination to proceed with a particular transaction are more typically associated with merger transactions, as discussed above, the de-SPAC transaction is a hybrid capital raising transaction that marks the introduction of the target company to the U.S. public securities markets (similar to an IPO), and such introduction is done by way of a business combination or similar transaction.  As a result, while we believe that the similarity to an IPO is a reason that the de-SPAC transaction regulatory framework generally should be similar to the IPO regulatory framework, the business combination element of de-SPAC transactions makes certain differences in the final rules that apply to de-SPAC transactions appropriate.

In response to commenters' concerns, we are revising Item 1606(a) to focus on situations in which a determination as to the advisability of the de-SPAC transaction is required by the law of the jurisdiction in which the SPAC is organized.[377]  Doing so will make clear that Item 1606(a) does not require the de-SPAC transaction to be substantively fair or the SPAC to make a fairness determination when it is not otherwise required to do so under applicable State or foreign corporate law.[378]

Instead, under final Item 1606(a), if the law of the jurisdiction of the SPAC's organization requires the SPAC's board of directors (or similar governing body)[379] to determine

---

[376] Letters from ABA, Andrew Tuch, Cato Institute, CFA Institute, Davis Polk, Freshfields, Kirkland & Ellis, Loeb & Loeb, NYC Bar, Ropes & Gray, Skadden, White & Case.  *See supra* notes 355 and 356 and accompanying text.

[377] *See generally* Section 251(b) of the Delaware General Corporation Law ("The board of directors…shall adopt a resolution approving an agreement of merger or consolidation and declaring its advisability.").

[378] This revision also addresses the comments questioning the Commission's authority to require a fairness determination and the comment expressing the view that imposing an obligation on a board to undertake an analysis of the fairness of the de-SPAC transaction is an issue that is the exclusive province of State law.  *See supra* notes 362 and 363, respectively, and accompanying text.

[379] This provision allows for the possibility that a SPAC's governing body may be other than a "board of directors," whether as a result of a SPAC being organized as an entity other than a corporation or being a corporation organized in a jurisdiction where the governing body is different than a "board of directors."

whether the de-SPAC transaction is advisable and in the best interests of the SPAC and its shareholders, or otherwise make any comparable determination, the SPAC will be required to disclose that determination.  Under Delaware General Corporation Law, a board of directors of a corporation that seeks to enter a merger or consolidation is required to adopt a resolution approving the transaction agreement and declaring its advisability.[380]  In the experience of the Commission staff, many SPACs governed by Delaware law provide a statement in registration statements or proxy statements filed for de-SPAC transactions that the transaction agreement the board approved is advisable and in the best interests of shareholders.  Comparable requirements may apply to registrants organized under the laws of other jurisdictions.  The final rule would codify existing disclosure practices in this regard and serve to standardize the disclosure across a variety of State or foreign law requirements.

We believe that the approach taken in final Item 1606(a) represents an appropriate balance between our goal of providing more transparency around the SPAC's decision to proceed with a particular de-SPAC transaction and the concerns raised by commenters that the proposed rule would create a new substantive corporate law requirement[381] as well as other concerns raised by commenters, including increased liability and risks of litigation and decreased de-SPAC transactions.[382]  The new disclosure requirement will help achieve the same goal sought by the proposed fairness determination requirement—enhancing SPAC security holders' ability to assess the SPAC's decision to proceed with a particular de-SPAC transaction—without

---

[380]  *See supra* note 377 and accompanying text.

[381]  The approach taken in final Item 1606(a) also addresses a related commenter's concern that disclosure arising from a fairness determination would be redundant in light of the fiduciary duties applicable to SPACs and their officers and directors.  *See* letter from Vinson & Elkins.  *See also supra* note 364 and accompanying text.

[382]  Letters from Cato Institute, CFA Institute, Davis Polk, Freshfields, Goodwin, Job Creators Network, Jonathan Kornblatt, Skadden, White & Case.  *See supra* notes 359 and 360 and accompanying text.

imposing new procedural obligations regarding how such a decision is made.  While the final rule will not require a SPAC to make a determination regarding the fairness or suitability of the de-SPAC transaction, if such a determination is required by applicable corporate law, we believe investors should be informed of that fact and receive appropriate disclosure (as described below) regarding the considerations that went into such a determination.[383]  The fact that many registrants already provide such disclosure supports our view that the factual disclosures required by the final rule should not impose undue costs or create excessive exposure to new liability or litigation risk.

In addition, these changes from the proposal should avoid any misimpression that Item 1606(a) creates a requirement, implicit or explicit, or expectation that a fairness opinion must be obtained to comply with its requirements.  We are mindful of commenters' concerns about increased liability and litigation risk associated with such opinions.[384]  We are also mindful of comments indicating that financial advisors may refuse to provide fairness opinions due to concerns about the potential liability related to delivery of a fairness opinion and that a SPAC's board of directors may decide not to proceed with an otherwise favorable de-SPAC transaction because it cannot obtain a fairness opinion.[385]  Cognizant of these concerns, we reiterate that nothing in the final rule requires a SPAC to obtain a fairness opinion in connection with a de-SPAC transaction.

---

[383]  Because final Item 1606(a) will require disclosure when a determination is required to be made under the law of the SPAC's jurisdiction of organization, rather than imposing a separate fairness determination that would be more burdensome, we do not believe there is a need to limit Item 1606(a) to instances of "severe conflicts of interest," as one commenter suggested.  *See* letter from Andrew Tuch.  *See also supra* note 368 and accompanying text.

[384]  Letters from Cato Institute, CFA Institute, Freshfields, Goodwin, Jonathan Kornblatt, White & Case.  *See supra* note 359 and accompanying text.

[385]  Letters from ABA, Goodwin.  *See supra* note 361 and accompanying text.

The changes to Items 1606(a) and (b) and 1607[386] should also address one commenter's concern that the new requirements would represent "a dramatic shift to de-SPAC transactions processes and disclosures" by requiring more limited disclosure aligned with requirements already applicable to a SPAC by the law of its jurisdiction of incorporation.[387]

We agree with commenters who stated that any rule addressing the board's decision to proceed with a de-SPAC transaction should focus on all of a SPAC's security holders rather than only its unaffiliated security holders.[388]  In response to these comments, we have revised the final rule to reference security holders of the SPAC generally, in contrast to the proposed rule, which addressed only unaffiliated security holders.

The changes to Item 1606(a) address one commenter's concern that the perceived requirement to obtain a fairness opinion could increase the need to include projections in the de-SPAC transaction disclosure documents in support of such fairness determination.[389]

Finally, in response to commenters' recommendations that proposed Item 1606(a) be required with respect to the de-SPAC transaction and related financing as a whole,[390] we are revising Item 1606(a) to remove any reference to related financing.  While the proposed rule was intended to result in the disclosure of a fairness determination with respect to a de-SPAC transaction as a whole, we were persuaded by commenters' concerns that including "any related financing" in the rule could have signaled a separate determination should be made with respect

---

[386]  *See infra* section II.G.10–12.

[387]  Letter from Ropes & Gray.  *See supra* notes 357 and 358 and accompanying text.

[388]  Letter from ABA, Goodwin.  *See supra* note 370 and accompanying text.

[389]  Letter from Cato Institute.  *See supra* note 367 and accompanying text.

[390]  Letters from ABA, Davis Polk, Freshfields, Goodwin, Ropes & Gray, Skadden, White & Case.  *See supra* notes 369–371 and accompanying text.

to the related financing.[391]  We continue to believe that related financing is usually fundamental to the success of the de-SPAC transaction but have adopted a final rule that simplifies the disclosure about the determinations made by a SPAC's board of directors (or similar governing body) with respect to the de-SPAC transaction.  On the other hand, given the continued importance to a SPAC's shareholders of the related financing, we are moving the reference to related financing to final Item 1606(b), which requires discussions of the factors considered by the SPAC board of directors (or similar governing body) in making the determination disclosed in response to Item 1606(a).  This change is discussed further below.

4. *Proposed Item 1606(b)*

The Commission proposed Item 1606(b) to supplement the fairness determination disclosure required by proposed Item 1606(a).  Specifically, proposed Item 1606(b) would require a SPAC to discuss the material factors upon which the reasonable belief regarding the fairness of a de-SPAC transaction and any related financing transaction is based and, to the extent practicable, the weight assigned to each factor.

5. *Comments: Item 1606(b)*

Commenters expressed differing views on proposed Item 1606(b).  Some commenters supported the proposed requirement generally[392] and some commenters specifically indicated the requirement would allow investors to conduct a better evaluation of the merits of a de-SPAC transaction and incentivize sponsors to avoid transactions that could potentially be viewed as unfair.[393]

---

[391]   *Id.*

[392]   Letters from Better Markets, CalPERS, Holger Spamann.

[393]   Letters from Committee on Capital Markets Regulation, Consumer Federation.

141

Other commenters stated that the inclusion of a mandatory list of factors to be addressed in disclosure under proposed Item 1606(b) may force the SPAC to disclose information not actually considered by the SPAC in making its fairness determination.[394]  Some commenters also stated that the mandatory list of factors in proposed Item 1606(b) is at odds with the Commission's history of implementing a principles-based disclosure regime and does not account for the fact that the factors relevant to making a fairness determination will vary from company to company and that different fairness assessors may also have different views on which factors are appropriate for the same company.[395]  These commenters proposed that the Commission modify proposed Item 1606(b) to provide that the factors should be discussed to the extent they were considered.[396]  One commenter said that it is "not within the Commission's authority to require SPAC boards of directors to conform their deliberative processes to the Commission's rules and that Item 1606(b) impermissibly encroaches upon the discretion of a board to evaluate whatever information it deems appropriate in deciding to proceed with a transaction."[397]

Some commenters stated that the factors the proposal required to be discussed should not be assigned weight because it would not be practical or workable to do so, such weighting could result in investors placing too much or not enough emphasis on the factors described by the SPAC, and various members of the SPAC board will likely assign differing weights to differing factors.[398]  Another commenter stated that a weighting of factors would require a high degree of

---

[394]  Letters from ABA, Goodwin, White & Case.

[395]  Letters from ABA, Goodwin.

[396]  *Id*.

[397]  Letter from White & Case.

[398]  Letters from ABA, Goodwin, Ropes & Gray.

professional subjectivity, which may expose boards and financial institutions to liability which would ultimately discourage them from pursuing de-SPAC transactions.[399]

### 6. Final Item 1606(b)

We are adopting Item 1606(b) as proposed, with certain modifications discussed below. We continue to believe that disclosure of the factors considered by a SPAC's board of directors (or similar governing body) in making the decision to proceed with a de-SPAC transaction, to the extent they were considered, would provide shareholders with important information to allow those shareholders to make informed voting or investment decisions.

While several commenters supported proposed Item 1606(b),[400] as discussed above, some commenters expressed the view that only factors actually considered should be required to be discussed.[401] This was the intent of the language in the proposed rule requiring a discussion of "factors upon which the belief stated in paragraph (a)…is based." In light of the comments received, however, to clarify our intent in the final rule, we have added the terms "To the extent considered" to qualify the factors and the analysis of those factors required to be discussed. This change will avoid any potential for ambiguity or misinterpretation that the rule requires a discussion of factors not considered or a more extensive analysis of any factor considered than would otherwise have taken place in the absence of the final rule.[402] As a result, final Item 1606(b) requires a discussion of a non-exclusive list of factors the board of directors (or similar governing body) considered in making any determination disclosed in response to Item 1606(a)

---

[399]   Letter from Skadden.

[400]   Letters from Better Markets, CalPERS, Committee on Capital Markets Regulation, Consumer Federation, Holger Spamann, NASAA, Public Citizen. *See supra* note 393 and accompanying text.

[401]   Letters from ABA, Goodwin, White & Case. *See supra* notes 394–396 and accompanying text.

[402]   This revision also addresses the comments questioning the Commission's authority to mandate the factors that a SPAC must discuss under Item 1606(b). *See supra* notes 362, 363, and 397 and accompanying text.

to the extent such factors were considered.  These factors would include, but not be limited to, the valuation of the target company, financial projections relied upon by the board of directors (or similar governing body), the terms of financing materially related to the de-SPAC transaction, any report, opinion, or appraisal referred to in Item 1607(a), and the dilution described in Item 1604(c).  We believe these factors are generally matters that a board of directors (or similar governing body) is likely to consider in determining whether a transaction is advisable and in the best interests of the SPAC and its security holders (or in making a comparable determination).  At the same time, by revising the disclosure requirement to make clear that the listed factors must be disclosed *to the extent considered*, the final rule reflects our understanding that the fiduciary duties and discussions of boards of directors (or similar governing bodies) are not uniform across companies or jurisdictions.  Moreover, this change makes clear that final Item 1606(b) does not require boards of directors (or similar governing bodies) to specifically consider the listed factors or, if considering them, dictate how thoroughly to consider them, when determining whether a transaction is advisable and in the best interests of the SPAC and its security holders (or in making a comparable determination).

Some commenters expressed concern with the practicability of assigning weight to factors, the possibility that shareholders would emphasize those weights too much or too little,[403] and that a weighting of factors, which may require a high degree of professional subjectivity, may expose boards and financial institutions to liability which would ultimately discourage them from pursuing de-SPAC transactions.[404]  Although proposed Item 1606(b) was never intended to force disclosure of the weight of each factor where the SPAC board did not, or could not,

---

[403]   Letters from ABA, Goodwin, Ropes & Gray.  *See supra* note 398 and accompanying text.

[404]   Letter from Skadden.  *See supra* note 399 and accompanying text.

conduct such a weighting (proposed Item 1606(b) required a discussion of such weighting only "to the extent practicable"), we nevertheless recognize commenters' concerns and the possibility that the proposed item requirement could be misunderstood.  Based on commenters' suggestions, we have removed references to the weighting of factors from final Item 1606(b) to eliminate such potential misinterpretation and in recognition of the potential practical challenges to assigning a weight to various factors or discussing such weighting.

To reduce potential redundancy in the disclosure requirement, we have also removed the terms "in reasonable detail" from the first sentence of Item 1606(b).  Any disclosure responsive to Item 1606(b) is already required to be complete, and the deleted terms are not necessary to confirm that such a principle applies here.

Further, as discussed above, we are revising Item 1606(b) to include any financing materially related to the de-SPAC transaction in the non-exclusive list of factors to be discussed because PIPE offerings and other financings are a common feature of a de-SPAC transaction and, in some instances, the success of the de-SPAC transaction and of the post-de-SPAC company is dependent on the existence of related financing.  Given the importance of such financing, we have revised final Item 1606(b) to include financing materially related to the de-SPAC transaction in the non-exclusive list of factors that a board of directors (or similar governing body) would be required to discuss, to the extent the board of directors (or similar governing body) considered such financing.  By moving the reference to related financing from Item 1606(a) to Item 1606(b), we are also eliminating any potential confusion that the board of directors (or similar governing body) would need to make a separate Item 1606(a) determination for financing materially related to the de-SPAC transaction.

*7.   Proposed Items 1606(c) through (e)*

The Commission proposed Items 1606(c) through 1606(e) to provide additional information about the de-SPAC transaction and any related financing transaction, including whether a majority of unaffiliated security holders is required to approve the transaction(s), the involvement of any unaffiliated representative acting on behalf of unaffiliated security holders, and whether the transaction(s) were approved by a majority of directors of the SPAC who are not employees of the SPAC.

*8.   Comments: Items 1606(c) through (e)*

Commenters expressed differing views on proposed Items 1606(c) through (e).  Some commenters supported the proposed requirements.[405]

With respect to proposed Item 1606(c), one commenter indicated that disclosure about whether the de-SPAC or related financing transaction was structured to require approval of at least a majority of unaffiliated security holders would be redundant due to the requirement of Item 21 of Schedule 14A to disclose similar information.[406]

With respect to proposed Item 1606(d), a few commenters expressed the view that retention of a representative to act solely on behalf of unaffiliated security holders in the negotiation of the de-SPAC transaction is rare and that, as a result, such a requirement will not result in meaningful additional disclosure.[407]  One of the commenters also indicated that the disclosure requirement would not result in a change in the use of unaffiliated representatives.[408]

---

[405]   Letters from Better Markets, CalPERS, Committee on Capital Markets Regulation, Consumer Federation, Holger Spamann, NASAA, Public Citizen.

[406]   Letter from Vinson & Elkins.

[407]   Letters from Freshfields, Vinson & Elkins.

[408]   Letter from Freshfields.

One commenter supported the proposed requirement to disclose whether any non-executive director voted against, or abstained from voting on, the approval of the de-SPAC transaction[409] and said it is consistent with current market practice.[410]  Another commenter stated that a requirement to identify any director that voted against or abstained from voting on the approval of the de-SPAC transaction would "prejudice[] companies against de-SPAC transactions" and could inhibit board discussions.[411]  This commenter said that this proposed requirement would make it more difficult and less likely that individual directors would oppose a transaction if they know that their objection will be made public.[412]  This commenter also recommended that the proposed rule be more precise about its applicability being only to directors of the SPAC.[413]

9.  *Final Items 1606(c) through (e)*

We continue to believe that the new disclosures under Items 1606(c) through (e) will provide investors with important information and a better understanding of the process by which a SPAC determined to proceed with a particular de-SPAC transaction.  We are adopting Items 1606(c), (d), and (e) as proposed, with some modifications and minor technical changes discussed below.  In the final rules, we moved the requirement to identify any director who voted against, or abstained from voting on, approval of the de-SPAC transaction from proposed Item 1606(a) to final Item 1606(e), because, as Item 1606(e) is generally related to issues involving

---

[409]  We have moved this requirement from proposed Item 1606(a) to final Item 1606(e).  Thus, we are including comments relating to that portion of proposed Item 1606(a) in this section.

[410]  Letter from Davis Polk.

[411]  Letter from Freshfields.

[412]  *Id.*

[413]  *Id*.

approval of the de-SPAC transaction by the board of directors (or similar governing body), we considered this a more appropriate place for this requirement.

We disagree with the assertion made by a commenter that the disclosure required under proposed Item 1606(c) would be redundant given the existing requirement in Item 21 of Schedule 14A, which requires disclosure of the vote required for approval (among other things) of the matter by shareholders.[414] Schedule 14A does not expressly differentiate among affiliated and unaffiliated security holders as with Item 1606(c). Also, a Schedule 14A may not be filed in connection with some de-SPAC transactions. Thus, we believe the information provided to investors under Item 1606(c) is not redundant and will benefit investors by improving their understanding of the SPAC's governance procedures followed in connection with approving the de-SPAC transaction. We expect this improved understanding will enhance investor voting, redemption, and other investment decisions. We have revised Item 1606(c) to clarify that the shareholder approval relates to shareholders of the SPAC.

A few commenters said the use of unaffiliated representatives in negotiations is rare.[415] One of those commenters also said the disclosure requirement in proposed Item 1606(d) would not lead to a change in market practices.[416] We note that the proposed rule was not intended and the final rule is not intended to change market practices relating to the retention of any such unaffiliated representative. As is the case with final Items 1606(c) and (e), final Item 1606(d) is a disclosure requirement intended to provide investors with important information and a better understanding of the process by which a SPAC determined to proceed with a particular de-SPAC

---

[414]   Letter from Vinson & Elkins. *See supra* note 406 and accompanying text.

[415]   Letters from Freshfields, Vinson & Elkins. *See supra* notes 407 and 408 and accompanying text.

[416]   Letter from Vinson & Elkins. *See supra* note 408 and accompanying text.

transaction and does not require SPACs to change their processes in connection with de-SPAC transaction approval.

One commenter said directors will be more reluctant to vote against a de-SPAC transaction if they know that their objection will be made public.[417]  We decline to revise Item 1606(e) in response to the commenter's concern.  Directors are generally subject to fiduciary duties imposed by State or foreign law.  We expect that directors will generally seek to make voting decisions consistent with their duties to security holders or the company irrespective of whether that decision is publicly disclosed.

We have also made conforming changes to Items 1606(c) through (e) to be consistent with final Item 1606(a), as discussed above.

*10. Proposed Item 1607*

The Commission proposed Item 1607(a) to require disclosure about whether or not the SPAC or SPAC sponsor received any report, opinion, or appraisal from an outside party relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the de-SPAC transaction or any related financing transaction to the SPAC, SPAC sponsor or unaffiliated security holders.

The Commission proposed Item 1607(b) to require disclosure of certain information about any such report, opinion, or appraisal from an outside party as well as any negotiation or report by an unaffiliated representative, including the identity of the outside party or unaffiliated representative, the qualifications of the outside party or unaffiliated representative, any material relationship between the outside party, its affiliates, or unaffiliated representative and the SPAC, SPAC sponsor, or their respective affiliates, whether the SPAC or SPAC sponsor determined the

---

[417]  Letter from Freshfields.  *See supra* notes 411 and 412 and accompanying text.

149

amount of consideration to be paid or the valuation of the target company, or whether the outside party recommended the amount of consideration to be paid or the valuation of the target company.  Proposed Item 1607(b) would also require a summary of the negotiation, report, opinion, or appraisal, including a description of the procedures followed, the findings and recommendations, the bases for and methods used to arrive at such findings and recommendations, any instructions received from the SPAC or SPAC sponsor, and any limitation imposed by the SPAC or SPAC sponsor on the scope of the investigation.

The Commission proposed Item 1607(c) to require all such reports, opinions or appraisals to be filed as exhibits to the Form S-4, Form F-4, and Schedule TO for the de-SPAC transaction or included in the Schedule 14A or 14C for the transaction.

*11. Comments: Item 1607*

We received differing views from commenters.  Some commenters generally supported proposed Item 1607.[418]  Other commenters generally opposed, or expressed concerns regarding specific aspects of, proposed Item 1607.[419]  We discuss these specific concerns in more detail below.

As discussed above in the comments on proposed Item 1606, several commenters stated that proposed Items 1606 and 1607 exceed the Commission's authority because they effectively require de-SPAC transactions to be "substantively fair."[420]

---

[418]  Letters from Committee on Capital Markets Regulation; Consumer Federation; ICGN; Michael Dambra, Ph.D., CPA, University at Buffalo, SUNY, Omri Even-Tov, Ph.D., University of California, Berkeley, Kimberlyn George, University of California, Berkeley (June 3, 2022) ("Michael Dambra, Omri Even-Tov, and Kimberlyn George").

[419]  Letters from ABA ("with respect to proposed Item 1607, we believe it is unnecessary and unrealistic to require the filing of board books and other written materials presented to the board in connection with the reports, opinions or appraisals, as in the case with going-private transactions"), Andrew Tuch, Ernst & Young, Goodwin, Ropes & Gray, Vinson & Elkins.

[420]  Letters from ABA, Goodwin, NYC Bar, White & Case.  *See supra* note 362 and accompanying text.

150

Some of these commenters suggested that the filing of board materials required under Item 1607(c) is inappropriate because it will "inevitably" result in a reduction of information presented to, and considered by, a SPAC's board of directors, which may affect the board's ability to fulfill its fiduciary duties.[421]  Given that board materials are typically not prepared with a view that they will be included in public filings and subject to liability, these commenters also expressed the view that filing such materials may expose their preparers to liability under the Securities Act and the Exchange Act and that the proposed requirement would be "impractical and unworkable" because the preparers are not trained to prepare any such materials to withstand scrutiny under the Federal securities laws.[422]  Also, the commenters indicated that some preparers will not consent to the use of their materials in a public filing.[423]  Finally, these commenters stated that some information included in such reports may be immaterial, speculative, or ultimately determined to be unreliable.[424]

One commenter indicated that the requirement in proposed Item 1607(c) to file as an exhibit (or include) any such report, opinion, or appraisal related to the fairness determination in addition to the requirement in proposed Item 1607(b) to disclose a summary of the report, opinion, or appraisal could limit any incremental benefit an investor would receive from the filing of such reports, opinions, or appraisals.[425]  Another commenter stated that proposed Item 1607 should not apply to de-SPAC transactions generally but only to those de-SPAC transactions that raise risks of "severe conflicts of interest."[426]  Yet another commenter suggested that the

---

[421]   Letters from ABA, Goodwin.

[422]   *Id.*

[423]   *Id.*

[424]   *Id.*

[425]   Letter from Ernst & Young.

[426]   Letter from Andrew Tuch.

Commission consider whether the incremental cost and liabilities related to filing the reports would have the unintended consequence of discouraging SPACs from obtaining the reports because SPACs would not be required to obtain the reports as a basis for their fairness determination under proposed Item 1606(a).[427]  One commenter also proposed that we more narrowly tailor Item 1607(b)(6) to de-SPAC transactions and modify Item 4(b) of Forms S-4 and F-4 to direct filers to comply with the requirements of Item 1607(b)(6), rather than Item 1015(b) of Regulation M-A, for de-SPAC transactions.[428]

### 12. Final Item 1607

We are adopting Item 1607(a) as proposed with the modifications discussed below.  Final Item 1607(a) only requires the disclosure specified in Item 1607(b) *if* the SPAC or SPAC sponsor received any report, opinion (other than an opinion of counsel), or appraisal from an outside party or unaffiliated representative materially relating to a determination disclosed in response to Item 1606(a), the approval of the de-SPAC transaction, the consideration or the fairness of the consideration to be offered to security holders of the target company in the de-SPAC transaction, or the fairness of the de-SPAC transaction to the SPAC, its security holders, or SPAC sponsor.  Thus, if such a report, opinion, or appraisal from an outside party or unaffiliated representative was not received, then no disclosure will be required under Item 1607.

The final rule includes some clarifying revisions to Item 1607(a).  We added a reference to an "unaffiliated representative" to avoid any confusion arising out of references to an "unaffiliated representative" in Item 1607(b) without a corresponding reference in Item 1607(a).  We also added the parenthetical terms "other than an opinion of counsel" to clarify that an

---

[427]   Letter from Ernst & Young.

[428]   Letter from Vinson & Elkins.

opinion of counsel is outside of the rule's scope.  In addition, we included a reference to the target company in final Item 1607(a)(3) to specify which security holders are being offered the consideration.  Finally, we reversed the order of "SPAC sponsor" and "security holders" in final Item 1607(a)(4) to avoid the implication that the rule also applies to security holders of SPAC sponsor.

To address commenters' concerns regarding the possible disclosure of immaterial, speculative, or unreliable materials,[429] we are revising Item 1607(a) to limit the scope of the final rule to only reports, opinions, or appraisals that are materially related to any Item 1606(a) determination of the board of directors (or similar governing body) or the other matters listed in final Items 1607(a)(2) through (4).  As they already do now in other filings relating to de-SPAC transactions, SPACs may continue to add any supplemental, explanatory discussion so that investors can properly understand the context and purpose of the disclosed reports, opinions, or appraisals and assess these reports, opinions, or appraisals appropriately.

In addition, by revising Item 1606 to remove the requirement to disclose a fairness determination in the context of a de-SPAC transaction and making corresponding revisions to Item 1607, the final rule should address commenters' concerns that proposed Item 1607 would exceed the Commission's authority.[430]

We believe adopting final Item 1607 is more consistent with the remaining rules applicable to SPACs and de-SPAC transactions than the alternative suggested by a commenter to instead update similar existing requirements in Form S-4 and F-4.[431]  Item 1607(a) is limited to a specific set of events and determinations, unlike Item 4(b) in Form S-4 and F-4, which more

---

[429]    Letters from ABA, Goodwin.  *See supra* note 424 and accompanying text.

[430]    Letters from ABA, Goodwin, NYC Bar, White & Case.  *See supra* note 420 and accompanying text.

[431]    Letter from Vinson & Elkins.  *See supra* note 428 and accompanying text.

generally refer to reports, opinions, or appraisals materially relating to the subject transaction. Also, under the alternative suggested by the commenter, the Item 1607(b) disclosure would not be required to the extent a de-SPAC transaction is not registered on Form S-4 or F-4.[432]  Finally, we believe registrants will benefit from the centralization of the SPAC-related requirements in the Item 1600 series of Regulation S-K, which are primarily applied to de-SPAC transactions through new general instructions in the relevant forms and schedules,[433] rather than through revisions to specific item requirements within each relevant form or schedule as suggested.

Several commenters expressed concern that compliance with Item 1607(c) will result in a reduction of information presented to the SPAC's board of directors, which could negatively affect the ability of those directors to fulfill their fiduciary duties.[434]  Another commenter suggested that the incremental cost and liability of filing such materials would discourage a SPAC from obtaining those materials.[435]  While we recognize these concerns and acknowledge that the final rule could impact the information provided to the SPAC's board of directors,[436] we believe there remain significant incentives (e.g., conducting due diligence on the target company or receiving an independent evaluation of the proposed de-SPAC transaction) for boards to seek and use this information as part of their decision-making process so we do not find this a persuasive reason to withhold such disclosure from investors.  Directors are generally subject to fiduciary duties imposed by State or foreign law.  We expect directors to seek to fulfill those

---

[432]  Item 14(b)(6) of Schedule 14A directs filers to comply with Item 1015(b) of 17 CFR 229.1000 through 229.1016 ("Regulation M-A") in the same manner as Form S-4 and F-4.  *But see* the potential registration requirements for de-SPAC transactions, in the absence of an exemption, as a result of the adoption of Rule 145a.

[433]  *See* General Instruction L.1 to Form S-4; General Instruction VIII to Form S-1; General Instruction I.1 to Form F-4; General Instruction VII to Form F-1; General Instruction K to Schedule TO.

[434]  Letters from ABA, Goodwin.  *See supra* note 421 and accompanying text.

[435]  Letter from Ernst & Young.  *See supra* note 427 and accompanying text.

[436]  *See* discussion of Item 1607, *infra* Section VIII.B.1.iii.f.

duties by continuing to inform themselves of the potential merits of a de-SPAC transaction with the assistance of outside parties despite the potential public nature, added cost, or risk of liability associated with the filing of any report, opinion, or appraisal.

Furthermore, we believe that it would be impractical to require disclosure under Item 1607 only in instances of "severe conflicts of interest" as one commenter suggested[437] because quantifying or classifying the extent of a conflict of interest is difficult given the wide variety of facts and circumstances in each de-SPAC transaction.

We are adopting Items 1607(b) and (c) as proposed, with two technical modifications. We revised Item 1607(b)(5) to specify that the related disclosure is only required for reports, opinions, or appraisals related to the fairness of the consideration to be offered to security holders of the target company in the de-SPAC transaction.  We also revised Item 1607(c) to specify that the reports, opinions, or appraisals required to be filed are those referred to in Items 1607(a) and (b).

We disagree with the comments that the filing of reports, opinions, or appraisals pursuant to Item 1607(c) would have limited incremental benefit to investors.[438]  Although the summary required by Item 1607(b)(6) provides investors with useful information regarding the preparation and findings or recommendations of the report, opinion, or appraisal, we believe that it is important for investors to be able to review the actual report, opinion, or appraisal being summarized and, in many cases, being relied upon by the board when considering the transaction.

---

[437]   Letter from Andrew Tuch.  *See supra* note 426 and accompanying text.

[438]   Letter from Ernst & Young.  *See supra* note 425 and the accompanying text.

155

We also disagree with the comments that the filing of reports, opinions, or appraisals pursuant to Item 1607(c) would present their preparers with an "impractical and unworkable" task or that the preparers would not consent to the public use of such materials.[439]  While the requirements of Item 1607(c) may affect how preparers price their services as well as the types of information included in their reports and opinions, such materials have historically and routinely been included with filings relating to transactions other than de-SPAC transactions,[440] and in those cases, registrants and preparers have been able to navigate the preparation, filing, and evaluation of such materials.  We are not aware of any reason (and commenters have not provided any specific reason) why materials used in de-SPAC transactions would be any different.

We are also amending Item 601 of Regulation S-K, Schedule 14A, and Schedule TO to implement the final Item 1607(c) exhibit filing requirement.  For Forms S-1, S-4, F-1, and F-4, which refer to the exhibit requirements in Item 601 of Regulation S-K, the Item 1607(c) exhibit filing requirement will be incorporated through new 17 CFR 229.601(b)(98) (Item 601(b)(98) of Regulation S-K).  Schedule 14A and Schedule TO will incorporate the Item 1607(c) exhibit filing requirement through new Item 25(b) of Schedule 14A and new Item 12(b) of Schedule TO, respectively.  Because Item 1 of Schedule 14C generally requires compliance with the relevant items of Schedule 14A, the Item 1607(c) exhibit filing requirement will be incorporated into Schedule 14C through new Item 25(b) of Schedule 14A.

---

[439]   Letters from ABA, Goodwin.  *See supra* notes 422 and 423 and accompanying text.

[440]   For example, in a going-private transaction subject to Rule 13e-3, any report, opinion (other than an opinion of counsel) or appraisal from an outside party that is materially related to the transaction is required to be filed as an exhibit to the Schedule 13E-3.  *See* Item 16 of Schedule 13E-3 and Item 1016(c) of Regulation M-A.  Additionally, in other public company mergers and business combinations, Item 21(c) of Forms S-4 and F-4 requires that any report, opinion or appraisal materially relating to the subject transaction and referred to in the prospectus be furnished as an exhibit to such form.

**H. Tender Offer Filing Obligations**

*1. Proposed Item 1608*

The Commission proposed Item 1608 to codify a staff position that a Schedule TO filed in connection with a de-SPAC transaction should contain substantially the same information about a target private operating company that is required under the proxy rules and that a SPAC must comply with the procedural requirements of the tender offer rules when conducting the transaction for which the Schedule TO is filed, such as a redemption of the SPAC securities. Redemption rights offered by a SPAC to its security holders in connection with the de-SPAC transaction or an extension of the timeframe to complete a de-SPAC transaction generally have indicia of being a tender offer, but the Commission staff has not objected if a SPAC does not comply with the tender offer rules when the SPAC files a Schedule 14A or 14C in connection with a de-SPAC transaction or an extension and complies with Regulation 14A or 14C, because the Federal proxy rules would generally mandate substantially similar disclosures and applicable procedural protections as required by the tender offer rules.[441]  Proposed Item 1608 would not affect the staff position for those SPACs that file Schedule 14A or 14C for their de-SPAC transactions or extensions.  SPACs that do not file a Schedule 14A or 14C (such as FPIs) in

---

[441]  *See supra* note 23.

connection with the de-SPAC transaction (or an extension of time to complete a de-SPAC transaction),[442] however, would be subject to the requirements of proposed Item 1608.[443]

### 2. Comments: Item 1608

A few commenters generally supported the proposed rule but suggested certain changes.[444]

One of these commenters recommended the Commission codify and clarify that a SPAC filing a Schedule 14A or 14C in connection with a de-SPAC transaction (or seeking an extension of time to complete a de-SPAC transaction) would neither need to file a Schedule TO nor comply with the tender offer rules.[445]  While expressing support for proposed Item 1608, the same commenter stated that a SPAC stockholder's ability to redeem its shares at its option does not result in the existence of a tender offer.[446]  The same commenter stated that SPACs that are FPIs and that elect to report generally on domestic forms and whose de-SPAC transaction disclosure document is nearly "identical" to a proxy or information statement filed by a domestic filer pursuant to Regulation 14A or 14C should not have to file a Schedule TO.[447]  Finally, the

---

[442]  "Foreign private issuer" is defined in Securities Act Rule 405 and 17 CFR 240.3b-4(c) under the Exchange Act. The term "foreign private issuer" means any foreign issuer other than a foreign government except for an issuer meeting the following conditions as of the last business day of its most recently completed second fiscal quarter: (1) More than 50% of the issuer's outstanding voting securities are directly or indirectly held of record by residents of the United States; and (2) Any of the following: (i) The majority of the executive officers or directors are United States citizens or residents; (ii) More than 50% of the assets of the issuer are located in the United States; or (iii) The business of the issuer is administered principally in the United States.

[443]  The staff has historically expressed the view that the same information about the target company that would be required in a Schedule 14A should be included in such a Schedule TO, in view of the requirements of Item 11 of Schedule TO and Item 1011(c) of Regulation M-A and the importance of this information in making a redemption decision.  Item 11 of Schedule TO states "Furnish the information required by Item 1011(a) and (c) of Regulation M-A."  Item 1011(c) of Regulation M-A states "Furnish such additional material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

[444]  Letters from ABA, Vinson & Elkins.

[445]  Letter from ABA.

[446]  *Id.*

[447]  *Id.*

commenter stated that such a SPAC's investors are confused when presented with a proxy statement *and* a tender offer document that proceed as parallel but different processes while not having any added protection.[448]

Another commenter suggested that proposed Item 1608 is too broad because it would apply to tender offers conducted by SPACs but not related to a de-SPAC transaction.[449]  The same commenter stated that the adoption of proposed Securities Act Rule 145a would effectively require the use of Form S-4 or F-4 for all de-SPAC transactions, thus rendering Item 1608 unnecessary.[450]

### 3. *Final Item 1608*

After considering the comments, we are adopting Item 1608 as proposed.

We decline to revise the final item to clarify that a SPAC filing a Schedule 14A or 14C in connection with a de-SPAC transaction (or seeking an extension of time to complete a de-SPAC transaction) would neither need to file a Schedule TO nor comply with the tender offer rules, as recommended by a commenter.[451]  We do not believe the codification of the commenter's view is necessary because Item 1608, as adopted, is a more precise way to address an exception to the standard de-SPAC transaction structures that have been used historically.  We also note that Item 1608 applies only if a SPAC files a Schedule TO for the redemption of securities offered to security holders (e.g., in connection with a de-SPAC transaction or an extension of the timeframe to complete a de-SPAC transaction).  We have revised General Instruction K to Schedule TO to separately address the requirements for a filing that relates to a redemption of securities offered

---

[448]  *Id*.

[449]  Letter from Vinson & Elkins.

[450]  *Id.*

[451]  Letter from ABA.  *See supra* note 445 and accompanying text.

159

to security holders other than in connection with a de-SPAC transaction (e.g., the redemption of securities in connection with an extension of the timeframe to complete a de-SPAC transaction).

With respect to the comment that the redemption of a SPAC's shares at the option of a stockholder is not a tender offer,[452] as noted above, the Commission has expressed the view that SPAC redemptions conducted pursuant to a SPAC's organizational documents generally have indicia of being a tender offer. However, as discussed above, the Commission staff has not objected if a SPAC does not comply with the tender offer rules when the SPAC files a Schedule 14A or 14C in connection with a de-SPAC transaction or an extension and complies with Regulation 14A or 14C. Item 1608 does not affect this staff position for those SPACs that file a Schedule 14A or 14C for their de-SPAC transactions or extensions.

Regarding the comment that FPIs whose de-SPAC transaction disclosure document is "identical" to a proxy or information statement filed by a domestic filer pursuant to Regulation 14A or 14C should not have to file a Schedule TO,[453] we note that an FPI is not required to comply with Regulations 14A or 14C and, thus, any filing the FPI considers to be a proxy or information statement would not be subject to compliance with those regulations and would not be subject to the liability provisions associated with filings required to comply with those regulations (although the filing would be subject to the liability provisions associated with the specific filing made).

Finally, with respect to the same commenter's statement that investors in a SPAC that is an FPI and which delivers both a disclosure document similar to a proxy statement and a tender offer document will be confused without any additional protection,[454] we believe the SPAC

---

[452]   Letter from ABA. *See supra* note 446 and accompanying text.

[453]   Letter from ABA. *See supra* note 447 and accompanying text.

[454]   Letter from ABA. *See supra* note 448 and accompanying text.

should be able to provide enough clarity and investor support regarding the purposes of each such document to surmount these concerns.

We also received a suggestion to expressly state that Item 1608 is applicable only to tender offers conducted by SPACs related to a de-SPAC transaction.[455] We decline to revise Item 1608 as suggested because Item 1608 is intended to apply to Schedule TO filings by SPACs for any redemption of securities offered to security holders, which would include the redemption of securities offered in connection with an extension of the timeframe to complete a de-SPAC transaction.[456]

In response to a commenter's view that the adoption of proposed Rule 145a may result in the requirement to use Form S-4 or F-4 for all de-SPAC transactions, thus rendering Item 1608 unnecessary,[457] we note that there are certain situations today,[458] and there could be situations under future SPAC structures, in which Item 1608 would still be applicable and provide security holders with important disclosure to use in making their investment decision.

---

[455]    Letter from Vinson & Elkins. *See supra* note 449 and accompanying text.

[456]    If a SPAC files a Schedule TO for any redemption of securities offered to security holders, final Item 1608 requires a Schedule TO to provide the information required by General Instruction L.2. to Form S-4, General Instruction I.2. to Form F-4, and Item 14(f)(2) of Schedule 14A (§ 240.14a-101), as applicable, in addition to the information otherwise required by Schedule TO. If the Schedule TO relates to an extension of the timeframe to complete a de-SPAC transaction and a target company has not been identified by the SPAC, we would not expect this information required by Item 1608 regarding a target private operating company to be known or disclosed.

[457]    *Id.*

[458]    For example, the redemption of securities offered by a foreign private issuer or in connection with an extension of the timeframe to complete a de-SPAC transaction where a Schedule 14A or 14C is not filed.

## I.  Structured Data Requirement

### 1.  Proposed Item 1610

The Commission proposed Item 1610 to require SPACs to tag all information disclosed pursuant to Subpart 1600 of Regulation S-K in Inline XBRL in accordance with Rule 405 of Regulation S-T and the EDGAR Filer Manual.

### 2.  Comments

A number of commenters supported proposed Item 1610.[459]  One of those commenters said that tagging the quantitative and narrative disclosures would provide investors with searchable formats to access the information they would like to review, including potential conflicts of interests and potential risks.[460]  Another commenter said the provision of structured data will make Subpart 1600 of Regulation S-K information more easily accessible for purposes of aggregation, comparison, filtering, and other analysis.[461]

Some commenters addressed whether the Commission should provide exemptions or different requirements for FPIs, SRCs, or emerging growth companies ("EGCs").[462]  One commenter said there was not a compelling reason to provide for such exemptions or different requirements.[463]  Another commenter said that "[u]ltimately requirements should be the same" across issuers "to ensure the availability of a complete dataset for investors," but that "the

---

[459]  Letters from ABA; Crowe LLP (June 13, 2022) ("Crowe"); ICGN; PwC; Campbell Pryde, President and CEO, XBRL US (June 13, 2022) ("XBRL US").

[460]  Letter from ICGN.

[461]  Letter from PwC.

[462]  Letters from ICGN, XBRL US.  *See* Proposing Release, *supra* note 7, at 29476 (request for comment number 55) (requesting comment on structured data with respect to FPIs, SRCs, and EGCs).

[463]  Letter from ICGN.

Commission may wish to offer a phase-in period for smaller companies and [foreign private issuers] that have more limited resources."[464]

One commenter indicated they believe there is no need for structured data tagging for SPAC IPOs because SPAC IPOs are considerably simpler and easier to understand for investors than traditional IPOs and the redemption rights make an investment in a SPAC IPO considerably less risky.[465]  Another commenter recommended that the Commission evaluate responses from the issuer community regarding the costs of tagging this information.[466]

One commenter said the Commission should provide detailed technical guidance prior to the rule implementation, taking account of all possible use cases for reporting, and an EDGAR Beta testing environment with voluntary early filing allowed 12 to 15 months prior to the first mandatory compliance date.[467]

One commenter suggested the Commission consider use of Legal Entity Identifiers (LEIs) within the registration process and enhanced disclosures of IPOs by SPACs and in de-SPAC transactions.[468]

### 3.  Final Item 1610 and Tagging Compliance Date

After considering the comments received, we are adopting Item 1610 as proposed,[469] but we are providing a one year phased-in compliance date for the tagging requirements.

---

[464]  Letter from XBRL US.

[465]  Letter from Vinson & Elkins.

[466]  Letter from PwC.

[467]  Letter from XBRL US.

[468]  Letter from Stephan Wolf, CEO, Global Legal Entity Identifier Foundation (June 13, 2022) ("Global Legal Entity Identifier Foundation") ("The LEI itself is a 20-digit, alpha-numeric code based on the ISO 17442 standard developed by the International Organization for Standardization (ISO).").

[469]  The tagging requirements we are adopting are implemented by inclusion of a cross-reference to Rule 405 of Regulation S-T in Item 1610 of Regulation S-K and by revising 17 CFR 232.405(b) of Regulation S-T to include the proposed SPAC-related disclosures.  We are also adopting amendments that add a corresponding Instruction to Schedule TO.

We agree with the commenter who said that tagging the quantitative and narrative disclosures would provide investors with searchable formats to access the information they would like to review, including potential conflicts of interests and potential risks.[470] We also agree with the commenter who said that the provision of structured data will make Subpart 1600 of Regulation S-K information more easily accessible for purposes of aggregation, comparison, filtering, and other analysis.[471]

We believe that the structured data requirements will enhance the usability of the SPAC disclosures. The requirements we are adopting include detail tagging of the quantitative disclosures and block text tagging of the narrative disclosures required under Subpart 1600. These structured data requirements will make SPAC disclosures more readily available and easily accessible to investors and other market participants for aggregation, comparison, filtering, and other analysis.[472]

One commenter suggested that the Commission may wish to "offer a phase-in period for smaller companies and [foreign private issuers] that have more limited resources."[473] To address these concerns, we have determined to provide a one-year phase in for the tagging requirements. We believe the additional one-year period for tagging compliance will help lessen burdens associated with the tagging requirements under the final rules for all registrants.[474]

---

[470] Letter from ICGN. *See supra* note 460 and accompanying text.

[471] Letter from PwC. *See supra* note 461 and accompanying text.

[472] These considerations are generally consistent with objectives of the recently enacted Financial Data Transparency Act of 2022, which directs the establishment by the Commission and other financial regulators of data standards for collections of information. Such data standards must meet specified criteria relating to openness and machine-readability and promote interoperability of financial regulatory data across members of the Financial Stability Oversight Council. *See* James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, P.L. 117-263, tit. LVIII, 136 Stat. 2395, 3421-39 (2022).

[473] Letter from XBRL US. *See supra* note 464 and accompanying text.

[474] Furthermore, SRCs and FPIs are subject to Inline XBRL requirements for other filings, which minimizes the burden reduction associated with any tagging phase-in for those entities. *See infra* note 477.

164

We disagree with one commenter's view that there is no need for structured data tagging for SPAC IPOs because SPAC IPOs are considerably simpler and easier to understand for investors than traditional IPOs and the redemption rights make an investment in a SPAC IPO considerably less risky.[475]  On the contrary, we believe structured data is useful to investors in the SPAC IPO setting (as well as the de-SPAC transaction setting), particularly by enabling comparison and the extraction and analysis of information, as discussed above.  In addition, as discussed above, special risks such as conflicts of interest and dilution in SPAC IPOs and de-SPAC transactions may be complex and enhancing investor ability to use, compare, and analyze the data will help investors assess such risks.

We have not received any responses from the issuer community regarding the costs of the data tagging requirements, but we nonetheless do not believe the structured data requirements will unduly add to companies' burden in preparing their filings based on our extensive experience with existing tagging requirements.  We believe such incremental costs are appropriate given the significant benefits to investors, as described above.

As a result of the requirement to tag SPAC IPO disclosures, SPACs will incur tagging compliance costs at an earlier stage of their lifecycle, because SPACs do not have to tag IPO registration statements under current Commission rules.[476]  While the tagging requirements for SPAC disclosures will impose additional compliance costs on registrants, we expect such costs will be modest and largely the final rules will simply shift the timing of such costs because under the current rules such registrants are subject to data tagging requirements in their first post-IPO

---

[475]  Letter from Vinson & Elkins.  *See supra* note 465 and accompanying text.

[476]  SPACs are currently not obligated to tag any disclosures until they file their first post-IPO periodic report on Form 10-Q, Form 20-F, or Form 40-F.  *See* 17 CFR 229.601(b)(101)(i)(A).

periodic report on Form 10-Q, 20-F, or 40-F,[477] as discussed in greater detail in Section VIII (Economic Analysis) below.

One commenter recommended that the Commission provide an EDGAR beta-testing environment with voluntary early filing allowed 12 to 15 months prior to the first mandatory compliance date.[478]  In lieu of the suggested beta-testing environment, we have determined to provide a one year phased-in compliance date for the tagging requirements, as noted above.  This approach will provide additional time for registrants to prepare for the new requirements.  It will also provide sufficient time for the adoption of a final taxonomy that will take into consideration initial disclosures that will be provided in response to the final rules, which should help lessen the compliance burden for registrants and improve data quality for investors by reducing the need for extensive custom tagging.  The commenter also said the Commission should provide detailed technical guidance prior to the rule implementation, "taking account of all possible use cases for reporting" to ensure consistency of reported data.[479]  Consistent with the Commission's common practice, a draft taxonomy will be made available for public comment, and the Commission will incorporate a final taxonomy into an updated version of the EDGAR system before the tagging requirements take effect.

One commenter suggested the Commission consider use of Legal Entity Identifiers (LEIs) within the registration process and enhanced disclosures of IPOs by SPACs and in de-

---

[477]  *See* 17 CFR 229.601(b)(101).

[478]  Letter from XBRL US.  *See supra* note 467 and accompanying text.

[479]  *Id.*

SPAC transactions.[480]  The Commission is not adopting requirements regarding LEIs in this rulemaking but will take the comment under advisement.[481]

## III. DISCLOSURES AND LIABILITY IN DE-SPAC TRANSACTIONS

In light of the reliance on de-SPAC transactions as a vehicle for private operating companies to access the U.S. public securities markets with greater relative frequency than in the past, the Commission proposed a number of new rules and amendments to existing rules to more closely align the treatment of private operating companies entering the public markets through de-SPAC transactions with that of companies conducting traditional IPOs.  In connection with these proposals, the Commission expressed the view in the Proposing Release that a private operating company's method of becoming a public company should not negatively impact investor protection.[482]

### A. Non-Financial Disclosures in De-SPAC Disclosure Documents

#### 1. *Proposed Rules*

The Commission proposed to require certain non-financial statement disclosures in connection with de-SPAC transactions.  The Commission proposed that, if the target company in a de-SPAC transaction is not subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, disclosure with respect to the target company pursuant to the following items in Regulation S-K would be required in the registration statement or schedule[483] filed in

---

[480]  Letter from Global Legal Entity Identifier Foundation.  *See supra* note 468 and accompanying text.

[481]  *See supra* note 472 (regarding the Financial Data Transparency Act of 2022).

[482]  Proposing Release, *supra* note 7, at 29477.

[483]  *See* (a) proposed Item 14(f)(2) of Schedule 14A; (b) proposed General Instruction L.2. to Form S-4; and (c) proposed General Instruction I.2 to Form F-4.  *See also* proposed Item 1608 of Regulation S-K (incorporating into Schedule TO applicable information required by Item 14(f)(2) of Schedule 14A, General Instruction L.2. to Form S-4, and General Instruction I.2 to Form F-4).  Proposed Item 14(f)(2)(vii) of Schedule 14A would have required additional disclosure for any directors appointed without action by the security holders of the SPAC.

connection with the de-SPAC transaction: (1) Item 101 (description of business); (2) Item 102 (description of property); (3) Item 103 (legal proceedings); (4) Item 304 (changes in and disagreements with accountants on accounting and financial disclosure); (5) Item 403 (security ownership of certain beneficial owners and management, assuming the completion of the de-SPAC transaction and any related financing transaction);[484] and (6) Item 701 (recent sales of unregistered securities).[485]  Where the private operating company is an FPI, the proposed amended registration forms included the option of providing disclosure relating to the private operating company in accordance with Items 3.C, 4, 6.E, 7.A, 8.A.7, and 9.E of Form 20-F, consistent with disclosure provided by FPIs in IPOs.[486]

Also, the Commission proposed amendments to Forms S-1 and F-1 to provide that where these forms are used to register securities in connection with a de-SPAC transaction, these forms must include the information required in Forms S-4 (in the case of Form S-1) and F-4 (in the case of Form F-1).[487]  Finally, the Commission proposed General Instruction K to Schedule TO and new Item 14(f)(1) to Schedule 14A to incorporate into each of those forms, if the filing relates to a de-SPAC transaction, the disclosure provisions of Items 1603 through 1609 of Regulation S-K, as well as the structured data provision of Item 1610 of Regulation S-K.

---

[484]    Item 18(a)(5) of Form S-4 currently requires disclosure pursuant to Item 403 regarding the target company and a SPAC's principal shareholders, through Item 6 of Schedule 14A, in a Form S-4 that includes a proxy seeking shareholder approval of the de-SPAC transaction.

[485]    The proposed changes to Forms S-4 and F-4 regarding disclosure pursuant to Item 701 of Regulation S-K were proposed to be required in Part I (information required in the prospectus) of Form S-4 and Form F-4, whereas in Form S-1, the Item 701 disclosure requirement appears under Part II (information not required in prospectus) of the form.

[486]    Proposed General Instruction L.2 to Form S-4; proposed General Instruction I.2 to Form F-4.

[487]    *See* proposed General Instruction VIII to Form S-1 ("If the securities to be registered on this Form will be issued in a de-SPAC transaction, attention is directed to the requirements of Form S-4 applicable to de-SPAC transactions, including, but not limited to, General Instruction L."); proposed General Instruction VII to Form F-1 ("If the securities to be registered on this Form will be issued in a de-SPAC transaction, attention is directed to the requirements of Form F-4 applicable to de-SPAC transactions, including, but not limited to, General Instruction I.").

## 2. *Comments*

Commenters generally supported the Commission's proposal to align non-financial disclosures for de-SPAC transactions with the requirements in a traditional IPO.[488]  A few commenters suggested the proposed disclosure requirements are consistent with current practice.[489]  These commenters said the proposed disclosure requirements would otherwise be required in a Form 8-K filing following the closing of the de-SPAC transaction.[490]  One commenter said the proposed requirements reflect "current best practice" and would not create a "significant burden" for targets.[491]

One commenter said that the proposed requirements, other than Item 701, would require information "already disclosed with respect to target companies."[492]  In the commenter's view, the proposed disclosures, including Item 701, "would not provide meaningful information or benefits to investors."[493]

Regarding the proposed amendment to Form S-1 to require the information required by Form S-4, one commenter recommended "the final rule include explicit language that such Form S-1 should include all information for the private operating company that would have been required in a Form S-4."[494]

---

[488]  Letters from ABA, CalPERS, Davis Polk, Ernst & Young, ICGN, NASAA, PwC.

[489]  *See* letters from ABA, PwC.

[490]  Letters from ABA, PwC.

[491]  Letter from ABA.

[492]  Letter from Vinson & Elkins.  This commenter also said, "We do not believe Item 701 disclosure with respect to the target company, as opposed to the registrant, would be consistent with IPO disclosure or provide meaningful information to investors."

[493]  Letter from Vinson & Elkins.

[494]  Letter from Grant Thornton LLP (June 13, 2022) ("Grant Thornton").

169

### 3. Final Rules

Except for the modifications we discuss below, we are adopting as proposed: (a) General Instruction L.2 to Form S-4, (b) General Instruction I.2 to Form F-4,[495] (c) Item 14(f)(2) of Schedule 14A, (d) General Instruction K to Schedule TO, (e) General Instruction VIII to Form S-1, and (f) General Instruction VII to Form F-1.[496]  We believe there will be two main benefits to investors from these requirements.  First, the inclusion of these disclosures in a Form S-4 or Form F-4 registration statement will mean that any material misstatements or omissions contained therein would subject the issuers and other parties to liability under Sections 11 and 12 of the Securities Act, which would align with the protections afforded to investors under the Securities Act for disclosures provided in a Form S-1 or F-1 for an IPO.

Second, as a result of these new requirements, this information will be available to investors prior to the inception of trading of the post-business combination company's securities on a national securities exchange, rather than the earliest instance of such requirement being the requirement to set this information out in a Form 8-K due within four business days of the

---

[495]   The regulatory text section of the Proposing Release inadvertently omitted Item 304 of Regulation S-K from proposed General Instruction I.2 to Form F-4.  We have corrected that oversight in this adopting release.  Additionally, the cross-references to the applicable Items from Form 20-F in the case where the target is a foreign private issuer have been corrected from those proposed to align with the requirements applicable to domestic targets, that is Items 4, 6.E, 7.A, 8.A.7, and 16F of Form 20-F.  In addition, in Form F-4, we have added the term "applicable" to modify "disclosure requirements" in the following sentence in General Instruction I in order to be consistent with similar language in Form S-4: "To the extent that the applicable disclosure requirements of Subpart 229.1600 are inconsistent with the disclosure requirements of this Form, the requirements of Subpart 229.1600 are controlling."  We made similar changes to add the term "applicable" to Schedule 14A and Schedule TO for the same reason.

[496]   Under the final rules, with respect to the requirements to provide Item 403 of Regulation S-K (security ownership of certain beneficial owners and management) information assuming the completion of the de-SPAC transaction and any related financing transaction, the Item 403 information that must be provided is with respect to certain beneficial owners, directors, named executive officers, and directors and executive officers as a group (i.e., the persons identified in Item 403) of the post-de-SPAC transaction combined company and not for the target company as a separate entity.

170

completion of the de-SPAC transaction.[497]  As a result, shareholders will be able to consider this information when they make voting, investment, or redemption decisions in connection with a de-SPAC transaction.

One commenter suggested that disclosure under the proposed requirements is already provided with respect to target companies and would not provide meaningful benefits to investors.[498]  We disagree with this view that the requirements would not provide meaningful benefits to investors.  Also, we believe compliance with these requirements will be minimally burdensome where disclosure of this information is already market practice and codifying this practice will create a uniform, transparent, minimum floor standard of disclosure across transactions, even if market practice were to change in the future.

In response to the comment recommending that Form S-1 should include explicit language that Form S-1 should include all information for the private operating company that would have been required in a Form S-4,[499] we have revised General Instruction VIII of Form S-1 to clarify that, if the securities to be registered on Form S-1 will be issued in a de-SPAC transaction, the requirements of Form S-4 apply to Form S-1, including, but not limited to, Item 17 and General Instruction L.  Similarly, in the final rules, we have revised General Instruction VII of Form F-1 to clarify that, if the securities to be registered on Form F-1 will be issued in a de-SPAC transaction, the requirements of Form F-4 apply to Form F-1, including, but not limited to, Item 17 and General Instruction I.

---

[497]  We note registrants should already be preparing this information in anticipation of making a Form 8-K filing (or a Form 20-F for an FPI) in connection with a de-SPAC transaction.  *See supra* note 489 (letters from ABA, PwC).

[498]  Letter from Vinson & Elkins.  *See supra* notes 492 and 493 and accompanying text.

[499]  Letter from Grant Thornton.  *See supra* note 494 and accompanying text.

With respect to instructions in both General Instruction L.2 to Form S-4 and General Instruction I.2 to Form F-4 that apply with respect to the target company "[i]f the target company is a foreign private issuer," we made several corrections from the proposal.  First, we deleted the requirement to provide target company information pursuant to Item 3.C of Form 20-F (reasons for the offer and use of proceeds), because there is not a similar analog in the list of disclosure items to be provided with respect to the target company when the target company is not an FPI in the same instructions.  Second, we deleted the requirement to provide target company information pursuant to Item 9.E of Form 20-F (dilution) because dilution information will already be required through the application of Item 1604 in the forms in connection with a de-SPAC transaction.[500]  Third, we added a requirement to provide target company information pursuant to Item 16F of Form 20-F (change in registrant's certifying accountant), because the intent of the proposal was that there should be an analog for FPI target companies to Item 304 of Regulation S-K (changes in and disagreements with accountants on accounting and financial disclosure) in the list of disclosure items to be provided with respect to the target company when the target company is not an FPI in the same instructions and the reference to Item 16F of Form 20-F was inadvertently omitted from the proposal.

In the final rules, we have also revised Item 14(f)(2) of Schedule 14A to remove the additional disclosure required for any directors appointed without action by the security holders of the SPAC to align the disclosure required under Item 14(f)(2) of Schedule 14A with that required under General Instruction L.2 to Form S-4 and General Instruction I.2 to Form F-4.

---

[500]  We made a similar change to Form F-1.  We added new Item 9.E.4 to Form F-1 that provides: Where the registrant is a special purpose acquisition company (as defined in Item 1601 of Regulation S-K), in lieu of providing the information required under Item 9.E.1 and Item 9.E.2, provide the disclosure required pursuant to Items 1602(a)(4) and 1602(c) of Regulation S-K  in an offering other than a de-SPAC transaction (as defined in Item 1601 of Regulation S-K) and provide the disclosure required under Item 1604(c) of Regulation S-K in connection with a de-SPAC transaction.

## B.  Minimum Dissemination Period

### 1.  *Proposed Rules*

Historically, in business combination transactions, there has been no requirement under Commission rules to provide security holders with a minimum amount of time to consider proxy statement or other disclosures.[501]  In view of the unique circumstances surrounding de-SPAC transactions, the Commission proposed to amend Exchange Act Rule 14a-6 and Rule 14c-2, as well as to add instructions to Forms S-4 (General Instruction L.3) and F-4 (General Instruction I.3), to require that prospectuses and proxy and information statements filed in connection with de-SPAC transactions be distributed to security holders at least 20 calendar days in advance of a security holder meeting or the earliest date of action by consent, or the maximum period for disseminating such disclosure documents permitted under the applicable laws of the SPAC's jurisdiction of incorporation or organization if such period is less than 20 calendar days.[502]

### 2.  *Comments*

A number of commenters generally supported the proposed minimum dissemination periods for disclosure documents in de-SPAC transactions.[503]

---

[501]  In Form S-4 and Form F-4, however, there is a requirement to send a prospectus to security holders a minimum of 20 business days prior to a security holder meeting, or, if no meeting is held, other action, that is applicable when a registrant incorporates by reference information about the registrant or the company being acquired into the form.  General Instruction A.2 of Form S-4 and General Instruction A.2 of Form F-4.

[502]  The 20-calendar day period is the same length of time as the 20-day advance disclosure period in 17 CFR 240.13e-3(f)(1) under the Exchange Act.  In adopting a 20-day advance disclosure requirement for dissemination of documents in connection with going private transactions, the Commission stated this requirement was intended to provide reasonable assurance that the information required to be disclosed to security holders would be disseminated sufficiently far in advance of the transactions to permit security holders to make "an unhurried and informed" decision.  *Going Private Transactions by Public Companies or Their Affiliates*, Release No. 33-6100 (Aug. 2, 1979), [44 FR 46736 (Aug. 8, 1979)].

[503]  Letters from ABA, Better Markets (supporting the 20-day dissemination period, stating that "[t]o make meaningful decisions, investors in a SPAC need the information regarding the proposed transaction in a timely manner" and that "[i]n the absence of a federally mandated minimum time period to disseminate information regarding the transaction, the potential for abuse is clear"); CalPERS; CFA Institute ("CFA Institute supports as much lead time as possible for dissemination of disclosure documents regarding the de-SPAC transaction and

173

One commenter on the proposal supported "as much lead time as possible for dissemination" and suggested the Commission "consider whether federal securities laws should override the laws of the jurisdiction of incorporation or organization if such jurisdictions allow less than 20 calendar days advance dissemination for de-SPAC merger/proxy vote documentation where such de-SPAC will be trading on SEC regulated markets."[504]

Another commenter said that the period of 20 calendar days "is consistent with current market practice for the solicitation period in de-SPAC transactions."[505]  The commenter said that, if the safe harbor from the Investment Company Act is adopted as proposed, the Commission should "consider an exception to the minimum dissemination period in the event necessary to stay within the safe harbor."[506]

Another commenter said, "The SEC's proposed solution does not align with the treatment of IPOs.  An IPO prospectus is substantially final at launch of the IPO roadshow; however, since there is no required length for a roadshow, investors in an IPO may only have access to a substantially final version of the prospectus for a few days prior to making their investment decision."[507]  The commenter said that stockholder meeting notices required to be provided certain numbers of days prior to a stockholder meeting are typically included in proxy statements and stated that, "Under the current framework, the final registration statement or proxy statement

---

agrees with the proposed minimum of twenty (20) calendar days in advance merger approval vote"); Davis Polk ("the minimum dissemination period proposed in the amendments to Exchange Act rules 14a-6 and [14c-2] is a welcome modification to improve public confidence by providing a minimum period to review the disclosures provided in connection with a de-SPAC transaction."); ICGN ("For investors, after a SPAC has searched for a potential business candidate for up to two years, time may be running out.  Investors should be able to receive proxy and prospectus statements within a reasonable time frame that provides them with the ability to assess the de-SPAC business transaction and vote accordingly."); NASAA.

[504]   Letter from CFA Institute.

[505]   Letter from Davis Polk.

[506]   Letter from Davis Polk.

[507]   Letter from Vinson & Elkins.

in a de-SPAC transaction is available for at least 10 days and a preliminary version is typically

publicly available for up to several months longer than in an IPO." This commenter also stated,

"The SEC justifies this differential treatment by citing the complexity of the SPAC structure, the

conflicts of interest that are often present in this structure and the effects of dilution on non-

redeeming shareholders, but it fails to appreciate that many of these same considerations can be

present in IPO transactions and that this proposed rule is decidedly contrary to the SEC's stated

intention of aligning de-SPAC transactions with IPOs."

Another commenter appeared to suggest that the minimum dissemination period for

purposes of proposed General Instruction L.3 to Form S-4 should be the same as the IPO "48

hour" rule of 17 CFR 240.15c2-8 ("Rule 15c2-8") under the Exchange Act.[508]

*3.   Final Rules*

We are adopting the amendments to Rule 14a-6 and Rule 14c-2 and Forms S-4 (General

Instruction L.3) and F-4 (General Instruction I.3) as proposed, except for clarifying changes

discussed below. In addition to the need for enhanced disclosure in de-SPAC transactions, we

continue to believe that it is important to ensure that SPAC security holders have adequate time

to analyze the information presented in these transactions.

Although the laws of a SPAC's jurisdiction of incorporation or organization may require

the SPAC to send a notice to its security holders at least a specified number of days before the

security holder meeting to approve a proposed business combination transaction, the information

in such notices is often limited.[509] These laws do not generally require a minimum period of

---

[508]   Letter from Loeb & Loeb.

[509]   *See, e.g.*, Del. Code Ann. tit. 8, §222; Del. Code Ann. tit. 8, §251(c) (stating, in part, that "[d]ue notice of the time, place and purpose of the meeting shall be given to each holder of stock, whether voting or nonvoting, of the corporation at the stockholder's address as it appears on the records of the corporation, at least 20 days prior to the date of the meeting [to vote on an agreement of merger or consolidation]").

time for dissemination of other information about the transaction (including any proxy statements or other materials required by the Federal securities laws) to security holders.[510] Exchange listing standards also do not impose such requirements.[511]  Without a minimum period for dissemination of prospectuses, proxy statements, and other materials before a security holder meeting (or action by consent), SPACs and SPAC sponsors may provide prospectuses or proxy or information statements for a de-SPAC transaction to the SPAC's security holders within an abbreviated time frame, leaving the security holders with relatively little time to review what are often complex disclosure documents for these transactions.

We recognize that SPACs are often required under their governing instruments and applicable exchange listing rules to complete de-SPAC transactions within a certain time frame. Nevertheless, given the complexity of the structure of SPACs, the conflicts of interest that are often present in this structure and the effects of dilution on non-redeeming shareholders, the 20-calendar day minimum dissemination periods we are adopting will provide an important investor protection by establishing a minimum time period for security holders to review prospectuses and proxy and information statements in de-SPAC transactions.[512]

---

[510]   *See* R. Franklin Balotti, Jesse A. Finkelstein, John Mark Zeberkiewicz & Blake Rohrbacher, Delaware Law of Corporations and Business Organizations, § 9.16 (4th ed. 2022 & Supp. 2022) ("[t]he only statutory requirements for the notice of the meeting are that it state the time, place and purpose of the meeting and that the notice contain a copy of the merger agreement or a summary of the agreement…[i]n practice, of course, many such meetings will be governed by the federal proxy rules, which require that a full proxy statement be submitted to the stockholders.").

[511]   *See, e.g.*, NYSE Listed Company Manual Section 401.03 which "recommends that a minimum of 30 days be allowed between the record and meeting dates so as to give ample time for the solicitation of proxies" and 402.05 which "recommends the [proxy soliciting] material be provided 30 days prior to the meeting date in order to allow the firms ample time to mail the material to beneficial owners and receive replies from them."

[512]   The requirements to "distribute" the various security holder materials under the minimum dissemination time periods in the rules we are adopting are satisfied when the materials are sent and not when they are received by the security holder.  Thus, where the registrant is mailing a full set of hard copy materials to security holders, the requirement would be met when the materials are placed in the mail.

In order to account for the prospect that the laws of a SPAC's jurisdiction of incorporation or organization may have a maximum advance time period provision applicable to the dissemination of materials to security holders, the rules we are adopting include provisions that would require a registrant to satisfy the maximum dissemination period permitted under the applicable law of such jurisdiction when this period is less than 20 calendar days to avoid conflicting with such a requirement.  One commenter suggested that the Commission should override the laws of the jurisdiction of incorporation or organization of the SPAC where such jurisdictions provide a maximum period for dissemination of less than 20 days.[513]  We are not adopting such suggestion because we believe the instances where there is a maximum period of less than 20 days will be limited.[514]

Another commenter said that the Commission should consider an exception to the minimum dissemination period where necessary to stay within the Investment Company Act safe harbor.[515]  As discussed below in Section VI, we are not adopting the proposed Investment Company Act safe harbor.

One commenter suggested that the proposed minimum dissemination period is contrary to the Commission's stated purpose of aligning de-SPAC transactions with IPOs because investors in IPOs typically have only short periods of time to review prospectuses.[516]  While we acknowledge that, under the final rules, investors may have more time to review prospectuses in a de-SPAC transaction than in an IPO, we believe this is appropriate because in the Commission

---

[513]   Letter from CFA Institute.  *See supra* note 117 and accompanying text.

[514]   A review, in June 2023, by the Commission staff of the corporation laws of each of the 50 U.S. States found there are currently no U.S. States with a maximum period of notice for a stockholder meeting that is less than 20 days.  We acknowledge that there remains the possibility a U.S. State could change its law to provide for a maximum period of notice less than 20 days or foreign law could contain such a provision.

[515]   Letter from Davis Polk.  *See supra* note 506 and accompanying text.

[516]   Letter from Vinson & Elkins.  *See supra* note 507 and accompanying text.

177

staff's experience, due to the hybrid nature of SPAC transactions, registration statements in de-SPAC transactions in some cases are substantially lengthier than both the earlier IPO registration statement for the specific SPAC (that is involved in the de-SPAC transaction) and registration statements for IPOs of traditional operating companies, as the registration statements contain both IPO-like information about the target company and M&A-like information about the de-SPAC (and other related) transactions.  Further, as noted by a different commenter[517] and as observed by Commission staff, current market practice appears to be that many SPACs deliver these disclosures to investors earlier than 20 calendar days prior to the meeting date, meaning the final rules we are adopting should impose minimal burdens in such instances and would provide a uniform and transparent minimum floor standard for the dissemination of such disclosure should market practices change.

One commenter also said that a preliminary version of the final registration statement may be available for months prior to the security holder meeting date related to the de-SPAC transaction.[518]  We do not believe this fact provides a basis for not adopting the proposed rules regarding minimum dissemination periods.  These preliminary filings may be amended prior to their becoming effective and, in the case of a combined registration and proxy statement that has not yet become effective, this disclosure would not yet have been delivered to security holders.

To the extent one commenter appeared to suggest that the minimum dissemination period should be the same as the IPO "48 hour" rule of Exchange Act Rule 15c2-8,[519] we do not believe a 48-hour period would provide investors sufficient time to review the disclosure, particularly given the complex hybrid nature of de-SPAC transactions.  Moreover, providing only 48 hours

---

[517]   Letter from Davis Polk.

[518]   Letter from Vinson & Elkins.  *See supra* note 507 and accompanying text.

[519]   Letter from Loeb & Loeb.  *See supra* note 508 and accompanying text.

before the shareholder meeting will not provide enough time for certain shareholders' votes to be considered as a practical matter, given that many shares are held through securities intermediaries such as broker-dealers and such intermediaries often require voting instruction forms to be submitted to them at least 48 hours prior to the shareholder meeting.[520]

We are making minor changes in the final rules compared to the proposals for purposes of clarity and to make the registration forms congruent with the amendments to Rule 14a-6 and Rule 14c-2 that we are adopting. The final rules provide that each of Rule 14a-6, Rule 14c-2, and Forms S-4 and F-4 will contain the language "must be distributed to security holders no later than the lesser of 20 calendar days prior to the date on which the meeting of security holders is to be held or action is to be taken in connection with the de-SPAC transaction." Where the proposed amendments to Forms S-4 and F-4 referred to the "date on which action is to be taken," these revisions eliminate any potential for misinterpretation that the proposed language only referred to action by consent and not at a meeting of security holders. In addition, the terms "to be held" and "to be taken" are intended to clarify these rules since these events are in the future when viewed from the point in time at which the security holder materials are distributed.

---

[520] As discussed in Sections III.C and IV.A, the Commission is adopting Rule 145a and amendments to registration statement forms that are related to certain co-registration obligations. As a result, in connection with de-SPAC transactions, Rule 15c2-8 may apply and require the delivery of the preliminary prospectus to any person who is expected to receive a confirmation of sale pursuant to the terms of that rule, because the target company is typically not such a reporting company before the transaction. We will continue to consider the effect of Rule 15c2-8 on de-SPAC transactions. At the present time, however, we are not making any changes to Rule 15c2-8.

## C. Private Operating Company as Co-Registrant

### 1. Proposed Rules

Under Section 6(a) of the Securities Act, each "issuer"[521] must sign a Securities Act registration statement.[522]  In the Proposing Release, the Commission stated that a de-SPAC transaction marks the introduction of a private operating company to the U.S. public securities markets, and investors look to the business and prospects of the private operating company in evaluating an investment in the combined company.[523]  The Commission stated that, accordingly, it is the private operating company that, in substance, issues or proposes to issue its securities, as securities of the newly combined public company.[524]

Given that the target company therefore is, in substance, an "issuer" of securities in a de-SPAC transaction regardless of transaction structure,[525] the Commission proposed to amend Instruction 1 to the signatures section of both Form S-4 and Form F-4 to require that, when the SPAC would be the issuer filing the registration statement for a de-SPAC transaction, the term "registrant" would mean not only the SPAC but also the target company.[526]  The Commission

---

[521]  The Securities Act broadly defines the term "issuer" to include every person who issues or proposes to issue any securities.  *See* Section 2(a)(4) of the Securities Act [15 U.S.C 77b].

[522]  In addition, Section 6(a) requires the issuer's principal executive officer or officers, principal financial officer, comptroller or principal accounting officer, and the majority of its board of directors or persons performing similar functions (or, if there is no board of directors or persons performing similar functions, by the majority of the persons or board having the power of management of the issuer) to sign a registration statement.  When the issuer is a foreign entity, the registration statement must also be signed by the issuer's duly authorized representative in the United States.

[523]  Proposing Release, *supra* note 7, at 29479.

[524]  Proposing Release, *supra* note 7, at 29479.

[525]  *See* Section 2(a)(4) of the Securities Act.

[526]  *See* Proposed Instruction 1 to the Signatures section of Form S-4 and Form F-4.  Securities Act registration statement forms use the term "registrant" throughout rather than the term "issuer."  *See, e.g.*, Form S-4.  A "registrant" is a type of "issuer."  Rule 405 defines the term "registrant" as "the issuer of the securities for which the registration statement is filed."  For the purposes of this release, we are using the terms "co-registrant" and "co-registration" to describe the situation where the target company must be included as a registrant on a registration statement for a de-SPAC transaction given that the target company is an "issuer" of

180

also proposed to amend the general instructions to Forms S-4 and F-4 to provide that, if the securities to be registered on the form will be issued by a SPAC in a de-SPAC transaction, the term "registrant" for purposes of the disclosure requirements of the form means the SPAC.[527]

### 2. Comments

A number of commenters generally supported the proposal.[528]  These commenters indicated that the co-registration proposal would better align liability and disclosure in de-SPAC transactions with IPOs.  One stated that "the proposed changes that would treat a target operating company as a co-registrant at the time a Form S-4 or F-4 is filed would contribute to the Commission achieving its objective to better align de-SPAC transactions with traditional IPOs and afford investors with consistent protections."[529]  Another stated that, "By making target companies co-registrants, the Proposed Rules ensure that target operating companies and their directors and officers have strong incentives under Section 11 to deter disclosure errors and other misconduct, even in conventionally structured de-SPACs."[530]  Yet another stated, "We believe that treating both the SPAC and the target as an issuer under Section 6(a) of the Securities Act would help to align investor protections with those of a traditional IPO."[531]

---

securities in a de-SPAC transaction regardless of transaction structure.  Moreover, the Commission has previously specified who constitutes the "registrant" for purposes of signing a Securities Act registration statement in certain contexts.  For example, an instruction in Forms S-4 and F-4 requires two or more existing corporations to be deemed co-registrants when they will be parties to a consolidation and the securities to be offered are those of a corporation not yet in existence at the time of filing.  See Instruction 3 to the signature page for Form S-4 and Form F-4.

527   Proposed General Instruction L.1. to Form S-4; proposed General Instruction I.1. to Form F-4.

528   Letters from Andrew Tuch; Americans for Financial Reform Education Fund (June 13, 2022) ("Americans for Financial Reform Education Fund"); Better Markets; CalPERS; CFA Institute; CII; Senator Elizabeth Warren; ICGN; KPMG LLP (June 13, 2022) ("KPMG"); Loeb & Loeb; NASAA; Paul Swegle.

529   Letter from KPMG.

530   Letter from Andrew Tuch.

531   Letter from CII.

Several of these commenters also indicated that the rule proposal would benefit investors by increasing the quality and reliability of the disclosure provided in de-SPAC transaction registration statements.  One argued that the disclosures provided in de-SPAC registration statements should be "enhanced" due to the fact that "both parties to the de-SPAC transaction [would be] liable for material misstatements and omissions to investors and shareholders,"[532] while another stated "the proposed co-registrant requirements, and attendant liabilities for misstatements or omissions, would ensure that target company directors, boards and managements make accurate representations regarding the status of the pre-merger entity."[533]

Other commenters generally opposed or had concerns regarding the proposal,[534] generally characterizing the proposal as "not necessary"[535] or "inappropriate."[536]  Several commenters stated that the rule proposal would not benefit investors or that the benefit would be uncertain.[537]  A number of commenters indicated that there are already strong incentives under the existing framework to ensure that disclosures in registration statements for de-SPAC transactions are accurate and complete, pointing to the existing liability frameworks that they state apply to de-SPAC transactions, such as Sections 11 and 17(a) of the Securities Act, Sections 10(b) and 14(a) of the Exchange Act, and 17 CFR 240.10b-5 ("Rule 10b-5") under the Exchange Act, and the Commission's ability to bring enforcement actions.[538]  A few of these

---

[532]  Letter from Better Markets.

[533]  Letter from NASAA.

[534]  Letters from ABA, Davis Polk, Freshfields, Job Creators Network, NYC Bar, Skadden, Vinson & Elkins.

[535]  Letter from Davis Polk.

[536]  Letter from ABA.

[537]  Letters from ABA ("It is unclear if the Co-Registrant Amendment would meaningfully enhance disclosures and protections for investors in practice"), Davis Polk ("we do not expect that the disclosure practice will be improved by such amendments"), Job Creators Network.

[538]  Letters from ABA (stating that "the Target and its affiliates—while not signatories of the Merger Registration Statement—may nonetheless still be subject to liability for disclosures in the Merger Registration Statement

commenters suggested it is unnecessary to impose additional liability because target company officers and directors, by virtue of their roles in the combined company, will effectively "own" any Exchange Act liabilities related to the disclosure in the de-SPAC transaction registration statement inherited by the combined company.[539]

Several commenters suggested the co-registrant proposal would create a disparity compared to traditional M&A business combination transactions where a target is not a co-registrant.[540]  In contrast, another commenter stated that de-SPAC transactions involve "clearly different facts and circumstances than a non-SPAC merger because the SPAC board is not making a decision about the benefits of changing its operating business model via merger but

---

under Rule 10b-5 of the Exchange Act and potential enforcement actions by the Commission under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and under the proxy rules as participants in the proxy solicitation by the SPAC."), Davis Polk ("the private operating target company and its affiliates are already subject to enforcement actions by the Commission irrespective of these amendments…."), Kirkland & Ellis (noting that "alternative statutory liability schemes cover various aspects of the de-SPAC transaction, including Section 11 where appropriate."), NYC Bar, Skadden, Vinson & Elkins, Winston & Strawn LLP (June 13, 2022) ("Winston & Strawn") ("In connection with the stockholder vote to approve the business combination and the repurchase of shares from redeeming SPAC stockholders, a SPAC already has liability under Section 14(a) of the Exchange Act and the antifraud provisions of Rule 10b-5.").

[539]  Letters from ABA (noting that under current law "the Target's directors and officers will 'own' the disclosures going forward…so there is already a strong incentive for the Target's directors and officers to ensure the accuracy and completeness of the initial Merger Registration Statement disclosures"), NYC Bar ("it is unnecessary to impose additional liability on the Target's directors and management in connection with the registration statement because those parties, by virtue of inheriting the disclosures of the registration statement and the ongoing disclosure obligations of the combined public company, will have Exchange Act liability going forward and with respect to historical disclosures as a result of the business combination.").

[540]  Letters from ABA ("Inasmuch as a De-SPAC Transaction is fundamentally an M&A transaction, and no different than business combinations in other contexts, the Commission has never required targets in other business combinations in these circumstances to be added as co-registrants of a merger registration statement."), CFA Institute ("As to the need to amend the merger registration statement forms and schedules filed in connection with de-SPAC mergers involving a private operating company target, but not other mergers, creates regulatory uncertainty and confusion."), Skadden ("Moreover, the proposed co-registrant changes may occasion inconsistent treatment of de-SPAC transactions compared to other business combination transactions that are substantively similar and where the Commission's concerns about the adequacy of target company disclosure also could exist.").  *See also* letter from Nicholas Pappas, King & Wood Mallesons (June 13, 2022) ("King & Wood Mallesons") ("An example of the species of transaction in respect of which the Proposed Rules require qualification is where a seller is proposing to sell a subsidiary/target company….At the time of running the sale process there is generally no intention on the part of the seller to IPO the target company.").

rather is offering its shareholders the alternative of investing in the surviving company if they prefer that to $10 in cash."[541]

Other commenters suggested the co-registration proposal is inconsistent with existing definitions of registrant and issuer because, they asserted, the target in a de-SPAC transaction is not issuing or proposing to issue any securities pursuant to the de-SPAC registration statement.[542]

One commenter opposed the co-registration proposal and expressed the view that: "[i]n most de-SPAC transactions the shares being registered on the SPAC's registration statement are being issued only to the target's shareholders and are not being issued or sold by the target company.  Adding the target company as a co-registrant means that, in most cases, the target company will have potential Section 11 liability with respect to its own shareholders, but this is not logical or intuitive and is not consistent with the structure of a traditional IPO.  In a traditional IPO, a company's existing shareholders at the time of the IPO do not receive registered shares and would not have potential Section 11 claims against the company due to the disclosures in the IPO registration statement."[543]

Another commenter suggested the co-registration proposal is inconsistent with 17 CFR 230.140 ("Rule 140") under the Securities Act.[544]  The commenter said the purpose of Rule 140—to "ensure[] that the requisite information about the underlying issuer is adequately disclosed so new investors are fully informed of the attendant risks and returns relating to a potential investment"—is "not a concern in de-SPAC transactions," because "full Form 10-type

---

[541]  Letter from Bullet Point Network.

[542]  Letters from ABA, Freshfields.  *See also* definitions of "issuer" and "registrant," *supra* notes 521 and 526.

[543]  Letter from Freshfields.

[544]  Letter from ABA.

information" is already provided under current rules about the SPAC and the target company.[545] This commenter also said that in a de-SPAC transaction "no new proceeds are being received by the Combined Company," which is a "notable difference" from Rule 140.[546]

Other commenters on the co-registration proposal requested certain clarifications. One commenter supported the co-registration requirement but suggested the Commission clarify whether "liability correctly or mistakenly extends to anyone other than unaffiliated, non-redeeming SPAC shareholder[s]."[547] A different commenter asked the Commission to clarify "which entities would be considered co-registrants in these types of transactions and therefore subject to the applicable requirements under the securities laws."[548]

Several commenters addressed issues related to the scope of Section 11 liability that may stem from the co-registration proposal. One commenter suggested that, as drafted, the proposal would make the target company a signer but not a co-registrant.[549] Specifically, this commenter said that the proposed change to Instruction 1 to the Signatures section of the forms purports to make the target company a registrant "for purposes of this instruction" but that "the change would solely require that the target company, along with its specified officers and directors, sign the registration statement," citing for purposes of comparison "existing Instruction 3 to the Signatures section of the forms, which the commenter said is not limited solely to the Signatures

---

[545]  *Id.*

[546]  *Id.*

[547]  Letter from CFA Institute ("For example, could such liability extend to various SPAC 'insiders' who may claim they are unaffiliated and do not redeem, even though they have conducted detailed due diligence and have negotiated special deal terms with the SPAC such as anchor and PIPE investors. Moreover, would this provision extend the target company liability to its own, private company shareowners.").

[548]  Letter from KPMG (specifically noting that "SPACs may acquire more than one operating company as part of a de-SPAC transaction").

[549]  Letter from Vinson & Elkins.

[549]  Letter from Vinson & Elkins.

section."[550]  The commenter opposed the proposed co-registration requirements and said that, "if the regulatory goal is exposing the target company and its officers and directors, as signatories, to Section 11 liability for material misstatements or omissions in the registration statement, the proposed amendment to Instruction 1 of the forms accomplishes that."[551]

Other commenters expressed views on which entity and which officers and directors should be required to sign the de-SPAC transaction registration statement.  One commenter said that the Commission should "clarify that directors and executive officers of the target company, who will not be directors or executive officers of the target company following the consummation of the de-SPAC transaction, are not required to sign the registration statement used for the de-SPAC transaction and are not deemed to be directors or executive officers of the target company for purposes of the liability provisions of the securities laws."[552]  Another commenter stated that the "required signatories should be the surviving company, which might be a new registrant and the directors and officers of that entity."[553]  In contrast, another commenter expressed the view that "[t]arget company managers and directors are responsible for providing the information necessary for investor approval of a de-SPAC merger, and must provide accounting information as well as current operations and forecasts," because they "also profit significantly from selling private shares and/or receiving significant ownership positions in the post-SPAC entity."[554]  A different commenter suggested that liability under the co-

---

[550]  Letter from Vinson & Elkins.  *See also supra* note 526 (describing Instruction 3 to the Signatures sections of Forms S-4 and F-4).

[551]  Letter from Vinson & Elkins.

[552]  Letter from Freshfields ("This would be consistent with the obligations in a traditional IPO, where the registrant identifies in the prospectus who will be its directors following the IPO").

[553]  Letter from Vinson & Elkins ("Putting aside the signatory/registrant distinction, we believe that the SEC should not make the target company sign the registration statement or be a full co-registrant").

[554]  Letter from NASAA ("With this in mind, [the commenter] supports the attachment of Section 11 responsibilities to the managers and directors of target companies.").

registration proposal would be both over-inclusive and under-inclusive, because new officers or directors may be appointed[555] and because target company officers or directors may resign.[556] Finally, one commenter pointed out that in a de-SPAC transaction structured as an acquisition of assets, the assets acquired could not sign a registration statement.[557]

A number of commenters addressed Exchange Act reporting company obligations of the target company as a result of proposed co-registration requirements.  Several commenters raised concerns that if the target company is a co-registrant on a de-SPAC registration statement, the target company would become an Exchange Act reporting company at the time of effectiveness.[558]  Specifically, commenters raised concerns about the target company being required to file Exchange Act reports during the interim period between when the registration statement for the de-SPAC transaction becomes effective and the closing of the de-SPAC transaction.[559]

---

[555]  Letter from ABA ("in many (if not substantially all) De-SPAC Transactions, given the minimum 20-day gap period between the Merger Registration Statement's effectiveness and Closing, and significant Closing uncertainty at the time of registration statement effectiveness, additional directors (such as 'outside' independent directors or Sponsor designees) will join the Combined Company board just prior to or concurrent with Closing.").

[556]  Letter from ABA ("In many De-SPAC Transactions, certain legacy Target directors (and sometimes officers) will resign immediately prior to Closing.  So the group of individuals to whom Securities Act liability attaches (i.e., the persons signing the Merger Registration Statement) under the Co-Registrant Amendment is at the same time both under-inclusive and over-inclusive.").

[557]  Letter from Vinson & Elkins.

[558]  Letters from ABA (noting that, in the time between effectiveness and closing of the merger, "there is a risk that the parties may terminate a De-SPAC Transaction subsequent to the Merger Registration Statement effectiveness date, including (among other reasons) for failure to obtain stockholder approval, failure to satisfy a 'minimum cash' or 'maximum redemption' closing condition, or failure to obtain a required regulatory or third-party approval.  However, once the Merger Registration Statement has been declared effective, under the Co- Registrant Amendment, the Target would nonetheless be subject to ongoing Exchange Act reporting obligations for at least 12 months, even if a De-SPAC Transaction is terminated."), Crowe, Davis Polk, Freshfields ("[I]f the Form S-4 or Form F-4 is declared effective by the SEC, but the de-SPAC transaction does not close, the target, previously a private company, would be burdened with disclosure obligations as if it was a public company for at least the remainder of the year but would have no securities trading in the public markets."), Grant Thornton, KPMG.

[559]  Letters from ABA ("The Co-Registrant Amendment, if adopted as proposed, would subject Targets to reporting obligations pursuant to Section 15(d) of the Exchange Act following effectiveness of the Merger Registration

187

A different commenter said "the proposed rules should clarify that a target company that will ultimately not be the public company parent following the de-SPAC transaction does not become subject to the periodic reporting requirements of Section 13 of the Exchange Act as a result of being a co-registrant in the registration statement for the de-SPAC transaction."[560]  If a target company that does not become the public company parent does become subject to periodic reporting, the commenter said that "upon effectiveness of such registration statement, the target company would, as a result of Section 15(d) of the Exchange Act, automatically be required to begin filing 10-Ks, 10-Qs and other periodic reports required by the Exchange Act, and this would be an Exchange Act reporting obligation that is separate from the public company Exchange Act reporting obligation.  These reports would be essentially the same reports as filed by its public parent company and would create significant additional compliance costs while resulting in no substantive additional public disclosure."  The commenter expressed the view that this was not an intended consequence of the rule proposal and said the Commission should clarify this aspect of the co-registration proposal.

Some commenters suggested the Commission should clarify in any final rules whether, in a situation where the de-SPAC transaction is not ultimately consummated, a target company that is a co-registrant for a de-SPAC registration statement that has been declared effective may suspend its periodic reporting obligations under procedures similar to those set out in Staff Legal

---

Statement.  Given the proposed 20-day minimum solicitation period prior to the SPAC stockholders' meeting, it is entirely possible that the SPAC acquirer and the Target could each be required to file a quarterly report on Form 10-Q or annual report on Form 10-K prior to the Closing date."), KPMG ("The Proposed Rules indicate that the target operating company would be an issuer, therefore subjecting it to the reporting obligations of a public company and requiring it to file a periodic report for that recently ended reporting period.  This would create circumstances where multiple periodic filings, such as Forms 10-K or 10-Q, are required to be filed for the same period for multiple entities involved in the transaction."), PwC.

[560]  Letter from Davis Polk.

Bulletin 18 regarding abandoned IPOs and acquired issuers.[561]  A number of commenters raised concerns about costs for target companies as co-registrants, particularly with respect to the cost of directors and officers insurance.[562]  One commenter stated, "Targets will be forced to substantially enhance their D&O liability insurance coverage…[and], if the De-SPAC Transaction is never completed for some reason, Targets would likely not be able to 'ratchet down' their coverage to more typical private company levels until the next policy renewal date."[563]  One commenter stated that co-registration would result in disclosure requirements that are inconsistent with the proposed revisions to Regulation S-X, raising the issue of whether, if there were multiple target companies, if each company would be required to provide financials audited in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), rather than solely the predecessor pursuant to proposed Rule 15-01(a) of Regulation S-X.[564]  This commenter indicated that co-registration would result in inconsistencies with IPOs where there are multiple target companies and queried whether all target companies "should be required to sign the registration statement or just the accounting predecessor or acquiror, the one whose shareholders own the largest amount of the surviving

---

[561]  Letters from Crowe, Grant Thornton.  *See also* KPMG ("It is also possible that a SPAC merger is terminated after the effective date of a Form S-4 or F-4 registration statement, due to the vote from shareholders or for other reasons.  In this situation, the Proposal indicates that the target operating company is a registrant, with ongoing filing obligations, but without having completed the merger.  We recommend the Commission consider clarifying the reporting obligations of target operating companies in such circumstances.").  *See Staff Legal Bulletin No. 18 (CF)* (Mar. 15, 2010).

[562]  Letters from ABA; Anonymous (Apr. 7, 2022) ("Anonymous (Apr. 7, 2022)"); Skadden ("Given the potential for increased risk of liability to boards, we also expect D&O liability insurance premiums to increase significantly, further diluting the value of the transaction to stockholders.").  *See also* letters from ABA, Goodwin, White & Case (each discussing directors and officers insurance premium costs in connection proposed Item 1606(a)) and Job Creators Network (noting that costs generally will increase, as "SPACs and target companies should expect extensive diligence requests from financial institutions, advisors, and their counsel in connection with a de-SPAC transaction" (citations omitted)).

[563]  Letter from ABA.

[564]  Letter from Vinson & Elkins.

company, etc."[565]  A different commenter asked for guidance regarding a target company's Section 15(d) reporting obligation in the case where there are multiple targets.[566]

One commenter suggested the Commission create a new form for de-SPAC transactions.[567]  The commenter, who supported "the SEC's stance that SPAC business combinations should be treated as de facto IPOs," suggested the Commission align SPAC disclosures with Form S-1 by creating a SPAC-specific form that would "closely resemble a traditional IPO S-1, rather than the traditional S-4 used for merger transactions."[568]  The commenter proposed that, in this new SPAC-specific form, "management projections should not be disclosed to public SPAC shareholders…even if management projections have been reviewed by the SPAC board of directors in their role as shareholder fiduciaries."[569]

### 3.   Final Rules

After considering the comments received, we are adopting the co-registration proposal substantially as proposed, with some modifications.

Under existing rules, when a SPAC or a holding company offers and sells its securities in a registered de-SPAC transaction, staff observed a majority of the relevant disclosure in the de-SPAC transaction registration statement is about the target company, but only the SPAC or holding company, its principal executive officer or officers, its principal financial officer, its controller or principal accounting officer, and at least a majority of its board of directors (or persons performing similar functions) are required to sign the registration statement for the de-

---

[565]  Letter from Vinson & Elkins.

[566]  Letter from PwC.

[567]  Letter from Bullet Point Network.

[568]  *Id.*

[569]  *Id.*

SPAC transaction.  These signers are subject to liability under Section 11 of the Securities Act (along with other persons who have liability under Section 11).  In these situations, the private operating company and its officers and directors may therefore not incur liability as signatories to the registration statement under Section 11 of the Securities Act, even though information about the target company is highly significant to investors and this result is unlike if the target company had conducted a traditional IPO registered on Form S-1 or Form F-1.  As discussed in more detail below, it is our view that in a de-SPAC transaction the target company is an issuer of securities under Section 2(a)(4) of the Securities Act, and, therefore, the target company along with its required officers and directors must sign a registration statement filed by a SPAC or another shell company for the de-SPAC transaction, because both in substance and by operation of new Securities Act Rule 145a, the target company is issuing or proposing to issue securities in a de-SPAC transaction, regardless of the transaction structure.  In addition, the business operations of the target company will be those that are carried on by the combined company going forward.  The co-registration requirements will therefore enhance investor protection by aligning Federal securities law liability with the entity that is the primary source of the information disclosed about the new public operating company.[570]

Section 2(a)(4) of the Securities Act broadly defines the term "issuer" to include every person who issues or proposes to issue securities.  The legislative history of this broad definition suggests that the identification of the "issuer" of a security should be based on the economic

---

[570]  Although target companies' Federal securities law liability is not currently aligned with the liability of a company in a traditional IPO, they may be exposed to other liability (as are companies in a traditional IPO) from Commission enforcement actions or potentially to investors under anti-fraud statutory provisions and rules that require scienter or negligence to the extent the elements of the relevant cause of action are met. *See, e.g.*, Exchange Act Section 10(b) and Rule 10b-5 thereunder (imposing liability for false or misleading statements made in connection with a purchase or sale of securities) and, where applicable, Rule 14a-9 (for false and misleading statements made in connection with the solicitation of proxies).

reality of a transaction to ensure that, in service of the disclosure purpose of the Securities Act, the person(s) that have access to the information most relevant to investors are responsible as an "issuer" for providing such information. [571]   However, certain commenters asserted that a target company cannot fall within the definition of issuer in a de-SPAC transaction because "[t]he [t]arget in a De-SPAC Transaction ordinarily is not issuing or proposing to issue any securities pursuant to the Merger Registration Statement—it is the SPAC's securities to be issued."[572]   We disagree.  As explained below, even in transaction structures where a target company does not issue its own securities in the course of the de-SPAC transaction, it will always be proposing to issue the securities of the combined company in connection with the Rule 145a transaction that is occurring when the SPAC conducts a business combination that changes it from a shell company to an operating company.[573]

The final rules will ensure that, when a registration statement is filed for a de-SPAC transaction, a target company, its principal executive officer or officers, its principal financial officer, its comptroller or principal accounting officer, and a majority of its board of directors or persons performing similar functions sign the registration statement.[574]   These signatories, among others, will be liable under Section 11, for any material misstatements or omissions in the registration statement (subject to a due diligence defense for all parties other than an issuer) and will thereby be held accountable to investors for the accuracy of the disclosures in the

---

[571]   *See, e.g.*, H.R. Rep. 73-85, 12 ("Special provisions govern the definition of 'issuer' in connection with security issues of an unusual character….[For example, in the case of an investment trust], although the actual issuer is the trustee, the depositor is the person responsible for the flotation of the issue.  Consequently, information relative to the depositor and to the basic securities is what chiefly concerns the investor—information respecting the assets and liabilities of the trust rather than of the trustee.").

[572]   Letter from ABA.

[573]   *See infra* Section IV.A.

[574]   *See* Section 6(a) of the Securities Act [15 U.S.C 77f].

registration statement that previously would have been signed only by the SPAC or a holding company and its officers and directors.[575]  We continue to believe such liability, and the corresponding accountability to investors, is appropriate given that it is the private operating company that, in substance, issues or proposes to issue its securities, as securities of the newly combined public company.  We expect that this requirement will improve the reliability of the disclosure provided to investors in connection with de-SPAC transactions by creating strong incentives for such additional signing persons (among others who would have liability under Section 11 as a result of these requirements, such as non-signing directors) to conduct thorough diligence in connection with the de-SPAC transaction and review more closely the disclosure about the target company.

As noted above, the final rules reflect certain modifications to the proposed rules.  First, we are requiring that the names of all co-registrants appear on the cover page.  Second, we are clarifying that the target company is a registrant and not merely a signatory to the registration statement, as suggested by some commenters.  Third, we are addressing scenarios where the target company is a business or assets.  Finally, we are expanding the instructions to Forms S-4 and F-4 to also require that the target company and its related Section 6(a) signatories sign a registration statement for a de-SPAC transaction filed by a holding company.  This change is intended to ensure that the target company signs the registration statement in a transaction structure involving a holding company given that, as noted above, the target company is an "issuer" of the securities in any registered de-SPAC transaction.  We have also added the same

---

[575]   In this regard, we note that the target company's officers and directors are the parties most similarly situated to the officers and directors of a private company conducting a traditional IPO, in terms of their knowledge of, and background in, the company going public through a de-SPAC transaction.

requirements to Form S-1 and Form F-1.  We discuss these changes to the final rules and the comments received on the proposal in more detail below.

Several commenters suggested that there are already strong incentives under the existing framework to ensure that disclosures in registration statements for de-SPAC transactions are accurate and complete.[576]  A few of these commenters suggested it is unnecessary to impose additional liability because target company officers and directors, by virtue of their roles in the combined company, will effectively "own" any Exchange Act liabilities related to the disclosure in the de-SPAC transaction registration statement inherited by the combined company.[577]

As commenters noted, currently when a SPAC[578] files a registration statement in connection with a de-SPAC transaction that becomes effective, the SPAC is exposed to strict liability for material misstatements regarding all disclosures in the registration statement, including the disclosures related to the target company.  In addition, the SPAC and/or target company may be exposed to liability from Commission enforcement actions or potentially to investors under anti-fraud statutory provisions and rules that require scienter or negligence.[579]

We disagree with the commenters who suggested that existing liability protections make it unnecessary for the target company to have strict liability for statements in the de-SPAC registration statement.  In the Securities Act, Congress determined that an issuer that offers and sells its securities to the public using a registration statement should be strictly liable to investors

---

[576]  Letters from ABA, Kirkland & Ellis, NYC Bar, Skadden, Vinson & Elkins, Winston & Strawn.  *See supra* note 538.

[577]  *See supra* note 539.

[578]  The discussion, with respect to SPACs filing a registration statement, applies equally to de-SPAC transaction structures where a holding company is created and files a registration statement.

[579]  *See supra* note 570.

for any material misstatements and omissions in the effective registration statement.[580] Furthermore, strong private liability in registered transactions is one of the central tenets of the Securities Act.[581] As discussed throughout this release, in a de-SPAC transaction, the target company is an issuer because it, in substance, issues or proposes to issue its securities, as securities of the newly combined public company. As an issuer and the primary source of information disclosed about the combined operating company in registered de-SPAC transactions, the target company and its officers and directors are best situated to ensure the accuracy and completeness of such disclosures. Accordingly, investors in de-SPAC transactions are entitled to the protections arising from having the target company and other issuers sign the de-SPAC registration statement, including strict liability for statements in the effective registration statement, regardless of any other liabilities that may apply.

With respect to commenters' argument that the target company, and its officers and directors, will "own" liability for statements made in the de-SPAC registration statement going forward, we acknowledge that, under the existing framework, in specific situations where the target company survives and/or the officers and directors of the target company are officers and directors of the surviving company, they would potentially have liability, including strict liability, for statements in the de-SPAC registration statement. However, that assumption of

---

[580] Under Section 6(a) of the Securities Act, each "issuer" must sign the registration statement, and "every person who signed the registration statement" has liability under Section 11(a) of the Securities Act. See 15 U.S.C. 72(a) and 77k(a). The provisions of Section 11(b) of the Securities Act provide limited situations where no liability under Section 11(a) will attach but exclude issuers from applying that provision. See 15 U.S.C. 77k(b) ("Notwithstanding the provisions of subsection (a) no person, *other than the issuer*, shall be liable as provided therein who shall sustain the burden of proof…." (emphasis added)).

[581] *See* William O. Douglas & George E. Bates, *The Federal Securities Act of 1933*, 43 Yale L.J. 171, 173 (1933) ("William O. Douglas") ("The civil liabilities imposed by the Act are not only compensatory in nature but also in terrorem. They have been set high to guarantee that the risk of their invocation will be effective in assuring that the 'truth about securities' will be told."). *See also supra* note 850 and accompanying text (noting the importance of private rights of action in addition to Commission enforcement mechanisms as part of the Federal securities law statutory scheme, which provides for several private rights of action).

liability under current regulations does not change the fact that in other transaction structures, the target company and its officers and directors may not be strictly liable for the statements made in any registration statement filed in connection with the de-SPAC transaction, notwithstanding that the target company is, in substance, an issuer in these transaction structures for the reasons discussed above. So that target company liability is consistent across de-SPAC transaction structures, we are adopting the co-registration proposal as proposed, subject to the changes discussed herein.

A few commenters suggested the co-registrant proposal would create a disparity compared to traditional business combination transactions, because the target company is not a co-registrant in those transactions.[582] In contrast, another commenter said, "These are clearly different facts and circumstances than a non-SPAC merger" because the SPAC board is not deciding whether to change its operating business model via merger but rather is offering its shareholders the opportunity to invest in the surviving company.[583] One commenter suggested that requiring the target company to sign a registration statement for a de-SPAC transaction would be inconsistent with how Section 11 liability applies in a traditional IPO because, under the co-registrant proposal, the target company could be liable to its existing shareholders for information about the target company included in the de-SPAC registration statement.[584] As discussed above,[585] the hybrid nature of de-SPAC transactions makes them distinguishable from other business combinations or traditional IPOs, because the transaction simultaneously: (i) functions as a form of public capital raising for the target company, (ii) transforms a shell

---

[582] Letters from ABA, Skadden. *See supra* note 540.

[583] Letter from Bullet Point Network.

[584] Letter from Freshfields.

[585] *See supra* Section I.

company, that is not a business combination related shell company, into an operating company, and (iii) commonly represents the introduction of a formerly private company to the public markets for the first time.  In a de-SPAC transaction, the target company is, in substance, acting as issuer of securities and therefore should incur Section 11 liability for the disclosures about its business and its financial results and condition, which constitute critical information for investors making investment, redemption, and voting decisions.

As noted above, the de-SPAC transaction commonly marks the introduction of the target company to the U.S. public securities markets, and investors look to the business and prospects of the target company in evaluating an investment in the combined company.[586]  Moreover, new Rule 145a recognizes that a de-SPAC transaction involves a sale of the securities of the combined company to the SPAC's shareholders.  Information relating to the target company is the most significant factor in investor decisions to participate in the de-SPAC transaction because the target company will become the operating business of the combined company upon consummation of the de-SPAC transaction.  In addition, the target company is the principal beneficiary of the capital that the SPAC has previously raised and is contributing to the combined company.  Co-registration is necessary in these circumstances so that appropriate levels of liability for the related disclosures attaches to the entity that is the primary source of the information disclosed—information that relates to and ultimately benefits the target company itself.  Requiring the target company and its officers and directors to sign the registration statement will help to ensure that the information provided to investors in connection with a de-

---

[586]  Less commonly, the target company may be a public company or may be a previously public company that went private.

SPAC transaction is accurate, complete, and reliable by incentivizing such parties to exercise more care in the preparation of that information.

One commenter suggested the co-registration proposal is inconsistent with Securities Act Rule 140, which according to the commenter "ensures that the requisite information about the underlying issuer is adequately disclosed," and does not apply to de-SPAC transactions, because de-SPAC registration statements already provide registrants with disclosures about the target company, and the target company already may be subject to some liability for disclosures contained therein.[587]  While Rule 140 and these new co-registration requirements both expose parties to liability, they do so in different factual situations and for different purposes, and therefore are not inconsistent.  As discussed above, we acknowledge that disclosure about target companies is already included in de-SPAC registration statements and target companies may have liability under de-SPAC registration statements in some situations.  However, target companies do not have liability as issuers in all transaction structures, notwithstanding the fact that a de-SPAC transaction marks the introduction of the target company to the U.S. public securities markets and investors look to the business and prospects of the target company in evaluating an investment in the combined company.

One commenter supported the proposal but suggested that the Commission clarify whether "liability correctly or mistakenly extends to anyone other than unaffiliated, non-redeeming SPAC shareholder[s]."[588]  Under the final rules, the target company, its Section 6(a)

---

[587]  Letter from ABA.  *See* Rule 140 ("A person, the chief part of whose business consists of the purchase of the securities of one issuer, or of two or more affiliated issuers, and the sale of its own securities, including the levying of assessments on its assessable stock and the resale of such stock upon the failure of the holder thereof to pay any assessment levied thereon, to furnish the proceeds with which to acquire the securities of such issuer or affiliated issuers, is to be regarded as engaged in the distribution of the securities of such issuer or affiliated issuers within the meaning of section 2(11) of the Act.").

[588]  Letter from CFA Institute.

signing persons, and its directors will be subject to the same liability as any other issuer (including to affiliated shareholders).

A different commenter recommended that the Commission clarify "which entities would be considered co-registrants in these types of transactions and therefore subject to the applicable requirements under the securities laws."[589] We have provided additional clarification regarding which entities would be a co-registrant in connection with changes to the instructions to registration forms compared to the proposed instructions that we discuss below.

As noted above, one commenter suggested the proposal would make the target company a signer but not a co-registrant on Forms S-4 and F-4.[590] We do not agree with this assessment because, as an "issuer" of the securities in a registered de-SPAC transaction, the target company is both a required signatory of the registration statement pursuant to Section 6(a) and a "registrant" under Rule 405. To that end, Rule 405 states that a "registrant" is a type of "issuer"—i.e., "the issuer of the securities for which the registration statement is filed."

The proposed instruction that the term "registrant" means the SPAC for purposes of the disclosure obligations of the form was not intended to mean that a target company would not also be considered a registrant. The purpose of that instruction was to make clear that the defined term "registrant" on the form refers to the "SPAC" and to allow for a different defined term to be used on the form when specialized disclosure with respect to the "target company" is required. The proposed instruction to the Signatures section was intended to clarify that both the SPAC and target company and their required officers and directors must sign the form but would not have made the target company a "signer not a registrant."

---

[589]   Letter from KPMG (specifically noting that "SPACs may acquire more than one operating company as part of a de-SPAC transaction").

[590]   Letter from Vinson & Elkins.

Nevertheless, to clarify this point, in the final rules, we are making technical changes to the instructions to the forms. In connection with the request by a commenter to compare the proposed instructions to current Instruction 3 to the Signatures section, we are revising the instructions to Forms S-4 and F-4 to require that the names of each co-registrant appear on the cover page consistent with current Instruction 3. We are also revising the instructions to require that the target company and its related Section 6(a) signatories sign a registration statement for a de-SPAC transaction filed by a holding company, to account for the fact that the target company is an "issuer" of the securities in any registered de-SPAC transaction. As a result, in the final rules, the last sentence of General Instruction L.1 of Form S-4 provides: "If the securities to be registered on this Form will be issued by a special purpose acquisition company (as such term is defined in Item 1601 of Regulation S-K) or another shell company in connection with a de-SPAC transaction, the registrants also include the target company (as such term is defined in Item 1601 of Regulation S-K), and it must be so designated on the cover page of this Form. In such a de-SPAC transaction, where the target company consists of a business or assets, the seller of the business or assets is deemed to be a registrant instead of the business or assets and must be so designated on the cover page of this Form. Further, in such a de-SPAC transaction, the term 'registrant' for purposes of the disclosure requirements of this Form means the special purpose acquisition company, and the term 'company being acquired' for the purposes of the disclosure requirements of this Form means the target company." Similarly, we are revising the last sentence of Instruction 1 of the Signatures section and revising proposed General Instruction I.1 to Form F-4 and the last sentence of Instruction 1 of the Signatures section of Form F-4 in the same manner as with Form S-4.

Also with respect to changes in the forms to implement the co-registration requirements, in the Proposing Release, the Commission solicited comment on whether Form S-1 and Form F-1 should be amended to include instructions as to signatures which, when used for a de-SPAC transaction, would align the signature requirements of these forms to Form S-4 and Form F-4.[591] Because Form S-1 and, where issuers are eligible, Form F-1, remain available for de-SPAC transactions, it is consistent with the protection of investors to include equivalent instructions as to signatures to ensure consistent liability for de-SPAC transactions regardless of which Securities Act form is used for registration.  Accordingly, we are adopting amendments to the instructions to signatures in Form S-1 and Form F-1 that correspond to those in Form S-4 and Form F-4.

A number of commenters stated that liability under the co-registration proposal would be over and/or under-inclusive with respect to the target company's officers and directors.  As discussed above, the final rules make clear that the target company is a co-registrant (and not merely a signer) with respect to the de-SPAC transaction.  Therefore, as with any registrant, the target company will be required to have its principal executive officer or officers, principal financial officer and controller or principal accounting officer, and at least a majority of its board of directors or persons performing similar functions sign the registration statement.

With respect to commenter suggestions that only continuing target company officers and directors should sign the registration statement,[592] we do not believe it would be necessary or appropriate to adopt such a requirement for several reasons.  First, to require signatures only

---

[591] See Proposing Release, *supra* note 7, at 29480 (request for comment number 69) ("Should we also adopt corresponding amendments to Form S-1 and Form F-1 in the event that these forms are used by a SPAC for a de-SPAC transaction?").

[592] *See* letters from Freshfields, Vinson & Elkins.

from continuing target company officers and directors would be inconsistent with the statutory signature requirements under Securities Act Section 6(a), which requires each issuer's "principal executive officer or officers, its principal financial officer, its comptroller or principal accounting officer, and the majority of its board of directors or persons performing similar functions" to sign the registration statement.[593]  Moreover, non-continuing directors who did not sign the registration statement nonetheless may be liable under Section 11, because Section 11(a)(2) provides that the persons with liability to persons who acquired securities include "[e]very person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted."[594]  Second, if a target company officer or director will not be a continuing officer or director in the combined company, it is within the control of the target company officer or director to resign prior to the effectiveness of the de-SPAC registration statement.[595]  Finally, we note that Securities Act Section 6 requires only the issuer's "principal executive officer or officers, its principal financial officer, [and] its comptroller or principal accounting officer," but not other officers, to sign the registration statement.[596]  Accordingly, if the non-continuing target company officers are not one of these officers, they are not required to sign the registration statement.

---

[593]  15 U.S.C. 77f(a).

[594]  15 U.S.C. 77k(a)(2).

[595]  *See also* 15 U.S.C. 77(k)(b)(1) (allowing for the potential removal of Section 11 liability from persons who "before the effective date…had resigned from or had taken such steps as are permitted by law to resign from, or ceased or refused to act in, every office, capacity, or relationship in which he was described in the registration statement as acting or agreeing to act, and…had advised the Commission and the issuer in writing that he had taken such action").

[596]  15 U.S.C. 77f(a).

The proposed definition of target company included a "business" or "assets" and the proposed definition of "de-SPAC transaction" included an "acquisition of assets."  One commenter pointed out that in a de-SPAC transaction structured as an acquisition of assets, the assets acquired could not sign a registration statement.[597]  We are not making any changes in the final definitions of those terms.  However, to align the signature requirements for the acquisition of a business or assets as closely as possible to the signature requirements being adopted for all other target companies, we are revising the instructions to Forms S-4 and F-4 to provide that, in de-SPAC transactions involving the purchase of assets or a business, the term "registrant" includes the seller of the business or assets.  As with target companies in non-asset deals, the signatories of the asset purchase agreement (or similar transaction agreement) would be the sellers required to sign the registration statement.[598]  When a de-SPAC transaction involves the sale of assets that meet the definition of a business in Article 11 of Regulation S-X,[599] the seller of the assets must provide the historical financial information regarding the acquisition in the registration statement.[600]  Thus, such seller of assets and its officers and directors are similarly situated to the target company and its officers and directors (i.e., the seller of a business that will continue as the combined company) in a de-SPAC transaction not structured as an asset sale.[601]

---

[597]  *See supra* note 557 and accompanying text.

[598]  This is consistent with the functional approach taken in the language of Section 6(a) of the Securities Act, whereby the signatories of a registration statement, who incur Section 11 liability, must include "the majority of its board of directors or persons performing similar functions (or, if there is no board of directors or persons performing similar functions, by the majority of the persons or board having the power of management of the issuer)."

[599]  Rule 11-01(d) of Regulation S-X.

[600]  In the unusual event that the assets do not meet the definition of a business, registrants may wish to contact the Division of Corporation Finance about the reporting of historical financial information for the assets.

[601]  The disclosure provided as to the assets acquired that constitute a business would be that which is required for 17 CFR 210.3-05(e) of Regulation S-X, as applicable.

Several commenters raised concerns that, if the target company is a co-registrant on a de-SPAC registration statement, then the target company would become an Exchange Act reporting company at the time of effectiveness and would be required to file reports during the interim period between when the registration statement for the de-SPAC transaction becomes effective and the closing of the de-SPAC transaction.[602]  Relatedly, several commenters noted that the target company would incur this reporting obligation even if the de-SPAC transaction does not ultimately close.[603]  In response to these concerns, some commenters suggested the final rules should either clarify that a target company that is a co-registrant on a de-SPAC registration statement does not become subject to periodic reporting requirements,[604] or, in a situation where the de-SPAC transaction is not ultimately consummated, a target company that is a co-registrant for a de-SPAC registration statement may suspend its periodic reporting obligations under procedures similar to those set out in Staff Legal Bulletin 18 regarding abandoned IPOs and acquired issuers.[605]

As "registrants" and "issuers," target companies will be required by applicable Exchange Act provisions to file periodic reports after the effectiveness of the de-SPAC registration statement and until the target company terminates and/or suspends its Exchange Act report obligations.  We do not believe an exemption from the Exchange Act's reporting requirements is necessary or appropriate in the public interest or consistent with the protection of investors because, during the pendency of the de-SPAC transaction, SPAC investors will benefit from receiving updated information about the target company that, in substance and as reflected in

---

[602]   Letters from ABA, KPMG, PwC (also noting this would be the case in de-SPAC transactions involving multiple target companies). *See supra* note 559.

[603]   Letters from ABA, Crowe, Davis Polk, Freshfields, Grant Thornton, KPMG.  *See supra* note 558.

[604]   Letter from Davis Polk.

[605]   Letters from Crowe, Grant Thornton.  *See supra* note 561.  *See also* KPMG, *supra* note 561.

Rule 145a, proposes to issue securities of the newly combined public company, through which the formerly private company will operate its business. In the event that a target company that is not the predecessor[606] to the shell company is required to file a periodic report such as a Form 10-K or 10-Q as a standalone issuer, the periodic report would be required to comply with the form requirements and doing so could require the disclosure of updated information about the target company that is not the predecessor that would not have been required in the registration statement.[607]

We agree with commenters,[608] however, that a target company (that became a reporting company by virtue of being a co-registrant for a de-SPAC transaction registration statement that has been declared effective) may look to Exchange Act Rule 12h-3 and Staff Legal Bulletin 18 for guidance regarding how it can suspend its reporting obligations under Section 15(d) of the Exchange Act in situations in which: (1) the de-SPAC transaction does not close, or (2) at the closing of the de-SPAC transaction, the target company is acquired and another company has become a public reporting company with respect to the combined business created by the de-SPAC transaction.

A number of commenters raised concerns about costs for target companies as co-registrants, particularly with respect to the cost of directors and officers insurance.[609] We

---

[606] The term "predecessor" when used in this section has the same meaning as applied under Regulation S-X and the determination of financial statement requirements. To have a target company that is not the predecessor, the de-SPAC transaction must include multiple targets. We note that the overwhelming majority of de-SPAC transactions only involve one target. *See infra* discussion at note 1226 (indicating that approximately 97% of de-SPAC transactions involve only one target).

[607] For example, a Form 10-K would require the financial statements of a non-predecessor target company to be audited in accordance with the standards of the PCAOB (17 CFR 210.1-02(d)) as well as disclosure of certain information specified in Regulation S-K, such as executive compensation (17 CFR 229.402).

[608] *See supra* note 561.

[609] Letters from ABA, Anonymous (Apr. 7, 2022), Skadden. *See supra* note 562. *See also* ABA, Job Creators Network, Goodwin, White & Case. *See supra* note 562.

205

recognize that the final rules, in particular the co-registration requirements, could result in increased costs for target companies.  Based on Commission staff's experience, target companies that enter de-SPAC transactions may have directors and officers insurance, and business combination agreements in connection with de-SPAC transactions may contain provisions regarding the provision of directors and officers insurance to target company officials.[610]  As a result, any increased costs incurred by target companies in connection with de-SPAC transactions with respect to directors and officers insurance under the final rules will be incremental to those already incurred.  Furthermore, we believe these incremental costs are justified by the enhanced investor protections that will be realized by the co-registration requirements.  We discuss our analysis of the costs and benefits of the final rules in more detail in Section VIII below.

One commenter said that co-registration would result in disclosure requirements that are inconsistent with the proposed revisions to Regulation S-X, raising the issue of whether, if there were multiple target companies, each company would be required to provide financial statements audited in accordance with PCAOB standards in the de-SPAC registration statement, rather than solely the predecessor pursuant to proposed Rule 15-01(a) of Regulation S-X.[611]  This commenter indicated that co-registration would result in inconsistencies with IPOs where there are multiple target companies.

---

[610]   De-SPAC transaction agreements (such as merger agreements) commonly contain a target company covenant, representation, or similar provision that the target company will maintain its directors and officers insurance or contain a representation or warranty that the target company's directors and officers insurance listed on the target company's disclosure schedules to the agreement is in force and effect.

[611]   Letter from Vinson & Elkins.

206

As the commenter notes, in the case of multiple companies being acquired by the SPAC, if each of those companies meets the definition of "target company" being adopted,[612] then each would be required to be a co-registrant on the de-SPAC registration statement. Under the final rules all target companies are issuers, as defined by Section 2(a)(7) of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act"),[613] and therefore, under current 17 CFR 210.1-02(d) ("Rule 1-02(d)") of Regulation S-X, any audit of the target's financial statements would be required to be performed in accordance with PCAOB standards by a PCAOB-registered audit firm. However, also as noted by the commenter, proposed Rule 15-01(a) provided that only target companies that would constitute the predecessor for financial reporting purposes would be required to comply with Rule 15-01 of Regulation S-X in connection with a de-SPAC transaction and provide financial statements audited in accordance with PCAOB standards.[614] We continue to believe this is the appropriate outcome given the hybrid nature of de-SPAC transactions, as it aligns the de-SPAC transaction financial reporting to that of an IPO that includes multiple companies.[615] All target companies provide information that is included in the registration statement and therefore should face Securities Act liability as co-registrants and issuers on the de-SPAC registration statement.[616]

---

[612]   *See* Item 1601(d) of Regulation S-K, adopted herein.

[613]   Pub. L. 107-204, Sec. 404(b) 116 Stat. 745 (2002).

[614]   *See* Rule 15-01 of Regulation S-X, adopted herein.

[615]   In an IPO where a shell company acquires multiple businesses in a "put together" transaction, only the predecessor(s) (in some transactions, there may be more than one predecessor) would be required to provide historical financial statements audited in accordance with PCAOB standards. *See* Rule 1-02(d) of Regulation S-X for the audit requirements and Rule 3-02(a) of Regulation S-X which incorporates a predecessor into these requirements.

[616]   Entities for which their financial statements are included in the Form S-4 or F-4 through application of Rule 3-05, Rule 3-14, or 17 CFR 210.8-04 ("Rule 8-04") of Regulation S-X that are not target companies would not be considered a registrant to the Form S-4 or F-4.

In order to address the tension identified by the commenter, and to clarify that all target companies are co-registrants and issuers but only target companies that are predecessors[617] must provide financial statements audited in accordance with PCAOB standards, we are modifying the proposed revisions to the definition of "audit (or examination)" in Rule 1-02(d) to clarify that Rule 15-01(a) governs the audit requirements for all issuers (both predecessors and non-predecessors) that combine with a shell company.[618]  We have also added language to Rule 15-01(a) to clarify that for non-predecessor issuers—in the context of a registration statement or proxy statement filed for the combination with an issuer that is a shell company[619] (e.g., in a de-SPAC transaction, non-predecessor co-registrant target companies)—the term "audit (or examination)" is defined as "an examination of the financial statements by an independent accountant in accordance with either the standards of the PCAOB or U.S. generally accepted auditing standards ("U.S. GAAS") as specified or permitted in the regulations and forms applicable to those entities for the purpose of expressing an opinion thereon."[620]  In addition to adopting the proposed changes to Item 17 of Form S-4 or Form F-4 that direct companies to Article 15 for the financial statements required in a de-SPAC transaction, we have revised the proposed Instruction L to Form S-4 and Instruction I to Form F-4 to clarify that for purposes of the disclosure requirements in those forms, the target company is the "company being acquired."

---

[617]  *See supra* note 606.

[618]  *See* Rule 1-02(d) of Regulation S-X, adopted herein.

[619]  In the event a non-predecessor issuer is required to file a Form 10-K on a standalone basis, the financial statements would be required to be audited under PCAOB standards, pursuant to Rule 1-02(d) of Regulation S-X because the entity is filing an Exchange Act report for itself and not as a non-predecessor issuer under Rule 15-01(a).

[620]  *See* Rule 15-01(a) of Regulation S-X, adopted herein.  An issuer that is not a predecessor that is already registered under Exchange Act Sections 13(a) or 15(d) would be required to file financial statements audited in accordance with PCAOB standards pursuant to Rule 1-02(d) of Regulation S-X.

As stated in the proposal,[621] the proposed financial reporting requirements were intended to more closely align the de-SPAC transaction disclosures to the disclosures made where a shell company acquires multiple businesses in a "put together" transaction before an IPO.  This approach recognizes the hybrid nature of the de-SPAC transaction and the fact that the historical financial statements of the predecessor(s), and in some circumstances the SPAC, would be the historical financial information that would be presented in the combined company's Exchange Act reporting.  The Commission proposed Article 15 of Regulation S-X instead of proposing a requirement that all target companies provide audited financial statements under the registrant disclosure requirements of Item 14 of Form S-4 and Form F-4, which apply to the information required to be provided by registrants other than Form S-3 and Form F-3 eligible registrants, respectively.

To illustrate application of the final rules, assume a SPAC files a Form S-4 to register the issuance of shares to acquire two unrelated businesses and only one of the businesses will be the predecessor for financial reporting purposes.  Under the final rules, each "issuer" (the SPAC and the two unrelated businesses) must sign the registration statement.[622]  The pro forma financial statements included in the Form S-4 depict a reverse recapitalization with the predecessor and an acquisition of the other business.  Subsequent Exchange Act reports, such as the next Form 10-K, will include the historical financial statements of the predecessor.  In this scenario, the Form S-4 would require two to three years of historical financial statements for the business that will be the

---

[621]  *See* Proposing Release at Section IV.B.

[622]  In addition, Section 6(a) requires the issuer's principal executive officer or officers, principal financial officer, comptroller or principal accounting officer, and the majority of its board of directors or persons performing similar functions (or, if there is no board of directors or persons performing similar functions, by the majority of the persons or board having the power of management of the issuer) to sign a registration statement.  When the issuer is a foreign entity, the registration statement must also be signed by the issuer's duly authorized representative in the United States.

predecessor audited in accordance with PCAOB standards.  By contrast, the non-predecessor business will be a company being acquired under Item 17 of Form S-4 and its financial statements may be audited in accordance with either PCAOB standards or U.S. GAAS standards, despite it being an issuer.

We recognize that predecessor determinations in de-SPAC transactions may include scenarios that differ from the above illustrative example.  For example, a transaction with two target companies could instead result in a determination that there are two predecessors.  In that example, the financial statements of both target companies must be audited in accordance with PCAOB standards.[623]

Section 102 of the Sarbanes-Oxley Act makes it "unlawful for any person that is not a registered public accounting firm to prepare or issue…any audit report with respect to any issuer."[624]  The final rules do not change this requirement for issuers to engage PCAOB-registered accounting firms, and therefore all issuers, including non-predecessor target companies, will need to engage a PCAOB-registered audit firm when the de-SPAC transaction requires audited historical financial statements (but, as discussed above, the PCAOB-registered firm could audit the financial statements of non-predecessor target companies either under the standards of the PCAOB or U.S. GAAS).  We acknowledge commenter concerns that, because PCAOB Rule 3211 requires a registered audit firm to file a Form AP with the PCAOB when its audit report for an issuer is included in a filing with the Commission,[625] multiple Forms AP may

---

[623]  Determination of the predecessor(s) in a de-SPAC transaction, as in any other transaction, is a facts and circumstances driven determination made by the registrant(s).

[624]  *See* 15 U.S.C. 7212(a).

[625]  *See* PCAOB Rule 3211, Auditor Reporting of Certain Audit Participants, *available at* https://pcaobus.org/about/rules-rulemaking/rules/section_3/section-3-auditing-and-related-professional-practice-standards-rule-3211-amended.  Note 2 to PCAOB Rule 3211 states that the rule requires the filing of a report on Form AP regarding an audit report only the first time the audit report is included in a document filed

be required for a single transaction where the related registration statement requires audit reports for multiple issuers and when more than one registered audit firm was involved.[626]  To the extent that the PCAOB deems it necessary to provide guidance or take other action in response to the final rules, the Commission and its staff will work with the PCAOB, as appropriate.

Regarding a commenter's suggestion that the Commission create a new S-1-like form for de-SPAC transactions, which should not include management projections,[627] we do not believe that is necessary.  The amendments to existing registration statement forms that we are adopting in this release accomplish our enhanced disclosure goals, including addressing similarities between IPOs and de-SPAC transactions, and appropriately take into account the business combination context of de-SPAC transactions.  With respect to projections in registration statements, as we discuss in detail below, our final definitions of "blank check company" should address the commenter's concerns regarding the use of projections in de-SPAC transaction registration statements.[628]  In addition, as noted below, there is no prohibition under current rules on including projections in registration statements on Form S-1 or F-1.[629]

## D.  Re-Determination of Smaller Reporting Company (SRC) Status

### 1.  Proposed Rules

SRCs constitute a category of registrants that are eligible for scaled disclosure requirements in Regulation S-K and Regulation S-X and in various forms under the Securities

---

with the Commission.  Subsequent inclusion of precisely the same audit report in other documents filed with the Commission does not give rise to a requirement to file another Form AP.  *See id*.

[626]   Letters from Crowe, Grant Thornton.

[627]   Letter from Bullet Point Network.

[628]   *See infra* Section III.E discussion of PSLRA Safe Harbor.

[629]   *See infra* discussion in Section III.E proximate to notes 836 and 858.

Act and the Exchange Act.[630]  For example, SRCs are not required to provide quantitative and qualitative information about market risk pursuant to Item 305 of Regulation S-K.[631]  In general, an SRC is a company that is not an investment company, an asset-backed issuer or a majority-owned subsidiary of a parent that is not an SRC and (1) had a public float of less than $250 million, or (2) had annual revenues of less than $100 million during the most recently completed fiscal year for which audited financial statements are available and either had no public float or a public float of less than $700 million.[632]  SRC status is determined at the time of filing an initial registration statement under the Securities Act or Exchange Act for shares of common equity and is re-determined on an annual basis.[633]  Once a company determines that it is not an SRC, it will retain this non-SRC status unless it determines, when making its annual determination, that its public float was less than $200 million or, alternatively, that its public float and annual revenues fell under certain thresholds.[634]

The Commission proposed to require a re-determination of SRC status following the consummation of a de-SPAC transaction through proposed amendments to the definition of "smaller reporting company" in each of Securities Act Rule 405, Exchange Act Rule 12b-2, and Item 10(f) of Regulation S-K.  Specifically, the Commission proposed that the post-de-SPAC

---

[630]  *See, e.g.*, 17 CFR 229.10(f) ("Item 10(f)") of Regulation S-K; 17 CFR 210.8-01 ("Rule 8-01"), Rule 8-02, 17 CFR 210.8-03, 17 CFR 210.8-07, and 17 CFR 210.8-08 ("Rule 8-08") of Regulation S-X; Item 1A of Form 10 and Form 10-K; Item 3.02 of Form 8-K.  An FPI is not eligible to use the scaled disclosure requirements for SRCs unless it uses the forms and rules designated for domestic issuers and provides financial statements prepared in accordance with U.S. GAAP.  Instruction 2 to Item 10(f) of Regulation S-K; Instruction 2 to definition of "smaller reporting company" in Securities Act Rule 405 and Exchange Act Rule 12b-2.

[631]  Item 305(e) of Regulation S-K.

[632]  The definition of "smaller reporting company" is set forth in Securities Act Rule 405, Exchange Act Rule 12b-2, and Item 10(f) of Regulation S-K.

[633]  *See* 17 CFR 229.10(f)(2)(i) and 17 CFR 229.10(f)(2)(ii) ("Item 10(f)(2)(ii)") of Regulation S-K.  In re-determining SRC status annually, a registrant is required to measure its public float as of the last business day of its most recently completed second fiscal quarter.

[634]  *See* 17 CFR 229.10(f)(2)(iii) of Regulation S-K; Securities Act Rule 405; Exchange Act Rule 12b-2.

transaction registrant must re-determine its SRC status prior to the time it makes its first Commission filing, other than the Form 8-K filed with Form 10 information,[635] and reflect this re-determination in the issuer's next periodic report.[636]

The Commission also proposed, in connection with this re-determination: (a) that public float be measured as of a date within four business days after the consummation of the de-SPAC transaction;[637] and (b) that annual revenues be measured using the annual revenues of the target company as of the most recently completed fiscal year reported in the Form 8-K filed with Form 10 information.[638]  The Commission did not propose any changes to the float and revenue thresholds in the current definitions of "smaller reporting company."

*2.  Comments*

Broadly categorized, commenters on the SRC re-determination proposal focused on four areas: (1) general comments, including those with general expressions of support for or opposition to the proposals, (2) timing and re-determination of public float, (3) ramifications of loss of SRC status, and (4) requests for guidance.  In addition, in response to a request for comment from the Commission in the Proposing Release, several commenters addressed issues of re-determination of the following: accelerated filer and large accelerated filer status, EGC status, and FPI status.

---

[635]   A Form 8-K with Form 10 information is filed pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of the form.

[636]   Proposed Item 10(f)(2)(iv) of Regulation S-K; proposed paragraph (3)(iv) in the definition of "smaller reporting company" in Securities Act Rule 405; proposed paragraph (3)(iv) in the definition of "smaller reporting company" in Exchange Act Rule 12b-2.

[637]   Proposed Item 10(f)(2)(iv)(A) of Regulation S-K; proposed paragraph (3)(iv)(A) in the definition of "smaller reporting company" in Securities Act Rule 405; proposed paragraph (3)(iv)(A) in the definition of "smaller reporting company" in Exchange Act Rule 12b-2.

[638]   Proposed Item 10(f)(2)(iv)(B) of Regulation S-K; proposed paragraph (3)(iv)(B) in the definition of "smaller reporting company" in Securities Act Rule 405; proposed paragraph (3)(iv)(B) in the definition of "smaller reporting company" in Exchange Act Rule 12b-2.

A few commenters generally supported the proposed re-determination of SRC status following a de-SPAC transaction.[639]  One commenter noted that such re-determination would "generally align that determination with that of an IPO."[640]  Another commenter noted that such re-determination was a signal that "the Commission appears to be forestalling a situation in which a company that would not have been eligible to use the scaled disclosures and other accommodations available to a smaller reporting company if it had become public through a traditional initial public offering would, nonetheless, be eligible to take advantage of those accommodations based on the smaller reporting company status of the pre-merger SPAC."[641]

Others opposed, or raised concerns regarding, the proposed re-determination of SRC status following a de-SPAC transaction.[642]  One commenter stated that such a re-determination immediately after the de-SPAC transaction is inconsistent with the Commission's objective of aligning the requirements with those of IPOs.[643]  Another commenter indicated that the change could be problematic for certain transactions, such as  "where (1) the SPAC is an SRC and the legal acquirer, (2) the target company was an SRC prior to the closing of the de-SPAC transaction and filed two years of audited financial statements and (3) the post-closing public float exceeds $700 million."[644]

One commenter stated they did not object to re-determination based on public float within a short time following closing of the de-SPAC transaction.[645]

---

[639]  Letters from KPMG, PwC.

[640]  Letter from KPMG.

[641]  Letter from PwC.

[642]  Letters from Ernst & Young, Vinson & Elkins.

[643]  Letter from Ernst & Young.

[644]  Letter from Vinson & Elkins.

[645]  Letter from ABA.

Another commenter recommended an alternative approach to re-determining SRC status similar to the determination of SRC status used by an IPO company filing its initial registration statement under Item 10(f)(2)(ii) of Regulation S-K but based on "the revenues and public float of the target company that will be the predecessor for financial reporting purposes."[646]  This commenter proposed the public float should be calculated "as the agreed value of the equity consideration payable to the owners of the target company, plus the total outstanding shares of the SPAC (valued at $10 per share, or whatever the agreed per-share valuation of the equity consideration is), plus any common equity to be issued to finance the de-SPAC transaction."[647] The commenter further stated, "The surviving company should have the option to redetermine its status based on the number of shares outstanding after the closing of the de-SPAC transaction (i.e., reflecting redemptions and any equity not issued in the financing transaction or as equity consideration), consistent with the last sentence of S-K Item 10(f)(2)(ii)(C)."[648]

Several commenters addressed the ramifications of the loss of SRC status.  Commenters observed that one such ramification is that a registration statement filed after the point at which non-SRC status must be reflected could require incremental disclosure for a non-SRC, such as an additional year of financial statements beyond what was provided in the Form S-4 in connection with a de-SPAC transaction.[649]  One of these commenters suggested, "An alternative approach

---

[646]  Letter from Vinson & Elkins.

[647]  Letter from Vinson & Elkins.

[648]  Letter from Vinson & Elkins.

[649]  Letters from Ernst & Young ("For example, the proposed redetermination timing could result in a post-business combination company losing its SRC status and having to provide an additional year of audited financial statements (i.e., for the year preceding the earliest period included in the Form S-4/proxy) in a follow-on registration statement…."), Grant Thornton ("the proposed rule would preclude the post-combination entity to use scaled disclosure alternatives in registration statements filed after it files the first periodic report on Form 10-Q but before its files its first annual report on Form 10-K."), Vinson & Elkins ("If the post-closing public float exceeds $700 million, the post-closing company would be required to include three years of audited financial statements in its annual report and any registration statement, which may be more than what was included in the Form S-4 or proxy statement filed in connection with the de-SPAC transaction.").

would be for a company, upon completion of a de-SPAC transaction, to transition into or out of SRC status in conjunction with the annual report to be filed for the year of the transaction based upon the public float as of the later of four business days after the merger transactions or the end of the second fiscal quarter."[650]  The commenter also added, "Such a revision could still result in an SRC merging with a public shell exiting SRC status more quickly than under current rules while mitigating the burden and inconsistency of providing incremental information not previously required for companies accessing the public market shortly after the de-SPAC transaction."[651]

Another commenter recommended that the Commission consider whether "accommodations may be warranted to the post-combination entity regarding presentation of audited financial statements and related information (such as MD&A or separate financial statements of significant equity method investees) for periods prior to those presented in the Form S-4 or F-4 for the private operating company."[652]

One commenter recommended that the Commission clarify whether an amendment to a Form 8-K with Form 10 information (often referred to as a "super 8-K") to include pre-acquisition annual financial statements of the private operating company "will be deemed to be the first periodic report for the purposes of effectiveness of the SRC status in connection with a de-SPAC transaction" in circumstances where a de-SPAC transaction is consummated shortly

---

[650]   Letter from Ernst & Young.

[651]   Letter from Ernst & Young.

[652]   Letter from Grant Thornton ("We note that while the provision in Section 7(a)(2)(A) of the Securities Act for providing only two years of audited financial statements is limited to initial registration statements, the SEC staff does not object if emerging growth companies (EGCs) do not present, in other registration statements, audited financial statements for any periods prior to the earliest audited period presented in its initial registration statement," *citing* Generally Applicable Questions on Title of the JOBS Act, Question 12).

after the fiscal year-end of the private operating company but before its financial statements for that annual period are required in a Form 10 registration statement.[653]

Another commenter recommended, for purposes of determining whether the post-de-SPAC registrant may exclude management's assessment of internal control over financial reporting in the Form 10-K covering the fiscal year in which the transaction was consummated, that the Commission codify the staff's view[654] that a SPAC's need to file an amended super 8-K to update the target company's financial statements for its most recent year-end is the equivalent to the first annual report.[655]

Another commenter stated that the Commission "should revisit and revise its guidance in 5230.1 of the Division of Corporation Finance's Financial Reporting Manual, which could result in more information being required in a Super 8-K…than would be required in a Form S-1 for the target company."[656]

In response to a request for comment in the Commission in the Proposing Release,[657] several commenters addressed issues of re-determination of filer status, EGC status, and FPI status.

---

[653]  Letter from Grant Thornton.

[654]  Letter from BDO USA, LLP (June 13, 2022) ("BDO").  *See* CDI 215.02 Division of Corporation Finance, *Compliance and Disclosure Interpretations: Regulation S-K, Section 215.02*, *available at* https://www.sec.gov/divisions/corpfin/guidance/regs-kinterp.htm.

[655]  The Commission views this comment from BDO, which discussed considering the amended "super 8-K" as the first *annual* report following the de-SPAC transaction, as a different comment than the one from Grant Thornton, *supra* note 653, which discussed considering the amended "super 8-K" as the first *periodic* report following the de-SPAC transaction.

[656]  Letter from Vinson & Elkins.

[657]  Proposing Release, *supra* note 7, at 29481 (request for comment number 74) ("Should we similarly require a re-determination of emerging growth company status, accelerated filer status, large accelerated filer status and/or foreign private issuer status upon the completion of a de-SPAC transaction?").

Some commenters recommended that the Commission should put post-de-SPAC transaction registrants on the same footing with respect to filer status as a company that has recently undertaken an IPO, because, otherwise, where a post-de-SPAC transaction registrant inherits the SPAC's reporting history, this could impact the timing of when the post-de-SPAC transaction registrant becomes subject to accelerated filing obligations.[658]  Other commenters suggested the Commission should further analyze or consider the issue.[659]

A few commenters recommended that the EGC status of the combined company following a de-SPAC transaction should be re-determined upon consummation of the de-SPAC transaction.[660]

---

[658]  *See* letters from BDO ("If a de-SPAC transaction is considered the equivalent of an IPO, it is not clear why the post-merger filer status would be treated differently for a company that chooses one going-public transaction over the other."), Ernst & Young ("We recommend aligning the determination of EGC status, filer status and foreign private issuer status for the post-business combination company with the requirements that apply to a traditional IPO.  We believe that, if the post-business combination company is not eligible to file a Form S-3 shelf registration statement, it would be consistent to disregard the SPAC's reporting history for purposes of determining filer status (i.e., a post-business combination company would generally be a non-accelerated filer).  Such entities should also be permitted to 'reset' the EGC clock of five years for considering their status as an EGC.  We have observed an evolution in the structuring of SPAC transactions (e.g., use of a double-dummy structure) that can achieve certain financial reporting results (e.g., filer status and foreign private issuer status).  Therefore, we support aligning the redetermination requirements so that the transaction structure would not result in financial reporting differences."), Fenwick & West LLP (June 7, 2022) ("Fenwick") ("The de-SPAC Issuer should benefit from the transition, grace periods and other accommodations following the Closing Date that IPO Issuers benefit from following the Effective Date (for example, the de-SPAC Issuer should benefit from the same exemption from Sarbanes-Oxley Act Section 404(a) compliance under Item 308 of Regulation S-K in respect of its first Annual Report on Form 10-K filed after the Closing Date."), Vinson & Elkins.

[659]  Letters from KPMG ("we recommend the Commission consider clarifying the determination of the combined company's filer status upon consummation of the de-SPAC transaction."), PwC ("We believe that the underlying policy objectives associated with each type of filer status should be evaluated to determine whether the goals would be furthered by re-determination….For instance, in proposing that the post-business combination company re-determine its smaller reporting company status shortly after consummating the de-SPAC transaction….We support the proposal to require timely re-determination in this circumstance.  We believe a similar analysis should be undertaken with respect to other statuses.").

[660]  Letters from Ernst & Young ("We recommend aligning the determination of EGC status, filer status and foreign private issuer status for the post-business combination company with the requirements that apply to a traditional IPO…Such entities should also be permitted to 'reset' the EGC clock of five years for considering their status as an EGC."), KPMG (recommending the Commission consider clarifying the determination of a combined company's filer status, including EGC status, upon consummation of a de-SPAC transaction), PwC (supporting SRC re-determination proposal and stating that "We support the proposal to require timely re-determination in this circumstance.…We believe a similar analysis should be undertaken with respect to other statuses."), Vinson & Elkins.

Several commenters, including some who made recommendations regarding EGC status, recommended that the Commission provide for re-determination of FPI status in connection with the de-SPAC transaction.[661]

One commenter noted that they have "observed an evolution in the structuring of SPAC transactions (e.g., use of a double-dummy structure) that can achieve certain financial reporting results (e.g., filer status and foreign private issuer status)" and expressed support for "aligning the redetermination requirements so that the transaction structure would not result in financial reporting differences."[662]

Another commenter stated: "Allowing redetermination of foreign private issuer status would result in disclosure requirements and filer status determinations that are consistent with what would apply if the target company went public via an IPO, without regard to the de-SPAC transaction structure.  A de-SPAC transaction may be structured so that an entity other than the SPAC is the acquiror for tax reasons, due to the domicile of the surviving company, or due to required consents and approvals applicable to the target company.  Aligning the disclosure requirements so that, for example, a target company that would have qualified as a foreign private issuer could be acquired by a domestic SPAC and then the surviving company could be immediately eligible for foreign private issuer status would allow de-SPAC transactions to be structured in the best interests of shareholders."[663]  Similar views were expressed by another commenter.[664]

---

[661]    Letters from Ernst & Young, KPMG, Vinson & Elkins.

[662]    Letter from Ernst & Young.

[663]    Letter from Vinson & Elkins.

[664]    *See* letter from Freshfields.

### 3.  Final Rules and Guidance

After considering the comments received, we are adopting amendments regarding SRC re-determination as proposed with certain modifications discussed below.  We are not adopting requirements, as suggested by several commenters, to re-determine filer status, EGC status, or FPI status upon the completion of a de-SPAC transaction.  We are providing guidance, however, concerning FPI status, as discussed further below.

Currently, most SPACs qualify as SRCs,[665] and Commission rules permit a post-business combination company after a de-SPAC transaction[666] to retain this status until its next annual determination date in cases where the legal entity that was the SPAC is the legal entity that is the combined company in connection with the de-SPAC transaction.  Under current rules, the absence of a re-determination of SRC status upon the completion of these de-SPAC transactions has permitted certain post-business combination companies to avail themselves of scaled disclosure and other accommodations when they otherwise would not have qualified as a SRC had they become public companies through a traditional IPO.  The final rules will help level the

---

[665]  Based on data from SPACInsider (using fields "IPO Date" (2021) and "SPAC Status" (Searching)), the Commission staff observed that out of 163 SPACs that had an IPO in 2021 and had not found a target company by the end of 2021, only two SPACs had outstanding shares of more than 70,000,000.  Assuming a per share price of $10 at the time of the IPO and no changes in outstanding shares since the time of the IPO, the Commission staff views this data as indicating that the 161 other SPACs among that cohort did not have a float at the time of IPO of more than $700 million, the threshold under paragraph (2)(ii) of the definition of "smaller reporting company" in Rule 12b-2.  (In an actual public float calculation for purposes of the "smaller reporting company" definition, affiliate shares would be subtracted from total outstanding shares used in this example, resulting in a lower value than produced in this example, because the applicable value would be multiplied by fewer shares.)  With respect to the $100 million revenue test under paragraph (2) of the definition of "smaller reporting company" in Rule 12b-2, income statement items such as "Interest earned on marketable securities held in trust account" and "Unrealized gain on marketable securities held in trust account" are generally not revenue for SPACs and SPACs typically do not record revenue.

[666]  *See* Item 10(f)(2) of Regulation S-K; Securities Act Rule 405; Exchange Act Rule 12b-2.

220

playing field with a traditional IPO in this respect and reduce information asymmetries that result when a target company chooses to go public through a de-SPAC transaction.[667]

As adopted, a post-de-SPAC transaction registrant must re-determine its SRC status prior to the time it makes its first Commission filing, other than the Form 8-K filed with Form 10 information, with public float measured as of a date within four business days after the consummation of the de-SPAC transaction and annual revenues measured using the annual revenues of the target company as of the most recently completed fiscal year reported in such Form 8-K.

We disagree with the commenter who recommended an alternative approach similar to the SRC determination for IPO companies under Item 10(f)(2)(ii) of Regulation S-K but based on the revenues and public float of the target company that will be the predecessor for financial reporting purposes.[668]  In an IPO, with respect to public float, Item 10(f)(2)(ii) looks to: the estimated offering price per share at the time of filing of the registration statement; the number of shares of common stock outstanding that are held by non-affiliates before the offering; and the number of shares of common stock to be sold at the estimated offering price.  17 CFR 229.10(f)(2) ("Item 10(f)(2)") of Regulation S-K also gives the registrant the option to recalculate its public float at the time the company completes the IPO.  As described above,

---

[667]  In the Proposing Release, the Commission said, if a SPAC qualified as an SRC before a de-SPAC transaction and was the legal acquirer in the de-SPAC transaction, the post-business combination company would continue to be able to rely on the scaled disclosure accommodations for SRCs when filing a registration statement between the re-determination date and the post-business combination company's first periodic report. Proposing Release, *supra* note 7, at 29480.  For the avoidance of any doubt on the part of registrants related to the references to "legal acquirer" in the Proposing Release, the Commission is clarifying that the final rules we are adopting—that provide re-determined SRC status be reflected in filings 45 days after consummation of the de-SPAC transaction—are not strictly limited to that particular transaction structure for the de-SPAC transaction and apply to any post-de-SPAC transaction combined company registrant that is the same legal entity as the legal entity that was a SPAC (prior to the de-SPAC transaction) regardless of the structure of the de-SPAC transaction.

[668]  Letter from Vinson & Elkins.  *See supra* notes 646, 647, and 648 and accompanying text.

221

under the commenter's suggested approach, the SRC determination would be made prior to the filing of the de-SPAC registration statement or proxy statement using an "agreed value" method.[669]  Although Item 10(f)(2)(ii) does allow for the use of estimations in the IPO context, we believe that the approach we are adopting, which focuses on a determination of SRC status based on actual post-transaction public float, is a more effective measure of the registrant's size in the context of a de-SPAC transaction.  While in many cases the commenter's suggested recalculation after closing to capture the actual number of shares outstanding would result in the same determination of SRC status post-transaction, the adopted approach helps to ensure the appropriate level of disclosures to investors both before and after the closing of the transaction.

Pursuant to the final rules, the four-business-day window to calculate the public float threshold following a de-SPAC transaction would begin  the first business day after the day of closing of the de-SPAC transaction and end four business days later (on the due date for the Form 8-K with Form 10 information that the post-de-SPAC transaction combined company registrant is required to file after the completion of a de-SPAC transaction).  Each of the number of shares outstanding that are held by non-affiliates and the price per share would be determined on the same day within the four-business-day window.  This window will provide some flexibility for issuers to measure public float compared to the annual re-determination of SRC status (which is determined based on a single business day, the last business day of the most recently completed second fiscal quarter).  This four-business-day window will allow for a more accurate reflection of a post-business combination company's public float in view of the limited trading history of the common equity securities of the post-business combination company following a de-SPAC transaction.

---

[669]  *See id.*

Under the proposed rule, a post-de-SPAC transaction registrant would be required to reflect its re-determined SRC status in its next periodic report after the filing of the Form 8-K with Form 10 information (often referred to as a "super 8-K").  We are aware that, if a registrant loses SRC status upon re-determination, there may be certain ramifications.  Several commenters observed that one such ramification is that a registration statement filed after the point at which non-SRC status must be reflected could require incremental disclosure for a non-SRC, such as an additional year of financial statements beyond what was provided in the Form S-4 in connection with a de-SPAC transaction.[670]  Inclusion of such incremental disclosure as a result of losing SRC status might present challenges for some registrants in situations where a periodic report becomes due shortly after the closing of the de-SPAC transaction.[671]

In response to these comments, in a change from the proposal, the final rules provide that a registrant does not need to reflect non-SRC status in any filing that is due in the 45-day period following the consummation of the de-SPAC transaction; the registrant would begin to reflect non-SRC status in filings made -no later than after the end of this 45-day period.  In contrast, under the proposal, a registrant would have needed to reflect non-SRC status in its next periodic report that could be due as soon as one day after the filing of the "super 8-K," which is due a maximum of four days after the consummation of the de-SPAC transaction.  We believe the final rule represents a reasonable compromise between the proposed rule's transition period (until the next periodic report, which could be as soon as one day after the de-SPAC transaction) and a

---

[670] Letters from Ernst & Young, Grant Thornton, Vinson & Elkins.  *See supra* note 649.

[671] *See* letters from Vinson & Elkins (indicating that the issue is particularly acute "if the post-closing company's first annual report is due shortly after closing or the company is required to file a registration statement after the company's first periodic report," and advocating for a redetermination based on Item 10(f)(2)(ii) (as discussed above), but stating that "longer periods or accommodations could ameliorate the issues with the proposed amendments to S-K Item 10(f)"), Ernst & Young (indicating that "companies [could be] required to provide additional information in a follow-on registration statement as soon as four days after the de-SPAC transaction").

223

commenter's recommended transition period (until filing of the next Form 10-K, which could be as long as nearly 15 months). Another benefit of affording this additional time to registrants that lose SRC status upon re-determination is that, where the registrant intends to file a resale registration statement shortly after the de-SPAC transaction, the registrant will retain its SRC status for purposes of any such resale registration statement filed during this additional time period.[672]

We are not adopting the commenter's recommendation to exclude, in post-de-SPAC transaction filings, any financial statements that predate the financial statements presented in the Form S-4.[673] In our view a registrant that is re-determined to be a non-SRC should not be able to avail itself of the scaled-down requirements applicable to SRCs. Furthermore, we believe the adopted approach will provide registrants with sufficient time to prepare the additional incremental information that may be required in a situation where the registrant has lost its SRC status. We further note that a registrant that loses SRC eligibility may continue to be an EGC, which includes certain scaled reporting accommodations. In light of new Rule 15-01(b), which requires a business combining with a shell company to comply with Regulation S-X as if the transaction were an IPO of common equity securities, we believe that if the registrant retained its EGC status after the transaction, then the registrant would not be required to present audited financial statements for any period prior to the earliest audited period presented in connection with the de-SPAC transaction. We evaluated whether a minimum transition period should be longer or shorter than 45 days. We concluded that 45 days provided an appropriate balance

---

[672] Title 17 section 230.401(a) under the Securities Act states that a registration statement shall conform to the applicable rules and forms in effect on the initial filing date of such registration statement, and the rule would apply to SRC status. Accordingly, if the registrant is an SRC at the initial public filing date of the resale registration statement, then it may comply with rules for an SRC in subsequent amendments of that registration statement.

[673] Letter from Grant Thornton. *See supra* note 652 and accompanying text.

between providing investors with the scaled-up information as soon as reasonably possible and providing registrants with time to prepare for compliance and the ability, in a limited number of instances,[674] to avoid the costs of preparing an additional year of audited financial statements beyond what was required in the Form S-4.

Commenters also requested guidance on certain issues. One commenter recommended that the Commission clarify whether an amendment to a "super 8-K" could be the first periodic report for the purposes of effectiveness of the SRC status.[675] Under the final rules, any filing made 45 days after the consummation of the de-SPAC transaction must reflect re-determined SRC status, including a filing to amend a "super 8-K."

Unrelated to SRC re-determination, other commenters recommended codification of, or revisions to, staff guidance relating to the position that a SPAC's need to file an amended Form 8-K to update the target company's financial statements for its most recent year-end is the equivalent to the first annual report[676] and, separately, the guidance in FRM 5230.1, which summarizes the Commission's basis for requiring Form 10 information under Item 2.01(f) of Form 8-K and how the staff looks to the accounting acquirer's SRC-eligibility at the time of the transaction for purposes of the disclosure in the Form 8-K.[677] We do not believe that such codification or revisiting of the referenced staff guidance is necessary in connection with the final amendments. We believe the guidance in FRM 5230.1 is consistent with the final rules

---

[674]    We understand that most post-de-SPAC registrants would be EGCs and would not be required to file the additional year of financial statements in reliance on the EGC accommodations.

[675]    Letter from Grant Thornton. *See supra* note 653.

[676]    Letter from BDO that references Division of Corporation Finance, Compliance and Disclosure Interpretations: Regulation S-K, Section 215.02, which discusses the application of management's assessment of internal control over financial reporting (ICFR) in Item 308(a) of Regulation S-K when there has been a reverse acquisition between an issuer and a private operating company. See further discussion of the application of ICFR at *infra* note 685.

[677]    Letter from Vinson & Elkins.

because the final rules look to the target company's SRC-eligibility in all shell company transactions, including where the target company is the accounting acquirer.

Rule 12b-2 provides the definitions of accelerated filer and large accelerated filer, including requisite conditions.[678] Accelerated filer and large accelerated filer status are re-determined annually as of the end of the issuer's fiscal year.[679] For a new registrant that just completed an IPO, however, a period of at least twelve months would need to elapse before it would be required to comply with rules as an accelerated filer or a large accelerated filer.[680] In contrast, after consummation of the de-SPAC transaction, depending on the timing of the SPAC IPO and the de-SPAC transaction, because of the SPAC's reporting history, where the legal entity that was the SPAC is the same legal entity that is the post-de-SPAC transaction combined company, the post-de SPAC transaction combined company may not have the same period until it must make filings pursuant to accelerated filer or large accelerated filer status as compared to a registrant that just completed an IPO.[681] By virtue of being an accelerated or large accelerated filer, among other differences compared to a non-accelerated or non-large accelerated filer, the

---

[678]   The four existing conditions for qualifying as an accelerated filer are that an issuer: (i) had an aggregate worldwide public float of $75 million or more, but less than $700 million, as of the last business day of the issuer's most recently completed second fiscal quarter; (ii) has been subject to the requirements of 15 U.S.C. 78m (Exchange Act Section 13(a)) or 15 U.S.C. 78o(d) (Exchange Act Section 15(d)) for a period of at least twelve calendar months; (iii) has filed at least one annual report pursuant to those sections; and (iv) the issuer is not eligible to use the requirements for SRCs under the revenue test in paragraph (2) or (3)(iii)(B) of the "smaller reporting company" definition in Rule 12b-2, as applicable. For a large accelerated filer, conditions (ii) through (iv) are the same, but condition (i) is that an issuer had an aggregate worldwide public float of $700 million or more, as of the last business day of the issuer's most recently completed second fiscal quarter. *See* paragraphs (1) and (2) in the definition of "accelerated filer and large accelerated filer" in Rule 12b-2.

[679]   *See* paragraphs (1), (2), and (3) in the definition of "accelerated filer and large accelerated filer" in Rule 12b-2.

[680]   *See* paragraph (1)(ii) in the definition of "accelerated filer and large accelerated filer" in Rule 12b-2 ("The issuer has been subject to the requirements of section 13(a) or 15(d) of the Act (15 U.S.C. 78m or 78o(d)) for a period of at least twelve calendar months;") and paragraph (2) in this definition.

[681]   If a new holding company is created to effect the de-SPAC transaction and the new holding company is the post-de-SPAC transaction combined company that will continue to be an Exchange Act reporting company, the same logic applies because the holding company would be the Exchange Act reporting successor to the SPAC. *See* definition of "Succession" in Exchange Act Rule 12b-2, 17 CFR 240.12g-3 under the Exchange Act.

post-de-SPAC transaction combined registrant would be required to: (a) file its periodic reports sooner than otherwise required;[682] and (b) subject its management's assessment of internal controls over financial reporting to auditor attestation.[683]  As noted above, several commenters recommended that the Commission put post-de-SPAC transaction registrants on the same footing with respect to filer status as a company that has recently undertaken an IPO.[684]

One of the main consequences of the approach suggested by these comments—that the reporting history of the SPAC should be disregarded such that the post-de-SPAC transaction combined company could recommence the 12-month period that must elapse (pursuant to paragraphs (1)(ii) and (2)(ii) in the definition of "accelerated filer and large accelerated filer" in Rule 12b-2) before it is possible to acquire accelerated or large accelerated filer status—would be to delay management's assessment of internal control over financial reporting and outside auditor attestation of management's assessment for companies that are not EGCs.  We do not believe it is necessary or appropriate to amend the filer status requirements for this reason; however, we note that the Commission staff has taken the position that under certain conditions, the Commission staff would not object if the post-combination registrant were to exclude management's assessment of internal control over financial reporting in the Form 10-K covering the fiscal year in which the transaction was consummated.[685]  Since the staff position about

---

682    *See* Form 10-Q, General Instruction A.1; Form 10-K General Instruction A(2).

683    17 CFR 229.308(b).  A registrant's status as an accelerated filer or a large accelerated filer triggers the requirement contained in Section 404(b) of the Sarbanes-Oxley Act to have the auditor provide an attestation report on internal control over financial reporting.

684    *See* letters from BDO, Ernst & Young, Fenwick, Vinson & Elkins.

685    *See* Division of Corporation Finance, *Compliance and Disclosure Interpretations: Regulation S-K, Section 215.02*, *available at* https://www.sec.gov/divisions/corpfin/guidance/regs-kinterp.htm, which states that the staff would not object if a surviving issuer in a reverse acquisition were to exclude management's assessment of internal control over financial reporting (ICFR) in the Form 10-K covering the fiscal year in which the reverse acquisition was consummated when it is not possible to conduct an assessment of the private operating company's ICFR in the period between the consummation date of the reverse acquisition and the date of

227

management's assessment of internal control over financial reporting is broader than the transactions covered by this rulemaking, as it applies to reverse acquisitions between an issuer and a private operating company, we did not codify it as part of this rulemaking.

In 2012, the Jumpstart Our Business Startups Act amended the Securities Act and Exchange Act to add provisions regarding and to define an "emerging growth company."[686] Commission rules also define an "emerging growth company."[687] The Commission has amended the definition of "emerging growth company" in the past to adjust the total annual revenue threshold in these rules for inflation.[688]

---

management's assessment of ICFR required by Item 308(a) of Regulation S-K and when the internal controls of the shell company may be insignificant when compared to the consolidated entity.

[686] Section 101(a) of the JOBS Act amended the Securities Act and the Exchange Act to provide in Section 2(a)(19) of the Securities Act (15 U.S.C. 77b(a)(19)) and Section 3(a)(80) of the Exchange Act (15 U.S.C. 78c(a)(80)) a definition of "emerging growth company." These statutes provided as follows. An "emerging growth company" is an issuer that had total annual gross revenues of less than $1,000,000,000 (as such amount is indexed for inflation every 5 years by the Commission to reflect the change in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics, setting the threshold to the nearest 1,000,000) during its most recently completed fiscal year. An issuer that is an emerging growth company as of the first day of that fiscal year shall continue to be deemed an emerging growth company until the earliest of— (A) the last day of the fiscal year of the issuer during which it had total annual gross revenues of $1,000,000,000 (as such amount is indexed for inflation every 5 years by the Commission to reflect the change in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics, setting the threshold to the nearest 1,000,000) or more; (B) the last day of the fiscal year of the issuer following the fifth anniversary of the date of the first sale of common equity securities of the issuer pursuant to an effective registration statement under this subchapter; (C) the date on which such issuer has, during the previous 3-year period, issued more than $1,000,000,000 in non-convertible debt; or (D) the date on which such issuer is deemed to be a "large accelerated filer", as defined in section 240.12b-2 of title 17, Code of Federal Regulations, or any successor thereto.

[687] Pursuant to Securities Act Rule 405 and Exchange Act Rule 12b-2, the term "emerging growth company" means an issuer that had total annual gross revenues of less than $1.235 billion during its most recently completed fiscal year. Pursuant to these rules, if an issuer qualifies as an "emerging growth company" on the first day of its fiscal year, it maintains that status until the earliest of: (i) the last day of the fiscal year of the issuer during which it had total annual gross revenues of $1.235 billion or more; (ii) the last day of its fiscal year following the fifth anniversary of the first sale of its common equity securities pursuant to an effective registration statement under the Securities Act; (iii) the date on which the issuer has, during the previous three-year period, issued more than $1 billion in nonconvertible debt; or (iv) the date on which the issuer is deemed to be a "large accelerated filer" (as defined in Exchange Act Rule 12b-2).

[688] In 2017, the Commission changed the $1 billion revenue threshold in these rules to $1.07 billion to account for inflation and, effective Sept. 20, 2022, the Commission further changed this $1.07 billon threshold to account for inflation to $1.235 billion. *See Inflation Adjustments and Other Technical Amendments Under Titles I and III of the Jobs Act*, Release No. 33-10332 (Mar. 31, 2017), 82 FR 17545 (Apr. 12, 2017); *Inflation Adjustments under Titles I and III of the JOBS Act*, Release No. 33-11098 (Sept. 9, 2022).

A SPAC typically qualifies as an EGC.[689]  A post-de-SPAC transaction combined company would lose EGC status on the last day of its fiscal year following the fifth anniversary of the first sale of its common equity securities pursuant to an effective Securities Act registration statement.[690]  A post-de-SPAC transaction combined company may also lose EGC status on the last day of a fiscal year during which it had total annual gross revenues of $1.235 billion or on the date on which it has issued more than $1 billion in nonconvertible debt during the previous three-year period.[691]  Finally, a post-de-SPAC transaction combined company may also lose EGC status on the date on which it is deemed to be a "large accelerated filer" (as defined in Exchange Act Rule 12b-2).[692]

Several commenters recommended that the EGC status of the combined company following a de-SPAC transaction should be re-determined upon consummation of the de-SPAC

---

[689]  With respect to the $1.235 billion revenue threshold in the definition of "emerging growth company" under Securities Act Rule 405 and Exchange Act Rule 12b-2, a pre-IPO SPAC may have limited or no revenue and post-IPO SPACs typically do not record revenue (because income statement items such as "Interest earned on marketable securities held in trust account" and "Unrealized gain on marketable securities held in trust account" are generally not revenue).  With respect to the large accelerated filer provision in these rules: (a) paragraph (2)(ii) in the definition of "accelerated filer and large accelerated filer" in Rule 12b-2 requires that the issuer has been subject to the requirements of Exchange Act Section 13(a) or 15(d) for a period of at least twelve calendar months, a period that generally would not yet have elapsed for a newly public SPAC after an IPO and (b) paragraph (2)(i) in the definition of "accelerated filer and large accelerated filer" in Rule 12b-2 requires aggregate worldwide market value of the voting and non-voting common equity held by non-affiliates be $700 million or more, as of the last business day of the issuer's most recently completed second fiscal quarter, a value threshold that many SPACs may be below.  *See supra* note 665 (discussing frequency of SPACs with a market capitalization of greater than $700 million).

[690]  Paragraph (2)(ii) of the definition of "emerging growth company" under Securities Act Rule 405 and Exchange Act Rule 12b-2.  For example, in a case where the legal entity that is the SPAC becomes the post-de-SPAC transaction combined company, the five-year reference period would run from the date of the IPO of the SPAC and not the date of the de-SPAC transaction.

[691]  Paragraphs (2)(i) and (2)(iii) of the definition of "emerging growth company" under Securities Act Rule 405 and Exchange Act Rule 12b-2.

[692]  Paragraph (2)(iv) of the definition of "emerging growth company" under Securities Act Rule 405 and Exchange Act Rule 12b-2.

transaction.[693]  As with filer status, we are not adopting any amendments concerning EGC status at this time but will consider whether future adjustments are appropriate.

Several commenters addressed determination of FPI status issues raised in a request for comment.[694]

A new registrant, such as a SPAC in an IPO, makes the determination of its FPI status[695] as of a date within 30 days prior to filing its initial registration statement.[696]  A reporting registrant that seeks to file as an FPI is required to determine its FPI status once a year on the last business day of its second fiscal quarter.[697]  A registrant that qualifies as an FPI upon such determination is immediately able to use the forms and rules designated for FPIs.[698]

A domestic SPAC (e.g., incorporated in a U.S. State) that intends to enter a de-SPAC transaction with a foreign target company would be required to file a Form S-4 (and not a Form F-4), because a domestic issuer cannot qualify as an FPI.[699]  Accordingly, where a domestic SPAC combines with a target company that is an FPI, the financial statements of the foreign target company would have to be presented in accordance with U.S. GAAP in Form S-4,[700] among other differences that exist between the requirements of Form S-4 and Form F-4.[701]

---

[693]  *See* letters from Ernst & Young, KPMG, PwC, Vinson & Elkins, *supra* note 660.

[694]  Proposing Release, *supra* note 7, at 29481 (request for comment number 74).  *See* letters from Ernst & Young, KPMG, Vinson & Elkins.

[695]  *See supra* note 442.

[696]  Paragraph (2) of the definition of "foreign private issuer" in Securities Act Rule 405.

[697]  Paragraph (3) of the definition of "foreign private issuer" in Securities Act Rule 405.

[698]  Paragraph (3) of the definition of "foreign private issuer" in Securities Act Rule 405.

[699]  *See* definitions of "foreign issuer" and "foreign private issuer" in Securities Act Rule 405.

[700]  As the target will be the predecessor to the SPAC and will report as a domestic registrant after the de-SPAC transaction, including reporting its financial statements on an Item 2.01 Form 8-K within four business days after the transaction, the target should comply with Regulation S-X and provide financial statements in accordance with U.S. GAAP.

[701]  Item 17 of Form S-4.

If such a domestic SPAC registrant were to reincorporate under the laws of a foreign country prior to the filing of the registration statement in connection with a de-SPAC transaction, that reincorporation may require the foreign SPAC, as a new entity, to file an initial registration statement.  The new entity's FPI status would be determined as of a date within 30 days prior to the filing of the initial registration statement, as described above.  If the new foreign entity were to qualify as an FPI, it may be eligible to file a Form F-4 registration statement in connection with the de-SPAC transaction.  Currently, the FPI status of the post-de-SPAC transaction combined company would not affect the registration form to be filed in connection with the de-SPAC transaction, regardless of whether the SPAC was an existing registrant or a new foreign entity.  Also, currently, where the legal entity that was the SPAC is not an FPI and is the legal entity that is the combined company following the de-SPAC transaction, even where the combined company may meet the definition of an FPI after the de-SPAC transaction, the combined company would need to wait until the end of the next second fiscal quarter to re-determine its status as an FPI.

Several commenters recommended that we should provide for re-determination of FPI status in connection with a de-SPAC transaction.[702]

We have considered these comments and recognize that, depending on the structure of a specific de-SPAC transaction, there may be some fact-specific circumstances in which an FPI registration statement may be used.  For example, a SPAC's use of an FPI registration statement (e.g., Form F-4) and compliance with FPI rules in connection with the de-SPAC transaction may be appropriate when, as of a date within 30 days prior to the filing of the de-SPAC transaction

---

[702]  Letters from Ernst & Young, Freshfields, KPMG, Vinson & Elkins.  *See supra* notes 662, 663, and 664 and accompanying text.

registration statement, the SPAC is a foreign issuer that is entering a de-SPAC transaction with a target company that is an FPI but is not a shell company, the legal entity that is the SPAC will be the legal entity that is the combined company registrant following the de-SPAC transaction, and the combined company registrant created in connection with the de-SPAC transaction is expected to be an FPI at the time of consummation of the de-SPAC transaction.

Contrary to the suggestion of some commenters,[703] we believe that earlier re-determination of FPI status would be inappropriate when a SPAC is a domestic SPAC (and therefore not a foreign issuer) prior to the de-SPAC transaction but enters a de-SPAC transaction with an FPI target company.  If the legal entity that is the SPAC is a domestic entity, the combined company following the de-SPAC transaction would also be a domestic entity, in which case use of FPI forms would not be appropriate.

### E.  PSLRA Safe Harbor

#### 1.  *Proposed Rules*

The PSLRA provides a safe harbor for forward-looking statements under the Securities Act and the Exchange Act, under which a company is protected from liability for forward-looking statements in any private right of action under the Securities Act or Exchange Act when, among other conditions, the forward-looking statement is identified as such and is accompanied by meaningful cautionary statements.[704]  Under the PSLRA, the safe harbor is not available,

---

[703]  Letters from Freshfields, Vinson & Elkins.  *See supra* notes 663 and 664 and accompanying text.

[704]  Section 27A of the Securities Act and Section 21E of the Exchange Act.  The PSLRA does not impact the Commission's ability to bring enforcement actions relating to forward-looking statements.

232

however, when a forward-looking statement is made in connection with, among other things, an offering by a blank check company, an offering by an issuer of penny stock, or an IPO.[705]

The Proposing Release discussed the Commission's concerns about the use of forward-looking statements, such as projections, in connection with de-SPAC transactions.[706]  The Commission stated that some market participants in de-SPAC transactions may not exercise the same level of care in preparing forward-looking statements, such as projections, as in a traditional IPO.[707]  The Commission also noted that a number of commentators had raised concerns about the use of projections that they believe to be unreasonable in de-SPAC transactions.[708]  In addition, the Commission stated that it saw no reason to treat blank check companies differently for purposes of the PSLRA safe harbor depending on whether they raise

---

[705]  Section 27A(b) of the Securities Act and Section 21E(b) of the Exchange Act.  The Commission has defined the term "blank check company" for purposes of and in Rule 419 as a development stage company that is issuing "penny stock," as defined in Exchange Act Rule 3a51-1, and that has no specific business plan or purpose, or has indicated that its business plan is to merge with or acquire an unidentified company or companies, or other entity or person.  SPACs that raise more than $5 million in a firm commitment underwritten IPO may be excluded from this definition of "blank check company" because they are not selling "penny stock."  *See Penny Stock Definition for Purposes of Blank Check Rule*, Release No. 33-7024 (Oct. 25, 1993) [58 FR 58099 (Oct. 29, 1993)].  The Commission's definition of "blank check company" in Rule 419 was adopted in 1992 to implement provisions of the Penny Stock Reform Act relating to registration statements filed by blank check companies offering penny stock.  This definition predates the PSLRA (which was enacted in 1995) and has not been amended since it was adopted by the Commission.

[706]  Proposing Release, *supra* note 7, at 29482.

[707]  Proposing Release, *supra* note 7, at 29482, n.162 and preceding text, *citing*, *see*, *e.g.*, Matt Levine, *Money Stuff: Maybe SPACs Are Really IPOs*, Bloomberg, Apr. 12, 2021; Eliot Brown, *Electric-Vehicle Startups Promise Record-Setting Revenue Growth*, Wall St. J., Mar. 15, 2021; Public Statement on SPACs, IPOs and Liability Risk under the Securities Laws (Division of Corporation Finance, Apr. 8, 2021).

[708]  Proposing Release, *supra* note 7, at 29482, n.163 and preceding text, *citing*, *see*, *e.g.*, Dambra, Even-Tov & George, *supra* note 36; letter dated Feb. 16, 2021, from Americans for Financial Reform and Consumer Federation of America to the House Financial Services Committee; Testimony of Andrew Park, Americans for Financial Reform, before the Investor Protection, Entrepreneurship, and Capital Markets Subcommittee of the U.S. House Committee on Financial Services, May 24, 2021, https://financialservices.house.gov/uploadedfiles/hhrg-117-ba16-wstate-parka-20210524.pdf; Usha R. Rodrigues & Michael Stegemoller, SPACs: Insider IPOs (SSRN Working Paper, 2021).

233

more than $5 million in a firm commitment underwritten IPO and thus are not selling penny stock.[709]

To address these concerns, the Commission proposed using its statutory authority under the PSLRA to amend the definition of "blank check company"[710] to include companies that would otherwise meet the Securities Act Rule 419 definition of "blank check company," except that they are not issuers of penny stock (such as a SPAC in a de-SPAC transaction).[711] Specifically, the Commission proposed a revised definition of "blank check company" to be located in Securities Act Rule 405 that would, for purposes of the PSLRA, remove the "penny stock" condition from the rule and define the term as "a company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person."[712]

The Commission proposed corresponding technical changes to Rule 419, the rule the Commission adopted to implement provisions of the Penny Stock Reform Act relating to registration statements filed by blank check companies offering penny stock, that were intended to maintain consistency with that rule's historic scope which is limited to blank check companies that issue penny stock. Similarly, the Commission proposed a new definition in Rule 405, "Blank check company issuing penny stock," and proposed conforming amendments to existing

---

[709]   Proposing Release, *supra* note 7, at 29482.

[710]   *See, e.g.*, Securities Act Section 27A(b)(7) ("The terms 'blank check company', 'rollup transaction', 'partnership', 'limited liability company', 'executive officer of an entity' and 'direct participation investment program', have the meanings given those terms by rule or regulation of the Commission.").

[711]   The target company typically cannot rely on the PSLRA safe harbor because at the time the statement is made it is not subject to the reporting requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 and thus does not meet the requirements of Section 27A(a)(1) of the Securities Act.

[712]   The Commission also proposed to amend the definition to remove the reference to "development stage company" on the basis that the reference was unnecessary for purposes of the proposed definition.

references to "blank check company" as defined in Rule 419 in various Securities Act rules in order to maintain the scope of those rules.[713]

## 2. Comments

A number of commenters expressed general support for the proposal.[714]  One of these commenters said, "Both the regular IPO and de-SPAC approaches for taking a new, emerging company public should be treated similarly in this critical area for market integrity—the legitimacy of forward-looking projections."[715]  Other commenters said they did not see a reason SPACs should be treated differently than traditional IPO participants[716] or companies that issue penny stock[717] with respect to forward-looking statements.  One commenter focused on the benefits of mitigating the risk of harm to investors, stating that the proposal "would significantly curb SPAC sponsors' abilities to make overblown and false projections, and increase their liability when this fraud occurs."[718]  Another commenter said that "[t]his safe harbor enables SPAC sponsors and underwriters to make future projections of the performance of the SPAC to investors with relative impunity.  This legal loophole enables SPAC sponsors to sell investors on bold projections that have little basis in reality.  These legal loopholes, including the PSLRA safe

---

[713]  Proposed amendments to Rules 137, 138, 139, 163A, 164, 174, 430B, and 437a.  The Commission proposed that the term "blank check company issuing penny stock" be defined as a company that is subject to Rule 419.  Due to current *Federal Register* formatting requirements, the Commission also proposed technical changes to 17 CFR 230.163A ("Rule 163A") and 17 CFR 230.164 under the Securities Act to move the Preliminary Note(s) in these rules to introductory paragraphs of the respective rules.

[714]  Letters from Andrew Tuch, Americans for Financial Reform Education Fund ("Amending the definition of a 'blank check company' and ensuring that the forward-looking projections of SPACs are subject to the same level of legal liability that currently exists for IPOs is an important step to protect investors."), Better Markets ("Perhaps one of the most important provisions in the Proposal is the provision clarifying that the statutory safe harbor in the PSLRA does not apply to forward-looking statements made in connection with a de-SPAC transaction."), CFA Institute, CII, Consumer Federation, Senator Elizabeth Warren, ICGN, NASAA.

[715]  Letter from CFA Institute.

[716]  Letter from NASAA.

[717]  Letters from Consumer Federation, NASAA.

[718]  Letter from Senator Elizabeth Warren.

harbor, among others, have created a regulatory arbitraged race-to-the-bottom IPO model…."[719] This commenter further said, "It is clear that far too many SPAC sponsors have utilized the PSLRA safe harbor to paint bold and enticing pictures of the financial outlook of their post-merger companies that were divorced from reality….The safe harbor from the PSLRA for forward-looking statements in de-SPAC transactions has fueled this trend, undermined public confidence in our capital markets, and harmed investors by enabling SPAC sponsors to make reckless projections about future financial performance.  In any final rule, the Proposal must retain the clarification that the PSLRA safe harbor does not apply in connection with de-SPAC transactions."  A separate commenter similarly said that "amending the definition of a 'blank check' company in The Private Securities Litigation Reform Act of 1995 would prevent SPACs from exploiting the safe harbor provision to make overblown and fraudulent projections."[720] Another commenter said the proposal "would resolve ambiguities about how the law applies in this context and promote accountability for SPAC market participants."[721]

A number of commenters suggested that unreasonably optimistic or inflated projections are prevalent in de-SPAC transactions.[722]  One of these commenters said that SPACs sometimes make "utterly absurd forward-looking projections."[723]  This commenter also said, "Post-merger investors in SPACs, who are predominantly retail investors, are often lured by ambitious projections of growth—made with the protection of the safe harbor—and unfortunately have already lost significant amounts of money as a result."  A different commenter said, "In fact, it is

---

[719]   Letter from Better Markets.

[720]   Letter from Senator Elizabeth Warren.

[721]   Letter from Consumer Federation.

[722]   Letters from Americans for Financial Reform Education Fund, Better Markets, CFA Institute, CII, Senator Elizabeth Warren.

[723]   Letter from Americans for Financial Reform Education Fund.

nearly impossible to ignore the research and findings of the wild and indiscriminate use of projections in de-SPAC transactions by sponsors with seemingly little care given to the accuracy or reality of those projections."[724]  Another of these commenters said that "too many of these de-SPAC forward-looking statements are an exercise in creative writing, baseless hype and embellishment."[725]  Another commenter said, "We believe historical uncertainty surrounding the availability of the safe harbor may have contributed to the proliferation of unreasonably optimistic forward projections that would not have been made if liability had more clearly paralleled the traditional IPO regime."[726]  Finally, one commenter said that "SPACs are rife with disclosures that border on or cross into outright fraud" and that "there have been multiple cases where companies used inflated information about their financials, their future business, or even their underlying technology."[727]

Several commenters expressed support for the proposal because they believed it would curb the use of unrealistic and potentially misleading projections that harm investors.[728]  One of these commenters said, "We support the proposal's revision to the definition of 'blank check company' to ensure that the safe harbor against a private right of action for forward-looking statements under the PSLRA is not available.  We believe this clarification may reduce the inclusion of unreasonably optimistic forward projections in SEC filings, which may in turn help SPAC investors avoid overestimating future revenues and other measures of future company

---

[724]  Letter from Better Markets.

[725]  Letter from CFA Institute.

[726]  Letter from CII.

[727]  Letter from Senator Elizabeth Warren.

[728]  Letters from Better Markets, CII, Consumer Federation, Senator Elizabeth Warren.  *See also* letter from Anonymous (Oct. 11, 2022) ("Please do not permit SPAC sponsors, their CEO or their board members to engage with the public in such a way that could create a false representation of…[p]rojections of value….").

237

performance."[729]  Another of these commenters said that "the proposal's approach to amend the definition of blank check company for purposes of the PSLRA safe harbor for forward-looking statements" would "strengthen incentives for SPACs to avoid potentially unrealistic and potentially misleading forward-looking statements and to expend more effort or care in the preparation and review of forward-looking statements."[730]  Another commenter said, "The Commission's proposal to amend the definition of 'blank check company' to remove the safe harbor in the Private Securities Litigation Reform Act of 1995 for forward-looking statements would significantly curb SPAC sponsors' abilities to make overblown and false projections, and increase their liability when this fraud occurs."[731]

Other commenters were generally opposed to the proposal.[732]  Some commenters who expressed general opposition to the proposal discussed the value of forward-looking information to investors.  One of these commenters said, "This safe harbor incentivizes the disclosure of potentially valuable information as to a company's future outlook."[733]  Another of these commenters said, "By removing the safe harbor provisions from SPAC mergers, the proposed rules would replicate the biggest flaw of IPOs, hindering investor visibility toward management expectations and related future prospects."[734]  A number of commenters focused on comparing

---

[729]  Letter from CII.

[730]  Letter from Consumer Federation.

[731]  Letter from Senator Elizabeth Warren.

[732]  Letters from ABA; Amanda M. Rose, Professor of Law, Vanderbilt University Law School (June 16, 2022) ("Amanda Rose"); American Securities Association; Bullet Point Network; Cato Institute; Cowen; Goodwin; Job Creators Network; Loeb & Loeb; Michael Dambra, Omri Even-Tov, and Kimberlyn George; Jennifer W. Han, Executive Vice President, Chief Counsel & Head of Regulatory Affairs, Managed Funds Association (June 13, 2022) ("Managed Funds Association"); NYC Bar; Paul Swegle; SPAC Association; Kristi Marvin, SPACInsider (June 13, 2022) ("SPACInsider"); Vinson & Elkins; Winston & Strawn.  Also, the Small Business Capital Formation Advisory Committee recommended that projections in de-SPAC transactions should be covered by the liability safe harbor provisions of the PSLRA, *supra* note 40.

[733]  Letter from Cato Institute.

[734]  Letter from SPAC Association.

de-SPAC transactions to other kinds of transactions in their comments.  One of the commenters who expressed general opposition to the proposal said, "We believe there are important distinctions between a De-SPAC Transaction and a traditional IPO that justify maintaining the PSLRA safe harbor in the form enacted by Congress."  This commenter said, "The PSLRA safe harbor…does not cover all forward-looking statements.  It contains a number of exclusions….[One] category of exclusions cover[s] situations—like tender offers, roll-up and going-private transactions—where companies are compelled by law to share projections with investors.  In such situations, there is less risk that liability will chill disclosure and the safe harbor exclusion can be understood as an effort to increase the accuracy of disclosures."  Further, this commenter said, "Projections disclosure in De-SPAC Transactions fall under this…category."[735]  Another commenter who generally opposed the proposal questioned whether it would benefit investors, stating that "the Commission's proposal to remove the PSLRA safe-harbor for de-SPAC transactions is unnecessarily broad with no real benefit to investors."[736]

A number of commenters on the proposal provided views related to the statutory authority of the Commission to amend the definition of blank check company as proposed. These comments fell into two main categories.  First, some of these commenters suggested the Commission does not have discretion to adopt or amend a definition of blank check company for purposes of the PSLRA that differs from the current Rule 419 definition (which includes the qualification the relevant company is issuing penny stock).[737]  One of these commenters said, "The elimination of the safe harbor for forward-looking statements under the Private Securities Litigation Reform Act (PSLRA) is unlawful.  The Proposal would—without any authorization

---

[735]   Letter from Goodwin.

[736]   Letter from Cowen.

[737]   Letters from ABA, Cato Institute, Paul Swegle, Winston & Strawn.

by Congress—amend the definition of a 'blank check' company under the PSLRA to prevent SPACs from utilizing the PSLRA safe harbor for forward-looking statements.  Given that de-SPAC transactions necessarily involve making a good deal of projections, there has been an underlying assumption that the PSLRA safe harbor applies to such projections….The SEC should drop this idea and recognize that it has no legal authority under law to change Congressional statutes on its own."[738]  Another of these commenters said that "this change alters the scope and effect of the PSLRA by substantially revising the definition that Congress relied on when it wrote the statute.  Such an alteration to the statute's scope should be made by Congress, not the Commission."[739]  Another of these commenters said, "I believe the SEC would be overreaching its authority in eliminating the availability of the PSLRA safe harbor for forward-looking statements in de-SPAC transactions.  The Projection Proposal would change the existing definition of 'blank check company' for purposes of the PSLRA by removing the 'penny stock' condition.  That was the definition Congress specifically relied upon when it wrote the PSLRA.  I believe it would be improper for the SEC to willfully ignore statutory language in this manner."[740]  Another commenter said that "de-SPAC transactions were not within the scope of issuers and transactions excluded from the PSLRA by Congress.  The PSLRA excludes from the safe harbor, among other things, forward-looking statements made in connection with an IPO, and an offering of securities by a blank check company or by an issuer that issues penny stock."[741]  This commenter also said that SPACs are not blank check companies subject to Rule 419 nor do SPACs issue penny stock.  This commenter also stated, "In transactions where the de-

---

[738]   Letter from American Securities Association.

[739]   Letter from Cato Institute.

[740]   Letter from Paul Swegle.

[741]   Letter from Winston & Strawn.

240

SPAC transaction is structured with the SPAC as the surviving company, the transaction is not an IPO of the SPAC.  As a result, we believe the proposed expansion of the exclusions from the PSLRA that were legislated by Congress are not merely clarifying or interpretive in nature; rather, they go beyond the Commission's rulemaking authority and should be addressed by statute."  Finally, one commenter said the proposed changes regarding the definition of blank check company "appears inconsistent with the exemptive authority found in Section 27A(g) and (h), which makes clear the Commission's ability to extend the scope of the safe harbor protections rather than narrow them."[742]

Second, some commenters suggested that the Commission's proposed definition of blank check company is inconsistent with the Penny Stock Reform Act's statutory definition of blank check company, which includes the qualification that the relevant company is issuing penny stock and which predated the PSLRA.[743]  One of these commenters stated, "As the Commission noted, the current definition of 'blank check company' predates the enactment of the PSLRA in 1995 and evidences a clear intent to exclude from that definition SPACs that raise more than $5 million in a firm commitment underwritten IPO for not selling 'penny stock.'"[744]  Another of these commenters said that "the SPAC Proposal's proposed elimination of the PSLRA safe harbor…is illegal for [the] reason [that]: it proposes an unreasonable definition of 'blank check company.'  The PSLRA generally provides a safe harbor for forward-looking statements, but the

---

[742]  Letter from ABA.  *See also* letter from Goodwin.

[743]  Letters from ABA, Job Creators Network, Kirkland & Ellis.  Section 508 of the Penny Stock Reform Act amended Securities Act Section 7 to provide for new Section 7(b)(3) that provides: "For purposes of paragraph (1) of this subsection, the term 'blank check company' means any development stage company that is issuing a penny stock (within the meaning of section 3(a)(51) of the Securities Exchange Act of 1934) and that—(A) has no specific business plan or purpose; or (B) has indicated that its business plan is to merge with an unidentified company or companies."

[744]  Letter from ABA.

safe harbor is not available for 'blank check companies.'  The PSLRA states that the term 'blank check company' has 'the meaning[] given…by rule or regulation of the Commission,' but of course the SEC does not have carte blanche to define the term however it wants—its proposal must be 'reasonable.'"[745]  The commenter also said, "The SEC's discretion in defining blank check company is accordingly cabined and informed by other relevant statutory provisions."[746] This commenter also said, "In particular, Congress has already defined a blank check company in the Securities Act, and the only absolute requirement in that definition is that the company issue 'penny stocks.'"[747]  This commenter further stated that "the SPAC Proposal would eliminate the penny stock requirement, even though Congress has made clear that that requirement is the core aspect that defines a blank check company.  The SPAC Proposal's definition of blank check company is hardly 'reasonable' when it eliminates the core of Congress's definition of that term within the same statutory regime, nor is it 'consistent with the statute's purpose' to allow the SEC to relabel any entity it chooses as a blank check company by disregarding the core aspect of what makes a blank check company."[748]  Another of these commenters said, "The Proposal to redefine 'blank check company' is not a clarification of existing law.  We disagree with the Commission that the proposed amendment to the definition of 'blank check company' is a clarification that the statutory safe harbor of the PSLRA is not available for forward-looking statements made in connection with offerings by SPACs.  As noted

---

[745]  Letter from Job Creators Network, *citing Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (statutory citations have been omitted from the quotation).

[746]  *Id.*, *citing see, e.g.*, *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 492 (D.C. Cir. 2016) (for the principle, according to the commenter, that "[at] Chevron step two, courts look at how Congress 'elsewhere defines' the specific term at issue").

[747]  *Id.* (statutory citation omitted).

[748]  *Id.*, *citing Chem. Mfrs. Ass'n v. EPA*, 919 F.2d 158, 163 (D.C. Cir. 1990) (footnotes omitted).

by the Commission, the current definition of a 'blank check company' predates the enactment of the PSLRA and this amendment changes the applicability of the PSLRA safe harbor."[749]

Finally, in addition to these two main groups of comments related to statutory authority issues, one commenter expressed the view that the proposed changes to the definition of "blank check company" are contrary to the Administrative Procedure Act of 1946[750] because "the SEC is seeking to amend the PSLRA on its own without any explicit statutory authority or directive from Congress."[751]  A different commenter argued that the proposal was "unlawful, arbitrary, and capricious" because Congress already defined blank check company in the Securities Act and "the only absolute requirement in that definition is that the company issue "'penny stocks.'"[752]

A number of commenters focused on comparing de-SPAC transactions to two categories of other kinds of transactions: (1) traditional IPOs and (2) other business combinations.  Some commenters supported the proposal with respect to rules related to the PSLRA safe harbor on the basis that it would level the playing field with IPOs.[753]  Other commenters, however, expressed concerns regarding how the playing field for traditional IPOs operates with respect to the interaction of issuers who provide projections, research analysts, and investors.  These commenters generally observed that, in traditional IPOs, issuers often provide projections to securities analysts who often share these projections with certain institutional investors (on a

---

[749]  Letter from Kirkland & Ellis.

[750]  5 U.S.C. 551 *et seq.*

[751]  Letter from American Securities Association.

[752]  Letter from Job Creators Network.

[753]  Letters from Bullet Point Network, CFA Institute ("both the regular IPO and de-SPAC approaches for taking a new, emerging company public should be treated similarly in this critical area for market integrity—the legitimacy of forward-looking projections."), NASAA ("We see no reason why de-SPAC transactions should be treated differently than penny stock issuers or traditional IPO participants with respect to forward looking statements.").

243

private and informal basis, i.e., not in the form of published research reports) but these issuers do not make this information available to other investors, particularly retail investors.[754]  One commenter said, "The [PSLRA] Safe Harbor, and subsequently Regulation FD,…had the desirable effect of leveling the playing field so that certain investors with access to management meetings and sell-side research analysts do not have an information advantage over less well-resourced retail investors."[755]  But the commenter indicated that, because "IPOs…are expressly excluded from the [PSLRA] Safe Harbor and Regulation FD is only applicable to companies that are already public,…companies do not provide any projections or forward-looking statements in the S-1s relating to their IPOs but generally do hold private meetings with qualified institutional investors."  Some commenters suggested that, instead of the proposed rule changes, IPO

---

[754]  Letters from Bullet Point Network (expressing the view that the inapplicability of the PSLRA safe harbor to traditional IPOs "effectively prohibit[s] management projections from S-1 filings" and that "[t]his relegates the topic to the game of '20 questions' privileged investors play.  Asking the right questions in the right way allows these investors to get valuable information others don't get, while technically staying on the right side of the published rules.  Issuers can essentially transmit projections by helping research analysts employed by their underwriters develop financial estimates, the substance of which are communicated verbally to privileged investors in private meetings ahead of an IPO."); SPACInsider ("It's quite common for a company that is going through the traditional IPO process to talk to a bank's research analyst, discuss their forward earnings, at which point, the analyst then models out the company into the future and then…ONLY distributes that information to the bank's key and favored clients (which usually pay the bank a lot of money in trading fees).  This is a far less democratic and equitable process to the investing public, and in particular, retail investors….This is in contrast to the SPAC process in which all investors get a free look at projections by filing them publicly, not just the wealthiest investors." (emphasis in the original)); Ropes & Gray ("a key challenge of the traditional IPO market is that it ends up depriving retail investors from participating in IPOs through an IPO allocation, and such investors are often unable to purchase at the same price as institutional investors.  Retail investors in companies that access the public markets through traditional IPOs also do not have the same access to third-party analysis as larger institutional investors who have ready access to the research analyst community.  SPAC transactions have served to democratize the process in enabling prospective investors to have the ability to participate on equal footing with initial investors…by way of…access to information."); SPAC Association ("we believe that an opposite result may take place if these proposed rules were to be promulgated: the public may be deprived of potentially helpful information and that same information will only be made available to institutional investors in private settings, like what happens in the IPO market…."); Vinson & Elkins ("Projections are used in IPOs—they are just customarily not included in the registration statement and prospectus.  Instead, they are disclosed to analysts at the investment banks, who use them to assist in pricing the securities and in building the analysts' models for disclosure to institutional investors."); White & Case ("issuers in IPOs indirectly provide investors with financial projections by sharing their financial models, including projections, with research analysts, who then provide their models to their institutional investor clients considering whether to participate in the IPO.").

[755]  Letter from Bullet Point Network.  *See also* letter from Ropes & Gray ("if these proposed rules were to be promulgated: the public may be deprived of potentially helpful information and that same information will only be made available to institutional investors in private settings, like what happens in the IPO market").

regulation should be put on a level playing field with de-SPAC transactions by Commission rule amendments or through statutory amendment to extend the PSLRA safe harbor to IPOs.[756]

Other commenters, however, suggested de-SPAC transactions should be treated differently than IPOs because de-SPAC transactions involve business combinations, which may be subject to disclosure obligations under State law.[757] One of these commenters said that "unlike companies undertaking a traditional IPO, SPACs are compelled by a combination of federal securities regulation and state corporate law to share Target projections with stockholders."[758] This commenter also said, "To truly place De-SPAC Transactions on a 'level playing field' with traditional IPOs in connection with forward-looking statements, the Commission would have to change its disclosure requirements in connection with De-SPAC Transactions and somehow override the state fiduciary obligations that compel disclosure of projections." Another of these commenters said that "SPACs will not be able to avoid liability by refraining from speaking, as many traditional IPOs do. SPAC sponsors generally must provide forward-looking information in connection with the de-SPAC transaction to satisfy state

---

[756] Letters from Bullet Point Network (recommending that the PSLRA safe harbors "should be available for IPOs of all Types [defined by the commenter as traditional IPOs, SPAC business combinations and Direct Listings], but should only be available for projections that serve the public interest by clearly communicating the risk and uncertainty associated with the projections in a standardized format."), Loeb & Loeb, Kirkland & Ellis, SPACInsider. *See also* letter from ABA ("This also appears inconsistent with the exemptive authority found in Section 27A(g) and (h), which makes clear the Commission's ability to extend the scope of the safe harbor protections rather than narrow them."), Amanda Rose (discussing "serious questions about the wisdom of the existing exclusion for communications made in connection with an IPO, which has the practical effect of silencing nearly all public disclosure of management projections in connection with IPOs to the detriment of reasonable investors"), SPAC Association ("By removing the safe harbor provisions from SPAC mergers, the proposed rules would replicate the biggest flaw of IPOs, hindering investor visibility toward management expectations and related future prospects.").

[757] Letters from ABA, Amanda Rose, Cato Institute, Cowen, Goodwin, Vinson & Elkins, NYC Bar. Also, the Small Business Capital Formation Advisory Committee recommended that projections in de-SPAC transactions should be covered by the liability safe harbor provisions of the PSLRA, because management projections are an important part of the rationale for companies in determining whether to engage in a merger with a SPAC and they are necessary when financial intermediaries provide fairness opinions related to de-SPAC transactions. *See supra* note 40.

[758] Letter from ABA.

fiduciary requirements in connection with mergers."[759]  Another of these commenters said, "With respect to forward looking statements, the SEC's 'de-SPAC transactions are merely IPOs of the target company' theory has flaws.  Specifically, the SPAC is a publicly traded company…and the directors and officers of the SPAC have fiduciary duties.  They are required to conduct substantial diligence (arguably more than underwriters in an IPO), and are required to disclose the material reasons for approving and proposing the de-SPAC transactions to the SPAC's shareholders, which frequently include projections provided to the directors in connection with their evaluation of the de-SPAC transaction."[760]  Another of these commenters said that "traditional IPOs and de-SPAC transactions are fundamentally different transactions. Financial projections are not required to be included, and are rarely included, in IPO registration statements.  On the other hand, both Delaware jurisprudence and the Commission's staff now require inclusion of management projections in proxy statements and registration statements on Form S-4/F-4 where such projections were relied upon by a board of directors in approving a transaction."[761]  This commenter also said, "The projections included in the de-SPAC transaction registration statement or proxy statement are not included in order to promote capital formation. In fact, such projections are generally only current as of the date a board of directors approved the execution of the acquisition agreement.  Such projections are not typically updated because they are being provided to SPAC shareholders to evaluate the board of directors' recommendation to approve the de-SPAC transaction, rather than to solicit a new investment.  As such, projections are often out of date, or 'stale', by the time the SPAC's shareholders receive them.  Issuers generally include disclosure to the effect that investors should not consider

---

[759]    Letter from Cato Institute (footnotes omitted).

[760]    Letter from Vinson & Elkins.

[761]    Letter from NYC Bar.

246

projections to be financial guidance, and investors are generally cautioned not to place undue reliance on such projections."  Another commenter said, "Under Delaware case law, the Board has a fiduciary duty to disclose to investors in a merger proxy (often in an S-4 registration statement) the projections it utilized in making its decision.  Moreover, if the SPAC receives a fairness opinion from a financial advisor (as the proposing release suggests will be required) that fairness opinion will be based on projections, which will have to be disclosed to investors.  Therefore, unlike a typical IPO, in the vast majority of de-SPAC transactions, projections will have to be disclosed, which further underscores the reasonableness of giving such statements PSLRA safe harbor protection, just as they would have in a typical M&A transaction that was not a de-SPAC."[762]

Furthermore, other commenters suggested de-SPAC transactions should be treated differently than IPOs, because of concerns about the interaction of the proposed changes regarding availability of the PSLRA safe harbor with other proposals in the Proposing Release.[763]  One of these commenters said, "This aspect of the Proposal is in direct opposition to the provisions of the Proposal that require the SPAC to disclose the material reasons for which the SPAC believes its proposed de-SPAC transaction is fair to its public shareholders."[764]  Another of these commenters said, "The combination of removing the safe harbor while adding amendments to Item 10(b) of Regulation S-K and Item 1609 of Regulation [S-K] essentially

---

[762]   Letter from Cowen.

[763]   Letters from American Securities Association; CFA Institute; Cowen ("if the SPAC receives a fairness opinion from a financial advisor (as the proposing release suggests will be required) that fairness opinion will be based on projections, which will have to be disclosed to investors.").

[764]   Letter from American Securities Association.

mandating some level of [forward-looking statement] projections, goes beyond leveling de-SPACs with IPOs."[765]

Some commenters suggested the proposal would create inconsistency by making the PSLRA safe harbor unavailable for one kind of business combination transaction (de-SPAC transactions) but not for other kinds of business combination transactions.[766]  One of these commenters said, "The Commission stated that the proposed change to the PSLRA definition is necessary to align traditional IPOs more closely with de-SPAC transactions.  However, the Commission's position is inconsistent with the provisions of Regulation M-A, which actually require disclosure of target company projections if the SPAC's board relied on such projections when approving the de-SPAC transaction.  There is no similar requirement in the IPO context.  We can see no justification for treating a de-SPAC transaction differently from any other stock-for-stock merger for this purpose."[767]

A number of commenters suggested the proposal would have a chilling effect on the use of projections that investors find useful.[768]  One of the commenters said that "we believe the removal of the PSLRA safe harbor would have a significant chilling effect on De-SPAC Transactions" and that this "chilling effect is also demonstrated by the fact that IPO issuers rarely publicly include projections in the registration statement."[769]  One of these commenters said the proposal "undoubtedly will" reduce "the amount of potentially relevant information

---

[765]  Letter from CFA Institute.

[766]  Letters from Cowen, SPAC Association, Winston & Strawn.

[767]  Letter from Winston & Strawn.

[768]  Letters from ABA, Amanda Rose, Cato Institute, CFA Institute, Goodwin, Kirkland & Ellis, Managed Funds Association, NYC Bar, SPAC Association, Vinson & Elkins, Winston & Strawn.  *See also* letter from Davis Polk (stating that the absence of the safe harbor will not "have a substantial impact" but may "be an additional factor that will cause many investment banks to refuse to participate in de-SPAC transactions to avoid liability").

[769]  Letter from ABA.

presented to investors" and suggested this would negatively affect investor ability to accurately value combined companies in de-SPAC transactions.[770]  Another of the commenters said that "the proposed amendment may discourage the disclosure of projections—especially given the Commission's broad statements on potential underwriter liability."[771]  A different commenter referred to an article that said, "Offering [mandated forward-looking] disclosures safe harbor protection may decrease their accuracy relative to a world in which safe harbor protection were not available, if companies emboldened by the liability shield approach the preparation of such disclosures with less care or honesty than they otherwise would.  But it could also *increase* the quality of the disclosures by reducing an incentive that might otherwise exist to negatively bias projections or obfuscate them, which has the twin effects of making them less vulnerable to attack in litigation *and* less useful to investors."[772]  The same article also said allowing a safe harbor to apply to forward-looking statements in de-SPAC transactions "might also work to lower liability insurance premiums."[773]

Commenters also expressed concerns about the combined effect of the proposed change in PSLRA safe harbor availability and proposed Rule 140a concerning underwriters.[774]  One of these commenters said, "In particular, when coupled with other proposed amendments that

---

[770]  Letter from Cato Institute.

[771]  Letter from Kirkland & Ellis.

[772]  Letter from Amanda Rose, including attachment of a forthcoming article that was published as: Amanda M. Rose, Rose, *SPAC Mergers, IPOs, and the PSLRA's Safe Harbor: Unpacking Claims of Regulatory Arbitrage*, 64 William & Mary L. Rev. 1757, 1806 (2023), *available at* https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=3995&context=wmlr (emphasis in original).

[773]  *Id.* at 1806.

[774]  Letters from ABA, Kirkland & Ellis, NYC Bar.  *See also* letter from Vinson & Elkins ("However, the expansion of underwriter liability to cover de-SPAC transactions may cause an increased focus on projections, and more thorough discussion regarding the assumptions and considerations underlying the projections, as well as material risks that could cause such projections to not be satisfied.  Where projections are not a material consideration for a SPAC board, under the Proposed Rules that SPAC will be less likely to disclose projections.").

would require disclosure of a fairness determination (effectively mandating the provision of projections) as well as impose underwriter liability in a De-SPAC Transaction, we believe removal of the PSLRA safe harbor protections would have a chilling effect on De-SPAC Transactions and significantly disadvantage a De-SPAC Transaction compared to a traditional IPO."[775]  Another of these commenters said, "We do have a concern that the proposed amendment may discourage the disclosure of projections—especially given the Commission's broad statements on potential underwriter liability."[776]  Another of these commenters said, "The elimination of the PSLRA safe harbor, combined with the Commission's proposed Rule 140a, may have a chilling effect on the use of projections in de-SPAC transactions, which may preclude investors from receiving information that sponsors and boards of directors rely in part on in connection with valuation determination."[777]

Other commenters, however, expressed the view that PSLRA safe harbor availability does not meaningfully affect existing disclosure practices.[778]  One of these commenters said that "the availability of the PSLRA safe harbor may not be a significant factor in determining the use of forward-looking statements in de-SPACs."[779]  Another of these commenters said that "the safe harbor has never provided a meaningful shield from liability" and that "we do not expect that the absence of the safe harbor will have a substantial impact on current market disclosure practices

---

[775]  Letter from ABA.

[776]  Letter from Kirkland & Ellis.

[777]  Letter from NYC Bar.

[778]  Letters from Andrew Tuch, Davis Polk, Kirkland & Ellis.  *See also* letter from Jeffrey M. Solomon, Chair and Chief Executive Officer, Cowen Inc. (June 8, 2022) ("Cowen") ("If the perceived 'problem' is unreasonable projections or projections not being made in good faith, it should be noted that such unreasonable, bad-faith projections would not qualify for PSLRA (or any other) safe harbor protection in the first instance, irrespective of the stay of discovery….").

[779]  Letter from Andrew Tuch.

and we do not object to the disapplication of the safe harbor to de-SPAC transactions."[780]

Another of these commenters said, "In our experience, the availability of the PSLRA safe harbor for forward-looking statements in certain de-SPAC transactions does not alter the decision on the presentation of projections.  Conversely, where the safe harbor is clearly available, such as for follow-on offerings by existing public companies, it remains rare to see the inclusion of projections in the actual offering documents."[781]

Several commenters observed that other safe harbors in Commission rules and legal doctrines protecting against liability under common law would continue to be available with respect to forward-looking statements notwithstanding the proposed changes regarding the availability of the PSLRA safe harbor.[782]  One of these commenters said, "An issuer's ability to rely on the judicial 'bespeaks caution' doctrine may mitigate to some extent liability concerns associated with providing projections."[783]  Another of these commenters said that 17 CFR 230.175 ("Rule 175") under the Securities Act and 17 CFR 240.3b-6 ("Rule 3b-6") under the Exchange Act, which were "adopted…prior to the PSLRA…provide safe harbor protection similar to that of the PSLRA safe harbor."[784]  This commenter also said that under the "judicially-created 'bespeaks caution' doctrine…now accepted in 11 federal judicial circuits…forward-looking statements accompanied by sufficient cautionary language" are rendered "non-actionable under securities laws if such statements are proved incorrect in the

---

[780]  Letter from David Polk.

[781]  Letter from Kirkland & Ellis.

[782]  Letters from ABA, Cowen, Winston & Strawn.

[783]  Letter from ABA.

[784]  Letter from Cowen.  Securities Act Rule 175 and Exchange Act Rule 3b-6 were adopted in 1979.  *See Safe Harbor for Projections*, Release No. 33-6084 (June 25, 1979) [44 FR 38810 (July 2, 1979)].  The PSLRA was enacted in 1995.

future."  Under the bespeaks caution doctrine, this commenter said, "Essentially, the same requirements apply as would under the PSLRA to obtain protection—that the forward-looking statements be accompanied by 'meaningful cautionary language.'"  Another of these commenters said that "even if the proposed amendment is adopted, under the so-called 'bespeaks caution' doctrine, SPACs should still be able to make forward-looking statements in the absence of the PSLRA safe harbor."[785]  A different commenter stated that the main difference between the PSLRA and the other safe harbors is that "the PSLRA safe harbor provides a stay of discovery while a motion to dismiss based upon the safe harbor protections is under review by the court," and that "[t]he Commission's proposal, in stripping away the protection of the PSLRA safe harbor for projections in de-SPAC transactions, has in actuality not increased anyone's exposure for the projections—it has simply increased the cost of defense."[786]  Another of these commenters expressed the view that the proposal "would only increase transaction costs and administrative burdens on de-SPAC transactions."[787]

Some commenters questioned the need for the amendments, expressing the view that investors are well-capable of assessing the reasonableness of projections used by SPACs.[788]  One of these commenters said, "The Commission is concerned that investors are misled by forward-looking statements, but some researchers have found that hype, if present, does not sway investors and that forecasts are often related to positive outcomes.  These types of findings

---

[785]  Letter from Winston & Strawn.

[786]  Letter from Cowen.

[787]  Letter from Winston & Strawn.

[788]  Letters from Cato Institute, Jonathan Kornblatt ("It is arguably much better to have a responsible party issuing projections rather than have a void of such filled by bloggers or posters on social media.  Individual investors may be far better served by having the C-suite as an accountable source of information instead of an anonymous chat room.  I hope the Commission will keep in mind that the purpose of the PSLRA safe harbor was to encourage companies to share their forecasts with investors, and that shielding the liability risk was necessary to encourage such disclosure."), Kirkland & Ellis, Paul Swegle.

should lead the Commission to question whether an effective prohibition on forward-looking disclosure in traditional IPOs is itself a good policy idea where it may inhibit price discovery and capital formation."[789]  Another commenter said that "the proposed amendment with respect to the PSLRA will not meaningfully affect the quality of projections made available for the review of the SPAC's board of directors and PIPE investors, if any" and that, "the proposed revisions to Item 10(b) and Item 1609(a) will assist in the comparability of projections included in the disclosure of materials reviewed by the board of directors of a SPAC.  In this way, investors will be able to assess for themselves whether underlying assumptions are reasonable rather than rely on the assertions of commentators in the market."[790]  Another of these commenters said, "It is also already standard practice to disclose key underlying risks and assumptions regarding projections and I find it hard to believe that investors are incapable of thoughtfully weighing projections together with a company's other disclosures in their decision-making processes."[791]

Some commenters suggested that the need to alter the availability of the PSLRA safe harbor is overstated.[792]  One of these commenters said that, because target companies may register securities in a de-SPAC transaction, in that situation, the PSLRA safe harbor is already not available to them.[793]  This commenter also suggested the need to alter the availability of the PSLRA is overstated because boards of directors of SPACs review projections, including related assumptions and cautionary language, consistent with their fiduciary duty of care.[794]  A different commenter suggested the need to alter the availability of the PSLRA safe harbor is overstated

---

[789]   Letter from Cato Institute.

[790]   Letter from Kirkland & Ellis.

[791]   Letter from Paul Swegle.

[792]   Letters from Kirkland & Ellis, Winston & Strawn.

[793]   Letter from Kirkland & Ellis.

[794]   Letter from Kirkland & Ellis.

because the PSLRA safe harbor only affects private litigation and does not prevent the Commission from pursuing claims for misleading disclosure.[795]

Several commenters suggested that the proposal would invite litigation against SPACs.[796] One commenter said, "The intent of removing the safe harbor for de-SPAC transactions is undeniable—it would open SPACs to a flood of private litigation that, when added to other provisions of the Proposal, would effectively kill the existing SPAC market."[797]

Other commenters suggested alternative policy approaches and other recommendations in connection with projection disclosure. One commenter suggested the Commission should restrict the use of projections because "[a]s written, the Proposal would leave the door open for projections for which there are little to no reasonable basis, when an issuer has no historical operations, and when the company or asset acquisition is speculative in nature without any disclosure" and because "[s]ponsors, target companies and underwriters that would become liable under the Proposal may attempt to evade liability by combining boilerplate risk factors with forward looking cautionary information that prefaces claims of unreasonable upside potential to investors."[798] Other commenters suggested the Commission should mandate qualifying language or additional disclosure around the use of projections.[799] One of these

---

[795]   Letter from Winston & Strawn.

[796]   Letters from American Securities Association, Anonymous (Apr. 7, 2022). In addition, one commenter discussed generally the occurrence of litigation as a check against "inaccurate projections" already under the status quo. *See* letter from Vinson & Elkins (stating, "We do not believe an amendment (and the proposed change is not a 'clarification') would improve the quality of projections in connection with de-SPAC transactions. SPACs and target companies already have strong incentives to make sure that the projections are as reasonable as possible. They may face suits over inaccurate projections…," and noting in a footnote, "The PSLRA safe harbor only protects against civil suits, and in a civil case it is not a shield against a fraud claim.") (other footnotes omitted).

[797]   Letter from American Securities Association.

[798]   Letter from NASAA.

[799]   Letters from Managed Funds Association; Michael Dambra, Omri Even-Tov, and Kimberlyn George.

commenters said, "Rather than barring forward-looking projections entirely, we recommend that the Commission instead consider requiring any such projections to include appropriate qualifying language, including the background and assumptions underlying such projections, along with any downside case analysis that was done in preparation of such projections."[800]  This commenter said, "We believe that such an approach would be consistent with the disclosure-based approach the Commission has used in similar circumstances, including in the case of Regulation G with respect to the regulation of the use of financial measures that vary from those included within generally accepted accounting principles."  Another of these commenters said that "rather than barring such young growth firms from providing forward looking information, we feel that additional disclosure should be provided around these forecasts."[801]

One commenter suggested that, instead of adopting the PSLRA proposal, the Commission should require that earnings statements include a comparison of past projections in earning statements to actual results in order to enhance issuer accountability.[802]  Other commenters suggested that market forces would hold accountable issuers with unmet projections by preventing future capital access.[803]

Two other alternative policy approaches suggested by commenters were that: (a) the safe harbor should be made unavailable only to the "maker" of the statement but that others such as "underwriters (or sellers) could continue to enjoy the full protection of the PSLRA;"[804] and (b) the safe harbor should be unavailable for longer-term projections (where the commenter

---

[800]  Letter from Managed Funds Association.

[801]  Letter from Michael Dambra, Omri Even-Tov, and Kimberlyn George.

[802]  Letter from SPAC Association.

[803]  Letters from Jonathan Kornblatt, Vinson & Elkins.

[804]  Letter from Cowen.

255

provided the example of a statement "we will penetrate 50% of [total addressable market] in 10 years") but available for short-term projections (where the commenter provided the example of a statement "we expect to make revenue in 1 year or have positive [free cash flow] in 2 years").[805]

One commenter said the Commission should "monitor the effects of the safe harbor removal for de-SPACs on the availability and quality of forward-looking information critical for SPAC investor decisions on merger approval votes and exercising redemption rights."[806] Finally, one commenter said, "While some de-SPAC transactions are in form 'initial public offering[s]' (e.g., where the target or a new company is formed to acquire the SPAC), it is inappropriate to deem a de-SPAC transaction where an existing public company stays public (e.g., where the SPAC survives the de-SPAC transaction as the publicly traded company) as an 'initial public offering.'"  This commenter suggested the Commission should provide an interpretation that de-SPAC transactions are "tender offers" which would make the PSLRA safe harbor unavailable.[807]

### 3. *Final Rules*

After considering the comments received, we are adopting a new definition of "blank check company" in Securities Act Rule 405 and Exchange Act Rule 12b-2 under the PSLRA. The new definition of "blank check company" in Rule 405 provides: "For purposes of Section 27A of the Securities Act of 1933 (15 U.S.C. 77z-2), the term *blank check company* means a company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person."  The new definition of "blank check company" in Rule 12b-2 provides: "For purposes

---

[805]   Letter from Charles Pieper.

[806]   Letter from CFA Institute.

[807]   Letter from Vinson & Elkins (footnotes omitted).

of Section 21E of the Securities and Exchange Act of 1934 (15 U.S.C. 78u-5), the term *blank check company* means a company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person."

We are not amending Securities Act Rule 419 as proposed. Instead, as discussed in detail below, we are adopting a definition of "blank check company" under the PSLRA in Securities Act Rule 405 and Exchange Act Rule 12b-2 to clarify that such definitions are solely for purposes of the PSLRA and not for purposes of any other rules (including rules the Commission adopted pursuant to mandates under the Penny Stock Reform Act, such as Securities Act Rule 419). The final rules have the same substantive effect as the proposal, notwithstanding the different approach taken.[808]

We also are not adopting any amendments as proposed to Securities Act Rules 137, 138, 139, 163A, 164, 174, 405, 430B, and 437a, because the definition of blank check company in Rule 419 that these rules cross-reference will not be changed as a result of the final rules. In addition, we also are not adopting a definition of "blank check company issuing penny stock" in Securities Act Rule 405 as proposed. This proposed amendment is also unnecessary since the definition of "blank check company" in Rule 419 will not change.

Having considered the comments received, we continue to believe that it is appropriate that forward-looking statements made in connection with de-SPAC transactions should be treated similarly with forward-looking statements made in traditional IPOs, because the de-SPAC transaction results in public shareholders acquiring a formerly private company, similar to

---

[808] The final rules and concomitant unavailability of the PSLRA safe harbor for forward-looking statements are not intended to have any retroactive effect related to forward-looking statements made prior to the effective date of the final rules.

an IPO.  In both IPOs and de-SPAC transactions, similar informational asymmetries exist between issuers (and their insiders and early investors) and public investors and there are similar risks of generating unfounded interest on the part of investors.  In both IPOs and de-SPAC transactions, there is no track record of public disclosure to help investors evaluate projections. Moreover, these risks do not disappear merely because a blank check company raised more than $5 million in a firm commitment underwritten IPO (and therefore may not be issuing penny stock).  The definitions of "blank check company" we are adopting and the concomitant changes to the availability of the PSLRA will help protect investors because blank check companies[809] may take more care in avoiding the use of forward-looking statements that are unreasonable.  As we discuss in detail below, we are not barring the use of forward-looking statements and recognize that forward-looking statements can provide useful and necessary disclosure.[810]

We disagree, based on the text of the PSLRA, with the commenters who expressed the view that the PSLRA does not give the Commission authority to amend the Commission's definition of "blank check company" that existed at the time the PSLRA was adopted.  On the contrary, in providing in the PSLRA that definitions, including blank check company, "have the meanings given those terms by rule or regulation of the Commission,"  Congress expressly provided the Commission the authority to define these terms and to amend those definitions, consistent with the text, structure, and purpose of the PSLRA.

The text of the PSLRA demonstrates in other ways as well that the Commission has the authority to define, and amend its definition of, "blank check company."  For example, Congress

---

[809]   In this subsection III.E.3, where we refer to "blank check companies" in connection with our discussion of the final rules, unless otherwise indicated, we are referring to blank check companies that are not limited by any qualification that the company is an issuer of penny stock.

[810]   Depending on specific facts and circumstances, protections other than the PSLRA safe harbors may apply in connection with forward-looking statements.  *See* letters from ABA, Cowen, Winston & Strawn, *supra* notes 782, 783, 784, and 785 and accompanying text, and discussion below proximate to note 840.

*did not* use tracking language in the PSLRA to define blank check companies, such as by a statutory definition of blank check company that closely resembles or mirrors the definition in the rules of the Commission at the time of the legislation.  In contrast, with respect to other defined terms in the PSLRA, Congress *did provide* long-form definitions (rather than cross-referencing by citation an existing Commission rule) that closely resemble the content of definitions in Commission rules.[811]  Congress also *did not* define the term blank check company in the PSLRA by referencing the statutory definition in Section 7(b)(3) of the Securities Act, as Congress *did* elsewhere in the PSLRA where it defined terms related to forward-looking statement safe harbors by cross-referencing to those terms.[812]  The absence in the PSLRA of such a statutory cross-reference to define the term blank check company is consistent with Congress's express grant of authority to the Commission, as discussed above, to define these terms and amend them consistent with the text, structure, and purpose of the PSLRA.

In addition, the PSLRA safe harbors provide that they are unavailable to issuers that issue "penny stock."[813]  The 1995 version of the definition of blank check company in Securities Act Rule 419 contained (and still contains) a restriction that it applies only to companies issuing penny stock.  This suggests that Congress did not intend to permanently fix the Commission's definition of "blank check company" to the 1995 version of that definition in Securities Act Rule 419, because it would have been redundant for Congress to include a carve-out for blank check companies that are penny stock issuers and also carve out penny stock issuers.

---

[811]   For example, the definition of "forward-looking statement" in the PSLRA is similar to the content of Securities Act Rule 175 (which pre-dated the PSLRA).  *Compare* Securities Act Section 27A(i)(1) (15 U.S.C. 77z-2(i)(1)), *with* 17 CFR 230.175(c) under the Securities Act.

[812]   *See infra* note 818 and accompanying text.

[813]   15 U.S.C. 77z-2(b)(1)(C); 15 U.S.C. 78u-5(b)(1)(C).

Furthermore, we also do not agree, based on the legislative history of the PSLRA, with commenters that asserted that Congress fixed the definition of "blank check company" to the Commission's rules as they existed in 1995, when the PSLRA was enacted.  Commission staff reviewed the complete legislative history of the PSLRA and found no evidence of any intent on the part of Congress to fix the definition of "blank check company" as the term was defined in Securities Act Rule 419 at the time of the adoption of the PSLRA in 1995.  The staff also found no evidence in the legislative history of the PSLRA of any intent on the part of Congress to restrict the authority of the Commission to amend the definition of this term.

One commenter said the proposed change regarding the definition of blank check company "appears inconsistent with the exemptive authority found in Section 27A(g) and (h), which makes clear the Commission's ability to extend the scope of the safe harbor protections rather than narrow them."[814]  We disagree.  While Securities Act Sections 27A(g) and 27A(h) and Exchange Act Sections 21E(g) and 21E(h) provide the Commission with authority to create new exemptions, subject to the conditions that they are in the public interest and protect investors, and clarify that the PSLRA did not limit the ability of the Commission to create new safe harbors for forward-looking statements, there is no limitation in these provisions on the express authority provided under Securities Act Section 27A(i)(7) and Exchange Act Section 21E(i)(5) to define "blank check company."[815]

---

[814] Letter from ABA.  *See also* letter from Goodwin.  Securities Act Section 27A(g) (15 U.S.C. 77z(g)) provides: "In addition to the exemptions provided for in this section, the Commission may, by rule or regulation, provide exemptions from or under any provision of this title, including with respect to liability that is based on a statement or that is based on projections or other forward-looking information, if and to the extent that any such exemption is consistent with the public interest and the protection of investors, as determined by the Commission."  Securities Act Section 27A(h) (15 U.S.C. 77z(h)) provides: "Nothing in this section limits, either expressly or by implication, the authority of the Commission to exercise similar authority or to adopt similar rules and regulations with respect to forward-looking statements under any other statute under which the Commission exercises rulemaking authority."

[815] Regarding Securities Act Section 27A(b)(7), *see supra* note 710.

With respect to the commenters who expressed the view that the Commission's definition of "blank check company" under the PSLRA may not be broader than the statutory definition of this term in the Penny Stock Reform Act, nothing in the text of either statute limits the Commission's definition for the term "blank check company" for purposes of the PSLRA to be no broader (i.e., not contain a qualification that the issuer issue penny stock) than how this term is defined in the Penny Stock Reform Act (i.e., containing a qualification that the issuer issue penny stock).[816]

Congress *did not* define "blank check company" in the PSLRA with language that tracks the definition of "blank check company" under the Penny Stock Reform Act.[817]  In contrast, with respect to other defined terms in the PSLRA, Congress *did* define terms using language that closely tracks existing definitions in other sources, such as the definition of "forward-looking statement" in the PSLRA which is similar to Securities Act Rule 175 and Exchange Act Rule 3b-6 (which both pre-dated the PSLRA).

Also, Congress *did not* define "blank check company" in the PSLRA by cross-referencing the definition of "blank check company" in Securities Act Section 7(b)(3) that was added by the Penny Stock Reform Act, but, instead, Congress defined "blank check company" and other defined terms in the PSLRA as having "the meanings given those terms by rule or regulation of the Commission."  In contrast, with respect to other defined terms in the PSLRA, Congress *did* cross-reference existing statutes as a means of supplying definitions for those terms.[818]

---

[816]  *See, e.g.*, S. Rep. No. 104-98 (1995); H.R. Rep. No. 104-369 (1995) (Conf. Rep.).

[817]  *See supra* note 710.

[818]  For example, Congress defined the terms "penny stock" and "investment company" in the PSLRA by cross-referencing existing statutory provisions providing definitions of those terms.  The PSLRA added Securities Act

Furthermore, the PSLRA legislative history does not evidence an intent by Congress to require the Commission's PSLRA "blank check company" to be fixed to a specific definition (e.g., to be no broader than the Penny Stock Reform Act definition). In contrast, Congress did fix the definition in the Penny Stock Reform Act. The legislative history of the Penny Stock Reform Act documents Congress's concerns that overbroad restrictions on "blank check company" issuances, with respect to penny stock abuses, could interfere with legitimate capital raising in connection with *that* statute. The legislative history of the Penny Stock Reform Act—which mandated the Commission to adopt restrictions on blank check companies and ultimately led the Commission to adopt Rule 419[819]—documents that Congress was concerned about blank check companies in connection with penny stock abuses (the focus of the legislation) because blank check companies were viewed as providing a large inventory of securities that fed into the market for penny stocks.[820] The legislative history of the Penny Stock Reform Act indicates that members of Congress were aware of concerns expressed by hearing witnesses that, if regulation

---

Section 27A(i)(2) (15 U.S.C. 77z-2(i)(2)) ("The term 'investment company' has the same meaning as in section 3(a) of the Investment Company Act of 1940.") and Section 27A(i)(3) (15 U.S.C. 77z-2(i)(3)) ("The term 'penny stock' has the same meaning as in section 3(a)(51) of the Securities Exchange Act of 1934, and the rules and regulations, or orders issued pursuant to that section.").

[819] H.R. Rep. No. 101-617, at 23 (1990) ("The bill thus mandates that the Commission adopt new blank check rules which the Committee expects will contain at least three critical elements: (1) information regarding the company to be acquired by the blank check company prior to or after the date the registration becomes effective; (2) limitations on the use of proceeds of blank check offerings and the distribution of the securities of the issuer until such time as adequate disclosure has been made; and (3) a right of rescission for shareholders who disapprove of the disclosed acquisition."); Penny Stock Reform Act of 1990, H.R. 4497, 101st Cong. § 9(a)(2) (1990).

[820] H.R. Rep. No. 101-617, at 22 (1990) ("nearly 70 percent of all penny stock issues offered in 1988 and through the third quarter of 1989 were blank checks; money raised with no purpose stated for its use."); Penny Stock Market Fraud (Part 2): Hearing on H.R. 4497 Before the Subcomm. on Telecomm. and Fin. of the Comm. on Energy and Com., 101st Cong. 31 (1990) (Statement of Hon. Richard C. Breeden, Chairman, Securities and Exchange Commission) ("The Commission recognizes that blank check offerings have been used extensively for abusive and fraudulent practices in the penny stock market. We empathize with the desire to ban these types of offerings."); The Securities Law Enforcement Remedies Act of 1989: Hearing on S. 647 Before the Subcomm. on Sec. of the Comm. On Banking, Housing, and Urban Aff., 101st Cong. 351 (1990) (testimony of Joseph Goldstein, Associate Director, Division of Enforcement, Securities and Exchange Commission, stating that "from the enforcement side, we have seen widespread abuse with blank checks. They are a very popular vehicle for committing penny stock fraud.").

of blank check companies were unduly restrictive, this could disrupt funding for investment vehicles such as private equity investment entities, particularly in real estate, hydrocarbons and technology sectors.[821]

Some commenters suggested that the proposed changes to the definition of "blank check company" are contrary to the Administrative Procedure Act of 1946, because the Commission does not have explicit statutory authority to make the changes.[822]  The final rules are consistent with the express statutory authority of the Commission as discussed above.

Notwithstanding the foregoing, the final rules include technical changes from the proposal to clarify that the definitions of "blank check company" that we are adopting are solely

---

[821] Penny Stock Market Fraud (Part 2): Hearing on H.R. 4497 Before the Subcomm. on Telecomm. and Fin. of the Comm. on Energy and Com., 101st Cong. 31–32 (1990) (Statement of Hon. Richard C. Breeden, Chairman, Securities and Exchange Commission) ("If blank checks were outlawed, it would be relatively easy for promoters to specify a particular field of investment, essentially turning what had been a blank check offering into a blind pool.  While these, too, could be barred, the blind pool financing approach has been used for years by legitimate issuers in venture capital, real estate, oil and gas exploration, and equipment leasing programs.  Thus, a proven mechanism for raising capital for productive uses could be eliminated or, at least, subjected to costs and additional regulation.  While the bill grants the Commission powers to define which issuers could be subject to regulation we are concerned that, at least as it is currently written, any such definition would most likely be circumvented by unethical issuers."); Penny Stock Market Fraud (Part 2): Hearing on H.R. 4497 Before the Subcomm. on Telecomm. and Fin. of the Comm. on Energy and Com., 101st Cong. 47-48 (1990) (Testimony of Richard C. Breeden, Chairman, U.S. Securities and Exchange Commission) ("H.R. 4497 would prohibit both blank check and certain blind pool offerings.  However, blind pool financings have been used for years by issuers in venture capital, real estate, oil and gas exploration programs, equipment leasing and other areas.  Thus, substantial costs and burdens could be imposed on this kind of financing technique for which disclosure regulation has been adequate in the past, and which has been an important source of producing capital.") Penny Stock Market Fraud (Part 2): Hearing on H.R. 4497 Before the Subcomm. on Telecomm. and Fin. of the Comm. on Energy and Com., 101st Cong. 189 (1990) (Statement of John Guion, President, National Association of Publicly Traded Companies) ("There has been much said about blank check and blind pools.  Our comment here is that they have been used legitimately by some organizations, particularly in gas and oil exploration, and I would assume that the subcommittee would take that into consideration in resolving that particular area.").  The U.S. House of Representatives documented these concerns in House Report No. 101-617 (1990) to accompany H.R. 4497.  See H.R. Rep. No. 101-617, at 22 (1990) ("While Commission Chairman Richard Breeden and NASD enforcement director John Pinto agreed that blank check offerings were a source of problems, they were also of the view that blank check offerings could be and were used in legitimate business transactions outside of the penny stock arena.  Accordingly, they opposed an outright ban of all blank check offerings.").  Ultimately H.R. 4497 was not approved by the House of Representatives.  The House of Representatives and the Senate approved the same versions of S.647, which became law when it was signed by the President.  See govtrack (regarding H.R. 4497 and S.647 in the 101st Congress), available at https://www.govtrack.us/congress/bills/101/s647 and https://www.govtrack.us/congress/bills/101/hr4497.

[822] Letter from American Securities Association, supra note 751.  See also letter from Job Creators Network, supra note 751.

for purposes of the PSLRA and not for purposes of any rules the Commission adopted pursuant to mandates under the Penny Stock Reform Act, such as Rule 419.  In the Proposing Release, the Commission proposed moving the definition of blank check company out of Rule 419 (into Rule 405) and amending Rule 419 to use the proposed blank check company definition with a qualification in Rule 419 (that would be outside of that definition) limiting the applicability of Rule 419 to issuers of penny stocks.[823]  We are adopting a definition of "blank check company" that will be located in Securities Act Rule 405, as proposed, but that includes revised language stating that the definition is "For purposes of Section 27A of the Securities Act of 1933 (15 U.S.C. 77z-2)."  As a result, we are not amending Rule 419 as the Commission proposed; thus, the existing definition of "blank check company" in Rule 419 will remain unchanged.[824]  We are also adding to Exchange Act Rule 12b-2 a nearly identical definition of "blank check company" as with the final Securities Act Rule 405 definition, except that it provides that the definition is "For purposes of Section 21E of the Securities and Exchange Act of 1934 (15 U.S.C. 78u-5)."[825]

As discussed above, some commenters did not support the proposal or expressed a view it is inappropriate to adopt the proposal because of concerns related to the definition of "blank check company" in the Penny Stock Reform Act.[826]  We do not agree with the commenters that suggested we could not adopt the proposed definition of blank check company on these grounds.

---

[823]   Proposing Release, *supra* note 7, at 29481–29482.

[824]   The Proposing Release requested comment on the following: "Should we consider retaining a separate definition of "blank check company" for purposes of Rule 419?"  *See* Proposing Release, *supra* note 7, at 29482 (request for comment number 78).

[825]   Notwithstanding several references to Section 21E of the Exchange Act in the Proposing Release, we did not propose an Exchange Act rules definition of "blank check company" in the Proposing Release to accompany the proposed amendments to the Securities Act rules and Regulation S-K.  We are adopting an Exchange Act rule definition of "blank check company" as well as a Securities Act rule definition, because this approach should be clearer for registrants and other relevant parties and is more consistent with how the Commission has traditionally exercised its authority to define terms in the acts.

[826]   Letters from ABA, Job Creators Network.  *See supra* notes 743, 744, 745, 746, 747, and 748 and accompanying text.  *See also* letter from Kirkland & Ellis, *supra* note 749 and accompanying text.

However, in order to make clear that we are using our authority to define terms under the PSLRA and not under the Penny Stock Reform Act, we are not amending Rule 419 as proposed. Rather, we are amending Securities Act Rule 405 and Exchange Act Rule 12b-2, as discussed above. The final rules have the same substantive effect as the proposal notwithstanding the different approach taken.

As discussed above, some commenters suggested that projections are rarely used in traditional IPOs.[827] Traditional IPOs, however, may include projections. IPO issuers commonly provide certain disclosures about the future in their registration statements, including estimates in historical financial statements and disclosure provided pursuant to Item 303 of Regulation S-K (Management's Discussion and Analysis of Financial Condition and Results of Operations) and Items 5 and 9 of Form 20-F. In an IPO, disclosures under Item 303 of Regulation S-K (for example, which may include statements about the effects of changing prices and future economic performance) are outside the bounds of the PSLRA safe harbor (which is not applicable to IPOs pursuant to Securities Act Section 27A(b)(2)(D)). In any offering, including an IPO, estimates in financial statements prepared in accordance with generally accepted accounting principles are outside the bounds of the PSLRA safe harbor pursuant to Securities Act Section 27A(b)(2)(A).

Issuers in certain types of IPOs also often include industry- or offering-specific projections. For example, Commission staff has observed that real estate investment trusts may disclose dividend distribution plans and anticipated cash available for distribution (sometimes referred to by industry participants as the "Magic Page"). One commenter also noted that "while it may not be common in certain industries, many types of IPO issuers (e.g., REITs, yieldcos,

---

[827] Letter from Cato Institute, *supra* note 759 and accompanying text; letter from NYC Bar, *supra* note 761 and accompanying text.

and master limited partnerships) do regularly disclose projections in their IPO registration statements and those projections are expected, and relied upon, by underwriters and institutional and retail investors."[828]  Furthermore, the fact that registrants in traditional IPOs (where there is no PSLRA safe harbor available) provide projections voluntarily and provide them to comply with applicable requirements reinforces our view that blank check companies will be able to provide projections where they may be required to disclose projections they have relied upon under Commission rules or may be required to disclose projections under State law.[829]

Some commenters expressed concern with the proposal because State law may require disclosure of certain projections[830] or because of the interaction of the proposed change in safe harbor availability with other aspects of the proposal, such as Item 1609.[831]  We do not believe, under the final rules, that registrants will be unable to provide a fair summary[832] of any projections considered material and reliable that the registrant considers to be required to be disclosed under State law or will be unable to provide the disclosure required by Item 1609.  As discussed in detail below, the final rules we are adopting do not bar SPACs from making

---

[828]  Letter from Winston & Strawn.

[829]  In connection with the disclosure of any determination of a board of directors under Item 1606(a), Item 1606(b) requires a discussion of financial projections relied upon by the board of directors.  *See supra* Section II.G.  In certain situations, it is also possible a fair summary of projections would be required under State law.  *See, e.g.*, *In re Pure Resources Inc. S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002) (requiring a fair summary of the substantive work performed by investment bankers advising a board of directors); *In re Netsmart Technologies, Inc. S'holders Litig.*, 924 A.2d 171, 176 (Del. Ch. 2007) ("In the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate."); *Louden v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 145 ("Speculation is not an appropriate subject for a proxy disclosure."); *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *16 (Del. Ch. Aug. 18, 2006) ("our law has refused to deem projections material unless the circumstances of their preparation support the conclusion that they are reliable enough to aid the stockholders in making an informed judgment.").

[830]  Letters from ABA, Amanda Rose, Cato Institute, Cowen, Goodwin, Vinson & Elkins, NYC Bar.  *See supra* notes 757, 758, 759, 760, 761, and 762 and accompanying text.  *See also* recommendation of the Small Business Capital Formation Advisory Committee, *supra* note 40.

[831]  Letters from American Securities Association, CFA Institute, Cowen.  *See supra* note 763.

[832]  *See supra* note 829.

266

forward-looking statements or any required disclosures.  The changes to the availability of the

PSLRA safe harbor in connection with the definition of blank check company we are adopting

will help protect investors by incentivizing SPACs to take more care in avoiding the use of

forward-looking statements that are unreasonable.

In addition, investors are likely to understand the difference between: (i) on one hand,

third-party projections provided to the management of a SPAC about a target company prior to

the business combination agreement with the target company; and (ii) on the other hand,

disclosure by registrants in registration statements in connection with de-SPAC transactions that

include SPAC or target company management projections regarding certain financial statement

line items or financial measures in future years with respect to the target company that is

intended to guide investors in connection with the de-SPAC transaction.[833]  To the extent a

SPAC is concerned that security holders may rely on a summary of third-party projections that

the SPAC believes it is required to disclose under State law in instances where the SPAC

believes the projections are no longer reliable, a SPAC could provide supplemental disclosure

advising and alerting security holders of this fact.[834]

Some commenters suggested that the proposal potentially would have a chilling effect on

the use of projections in de-SPAC transactions and give rise to one of the perceived downsides of

an IPO, where a limited group of institutional investors may receive issuer projections indirectly

---

[833]  One commenter expressed similar views in connection with their comments on proposed Item 1609.  *See* letter from Freshfields ("The projections are included in the de-SPAC offering document in order to describe the basis upon which the board of directors of the SPAC approved the de-SPAC transaction — not to serve as a basis for investors to make an investment decision.").

[834]  For example, final Item 1609 requires certain disclosure where projections no longer reflect the views of a SPAC's or a target company's management or board of directors (or similar governing body) regarding the future performance of their respective companies.

267

(i.e., from securities analysts who have received projections directly from the issuer).[835]  While we acknowledge that there may be increased liability for projections disclosed in connection with de-SPAC transactions, we believe the rules we are adopting are necessary to protect investors receiving such projections.  As we discuss in connection with other comments expressing concerns there may be a chilling effect on projection use, the final rules do not prohibit the use of projections in connection with blank check company business combinations.  As in an IPO and as SPACs have done in the past, SPACs will continue to be able to disclose projections in connection with de-SPAC transactions after the effective date of the final rules, and securities analysts may elect to use such forward-looking statements as appropriate.  In some cases, a SPAC may decide to qualify its disclosure to put it in the proper context.[836]

Some commenters suggested the proposal would create inconsistency by making the PSLRA safe harbor unavailable for one kind of business combination transaction (de-SPAC transactions) but not for other kinds of business combination transactions.[837]  In contrast, another commenter said that "[t]he rationale for treating SPAC business combinations differently from other mergers with respect to the disclosure of projections is exactly that the SPAC is a shell company designed exclusively to merge with a private company seeking public listing and SPAC

---

[835]  Letters from Bullet Point Network, Ropes & Gray, SPACInsider, SPAC Association, Vinson & Elkins, White & Case.  *See supra* note 754.  In addition, certain comments also expressed concerns about the potential chilling effect on the use of projections in the SPAC market due to the combination of the change in the PSLRA safe harbor availability and proposed Rule 140a concerning underwriters.  We expect the same incentives to take more care in avoiding the use of unreasonable forward-looking statements will apply to underwriters.  *See* letter from NYC Bar, *supra* note 777 and accompanying text.  *See also* letter from Vinson & Elkins, *supra* note 774.

[836]  *See supra* note 834 regarding required disclosures where projections no longer reflect views on future performance.

[837]  Letters from SPAC Association, Winston & Strawn.

shareholders have an unconditional right to redeem for the initial price per share paid (typically $10 per share)."[838]

As discussed above, there are certain differences between SPACs and other business combination transactions due to the hybrid nature of de-SPAC transactions.[839] In light of these differences, we believe it is appropriate to take a different regulatory approach with respect to de-SPAC transactions—including in connection with the final definitions of "blank check company" we are adopting—in order to ensure that investors in these hybrid transactions are adequately protected.

As discussed above, several commenters addressed protections from liability in Commission rules and in common law other than the PSLRA safe harbor.[840] We agree with commenters that these protections for defendants remain potentially applicable, depending upon specific facts and circumstances.[841] We disagree, however, with the commenters who stated that

---

[838]   Letter from Bullet Point Network.

[839]   *See supra* Section III.C.

[840]   Letters from ABA, Cowen, Winston & Strawn. *See supra* notes 782, 783, 784, 785, 786, and 787 and accompanying text.

[841]   With respect to Securities Act Rule 175, which defines the term fraudulent statement to include, among other things, a statement which is an untrue statement of a material fact and a statement false or misleading with respect to any material fact, *see, e.g.*, *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 513 (7th Cir.1989) (court determined that Rule 175 applies to actions under Securities Act Section 11 even though liability under that section does not depend on fraud). *See also Arazi v. Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993) ("Bally's public statements fell within the safe harbor created by Exchange Act Rule 3b-6, and the plaintiffs have failed to allege with the particularity required by Fed.R.Civ.P. 9(b) that these statements lacked a reasonable basis."), *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411 (7th Cir. 1992) ("Defendants…are entitled to dismissal under Rule 175…."). With respect to the bespeaks caution doctrine, *see, e.g.*, *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371–373 (3d Cir. 1993) (upholding district court grant of defendant's motion to dismiss claims that included Section 11 claims and applying bespeaks caution doctrine), *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 n.3 (9th Cir. 1994) ("The plaintiffs appear to contend that, if the bespeaks caution doctrine is viable, it applies only to section 10(b) claims and not to section 11 claims. This argument is plainly wrong….[C]ourts have applied the doctrine to section 11 claims as well as section 10(b) claims."), *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 763 (2d Cir. 1991) ("The statements contained within the prospectus clearly 'bespeak caution'…." and "We conclude that Pincus can prove no set of facts which would demonstrate that the language…of the prospectus, read in context, is materially misleading….The complaint thus fails to state a claim under either Section 11 of the 1933 Act [or] Section 10(b) of the 1934 Act.").

269

adopting a new definition of blank check company under the PSLRA will merely increase costs such as by eliminating the stay of discovery during the pendency of a motion for summary judgment.[842]  Rather, we believe that removal of the procedural protections under the PSLRA will incentivize SPACs and other blank check companies to take greater care to avoid the use of forward-looking statements that are unreasonable.  We analyze the impact of costs related to the final definition of blank check company in Section VII (Economic Analysis).

With respect to commenters that expressed the view that the PSLRA safe harbor availability does not meaningfully affect existing disclosure practices,[843] we do not agree that the PSLRA safe harbor has no effect on the accuracy and reliability of disclosure.  For example, with respect to knowingly misleading statements, courts are split on whether knowingly false or even fraudulent forward-looking statements are protected by the PSLRA safe harbor;[844] whereas

---

[842]  15 U.S.C. 77z-2(f), 15 U.S.C. 78u-5(f).  *See* letters from Cowen, Winston & Strawn.  *See supra* notes 786 and 787 and accompanying text.  We note these final rules do not affect the stay of discovery during the pendency of a decision on a motion to dismiss under Securities Act Section 27(b)(1) (15 U.S.C. 77z-1(b)(1)) or Exchange Act Section 21D(b)(3)(B) (15 U.S.C. 78u-4(b)(3)(B).

[843]  Letters from Andrew Tuch, Davis Polk, Kirkland & Ellis.  *See supra* notes 778, 779, 780, and 781 and accompanying text.  *See also* letter from Cowen, *supra* note 778.

[844]  *Compare Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) ("[I]f the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind."), *and Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999) ("[I]f a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant."), *with Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations."), *and In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F.Supp.2d 549, 576 (S.D. Tex. 2002) ("The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.").  *Compare also* Brief for Securities and Exchange Commission as Amicus Curiae, *Slayton v. Am. Express Co.*, No. 08-5442-cv (2d Cir. 2010) ("[T]o remove a forward-looking statement from the protection of the safe harbor, a plaintiff must show that the defendant (i) actually knew (ii) that the statement was misleading."), *with* Amanda M. Rose, *SPAC Mergers, IPOs, and the PSLRA's Safe Harbor: Unpacking Claims of Regulatory Arbitrage* (May 19, 2022), at 26–27, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3945975, submitted as attachment to letter from Amanda Rose ("Prongs A and B of the PSLRA's safe harbor are written in the disjunctive, meaning that if either prong is met the suit must be dismissed….This reading of the safe harbor was critiqued by some as giving rise to a 'right to lie' on the part of defendants, but it can be defended from a public policy perspective in light of the broader goals of the legislation…mistaken scienter determinations are a real

removing any doubt about the applicability of the safe harbor would incentivize parties to take care to avoid the use of unreasonable forward-looking statements.  We do agree, however, as discussed above, that the removal of the PSLRA safe harbor will not eliminate forward-looking statements.

Some commenters suggested the need to alter the availability of the PSLRA safe harbor is overstated.[845]  One of these commenters said that, because target companies may register securities in a de-SPAC transaction, in that situation, the PSLRA safe harbor is already not available to them.[846]  We agree that, since the PSLRA safe harbor is not applicable to non-reporting companies and is not applicable to IPOs, in certain deal structures where a non-publicly traded target company is registering securities that it is offering in the de-SPAC transaction, the PSLRA safe harbor is already unavailable.  There are, however, a number of de-SPAC transactions that are not structured in this manner.

This commenter also suggested the need to alter the availability of the PSLRA is overstated because boards of directors of SPACs review projections, including related assumptions and cautionary language, consistent with their fiduciary duty of care.[847]  Despite these existing fiduciary duties, as discussed by commentators cited in the Proposing Release and by several commenters on the Proposing Release, there have been uses of projections in de-SPAC transactions that appear to be unreasonable, unfounded, or potentially misleading, particularly where the target company is an early stage company with no or limited sales,

---

risk in suits challenging forward-looking statements due to the phenomenon of hindsight bias, and the need to fight over this fact-laden issue may preclude early termination of the case, inviting strike suit litigation.").

[845]  Letters from Kirkland & Ellis, Winston & Strawn.

[846]  Letter from Kirkland & Ellis. *See also* letter from Andrew Tuch ("Just as the legal structure of de-SPACs determines the threat of liability to transaction participants, it also determines the application of the PSLRA safe harbor.").

[847]  Letter from Kirkland & Ellis.

271

products, or operations.[848]  Therefore, we believe that the final rules will supplement such State legal or equitable doctrines imposing fiduciary duties and help ensure blank check companies take more care to avoid the use of unreasonable forward-looking statements.

A different commenter suggested the need to alter the availability of the PSLRA safe harbor is overstated because the PSLRA safe harbor only affects private litigation and does not prevent the Commission from pursuing claims for misleading disclosure.[849]  We disagree with this view to the extent that it implies there is no need for investor private rights of action under the Federal securities laws when Commission enforcement actions are available.  We consider that view to be inconsistent with the Federal securities law statutory scheme, which provides for several private rights of action.[850]

Several commenters suggested that the proposal regarding the change in availability of the PSLRA safe harbor would invite litigation against SPACs.[851]  While it is possible that litigation may increase as a result of the removal of the PSLRA safe harbor protections, it is also possible litigation may not increase or may decrease if some issuers who otherwise would have provided unreasonable projections instead provide reasonable projections as a result of the final rules.[852]

---

[848]  Proposing Release, *supra* note 7, at 29462, n.33, and at 29482; letters from Americans for Financial Reform Education Fund, Better Markets, CFA Institute, CII, Senator Elizabeth Warren, *supra* notes 722–727  and accompanying text.  The Commission has brought a number of enforcement actions involving SPACs alleging the use of baseless or unsupported projections about future revenues and the use of materially misleading underlying financial projections.  *See, e.g.*, *SEC v. Ulrich Kranz and Paul Balciunas*, No. 23-cv-06332 (C.D. Cal. filed Aug. 4, 2023); *In the Matter of Momentus, Inc., et. al.*, Exchange Act Release No. 34-92391 (July 13, 2021); *SEC vs. Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D.N.Y., filed June 18, 2019); *In the Matter of Benjamin H. Gordon*, Exchange Act Release No. 34-86164 (June 20, 2019); *SEC vs. Milton*, Case No. 1:21-cv-6445 (S.D.N.Y., filed July 29, 2021).

[849]  Letter from Winston & Strawn.

[850]  *See, e.g.*, Securities Act Section 11 (15 U.S.C. 77k); Securities Act Section 12 (15 U.S.C. 77l).

[851]  Letters from Anonymous (Apr. 7, 2022), American Securities Association, Vinson & Elkins.

[852]  *See also supra* note 844 (discussing splits among courts on whether knowingly false or fraudulent forward-looking statements are protected by the PSLRA safe harbor).

Several commenters provided a range of views on how the proposal could or should change the current use of forward-looking statements, such as projections.  Some commenters expressed concerns that the proposal would bar issuers from using projections.[853]  These commenters suggested that, rather than barring the use of projections, the Commission should mandate qualifying language or additional disclosure around the use of projections.[854]  Other commenters expressed concerns that the proposal would have a chilling effect on the use of projections.[855]  Another commenter suggested the Commission should restrict the use of projections.[856]  Other commenters asked the Commission to expand the PSLRA safe harbor to cover IPOs.[857]

The final definition of "blank check company" we are adopting would not prohibit the use of projections in SPAC registration statements.  In this respect, the final rules are not a departure from the Commission's general policies towards projections held since 1973 when the Commission moved away from its previous "long standing policy generally not to permit projections to be included in prospectuses and reports filed with the Commission."[858]  That the

---

[853] Letters from Managed Funds Association (referring to the proposal as "barring forward-looking projections entirely"); Michael Dambra, Omri Even-Tov, and Kimberlyn George (referring to the proposal as "barring…young growth firms from providing forward looking information.").  *See supra* notes 800 and 801 and accompanying text.

[854] *Id.*

[855] Letters from ABA, Amanda Rose, Cato Institute, CFA Institute, Goodwin, Kirkland & Ellis, NYC Bar, SPAC Association, Vinson & Elkins, Winston & Strawn.  *See supra* notes 768, 769, 770, 771, and 772 and accompanying text.

[856] Letter from NASAA.  *See supra* note 798 and accompanying text.

[857] See *supra* note 756 (letters from Bullet Point Network, Loeb & Loeb, Kirkland & Ellis, SPACInsider).  *See also* letters from ABA, Amanda Rose, SPAC Association, *supra* note 756.

[858] *Disclosure of Projections of Future Economic Performance*, Release No. 33-5362 (Feb. 2, 1973) [38 FR 7220 (Mar. 19, 1973)].  With respect to development of policies towards projections, s*ee also Guides for Disclosure of Projections of Future Economic Performance*, Release No. 33-5992 (Nov. 7, 1978) [43 FR 53246 (Nov. 15, 1978)]; *Rescission of Guides and Redesignation of Industry Guides*, Release No. 33-6384 (Mar. 16, 1982) [47 FR 11476 (Mar. 16, 1982)].

final definition of "blank check company" does not prohibit projections is also consistent with existing 17 CFR 229.10(b) ("Item 10(b)") of Regulation S-K, which we are amending in this release, and new Regulation S-K Item 1609.  These rules both relate to the use of projections, including those of SPACs—rules which would be unnecessary if projections were barred in registration statements of blank check companies.

We recognize that forward-looking statements can provide useful and necessary disclosure to investors, and that such statements may be mandated by State and/or fiduciary legal obligations.  We also recognize that removing certain liability protections for these forward-looking statements could lead some blank check companies to provide fewer forward-looking statements or no forward-looking statements compared with what they might have provided in the absence of the final rules.  However, we believe the definition of "blank check company" that we are adopting and the concomitant impact on the availability of the PSLRA safe harbors are necessary and appropriate to help address concerns over the misuse of forward-looking statements in de-SPAC transactions and other business combinations involving blank check companies.[859]  These risks to investors are present in de-SPAC transactions just as in IPOs; in both transactions, there is no track record of public disclosure for a target company to help investors evaluate forward-looking statements.[860]  The final definition of "blank check company" we are adopting will better protect these investors by incentivizing blank check companies to

---

[859]  *See* letters from Americans for Financial Reform Education Fund, Better Markets, CFA Institute, CII, Senator Elizabeth Warren, *supra* notes 722–727  and accompanying text.

[859]  *See* letters from Americans for Financial Reform Education Fund, Better Markets, CFA Institute, CII, Senator Elizabeth Warren, *supra* notes 722–727  and accompanying text.

[860]  For the same reason, we disagree with the commenters who suggested the Commission should expand the PSLRA safe harbor to apply to IPOs.  *See* letters from Bullet Point Network, Loeb & Loeb, Kirkland & Ellis, SPACInsider, *supra* note 756 and accompanying text.  *See also* letters from ABA, Amanda Rose, SPAC Association, *supra* note 756.  The concerns we have about the use of forward-looking statements in de-SPAC transactions and other business combinations involving blank check companies discussed above are equally prevalent in traditional IPOs.

take more care in avoiding the use of unreasonable forward-looking statements.  In addition, we note that the final rules require a discussion of qualifying information, such as assumptions, in connection with the use of projections in de-SPAC transactions as recommended by one of the commenters, which will further enhance investor protections in connection with such forward-looking statements.[861]

Some commenters suggested that market forces would hold issuers with unmet projections accountable by preventing future capital access.[862]  While accountability-imposing market reactions potentially could limit future capital-raising ability of some SPACs that provide unreasonable projections, relying solely on such market-based protections would not provide investors with any recourse at the time the projections are made.  In addition, some companies may not return to the capital markets in the future to raise additional cash.  In such cases, to the extent that market accountability mechanisms may operate in the manner suggested by these commenters, we believe that the passage of time creates risks that such accountability mechanisms may be less likely to operate as theorized.

One commenter suggested allowing the PSLRA safe-harbor to apply to de-SPAC transactions might lower liability insurance premiums.[863]  We recognize that removal of PSLRA safe-harbor protection from SPACs could result in increased insurance costs for target companies.  Based on Commission staff's experience, companies that enter business combination agreements with blank check companies may have directors and officers insurance, and such business combination agreements may contain provisions regarding the provision of

---

[861]   *See* Item 1609 of Regulation S-K.  *See also* letter from Managed Funds Association *supra* note 800.

[862]   Letters from Jonathan Kornblatt, Vinson & Elkins.

[863]   *See* letter from Amanda Rose.

275

directors and officers insurance to company officials.[864]  As a result, any increased costs incurred by companies in connection with business combinations with blank check companies with respect to directors and officers insurance under the final rules will be incremental to those already incurred.  Furthermore, we believe these incremental costs are justified by the enhanced investor protections that will be realized by the incentives created by the final rules for blank check companies to take care to avoid the use of forward-looking statements that are unreasonable.  We discuss our analysis of the costs and benefits of the final rules releasing in more detail in Section VIII below.

One commenter suggested the Commission should require that earnings statements include a comparison of past projections to actual results in order to enhance issuer accountability.[865]  While we recognize the potential benefits of such disclosure, in order to achieve our goals of incentivizing SPACs and other blank check companies to take more care in avoiding the use of unreasonable forward-looking statements, we do not believe it is necessary to adopt the commenter's suggestion and believe that these goals will be achieved by the final rules.

Another commenter suggested that the safe harbor should be made unavailable only to the "maker" of the statement but that others such as "underwriters (or sellers) could continue to enjoy the full protection of the PSLRA."[866]  "Sellers" are not one of the enumerated persons whose forward looking statements are covered by the PSLRA safe harbors.[867]  With respect to

---

[864]  Business combination agreements (such as merger agreements) between a company and a blank check company commonly contain a company covenant, representation, or similar provision that the company will maintain its directors and officers insurance or contain a representation or warranty that the company's directors and officers insurance listed on the company's disclosure schedules to the agreement is in force and effect.

[865]  Letter from SPAC Association.

[866]  Letter from Cowen.

[867]  *See, e.g.*, Securities Act Section 27A(a) (15 U.S.C. 77z-2(a)) ("This section shall apply only to a forward-looking statement made by—(1) an issuer that, at the time that the statement is made, is subject to the reporting requirements of section 78m(a) or section 78*o*(d) of this title; (2) a person acting on behalf of such issuer; (3) an

underwriters, Securities Act Section 27A(a)(4) provides that Section 27A's safe harbor for forward-looking statements applies only to a forward-looking statement "made by" certain persons, including "an underwriter, with respect to information provided by such issuer or information derived from information provided by the issuer." Exchange Act Section 21E(a)(4) contains similar provisions. Section 27A(a)(4) and Section 21E(a)(4) do not explicitly discuss situations where an underwriter is not the maker of the statement. Securities Act Section 27A(g) and Exchange Act Section 21E(g) give the Commission exemptive authority to adopt rules or regulations to provide exemptions from or under any provision of the PSLRA "with respect to liability that is based on a statement or that is based on projections or other forward-looking information if and to the extent that any such exemption is consistent with the public interest and the protection of investors, as determined by the Commission." We are not exercising that authority and are not adopting the commenter's suggestion with respect to sellers and underwriters because we do not believe that it is consistent with the public interest and the protection of investors to expand the protections of the PSLRA safe harbors in this manner and believe it would be inconsistent with the purpose of the final rules to incentivize blank check companies to take more care in avoiding the use of unreasonable forward-looking statements.[868]

Another commenter suggested that the safe harbor should be unavailable for longer-term projections (where the commenter provided the example of a statement, "we will penetrate 50% of [total addressable market] in 10 years") but available for short-term projections (where the

---

outside reviewer retained by such issuer making a statement on behalf of such issuer; or (4) an underwriter, with respect to information provided by such issuer or information derived from information provided by the issuer."). Exchange Section 21E(a) contains similar provisions.

[868] As noted by a commenter and as discussed above, other safe harbors, such as Securities Act Rule 175 and Exchange Act Rule 3b-6 and the bespeaks caution may continue to apply, depending on specific facts and circumstances. In contrast to the PSLRA, Rule 175 and Rule 3b-6 do not explicitly refer to statements made by underwriters. Rule 175 and Rule 3b-6 apply to statements "made by or on behalf of an issuer or by an outside reviewer retained by the issuer."

277

commenter provided the example of a statement, "we expect to make revenue in 1 year or have positive [free cash flow] in 2 years.")[869]  We believe that it is equally important for investor protection purposes that blank check companies take care to avoid the use of unreasonable short-term projections as well as unreasonable longer-term projections.[870]  Therefore, we are not adopting this suggestion.

One commenter said it is inappropriate to deem a transaction to be a de-SPAC transaction where the SPAC survives as an IPO and suggested the Commission should provide an interpretation that de-SPAC transactions are "tender offers" which would make the PSLRA safe harbor unavailable.[871]  We disagree with the view de-SPAC transactions should not be considered the IPO of the target company.  As we discuss in detail in this release,[872] the de-SPAC transaction is functionally the IPO of the target company.  While redemption rights exercisable by security holders in connection with the de-SPAC transaction (or extension of the timeframe to complete a de-SPAC transaction) generally have indicia of a tender offer,[873] the business combination component of the de-SPAC transaction is typically structured as a statutory merger, and not as a tender offer.  Therefore, we disagree with the commenter's suggestion that entire de-SPAC transactions could be interpreted or viewed as tender offers.

---

[869]  Letter from Charles Pieper.

[870]  We note that 17 CFR 229.10(b)(1) of Regulation S-K, as amended in this release, sets out the policy of the Commission that registrant assessments of future performance must have a reasonable basis.  In addition, 17 CFR 229.10(b)(2) of Regulation S-K, as amended in this release, provides: "The period that appropriately may be covered by a projection depends to a large extent on the particular circumstances of the company involved. For certain companies in certain industries, a projection covering a two- or three-year period may be entirely reasonable.  Other companies may not have a reasonable basis for projections beyond the current year."  Blank check companies should consider whether projections that extend a substantial period into the future, such as the 10-year projection provided in the commenter's example, are consistent with this policy.

[871]  Letter from Vinson & Elkins.  *See supra* note 807.

[872]  In particular, *see supra* Section III.C and *infra* Section IV.A.

[873]  Proposing Release, *supra* note 7, at 29461, n.21.

278

### F. Underwriter Status and Liability in Securities Transactions

#### 1. Proposed Rule

The Commission proposed Rule 140a to clarify that anyone who acts as an underwriter in a SPAC IPO and participates in the distribution associated with a de-SPAC transaction by taking steps to facilitate such transaction, or any related financing transaction, or otherwise participates (directly or indirectly) in the de-SPAC transaction is engaged in the distribution of securities of the surviving public entity and, therefore, is an "underwriter" within the meaning of Section 2(a)(11) of the Securities Act.[874]  In this way, the proposed Rule was intended to clarify that liability protections similar to those in traditional underwritten IPOs would apply to de-SPAC transactions in which a statutory underwriter has participated.  The Commission also described in the Proposing Release some of the activities sufficient to establish a SPAC IPO underwriter as a participant in the distribution of target company securities, as securities of the combined company.[875]  The Proposing Release stated that the discussion of such activities was non-exhaustive and not intended to limit the definition of underwriter for purposes of Section 2(a)(11) of the Securities Act.

#### 2. Comments

Several commenters generally supported proposed Rule 140a.[876]  However, several other commenters expressed concerns about the potential impact on transaction participants and the

---

[874]  Proposing Release, *supra* note 7, at 29483.

[875]  *See* Proposing Release, *supra* note 7, at 29486.

[876]  Letters from Andrew Tuch, Americans for Financial Reform Education Fund, Better Markets, Bullet Point Network, CII, Consumer Federation, Senator Elizabeth Warren, ICGN, Mohammed Ali Rashid (May 7, 2022) ("Mohammed Ali Rashid"), NASAA, Public Citizen.

overall market if proposed Rule 140a were adopted.[877]  Several commenters also expressed concerns about increased costs if proposed Rule 140a were adopted.[878]  In addition, numerous commenters expressed concerns that the proposed rule could result in increased liability and/or litigation risk for transaction participants.[879]  Several commenters also expressed broader concerns about the effects of proposed Rule 140a on M&A transactions other than de-SPAC transactions.[880]  A Commission advisory committee recommended that participants who would have underwriter liability should be clearly identified and participants should be held accountable to the same extent they would be in traditional IPOs.[881]

Several commenters disagreed with the discussion in the Proposing Release regarding what it means to participate in a distribution.[882]  A number of commenters asserted that proposed Rule 140a was inconsistent with the statutory text of Section 2(a)(11), other Commission rules, and case law construing the application of Section 11 to parties other than named underwriters.[883]  In particular, commenters argued that the term "underwriter" as used in Section 2(a)(11) does not have unlimited applicability to capture anyone associated with an issuance of

---

[877]  Letters from Andrew Tuch, ABA, Anonymous (May 9, 2022) ("Anonymous (May 9, 2022)"), American Securities Association, Committee on Capital Markets Regulation, CFA, Cleary Gottlieb Steen & Hamilton LLP (June 13, 2022) ("Cleary Gottlieb"), Cowen, Davis Polk, Fenwick, Freshfields, Goodwin, ICGN, Cato Institute, Job Creators Network, King & Wood Mallesons, Kirkland & Ellis, Loeb & Loeb, Managed Funds Association, NYC Bar, Paul Swegle, Ropes & Gray, Securities Industry and Financial Markets Association (June 10, 2022) ("SIFMA"), Skadden, SPAC Association, Usha Rodrigues and Mike Stegemoller (May 31, 2022) ("Usha Rodrigues and Mike Stegemoller"), Vinson & Elkins, White & Case, Winston & Strawn.

[878]  Letters from ABA, Anonymous (May 9, 2022), Committee on Capital Markets Regulation, Cowen, Davis Polk, Goodwin, Cato Institute, Managed Funds Association, Paul Swegle, SIFMA, Skadden, Vinson & Elkins.

[879]  Letters from ABA, Anonymous (May 9, 2022), American Securities Association, Cleary Gottlieb, Cowen, Davis Polk, Freshfields, Goodwin, King & Wood Mallesons, Kirkland & Ellis, Loeb & Loeb, Managed Funds Association, NYC Bar, Ropes & Gray, SIFMA, Skadden, Tony Crom (May 18, 2022), Usha Rodrigues and Mike Stegemoller, Vinson & Elkins, White & Case, Winston & Strawn.

[880]  Letters from Andrew Tuch, ABA, Davis Polk, Ropes & Gray, White & Case.

[881]  *See* Small Business Capital Formation Advisory Committee recommendations, *supra* note 40.

[882]  Letters from Davis Polk, Kirkland & Ellis, NYC Bar, SIFMA, Vinson & Elkins.

[883]  Letters from ABA, Cleary Gottlieb, Cowen, Davis Polk, Freshfields, Goodwin, SIFMA.

securities within its meaning.[884]  Some commenters argued that no person in a de-SPAC transaction purchases with a view to distribution or sells for an issuer or participates in any purchase, offer, or sale of securities for distribution or that a de-SPAC transaction generally does not involve underwriters.[885]

Some commenters questioned the scope of the Section 11 liability that would attach to any underwriter under the proposed rule.[886]  In addition, commenters questioned how a court would apportion damages among underwriters were Rule 140a to be adopted as proposed.[887] While some commenters stated that underwriter status would improve diligence performed by parties in a de-SPAC transaction,[888] other commenters disagreed that proposed Rule 140a would improve diligence performed in de-SPAC transactions.[889]

To the extent the Commission were to adopt Rule 140a, some commenters requested specific changes or additional provisions related to the rule.  Several commenters asked the Commission to limit the scope of proposed Rule 140a underwriter liability in a de-SPAC transaction to disclosures akin to those in a traditional IPO.[890]

Several commenters proposed alternatives to adopting Rule 140a, including:

- Relying on statutory "seller" liability under Securities Act Section 12(a)(2);[891]

---

[884]   Letters from ABA, Cleary Gottlieb, Cowen, Davis Polk, Freshfields, Goodwin, SIFMA.

[885]   Letters from ABA, SIFMA.

[886]   Letters from ABA, American Securities Association, CFA, Cowen, Cleary Gottlieb, Davis Polk, Freshfields, Goodwin, Kirkland & Ellis, Managed Funds Association, Ropes & Gray, SIFMA, Skadden, Vinson & Elkins, White & Case, Winston & Strawn.

[887]   Letter from Cowen.

[888]   Letters from Americans for Financial Reform Education Fund, Better Markets, Consumer Federation, ICGN, Mohammed Ali Rashid, Managed Funds Association, NASAA.

[889]   Letters from ABA, Davis Polk, Freshfields, Goodwin, Kirkland & Ellis, Managed Funds Association, Skadden, Vinson & Elkins.

[890]   Letters from ABA, Better Markets, Davis Polk, ICGN, Ropes & Gray, Vinson & Elkins, White & Case.

[891]   Letter from Cowen.

- Requiring a SPAC to file a current report upon announcement of a signed agreement to consummate a de-SPAC Transaction;"[892]

- Mandating "a new role for an investment bank in de-SPAC transactions for all exchange-listed SPACs;"[893] and

- Establishing a maximum threshold on redemptions in order for a de-SPAC transaction to proceed.[894]

Finally, several commenters asked the Commission to apply proposed Rule 140a on a prospective basis or to adopt a phase in period.[895]

### 3. Declining to Adopt Proposed Rule 140a, and Commission Guidance on Underwriter Status in De-SPAC Transactions

As discussed in the Proposing Release, underwriters play an important role in the U.S. financial markets, acting as gatekeepers for the investing public in the distribution of a new issuer's securities to the public markets for the first time.[896] Section 2(a)(11) of the Securities Act defines underwriter as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking."[897] The Commission and courts

---

[892] Letter from NYC Bar.

[893] Letter from Vinson & Elkins.

[894] Letter from Usha Rodrigues and Mike Stegemoller.

[895] Letters from ABA, Committee on Capital Markets Regulation, Davis Polk, Ropes & Gray, SIFMA, Winston & Strawn.

[896] *New High Risk Ventures*, Release No. 33-5275 (July 27, 1972) [37 FR 16011, 16013 (Aug. 9, 1972)] ("Also unique is the importance of the underwriter in the distribution of the securities. His role is central as the intermediary between the issuer and the investing public. Correspondingly, the public looks to the underwriter for protection and expects him to verify the accuracy of the statements in the registration statement.").

[897] 15 U.S.C. 77b(a)(11).

generally have emphasized that such concepts should be applied broadly and not formulaically.[898]

Having considered the comments received on proposed Rule 140a and given the broad nature of the definition of underwriter in Section 2(a)(11), we are not adopting Rule 140a. Although we agree with commenters that the term underwriter does not have "unlimited applicability," as further explained below, the statutory definition of underwriter, itself, encompasses any person who sells for the issuer or participates in a distribution associated with a de-SPAC transaction. To assist parties in applying Section 2(a)(11) to de-SPAC transactions, we are providing the following general guidance regarding statutory underwriter status. For the avoidance of doubt, this guidance does not implement proposed Rule 140a. Rather than promulgate a rule clarifying when a specific party is an underwriter for de-SPAC transactions, we intend to follow the Commission's longstanding practice of applying the statutory terms "distribution" and "underwriter" broadly and flexibly, as the facts and circumstances of any transaction may warrant.

---

[898] *See Definition of Terms "Underwriter" and "Brokers' Transactions"*, Release No. 33-5223 (Jan. 11, 1972) [37 FR 591, 592 (Jan. 14, 1972)] ("Rule 144 Adopting Release") ("The term underwriter is broadly defined in section 2[(a)](11) of the Act….Thus, an investment banking firm which arranges with an issuer for the public sale of its securities is clearly an 'underwriter' under that section. Not so well understood is the fact that individual investors who are not professionals in the securities business may be 'underwriters' within the meaning of that term as used in the Act if they act as links in a chain of transactions through which securities move from an issuer to the public."). *See also Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1400 (7th Cir. 1995) ("Both the Supreme Court and this court have interpreted broadly the phrases 'participate in' and 'participation' found in 15 U.S.C. 77b(11). In *Pinter v. Dahl*, 486 U.S. 622, 108 S. Ct. 2063, 100 L.Ed.2d 658 (1988), for example, the Supreme Court discussed whether the Congress intended to impose liability under section 12[(a)](1) of the Securities Act on those collateral to the offer or sale of a security. Rejecting the possibility, the Court commented, in dictum, that 'Congress knew of the collateral participation concept and employed it in the Securities Act….Liabilities and obligations expressly grounded in participation are found elsewhere in the Act, *see, e.g.*, 15 U.S.C. 77b(11).' *Dahl*, 486 U.S. at 650 n. 26, 108 S. Ct. at 2080 n. 26. The Court's footnoted discussion makes clear that, in its view, one who 'participates,' or 'takes part in,' an underwriting is subject to section 11 liability.").

### i.  A De-SPAC Transaction is a Distribution of Securities

The concept of distribution within Section 2(a)(11) is not limited to a transaction taking the form of a traditional IPO or traditional capital raising.  For example, a spin-off is not traditional capital raising; yet, in certain circumstances, has been found to constitute a distribution of securities for the purposes of Section 2(a)(11).[899]  In the Proposing Release, the Commission stated that the de-SPAC transaction marks the introduction of the private operating company to the public capital markets and is effectively how the private operating company's securities "come to rest"—in other words, are distributed—to public investors as shareholders of the combined company.[900]

Some commenters asked the Commission to better explain the distribution that occurs in a de-SPAC transaction.[901]  Although the word "distribution" has no definition in the Securities Act, the term "distribution" refers to the entire process in a public offering through which a block of securities is dispersed and ultimately comes to rest in the hands of the investing public.[902]  In a

---

[899]  A "spin-off" is a transaction by which a parent company distributes shares of a subsidiary to the parent company's shareholders.  These transactions are frequently accompanied by the creation of a public market for the subsidiary's securities via listing on a national securities exchange.  *See, e.g.*, *Spin Offs and Shell Corporations*, Release No. 33-4982 (July 14, 1969) [34 FR 11581 (July 15, 1969)] ("Spin Offs Release") ("It is accordingly the Commission's position that the shares which are distributed in certain spin offs involve the participation of a statutory underwriter and are thus, in those transactions, subject to the registration requirements of the Act….").  *See also Revisions to Rules 144 and 145*, Release No. 33-8869 (Dec. 6, 2007) [72 FR 71546, 71559 (Dec. 17, 2007)] ("The presumptive underwriter provision in Rule 145 is no longer necessary in most circumstances.  However, based on our experience with transactions involving shell companies that have resulted in abusive sales of securities, we believe that there continues to be a need to apply the presumptive underwriter provision to reporting and non-reporting shell companies and their affiliates and promoters.").

[900]  Proposing Release, *supra* note 7, at 29485.

[901]  Letter from ABA.

[902]  *See Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) (finding that head trader and salesman, respectively, at a securities brokerage firm, who made resales in broker transactions over a two-week period of 133,333 shares of the roughly 25 million shares then outstanding, were engaged in a distribution within the meaning of Section 2(a)(11) of the Securities Act and that one "did not have to be involved in the final step of [a] distribution to have participated in it").  *See also R.A Holman v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (finding that a distribution "comprises the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public") (internal quotation marks omitted).

traditional IPO, an underwriter distributes shares in a private company to investors thereby providing access to capital and the public markets. Although different in form from traditional capital raising in an IPO, the purpose of a de-SPAC transaction is to provide the target company with capital and access to the public markets.[903] In the course of such a transaction, regardless of the transaction structure, public shareholders of the SPAC become owners of the combined operating company through the business combination.[904] Given this, in the context of a de-SPAC transaction, interests in the typically private target company are dispersed to the public via a business combination with a SPAC. The distribution is therefore the process by which the SPAC's investors, and therefore the public, receive interests in the combined operating company.

One commenter asserted that not every de-SPAC transaction would involve a distribution of securities because in at least some de-SPAC transactions the target company is not "selling" or "distributing" any securities in the transaction.[905] As discussed elsewhere in this release, however, the statutory concepts of offer and sale have a very broad meaning and can encompass situations in which there is no actual exchange of securities.[906] However, assuming, for the sake of addressing this commenter's argument, that a distribution requires a "sale" that meets the definition of such term under Section 2(a)(3), we are adopting Rule 145a, which deems there to be a sale from the combined company to the SPAC's existing shareholders even in de-SPAC

---

[903] Such transactions historically have been known as "going public through the back door." *See, e.g.*, Leib Orlanski, *Going Public Through the Back Door and the Shell Game*, 58 Va. L. Rev. 1451 (1972), *available at* https://heinonline.org/HOL/Page?public=true&handle=hein.journals/valr58&div=72&start_page=1451&collection=usjournals&set_as_cursor=0&men_tab=srchresults.

[904] For example, shareholders of a SPAC become shareholders of a combined operating company by operation of State or local law in a statutory merger.

[905] Letter from ABA.

[906] *See* the discussion regarding the broad definition of "sale" in Section 2(a)(3) and the related examples in *infra* Section IV.A.3.i.

transaction structures where the target company is not "selling" or "distributing" its own securities into the market.[907]

### ii. Statutory Underwriters in De-SPAC Transactions

While one commenter asserted that there is not always a distribution of securities associated with a de-SPAC transaction,[908] another asserted that the de-SPAC distribution "occurs directly from the issuer to the counterparties to the business combination, without the involvement of underwriters."[909]  It is well established that the statutory definition of underwriter is not limited to traditional underwriters in firm commitment IPOs, but also includes anyone who otherwise meets the statutory definition.[910]  Anyone in this second category is generally known as a "statutory underwriter" because, although they may not be named as an underwriter in a given offering and may not engage in activities typical of a named underwriter, they nevertheless meet the definition of underwriter in the statute.  As such, the statute applies to such parties in the same way as it would to a named underwriter in a firm commitment offering.  In addition, the Commission has previously stated that "the statutory language of [S]ection 2[(a)](11) is in the disjunctive.  Thus, it is insufficient to conclude that a person is not an underwriter solely because he did not purchase securities from an issuer with a view to their distribution.  It must also be established that the person is not offering or selling for an issuer in connection with the distribution of the securities, does not participate or have a direct or indirect participation in any

---

[907]  *See infra* Section IV.A.  As discussed below, Rule 145a applies regardless of the structure the de-SPAC transaction may take.

[908] Letter from ABA.

[909]  Letter from SIFMA.

[910]  *See* 2 Louis Loss (late), Joel Seligman, and Troy Paredes, Securities Regulation 3.A.3 (6th ed. 2019) ("The term underwriter is defined not with reference to the particular person's general business but on the basis of his or her relationship to the particular offering….Any person who performs one of the specified functions in relation to the offering is a statutory underwriter even though he or she is not a broker or dealer.").

such undertaking, and does not participate or have a participation in the direct or indirect underwriting of such an undertaking."[911]

Several commenters disagreed with the discussion in the Proposing Release regarding what it means to participate in a distribution.[912] These commenters asserted that some courts have adopted a narrower view of the concept of "participation" than what was discussed in the Proposing Release.[913] We acknowledge that some courts have declined to find that parties other than named underwriters were acting as distribution participants. These cases, however, arose in more conventional capital raising contexts and were based on the particular facts and circumstances before the court. It is far from clear that the cases cited by the commenters should be determinative of how the concepts of "distribution" and "underwriter" apply in the context of a de-SPAC transaction, which combines elements of both a traditional IPO and an M&A transaction.

We acknowledge that in a de-SPAC transaction, there is generally no single party accepting securities from the issuer with a view to resell such securities to the public in a distribution in the same manner as a traditional underwriter in traditional capital raising. Nevertheless, in a de-SPAC distribution, there would be an underwriter present where someone is selling for the issuer or participating in the distribution of securities in the combined company to the SPAC's investors and the broader public. Depending on the facts and circumstances, such

---

[911] Rule 144 Adopting Release, *supra* note 898, at 596.

[912] Letters from Davis Polk, Kirkland & Ellis, NYC Bar, SIFMA, Vinson & Elkins.

[913] Many such commenters have pointed to *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167 (2d Cir. 2011) as evidence that the Second Circuit has more narrowly defined the concept of participant in a distribution. *See* letters from ABA, Cleary Gottlieb, Committee on Capital Markets Regulation, Kirkland & Ellis, SIFMA, Skadden, Vinson & Elkins, Winston & Strawn. There, the Court held that the various credit rating agency defendants could not be liable as underwriters Section 2(a)(11). *See also* commenter references to *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 507–09 (S.D.N.Y. 2018); *In re REFCO, Inc. Sec. Litig.*, 2008 WL 3843343, at *4 (S.D.N.Y. Aug. 14, 2008).

an entity could be deemed a "statutory underwriter" even though it may not be named as an underwriter in any given offering or may not be engaged in activities typical of a named underwriter in traditional capital raising. Section 11 would apply as it would to anyone acting as underwriter with respect to a registered de-SPAC transaction, and such person will have liability for any material misstatement or omission in the registration statement.[914] Similarly such person would have any defenses available to the parties upon whom the statute imposes liability.[915]

The prior discussion is not intended to signal that we believe that every de-SPAC transaction or offering of securities generally involves or needs the involvement of an underwriter. But where a distribution and an underwriter are present, the party acting as underwriter will need to perform the necessary due diligence of the disclosures made in connection with the registered offering of securities or face full exposure to liability without the benefit of the due diligence defense under the Securities Act of 1933.[916]

### iii. A De-SPAC Transaction is Distinguishable from Other M&A Transactions

By its terms, proposed Rule 140a would have applied only to SPAC IPO underwriters that took steps to facilitate a de-SPAC transaction or any related financing transaction, or otherwise participated (directly or indirectly) in the de-SPAC transaction. However, as noted above, commenters indicated that the proposal raised numerous questions about whether other parties that similarly facilitate de-SPAC transactions would be subject to liability and, whether a

---

[914] Similarly, Section 12(a)(2) imposes liability upon anyone, including underwriters, who offers or sells a security, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, to any person purchasing such security from them. 15 U.S.C. 77l(a)(2).

[915] *See* the defenses to Section 11 liability in 15 U.S.C. §77k(b).

[916] 15 U.S.C. §77k(b)(3).

similar analysis applies to other types of transactions, such as more "traditional" M&A transactions (i.e., those not involving a SPAC).[917]

In response to these comments, we note that Rule 140a was not intended to address any business combination transaction not involving a de-SPAC transaction. Similarly, the guidance presented in this release is not intended to influence current practice in traditional M&A, as the two situations are readily distinguishable. As discussed above,[918] although de-SPAC transactions have many of the same features of traditional M&A transactions, they have a different purpose. While they take the form of a business combination, de-SPAC transactions serve as the means by which a private company may enter the public market for the first time and thus are the equivalent of an IPO by the target company. Indeed, it is in recognition of this unique method of conducting a public offering that we are adopting Rule 145a and the co-registration requirements to account for the fact that the combined company in a de-SPAC transaction is effectively acting as an issuer engaged in a sale of its securities to the public shareholders of the SPAC. We reiterate, however, that nothing in this release is intended to limit or alter the definition of underwriter for purposes of Section 2(a)(11) of the Securities Act.

## IV. BUSINESS COMBINATIONS INVOLVING SHELL COMPANIES

In response to concerns regarding the use of shell companies[919] as a means of accessing the U.S. capital markets, the Commission proposed new rules that would apply to business combination transactions involving shell companies, which include de-SPAC transactions. First,

---

[917]    Letters from ABA, Andrew Tuch, Davis Polk, Ropes & Gray, White & Case.

[918]    *See supra* Section I and *infra* Section IV.A.3.

[919]    As stated above, throughout this release, we use "shell company" and "reporting shell company" in lieu of the phrases "shell company, other than a business combination related shell company" and "reporting shell company, other than a business combination related shell company." *See supra* note 41 for the definition of "reporting shell company."

the Commission proposed new Rule 145a under the Securities Act that would deem such business combination transactions to involve a sale of securities to a reporting shell company's shareholders.  The Commission is adopting that rule as proposed as discussed below.  Second, the Commission proposed new Article 15 of Regulation S-X and related amendments to more closely align the required financial statements of private operating companies in connection with these transactions with those required in registration statements on Form S-1 or F-1 for an IPO.[920]  The Commission is adopting those rules mostly as proposed, with certain changes discussed below.  The issues the Commission is addressing with the adoption of both of these sets of final rules are common to these shell company transactions, regardless of whether the shell company is a SPAC.

**A.  Shell Company Business Combinations and the Securities Act of 1933**

*1.  Proposed Rule*

The Commission proposed Rule 145a to address the use of reporting shell companies as a means to enter the U.S. capital markets without Securities Act registration and the related disclosures which are intended to protect investors.  The rule was proposed due to the significant increase in such reporting shell company business combination transactions, including through the use of a SPAC, in an effort to provide reporting shell company shareholders with more consistent Securities Act protections regardless of transaction structure.[921]  Proposed Rule 145a would deem any direct or indirect business combination of a reporting shell company that is not a business combination related shell company involving another entity that is not a shell

---

[920] The requirements in Form S-4, Form F-4, and Schedule 14A for an acquisition of a business were developed at a time when acquirers were generally operating companies, and these requirements do not specifically address transactions involving shell companies.  For example, Form S-4 was adopted by the Commission in 1985, which predates the origins of SPACs in the 1990s. *See Business Combination Transactions; Adoption of Registration Form*, Release No. 33-6578 (Apr. 23, 1985) [50 FR 18990 (May 6, 1985)].

[921] *See* Proposing Release, *supra* note 7, at 29488.

company to involve a sale of securities to the reporting shell company's shareholders. While nothing in proposed Rule 145a would prevent or prohibit the use of a valid exemption, if available, for the deemed sale of securities to the reporting shell company's shareholders, the Commission stated that the exemption under Section 3(a)(9) of the Securities Act generally would not be available for the sales covered by the proposed rule.[922] The proposed rule would not apply to the merger of an existing reporting shell company into a new shell company where the surviving company remains a shell.

## 2. Comments

Several commenters generally supported proposed Rule 145a.[923] Some of these commenters pointed to investor protection concerns related to SPACs and de-SPAC transactions and the benefits associated with registration under the Securities Act.[924] In this regard, some commenters pointed out that the reform contemplated by Rule 145a would help prevent certain disparities in regulation for transactions that vary in legal structure but not in economic substance, ensuring that unaffiliated security holders enjoy the protections that come from investing in a registered offering.[925] Other commenters noted that the likely registration of de-SPAC transactions as a result of Rule 145a would result in enhanced liabilities for signatories to any registration statement and underwriter and expert liability, thereby ensuring investors receive fair and reliable information.[926]

---

[922] *Id.* at 29489.

[923] Letters from Andrew Tuch, Bullet Point Network, ICGN, Public Citizen. *See also* letter from Jorge Stolfi (May 30, 2022) ("Jorge Stolfi") ("Ideally, ANY merger involving a publicly traded company should require evaluation and approval of the stock of the proposed merged company's stock by the SEC, as if it was a new security.").

[924] Letters from Andrew Tuch, ICGN, Jorge Stolfi, Public Citizen.

[925] Letter from Andrew Tuch.

[926] Letter from IGCN.

Other commenters generally opposed, or expressed concerns regarding, proposed Rule 145a.[927]  Some commenters discussed the potential costs and effects of proposed Rule 145a.[928]  Certain commenters questioned the Commission's authority to adopt Rule 145a where, in commenters' views, no distribution of securities actually occurs[929] or for situations in which there is neither a vote nor any securities changing hands as there is no traditional "investment decision."[930]  Some commenters asserted that proposed Rule 145a is unnecessary for the protection of investors and that de-SPAC transactions, in particular, are already accompanied by a full set of disclosures.[931]  Other commenters asserted that proposed Rule 145a conflicted with proposed Rule 140a because proposed Rule 140a implied that there is a single distribution occurring between a SPAC's IPO and the de-SPAC transaction.[932]

One commenter asserted that not all shell company business combinations are similar and, in particular, that de-SPAC transactions are not comparable to shell company transactions with microcap companies.[933]  Another commenter stated that it is unclear to them why de-SPAC transactions should be treated differently than other reverse mergers.[934]

A number of commenters requested that the Commission clarify and/or modify aspects of proposed Rule 145a.  In particular, a commenter requested, if Rule 145a were adopted, that "[i]n the spirit of aligning treatment of IPOs and de-SPAC transactions, Rule 145 should be revised to

---

[927]  Letters from ABA, Freshfields, Kirkland & Ellis, NYC Bar, Vinson & Elkins, Winston & Strawn.

[928]  Letters from ABA, Freshfields, Loeb & Loeb, Vinson & Elkins.  *See infra* Section VIII.

[929]  Letter from Vinson & Elkins.

[930]  Letter from ABA.

[931]  Letters from Freshfields, Kirkland & Ellis, NYC Bar, Vinson & Elkins.

[932]  Letters from ABA, Kirkland & Ellis, SIFMA.

[933]  Letter from Kirkland & Ellis.

[934]  Letter from Winston & Strawn.

not apply to any transaction that Rule 145a applies to."[935]  The same commenter requested that the Commission limit the scope of proposed Rule 145a so as not to apply to business combination related shell companies.[936]  Another commenter asked us to further clarify the application or operation of proposed Rule 145a.[937]  In particular, this commenter asked that the Commission clarify the intended trigger for the application of Rule 145a in a de-SPAC transaction.

Finally, certain commenters questioned the Commission's explanation of the application of Section 3(a)(9) in Rule 145a transactions.[938]  In particular one commenter stated that they did not agree that the "deemed exchange" should be integrated with the exchange of the private company's securities for interests in the SPAC, such that Section 3(a)(9) would be unavailable because a proxy solicitor is paid to solicit proxies from SPAC shareholders in connection with the shareholder vote on a de-SPAC transaction.[939]  The commenter asserted that any vote associated with the de-SPAC transaction and the related proxy solicitation is irrelevant to whether the transaction would be deemed a sale under existing rules.  A different commenter asserted that if there is an exchange it is embodied in the redemption decision, not the vote in connection with a de-SPAC transaction, and thus payment of compensation for a proxy solicitor should not prevent reliance on Securities Act Section 3(a)(9).[940]

---

[935]  Letter from Vinson & Elkins.

[936]  *Id.*

[937]  Letter from ABA.

[938]  Letters from Kirkland & Ellis, Vinson & Elkins.

[939]  Letter from Kirkland & Ellis.

[940]  Letter from Vinson & Elkins.

3. *Final Rule*

We are adopting Rule 145a as proposed.  Currently, investors in reporting shell companies may not always receive the disclosures and other protections afforded by the Securities Act at the time when there is a fundamental change in the nature of their investment due to the business combination involving another entity that is not a shell company.[941]

To address this, Rule 145a specifies that a sale occurs from the post-transaction company to the existing shareholders of a reporting shell company in situations where a reporting shell company that is not a business combination related shell company enters into a business combination transaction involving another entity that is not a shell company.[942]  In these situations, Rule 145a deems there to be a share exchange implicating the requirements and protections of Section 5 of the Securities Act because the interests the former reporting shell company shareholders owned have been exchanged for something entirely different—interests in an operating company in the course of a transaction whereby the former reporting shell company provides the operating company with access to the public markets.  The sale identified by the rule occurs regardless of whether securities are changing hands in the business combination transaction, and thus the transaction will need to be registered in accordance with the Securities Act unless an exemption from registration is available.  The final rule also applies regardless of

---

[941]  Although other private liability may apply in situations where disclosures are provided to investors in connection with business combinations involving reporting shell companies, such liability is not as extensive as the protections investors receive under the Securities Act.  *See* William O. Douglas, *supra* note 581.

[942]  As noted above, certain commenters asserted that proposed Rule 145a was inconsistent with proposed Rule 140a because proposed Rule 140a implied that there is a single distribution occurring between a SPAC's IPO and its de-SPAC transaction.  Letters from ABA, Kirkland & Ellis, SIFMA.  As discussed in further detail above, we are not adopting proposed Rule 140a; rather, we have noted that the statutory definition of underwriter is sufficient to encompass any person who sells for the issuer or participates in a distribution associated with a de-SPAC transaction.  *See supra* Section III.F.

transaction structure or the form of business combination (e.g., statutory merger, share exchange, stock purchase, asset purchase, etc.).

As discussed in the Proposing Release, Rule 145a will apply to any reporting shell company that has assumed the appearance of having more than "nominal" assets or operations.[943]  However, as proposed and for the avoidance of doubt, the final rule will not have any impact on traditional business combination transactions between operating businesses, including transactions structured as traditional reverse mergers and traditional business combination transactions that make use of only business combination related shells.[944]  In addition, we note that Rule 145a is not intended to change the treatment of any transaction, whether or not involving a shell company, under State or other Federal laws, including, but not limited to, State corporate law and the Internal Revenue Code.  Finally, because it is premised upon the change in the nature of a security when a reporting shell company changes its status to

---

[943]  Proposing Release, *supra* note 7, at 29489.  We reiterate the Commission's previous position on structuring transactions to avoid shell company status in adopting the 2005 shell company limitations.  *See Use of Form S-8, Form 8-K, and Form 20-F by Shell Companies*, Release No. 33-8587 (July 15, 2005) [70 FR 42234, 42236, n. 32 (July 21, 2005)] ("Shell Company Adopting Release").  Rule 145a as well as any other requirements applicable to reporting shell company business combinations apply in situations where, in substance, a shell company business combination is used to convert a private company into a public company.  For example, the requirements applicable to reporting shell company business combinations adopted herein will apply to any company that sells or otherwise disposes of its historical assets or operations in connection with or as part of a plan to combine with a non-shell private company in order to convert the private company into a public one.  This is true regardless of whether such sale or disposal of the legacy assets or operations occurs prior to or after the consummation of the business combination.

[944]  By its terms, Rule 145a only impacts business combinations involving shell companies that are not business combination related shell companies.  The term "business combination related shell company" is defined in Securities Act Rule 405 and Exchange Act Rule 12b-2 as a shell company that is: "(1) Formed by an entity that is not a shell company solely for the purpose of changing the corporate domicile of that entity solely within the United States; or (2) Formed by an entity that is not a shell company solely for the purpose of completing a business combination transaction (as defined in 17 CFR 230.165(f)) among one or more entities other than the shell company, none of which is a shell company."  Neither a SPAC nor any entity formed for facilitating a transaction with a SPAC is ever a business combination related shell company because neither of these entities would be a shell company formed solely for the purpose of changing the corporate domicile solely within the United States or formed solely for the purpose of completing a business combination transaction among one or more entities other than the shell company, none of which is a shell company.  *See* Proposing Release, *supra* note 7, at 29489, n.243.

an operating company, Rule 145a specifically does not apply to a transaction where a reporting shell company combines with another shell company.  Below we respond to various objections raised by commenters regarding the proposal and provide additional explanation to clarify the scope and application of Rule 145a.

i.  *Arguments Regarding No Investment or Vote*

Some commenters questioned the Commission's authority to adopt Rule 145a because, in the commenters' view, a sale cannot be deemed to occur in situations where no actual distribution of securities occurs[945] or there is no traditional "investment decision."[946]  Section 2(a)(3) of the Securities Act broadly defines the terms "sale" or "sell" to include every contract of sale or disposition of a security or interest in a security, for value.[947]  Finding it necessary for investors to have the protections of the Securities Act, the Commission has previously applied this definition broadly, including in cases where there is no affirmative decision from investors to buy or sell securities.  For example, the Commission has previously determined that the following transactions may involve a sale even where there is no vote or investment decision:

---

[945]  *See* letter from Vinson & Elkins.

[946]  *See* letter from ABA.

[947]  15 U.S.C. 77b(a)(3).

spin-offs, split-offs and similar transactions;[948] short-form mergers;[949] and distributions of "free stock."[950]

Similarly, here, we have concluded that, notwithstanding the fact that there may be no traditional investment decision or vote in connection with a business combination transaction where a shell company changes its status from a shell company to an operating company through a business combination, such a change is nonetheless a sale of securities for the purposes of Section 2(a)(3) because investors are exchanging their interests in a shell company for interests in a combined public operating company, which is a transaction "for value."

### a. The "For Value" Requirement

Several commenters questioned whether the constructive sale would be "for value," within the meaning of this term in Section 2(a)(3).[951]  We disagree with the commenter that asserted that, similar to an ordinary M&A transaction, a de-SPAC transaction will not result in a

---

[948]  *See* Spin Offs Release, *supra* note 899, at 11581 ("The theory has been advanced that since a sale is not involved in the distribution of the shares in a spin off that registration is not required and that even if it is required, no purpose would be served by filing a registration statement and requiring the delivery of a prospectus since the persons receiving the shares are not called upon to make an investment judgment….Moreover, it ignores what appears to be primarily the purpose of the spin off in numerous circumstances which is to create quickly, and without the disclosure required by registration, a trading market in the shares of the issuer.  Devices of this kind, contravene the purpose, as well as the specific provisions, of the [Securities] Act which, in the words of the statutory preamble, are 'to provide full and fair disclosure of the character of the securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof.'").

[949]  *See Registration of Certain Transactions Involving Mergers, Consolidations and Acquisitions of Assets*, Release No. 33-5316 (Oct. 6, 1972) [37 FR 23631, 23633 (Nov. 7, 1972)] ("Because Rule 145(a) is couched in terms of offers arising in connection with a submission for the vote or consent of security holders, short form mergers not requiring such vote or consent are not within the scope of the rule.  However, if a security is to be issued in such short form mergers, the Commission is of the opinion that the transaction involves an 'offer,' 'offer to sell,' 'offer for sale,' or 'sale,' within the meaning of section 2[(a)](3) of the Act, and accordingly such transactions are subject to the registration provisions of the Act unless an exemption is available.").

[950]  *See, e.g.*, *In the Matter of Capital General Corp.*, Release No. 33-7008 (July 23, 1993) ("*Capital General*") in which the Commission concluded that Capital General's unregistered distributions of securities in a shell company as purported gifts were a sale in violation of Section 5 because value accrued to the defendants "by virtue of the creation of a public market for the issuer's securities, and the fact that, as a public company, the issuer could be sold for greater consideration."

[951]  Letters from ABA, Kirkland & Ellis.

fundamental change in the nature of the security held by SPAC stockholders that would constitute an exchange of value and, thus, should not be deemed to constitute consideration in connection with the business combination.[952]  Likewise, we disagree with the commenter that asserted that even though the specific target company is unidentified at the time of the SPAC's IPO, when acquired, a SPAC security represents an investment in a target company because the sole purpose of a SPAC is to engage in a business combination.[953]

A change in a reporting shell company's status via a business combination with an operating company results in the reporting shell company investors effectively exchanging their security representing an interest in the reporting shell company, an entity that has no or nominal operations and either (i) no or nominal assets; (ii) assets consisting solely of cash and cash equivalents; or (iii) assets consisting of any amount of cash and cash equivalents and nominal other assets, for a new security representing an interest in a combined operating company.[954] This is a change in the nature of the investment, which does not occur in traditional M&A transactions.[955]  Although shell company shareholders may not actually be receiving shares from the combined public operating company, they have surrendered "value" for purposes of Section 2(a)(3) because, unlike a business combination not involving a reporting shell company and an operating company, they have effectively surrendered their shares in a public shell company for shares in a fundamentally different company, a combined operating company.  In addition,

---

[952]  Letter from ABA.

[953]  Letter from Kirkland & Ellis.

[954]  We note that this rule does not change the conclusion that a merger with a reporting shell company may constitute the offer and sale of securities to other parties for which registration under the Securities Act or an exemption would be required.  For example, where a SPAC survives the de-SPAC transaction, the SPAC will frequently issue its securities to shareholders of the private company in exchange for their interests in the private company.  Such a transaction would still require registration or an exemption from registration.

[955]  As discussed above, Rule 145a is limited to business combinations that involve reporting shell companies. *See supra* Section IV.A.3.

unlike a business combination that does not involve a reporting shell company and an operating company, such a transaction involves the use of a public shell to create a public market for the combined operating company.[956]

Moreover, courts[957] and the Commission[958] have determined that it does not matter what party in the course of a transaction receives value—as long as any party receives value, the "for value" requirement in Section 2(a)(3) is satisfied.  In particular, transactions involving the use of public shells to provide access to the public markets have been found to constitute a sale under Section 2(a)(3) of the Securities Act.[959]  We view a reporting shell company (that is not a business combination related shell company) merging with a private operating company as similarly providing access to the public markets, and thus creating value.  Therefore, the business

---

[956]    *See SEC v. Datronics Engineers, Inc.*, 490 F.2d 250 (4th Cir. 1973) cert. denied, 416 U.S. 937 (1974) ("*Datronics*") (finding a sale under the Securities Act requiring registration or an exemption from registration when a parent company, Datronics, created shell subsidiaries for the purpose of merging them with private companies.  Datronics reserved approximately one-third of the shares of the post-merger subsidiary for itself and distributed the remainder to its shareholders without registration.  Secondary market trading of the shares began promptly.  Datronics' only business purpose was to create a trading market for the shares).  *See also SEC v. Harwyn Industries Corp.*, 326 F. Supp. 943 (S.D.N.Y 1971) ("*Harwyn*").  In *Harwyn*, the court found a sale under the Securities Act requiring registration or an exemption from registration when each of several subsidiaries of the public parent acquired assets from a corporation in exchange for a controlling interest in the subsidiary.  The parent then spun off shares of the subsidiaries to its stockholders in an unregistered transaction, creating over-the-counter trading markets in the shares.  The court stated that "value" was received by Harwyn and other insiders "in the form of a contribution of substantially new assets to each subsidiary and the creation of a public market in the shares."

[957]    *See Datronics*, *supra* note 956, at 253–254 ("Value accrued to Datronics in several ways.  First, a market for the stock was created by its transfer to so many new assignees—at least 1000, some of whom were stockbroker-dealers, residing in various States.  Sales by them followed at once—the District Judge noting that 'in each instance dealing promptly began in the spun-off shares'. [sic]  This result redounded to the benefit not only of Datronics but, as well, to its officers and agents who had received some of the spun-off stock as compensation for legal or other services to the spin-off corporations.  Likewise, the stock retained by Datronics was thereby given an added increment of value.");  *Harwyn*, *supra* note 956, at 954 ("We see no reason to construe §§ 2[(a)](3) and 5 as requiring that the 'value' requiring registration must flow from the immediate parties who received the stock, in this case Harwyn's shareholders.").

[958]    *See Capital General*, *supra* note 950, at *11 (The Commission found that "the analysis of whether a sale occurred focuses not only on whether the recipient of the securities gives something of value in exchange for the securities, but also on whether value is received from any other source.  *Harwyn Industries* and *Datronics* also make clear that the analysis must include the entire transaction—the distribution of the issuer's shares, and subsequent change in control of the issuer—to determine whether value was received from the distribution.").

[959]    *Id.*

combination transaction is a sale which entitles the reporting shell company's existing shareholders, who are the investors acquiring securities in this sale, to all applicable protections provided by the Securities Act.

Finally, one commenter asked that we clarify within the rule text that the sale contemplated by Rule 145a would be "a disposition of a security or an interest in a security…for value."[960]  Although, as we explain above, we agree with the commenter that such a transaction would be "for value," we do not believe it is necessary to add that detail within the text of Rule 145a because the Securities Act, itself, already contains the "for value" requirement in Section 2(a)(3).[961]

ii.  *No Additional Registration Statement Required Where a Shell Company Business Combination is Already Registered*

If, in the course of a business combination with a reporting shell company, the exchange of the shell company shares for securities of the surviving combined operating business is already being registered, then there is no need to register any additional transaction under the Securities Act to comply with Rule 145a because the transaction that is recognized as a sale by Rule 145a is already being registered.  For example, in many de-SPAC transactions, an actual exchange of securities between the SPAC's existing shareholders and the target company or a new holding company is already being registered at the time of the business combination transaction.[962]  In these circumstances, the transaction that Rule 145a construes as a sale is

---

[960]  Letter from ICGN.

[961]  *See* 15 U.S.C. 77b(a)(3).

[962]  Share exchanges in which the target company survives the business combination as the public entity are commonly referred to as "Target-on-Top" structures.  Alternatively, the combining entities may also form a new holding company such that both holders of the SPAC and the target company receive securities in the holding company in exchange for their existing interests in the target company.

typically already being registered because the SPAC's existing shareholders are receiving securities of the combined company in exchange for their shares of the SPAC.  Where Securities Act registration of this transaction is already occurring, Rule 145a would not require the filing of an additional registration statement.  However, Rule 145a only applies with respect to a shell company's existing security holders.  The surviving company in a de-SPAC transaction must give separate consideration as to whether a registration statement or exemption would be required for any offer and sale of securities to the target company's security holders.

### iii. Where Rule 145a Requires Registration in the Absence of an Exemption

However, in transaction structures where reporting shell company shareholders are not actually exchanging their shell company shares for securities of a combined operating company, the parties will need to consider Rule 145a in structuring the transaction.  For example, in a de-SPAC transaction structured such that the shareholders of the SPAC keep their existing shares in the SPAC throughout the business combination transaction, and those interests change into interests in the combined company, the parties would need to consider the impact of Rule 145a on the transaction and either register the transaction or find an exemption for the constructive exchange between the shell company's pre-transaction shareholders and the surviving combined company.[963]  Such transactions would be situations implicating a Rule 145a constructive sale.

---

[963] This would typically be any transaction where the SPAC survives the business combination as the public company.  Such transactions are commonly referred to "SPAC-on-Top."  Where registration is required for a Rule 145a constructive sale, the registration statement should register the exchange of the number of outstanding shares that represent the interests of all shareholders of the shell company immediately preceding the business combination.

### iv.  Investor Protection and Liability

While we acknowledge, as several commenters have argued,[964] that certain transactions, such as de-SPAC transactions, may already be accompanied by a set of disclosures provided to the reporting shell company's shareholders, the timing and nature of such disclosures may not be equivalent,[965] and such disclosures do not have equivalent levels of investor protection as there currently would be in a transaction involving Securities Act registration.  To the extent that Rule 145a transactions are registered, registration would result in enhanced liabilities for the registrant and other parties who have liability under the Federal securities laws with respect to the registration statement, including potential underwriter liability (as described elsewhere in this release) and liability under Securities Act Section 11(a)(4) for experts.  Given the change in the nature of an investor's security when a reporting shell company engages in a business combination transaction with an operating company, Rule 145a is designed to ensure that shareholders more consistently receive the full protections of Securities Act disclosure and liability provisions, as applicable, and that such investor protections will apply regardless of transaction structure.

### v.  Market for Shell Company Mergers

A commenter asserted that the Commission had not previously found it necessary to adopt a provision like Rule 145a to regulate shell company mergers "and was amenable at that

---

[964]  Letters from Freshfields, Kirkland & Ellis, NYC Bar, Vinson & Elkins.

[965]  For example, investors in a reporting shell company undergoing a business combination in which there is no shareholder vote and no redemption feature currently may receive no disclosure about the pending business combination until four business days after closing at which time the shell company would be required, to file a Form 8-K to provide the disclosure required by Items 5.06 and 9.01.  Even though pursuant to these items shareholders will receive the equivalent of Form 10 information about the combined company, investors will still not receive certain transaction-specific information that would be required in a Securities Act registration statement.  For example, a Securities Act registration statement would require disclosure of a summary of the terms of the acquisition agreement and the reasons of the registrant and of the company being acquired for engaging in the transaction.  *See* Items 4(a)(1) and (2) of Form S-4.

time to allow such transactions to proceed so long as public investors were given current and complete information about the new business they owned."[966]  The commenter further asserted that proposed Rule 145a no longer reflects this Commission position on shell company mergers and can be expected "to shut down [the shell company] market."[967]  We disagree.  Although the Commission adopted rules and rule amendments addressing the use of Form S-8, Form 8-K, and Form 20-F by shell companies,[968] the Commission is not precluded from revisiting shell company transactions and considering the investor protections applicable to these transactions.  In this regard, we believe Rule 145a complements the disclosure protections that the Commission adopted in 2005.[969]  In addition, we do not believe that a requirement to register a transaction or find an applicable exemption when a reporting shell company becomes an operating company, would "shut down the market."  Indeed, depending on the structure, many business combinations involving reporting shell companies are already registered under the Securities Act.

### vi.  Perceived Conflicts between Non-SPAC Reporting Shell Companies and SPACs

A commenter stated that an investment in a SPAC transaction is not comparable to other reporting shell company business combinations.[970]  In particular, the commenter indicated that an investor in a non-SPAC reporting shell company does not necessarily invest in a company seeking a business combination opportunity.  While we acknowledge that non-SPAC shell companies typically have some investors that predated the company's shell company status, this

---

[966]   *See* letter from Loeb & Loeb.

[967]   *See id*.

[968]   *See* Shell Company Adopting Release, *supra* note 943.

[969]   *See id*.

[970]   *See* letter from Kirkland & Ellis.

303

distinction is not relevant for this purpose because the effect of a business combination transaction in both cases is the same. Both involve a situation where a public shell company is no longer going to be a shell company and the nature of the investor's shares has changed to an investment in an entirely new operating business. Moreover, the purpose of the transaction is to provide the formerly private company with access to the public markets. As such, the concerns that we are addressing in adopting Rule 145a are present in both non-SPAC reporting shell company business combinations and de-SPAC transactions.

### vii. Perceived Analogies to Traditional Reverse Mergers

A commenter argued that de-SPAC transactions should not be distinguished from other reverse mergers because the accounting predecessor in a reverse merger is not currently deemed to be engaged in a distribution of its securities to stockholders of the non-predecessor entity.[971] We do not agree with the commenter's analogy because in traditional mergers, regardless of the accounting treatment of the respective parties, the issuer of securities whose offer and sale is registered is the entity whose securities are being sold to investors (e.g., in a share exchange, the entity whose securities are being offered in exchange for outstanding securities of another entity).[972] The commenter further asserted that if the SPAC is not actually issuing securities, the SPAC should not be a "registrant" and that, to the extent Rule 145a is adopted, only the target should be considered a registrant. We disagree, in part, with this argument. While we agree that the target company must be a registrant in all registered de-SPAC transactions,[973] we see no

---

[971]  Letter from Winston & Strawn.

[972]  Although the commenter seeks to analogize de-SPAC transactions to reverse mergers in traditional M&A, such transactions are readily distinguishable. With respect to other reverse mergers not involving shell companies, although the entity surviving the transaction may acquire new assets or new lines of business as a result of the transaction, it is not changing the actual nature of the investment—from a company with no operations to an operating company—and it is not a means to provide a company access to the public markets for the first time.

[973]  *See supra* Section III.C.

basis to disregard the SPAC's status as a registrant, where applicable, even in cases where the SPAC is issuing securities only within the meaning of Rule 145a.  Rule 145a is designed to identify a sale between the combined company and pre-business combination shareholders of the reporting shell company.  For the reasons discussed above, we view this to be a sale even if the reporting shell company is not actually issuing securities.  Given that this constructive sale occurs even if shares do not actually change hands, we decline to narrow Rule 145a by concluding that a sale occurs in a de-SPAC transaction only by the target company.  To the extent that the choice of transaction structure may impact who is a registrant that must sign a registration statement, that is a separate analysis.[974]

Additionally, some commenters asked for clarification regarding the intended trigger for the application of Rule 145a in a de-SPAC transaction[975] and who would be the exchanging parties in a Rule 145a constructive sale.[976]  As discussed above, Rule 145a specifies that a sale occurs from the post-transaction company to the existing shareholders of a reporting shell company in situations where a reporting shell company that is not a business combination related shell company enters into a business combination transaction involving another entity that is not a shell company.  Pursuant to Rule 145a, all existing holders of the reporting shell company's shares, at the time of the business combination, are constructively exchanging their securities for securities in the combined company, whether or not these investors are actually exchanging any shares to complete the business combination.[977]  The surviving public company will be the entity that is constructively selling the securities of the combined company.

---

[974]  *Id.*

[975]  Letter from ABA.

[976]  Letter from Winston & Strawn.

[977]  *See supra* Section IV.A.3.iii regarding when a shell company must consider registering the sale identified by Rule 145a.

> viii.     *Section 3(a)(9) Does Not Apply to Rule 145a Constructive Sales*

Having considered the views of commenters regarding the application of the Section 3(a)(9) exemption in Rule 145a constructive sales,[978] we continue to believe Section 3(a)(9) would not be available for a transaction that is a Rule 145a constructive sale.  There are several features of these transactions which cast doubt on the availability of the exemption.  In particular, Section 3(a)(9) was designed to facilitate "certain voluntary readjustment[s] of [an issuer's] obligations."[979]  A reporting shell company business combination with an operating company is not merely a voluntary readjustment, but the combination of such an entity with an entirely new business.

In addition, the four requirements of an exchange qualifying for the Section 3(a)(9) exemption are as follows:

(i) Same issuer—the issuer of the old securities being surrendered must be the same as the issuer of the new securities;

(ii) No additional consideration from the security holder;

(iii) Offer must be made exclusively with existing security holders; and

(iv) No commission or compensation may be paid for soliciting the exchange.

The failure to meet any single one of these requirements would be enough to preclude use of the Section 3(a)(9) exemption.

First, Section 3(a)(9) is limited to securities exchanged by the issuer with its existing shareholders.  In the case where shareholders of a reporting shell company constructively exchange their shares with securities of the combined entity, we view the combined entity to be a

---

[978]   Letters from Kirkland & Ellis, Vinson & Elkins.

[979]   H.R. Rep. No. 152, 73rd Cong. 1st Sess. 25 (1933).

306

different issuer than the shell that originally issued the securities even if the reporting shell company is the entity that survives the merger.  Although the combined company may retain the legal identity of the shell for the purposes of State or local law, it is substantively a new entity. To hold otherwise would place form over substance, given that the use of the Section 3(a)(9) exemption is premised upon an investor's familiarity with the company in which they have already invested.[980]

Second, the Section 3(a)(9) exemption would not be available where the Rule 145a constructive sale occurs in connection with the offer and sale of securities to target company security holders.  Such a sale would not occur exclusively to the reporting shell company's existing security holders.  Thus, where interests in the existing reporting shell are also being exchanged with the target company's shareholders, the exchange would not be exclusively with the reporting shell company's existing security holders and Section 3(a)(9) would not be available to exempt the deemed sale to the reporting shell company shareholders.

Finally, Section 3(a)(9) is not available where a commission or other remuneration is paid or given directly or indirectly for soliciting participation in the deemed exchange.  This would occur, for example, if a proxy solicitor is compensated to solicit the reporting shell company's shareholders for proxy votes in connection with the business combination.  Certain commenters asserted that Section 3(a)(9) of the Securities Act should not be rendered unavailable simply because a proxy solicitor is paid to solicit proxies from SPAC shareholders in connection with

---

[980]  The Commission has stated that the rationale for the Section 3(a)(9) exemption, in part, is that the market already has adequate familiarity with the issuer, and thus, the protections under the registration provisions of the Securities Act are not necessary.  *See, e.g.*, *Form for Registration of Securities When Issuers Qualify Under Certain Proposed Rule*, Release No. 33-5011 (Oct. 7, 1969) [34 FR 17033, 17033 (Oct. 18, 1969)] ("[T]he exemption in section 3(a)(9) of the Act applies only where the issuer of the convertible security and the security issuable on conversion is the same.  In such a situation the information available to the trading markets through periodic reports filed by the issuer under the Securities Exchange Act should provide an adequate substitute for the disclosure which would be provided by the registration and prospectus delivery provisions of the Securities Act.").

the shareholder vote on a de-SPAC transaction.[981]  As discussed above, Rule 145a deems there to be a share exchange in situations, such as de-SPAC transactions, where a reporting shell company that is not a business combination related shell company enters into a business combination transaction involving another entity that is not a shell company.  In our view, if shareholder approval is being solicited on a matter that is required to accomplish a reporting shell company business combination,[982] and compensation is being paid for such solicitation, then that is, in substance, a solicitation for approval of the Rule 145a transaction.  This is consistent with views the Commission previously has expressed in analogous contexts.  For example, the Commission has previously taken the position that where a solicitation of security holders is for the purpose of approving the authorization of additional securities which are to be used to acquire another specified company, and the security holders will not have a separate opportunity to vote upon the transaction, the solicitation to authorize the securities is also a solicitation with respect to the acquisition.[983]  Accordingly, if a proxy solicitor is compensated to solicit the reporting shell company's shareholders for proxy votes in connection with the shareholder vote on a de-SPAC transaction, such solicitation would mean the transaction would not qualify for the Section 3(a)(9) exemption for the Rule 145a constructive sale.

---

[981]  Letters from Kirkland & Ellis, Vinson & Elkins.

[982]  For example, approval of the business combination, the authorization of additional shares, revisions to the articles of incorporation, or a reincorporation to a different jurisdiction.

[983]  *See, e.g.*, Note A to Schedule 14A ("Where any item calls for information with respect to any matter to be acted upon and such matter involves other matters with respect to which information is called for by other items of this schedule, the information called for by such other items also shall be given.  For example, where a solicitation of security holders is for the purpose of approving the authorization of additional securities which are to be used to acquire another specified company, and the registrants' security holders will not have a separate opportunity to vote upon the transaction, the solicitation to authorize the securities is also a solicitation with respect to the acquisition.").

### B. Financial Statement Requirements in Business Combination Transactions Involving Shell Companies

After a business combination involving a shell company, the financial statements of a business[984] that will be a predecessor[985] to the shell company registrant become those of the registrant for financial reporting purposes.

How a business chooses to become a public company could affect its financial statement disclosures due to differences in the requirements of registration statements on Form S-1 or F-1 (for IPOs) and the requirements of registration statements on Form S-4 or F-4 (regarding business combination transactions). In our view, a company's choice of the manner in which it goes public should not generally result in substantially different financial statement disclosures being provided to investors.

In the Proposing Release, the Commission proposed amendments to its forms and rules to more closely align the financial statement reporting requirements in business combinations involving a shell company registrant and a business with those in traditional IPOs.[986] The financial statement requirements that are being adopted under the final amendments are based, in part, on current Commission staff guidance for transactions involving shell companies.[987] In

---

[984] We use the term "business" throughout, rather than "private operating company" (or "target company") as it encompasses both terms. In the Proposing Release, the Commission stated, in a business combination transaction involving a shell company, the private operating company would meet the definition of a "business" in Rule 11-01(d) of Regulation S-X. Proposing Release, *supra* note 7, at 29491, n.253. In connection with the adoption of final Rule 15-01(b) in this release, we reiterate that, in a business combination transaction involving a shell company, a "business" includes but is not limited to a private operating company or a target company that is not an asset acquisition.

[985] The term "predecessor" when used in this section has the same meaning as applied in its use under Regulation S-X and determination of financial statement requirements.

[986] *See* Proposing Release, *supra* note 7, at 29490–29494. *See also* proposed amendments to Forms S-4, F-4, and 8-K and to Regulation S-X.

[987] Commission staff has provided informal guidance to address practical questions related to financial reporting issues for shell company mergers in the FRM.

309

proposing to codify this guidance, the Commission sought to reduce any asymmetries between financial statement disclosures in business combination transactions involving shell companies and traditional IPOs.

   1.  *Proposed Rule 15-01(a), Rule 1-02(d), and Form Instructions: Audit Requirements*

In the Proposing Release, the Commission proposed Rule 15-01(a), amendments to Rule 1-02(d), and related new instructions to Forms S-4 and F-4.[988]  The Commission noted in the Proposing Release that these changes would align the level of audit assurance required for the target business in business combination transactions involving a shell company with the audit requirements for an IPO.[989]  Specifically, proposed Rule 15-01(a) provided that the term "audit (or examination)," when used with respect to financial statements of a business that is or will be a predecessor to a shell company,[990] means an examination of the financial statements by an independent accountant in accordance with the standards of the PCAOB for the purpose of expressing an opinion thereon.  The Commission also proposed to amend Rule 1-02(d) to include the following new provision: "See § 210.15-01(a) for definition of an audit when used in regard to financial statements of a company that will be a predecessor to an issuer that is a shell company (other than a business combination related shell company)."  The combined effect of the proposals would be that a predecessor to a shell company, including one that is a target

---

[988]  *See* proposed Rule 15-01(a) of Regulation S-X, proposed Rule 1-02(d), proposed Instruction 1 to Item 17(b)(7) of Form S-4 (adding requirement, in a de-SPAC transaction to provide the financial statements required by § 240.15-01 (Rule 15-01 of Regulation S-X)), proposed Instruction 1 to Item 17(b)(5) of Form F-4 (adding requirement, in a de-SPAC transaction to provide the financial statements required by § 240.15-01 (Rule 15-01 of Regulation S-X) at Proposing Release, *supra* note 7, at 29491.

[989]  *See* Proposing Release *supra* note 39, at 29491.

[990]  *See* definition of the term "business combination related shell company" in Securities Act Rule 405 and Exchange Act Rule 12b-2.

private operating company, would be required to comply with the same definition of audit as in Rule 1-02(d) of Regulation S-X for its audited financial statements as if it were filing for an IPO.

   2.   *Comments: Rule 15-01(a), Rule 1-02(d), and Form Instructions: Audit Requirements*

We received comments from several commenters that were supportive of proposed Rule 15-01(a), because it would codify existing staff guidance.[991]  No commenters opposed proposed Rule 15-01(a), the proposed amendments to Rule 1-02(d), or the proposed new instructions to Forms S-4 and F-4.  One commenter recommended that we adopt an exception to the audit requirements applicable to SPACs to permit the audits of the financial statements of target companies that would otherwise be eligible for multijurisdictional disclosure system ("MJDS") reporting to be able to use Canadian Generally Accepted Auditing Standards ("Canadian GAAS").[992]

As noted in Section III.C above, one commenter said that co-registration would result in disclosure requirements that are inconsistent with the proposed revisions to Regulation S-X, raising the issue of whether, if there were multiple target companies, each company would be required to provide financial statements audited in accordance with PCAOB standards in the de-SPAC registration statement, rather than solely the predecessor pursuant to proposed Rule 15-01(a) of Regulation S-X.[993]  This commenter indicated that co-registration would result in inconsistencies with IPOs where there are multiple target companies.

---

[991]   Letters from PwC, RSM US LLP (May 25, 2022) ("RSM") ("We believe the proposed rule, if finalized, would appropriately codify current SEC staff guidance and align the level of audit assurance required for the target private operating company in business combination transactions involving a shell company with the current requirements for an audit of a private operating company in a traditional IPO to be performed in accordance with the standards of the Public Company Accounting Oversight Board."), Vinson & Elkins.

[992]   Letter from ABA.

[993]   Letter from Vinson & Elkins.

3. *Final Rule 15-01(a), Rule 1-02(d), and Form Instructions: Audit Requirements*

After considering the comments, we are adopting Rule 15-01(a), the amendments to Rule 1-02(d), and the instructions to Forms S-4 and F-4 largely as proposed, with a few modifications discussed below.

In the past, the Commission staff has advised shell companies that it expects the financial statements of the predecessor, including a private operating company, in a transaction involving a shell company, to be audited under the same standards as a registrant in an IPO, because, at consummation, the financial statements of the business become that of the shell company.[994]  As noted in Section III.C above, the amendments to Form S-4 and Form F-4 will result in each business that is reported as a company being acquired on Form S-4 or F-4 being an issuer under Section 2(a)(7) of the Sarbanes-Oxley Act.  The final amendments to Rule 1-02(d) have been modified to refer any entity that is involved in a combination with a shell company to Rule 15-01(a), which in turn provides rules as to the level of audit assurance required depending on whether the entity in the combination is a predecessor or non-predecessor.  Consistent with existing staff guidance and the proposal, an entity that is or will be a predecessor, whether it is part of a shell company transaction or an issuer under the amendments to Form S-4 and Form F-4 that is part of a shell company transaction, will be required to have its financial statements audited by an independent accountant in accordance with the standards of the PCAOB.  Consistent with the level of assurance in an IPO involving multiple businesses today, the financial statements of an entity that is not a predecessor that are included in a registration

---

[994]  *See* FRM at Sections 1140.5 and 2200.7 that discusses "Audit Requirement for Non-Reporting Target" in relation to Forms S-4 or F-4 when the registrant is a SPAC.  In addition, Section 4110.5 includes a chart that outlines the staff's views on the application of certain PCAOB requirements in various filings with the SEC, which includes transactions involving a shell company.

statement or proxy statement[995] filed for a combination with an issuer that is a shell company may be audited in accordance with either the standards of the PCAOB or U.S. GAAS as specified or permitted in the regulations and forms applicable to those entities for the purpose of expressing an opinion thereon.[996]  The final rule has been revised from that proposed in order to codify existing staff practice that the predecessor in a shell company transaction that does not involve a SPAC and is not an issuer be audited by an independent accountant registered with the PCAOB.[997]  In addition, the final rule refers to "entity" instead of "issuer," as proposed, in order for the rule to apply to shell company business combinations that are not de-SPAC transactions. All issuers in a de-SPAC transaction would still need a PCAOB-registered audit firm in accordance with Section 102 of the Sarbanes-Oxley Act to perform the audit.  Further, these amendments that permit U.S. GAAS audits for the financial statements of an issuer that is not the predecessor apply to a small subset of de-SPAC transactions involving multiple target companies where there may be an issuer that is a not a predecessor.[998]

We are not adopting amendments to permit the use of Canadian GAAS in connection with de-SPAC transactions involving a Canadian business.  Under current rules, a registrant must meet the MJDS requirements and register on an MJDS form in order to rely on such

---

[995]  For ease of reference, when we refer to disclosures in a "proxy statement", the same discussion applies to "information statement".  Information statements call for the same information as a proxy statement.  *See* Item 1 of § 240.14c-101 (Schedule 14C).

[996]  *See supra* Section III.C for additional discussion regarding the definition of audit for issuers that are not predecessors in business combination transactions with a shell company involving multiple targets.

[997]  *See* FRM at Section 12250.1, which stipulates in a reverse recapitalization by a non-public company with a public shell company, the financial statements of the non-public company filed in the Form 8-K or Form 20-F must be audited by a public accounting firm registered with the PCAOB.  Further, the auditor would need to be independent under PCAOB and Commission independence rules for all years required to be in the Form 8-K. For Form 20-F, the auditor of the non-public company that is a foreign private issuer must comply with the PCAOB and Commission independence rules for at least the latest fiscal year as long as the auditor is independent in accordance with home-country standards for earlier periods.

[998]  *See infra* Section VIII.A.  There were approximately 17 out of 583 de-SPAC transactions between 1990–2022 that had two or more targets.

accommodations.[999]  Also under current rules, a SPAC that satisfies the MJDS-eligibility requirements and is involved in a de-SPAC transaction involving a Canadian business that also meets the MJDS-eligibility requirements once combined is permitted to use Canadian GAAS post-combination if it files on an MJDS form.  Moreover, virtually all MJDS issuers provide audit opinions under PCAOB standards, even though they are able to provide audit opinions under Canadian GAAS, so it is unclear whether any Canadian registrants would provide audit opinions under Canadian GAAS even if that were an option at the time of filing the registration statement.[1000]  MJDS accommodations go beyond the use of Canadian GAAS.

In final Rule 1-02(d), we have deleted the proposed term "financial statements of a company" and replaced it with the term "financial statements of an issuer."  The use of "issuer" rather than "company" will ensure consistency with related provisions in Rule 15-01.

We have revised proposed Instruction 1 to Item 17(b)(7) of Form S-4 and Instruction 4 to Item 8 of Form 20-F by replacing "provide the financial statements required by § 240.15-01 (Rule 15-01 of Regulation S-X)" with "see § 240.15-01 (Rule 15-01 of Regulation S-X)," because the financial statement requirements extend beyond Rule 15-01.  We further revised Instruction 4 to Item 8 of Form 20-F by clarifying that it is applicable for filings on Form 20-F filed pursuant to General Instruction A.(d) of this form and for registration statements, so that a shell company would not consider Rule 15-01 when it is filing its annual report in due course before acquiring a business.  Also for this Instruction 4, we revised "shell company that will acquire a business" to "shell company that is combining with a business", in order for the

---

[999]  *See Multijurisdictional Disclosure and Modifications to the Current Registration and Reporting system for Canadian Issuers*, Release No. 33-6902 (June 21, 1991) [56 FR 30036 (July 1, 1991)] (adopting the MJDS system).

[1000]  *See* General Instruction B. to Form 40-F.

reference to Rule 15-01 to apply in more structures.  Last, we have revised each of these instructions to remove reference to the predecessor because the instruction would apply to a non-predecessor as well.

### 4. *Proposed Rule 15-01(b): Number of Years of Financial Statements*

Currently, a registration statement in connection with a de-SPAC transaction on Form S-4 or F-4 and a proxy or information statement must include financial statements of the target company for the same number of years as would be required by the target company in an annual report and any subsequent interim periods, which could require three years of comprehensive income, changes in stockholders' equity, and cash flows even if the target company qualifies as an EGC.[1001]  In contrast, in a traditional IPO under the Securities Act, a registrant that qualifies to be an EGC may provide only two years of these financial statements.[1002]

In the Proposing Release, the Commission proposed Rule 15-01(b) in order to align the number of fiscal years required to be included in the financial statements for a business[1003] that will be the predecessor(s) in a shell company business combination with the financial statements required to be included in a Securities Act registration statement for an IPO of equity securities.[1004]  Proposed Rule 15-01(b) provided that when the registrant is a shell company, and the financial statements of a business that will be a predecessor(s) to the shell company registrant

---

[1001]  *See* Items 17(b)(7) and 17(b)(8) of Form S-4; Items 17(b)(5) and 17(b)(6) of Form F-4; Item 14 of Schedule 14A; and Instruction 1 of Schedule 14C.  Balance sheets as of the end of the two most recent fiscal years are always required.

[1002]  Only two years of these financial statements may be required in other scenarios, such as when the registrant is an SRC.

[1003]  The Commission proposed to use the term "business" in this context, rather than "private operating company" (or "target company" which would have been a different, potentially narrower, set of persons than a "business" in the context of the proposed rules reference to "any shell company," which thereby was not limited to SPACs) in order to be consistent with the provisions in Regulation S-X that define and use "business," such as Rule 11-01(d) of Regulation S-X.

[1004]  *See* Proposing Release, *supra* note 39, at 29491.

are required in a registration statement or proxy statement, the shell company registrant must file financial statements of that business(es) in accordance with § 210.3-01 to 3-12 and § 210.10-01 (Articles 3 and 10 of Regulation S-X) or § 210.8-01 to 8-08 (Article 8), if applicable, as if the filing were a Securities Act registration statement for the IPO of that business's equity securities. The effect of proposed Rule 15-01(b) would be that, when the registrant filing is a shell company (which would include, but not be limited to, any SPAC), the Forms S-4 or F-4 or proxy statement may include only two years of statements of comprehensive income, changes in stockholders' equity, and cash flows for the business(es) that would be the predecessor when those business(es) would qualify as an EGC and/or SRC if it were doing its own IPO for equity securities.

5.   *Comments: Rule 15-01(b): Number of Years of Financial Statements*

Several commenters supported this proposed rule, noting generally that it would align the number of fiscal years required to be included in the financial statements for a private company that will be the predecessor in a shell company combination with those that would be required for a traditional IPO.[1005]  No commenters opposed the proposed rule.

6.   *Final Rule 15-01(b): Number of Years of Financial Statements*

Having considered the comments received, we are adopting Rule 15-01(b) largely as proposed, except for certain revisions, in order to align the number of fiscal years required to be included in the financial statements for a business that will combine with a shell company registrant with the financial statements required to be included in a Securities Act registration statement for an IPO of equity securities.  We are clarifying that a business that is combining with a shell company registrant, beyond just the predecessor, must comply with the financial

---

[1005]  Letters from Ernst & Young, PwC, RSM.

statement requirements of Regulation S-X as if the filing were a registration statement for its own IPO by removing the reference to predecessor in this rule. Absent this revision, three years of financial statements for a business that would be an EGC but is not a predecessor may be required, which would exceed the two years required for a predecessor that qualifies as an EGC.[1006] We believe that the predecessor and another business combining with the shell company registrant should both be subject to Rule 15-01(b). Further, we are replacing the proposed term "the registrant" with "such registrant" to recognize there may be multiple registrants and promote readability. Also, in the final sentence of the rule, we have revised the phrase "if it were filing a registration statement itself" to delete the word "itself" and replace it with the word "alone"; we believe the term "alone" will more clearly convey the intent of the rule.[1007] Last, we added to final Rule 15-01(b), as well as Rule 15-01(c) and Rule 15-01(d), "for which audited financial statements are available" to "most recently completed fiscal year" in order to conform to its usage in Item 10(f)(2) of Regulation S-K.

   7.  *Proposed Rule 15-01(c): Age of Financial Statements*

In the Proposing Release, the Commission proposed Rule 15-01(c) regarding the age of predecessor financial statements. The proposed rule provided that the financial statements of a business that will be the predecessor to a shell company must comply with the requirements in 17 CFR 210.3-12 ("Rule 3-12") of Regulation S-X (Rule 8-08 when that business would qualify to be an SRC based on its annual revenues as of the most recently completed fiscal year, if it

---

[1006] Financial statements being provided under Rules 3-05, 8-04, 8-06 or 3-14 of Regulation S-X for a business being acquired by the predecessor are addressed in Rule 15-01(d) and the number of years of financial statements provided would be based on the significance test in those rules, which is two years or less.

[1007] *See supra* Sections III.C and IV.A. (discussing co-registration of target companies and Rule 145a respectively).

were filing a registration statement alone) in determining the age of the financial statements of the predecessor business in the registration statement or proxy statement of the registrant.

8.  *Comments: Rule 15-01(c): Age of Financial Statements*

Several commenters indicated support for proposed Rule 15-01(c).[1008]  No commenters opposed the proposed rule.

9.  *Final Rule 15-01(c): Age of Financial Statements*

We are adopting Rule 15-01(c) largely as proposed, with certain modifications discussed below.

Currently—with respect to companies being acquired that do not meet Form S-3 use requirements and are not subject to the reporting requirements of either Section 13(a) or 15(d) of the Exchange Act, which is the case with most target companies in de-SPAC transactions— Form S-4 (under Item 17(b)(7)) requires inclusion of financial statements that would be required in an annual report sent to security holders under Rules 14a-3(b)(1) and (b)(2), if an annual report is required.  In summary, Rules 14a-3(b)(1) and (b)(2) require the inclusion of consolidated audited balance sheets as of the end of the two most recent fiscal years and consolidated audited statements of income and cash flows for each of the three most recent fiscal years prepared in accordance with Regulation S–X.  Form F-4 is similar in this respect.[1009]  The position of the Commission's staff is that the requirement to update target company financial statements in a Form S-4 is based on the  obligation of the registrant filing the Form S-4 to update under Rule 3-12 (or Rule 8-08 for a smaller reporting company).  Rule 3-12 addresses the

---

[1008]  Letters from ABA, PwC, RSM.

[1009]  *See* Form F-4, Item 17(b)(5) (for company being acquired that may not use Form F-3 and is not a reporting company, include financial statements that would have been required to be included in an annual report on Form 20-F); Form 20-F, Item 17(b) (The financial statements shall disclose an information content substantially similar to financial statements that comply with U.S. generally accepted accounting principles and Regulation S-X.).

age of financial statements at the effective date of a registration statement or at the mailing date of a proxy statement.[1010]  A registration statement on Form S-1 for an IPO would also require application of Rule 3-12[1011] (or Rule 8-08[1012] for SRCs), regarding the age of financial statements at the effective date of a registration statement or at the mailing date of a proxy statement.  However, Rule 3-12 requires application of Rule 3-01(c), which permits reporting companies 45 more days to update annual financial statements when certain conditions are met.

Absent this amendment, the required financial statements of each company being acquired in a Form S-4, because the shell company is a reporting company, would not have the same age requirements as those in the context of an initial registration statement.

Thus, in order to align the age requirements for financial statements for each business involved in a business combination with a shell company filed on Forms S-4 or F-4 with those for an issuer in an IPO on Form S-1 or F-1, we are adopting final Rule 15-01(c).  Further, we revised the rule to clarify that Rules 3-12 or 8-08 must be applied to each business involved in a business combination with a shell company as if the financial statements were included in an initial registration statement.  Based on the Commission staff's experience reviewing filings in

---

[1010] *See* FRM 2200.8.  As further described in Section 2045.5 of the FRM, while the age of financial statements is dependent on the registrant's requirements and eligibility for relief under Rule 3-01(c) of Regulation S-X, after a reverse acquisition accounted for as a business combination, the position of the Commission's staff is that the accounting acquirer's ability to meet those requirements should be considered in determining the need to update.

[1011] *See* Rule 3-12 of Regulation S-X, which stipulates for registrants that are not FPIs and are not large accelerated filers or accelerated filers that the balance sheet date in an initial registration statement must not be more than 134 days old, except that third quarter data is timely through the 45th day after the most recent fiscal year-end. For FPIs, Rule 3-12 requires compliance with the age requirements in Form 20-F.  Form 20-F requires financial statements of an FPI must be as of a date within nine months of the effective date of a registration statement, and audited financial statements for the most recently completed fiscal year must be included in registration statements declared effective three months or more after fiscal year-end.

[1012] *See* Rule 8-08 of Regulation S-X, which states financial statements may be as current as of the end of the third fiscal quarter when the anticipated effective or mailing date falls within 45 days after the end of the fiscal year, or if the date falls within 90 days of the end of the fiscal year and (1) if a reporting company, all reports due were filed; (2) in good faith the company expects to report income in the fiscal year just completed; and (3) it reported income in at least one of the two previous fiscal years.

de-SPAC transactions and other shell company business combination transactions, Rule 15-01(c) is consistent with existing market practice for the age of financial statements, where they are updated similar to an IPO. We further revised the rule to clarify that the rule applies to any business being acquired by a shell company, and not only a predecessor, that is included in registration statement under Item 17 of Form S-4, in order to ensure that the financial statements of non-predecessors are subject to the same age requirements. Also, in the parenthetical in the final sentence of the rule, we have revised the phrase "if it were filing a registration statement itself" to delete the word "itself" and replace it with the word "alone"; we believe the term "alone" will more clearly convey the intent of the rule.[1013]

        *10. Proposed Rules: 15-01(d), 1-02(w)(1), 3-05(b)(4)(ii), 3-14(b)(3)(ii): Acquisition of a Business or Real Estate Operation by a Predecessor*

Currently, the financial statements of a business that is, or will be, the predecessor to a shell company registrant are required in registration statements or proxy statements related to the business combination.[1014] Aside from the predecessor, the financial statements of any other businesses that have been, or are probable to be, acquired may also be required.[1015] For example, "Shell Company A" and "Target Business B" are part of a business combination and a Form S-4 registration statement is filed. Target Business B, the predecessor, acquired "Company C" before the Form S-4 was filed, so Company C is not another company being acquired by Shell Company A (the registrant) as Company C will have been subsumed into Target Business B

---

[1013]  *See supra* Sections III.C and IV.A. (discussing co-registration of target companies and Rule 145a respectively).

[1014]  *See* Item 17 of Form S-4 and Form F-4; § 240.14A-3(b); Items 13 and 14 of Schedule 14A.

[1015]  *See* 17 CFR 230.408(a) ("Rule 408(a)") under the Securities Act; 17 CFR 240.12b-20 ("Rule 12b-20") under the Exchange Act.

before the Form S-4 is filed.  The proposed rules and amendments addressed the financial reporting required for Company C in this non-exclusive example.

Commission staff has taken the position that existing Securities Act Rule 408(a) and Exchange Act Rule 12b-20, elicit financial statements of a business (*e.g.*, "Company C" in the above example) acquired or probable of being acquired by the target business (e.g., "Target Business B" in the example) in a shell company business combination filed in a registration statement or proxy statement only when omission of those financial statements would render the target business's financial statements substantially incomplete or misleading.[1016]  The Commission proposed Rule 15-01(d) of Regulation S-X to reduce the judgment required in determining when to include financial statements of a business other than the shell company registrant or its predecessor and instead provide certainty by requiring application of Rule 3-05 or Rule 8-04 of Regulation S-X,[1017] aligning with the reporting in an IPO when there is a similar acquisition.  These provisions would dictate when the financial statements of a non-predecessor business[1018] that has been acquired, or is probable to be acquired, by a shell company registrant or its predecessor should be included in the registration statements or proxy statements related to the business combination.

Since proposed Rule 15-01(d) would require the application of Rule 3-05 or Rule 8-04, which in turn would require application of 17 CFR 210.1-02(w)(1) ("Rule 1-02(w)(1)") of

---

[1016] *See* FRM at Section 2005.5.  If a company being acquired that is not the predecessor acquired a business, the registrant must evaluate Securities Act Rule 408 and disclose the financial statements for that acquired business when omission of those financial statements would render the financial statements for the company being acquired substantially incomplete or misleading.

[1017] Rule 8-04 applies when the registrant or, depending on the context, its predecessor would qualify to be an SRC based on its annual revenues as of the most recently completed fiscal year if it were filing a registration statement alone.

[1018] For ease of reference, in this section, when we refer to "business", we also mean "real estate operation."  When we refer to "Rule 3-05," we also mean Rule 3-14 of Regulation S-X.  When we refer to "Rule 8-04", we also mean 17 CFR 210.8-06 ("Rule 8-06") of Regulation S-X.

Regulation S-X in measuring significance, the Commission also proposed amendments to Rule 1-02(w)(1) and a new Rule 15-01(d)(1) to change how significance is measured in a shell company business combination transaction.

The existing significance tests in 17 CFR 210.1-02(w) ("Rule 1-02(w)") of Regulation S-X, as applied to acquisitions involving shell companies where significance would be measured against the shell company registrant, appeared inconsistent with the reasons underlying the sliding scale approach adopted in Rule 3-05 (or Rule 8-04).  The sliding scale approach recognizes that certain acquisitions have a greater impact on a company than others and those acquisitions should result in additional financial information about the acquired business.  The significance tests in Rule 1-02(w)[1019] do not address the scenario when there is both a shell company registrant and a business that is or will be its predecessor.  Because a shell company has nominal activity and therefore the denominator for the tests would be minimal, the application of such tests generally result in an acquisition being significant at the maximum level, which suggests that the existing sliding scale for business acquisitions may not be effective in the context of a shell company business combination transaction.[1020]  In order to address the ineffectiveness of the existing sliding scale in these specific transactions, the proposed amendments to Rule 1-02(w) would require the significance of the acquired business that is not the predecessor to be calculated using the predecessor's financial information as the denominator instead of that of the shell company registrant.

The Commission also proposed Rule 15-01(d)(2) to specify when the proposed Rule 15-01(d)-required financial statements, through application of Rule 3-05 (or Rule 8-04), for a

---

[1019]  Rule 1-02(w) requires the financial information of the registrant, which may be a shell company, to be used as the denominator for the significant subsidiary tests.

[1020]  *See* Proposing Release, *supra* note 7, at 29492.

business that is not the predecessor to a shell company, would be required to be filed if such financial statements are properly omitted from a registration, information, or proxy statement under Regulation S-X. Specifically, 17 CFR 210.3-05(b)(4)(i) ("Rule 3-05(b)(4)(i)") of Regulation S-X provides that financial statements of a recently acquired or to be acquired business may be omitted from a registration or proxy statement when the significance of that acquisition, under the required significance tests in Rule 3-05, is measured at 50% or less. Rule 3-05 further provides that such omitted financial statements must be filed under cover of Form 8-K within 75 days after consummation of the acquisition.[1021] A company that is not required to register a class of securities under the Exchange Act is not required to file a current event report, such as Form 8-K, and we are not changing that in our final rules.[1022] However, the Commission proposed in Rule 15-01(d)(2) that the financial statements of the business acquired by the shell company or the predecessor that were properly omitted under Rule 3-05 from the previously-filed registration or proxy statement would be required as part of the already-required Item 2.01(f) Form 8-K filed with Form 10 information within four business days of the de-SPAC transaction. The Commission also proposed amendments to Rule 3-05 and Rule 3-14 to refer to Rule 15-01(d)(2) for completeness and to avoid confusion on when such financial statements are due when a shell company business combination transaction is involved.

---

[1021] *See* Rule 3-05 (generally requiring the filing of financial statements of an acquired business when the conditions in Rule 1-02(w) related to significant subsidiary exceed 20%).

[1022] As a co-registrant, target companies will have an Exchange Act reporting obligation. *See supra* Sections III.C and IV.A. (discussing co-registration of target companies and Rule 145a respectively).

*11. Comments: Rule 15-01(d), 1-02(w)(1), 3-05(b)(4)(ii), 3-14(b)(3)(ii): Acquisition of a Business or Real Estate Operation by a Predecessor*

Several commenters expressed general support for proposed Rule 15-01(d) or general support for proposed changes to Regulation S-X.[1023] However, each of the commenters who were generally supportive of Rule 15-01(d) and a few other commenters suggested changes to Rule 15-01(d)(2).[1024] Specifically, these commenters observed that the proposed rule could accelerate the filing of financial statements of an acquired business in a Form 8-K that have previously been omitted from a registration statement, compared to the timing that would be required after an IPO, and recommended that we conform the timing.[1025] After an IPO, a registrant must file the omitted financial statements no later than 75 days after consummation of the acquisition.[1026] In contrast, commenters suggested the proposed rule could give the combined company insufficient time to prepare the financial statements of the acquired business because the proposed rule could require the omitted financial statements to be filed sooner than 75 days after the relevant acquisition in cases where the Form 8-K filed in connection with the consummation of the de-SPAC transaction is filed earlier than 71 days after such acquisition.[1027]

---

[1023] Letters from ABA (expressing support for Rule 15-01(d) but suggesting changes to Rule 15-01(d)(2)), Freshfields (expressing support for Rule 15-01(d)(1) but suggested changes to proposed Rule 15-01(d)(2)), ICGN (supporting Article 15), PwC (expressing support for Regulation S-X changes to align with an IPO with respect to acquisitions by a predecessor but suggesting changes be made to proposed Rule 15-01(d)(2)), Vinson & Elkins (expressing support for Rule 15-01 but suggesting changes to proposed Rules 15-01(d)(2) and 15-01(e)), Winston & Strawn (expressing general support for Regulation S-X proposed amendments but suggesting changes to proposed Rule 15-01(d)(2)). *See also* letters from BDO, Deloitte & Touche LLP (June 7, 2022) ("Deloitte"), Ernst & Young, KPMG, Loeb & Loeb, RSM (expressing general support for proposed Regulation S-X amendments).

[1024] Letters from ABA, BDO, Freshfields, Goodwin, PwC, Vinson & Elkins, Winston & Strawn.

[1025] *Id.*

[1026] Rule 3-05(b)(4)(ii) of Regulation S-X.

[1027] Letters from ABA, Freshfields, Goodwin, Vinson & Elkins, Winston & Strawn.

One commenter recommended "that the Commission address the interaction between proposed Rule 15-01(d)(2) of Regulation S-X and the company's reporting requirements under Section 15(d) as it relates to recently acquired businesses (or real estate operations) which are excluded from a registration or proxy or information statement prepared in connection with the de-SPAC transaction." [1028]

This same commenter also recommended that Rule 15-01(d) reference Rule 3-14 for real estate operations the same way the proposed rule referenced Rule 3-05 and Rule 8-04 for businesses so that the acquisition of real estate operations is explicitly addressed.[1029]

Several commenters supported,[1030] and no commenters opposed, the proposed amendments to Rule 1-02(w)(1) that required that the significance of acquired businesses be measured using the predecessor's financial information as the denominator, instead of the shell company's, because use of the predecessor's financial statements for the denominator should produce results more consistent with the sliding scale approach in Rule 3-05.

12. *Final Rules 15-01(d), 1-02(w)(1), 3-05(b)(4)(ii), 3-14(b)(3)(ii): Acquisition of a Business or Real Estate Operation by a Predecessor*

We are adopting new Rules 15-01(d), 15-01(d)(1), and 15-01(d)(2), as well as the amendments to Rule 1-02(w)(1), Rule 3-05, and Rule 3-14, substantially as proposed, except for certain modifications discussed below. New Rule 15-01(d) and corresponding amendments more closely align the financial reporting of an acquired business in a shell company business combination transaction reported on Forms S-4 or F-4 or proxy statement with that in an IPO by requiring application of Rule 3-05 or Rule 8-04 of Regulation S-X to acquisitions of a business

---

[1028] Letter from PwC.

[1029] *Id.*

[1030] Letters from ABA, Freshfields, PwC, RSM, Vinson & Elkins.

or real estate operation, respectively, by a predecessor to the shell company.  They are also consistent with the Commission staff observations that current market practice applies Rule 3-05 (or Rule 8-04) to acquisitions by the business that will be the predecessor.

In the context of a registration statement on Form S-4 or F-4, the acquired business financial statements addressed in Rule 15-01(d) that are filed pursuant to Rule 3-05 do not represent financial statements of a company being acquired that would be a co-registrant in a shell company business combination.[1031]  For example, the financial statements of a business when its acquisition is cross-conditioned on the acquisition of a predecessor would ordinarily fall under Item 17 of Form S-4 or Form F-4, rather than under Rule 3-05.  Judgment may be required in other examples when determining whether the financial statements of a business would be required under Item 17 of Form S-4 or Form F-4[1032] as a "company being acquired" or under the provisions of Rule 3-05 for a significant acquisition.

New Rule 15-01(d)(1) directs registrants to Rule 1-02(w)(1) in order to determine how significance is measured in certain shell company business combination transactions.  New Rule 15-01(d)(2) clarifies when and how financial statements for a recently acquired or to be acquired business should be filed.

We have made a few revisions to the final rule in response to comments received and some other revisions to improve the clarity of the final rules.  First, consistent with commenters'

---

[1031]  See *infra* Section III.C.

[1032]  We are adopting as proposed the amendment to Instructions to paragraph (b)(5) and (b)(6) of Item 17 of Form F-4.  This amendment requires a reconciliation under Item 18 of Form 20-F when a shell company acquires a foreign business that will be a predecessor that prepares financial statements on the basis of a comprehensive body of accounting principles other than U.S. GAAP.  Absent this amendment, the foreign business being acquired would present a reconciliation under Item 17 of Form 20-F, which does not include the disclosures required under U.S. GAAP.  A predecessor that applies IFRS, as adopted by the IASB, in financial statements presented in Form F-4 would not have to present a reconciliation to U.S. GAAP, pursuant to Item 17(c) of Form 20-F.

suggestions,[1033] we revised Rule 15-01(d)(2) from the proposal so that when the financial statements of a recently acquired business that is not or will not be the predecessor to the shell company are omitted from a registration statement or proxy statement pursuant to Rule 3-05(b)(4)(i) of Regulation S-X, those financial statements must be filed in a Form 8-K by the later of the filing of the Form 8-K filed pursuant to Item 2.01(f) or 75 days after consummation of the acquisition.  This revision does not accelerate the filing of such financial statements when compared to the application of Rule 3-05(b)(4)(i) outside of a shell company transaction.

In response to a comment about the interaction of this rule and Section 15(d) of the Exchange Act,[1034] which includes requirements relating to periodic reporting on Forms 10-K and 10-Q and current reporting on Form 8-K, the revised rule specifies that a business whose financial statements are omitted from the registration statement in reliance on Rule 3-05(b)(4)(i) will be required to file those financial statements in a Form 8-K.

Next, we have revised Rule 15-01(d) to add references to Rule 3-14 and Rule 8-06 regarding real estate operations, which were inadvertently omitted from the proposal, as noted by a commenter.[1035]  For similar reasons we have also revised Rule 15-01(d)(2) to change the reference from "recently acquired business" to "recently acquired business or real estate operation."  We reference "real estate operation" in the context of Rule 15-01(d) and not the other rules in Article 15 because a real estate operation can meet the definition of a business under 17 CFR 210.11-01(d) ("Rule 11-01(d)") of Regulation S-X, but the permitted financial statement presentation for an acquired real estate operation (Rule 3-14) is different than that for

---

[1033]  Letters from ABA, Freshfields, Vinson & Elkins, Winston & Strawn.  *See supra* note 1027.

[1034]  Letter from PwC.

[1035]  *Id.*

327

other acquired businesses (Rule 3-05). Where the rules in Article 15, other than Rule 15-01(d), refer to "business", such references contemplate a real estate operation.

Unrelated to commenter feedback, we revised the parenthetical in Rule 15-01(d) related to when Rule 8-04 and Rule 8-06 for SRCs will apply to clarify that these rules would apply when the predecessor qualifies as an SRC.

We also made several technical changes to improve the clarity of each of final Rules 15-01(d), 15-01(d)(1), and 15-01(d)(2). In final Rule 15-01(d), in place of the proposed term "when that business," we have inserted instead the term "when the predecessor." This change will help clarify which entity's SRC status is being referred to. Also, we have changed the term "itself" to "alone" for the same reasons the same change was made in Rules 15-01(b) and (c) as discussed above.[1036]

We also removed from final Rule 15-01(d) references to acquisitions by a shell company, because we determined that the financial statements for acquisitions by a shell company would be required by Item 17 of Form S-4 or F-4 as a "company being acquired", and not required through application of Rules 3-05 or 3-14. Relatedly, we revised Rule 1-02(w), Rule 3-05, and Rule 3-14 so that they pertain to acquisitions by a predecessor rather than an acquisition by a shell company. Last, we reorganized some of the language in Rule 15-01(d)(2) to improve the readability of the requirement.

We are adopting the amendments to Rule 1-02(w) largely as proposed, except for two modifications discussed below. Final Rule 1-02(w) provides for the use of the predecessor's financial statements as the denominator in the significance tests, which determine when financial

---

[1036] We also changed the plural term "businesses" to singular "business" and changed the related plural verb "are" to singular "is" in Rule 15-01(d), as well as in Rule 15-01(d)(1), in order to be consistent throughout Rule 15-01(d).

statements are required for an acquired business, instead of those of the shell company registrant. We expect the rule will produce results more consistent with the objective of the sliding scale approach in Rule 3-05 and appropriately differentiate for investors those acquisitions that have a greater impact to the predecessor than others.

In the final rule, we made some technical changes and the modification already discussed above, in relation to final Rule 15-01(d), to remove the reference to acquisitions by a shell company.   In the final rule, we also added the terms "consolidated" before "predecessor" and "those of" before "the shell company registrant" as well as eliminated "the subsidiaries consolidated" for clarity. We also added "shell company" before "registrant" in order to clarify which registrant should not be used as part of the significance test.

13. *Proposed Rule 15-01(e): Financial Statements of a Shell Company Registrant after the Combination with Predecessor*

In recent years, the Commission staff has received questions on whether the historical financial statements of a shell company registrant are required in filings made after a business combination.  The Commission proposed new Rule 15-01(e) to allow a shell company, including a SPAC, to exclude the financial statements of the shell company, for periods prior to a business combination that results in the combined entity no longer being a shell company, once the following conditions have been met: (1) the financial statements of the predecessor, as that term is used in financial reporting, have been filed for all required periods through the acquisition date, and (2) the financial statements of the combined entity registrant include the period in which the acquisition was consummated, which would also include the accounting for the business combination.

329

In the example of a de-SPAC transaction assuming the first condition is met, the financial statements of the SPAC, as a shell company, would generally no longer be relevant or meaningful to an investor once the financial statements of the registrant include the period in which the de-SPAC transaction was consummated for any filing.[1037]

14. *Comments: Rule 15-01(e): Financial Statements of a Shell Company Registrant after the Combination with Predecessor*

Several commenters were supportive of the proposed rule.[1038]  One of these commenters expressed the view that shell company financial statements would no longer be relevant or meaningful once the financial statements of the registrant include the period in which the combination was consummated.[1039]

Two commenters, however, asserted that the financial statements of the shell company should no longer be required in any filings made after consummation of a transaction because the shell company's financial statements would no longer be relevant or material.[1040]  Two commenters highlighted an inconsistency between the proposed rule text and the discussion of the proposed rule in the Proposing Release as it relates to one of the conditions for when the shell company's financial statements may be omitted.[1041]

---

[1037]  Once the financial statements of the registrant include the period in which the de-SPAC transaction was consummated, the financial statements required would be those of the predecessor for all historical periods presented.

[1038]  Letters from Ernst & Young, PwC, RSM.

[1039]  Letter from RSM.

[1040]  Letters from Ernst & Young, Freshfields.  *See also* letter from Vinson & Elkins, which stated: "We disagree that financial statements of the SPAC could ever be material to an investor in the combined company, as surmised by the SEC in the Proposing Release, but if they were material then Exchange Act Rule 12b-20 or Securities Act Rule 408(a) would require their disclosure."

[1041]  Letters from Freshfields, Vinson & Elkins (both highlighting that Rule 15-01(e), as proposed, would permit the financial statements of the shell company for periods prior to the consummation of the acquisition to be omitted once the financial statements of the predecessor have been filed for all required periods through the acquisition date, whereas the Proposing Release refers to financial statements of the shell company (and not the predecessor)).  *See* Proposing Release, *supra* note 7, at 29493.

*15. Final Rule 15-01(e): Financial Statements of a Shell Company Registrant after the Combination with Predecessor*

We are adopting Rule 15-01(e) substantially as proposed, except for modifications discussed further below.  The final rules reflect our belief that the financial statements of a shell company would be necessary and material to an investor until such time that the combined registrant's financial statements include the period in which the acquisition was consummated.

We disagree with commenters' assertions that the shell company's financial statements would provide no material information prior to the point in time when the financial statements of the combined entity registrant include the period in which the acquisition was consummated.  Specifically, we note that the shell company's financial statements may include material information about its equity or outstanding derivative financial instruments.  While we understand, as a commenter[1042] asserted, that application of Securities Act Rule 408(a) may result in inclusion of the shell company's financial statements in a registration statement because of a determination that they are material, we believe that the new rule appropriately eliminates a determination that could result in the financial statements' exclusion and the related regulatory uncertainty involved in such judgment because we believe the shell company's financial statements would be material.  The staff has not objected to the registrant excluding the historical financial statements of the shell company from periodic reports once the financial statements include the period in which the acquisition or recapitalization was consummated.[1043]  Further, in the staff's experience with reviewing these filings, the registrant has continued to include the

---

[1042]  Letter from Vinson & Elkins.

[1043]  Proposing Release, *supra* note 7, at 29493.

331

historical shell company's financial statements until that time period. Thus, the new rule codifies the existing staff view and current practice.

In response to the comments on the inconsistency between the proposed rule text and the discussion in the Proposing Release, we added "registrant" to "shell company" for clarity that the shell company in this rule represented a registrant. As a registrant, the shell company is required to file financial statements for all required periods through the acquisition date under Exchange Act Sections 13(a) or 15(d) and rules thereunder.

In final Rule 15-01(e), we have made a change from the proposal to include a provision that has a similar effect as the proposed amendments to Rule 11-01(d) would have had if we had adopted them. This added provision states that if a registrant[1044] is to acquire or has acquired a shell company, the financial statements of the shell company are required to be included in any filing that requires the registrant's financial statements, as if the shell company were the registrant for the filing, unless the financial statements of the registrant include the period in which the acquisition of the shell company was consummated. As also discussed below, as a result of this change, it is unnecessary to adopt proposed Rule 11-01(d) which would have had a similar effect.

The final rule will provide clarity as to when the financial statements of a shell company are required after a shell company business combination transaction. The final rule applies regardless of whether the business combination is accounted for by the shell company as a forward acquisition of the business, which may be a private operating company, or as a reverse

---

[1044] A registrant that would be required to include the financial statements of a shell company is a new holding company that is created where a SPAC and a target company merge into that new holding company.

recapitalization of the business.[1045]  Under the final rule, the historical financial statements of the shell company will be required in all filings that require financial statements (including registration statements and the Form 8-K with Form 10 information filed following the de-SPAC transaction) filed prior to the first periodic report, such as Form 10-Q, that includes those post-business combination financial statements.[1046]  For example, under the final rule, registration statements filed before the first periodic report filed with the post-business combination financial statements, such as a registration statement to register the resale of shares issued in connection with a PIPE financing filed shortly after the de-SPAC transaction, will require the SPAC's financial statements.

### 16. Proposed Rule 11-01(d)

The Commission proposed to amend Rule 11-01(d) of Regulation S-X to state that a SPAC is a business for purposes of the rule.  While Rule 11-01(d) states that an entity is presumed to be a business, consideration of the continuity of the SPAC's operations prior to and after the de-SPAC transaction may lead some parties to conclude that the SPAC is not a business.[1047]  The Commission noted in the Proposing Release that, given the significant equity transactions generally undertaken by a SPAC, the Commission believes the financial statements of the SPAC could be material to an investor, particularly when they underpin adjustments to pro forma financial information in a transaction when an operating company is the legal acquirer of a SPAC.

---

[1045]  A reverse recapitalization is considered to be an equivalent to the issuance of stock by a private company for the net monetary assets of a shell company accompanied by a recapitalization.

[1046]  Proposing Release, *supra* note 7, at 29493.

[1047]  Proposing Release, *supra* note 7, at 29494.

As a result of the proposed rule, an issuer that is not a SPAC may be required to file financial statements of the SPAC in a resale registration statement on Form S-1.[1048]

Further, the proposed amendment to Rule 11-01(d) would change the application of 17 CFR 210.11-01(b)(3)(i)(B) ("Rule 11-01(b)(3)(i)(B)") of Regulation S-X[1049] by allowing the significance of a future acquired business to be compared to the pro forma amounts related to the shell company and target company business combination transaction in filings made after the consummation of the business combination transaction.[1050]  The impact of such application would be that the shell company's financial statements, including its cash, would be part of the pro forma financial information and would likely increase the denominator in the significance tests compared to measuring the significance of an acquisition against only the target private operating company's financial information.  While the Commission did not propose amendments to Rule 11-01(b)(3)(i)(B), the Proposing Release sought feedback on the potential change in its application as a result of the proposed amendments to Rule 11-01(d).[1051]

---

[1048]  Proposing Release, *supra* note 7, at 29493.  By contrast, application of Rule 3-05 to a significant business under Rule 11-01(d) requires its financial statements to continue to be filed in any subsequent registration statements until the acquired business is included in the registrant's results for at least nine months subsequent to acquisition.  As proposed, the application of Rule 3-05 would require the SPAC financial statements for a longer duration subsequent to the de-SPAC transaction than the application of proposed Rule 15-01(e).

[1049]  This rule permits in certain circumstances the use of pro forma amounts that depict significant business acquisitions and dispositions consummated after the latest fiscal year-end for which the registrant's financial statements are required to be filed for the registrant's financial information in the significance tests.  Such pro forma use is permitted if the registrant has filed audited financial statements for any such acquired business for the periods required by Rule 3-05, Rule 8-04, or Rule 3-14 and the pro forma information required by 17 CFR 210.11-01 through 210.11-02 of Regulation S-X.

[1050]  Proposing Release, *supra* note 7, at 29493.  The Commission also said in the Proposing Release that, pursuant to the proposed amendment to Rule 11-01(d) that would stipulate that the SPAC is a business, an acquisition of the SPAC would be considered an acquisition of a business, and the conditions under Rule 11-01(b)(3)(i)(B) to use pro forma financial statements depicting the acquisition as the denominator in the significance tests may be met.  Proposing Release, *supra* note 7, at 29493, n.273.

[1051]  Proposing Release, *supra* note 7, at 29494.

*17. Comments: Rule 11-01(d)*

Several commenters opposed the proposed amendments to Rule 11-01(d) that would treat the SPAC as a business for purposes of 17 CFR 210.11-01 of Regulation S-X.[1052]  One commenter, while not specifically referring to proposed Rule 11-01(d), expressed views consistent with support for the rule.[1053]

One commenter that opposed the amendments said that the SPAC historical financial statements are not relevant to the ongoing business of the target operating company.[1054]  The commenter said that the balance sheet of the combined public company will already reflect the impact of the combination of the SPAC with the target operating company.[1055]  The commenter also said that the proposed amendment would result in significant additional compliance costs while resulting in no substantive additional public disclosure.[1056]

One commenter expressed the view that the proposed amendment is contradictory to current Rule 11-01(d)'s requirement to evaluate whether there is sufficient continuity of the acquired entity's operations prior to and after the transaction so that disclosure of prior financial information is material to an understanding of future operations.[1057]  Another commenter expressed similar views, asserting that, "[i]n a de-SPAC transaction there is no continuity of operations between the SPAC and the surviving company, and the SPAC's revenue producing activities (interest on short term U.S. government securities or money market funds investing in

---

[1052]  Letters from Davis Polk, Vinson & Elkins, Ernst & Young.

[1053]  Letter from Freshfields.

[1054]  Letter from Davis Polk.

[1055]  *Id.*

[1056]  *Id.*

[1057]  Letter from Ernst & Young.

the same) do not continue post-closing and are not material to investors in the surviving company." [1058]

This commenter also said, "[w]hile there is a presumption that a separate entity, such as a SPAC, is a business, none of the attributes identified in S-X Rule 11-01(d)(2) for evaluation of whether a lesser component of a business constitutes a business (i.e. physical facilities, employee base, market distribution system, sales force, customer base, operating rights, production techniques or trade names) remain after the de-SPAC transaction."

Current Rule 11-01(b)(3)(i)(B) permits pro forma information to be used in the denominator of significance tests under certain circumstances.  This commenter also said that "[t]he use of pro forma financials should only be allowed to the extent they would be permitted for an acquisition in connection with a pending or completed IPO."[1059]

One commenter said that the proposed amendment to Rule 11-01(d) is contradictory to proposed Rule 15-01(e), about which the Proposing Release stated: "the financial statements of the SPAC, as a shell company, would generally no longer be relevant or meaningful to an investor after a de-SPAC transaction once the financial statements of the registrant include the period in which the de-SPAC transaction was consummated for any filing."[1060]  The commenter expressed a similar view with respect to pro forma information as the foregoing, stating that the historical financial statements of the SPAC are not necessary for the purposes of the pro forma financial information.  The commenter said, "[f]or example, the trust account amounts in the pro forma information significantly differ from actual amounts due to transaction costs and

---

[1058]  Letter from Vinson & Elkins (also expressing the view that Exchange Act Rule 12b-20 or Securities Act Rule 408(a) would require disclosure of the SPAC's financial statements if they were material).

[1059]  *Id.*

[1060]  Letter from Ernst & Young.

redemptions.  Any private investment in public equity (PIPE) transaction is also not reflected in the historical SPAC financials, and much of the SPAC's historical income statement activity is generally eliminated in the preparation of the pro forma financial statements."

One commenter, while not specifically referring to proposed Rule 11-01(d), expressed views consistent with proposed Rule 11-01(d).[1061]  The commenter said, "we agree that the pro forma financial information that gives effect to the shell company transaction should be allowed to be used as the denominator in measuring the significance of other acquisitions not involving a predecessor."  The commenter also indicated that the use of pro forma financial information to measure significance should not be limited to acquisitions that occur subsequent to a de-SPAC transaction.  The commenter said, "[i]n most de-SPAC transactions there are numerous other contemporaneous transactions occurring that affect the target's capital structure and, as a result, using proforma financial statements for measuring significance can produce a more accurate analysis of an acquiree's significance."

*18. Decline to Adopt Rule 11-01(d)*

After considering the comments received, we are not adopting the proposed amendment of Rule 11-01(d), because we agree with a commenter's feedback[1062] that it would be contradictory to proposed Rule 15-01(e).  In this regard, the proposed amendment to Rule 11-01(d) could require filing of the shell company's financial statements in subsequent registration statements despite Rule 15-01(e) potentially permitting their omission.[1063]  Instead we are making revisions to proposed Rule 15-01(e) to require that, if a registrant is to acquire or has acquired a shell company, the financial statements of the shell company must be filed, as if the

---

[1061]  Letter from Freshfields.

[1062]  Letter from Ernst & Young.

[1063]  *See supra* Section IV.B.15.

shell company were the registrant for the filing, unless the financial statements of the registrant include the period in which the acquisition was consummated.  Accordingly, in structures where another issuer is the legal acquirer of a shell company, that issuer will look to final Rule 15-01(e), rather than Rule 11-01(d) and Rule 3-05, for determining whether financial statements of the shell company are required in filings made subsequent to the transaction.  Final Rule 15-01(e) will require financial statements of the SPAC in registration statements filed subsequent to the de-SPAC transaction when the de-SPAC transaction has not yet been reflected in in the financial statements filed by the registrant.  In contrast to the proposed rule,[1064] the final rule would not require financial statements of the SPAC once the de-SPAC transaction has been reported on in the financial statements filed by the registrant.  The final rules reflect our view that the financial statements of the SPAC could be material to an investor.

As highlighted in the Proposing Release, application of the proposed amendment to Rule 11-01(d) that would treat a shell company as a business could have resulted in significance testing of a future acquired business (i.e., numerator) being measured against pro forma amounts that combine the shell company and target private operating company (i.e., denominator).[1065] Because the proposed amendment to Rule 11-01(d) is not being adopted, the shell company will not be included in the denominator, similar to how proceeds from an offering would not be included in the comparison.

---

[1064]  If Rule 3-05 were applied to the SPAC because the SPAC was considered a business under Proposed Rule 11-01(d), then financial statements of the SPAC may be required in registration statements of the registrant until the SPAC has been included in the registrant's financial statements for at least nine months.

[1065]  Proposing Release, *supra* note 7, at 29493.

*19. Proposed Item 2.01(f) of Form 8-K*

Item 2.01(f) of Form 8-K currently requires a shell company registrant to file, after an acquisition, the information that would be required if the registrant were filing a general form for the registration of securities on Form 10 under the Exchange Act.  The Commission proposed to revise this item to refer to "acquired business," rather than "registrant," in an effort to clarify that the information provided relates to the acquired business for periods prior to consummation of the acquisition and not the shell company registrant.[1066]

*20. Comments: Item 2.01(f) of Form 8-K*

One commenter supported the proposed amendment to refer to "acquired business" instead of "registrant."[1067]  Another commenter recommended that we use the term "predecessor," instead of "acquired business," in order to avoid potential confusion with acquired businesses that are not the predecessor.[1068]

Currently, a Form 8-K filed pursuant to Item 2.01(f) may require three fiscal years of financial statements for an acquired business that is the predecessor to a shell company, while only two fiscal years may be required in the Form S-4 for the de-SPAC transaction for the same company under Rule 15-01(b).[1069]  For example, an EGC that is not an SRC would need to present an additional year of financial statements within four business days of consummation of the de-SPAC transaction.  Several commenters responded to a request for comment that asked whether we should amend the Form 8-K requirement to provide an exception to the required Form 10 type-information so that the financial statements of the acquired business need not be

---

[1066]  Proposing Release, *supra* note 7, at 29294.

[1067]  Letter from PwC.

[1068]  Letter from Ernst & Young.

[1069]  As discussed above, we are adopting Rule 15-01(b) largely as proposed, with certain technical modifications in the final rule.

presented for any period prior to the earliest audited period of that acquired business previously presented in connection with a registration, proxy, or information statement of the registrant.[1070] Each of the commenters that responded to the request for comment supported the exception,[1071] with one commenter stating that it was not clear why an earlier annual period would be required in the Form 8-K filed after consummation of the merger when such information was not considered necessary for an investment decision by the SPAC's shareholders.[1072]  No commenters opposed such an exception.

*21. Final Item 2.01(f) of Form 8-K*

We are adopting the proposed amendments to Item 2.01 of Form 8-K, with modifications made in response to comments received.  We agree with the commenter's recommendation that we use the term "predecessor," instead of "acquired business," in order to avoid potential confusion with acquired businesses that are not the predecessor.[1073]

We agree with the comments suggesting that, when the predecessor meets the conditions of an EGC at the time of filing the Form 8-K, the registrant should not be required to present audited financial statements for any period prior to the earliest audited period presented in the predecessor's financial statements in connection with a de-SPAC registration or proxy statement of the registrant.[1074]  The final rule provides that, when, at the time of filing of the Item 2.01(f) Form 8-K, the predecessor meets the conditions of an "emerging growth company," as defined in Securities Act Rule 405 or Exchange Act Rule 12b-2, the registrant need not present audited

---

[1070]  Proposing Release, *supra* note 7, at 29494 (request for comment number 109).

[1071]  Letters from BDO, PwC, Deloitte, RSM, Freshfields, Vinson & Elkins.

[1072]  Letter from BDO.

[1073]  Letter from Ernst & Young.  *See supra* note 1068.

[1074]  Letters from BDO, PwC, Deloitte, RSM, Freshfields, Vinson & Elkins.  *See supra* note 1071.

340

financial statements for the predecessor for any period prior to the earliest audited period presented in its financial statements included in a previously filed registration or proxy statement for the transaction resulting in the loss of shell company status.

*22. Proposed Rules 3-01, 8-02, 10-01(a)(1): Balance Sheets of Predecessors*

Currently, 17 CFR 210.3-02 ("Rule 3-02") of Regulation S-X requires that statements of comprehensive income be filed for the registrant and its predecessors.  Rule 3-01, Rule 8-02, and 17 CFR 210.10-01(a)(1) ("Rule 10-01(a)(1)") of Regulation S-X, however, specify that balance sheets be filed for the registrant but do not specifically refer to balance sheets of predecessors.  In the Proposing Release, the Commission proposed amendments to Rules 3-01, 8-02, and 10-01(a)(1) of Regulation S-X to refer specifically to financial statements of predecessors (consistent with the provision in current Rule 3-02 regarding statements of comprehensive income).[1075]

*23. Comments: Rules 3-01, 8-02, 10-01(a)(1): Balance Sheets of Predecessors*

One commenter expressed support for the proposed amendments.[1076]  No commenters opposed the proposed amendments.

*24. Final Rules 3-01, 8-02, 10-01(a))(1): Balance Sheets of Predecessors*

We are adopting the amendments largely as proposed, with a technical modification discussed below.  We do not believe the intent of current Rule 3-02, Rule 8-01, and Rule 10-01(a)(1) is to require a predecessor's statements of comprehensive income without the balance sheets as that would not be considered a complete set of financial statements, which would be inconsistent with Article 3 of Regulation S-X.

---

[1075]  Proposing Release, *supra* note 7, at 29494.

[1076]  Letter from PwC.

These final amendments are consistent with existing financial reporting practices of registrants.  We do not expect the final amendments to result in any changes in disclosures.

Finally, we made a technical revision to Rule 8-02 to add "and its subsidiaries consolidated" to "registrant" in order to conform to Rule 3-01.

*25. Other Shell Company Matters*

In order to deter potential abuses involving shell company transactions,[1077] the Commission has adopted various rules and limitations over the years, some of which apply to former shell companies.[1078]  For example:

- For a person to resell securities initially issued by a shell company in reliance on 17 CFR 230.144 under the Securities Act, a former shell company must satisfy the requirements of 17 CFR 230.144(i)(2) under the Securities Act;[1079]

- A former shell company may not use Form S-8 until at least 60 calendar days after the company is no longer a shell company and has filed current Form 10 information;[1080]

- For three years following the change in shell company status, a former shell company is an "ineligible issuer" under Rule 405 that may not, among other things, use free writing prospectuses for communications during a registered offering or rely on the

---

[1077] *See, e.g.*, Shell Company Adopting Release, *supra* note 943.  Also affiliates of any non-issuer party to a transaction identified in 17 CFR 230.145(a) must consider 17 CFR 230.145(c) and 17 CFR 230.145(d).

[1078] These rules and limitations generally do not apply to shell companies that qualify as "business combination related shell companies" as defined in Rule 405.

[1079] *See* 17 CFR 230.144(i), 17 CFR 230.145(c) and (d); *Revisions to Rules 144 and 145,* Release No. 33-8869 (Dec. 6, 2007) [72 FR 71546 (Dec. 17, 2007)].

[1080] *See* General Instruction A.1, Form S-8 (17 CFR 239.16b); Shell Company Adopting Release, *supra* note 943.

safe harbor of Rule 163A from Section 5(c) of the Securities Act for pre-filing communications;[1081] and

- For three years following the change in shell company status, a broker-dealer may not rely on the safe harbors of Securities Act Rules 137, 138, and 139 for research reports regarding a former shell company.[1082]

Several commenters asked the Commission to carve out a post-de-SPAC transaction combined company from these and other former shell company limitations and to make certain safe harbors available to the combined company that are not available to former shell companies.[1083]  Generally, these commenters expressed the view that doing so would more closely align the rules that apply to target companies that enter the public markets through a de-SPAC transaction with the rules that apply to companies that conduct a traditional IPO.

We are not adopting changes to these limitations or to other rules and limitations related to former shell companies that may apply to the combined company at this time.  In light of the comments we received and taking into account the rules being adopted herein and market practices that may develop as a result, we believe that further consideration of potential application of these rules and limitations to the combined company is warranted.

---

[1081] *See* 17 CFR 230.165(e)(2)(ii); 17 CFR 230.163A(b)(3)(ii); *Securities Offering Reform,* Release No. 33-8591 (July 19, 2005) [70 FR 44722 (Aug. 3, 2005)].

[1082] *See* 17 CFR 230.137(d)(2); 17 CFR 230.138(a)(4); 17 CFR 230.139(a)(1)(ii).

[1083] *See* letters from ABA, American Securities Association, Cowen, Ernst & Young, Fenwick, Freshfields, Goodwin, Vinson & Elkins, White & Case, Winston & Strawn.

## V. ENHANCED PROJECTIONS DISCLOSURE

### A. Proposed Items 10(b) and 1609 of Regulation S-K

#### 1. *Proposed Rules*

Current Item 10(b) of Regulation S-K provides Commission guidance with respect to factors to be considered in formulating and disclosing management's projections of future economic performance that applies to all filings made with the Commission. The Commission proposed to amend Item 10(b) of Regulation S-K to expand and update the Commission's views on the use of such projections. The proposed amendments to Item 10(b) continued to state the Commission's view that projected financial information included in filings must have a reasonable basis. To address specific concerns with respect to the format of projections, namely that some companies may present projections more prominently than actual historical results (or the lack of historical results where they have no operations at all) or use non-GAAP financial measures in the projections without a clear explanation or definition of such measures, the Commission proposed amending Item 10(b) to state that:

- Any projected measures that are not based on historical financial results or operational history should be clearly distinguished from projected measures that are based on historical financial results or operational history;

- It generally would be misleading to present projections that are based on historical financial results or operational history without presenting such historical measure or operational history with equal or greater prominence; and

- The presentation of projections that include a non-GAAP financial measure should include a clear definition or explanation of the measure, a description of the GAAP

344

financial measure to which it is most closely related,[1084] and an explanation why the non-GAAP financial measure was used instead of a GAAP measure.[1085]

Finally, the Commission proposed amending Item 10(b) to clarify that it would apply to a target company's projections when they are presented to investors through the registrant's Commission filings. Pursuant to the proposed amendments, the guidance in amended Item 10(b) would apply to any projections of future economic performance of both the registrant and persons other than the registrant (which would include a target company in a de-SPAC transaction), that are included in the registrant's Commission filings.

The Commission proposed Item 1609 of Regulation S-K, which would apply only to de-SPAC transactions, to require a registrant to provide the following disclosures:

- With respect to any projections disclosed in the filing, the purpose for which the projections were prepared and the party that prepared the projections;

- All material bases of the disclosed projections, all material assumptions underlying the projections, and any factors that may impact such assumptions (including a discussion of any material growth rates or discount multiples used in preparing the projections, and the reasons for selecting such growth rates or discount multiples); and

- Whether the disclosed projections reflect the view of the board or management of the SPAC or target company, as applicable, as of the date of the filing; if not, then a

---

[1084]  The reference to the most closely related GAAP measure called for by the proposed amendments to Item 10(b) would not require a reconciliation to that GAAP measure. The need to provide a GAAP reconciliation would continue to be governed by Regulation G and Item 10(e) of Regulation S-K.

[1085]  The Commission stated a similar view in 2003. *See Conditions for Use of Non-GAAP Financial Measures,* Release No. 33-8176 (Jan. 22, 2003), section II.B.2 [68 FR 4820 (Jan. 30, 2003)].

345

statement regarding the purpose of disclosing the projections and the reasons for any continued reliance by management or the board on the projections.

## 2. *Comments*

A number of commenters generally supported the proposed items.[1086]  In addition, some of these commenters, in response to issues raised in a request for comment in the Proposing Release,[1087] indicated that the updated guidance in proposed Item 10(b) should apply to all filings.[1088]

In a comment letter that addressed issues raised in a request for comment in the Proposing Release, one group of commenters expressed support for the proposals but stated that "[w]e are opposed to mandating the disclosure of certain financial statement line items (e.g., revenue, EBITDA, etc.)" and said, "Some of the proposals regarding Item 10(b) of Regulation S-K and Item 1609…should also extend to the investor presentations disclosed as an attachment to the Form 8-K."[1089]  These commenters said their analysis and that of others "suggests that the

---

[1086] Letters from ABA (except for proposed Items 1609(b) and (c)); Americans for Financial Reform Education Fund; Chris Barnard (May 27, 2022) ("Chris Barnard"); Goodwin (except for proposed Items 1609(b) and (c)); ICGN; Julianna Marandola (Apr. 30, 2002); Michael Dambra, Omri Even-Tov, and Kimberlyn George.

[1087] Proposing Release, *supra* note 7, at 29493 (request for comment number 111) ("Instead of applying to all filings covered by Item 10(b), as proposed, should the proposed updated guidance apply solely to filings relating to business combination transactions (including de-SPAC transactions), while retaining the existing Item 10(b) guidance for other filings?").

[1088] Letters from ABA; Chris Barnard; Goodwin; Michael Dambra, Omri Even-Tov, and Kimberlyn George.

[1089] Letter from Michael Dambra, Omri Even-Tov, and Kimberlyn George ("We note that the announcement of a prospective de-SPAC transaction often results in an immediate and substantial increase in the trading volume of the securities of the SPAC, based on the terms of the transaction that have been disclosed and the limited information publicly available on the private operating company at the time of the announcement, which is far less extensive than that of a newly public company after a traditional initial public offering.); Proposing Release, *supra* note 7, at 29504 (request for comment number 150) ("Should we consider requiring additional disclosures, such as more disclosure on the private operating company or risk factor disclosure, in a Form 8-K filed pursuant to Item 1.01 of the form disclosing that the parties have entered into a business combination agreement?  If so, what additional disclosure should we require?  Should we amend Item 1.01 of Form 8-K to require the filing of the business combination agreement as an exhibit to the Form 8-K filing (as opposed to allowing the agreement to be filed as an exhibit to a subsequent periodic report)?  What other amendments should we consider in this regard?").

market response to a de-SPAC transaction and financial projections occur at the time of the merger announcement."[1090]

Several commenters addressed the reasonableness of projections made concerning companies with no operating history.  One of the commenters who supported the proposed amendments recommended that we adopt an additional provision providing that "if a registrant does not have a history of operations for the basis of the projections, then it is possible to acquire an outside review of the projections as support for the 'reasonable' projections."[1091]  Another commenter said, "As for the proposed amendments to Regulation S-K on the use of projections, we believe not only that non-GAAP metrics need to be conspicuously highlighted and marked for investor review, but also that disclosures should state succinctly that issuers with no historical operations or completed negotiations for company/asset acquisitions do not have a reasonable basis for projections."[1092]

Another commenter recommended that Item 1609(b) include a requirement to disclose sensitivity testing of the key assumptions underlying the projections.[1093]

A few commenters also sought clarification that the staff guidance provided in Questions 101.01, 101.02 and 101.03 of the Compliance and Disclosure Interpretations relating to Non-GAAP Financial Measures (last updated December 13, 2022)[1094] will continue to apply, notwithstanding adoption of proposed Item 10(b)(2)(iv).[1095]

---

[1090]  *Id.*

[1091]  Letter from ICGN.

[1092]  Letter from NASAA.

[1093]  Letter from Chris Barnard.

[1094]  The interpretations relate to whether certain forecasts are considered non-GAAP financial measures, as that term is used in Item 10(e) of Regulation S-K and Regulation G.

[1095]  Letters from ABA, Goodwin.

347

In response to a request for comment,[1096] one commenter stated that we should not require projections to be presented in a separately captioned section of a Commission filing because doing so would "change the purpose" for which the projections were prepared.[1097]  On the other hand, a few commenters stated that such a requirement would be consistent with current practice and unlikely to lead to significant changes in the information disclosed or create undue burdens on registrants.[1098]

In comment letters that addressed issues raised in a request for comment in the Proposing Release,[1099] some commenters suggested that Item 1609 should apply to all filings,[1100] while one commenter expressed support for limiting the applicability of Item 1609 to de-SPAC transaction filings only.[1101]  Some commenters who supported Item 1609 applying to all filings emphasized that Item 1609 should apply to all companies that disclose financial projections in Commission filings (and not just to de-SPAC transactions as proposed) in connection with business combinations in which the target is at an early stage and has a limited financial track record and the transaction may involve more significant dilution.[1102]

A few commenters indicated that proposed Item 1609(b) is likely to reduce the disclosure of projections in Commission filings but acknowledged that the rules are unlikely to

---

[1096]  Proposing Release, *supra* note 7, at 29496 (request for comment number 113) ("Are there different ways of presenting financial projections that would be beneficial to investors?  For example, should we require registrants to present some or all financial projections in a separately captioned section of a Commission filing?").

[1097]  Letter from Kirkland & Ellis.

[1098]  Letters from ABA, Goodwin.

[1099]  Proposing Release, *supra* note 7, at 29496 (request for comment number 115) ("As proposed, Item 1609 of Regulation S-K would apply only to de-SPAC transactions.  Should we expand the scope of the item to apply to all companies that publicly disclose financial projections in Commission filings?").

[1100]  Letters from ABA, Goodwin, Vinson & Elkins.

[1101]  Letter from Chris Barnard.

[1102]  Letters from ABA, Goodwin.

"significantly impact the willingness of parties to De-SPAC Transactions to continue preparing and disclosing projections" because the disclosure of projections is compelled by certain other Federal and State requirements.[1103]

A few commenters stated that the requirement in proposed Item 1609(b) to discuss the material bases and assumptions underlying projections, despite the inclusion of a materiality qualifier, is unduly prescriptive, may result in the inclusion of "inputs and assumptions that are not material to an investor's understanding of the projections" and may lead registrants towards a conservative approach of disclosing growth rates or discount multiples in order to protect against future claims that such inputs were material.[1104]  Another commenter, however, said that "asking for more clarity in assumptions and identifying where they came from strike us as very sensible."[1105]

With respect to Item 1609(c), some commenters indicated that registrants should not have to affirm the validity of projections as of the date of the filing because it would be unduly burdensome and inconsistent with the purpose of the preparation of the projections.[1106]  The commenters also suggested that the disclosure requirement may result in the need to prepare an updated set of projections, which would be expensive and time-consuming.[1107]  Two commenters suggested an alternative approach to Item 1609(c) involving several elements.[1108]  First, they suggested requiring disclosure of "(i) the date as of which the projections were prepared and (ii) the views of the preparer of the projections as of such date of preparation and, if different, the

---

[1103]  Letters from ABA, Goodwin.

[1104]  Letters from ABA, Goodwin.

[1105]  Letter from Loeb & Loeb.

[1106]  Letters from ABA, Freshfields, Goodwin, Kirkland & Ellis.

[1107]  Letters from ABA, Goodwin, Kirkland & Ellis.

[1108]  Letters from ABA, Goodwin.

349

date upon which the SPAC board approved the transaction."[1109]   Second, they suggested that registrants should be permitted to "disclaim any duty to update the projections as of a later date except to the extent there is a material lapse in time and change in circumstances."[1110]   Third, they suggested "the Commission may seek disclosure confirming whether the projections still reflect management's views on future performance and/or describing what consideration the board gave to obtaining updated projections or a lack of reliance upon the projections."[1111]

Also regarding Item 1609(c), one commenter expressed the view that projections are included in a de-SPAC transaction disclosure document to describe the basis upon which the directors of the SPAC approved the transaction, not to serve as a basis for investors to make an investment decision.[1112]   The commenter also indicated that "projections are routinely disclosed in proxy statements and registration statements as the basis for fairness opinions issued at the time of the execution of the merger agreement of the public merger, but the SEC has not historically required the parties to the merger to confirm the projections in connection with each filing."[1113]

Some commenters expressed the view that the proposed rule was not sufficiently specific in its use of the phrase "as of the date of the filing" and that the requirement could be interpreted to require compliance with this item in the original filing and all subsequent amendments.[1114]

---

[1109]   *Id.*

[1110]   *Id.*

[1111]   *Id.*

[1112]   Letter from Freshfields.

[1113]   *Id.*

[1114]   Letters from Freshfields, Kirkland & Ellis.

One commenter made a number of suggestions with respect to the disclosure of projections in IPOs of all types, including in de-SPAC transactions.[1115]  First, the commenter recommended requiring disclosure of management's assessment of the probability of achieving any forecasts provided and the major assumptions underlying all forecasts provided.[1116]  Second, the commenter suggested that when financial projections are disclosed, to qualify for the PSLRA safe harbor, the directors, management and other affiliates must agree to a lock-up on sales of shares until the combined company has released audited financial statements for its first full fiscal year following the transaction.[1117]  Third, the commenter suggested requiring disclosure of the track record of the company, the sponsor, or the chief executive officer or chief financial officer for meeting past projections disclosed.[1118]

### 3.  Final Rules

We are adopting the amendment of Item 10(b) as proposed and new Item 1609 substantially as proposed, except for clarifying revisions that we discuss below.

With respect to the final amendment to Item 10(b), we note that the rule is Commission guidance that already applies to all filings made with the Commission and this aspect of Item 10(b) precedes the revisions to the rule adopted in this release.[1119]  We also note that Item 1609 applies only to de-SPAC transactions.

---

[1115]  Letter from Bullet Point Network.

[1116]  *Id*.

[1117]  *Id.*

[1118]  *Id.*

[1119]  Some commenters indicated that the updated guidance in Item 10(b) should apply to all filings.  *See supra* note 1088 and accompanying text.

In response to one commenter's opposition to an obligation to present certain specific line items in all projections,[1120] we note that the Commission guidance in Item 10(b) does not mandate the inclusion of any specific line item.  Instead, the final amendment to Item 10(b) acknowledges that projections have traditionally included certain line items, but registrants are free to determine which line items are appropriate to include in projections.

With respect to the recommendation to revise the rule to allow a company with no history of operations to obtain an outside review of projections,[1121] we note that neither Item 10(b) nor Item 1609 prevents companies from obtaining any such outside review.

With respect to the suggestion from a commenter that non-GAAP financial metrics should be highlighted for investor review,[1122] we believe the provisions of Item 10(e) already address this concern.  With respect to the same commenter's suggestion that we require a statement from the registrant when a target company has no history of operations or a negotiated acquisition that the projections disclosed do not have a reasonable basis, we believe the provisions of Item 10(b), Item 1609, and other rules adopted in this release will provide sufficient information about the basis for any disclosed projections.[1123]

With respect to commenters' request for clarification that certain staff guidance will continue to apply notwithstanding adoption of proposed Item 10(b)(2)(iv),[1124] we confirm that the final rules do not impact the staff's guidance in Questions 101.01, 101.02 and 101.03 of the Compliance and Disclosure Interpretations related to Non-GAAP Financial Measures.

---

[1120] Letter from Michael Dambra, Omri Even-Tov, and Kimberlyn George.  *See supra* notes 1089–1090 and accompanying text.

[1121] Letter from ICGN.  *See supra* note 1091 and accompanying text.

[1122] Letter from NASAA.  *See supra* note 1092 and accompanying text.

[1123] *See*, *e.g.*, Item 1605, Item 1606(b), and Item 1607.

[1124] Letters from ABA, Goodwin.  *See supra* note 1095 and accompanying text.

With respect to commenters' responses to our request for comment that we should not require projections to be presented in a separately captioned section of a filing,[1125] we note that we have not added such a requirement to the presentation of projections.

In the final rules, we made three technical revisions to Item 10(b).  First, in final Item 10(b)(2)(i), we replaced the term "foregoing measures of income" with the term "foregoing measures of income (loss)."  Second, in final Item 10(b)(2)(iii), we replaced the term "historical financial measure" with the term "historical financial results."  We believe these changes will enhance clarity and avoid potential ambiguity.  Third, we made revisions in final Item 10(b)(2)(iv) to require a description of the GAAP financial measure "most directly comparable" to the non-GAAP measure, rather than "most closely related" (as proposed).  We made this change in final Item 10(b)(2)(iv) to create consistency with the terms used in existing Item 10(e)(1)(i)(A) of Regulation S-K, which requires the inclusion of the directly comparable financial measure or measures calculated and presented in accordance with GAAP whenever one or more non-GAAP financial measures are included in a filing with the Commission.

With respect to commenters' views that Item 1609 should apply to all companies that publicly disclose financial projections in Commission filings,[1126] we decline to expand the coverage of Item 1609 beyond SPACs since the specialized disclosure requirements in new Subpart 1600 of Regulation S-K are intended to only apply to SPAC IPOs and de-SPAC transactions.  Item 10(b), as updated in this release, will continue to provide helpful guidance for all companies that publicly disclose projections in Commission filings.

---

[1125] Letter from Kirkland & Ellis.  *See supra* note 1097 and accompanying text.

[1126] Letters from ABA, Goodwin, Vinson & Elkins.  *See supra* note 1100 and accompanying text.

With respect to commenters who expressed concern there could be an uncertain impact on the use of projections under Item 1609,[1127] we note that final Item 1609 does not restrict the registrant's ability to disclose projections and is not intended to alter the registrant's determination as to whether or not projections should be disclosed under other Federal or State law requirements.  Rather, if a registrant determines to include projections in a filing in connection with a de-SPAC transaction, Item 1609 creates a level of consistency for the presentation of projections that would make the information more useful to investors.

With respect to the recommendation that Item 1609(b) include a requirement to disclose sensitivity testing of the key assumptions underlying the projections,[1128] we believe that such a requirement would be inconsistent with the general approach of Item 1609, which does not prescribe a specific format for the projections and does not require specific line items to be included in the projections.

With respect to the comment that the requirement in Item 1609(b) to discuss material growth rates or discount multiples used in preparing the projections is unduly prescriptive and may result in the over-inclusion of certain immaterial information,[1129] we note that this requirement includes a materiality qualifier, which makes clear that Item 1609(b) is not intended to capture immaterial information and does not require disclosure of growth rates or discount rates that are not material.

In final Item 1609(b), we have added a materiality qualifier to the requirement to disclose any factors that may impact the material assumptions underlying the projections to clarify that only material factors are required to be disclosed.  In final Item 1609(b), we have also made two

---

[1127]  Letters from ABA, Goodwin.  *See supra* notes 1103–1104 and accompanying text.

[1128]  Letter from Chris Barnard.  *See supra* note 1101 and accompanying text.

[1129]  Letters from ABA, Goodwin.  *See supra* note 1104 and accompanying text.

technical revisions to the proposal in order to improve the clarity of this item and avoid potential ambiguity.[1130]  First, we have replaced the proposed terms "material growth rates" with the terms "material growth or reduction rates" throughout final Item 1609(b), because projections may involve some line items in financial statements that are projected to increase and others that are projected to decrease.  Second, we have replaced the proposed term "discount multiples" with the term "discount rates" throughout final Item 1609(b) to reflect more closely the terminology for the relevant concept that is frequently used by valuation professionals.[1131]

With respect to the proposed requirement in Item 1609(c)—to include a statement regarding whether or not projections disclosed in a filing reflect the current views of the SPAC or target company management or board of directors as of the date of filing—commenters expressed concerns that the requirement would be unduly burdensome, may involve an expensive and time-consuming effort to update the projections,[1132] and would be inconsistent with the purpose of the preparation of the projections and current market practice.[1133]  We acknowledge that if the SPAC or the target company determines to affirm that the projections disclosed in a filing reflect the current views of the SPAC or target company management or board of directors, the SPAC or the target company, as applicable, would likely undertake additional analysis with respect to the projections, whether to provide updated projections or otherwise.  If the SPAC or the target company determines to state that the disclosed projections do not reflect the current views of the SPAC or target company management or board of

---

[1130]  In addition, in final Item 1609(b) we replaced the proposed term "impact" with the term "affect" for clarity.

[1131]  Two examples of "discount rates" are: (1) the weighted average cost of capital used to discount to present value the future cash flows over the period of years projected in a discounted cash flow analysis and (2) the rate applied to the terminal value in a discounted cash flow analysis to calculate its present value.

[1132]  Letters from ABA, Goodwin, Kirkland & Ellis.  *See supra* note 1107 and accompanying text.

[1133]  Letters from ABA, Goodwin, Freshfields, Kirkland & Ellis.  *See supra* notes 1106–1107 and 1112–1113 and accompanying text.

directors, we believe the additional burden created by final Item 1609(c) is likely to be considerably less because the level of analysis undertaken, if any, will be minimal as compared to the analysis undertaken to affirm that the disclosed projections reflect the current views of the SPAC or target company management or board of directors.  For example, if the target company chooses not to affirm that its projections reflect the current view of management due to a significant lapse of time, we do not believe target company management will update the projections or rerun its analysis in order to make that choice.   We believe the required disclosure reflects an appropriate balance between the benefits to investors of this disclosure and the costs of compliance with the rule requirements.  The required disclosure should help investors better assess the continued reliability of the projections through the current views of the SPAC or target company management or board of directors.  We also note that Item 1609(c) does not impose a duty to update the disclosed projections.  Item 1609(c) only requires a statement as to whether or not the disclosed projections reflect the view of the SPAC or target company management or board of directors about its future performance as of the most recent practicable date prior to the date of the disclosure document required to be disseminated to shareholders.  We revised Item 1609(c) to replace the proposed terms "state whether the projections" and "disclose whether the target company" with the terms "state whether or not the projections" and "disclose whether or not the target company", respectively, for purposes of clarity.

In response to commenters who said that the proposed terms "as of the date of the filing" were unclear and could be interpreted to require compliance with this item in the original filing and all subsequent amendments,[1134] we are making one change to final Item 1609(c) to improve the clarity of this item and avoid potential ambiguity.  We replaced the proposed term "as of the

---

[1134] Letters from Freshfields, Kirkland & Ellis.  *See supra* note 1114 and accompanying text.

356

date of the filing" with the term "as of the most recent practicable date prior to the date of the disclosure document required to be disseminated to security holders" throughout final Item 1609(c). This change is intended to clarify that the statement required by Item 1609(c) on whether or not the projections reflect the view of management or the board of directors (or similar governing body) about future performance must be made as of a recent date prior to, and as close as is feasible to, the date of the disclosure document disseminated to security holders.[1135] Thus, the Item 1609(c) statement is not required to be made as of the filing date of the initial or preliminary filing and as of each amendment thereto.

For several reasons we discuss below, we are not adopting the alternative approach suggested by two commenters that involved several elements, including: (1) that disclosure should be required that provides the date the projections were prepared and the views of the preparer of the projections as of the date of preparation, (2) that, with certain exceptions, registrants should be permitted to disclaim any duty to update the projections, and (3) that the Commission may seek disclosure confirming whether the projections still reflect management's views on future performance.[1136] First, there is nothing in final Item 1609 that prevents the disclosure of the date of the projections or the projection preparer's views. Depending on the facts and circumstances, this information could be material to investors. In addition, we note that, where an outside party is the preparer of a report, opinion, or appraisal that materially

---

[1135] For example, a statement made in response to Item 1609(c) as of the date of the final Form S-4 amendment prior to the registrant's request for acceleration of effectiveness could be considered to be made as of the "most recent practicable date prior to the date of the disclosure document required to be disseminated to security holders" if the date of the final prospectus disseminated to shareholders is within five days following effectiveness of the subject registration statement on Form S-4. If additional disclosure is included in the Form S-4 amendment to support the statement required by Item 1609(c), the Commission staff will need adequate time to review the new disclosure before the registrant's request for acceleration of effectiveness of the Form S-4 is submitted as is the case currently when new disclosure is included in a Form S-4 amendment.

[1136] Letters from ABA, Goodwin. *See supra* notes 1108–1111 and accompanying text.

relates to any of certain criteria set out in final Item 1607(a), final Item 1607(b)(6) requires a summary of such report, opinion, or appraisal that includes, among other things, a summary of findings and recommendations.  Second, as we discuss immediately above, Item 1609(c) does not impose a duty to update the projections disclosed in a filing.  Also, as we discuss above in Section III.E.3, to the extent a SPAC is concerned that security holders may rely on the projections disclosed in a filing in instances where the SPAC believes security holders should not rely on them, a SPAC could provide supplemental disclosure advising and alerting security holders of this fact, including by noting factors such as the date of the projections (and discussing any staleness issues) and the independence from the SPAC of the third-party that conducted the analysis.[1137]  Third, we do not agree with the suggestion that having the Commission seek disclosure confirming the ongoing reliability of the projections included in the filing would better ensure that investors have information about the ongoing reliability of those projections than a disclosure rule.  On the contrary, registrants will be in a better position to know about the ongoing reliability of projections concerning the SPAC or the target company and to make the related disclosures under final Item 1609 than the Commission, which would need to determine when it may be necessary to request the confirmatory disclosure depending on the particular facts and circumstances of the SPAC or the target company.

For several reasons we discuss below, we are also not adopting the following suggestions of one commenter with respect to the disclosure of projections in IPOs of all types, including in de-SPAC transactions: (1) requiring disclosure of management's assessment of the probability of achieving any forecasts provided, (2) requiring as a condition to qualify for the PSLRA safe

---

[1137] Section III.E.3 discusses final definitions of "blank check company" and related availability of PSLRA safe harbors in connection with comments received providing comparative analysis of de-SPAC transactions to other types of transactions.

harbor when projections are disclosed that directors, management and other affiliates must agree to a lock-up on sales of shares until the company has released audited financial statements for its first full fiscal year following the transaction, and (3) requiring disclosure of the track record of the company, the sponsor, or the chief executive officer or chief financial officer for meeting past projections disclosed.[1138]  First, we believe that management's assessment of the probability of achieving any forecasts provided would require a high degree of subjectivity and such disclosure would likely not be useful to investors without significant additional disclosure regarding the assessment, including the bases and assumptions that underlie the assessment, which disclosure could be distracting or confusing to investors.  We also believe that such disclosure may cause investors to place undue reliance on the probability or projections disclosed.  Second, we believe requiring a long-term lock-up as a condition to qualify for the PSLRA safe harbor has potential far-reaching implications for the parties involved and the market that are uncertain.  Third, we believe the track records for meeting projections disclosed in prior transactions would not necessarily be relevant to an investor's evaluation of the projections disclosed with respect to the de-SPAC transaction that is the subject of the filing and may not be useful without significant additional disclosure regarding the facts and circumstances of the prior transactions.  Such additional disclosure, if added, could become distracting or confusing for investors trying to evaluate the projections disclosed with respect to the subject de-SPAC transaction.

We are amending General Instruction B to Form 8-K to require the information set forth in paragraphs (a) and (b) of Item 1609 in any Form 8-K report or exhibit to such report that relates to a de-SPAC transaction and includes projections that relate to the performance of the

---

[1138]  Letter from Bullet Point Network.

SPAC or the target company.  One commenter indicated that the market response to a de-SPAC transaction and the disclosed financial projections occurs at the time of the merger announcement, and "[s]ome of the proposals regarding Item 10(b) of Regulation S-K and Item 1609 as discussed above should also extend to the investor presentations disclosed as an attachment to the Form 8-K."[1139]  The issue noted by this comment raises significant investor protection concerns, and we are amending the General Instructions to Form 8-K and revising proposed Item 1609(a) in response.  Based on the Commission staff's experience, Form 8-K filings in connection with the announcement of a de-SPAC transaction may contain projections in the exhibits to the Form 8-K filings, including in investor presentation materials featuring projections that also have been provided by the SPAC to PIPE investors.  These projections may begin to shape investors' decisions concerning the de-SPAC transaction even before a registration or proxy statement in connection with the de-SPAC transaction is filed.  We believe investors would benefit from the background and context provided by the application of new Item 1609 to those projections.

Finally, we revised Item 1609(c) to replace the proposed term "board" with the terms "board of directors (or similar governing body)" for purposes of clarity and consistency with other final rules.

## VI. THE STATUS OF SPACS UNDER THE INVESTMENT COMPANY ACT

### A.  Background

The Commission proposed Rule 3a-10 under the Investment Company Act, which would have provided a safe harbor from the definition of investment company under Section 3(a)(1)(A)

---

[1139] Letter from Michael Dambra, Omri Even-Tov, and Kimberlyn George.  *See supra* notes 1089–1090 and accompanying text.

of the Investment Company Act[1140] for certain SPACs.[1141]  As discussed in the Proposing

Release, in recent years, the number of SPACs has grown dramatically,[1142] and some SPACs and

their sponsors have sought to operate SPACs in ways that suggest that SPACs and their sponsors

should increase their focus on evaluating when a SPAC could be an investment company.  Such

developments sparked debate about the status of SPACs as investment companies under the

Investment Company Act.[1143]  For the reasons discussed below, we are not adopting the

proposed safe harbor.

Instead, we are setting forth below our views on facts and circumstances that are relevant

to whether a SPAC meets the definition of investment company under the Investment Company

Act.[1144]  Like any other issuer, depending on the facts and circumstances, a SPAC may meet the

definition of investment company under Sections 3(a)(1)(A) or 3(a)(1)(C)[1145] or both.  The views

below are intended to assist SPACs in analyzing their status under these sections, particularly

---

[1140]  15 U.S.C. 80a-3(a)(1)(A).  Section 3(a)(1)(A) defines an "investment company" as any issuer that is or holds itself out as being engaged primarily, or proposes to be engaged primarily, in the business of investing, reinvesting, or trading in securities.  *See infra* note 1146.

[1141]  For purposes of this section, the terms "SPAC", "De-SPAC transaction" and "target company" have the same meaning as set forth in Item 1601 of Regulation S-K.  *See supra* Section II.A (Definitions).

[1142]  *See, e.g., supra* note 25 and accompanying text; *see also* Proposing Release, *supra* note 7, at nn.7-8 and accompanying text.

[1143]  *See* Kristi Marvin, 49 Law Firms Unite and Push Back on Recent SPAC Litigation, SPAC Insider (Aug. 27, 2021), *available at* https://www.spacinsider.com/news/spacinsider/49-law-firms-unite-push-back-on-spac-litigation; Alison Frankel, Law Profs Defend Theory that SPAC is Illegal under the Investment Company Act, Reuters (Nov. 1, 2021).

[1144]  This guidance is intended to address the status of a SPAC from the time of the SPAC's initial offering until it completes its de-SPAC transaction.  The remaining company (or companies) after the de-SPAC transaction may also raise separate questions of Investment Company Act status.

[1145]  Section 3(a)(1)(C) defines an investment company as any issuer that is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and that owns or proposes to acquire investment securities having a value exceeding 40% of the value of the company's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.  Section 3(a)(2) of the Investment Company Act generally defines "investment securities" to include all securities except Government securities, securities issued by employees' securities companies, and securities issued by majority-owned subsidiaries of the owner which are not investment companies or certain private investment companies.  If a SPAC owns or proposes to acquire 40% or more of its total assets in investment securities, it would likely need to register under the Investment Company Act unless an exclusion from the definition applies.

with regard to how SPACs may apply the five-factor test that is traditionally used to determine whether an issuer is an investment company under Section 3(a)(1)(A) (known as the *Tonopah* factors).[1146]

The Commission received comments that represented a range of views and positions on proposed Rule 3a-10. While some commenters expressed the view that SPACs are not investment companies,[1147] others stated that SPACs are unregistered investment companies.[1148] Similarly, while some commenters disagreed with the Commission's concern that investors might view SPACs as fund-like investments,[1149] other commenters asserted that SPAC shareholders often treat SPACs like investment companies[1150] and should be regulated under the Investment Company Act accordingly.[1151]

---

[1146] To assess an issuer's primary engagement under Section 3(a)(1)(A), and in other contexts under the Investment Company Act, we historically have looked at (1) the company's historical development; (2) its public representations of policy; (3) the activities of its officers and directors; (4) the nature of its present assets; and (5) the sources of its present income (known as the "*Tonopah* factors"). *See In the Matter of Tonopah Mining Co.*, 26 S.E.C. 426 (July 21, 1947). The Commission has also considered the activities of the company's employees, in addition to company's officers and directors, in determining a company's primary business. *See, e.g.*, 17 CFR 270.3a-8 (Rule 3a-8 under the Investment Company Act); *Snowflake Inc.*, Release No. IC-34049 (Oct. 9, 2020) [85 FR 65449 (Oct. 15, 2020)] (notice), Release No. IC-34085 (Nov. 4, 2020) (order); *Lyft Inc.*, Release No. IC-33399 (Mar. 14, 2019) [84 FR 10156 (Mar. 19, 2019)] (notice), Release No. IC-33442 (Apr. 8, 2019) (order).

[1147] *See, e.g.*, letters from ABA, Davis Polk, Goodwin.

[1148] *See, e.g.*, letters from Consumer Federation; Robert J. Jackson, Jr. and Professor John Morley (June 13, 2022) ("Robert Jackson and John Morley").

[1149] *See, e.g.*, letters from Goodwin, Skadden, Vinson & Elkins, White & Case.

[1150] Letters from Consumer Federation ("From the time that a SPAC goes public until the time a business combination with a private company is completed, a SPAC functions like a mutual fund, investing in Treasuries, money market funds, or other cash-like securities, while providing initial investors a fixed income–equivalent return….'Nearly all' SPAC IPO investors treat SPACs like mutual funds."), Robert Jackson and John Morley ("SPAC investors clearly understand SPACs to be substitutes for mutual funds and other types of investment companies" and noting that "[i]n the median SPAC, *nearly three quarters* of investors choose to redeem rather than hold their shares through the completion of the SPAC's acquisition. When they redeem, they avoid any exposure to the SPAC's future operations, taking only the return on the SPAC's securities portfolio.") (emphasis in original). *See also* Alex Wittenberg and Jack Pitcher, *Saba Capital's Boaz Weinstein Recommends SPACs, CDS as Fed Tightens*, Bloomberg (January 28, 2022), *available at* https://www.bloomberg.com/news/articles/2022-01-28/saba-s-weinstein-recommends-spacs-cds-as-fed-tightens#xj4y7vzkg (SPACs are misunderstood because they're "fixed-income products" quoting Weinstein).

[1151] Letters from Consumer Federation, Robert Jackson and John Morley.

Commenters also held varying views about the need for a Commission safe harbor. Some commenters believed that a safe harbor would provide clarity.[1152]  Other commenters, including some that believed SPACs are not investment companies, believed the proposed safe harbor was unnecessary.[1153]  In contrast, some commenters suggested that the proposed safe harbor was unnecessary because SPACs are investment companies that should be subject to the Investment Company Act.[1154]  Finally, one commenter stated that it welcomed the Commission's efforts to provide clarity but suggested that instead of adopting a safe harbor, the Commission should issue interpretive guidance on the activities that SPACs could undertake that would cause a SPAC to become an investment company.[1155]

Commenters also expressed differing opinions about the proposed safe harbor's duration limits.  Some commenters stated that the duration limits were unnecessary and potentially harmful to SPACs and their investors.[1156]  Some of these commenters suggested that if duration limits are to be included in the safe harbor, the duration limits should be lengthened to require SPACs to complete the de-SPAC transaction within 36 months (with no interim target agreement duration limit) to match national securities exchanges' current listing standards.[1157]  In contrast,

---

[1152] Letters from Skadden (stating that a safe harbor would facilitate the ability to raise capital "without the specter of strike lawsuits" but that some conditions included in the proposed safe harbor were "unnecessarily restrictive"), Robert Jackson and John Morley (arguing that a safe harbor is "necessary to eliminate any doubt that the [Investment Company Act] applies to SPACs" and, among other things, that we should shorten the permitted acquisition periods under the safe harbor).  *See also* letter from Vinson & Elkins ("We are supportive of a safe harbor, but believe proposed Rule 3a-10 should be revised substantially.").

[1153] *See, e.g.*, letters from ABA ("there is no apparent need or basis for this safe harbor"), Loeb & Loeb ("we are not inclined to consider the 'safe harbor'…as either safe or necessary"). *See also* letter from Ropes & Gray.

[1154] Letter from Consumer Federation ("The proposed safe harbor allows SPACs to function as investment companies without having to comply with the investor protections afforded by the Investment Company Act"). *See also* letter from Lucas Schwartz ("no safe harbor should be carved out to create yet another privileged investment instrument").

[1155] Letter from Davis Polk.

[1156] *See, e.g.*, letters from NYC Bar, Ropes & Gray.  *See also* recommendation of the Small Business Capital Formation Advisory Committee, *supra* note 40.

[1157] *See, e.g.*, letters from ABA, Kirkland & Ellis, Managed Funds Association.

other commenters argued that the proposed duration limits were too long, and suggested that the Commission should require a SPAC to announce a de-SPAC transaction within 12 months and complete the transaction within 18 months.[1158]  In their view, any additional leeway would provide SPACs with special treatment not afforded to "transient investment companies" as permitted under Rule 3a-2 under the Investment Company Act, and thus would not be consistent with the Commission's approach in that rule.[1159]  One of these commenters also argued that shorter duration limits would benefit investors by reducing the number of "low quality de-SPAC transactions to which investors are exposed."[1160]

As discussed above, depending upon the facts and circumstances, a SPAC may meet the definition of "investment company" in Section 3(a)(1) of the Investment Company Act.[1161] Given the fact-based, individualized nature of this determination and because, depending on the facts and circumstances, a SPAC could be an investment company at any stage of its operation such that a specific duration limitation may not be appropriate, we have decided not to adopt proposed Rule 3a-10.  Rather, whether a SPAC is an investment company under Section 3(a)(1) is based on the particular facts and circumstances, which a SPAC should evaluate both at its inception and throughout its existence.  No one specific duration period is the sole determinant of a SPAC's status under the Investment Company Act.  The duration of a SPAC, however, should be considered in its analysis of the long-standing factors that are considered in the determination of an issuer's status as an investment company under Section 3(a)(1)(A) of the Act, including,

---

[1158] *See, e.g.*, letters from Consumer Federation, Robert Jackson and John Morley.

[1159] *See, e.g.*, letters from Better Markets, Consumer Federation, Robert Jackson and John Morley.

[1160] Letter from Robert Jackson and John Morley.

[1161] In addition, SPACs may also need to be mindful that Section 48(a) of the Investment Company Act generally makes it unlawful for any person to do indirectly through another person or entity what would be unlawful for the person to do directly.

for example, a SPAC's historical development and the activities of its officers, directors and employees.[1162]

### B. SPAC Activities

Typically, a SPAC is organized for the purpose of merging with or acquiring one or more operating companies.[1163]  The SPAC thereby provides its shareholders with the opportunity to own interests in a public entity that, in contrast to an investment company, will, as a result of the de-SPAC transaction, either be an operating company, or will, through a primarily controlled company, operate such operating company.  Nevertheless, a SPAC might engage in certain activities that would raise serious questions about whether it is an investment company under the Investment Company Act, including activities that would affect a SPAC's analysis under the *Tonopah* factors.  By way of illustration, some activities of a SPAC that would raise concerns about its status as an investment company under the Investment Company Act include:

#### 1.  *The Nature of SPAC Assets and Income*

A SPAC may hold, or propose to hold, assets[1164] that would weigh heavily in favor of it being an investment company.[1165]  For example, if a SPAC were to invest in corporate bonds, or not engage in a de-SPAC transaction but instead acquire a minority interest in a company with the intention of being a passive investor, such activities would affect the analysis of the SPAC's status under Section 3(a)(1)(C).  In this regard, a SPAC that owns or proposes to acquire 40% or

---

[1162] *See supra* note 1146 (discussion of factors considered in determining an issuer's status as an investment company under Section 3(a)(1)(A)).  As discussed below, a SPAC's activities may become more difficult to distinguish from an investment company the longer the SPAC takes to achieve its business purpose.

[1163] *See supra* note 5 and accompanying text.

[1164] Any references to the SPAC's assets refer to both the assets held in a trust or escrow account and any assets held by the SPAC directly.

[1165] A SPAC that does not hold any securities would generally not implicate the Investment Company Act, unless it proposes to engage in the business of being an investment company as defined in Section 3(a)(1) of the Investment Company Act.  *See* Proposing Release, *supra* note 7, at n. 550.

more of its total assets in investment securities would likely need to register under the Investment Company Act unless an exclusion from the definition applies. Such activities would also weigh in favor of a SPAC being considered to be primarily engaged in the business of investing, reinvesting, and trading in securities under Section 3(a)(1)(A).[1166] In addition, a SPAC whose income is substantially derived from such assets would further suggest that the SPAC is an investment company under section 3(a)(1)(A).[1167]

A SPAC that holds only the sort of securities typically held by SPACs today, such as U.S. Government securities, money market funds[1168] and cash items prior to the completion of the de-SPAC transaction, and that does not propose to acquire investment securities, would be more likely not to be considered an investment company under Section 3(a)(1)(C). While U.S. Government securities and money market funds are securities for purposes of Section 3(a)(1)(A), asset composition is only one of the factors that should be considered in analyzing a SPAC's status under the Investment Company Act. For example, an issuer that holds these assets, but whose primary business is to achieve investment returns on such assets would still be an investment company under Section 3(a)(1)(A).

### 2. Management Activities

Another significant factor in the analysis of whether a SPAC is an investment company under Section 3(a)(1)(A) is the actions of its officers, directors, and employees.[1169] For example,

---

[1166] As stated in the Proposing Release, a SPAC that purchases multiple companies as part of a single transaction would not be engaging in the types of activities that raise investor protection concerns addressed by the Investment Company Act as it would still be seeking to be primarily engaged in the business of an operating company or companies after the de-SPAC transaction and not be engaged in investment management activities. Proposing Release, *supra* note 7, at 29500.

[1167] *See supra* note 1146.

[1168] The term "money market fund" refers to those money market funds registered under the Investment Company Act and regulated pursuant to rule 2a-7 of that Act. 17 CFR 270.2a-7.

[1169] *See supra* note 1146.

we would have serious concerns if a SPAC held its investors' money in securities, but the SPAC's officers, directors, and employees did not actively seek a de-SPAC transaction or spent a considerable amount of their time[1170] actively managing the SPAC's portfolio for the primary purpose of achieving investment returns.  Such activities would affect the analysis as to whether the SPAC was primarily engaged in seeking to complete a de-SPAC transaction and weigh more in favor of the SPAC being primarily engaged in the business of investing, reinvesting, or trading in securities such that it would be an investment company under the Investment Company Act.

Depending on the facts and circumstances, the management of a SPAC also could cause SPAC sponsors to come within the definition of "investment adviser" in Section 202(a)(11) of the Investment Advisers Act of 1940.[1171]  That section generally defines an investment adviser as any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or any person who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.  The definition generally includes three elements for determining whether a person is an investment adviser: (i) the person provides advice, or issues analyses or reports, concerning securities; (ii) the person is in the business of providing such services; and (iii) the person provides such services for compensation.  Each element must be met in order for a person to be deemed an investment adviser.[1172]

---

[1170] *See In the Matter of Tonopah Mining Co., supra* note 1146; Daxor Corp., Initial Dec. Rel. 428 (Aug. 31, 2011) ("The Commission next considers how and where the issuer's employees spend their time and effort. Where employees spend considerable time managing the investment securities, there is greater likelihood that the issuer is primarily engaged in the investment business." (citation omitted)).

[1171] 15 U.S.C. 80b-2(a)(11).

[1172] *See Request for Comment on Certain Information Providers Acting as Investment Advisers*, Securities and Exchange Commission (June 15, 2022), *available at* https://www.sec.gov/rules/other/2022/ia-6050.pdf.

### 3. *Duration*

When evaluating whether it is an investment company under Section 3(a)(1)(A), a SPAC whose assets and income are substantially composed of, and derived from, securities should be mindful of the length of time that it has been operating prior to entering into an agreement with a target company and then completing the de-SPAC transaction with that company.[1173]  While the duration of a SPAC is not the sole determinant of its status under the Investment Company Act, a SPAC's activities may become more difficult to distinguish from those of an investment company the longer the SPAC takes to achieve its stated business purpose.[1174]  For example, when a SPAC operates without completing a de-SPAC transaction with a target company, particularly where its assets are substantially composed of and its income derived from securities, its duration may indicate that its historical development is that of an investment company even if its representations say otherwise.  Similarly, the longer that a SPAC takes to achieve its stated business purpose, the more questions arise as to whether its officers, directors, and employees are more engaged in achieving investment returns from the securities the SPAC holds rather than in achieving the SPAC's stated business purpose.  Accordingly, after a certain period of time, a SPAC's historical development and director, officer, and employee activities, together with its asset composition and sources of income may suggest that the SPAC is primarily engaged in the business of investing, reinvesting, and trading in securities.

In evaluating whether a SPAC has reached such a point in time, a SPAC should consider how its duration falls within the framework of the Investment Company Act, the rules

---

[1173] *See supra* note 1146 (discussion of *Tonopah* factors).  As discussed previously, given the other factors in the analysis, however, we note that a SPAC could be an investment company at any stage of its operation.

[1174] S*ee* Proposing Release, *supra* note 7, at 29501; c*f.* Goodwin ("We acknowledge that after some period of time without [c]losing [a de-SPAC transaction], a SPAC will appear not to be focused on consummating a De-SPAC transaction.").

thereunder, and past Commission positions, including Rule 3a-2 under the Investment Company Act and the Commission's position regarding Rule 419 under the Securities Act.[1175]  Rule 3a-2 provides a one-year safe harbor to so-called "transient investment companies" which are issuers that, as a result of an unusual business occurrence may be considered an investment company under the statutory definitions but intend to be engaged in a non-investment company business. In addition, the Commission took the position that accounts of certain blank check companies relying on Rule 419 need not be required to be regulated under the Investment Company Act in part because, among other things, the rule limits the duration of such accounts to 18 months and restricts the nature of investments.[1176]  A SPAC that operates beyond these timelines raises concerns that the SPAC may be an investment company, and these concerns increase as the departure from these timelines lengthens.  Thus, a SPAC needs to be cognizant that, depending on the facts and circumstances, it could be viewed as a fund-like investment if it operates beyond the duration limits contemplated in other similar contexts.  Accordingly, we believe that a SPAC should reassess its status and analyze whether it has become an investment company if it has, for example, failed to enter into an agreement with a target company beyond such timelines.[1177] When considering its status under the Investment Company Act, a SPAC should consider all

---

[1175] *See* Investment Company Act Rule 3a-2 and Securities Act Rule 419.  We note that while exchange listing rules contemplate potentially longer SPAC lifespans, those rules were adopted for a different regulatory purpose and do not address investment company status concerns.

[1176] Specifically in adopting Rule 419, the Commission stated that "although [an escrow or trust account established by blank check companies that comply with Rule 419 under the Securities Act] may be an investment company under the Investment Company Act of 1940, in light of the purposes served by the regulatory requirement to establish such an account, the limited nature of the investments, and the limited duration of the account [i.e., 18 months], such an account will neither be required to register as an investment company nor regulated as an investment company as long as it meets the requirements of Rule 419." *Blank Check Offerings*, *supra* note 3, at text accompanying n.32; *see also* 17 CFR 230.419(e)(2)(iv) ("If a consummated acquisition(s) meeting the requirements [of Rule 419] has not occurred by a date 18 months after the effective date of the initial registration statement, funds held in the escrow or trust account shall be returned [to investors.]").  As noted in the Proposing Release, SPACs are not subject to the requirements of Rule 419. *See* Proposing Release, *supra* note 7, at nn.12-13 and accompanying text.

[1177] *See* Rule 3a-2 and Rule 419.

relevant facts and circumstances, including, among other things the length of time that it has been operating prior to entering into an agreement with a target company and then completing the de-SPAC transaction with that company.

### 4. Holding Out

A SPAC that holds itself out in a manner that suggests that investors should invest in its securities primarily to gain exposure to its portfolio of securities prior to the de-SPAC transaction would likely be an investment company under the definition in Section 3(a)(1)(A). For example, if a SPAC were to market itself primarily as a fixed-income investment, as an alternative to an investment in a mutual fund, or as an opportunity to invest in Treasury securities or money market funds, it would likely be holding itself out as being primarily engaged in the business of investing, reinvesting or trading in securities. Accordingly, such a SPAC would likely be an investment company under Section 3(a)(1)(A).

### 5. Merging with an Investment Company

If a SPAC were to engage or propose to engage in a de-SPAC transaction with a target company that meets the definition of investment company, such as a closed-end fund or a business development company, the SPAC is likely to be an investment company under Section 3(a)(1)(A) of the Investment Company Act because it would be proposing to be engaged in the business of investing, reinvesting and trading in securities as set out in Section 3(a) of that Act. A SPAC that seeks to engage in a de-SPAC transaction with an investment company would, at some point prior to the de-SPAC transaction, be proposing to engage in the business of being an investment company.

370

### C. Conclusion

Depending upon the facts and circumstances, a SPAC may meet the definition of investment company in Section 3(a)(1)(A) or Section 3(a)(1)(C) (or both) of the Investment Company Act. To the extent that a SPAC's activities—including any of those discussed above—may cause it to fall within one or more of these definitions, a SPAC should consider options that would bring it into compliance such as changing its operations, winding down its operations, or registering as an investment company under the Investment Company Act. The Investment Company Act imposes registration, reporting, governance and minimum capital requirements on investment companies. Issuers that meet the definition of investment company but fail to comply with the Investment Company Act's provisions, or otherwise qualify for an exclusion or exemption from the provisions of the Act, could, among other things, be subject to enforcement action by the Commission or to private litigation.

## VII.    OTHER MATTERS

If any of the provisions of these rules, or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application.

Pursuant to the Congressional Review Act, the Office of Information and Regulatory Affairs has designated this rule as a "major rule," as defined by 5 U.S.C. 804(2).

## VIII.   ECONOMIC ANALYSIS

We are mindful of the costs and benefits of these new rules and amendments. The discussion below addresses the potential economic effects of the new rules and amendments, including the likely benefits and costs, as well as the potential effects on efficiency, competition,

371

and capital formation.[1178]  We have analyzed the expected economic effects of the new rules and amendments relative to the current baseline, which consists of the existing regulatory framework of disclosure requirements and liability provisions, current market practices, and the distribution of participants and their characteristics.

A SPAC is a shell company organized for the purpose of combining with one or more target companies.[1179]  Like traditional IPOs, SPACs provide target companies with a way to raise capital through public markets.  To that end, as noted above, the SPAC process is unique in that the de-SPAC transaction is a hybrid transaction that contains elements of both an IPO and an M&A transaction.[1180]  Under the current regulatory framework, the SPAC process allows the target company to raise capital through public markets without requiring the same level of disclosure or incurring the same liability as with a traditional IPO.[1181]  As such, some commenters and academics have expressed the view that, compared to traditional IPOs, de-SPAC transactions raise additional "adverse selection"[1182] concerns stemming from information

---

[1178]  Section 2(b) of the Securities Act (15 U.S.C. 77b(b)) and Section 3(f) of the Exchange Act (17 U.S.C. 78c(f)) require the Commission, when engaging in rulemaking where it is required to consider or determine whether an action is necessary or appropriate in the public interest and to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.  Further, Section 23(a)(2) of the Exchange Act (17 U.S.C. 78w(a)(2)) requires the Commission, when making rules under the Exchange Act, to consider the impact that the rules would have on competition and prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the Exchange Act.

[1179]  *See* discussion in Section I.  Like above, our discussion of de-SPAC transactions and target companies generally focuses on target companies that are private operating companies, but we also address situations where the target company of a de-SPAC transaction may comprise an operating company that is a public company, a business, or assets, or combinations of multiple thereof.  *See* Item 1601(d) of Regulation S-K.

[1180]  The SPAC process begins when a SPAC conducts an IPO and ends when the SPAC combines with a target company in a de-SPAC transaction.

[1181]  *See, e.g.*, Sris Chatterjee, N.K. Chidambram & Gautam Goswani, *Security Design for a Non-Standard IPO: The Case of SPACs*, 69 J. Int'l Money & Fin. 151 (2016).

[1182]  A well-known example of adverse selection is the "market for lemons," in which sellers of used cars know the quality of the car, but buyers do not.  Because buyers have less information than sellers (information asymmetry) and cannot differentiate the "good" cars from the "lemons," their bids will be lower to reflect this uncertainty.   In response, the sellers of high-quality products may exit the market, causing further decline in

asymmetry and conflicts of interest between SPAC investors and managers that are not fully resolved by market forces.[1183]

The final rules include a number of additional disclosure requirements that help address information asymmetries between investors[1184] and the SPAC,[1185] which will enable investors to make more informed investment and voting decisions.  For example, at the SPAC IPO stage, as discussed in detail in the sections below, the rules require disclosures about dilution, compensation, and conflicts of interest, among other things.  As another example, at the de-SPAC transaction stage, the rules require disclosures related to the information considered by the SPAC in its assessment of the transaction, such as projections or assessments by third parties, among other things.

The final rules also include several provisions to help ensure that shareholders more consistently receive the full protections of Securities Act disclosure and liability provisions in connection with the de-SPAC transaction.  For example, because the target company is effectively an "issuer" of the securities in any registered de-SPAC transaction, the rules require that the target company sign the registration statement filed in connection with the de-SPAC

---

buyers' willingness to pay, which could cause the market to fall apart or "unravel" entirely, and no used cars to be purchased.  *See, e.g.*, George Akerlof, *The Market for "Lemons": Quality Uncertainty and the Market Mechanism*, 84 Qtr. J. Econ. 488 (1970).  For examples of existing market solutions to this adverse selection, *see* Proposing Release, *supra* note 7, at 29506.

[1183] *See, e.g.*, letters from Americans for Financial Reform Education Fund, Better Markets, Robert Jackson and John Morley.  *See also* Lora Dimitrova, *Perverse Incentives of Special Purpose Acquisition Companies, the "Poor Man's Private Equity Funds,"* 63 J. Acct. & Econ. 99 (2017); Klausner, Ohlrogge & Ruan, *supra* note 18.

[1184] Throughout this section, "investor" can refer to any current or a potential security holder of a company, though it is generally understood that costs and benefits may accrue to such investors heterogeneously based on size, sophistication, and affiliation.

[1185] We refer to SPACs throughout this analysis as shorthand but acknowledge that the various controlling parties of a SPAC that are involved in the decision making of the SPAC (including the SPAC sponsor, management, board, or other governing group) may have disparate incentives, each adding their own complexity to the principal-agent dynamic.  However, the existence and general nature of the relationship between investors and the SPAC "agent" is not significantly different based on which specific agent is considered, thus the reference to the SPAC broadly.  When this generalization does not hold, we provide more precise explanations.

transaction.[1186]  Because signatories are subject to Section 11 liability for material omissions and misstatements, we expect this requirement to increase incentives for targets to ensure the accuracy of the disclosures in de-SPAC transaction registration statements.  We are also adopting definitions of "blank check company" for PSLRA safe harbor purposes that would not contain a qualification that the company issues penny stock.  As a result, the safe harbor for forward-looking statements under the PSLRA will be unavailable to SPACs and other blank check companies, regardless of whether they would have qualified as an issuer of penny stock.  This approach will help incentivize such blank check companies taken to take greater care when making forward-looking statements.[1187]

Certain rules we are adopting are intended to align disclosures in de-SPAC transactions more closely to those of traditional IPOs.  For example, certain non-financial disclosures regarding a target company that are currently not filed by the company until a Form 8-K, within four business days after the completion of a de-SPAC transaction, will be required to be included in the disclosures that are filed in connection with a de-SPAC transaction (on Form S-4 or F-4, a proxy or information statement, or a Schedule TO).[1188]  Also, the combined company following a de-SPAC transaction will be required to re-determine its eligibility for SRC status and reflect any change in status in its filings, beginning 45 days after consummation of the de-SPAC transaction.[1189]

We are also adopting final rules that apply to shell companies more broadly.  Rule 145a deems any business combination involving a reporting shell company and another entity that is

---

[1186]  *See supra* Section III.C.

[1187]  *See supra* note 705.

[1188]  *See supra* Section III.AA.

[1189]  *See supra* Section II.D.

not a shell company to involve a sale of securities to the reporting shell company's shareholders. Currently, investors in reporting shell companies may not always receive the disclosures and other protections afforded by the Securities Act at the time when there is a fundamental change in the nature of their investment due to the business combination involving another entity that is not a shell company. In addition, the amendments to Regulation S-X more closely align the financial statement requirements in business combinations between a shell company and a non-shell company with those required in connection with traditional IPOs.

As discussed in Section I, market participants have raised concerns that disclosures that currently accompany SPAC IPOs and de-SPAC transactions do not provide investors with adequate information to assess the potential risks of investing in SPACs and the ways in which the SPAC sponsor and other affiliates stand to gain from these transactions. We expect the final rules to elicit information regarding SPAC transactions that is more consistent, useful, and readily comparable.[1190] As a result, investors will be able to make more informed voting and investment decisions, resulting in more efficient pricing of securities.[1191] Moreover, by reducing information asymmetry and agency costs, we expect the final rules to result in less adverse selection than might otherwise occur at the de-SPAC transaction stage, which should encourage greater investor participation. We further anticipate that, by addressing the liability of various parties in de-SPAC transactions and other shell company business combinations, the final rules

---

[1190] *See infra* Sections VIII.B.1.iii.7, VIII.B.1.iii.8.

[1191] *See, e.g.*, Orie E. Barron & Hong Qu, *Information Asymmetry and the Ex Ante Impact of Public Disclosure Quality on Price Efficiency and the Cost of Capital: Evidence from a Laboratory Market*, 89 Acct. Rev. 1269 (2014), *available at* https://ssrn.com/abstract=2312812 (retrieved from SSRN Elsevier database) (high-quality public disclosure leads to increased price efficiency and decreased cost of capital); Ulf Brüggemann, Aditya Kaul, Christian Leuz & Ingrid Werner, *The Twilight Zone: OTC Regulatory Regimes and Market Quality* (Research Paper No. 3126379, Mar. 1, 2018, last revised June 12, 2018), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3126379 (retrieved from SSRN Elsevier database) (increased disclosure regimes lead to increased liquidity and lower crash risk).

will incentivize parties to exercise greater care in disclosing information in connection with relevant business combinations, increasing the protections afforded to investors.  Overall, we expect the final rules will enhance the protection of investors and promote market efficiency.

SPACs and their target companies may incur costs related to the public disclosure of the newly required information.  The costs will be lower for parties that already provide such disclosures voluntarily in response to market demands.[1192]  We are also mindful that some aspects of this rulemaking may deter some forms of communications or some transactions that might otherwise be economically beneficial to issuers or investors (or both).  We discuss these considerations in more detail below.

We received several comments specifically addressing the economic analysis of the Proposing Release.[1193]  A number of commenters shared the results of quantitative analyses that addressed SPAC-related issues considered by the proposed rules.[1194]  We discuss these comments below in our analysis of the costs and benefits of the final rules.  We also discuss the

---

[1192] *See SPAC to the Future III*, IPO Edge (Nov. 10, 2021) (remarks of panelist Chris Weekes, Managing Director and Co-Head of SPACs, Cowen), *available at* https://ipo-edge.com/join-spac-to-the-future-iii-with-nasdaq-cowen-gallagher-ve-icr-morrow-sodali-morganfranklin-featuring-gigcapital-hennessy-and-switchback/.

[1193] *See* letters from Virtu Financial Inc. (June 13, 2022) ("Virtu"), Skadden, Kirkland & Ellis, Committee on Capital Markets Regulation.

[1194] *See* letters from Danial Hemmings, Institute of European Finance, Bangor University and Aziz Jaafar, University of Sharjah (June 29, 2023); Tom Nohel, Department of Finance, Imperial College and Quinlan School of Business, Loyola University–Chicago, Felix Feng, Michael G. Foster School of Business, University of Washington, Xuan Tian, PBC School of Finance, Tsinghua University, Wenyu Wang, Kelley School of Business, Indiana University, and Yufeng Wu, Gies College of Business, University of Illinois Urbana-Champaign (Feb. 7, 2023); Michael Goffman, Hebrew University of Jerusalem and Yuchi Yao, University of Rochester (July 19, 2022 and Dec. 31, 2022); Alexander Groh, Professor of Finance, EMLYON Business School, France (Sept. 2, 2022 and Dec. 5, 2022); Michael Klausner, Michael Ohlrogge, Amanda Rose and Emily Ruan (July 11, 2022); Michael Klausner, Michael Ohlrogge, and Harald Halbhuber; Holger Spamann; Debarshi Nandy, Barbara and Richard M. Rosenberg Professor of Global Finance, Brandeis International Business School, Yaxuan Wen, PhD Candidate in International Economics and Finance, Brandeis International Business School, and Mengnan Zhu, Assistant Professor of Finance, Dickinson College (June 7, 2022), *citing* Yaxuan Wen & Mengnan "Cliff" Zhu, *Is Going Public via SPAC Regulatory Arbitrage? A Textual Analysis Approach* (2022), https://ssrn.com/abstract=4066641 or http://dx.doi.org/10.2139/ssrn.4066641; Usha Rodrigues and Mike Stegemoller; Snehal Banerjee, Associate Professor of Finance and Accounting, UC San Diego, and Martin Szydlowski, Assistant Professor of Finance, University of Minnesota (Apr. 1, 2022).

anticipated impacts on efficiency, competition, and capital formation and assess several reasonable policy alternatives.  Where possible, we have attempted to quantify the economic effects of the final rules.[1195]  In many cases, however, we are unable to do so because we lack access to data that would allow us to quantify the effects with a reasonable degree of accuracy.  Further, even in cases where the Commission has some data, quantification is not practicable due to the number and type of assumptions necessary to quantify certain economic effects, which render any such quantification unreliable.  Where we are unable to quantify the economic effects of the final rules, we provide a qualitative assessment of the potential effects.

### A.  Baseline and Affected Parties

The baseline against which the costs, benefits, and the effects on efficiency, competition, and capital formation of the final rules and amendments are measured consists of the current state of the SPAC market, current practice as it relates to SPAC IPOs and subsequent business combination transactions between SPACs and private operating companies, and the current regulatory framework.

We begin by discussing current market practices related to SPAC IPOs in Section VIII.A.1.  We then discuss de-SPAC transactions in Section VIII.A.2.

### 1.  SPAC Initial Public Offerings

The parties most likely to be directly affected by the final rules regarding specialized disclosure requirements for SPACs in IPOs and other registered offerings are: SPAC sponsors and their affiliates or potential SPAC sponsors intending to organize a new SPAC; current SPAC

---

[1195] For our estimates of the paperwork burdens associated with the rules and amendments for purposes of the Paperwork Reduction Act of 1995 ("PRA"), *see infra* Section X.  These PRA burden estimates pertain to "collections of information," as that term is defined in the PRA, and therefore reflect only the hours and costs to prepare required disclosures, as required by that Act.  As a result, these PRA estimates do not reflect the full economic effects or full scope of economic costs of the rules and amendments that are discussed in this analysis.

officers, SPAC directors, or promoters; SPAC investors; and any other market participants whose service or activities involve analysis of the information, data, and disclosures related to SPACs in these offerings.

In addition, if the adoption of the final rules alters the incentives for other parties (e.g., SPAC sponsors or underwriters) to participate in or be involved with SPAC transactions, we would expect secondary impacts on the prospects or opportunities of private companies that would be potential target companies of such newly-organized SPACs. The final rules also may affect parties who provide advisory or other services to SPACs or SPAC sponsors in connection with SPAC transactions through additional disclosures about the parties and provided services or potential liability.

Table 2 shows the estimated number of SPAC IPOs since 1990. They peaked in 2021, following a similar trend in traditional IPOs.[1196] In 2023, there were an additional 31 SPAC IPOs.[1197]

**Table 2. Number of SPAC IPOs[a]**

|  | 1990–2000 | 2001–2005 | 2006–2010 | 2011–2015 | 2016–2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|
| Total | 18 | 41 | 128 | 67 | 400 | 613 | 86 | 31 |
| Nasdaq | 18 | 0 | 3 | 56 | 248 | 433 | 74 | 27 |
| NYSE | 0 | 0 | 1 | 0 | 147 | 178 | 10 | 4 |
| AMEX/NYSE American | 0 | 6 | 78 | 0 | 5 | 2 | 2 | 0 |
| OTC | 0 | 35 | 46 | 11 | 0 | 0 | 0 | 0 |

[a] Estimates for 1990 to 2023 are based on all SPACs that conducted an IPO with a confirmed pricing date through the end of 2023, identified by Dealogic, SPACInsider, Audit Analytics, and staff manual review. Values reflect the total over the period in the column headers rather than annual averages.

---

[1196] *See, e.g.*, letter from Committee on Capital Markets, noting significant increases in the number of traditional IPOs in 2020 and especially 2021. *See also* data collected, cleaned, and made available by Jay Ritter on SPAC IPOs and overall IPO activity *available at* https://site.warrington.ufl.edu/ritter/ipo-data/ (*last accessed* 10/24/2023).

[1197] Data from Dealogic, based on IPO listing date for offerings with a confirmed pricing date.

The vast majority of SPACs claim either SRC or EGC status, with the majority claiming both.[1198]  For example, all of the 86 SPAC IPOs in 2022 claimed EGC status and 84 claimed SRC status.[1199]

### i.  SPAC Exchange Listings

SPAC listings have migrated from the over-the-counter (OTC) market to three national securities exchanges: first, NYSE American (formerly, the American Stock Exchange ("AMEX")); then, the Nasdaq Stock Market ("Nasdaq") and the New York Stock Exchange ("NYSE") (see Table 2).[1200]

NYSE, Nasdaq, and NYSE American have rules setting forth listing requirements for a company whose business plan is to complete an IPO and engage in a business combination.[1201] Among other things, the rules of all three exchanges permit the initial listing of SPACs only if at least 90% of the gross proceeds from the IPO and any concurrent sale by the SPAC of equity securities will be deposited in a trust account.[1202]  The rules of these exchanges further require that, within three years of the effectiveness of its IPO registration statement (or such shorter period specified in the registration statement under Nasdaq and NYSE American rules or its

---

[1198] *See also supra* note 665.

[1199] Based on status disclosed by SPACs in the financials filed after the IPO, if available, otherwise from Form S-1 or Form F-1.

[1200] SPACs first were listed on the AMEX in 2005.  The Commission approved the NYSE's proposed rule change to adopt listing standards to permit the listing of SPACs on May 6, 2008 and approved Nasdaq's proposed rule change to adopt listing standards to permit the listing of SPACs on July 25, 2008.  *See* Release No. 34-57785 (May 6, 2008) 73 FR 27597 (May 13, 2008) (SR–NYSE–2008–17); Release No. 34-58228 (July 25, 2008) 73 FR 44794 (July 31, 2008) (SR–NASDAQ–2008–013).  *See also* Release No. 34-63366 (Nov. 23, 2010) 75 FR 74119 (Nov. 30, 2010) (SR-NYSEAmex–2010–103) (notice of filing and immediate effectiveness of proposed rule change to adopt additional criteria for the listing of SPACs).

[1201] NYSE Listed Company Manual Section 102.06; Nasdaq Listing Rule IM-5101-2; NYSE American Company Guide Section 119.  The Rules of the CBOE BZX Exchange, Inc. provide another example of listing requirements that are substantially similar to those described in this section.  *See* CBOE BZX Rule 14.2(b).

[1202] NYSE Listed Company Manual Section 102.06; Nasdaq Listing Rule IM-5101-2(a); NYSE American Company Guide Section 119(a).

constitutive documents or by contract under NYSE rules), the SPAC complete a business combination(s) having an aggregate fair market value of at least 80% of the value of the net assets in the trust account excluding certain costs.[1203]  The rules of NYSE, Nasdaq, and NYSE American require that a business combination meeting this 80% requirement be approved by a majority of the SPAC's independent directors.[1204]  The rules of all three exchanges also require, if a shareholder vote is held, that a majority of the shares voted at the shareholder meeting approve a de-SPAC transaction meeting this 80% requirement.[1205]  In addition, the rules of all three exchanges provide that, if a business combination transaction meeting this 80% requirement is approved and consummated, public shareholders voting against the transaction must have the right to convert their shares of common stock into a pro rata share of the aggregate amount then in the trust account net of taxes and working capital disbursements.[1206]  Under the rules of all three exchanges, if a shareholder vote on a business combination transaction is not held, the SPAC must provide all shareholders with the opportunity to redeem all their shares for cash equal to their pro rata share of the aggregate amount then in the trust account net of taxes and working capital disbursements, pursuant to Rule 13e-4 and Regulation 14E under the Exchange Act, which regulate issuer tender offers.[1207]

---

[1203]  NYSE Listed Company Manual Section 102.06(e); Nasdaq Listing Rule IM-5101-2(b); NYSE American Company Guide Section 119(b).

[1204]  NYSE Listed Company Manual Section 102.06(d); Nasdaq Listing Rule IM-5101-2(c); NYSE American Company Guide Section 119(c).

[1205]  NYSE Listed Company Manual Section 102.06(a); Nasdaq Listing Rule IM-5101-2(d); NYSE American Company Guide Section 119 (d).

[1206]  *Id.*

[1207]  NYSE Listed Company Manual Section 102.06(c); Nasdaq Listing Rule IM-5101-2(e); NYSE American Company Guide Section 119(e).

## ii.  SPAC Sponsors

SPACs are managed by SPAC sponsors, who spend time and effort managing the SPAC process and searching for a suitable target to complete a de-SPAC transaction.  Sponsors also invest in the SPAC and are compensated with a portion of ownership in the combined company that results from the de-SPAC transaction, which means that such compensation will generally only be realized if a de-SPAC transaction occurs.  Commentators have suggested that one reason a SPAC might provide a more attractive route to the public markets than a traditional IPO is because the target company may benefit from the leadership and professional advice from one or more individuals composing the SPAC sponsor, including in some cases beyond the consummation of the de-SPAC transaction and into the life of the resulting combined public company.[1208]  Although the majority of sponsors from 2019 through the first half of 2021 were financial institutions, a sizable fraction (47%) of companies classified as SPACs were self-reported as sponsored by individuals.[1209]  This percentage has been increasing, as 66% of SPACs with IPOs in the second half of 2021 and 83% in 2022 were sponsored by individuals.[1210]

## iii.  SPAC IPO Underwriters

Underwriters of SPAC IPOs may be affected by the final rules, to the extent they are liable for IPO disclosures or any involvement in de-SPAC transactions.  During the period 1990–

---

[1208] *See* Robert Berger, *SPACs: An Alternative Way to Access the Public Markets*, 20 J. Applied Corp. Fin.68 (2008) ("Though privately negotiated, tailored transactions, SPACs can provide companies with access to the public markets in ways that a traditional IPO cannot.  SPAC mergers typically exhibit…specialized SPAC management teams that add experience that is difficult to replicate.").

[1209] *See* SPACInsider, 1H-2021 Report, *available at* https://mcusercontent.com/764dc55fe6da1e37d427265ad/files/b90cf236-0845-f778-e35c-db7417200d35/1H_2021_SPAC_Report.pdf.

[1210] Based on staff analysis of data from SPACInsider.  SPACs with sponsor type "Sponsor" were counted as individually sponsored.

2022, the average number of named underwriters participating in a SPAC IPO was 2.4.[1211]  In 2022, the average was 2.1.  Although we are not aware of any database listing investment banks that are willing to provide underwriting services for SPACs, there were six investment banks that participated in at least ten SPAC IPOs in 2021 that did not participate in any SPAC IPOs in 2022 or in the first two quarters of 2023.[1212]  All of these SPAC IPOs were done via a firm commitment underwriting.[1213]  The average fee charged by SPAC IPO underwriters from 1990–2022 was approximately 5.4% of IPO proceeds.[1214]  The average underwriting fee has declined from approximately 6.9% in the 1990s and 2000s to approximately 5.2% in the 2010s and 2020s.[1215]  The average underwriting fee for SPACs in 2022 was 5.1%.[1216]  SPAC IPO underwriters may provide services to a SPAC or its eventual target company both before and after the completion of an IPO.  For example, a SPAC IPO underwriter may help a SPAC identify potential target companies, provide financial advisory services to the SPAC or the target company, or act as a PIPE placement agent.  As discussed in the Proposing Release, current

---

[1211]  This estimate is based on staff analysis of Dealogic of SPAC IPOs registered with the SEC with a confirmed pricing date.

[1212]  *Id.*  Some commenters asserted that underwriters may have become more reluctant to participate in SPAC IPOs as a result of proposed Rule 140a, which would have deemed a SPAC IPO underwriter that takes steps to facilitate a de-SPAC transaction, or any related financing transaction, or otherwise participates (directly or indirectly) in the de-SPAC transaction to be engaged in the distribution of the securities of the surviving public entity in a de-SPAC transaction within the meaning of section 2(a)(11) of the Securities Act.  *See* Proposing Release, *supra* note 7, at 29486.  *See, e.g.*, letter from White and Case.  A decrease in the supply of underwriters providing services to SPACs may have resulted in fewer SPAC IPOs because SPAC IPOs are typically structured as underwritten offerings.  Conversely, it could also be the case that the decline in SPACs activity during this period, which may be due to other reasons, could naturally result in fewer underwriters.

[1213]  SPACs that conduct a firm commitment IPO and raise more than $5 million in the offering are not subject to the requirements of Securities Act Rule 419.  *See supra* note 14.

[1214]  This estimate is based on staff analysis of data as described in *supra* note 1211.  *See also* letter from Sagiv Shiv, Managing Director, Head of MA and Advisory, ACP Capital Markets LLC (March 24, 2023), noting that the SPAC underwriting fee percentage is based on IPO proceeds, not the non-redeemed share of these proceeds at the de-SPAC stage.

[1215]  *See supra* note 1214.

[1216]  *Id.*

SPAC IPO underwriter practice is to defer a portion of the underwriting fee until, and conditioned upon, the completion of the de-SPAC transaction.[1217]  Prior to 2004, SPAC IPO underwriters typically did not defer their fee until completion of the de-SPAC transaction.[1218]  During the period 2005–2022, we estimate that the average size of the deferred SPAC IPO underwriting fee was 3.1% of IPO proceeds (3.4% if excluding the cases where there was no deferred fee), or approximately 56% of total SPAC IPO underwriting fees.  We have not observed significant differences in the structure or level of SPAC IPO underwriting fees and deferred fees, as disclosed at the IPO stage, when comparing SPACs that have completed a de-SPAC transaction versus SPACs that did not do so.

### iv.  Public Warrants

Most SPAC IPOs register the offering of a unit composed of a common share, warrants, or fractions thereof, and—in some cases—rights.[1219]  Currently, SPAC units usually include one common share and one or more fractional out-of-the-money warrants.[1220]  Public warrants, i.e.,

---

[1217]  *See* Proposing Release, *supra* note 7, at 29486.  This practice has not changed since the proposal.  The average deferred fee in 2022 through the first two quarters of 2023 was 3.3% of IPO proceeds.

[1218]  This conclusion is based on staff analysis.  *See supra* note 1211.  *See also* Yochanan Shachmurove & Milos Vulanovic, *Specified Purpose Acquisition Company IPOs*, *in* The Oxford Handbook of IPOs (Douglas Cumming ed., 2018, p. 301).

[1219]  *See, e.g.*, Gül Okutan Nilsson, *Incentive Structure of Special Purpose Acquisition Companies*, 19 Eur. Bus. Org. L. Rev. (2018) ("[R]ecent SPACs seem to be experimenting with issuing certain 'rights'…defined as the 'right to receive one-tenth of a SPAC share upon consummation of the business combination'.  Unlike in the case of warrants, shareholders are not required to pay for receiving these shares.  'Rights' can also trade separately and even the shareholders who convert their shares can keep them.  If the business combination cannot be completed, rights expire worthless.").

[1220]  Early practice for SPACs often involved the offered unit containing multiple in-the-money warrants.  *See, e.g.*, Lola Miranda Hale, *SPAC: A Financing Tool with Something for Everyone*, J. of Corp. Acct. & Fin. 18(2), (2007) ("The typical structure involves the offering of a unit consisting of common stock and one or two separate warrants for common stock.  In a two-warrant unit, the unit price is $6, including one share of common stock and two warrants….Typically, each warrant entitles the holder to purchase one share of common stock at a price of $5 each."); Carol Boyer & Glenn Baigent, *SPACs as Alternative Investments: An Examination of Performance and Factors that Drive Prices*, 11 J. Private Equity 8 (2008) ("SPACs typically sell in units that are priced at $6, and each unit is composed of one common share and two warrants that give investors the right to buy two more shares for $5 each.").  Staff analysis of Dealogic data suggests unit offerings of 1 common

those issued to non-affiliated shareholders, give the holder the right to purchase common stock, typically at an exercise price of $11.50, for up to five years after the completion of the de-SPAC transaction.[1221]

**Figure 1. Warrants offered in SPAC IPO Units, 1990–2022[a]**



[a] The estimated distribution is based on the warrant offering information presented in either the IPO prospectus or the Form S-1 or Form F-1 registration statement filed in connection with all SPACs identified in Table 1.

As SPAC offerings have evolved, however, the dilutive potential of the warrant component of a SPAC offering unit appears to have somewhat diminished.  As indicated in Figure 1, across all the years included in Table 1, many SPACs offer units with fractional warrant components.  In more recent years (2019–2022, inclusive), the majority of SPACs that have conducted an IPO offered units with fractional warrants representing half a share or less.  The result of this trend is that warrant features have in some respects become less dilutive in

---

stock and two warrants was typical between 2000 and 2005.  Such structures reappear after 2020 but as a much smaller proportion of all unit structures.

[1221] *See* Gahng, Ritter & Zhang, *supra* note 30.

more recent years.[1222]  SPAC sponsors also often acquire warrants, with some studies estimating the amount of those acquisitions representing 3–5% of the IPO proceeds.[1223]

### 2.  De-SPAC Transactions

At the de-SPAC transaction stage, the primary parties affected by the new disclosure requirements include SPACs, SPAC sponsors, investors (including PIPE investors if any), and target companies.  Additionally, the final rules to amend or otherwise clarify the existing liability framework would affect those same parties (and certain individuals at those parties).

As illustrated in Table 3, based on staff analysis of SPAC IPOs that registered a sale of securities between 1990 and 2023, approximately two-thirds (65%) of all SPACs following their IPOs announced a de-SPAC transaction, and about one-half (49%) completed such transactions.[1224]  It is possible that SPACs currently searching for target companies may still identify target companies, complete de-SPAC transactions, and thereby increase the fractions of SPACs with announcements and completed transactions.  This de-SPAC transaction completion rate of approximately one-half is generally consistent with previous research findings (which may have used different ranges or filters for their samples).[1225]

---

[1222] Early SPACs typically offered one or two in-the-money warrants.  *See supra* note 1220.  More recent SPAC structures offer out-of-the-money fractional warrants.  *See supra* note 1221.

[1223] *See, e.g.*, Gül Okutan Nilsson, *Incentive Structure of Special Purpose Acquisition Companies*, 19 Eur. Bus. Org. L. Rev. (2018), *supra* note 1219.

[1224] Staff analysis based on the sample of SPAC IPOs described in Table 2 note a that reflect all confirmed, completed activity as of Dec. 31, 2023.

[1225] Studies performed in 2016 or later reviewing the 2003–2013 cohort of SPACs found that approximately 51.5% of SPACs that had an IPO during the decade successfully completed a de-SPAC transaction and 21.6% were still publicly traded three years later in 2016.  *See, e.g.*, Milos Vulanovic, *SPACs: Post-Merger Survival*, 43 Managerial Fin. 679, 679–699 (2017); Kamal Ghosh Ray & Sangita Ghosh Ray, *Can SPACs Ensure M&A Success?*, 16 Advances in Mergers & Acquisitions 83, 83–97 (2017).

**Table 3. SPAC Outcomes, Grouped by IPO Year, 1990–2023[a]**

| SPAC IPO Year | 1990–2000 | 2001–2005 | 2006–2010 | 2011–2015 | 2016–2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|
| Number of IPOs in Year | 18 | 41 | 128 | 67 | 400 | 613 | 86 | 31 |
| De-SPAC Transaction Announced | 17 | 41 | 108 | 59 | 334 | 282 | 47 | 8 |
| De-SPAC Transaction Completed | 17 | 35 | 64 | 52 | 319 | 175 | 11 | 0 |
| Liquidated | 1 | 6 | 64 | 15 | 71 | 258 | 12 | 0 |

[a] Estimates reported here are based on the respective samples of SPAC IPOs (see Table 2 note a) that reflect all confirmed, completed activity as of Dec. 31, 2023.  Transactions announced, transactions completed, and SPAC liquidations for each time period are based on realized future outcomes of the SPAC IPOs during that time period rather than the year of the announcement, completion, or liquidation.

Currently, the typical SPAC discloses in its IPO prospectus that it is formed for the purpose of effecting a business combination with one or more businesses.  Most SPACs pursue only one target company for a de-SPAC transaction.  Of the 583 business combination transactions with operating companies that occurred over the 1990–2022 period involving SPAC IPOs approximately 3% of transactions (17 of 583) involved two or more target companies (15 transactions involved two target companies and two transactions involved three target companies).[1226]

### i.  PIPEs in Connection with De-SPAC Transactions

PIPEs have supported de-SPAC transactions since approximately 2005.[1227]  However, in some recent de-SPAC transactions, PIPEs have played a larger role than they have historically played, and this has given rise to concern about the potential dilutive effects of PIPEs on SPAC shareholders and how well these dilutive effects might be understood by other investors.

According to a recent study analyzing the 47 registered de-SPAC transactions that

---

[1226]  Target counts are from Dealogic's SPAC M&A data.

[1227]  *See* Meghan Leerskov, *Shell Mergers and SPACs: A Statistical Overview of Alternative Public Offering Methods*, The Issuer's Guide to PIPES: New Markets, Deal Structures, and Global Opportunities 281 (Steven Dresner ed., 2015).

occurred between January 2019 and June 2020, the median cash raised through third-party PIPE investors was approximately 25% of the cash raised in the de-SPAC transactions.[1228]  The same study found that, following these transactions, the median portion of the post de-SPAC company owned by SPAC shareholders  including the sponsor was 35% and the median portion owned by the sponsor alone was 12%.[1229]  Because PIPE investors may receive confidential information with which to make an investment decision (including one-on-one conversations with the target company's management, which may convey soft information that enables PIPE investors to assess management abilities or determine their level of confidence in the management team) and may also engage in extended and detailed due diligence on the SPAC and target company,[1230] their participation has at times been considered a benefit to SPAC IPO investors, providing a positive signal of the expected future financial performance of the post-de-SPAC transaction combined company.

As the SPAC market has evolved, so too has the role of PIPEs that support, and in some cases enable, de-SPAC transactions.  In 2021, according to one study, approximately 95% of de-SPAC transactions included PIPE financings and the average ($316 million) and median ($210 million) amounts raised in PIPE financings were similar to the average size of the SPAC trust account at the time of the IPO.[1231]  This may reflect that in more recent SPACs, in addition to

---

[1228]  *See* Klausner, Ohlrogge & Ruan, *supra* note 18.  The authors analyzed data for the 47 public company SPACs that entered into a business combination with a target company, and thereby brought the operating company public, between Jan. 2019 and June 2020.

[1229]  *Id.*

[1230]  *Id.*

[1231]  *See* Michael Levitt, Valerie Jacob, Sebastian Fain, Pamela Marcogliese, Paul Tiger, & Andrea Basham*, 2021 De-SPAC Debrief,* FRESHFIELDS.US (Jan. 24, 2022)*, available at* https://blog.freshfields.us/post/102hgzy/2021-de-spac-debrief.  The difference between average and median PIPEs in this sample reflects that the data is positively skewed, implying that, while some deals may involve little or no additional financing via PIPEs, other deals feature large investments outside the SPAC IPO process.

enabling larger deals, some PIPEs may provide capital to ensure that a deal that otherwise may fail due to a high redemption rate can proceed to completion, although many PIPE offerings in connection with a de-SPAC transaction still appear to facilitate larger acquisitions rather than replace SPAC share redemptions.[1232]  In these cases, the ownership stake of the PIPE investors in the combined company may exceed that of the non-redeeming SPAC investors.[1233]  PIPE investors may, therefore, come to have a larger stake in the combined company than SPAC IPO investors anticipated when making an initial investment.  In 2022, this trend may have lessened slightly, with only 71% of de-SPAC transactions including PIPE financing, and the average ($128 million) and median ($92 million) amounts raised in PIPE financings were smaller than the average and median (both $269 million) sizes of the SPAC trust account at the time of the IPO.[1234]

---

[1232] *See supra* note 1203 which discusses de-SPAC transaction 80% minimum cash conditions.  We note that while there may be more instances in which PIPE financing functions to ensure that the cash requirements of a de-SPAC transaction are met in recent years, the difference between the average and median amount of PIPE financing raised (respectively approximately $300 million and $200 million) and the average and median consideration paid to target shareholders (respectively approximately $2 billion and $1.25 billion) point to PIPE offerings facilitating larger acquisitions.  *See id*.

[1233] Assuming the price of shares sold to PIPE investors is the same as or less than the IPO price, this outcome would also occur if the PIPE investments simply exceeded the size of the SPAC IPO proceeds without redemptions, but such cases have not been commonly observed.  In a review of PIPE finance raised in connection with de-SPAC transactions that occurred between Jan. 2018 and June 2021, the Commission staff found that while PIPE proceeds ranged on average from 60% to 88% of SPAC  IPO proceeds, net of redemptions, these proceeds represented up to 137% on average (in calendar year 2019) of SPAC IPO proceeds (raised from SPAC shareholders whose shares were not redeemed) at the consummation of the de-SPAC transaction.  De-SPAC transactions were less reliant on funding through PIPEs in 2022 than in 2021, according to one study, finding PIPEs were less common in de-SPAC transactions (70% compared to 95% in 2021) and were smaller in both absolute size (averaging approximately $128 million in 2022, compared to $316 million for the 2021) and size relative to the SPAC trust account (less than 50% in the 2022 deals, compared to nearly 100% in the 2021 deals).  *See* Freshfields, *2022 De-SPAC Debrief: A Comprehensive Review of all 102 de-SPAC Transactions That Closed in 2022*, FRESHFIELDS.US (Jan. 2023), *available at* https://www.freshfields.us/490963/globalassets/noindex/documents/2022-de-spac-debrief.pdf.

[1234] *See* Freshfields, *2022 De-SPAC Debrief: A Comprehensive Review of all 102 de-SPAC Transactions That Closed in 2022*, FRESHFIELDS.US (Jan. 2023), *available at* https://www.freshfields.us/490963/globalassets/noindex/documents/2022-de-spac-debrief.pdf.

PIPEs are typically priced at a discount relative to the market value of the publicly traded securities. For example, one study of PIPE transactions (including but not limited to de-SPAC transactions) indicates that the average discount for PIPE investors is 11.2% (compared to the market value of those securities), and for the subsample of PIPEs that do not include warrants, the average discount is 5.7%.[1235] Another study that focused on PIPEs in de-SPAC transactions of SPACs that conducted an IPO in or after 2015 and that completed a de-SPAC by March 2021 estimates that the mean discount for PIPE investors was approximately 20%.[1236]

### ii. Use of Projections in Connection with De-SPAC Transactions

Item 1609 of Regulation S-K will require certain enhanced disclosures about any projections disclosed in de-SPAC transactions.[1237] Hence, Item 1609 will potentially affect preparers and users of financial projections related to de-SPAC transactions, including SPACs, SPAC boards of directors, SPAC sponsors, target companies, both sets of controlling shareholders and management, and current and prospective investors.

Three recent papers discuss the use of projections by SPACs and target private operating companies in de-SPAC transactions. Chapman, Frankel, and Martin (2021) collected data on SPACs with IPO dates from 2015 to 2020.[1238] The authors found that 87% (249 out of 285) of de-SPAC transactions were accompanied by at least one forecast. Dambra, Even-Tov, and

---

[1235] *See* Jongha Lim, Michael Schwert & Michael Weisbach, *The Economics of PIPEs*, 45 J. Fin. Intermediation 100832 (2021). These results are based on a sample of 3,001 PIPE transactions by U.S. firms listed on NYSE or Nasdaq between 2001 and 2015.

[1236] *See* Gahng, Ritter & Zhang, *supra* note 30. We note that discount calculations involve several methodological assumptions regarding the valuation of warrants and the treatment of transfers. For example, another study finds that between 2019 and June 2020, the median discount received by PIPE investors was 5.5% relative to the market value of the publicly traded SPAC shares and that, in 37% of SPACs with PIPE deals, PIPE investors received a 10% discount or more. *See* Klausner, Ohlrogge, & Ruan, *supra* note 18.

[1237] 17 CFR 229.1609.

[1238] *See* Kimball Chapman, Richard M. Frankel & Xiumin Martin, *SPACs and Forward-Looking Disclosure: Hype or Information?* (Working Paper, Oct. 20, 2021), *available at* https://ssrn.com/abstract=3920714 (retrieved from SSRN Elsevier database).

George (2022) focus on de-SPAC transactions between January 1, 2010, and December 31, 2020.  The authors restricted their sample to transactions with a single target and excluded SPACs that delisted before the merger effective date, traded on the OTC market, or focused on the biotechnology industry, yielding a sample of 142 observations.[1239]  They identified 128 target private companies (90.1%) that provided at least one form of forecast (e.g., revenue or net income) in investor presentations.  Blankespoor, Hendricks, Miller, and Stockbridge (2022) reviewed a sample of 963 SPAC IPOs completed between January 1, 2000, and July 1, 2021.[1240] The authors removed companies "that are still seeking a merger target, have liquidated, are foreign, or have not publicly filed their roadshow" and arrived at a sample of 389 SPACs.  Of this sample, 312 (80.21%) SPACs provided a revenue forecast.  These three studies suggest that the use of projections is common in de-SPAC transactions.

### iii.  Use of Fairness Opinions

Item 1607 of Regulation S-K will require disclosures related to any report, opinion (other than an opinion of counsel) or appraisal received by the SPAC or the SPAC sponsor from an outside party or unaffiliated representative materially relating to, among other things, the fairness of the de-SPAC transaction to the SPAC, its security holders or SPAC sponsor if the SPAC or SPAC sponsor receives such a report, opinion, or appraisal.[1241]  Third-party providers of fairness opinions may factor the requirement for these disclosures into how they price their services as well as the types of information included in their reports and opinions.  As such, this disclosure requirement may affect SPACs' determination of whether to obtain fairness opinions.

---

[1239]  *See, e.g.*, Dambra, Even-Tov & George, *supra* note 36.

[1240]  *See* Elizabeth Blankespoor, Bradley E. Hendricks, Gregory S. Miller & DJ Stockbridge, *A Hard Look at SPAC Projections*, 68 Mgmt. Sci. 4742 (2022), *available at* https://doi.org/10.1287/mnsc.2022.4385.

[1241]  17 CFR 229.1607(a)(4).

In 2021, only 15% of de-SPAC transactions disclosed that they were supported by fairness opinions, according to one study.[1242]  In 2022, that proportion increased to 32%.[1243]  In contrast, a broader study of M&A transactions (not limited to SPACs) found that 85% of bidders obtained fairness opinions.[1244]

### iv. Changes in Jurisdiction of the Combined Company

In considering the potential economic effects of the final rules, we have taken into consideration elements of both the economic and the regulatory baseline, including consideration of variations between the applicable legal frameworks in the jurisdictions in which SPACs are organized.  Table 4 presents information on the jurisdiction of organization for each SPAC that conducted its IPO after 1990 and completed a de-SPAC transaction before 2022.  The first two columns state the percentage of SPACs that later had de-SPAC transactions that were originally organized in each of six listed jurisdictions at the time of their IPO.  The second two columns state—for each originating jurisdiction—the percentage of combined companies that have their jurisdiction of organization in the listed jurisdictions following a de-SPAC transaction.

---

[1242]  Michael Levitt, Valerie Jacob, Sebastian Fain, Pamela Marcogliese, Paul Tiger, & Andrea Basham, *supra* note 1231.

[1243]  *See supra* note 1234.

[1244]  *See* Tingting Liu, *The Wealth Effects of Fairness Opinions in Takeovers,* 53 Fin Rev. 533 (2018) (finding that fairness opinions are positively related to bidders' shareholder value and post-merger operating performance after the adoption of FINRA Rule 2290 in Dec. 2007 which regulates the identification and disclosure of conflicts of interest of FINRA members—e.g., broker-dealers with investment banking or valuation businesses—rendering fairness opinions.) The study's sample is of deals that occurred between 1995 and 2015, involving a publicly traded bidder that the study identified as seeking to acquire a majority of the target's shares.  As discussed by the authors, it is difficult to estimate the fraction of deals that involve a fairness opinion since, according to the authors, the use of fairness opinions is required to be disclosed only if bidders are required to file proxy statements in connection with the solicitation of shareholder votes.  They note that listing rules of the NYSE, NYSE American (named Amex in the study), and Nasdaq require a bidder shareholder vote only when the bidder plans to issue 20% or more new equity to finance a deal.   In other words, according to the authors, if the bidder issues less than 20% of its outstanding shares or uses cash as consideration to pay for the acquisition, the bidder would not be required to disclose the fairness opinion even if the firm had obtained one.

While the majority of SPACs that subsequently consummated a de-SPAC transaction remain organized in the same location, Table 4 indicates that, for some SPACs, the jurisdiction of organization of the combined company may change (compared to the SPAC's jurisdiction) in connection with the de-SPAC transaction. As a result, SPACs may face changes in prevailing legal standards that arise from a change in jurisdiction of organization. To the extent that different jurisdictions have different disclosure requirements and provide differing levels of investor protections, the baseline regulatory framework will vary across SPACs and may change upon the de-SPAC transaction. For example, the incremental impact of the minimum dissemination period requirement may vary by jurisdiction.[1245]

---

[1245] *See infra* note 1364.

392

**Table 4. Distribution of Combined Company Jurisdiction of Organization by SPAC Jurisdiction of Organization, 1990–2022[a]**

| Organization at IPO | % of IPOs that Later de-SPAC | Organization Post de-SPAC | % of Total Number of Organization at IPO |
|---|---|---|---|
| Delaware | 67.0% | Delaware | 82.3% |
| | | Cayman Islands | 4.2% |
| | | Virgin Islands (British) | 1.9% |
| | | Bermuda | 1.9% |
| | | Israel | 1.3% |
| | | Marshall Islands | 1.0% |
| | | Luxembourg | 1.0% |
| | | United Kingdom | 0.7% |
| | | Channel Islands | 0.7% |
| | | British Columbia | 0.7% |
| | | Island of Guernsey | 0.7% |
| | | Netherlands | 0.7% |
| | | Utah | 0.3% |
| | | Switzerland | 0.3% |
| | | India | 0.3% |
| | | Virginia | 0.3% |
| | | Bahamas | 0.3% |
| | | Gibraltar | 0.3% |
| | | Australia | 0.3% |
| | | New York | 0.3% |
| | | Quebec | 0.3% |
| | | Nevada | 0.3% |
| Cayman Islands | 28.3% | Delaware | 60.3% |
| | | Cayman Islands | 26.0% |
| | | Netherlands | 3.8% |
| | | Israel | 3.8% |
| | | Luxembourg | 2.3% |
| | | Republic of Ireland | 0.8% |
| | | Ireland | 0.8% |
| | | United Kingdom | 0.8% |
| | | Jersey (Bailiwick of Jersey) | 0.8% |
| | | Ontario | 0.8% |
| British Virgin Islands | 3.7% | British Virgin Islands | 47.1% |
| | | Delaware | 17.7% |
| | | Cayman Islands | 11.8% |
| | | Singapore | 5.9% |
| | | United Kingdom | 5.9% |
| | | Ireland | 5.9% |
| | | Mexico | 5.9% |
| Marshall Islands | 0.4% | Marshall Islands | 100.0% |
| Florida | 0.2% | Delaware | 100.0% |
| Massachusetts | 0.2% | Massachusetts | 100.0% |
| Nevada | 0.2% | Cayman Islands | 100.0% |

[a] Estimates are based on the subsample of SPAC IPOs that subsequently completed a de-SPAC transaction. Data on state of organization is obtained from a combination of sources, including Dealogic, Audit Analytics, and SEC filings available on EDGAR. These estimates reflect all confirmed, completed activity as of Dec. 31, 2022.

393

### 3. Blank Check Companies

We are adopting final rules that define "blank check company" for purposes of the PSLRA safe harbor provisions regarding forward-looking statements.[1246]  The final rules will affect SPACs and any other companies that would otherwise meet the Rule 419 definition of "blank check company" except that they are not issuers of penny stock, which currently seek to rely on the PSLRA safe harbor.  The final rules also may affect investors and other market participants' access to the informational content of forward-looking statements or potential remedies in the case of material omissions from, or material misstatements in, a prospectus or registration statement or in connection with the purchase or sale of a security.

We estimate that, in addition to potentially affected SPACs, as previously discussed,[1247] the final rules also may affect approximately 32 non-SPAC entities that self-identified as blank check companies but would not meet the current definition of "blank check company" under Rule 419 given that they did not self-identify as penny stock issuers.[1248]

---

[1246]  *See supra* Section III.D.

[1247]  *See supra* Sections VIII.A.1.i, VIII.A.2.

[1248]  This estimate is based on staff review of all registrants, by unique CIK, that filed at least one registration statement, or quarterly or annual report in 2022 and for which the term "penny stock" did not appear in any of these filings according to a text search from Intelligize.  This approach to identifying penny stock issuers may be subject to errors as studies have found that self-reported SIC codes may contain errors that could cause a higher number of issuers to be counted as affected parties than should be counted.  *See, e.g.*, Murat Aydogdu, Chander Shekhar & Violet Torbey, *Shell Companies as IPO Alternatives: An Analysis of Trading Activity Around Reverse Mergers*, 17 Applied Fin. Econ. 1335 (2007) ("Not all firms that use SIC code 6770 are actually blank checks.  For instance, companies are required to file Form 12 after an acquisition to notify the SEC of their new SIC code.  Many fail to file as they acquire operations in a business with a more descriptive SIC code, yet they continue to use 6770.").  Our estimate does not seek to reclassify potential errors in this case because we are not able to distinguish when the classification error would represent a mistake made by a registrant that knows it is not a blank check company for SIC code purposes versus when the registrant is mistaken in its belief that it is a blank check company for SIC code purposes.  In the latter case, even if mistaken about its blank check company status for SIC code purposes, the party may still be affected by the final rules because they may currently make, or believe they are able to make, forward-looking statements that would fall under the PSLRA safe harbors.

*4.   Shell Company Business Combinations*

Securities Act Rule 145a and Article 15 of Regulation S-X may affect SPACs and other shell companies (other than business combination related shell companies) involved in business combination transactions.  To the extent that Rule 145a transactions are registered, investors would receive disclosures in a registration statement, and registration would result in enhanced liabilities for the registrant and other parties who have liability under Securities Act Section 11 with respect to the registration statement.  Article 15 of Regulation S-X will affect the financial statements associated with business combinations involving shell companies and thereby affect parties that are typically associated with the preparation, review, and dissemination of financial statements.[1249]

Table 5 below illustrates that the proportion of de-SPAC transactions to non-SPAC reporting shell company business combinations has increased due to the recent increase in the number of SPACs entering the market and subsequently merging with target companies.[1250]  In 2016, only 8% of all targets acquired by a reporting shell company merged with a SPAC.  The proportion increased to 76% in 2021 and 65% in 2022.

**Table 5. Distribution by Year of Shell-Mergers Reported on Form 8-K[a]**

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|
| SPAC | 8.3% | 9.5% | 22.9% | 37.0% | 51.4% | 76.1% | 64.9% |
| Non-SPAC | 91.7% | 90.5% | 77.1% | 63.0% | 48.6% | 23.9% | 35.1% |

[a] Based on Form 8-Ks by calendar year of filing that contain Item 5.06 (Change in Shell Company Status) disclosures, based on data from Intelligize, omitting duplicate reports from the same issuer filed on the same day.

---

[1249]  If a previously non-public shell company files a registrant statement, the financial statements included in the registration statement would be required to comply with Regulation S-X, including final Rule 15-01.   We currently lack the data necessary to estimate the number of shell companies that are private that could be impacted by Article 15 if they file such a registration statement.  As a result, this data is not included in the estimates discussed in our analysis.

[1250]  The portion of non-SPAC shell company mergers may be overstated if some of the filings reflect changes in shell company status that are not a result of a business combination, such as a change in business model.

We estimate that, in addition to existing SPACs that have yet to complete a de-SPAC transaction (as of the end 2022, there were 324 such SPACs according to the figures reported in Table 3), approximately 156 additional existing non-SPAC reporting shell companies may be affected by the final rules.[1251]  Almost all of these non-SPAC reporting shell companies trade in the OTC market and are smaller than SPACs in terms of market capitalization and total assets.[1252] We further estimate that approximately 7.7% (12) of these shells may also be affected by the definition of the term "blank check company" for purposes of the PSLRA in the final rules.[1253]

## B. Benefits and Costs of the Adopted Rules

### 1. Disclosure-Related Rules

#### i. Definitions (Item 1601)

New Item 1601 defines certain parties and transactions to which the requirements of Regulation S-K subpart 1600 apply.  Defining the terms "special purpose acquisition company," "de-SPAC transaction," "SPAC sponsor," and "target company" establishes the scope of the parties and transactions subject to the requirements of Subpart 1600 and any other rules, including other final rules, that rely on these definitions and thereby provides both registrants and investors notice of the associated obligations and expectations.[1254]

---

[1251] This estimate is based on staff review of all registrants' self-reported status as a shell company on the cover page of the most recent annual report (Forms 10-K, 20-F, or 40-F) or an amendment thereto filed in calendar year 2022  by unique CIKs of entities that are not already identified as SPACs.

[1252] As of year-end 2021, the average market capitalization of a non-SPAC shell company was $154,731,262 while the average market capitalization of a SPAC was $306,204,218.  Based on the most recent periodic disclosure filed per registrant before Dec. 31, 2021, the average total assets of a non-SPAC shell was $33,666,553 while the average of total assets of a SPAC was $309,570,778.

[1253] This estimate is based on a cross-tabulation, by unique CIK, of potentially affected parties identified as blank check companies (*supra* note 1248) and as shell companies (*supra* note 1251).

[1254] *See, e.g.*, General Instruction I.2 of Form S-4 (If the target company, as defined in Item 1601(d) of Regulation S-K (17 CFR 229.1601(d)), in a de-SPAC transaction is not subject to the reporting requirements of either Section 13(a) or 15(d) of the Exchange Act, certain additional information with respect to the target company must be provided).

As discussed above, in response to commenters, the Commission is adopting Item 1601 with modifications.[1255]  We have designed the rules with particular types of parties and transactions in mind and we have endeavored to define these parties and transactions in a way that is consistent with our understanding of current market usage.  Overly narrow definitions will generally result in reduced costs and benefits.  Conversely, overly broad definitions may introduce unintended costs to market participants without necessarily providing commensurate benefits, as they may be less applicable to settings we are not explicitly contemplating today.

### ii.  *SPAC IPOs and Other Registered Offerings*

At the SPAC IPO stage, there are information asymmetries between potential SPAC investors and the SPAC, making it challenging for investors to differentiate between SPACs and other investment options and to differentiate among SPACs.  A SPAC sponsor looking to secure IPO investments may have incentives to obscure information that would be relevant to potential investors.[1256]  Information regarding the specifics of the SPAC that informs investors about the probability of completion of a de-SPAC transaction and the potential payoffs to the investor of such a transaction is important for investment decisions.  For example, information about the SPAC sponsor or potential conflicts of interest of the SPAC sponsor may factor into investors' decisions.[1257]  This information should also benefit investors attempting to differentiate between investments in alternative SPACs.

---

[1255]  *See supra* Sections II.A.1.iii, II.A.2.iii, II.A.3.iii, II.A.4.iii.

[1256]  We acknowledge there may exist heterogeneity in risk preferences among investors, but this does not substantially change the incentive misalignment with the SPAC's incentives.

[1257]  *See supra* Sections II.B and II.C.

*a. Prospectus Cover Page, Summary, and Other Disclosures (Item 1602)*

Item 1602 requires a prospectus filed in connection with a SPAC's IPO to disclose information in plain English on certain features unique to SPAC offerings and the potential associated risks, in addition to the information currently required by Item 501 and Item 503 of Regulation S-K, on the prospectus cover page and in the prospectus summary, as discussed above.[1258]  On the cover page, SPACs will be required to disclose, among other information: the proposed timeline of the SPAC to consummate a de-SPAC transaction; redemption terms; compensation (including securities issued to certain SPAC insiders); any actual or potential conflict of interest of the SPAC sponsor, its affiliates, or promoters; and a tabular disclosure of net tangible book value per share, as adjusted, for various redemption levels.  In the prospectus summary, SPACs will be required to disclose, among other information, the manner in which the SPAC will identify and evaluate potential business combination candidates, period of time in which the SPAC intends to consummate a de-SPAC transaction and its plans in the event it does not consummate such a transaction within the time period including the timeline and potential extensions, the material terms of the trust or escrow account, plans to seek additional financing (and the impact on shareholders), and details on the impact of compensation and securities issuances on dilution.  These additional disclosures are meant to reduce the information asymmetry between the SPAC and potential investors.  These disclosures will provide enhanced information for investors to assess their investment and voting decisions and to differentiate between the SPAC and other investment options.

We expect Item 1602 will also reduce SPAC investors' information processing costs. Investors in SPACs vary in financial sophistication and ability to process the information

---

[1258] *See supra* Section II.E for more information about current disclosure requirements.

provided in SPAC IPO prospectuses, and the potential benefits may accrue more to investors that are less financially sophisticated. Specifically, because investors are likely to allocate their attention selectively,[1259] requiring disclosure regarding important features and associated risks of SPAC investments on the prospectus cover page and in the prospectus summary will increase the likelihood that investors focus on the salient information by making it more noticeable and easier to parse.[1260] In addition, the new disclosures in the prospectus summary may further reduce information processing costs by providing information about important SPAC features in plain English and in a concise format.[1261]

Item 1602(b)(6) will require tabular disclosure in the prospectus summary regarding the nature and amount of the compensation received or to be received by, as well as the amount of securities issued or to be issued to, the SPAC sponsor, its affiliates, and promoters separately, and the extent to which this may result in a material dilution of the purchasers' equity interests. There is empirical evidence that visualization improves individuals' perception of information.[1262] For example, one experimental study shows that tabular reports can lead to

---

[1259] *See, e.g.*, George Loewenstein, Cass R. Sunstein & Russell Golman, *Disclosure: Psychology Changes Everything*, 6 Ann. Rev. Econ. 391 (2014).

[1260] Salience detection is a key feature of human cognition allowing individuals to focus their limited mental resources on a subset of the available information and can cause them to over-weight this information in their decision-making processes. *See, e.g.*, Daniel Kahneman*, Thinking Fast and Slow* (New York, Farrar, Straus and Giroux, 2013); Susan Fiske & Shelley E. Taylor*, Social Cognition: From Brains to Culture* (3d ed., London, SAGE Publications, 2017). Moreover, for financial disclosures, research suggests that increasing signal salience is particularly helpful in reducing limited attention of individuals with lower education levels and financial literacy. *See, e.g.*, Victor Stango & Jonathan Zinman, *Limited and Varying Consumer Attention: Evidence from Shocks to the Salience of Bank Overdraft Fees*, 27 Rev. of Fin. Stud. 990 (2014).

[1261] Existing research notes that individuals bear costs in absorbing information and that the ability of individuals to process information is not unbounded. *See* Richard Nisbett & Lee Ross, *Human Inference: Strategies and Shortcomings of Social Judgment* (Prentice-Hall, 1980); David Hirshleifer & Siew Hong Teoh, *Limited Attention, Information Disclosure, and Financial Reporting*, 36 J. Acct. & Econ. 337 (2003).

[1262] *See, e.g.*, John Hattie, *Visible Learning: A Synthesis of Over 800 Meta-Analysis Related to Achievement* (London, Routledge, 2008).

better decision-making.[1263]  Because information about compensation received by and securities issued to SPAC sponsors and others may be important to SPAC investor decision-making, the tabular format of these required disclosures may help those investors (especially those that are less financially sophisticated) more easily process the implications of such compensation or securities issuances thereby potentially improving their investment decisions.[1264]

More broadly, Item 1602 will standardize these disclosures across all registration statements filed for SPAC IPOs, which may make it less costly for investors to compare terms across offerings and thereby promote better investment decisions to the extent these lower costs facilitate broader or more comprehensive analysis.

Finally, to the extent the additional disclosures on the cover page and in the prospectus summary would increase investors' awareness of SPAC sponsors' incentives and potential conflicts of interest, they may have an incremental disciplining effect on SPAC sponsors' behavior.  For example, if SPAC sponsors face greater scrutiny from investors, they may take additional care in finding and negotiating terms with various parties or take steps to mitigate the extent of any conflict of interests they will have to disclose.

The additional required disclosures on the prospectus cover page and in the prospectus summary may increase compliance costs for SPACs to the extent that they will need to provide more information in their IPO prospectuses than they currently provide.  We believe that SPACs are likely to have this information readily available.  In addition, based on the experience of the Commission staff reviewing current SPAC filings, SPACs often already disclose some of this

---

[1263]  *See* Izak Benbasat & Albert Dexter, *An Investigation of the Effectiveness of Color and Graphical Information Presentation Under Varying Time Constraints*, 10-1 Mis Q. 59 (1986).

[1264]  *See infra* Section VIII.B.1.ii.b.1.ii.b VIII.B.1.VIII.B.1.ii.a for the discussion of Item 1602(a)(4), which would require that the prospectus cover page include a simplified dilution table depicting the estimated remaining net tangible book value, as adjusted, per share at quartile intervals up to the maximum redemption threshold.

information, such as the time frame for the SPAC to consummate a de-SPAC transaction. Thus, we expect that the additional compliance costs resulting from these new items will not be significant.

Investors may also experience additional economic costs from these new disclosures. In particular, it is possible that, by requiring more items to be added to the cover page and the prospectus summary, the salience of the current required disclosures on the cover page and in the prospectus summary may be reduced because they will have to compete with the new required disclosures for investors' attention, a concern voiced by some commenters.[1265] In addition, because Item 501(b) of Regulation S-K limits the information on the outside cover page to one page, it is possible that, under certain facts and circumstances, the amount of information required to be included could reduce the readability of the cover page. As a result, some investors may pay less attention to the cover page as a whole. Conversely, it is possible that investors may overweigh the salience of certain disclosures of potential outcomes, such as tentative plans to seek additional financing, potentially assuming them to be statements of greater certainty than intended.[1266] However, this potential cost could be mitigated by firms providing clarity as to their assumptions and expectations regarding these disclosures.

### b. Dilution (Items 1602(a)(4) and 1602(c))

SPAC investors may experience dilution from various transactions by a number of parties at various stages of a SPAC's lifecycle, and understanding these potential dilutive impacts is important for investment and other decisions.[1267] As an example of such a source of dilution, in

---

[1265] Letters from ABA, Loeb & Loeb, Ropes & Gray and Vinson & Elkins. *See supra* note 325 and accompanying text.

[1266] A similar concern was raised by a letter from Vinson & Elkins.

[1267] In this section and throughout the Economic Analysis, references to dilution of SPAC investor interests refer to the dilutive effects on non-redeeming public shareholders, unless otherwise specified.

different transactions over the life cycle of the SPAC, there may be variations in the amount of consideration paid in exchange for shares of the SPAC that will cause dilutive or anti-dilutive effects. One specific example of such variations involves the SPAC sponsors' "promote," which is typically obtained at a nominal value (e.g., $25,000, which depending on specific facts and circumstances could result in a per share purchase price of several cents) compared to the SPAC IPO purchase price (typically $10 per share). SPAC IPO shares are also commonly bundled with warrants and rights, resulting in the potential future impacts on net tangible book value per share, which may be dilutive or anti-dilutive of net tangible book value per share depending on whether the exercise price exceeds net tangible book value per share at the time.

The impact of dilution is further magnified by a common feature in many SPACs whereby public shareholders may redeem their shares before the de-SPAC transaction and have their original investment returned plus a pro-rata amount of earnings (typically interest) accrued on the original investment proceeds held in the trust account. Following these redemptions, the non-redeeming IPO investors will own a relatively smaller portion of the SPAC relative to the portion owned by the SPAC sponsor (SPAC sponsor shares are typically not redeemable). This change in the relative portion of shares generally has a dilutive effect because the IPO investors often contribute more per share to net tangible book value (typically $10/share) than do SPAC sponsors (typically several cents per share, as mentioned above).

To put the effects of redemption in context, we present the historical redemption levels below in Figure 2. Figure 2 presents the average realized redemptions from de-SPAC transactions between 2010 and 2022. As shown in Figure 2, typically just over half of the public shareholders opt to redeem their shares on average before the de-SPAC transaction (the average redemption level for de-SPACs from 2010 to 2022 was 55% and the median was 65%), but that

the level of redemptions is not consistent over time.  For example, in 2022 the average

redemption level was 85%, whereas the average in 2020 and 2021 was 38% and 45%,

respectively. This time-series variation in average redemption rates is not a result of variation in

the average maximum redemption rate, which has remained relatively steady at just above 90%

since 2015.[1268]

**Figure 2. Realized Redemptions at de-SPAC[a]**



[a] The redemption realizations are based on the sample of SPACs identified in Table 2.

Understanding the sources and extent of dilution, including the impact of potential

redemptions, is important for investors to make informed decisions and efficiently allocate

capital.  As discussed above, the final rules require new disclosures about the sources and extent

of expected dilution, which we expect will reduce the information asymmetry between the

various SPAC participants by providing information that investors can use to form their

expectations about the investment value of a SPAC.[1269]  Further, we are requiring disclosures

---

[1268]  Based on staff review, many SPACs set maximum redemption thresholds to maintain a minimum of $5,000,000 net tangible assets to avoid meeting the definition of a "penny stock" in 17 CFR 240.3a51-1(g)(1) under the Exchange Act.

[1269]  *See supra* Section II.D.

that demonstrate the changing effect on dilution that various levels of redemptions might have.[1270]

The dilution disclosures in Items 1602(a)(4) and 1602(c) require measuring dilution using net tangible book value per share, adjusted as if the offering (and assumed redemption levels) have occurred and giving effect to material probable or consummated transactions (other than the de-SPAC transaction itself).  Net tangible book value per share, as adjusted, captures effects from changes in net tangible book value, as adjusted, in the numerator (for example, returning cash to redeeming shareholders or other transactions that change the amount of assets held in the SPAC trust account), and/or the number of shares outstanding in the denominator (for example, redemptions of shares or other transactions that change the total shares outstanding).

As a simple illustrative example of how net tangible book value per share, as adjusted, reflects various dilutive effects, a hypothetical SPAC might conduct an IPO at $10/share, and sell 80 shares, resulting in $800 in the trust account.  The SPAC sponsor might receive promote shares equal to 25% of the IPO shares sold, or 20 shares, bringing the total shares outstanding to 100 (for simplicity, we omit the typical nominal amount SPAC sponsors often pay for their promote).  Assuming no other expenses, the net tangible book value per share, as adjusted, in this simplified hypothetical would be $800/100 shares or $8/share.  In this hypothetical example, if 75% of public shareholders, representing 60 total shares, were to redeem their shares for $10/share, then $600 would be removed from the trust account and paid to those redeeming shareholders, and the SPAC would be left with $200 in the trust account, 20 shares owned by the public shareholders, and 20 shares owned by the sponsor.  In this case, the net tangible book value per share, as adjusted, would be $200/40 or $5/share.  This $5/share value can be thought

---

[1270]  *Id.*

of as reflecting that, of the $10/share invested by public investors in the IPO, only half remains to be invested in the target.  It can also be seen to reflect the fact that the SPAC sponsor and the non-redeeming public investors now have an equal ownership (where initially there was a 4:1 ownership ratio), and the SPAC sponsor owns half of the remaining shares.[1271]

At the SPAC IPO stage, we expect that the tabular disclosure of net tangible book value per share, as adjusted, under Items 1602(a)(4) and 1602(c) typically may include fewer sources of dilution that factor into such calculation as compared to the number of sources of dilution that factor into tabular disclosure of value.[1272]  While many SPACs adopt a standard structure and set of governing terms, and we expect the sources of dilution to be broadly similar across SPACs at the IPO stage, we expect the final rules will enable investors to better differentiate the SPAC from other investment opportunities and, where they exist, identify differences among individual SPACs.

Specifically, Item 1602(a)(4) requires registration statements on Form S-1 or Form F-1 filed by SPACs, including for an IPO, to include on the cover page a tabular disclosure of net tangible book value per share, as adjusted, as of the most recent balance sheet date at quartile intervals based on the percentages of the maximum redemption threshold, and the difference between this value and the offering price.[1273]  This net tangible book value measure must be adjusted "as if" the offering and assumed redemption levels, under Item 1602(a)(4), have occurred and to give effect to material probable or consummated transactions (other than the completion of the de-SPAC transaction itself).

---

[1271] We note that while this example suggests the redemptions resulted in dilution as measured by net tangible book value per share, as adjusted, the resultant concentration of ownership may be seen by the non-redeeming shareholders as beneficial.

[1272] *See supra* Section II.D.

[1273] *Id.*

405

Item 1602(a)(3) also requires a further cover page disclosure of whether the compensation or issuance of securities described in Item 1602(a)(3) may result in material dilution of the purchasers' equity interests.  Item 1602(b)(6) requires in the prospectus summary similar disclosure to that of Item 1602(a)(3) but specifies that the registrant should describe the extent (rather than "whether," as required in Item 1602(a)(3)) to which the associated compensation or issuance of securities may result in material dilution of the purchasers' equity interests.

Item 1602(c) requires that registered offerings by SPACs (other than de-SPAC transactions) provide a description of each material potential source of future dilution following the registered offering (e.g., a SPAC's IPO).  The item also requires tabular disclosure for the same quartile intervals as in Item 1602(a)(4) of the net tangible book value per share, as adjusted, and the natures and amounts of dilution used to determine the values in the tabular disclosure, as well as other information necessary to understand the disclosure, among other things.[1274]  These new disclosures will provide investors with more detailed information on the potential sources of dilution which may better enable them to form expectations regarding the future value of their securities, including their shares should they opt not to redeem.

We expect these dilution disclosures at the SPAC IPO stage will facilitate investor differentiation between SPACs as an investment and other non-SPAC investments by highlighting the sources of potential dilution and demonstrating their effects for investors to incorporate into their investment decisions.  While some of this information is available elsewhere as required by existing disclosures (e.g., outstanding share information),[1275] these

---

[1274]  *See supra* Section II.D for a more detailed description of the disclosure requirements.

[1275]  Some commenters raised this issue.  *See, e.g.*, letter from Loeb & Loeb.  *See supra* note 245 and accompanying text.  With regard to outstanding share information, *see, e.g.*, 17 CFR 210.5-02 (Item 5-02 of Regulation S-X)

dilution disclosures centralize and standardize that information, making it more salient and readily available for investors to understand the material differences in a SPAC in contrast with other investments.  Similarly, we expect the additional detail of potential sources of dilution and tabular disclosure of net tangible book value per share, as adjusted, to provide relevant comparison information to investors seeking to differentiate between SPACs.  Together, we expect this information will help investors to better understand the effects of dilution on their investments and ultimately to make better-informed investment decisions.

We acknowledge that it is possible the dilution disclosures could be interpreted by investors as conveying more certainty about the sources or effects of dilution (or lack or omission thereof, where those sources are not deemed probable) than is intended by the SPAC.[1276]  However, the requirement in Item 1602(c) that the SPAC include a "description of the model, methods, assumptions, estimates, and parameters necessary to understand the tabular disclosure" should mitigate this possibility, and provide investors sufficient context to fully understand the disclosure's underlying assumptions and limitations they impose.

We expect the dilution disclosures at the IPO stage to provide valuable information to investors, both to compare between SPAC IPOs, and as a baseline against which they can compare the de-SPAC dilution disclosures, if and when a de-SPAC transaction is proposed.  We expect this dilution disclosure to be especially informative for SPAC investors who remain investors in the combined company, as historically they have been greatly impacted by the

---

(requiring disclosure of the title of each class of stock, the number authorized, the number outstanding, and the dollar amount thereof) and Item 11(e) of Form S-1 (requiring financial statements that meet the requirements of Regulation S-X).

[1276] A similar concern was raised by a commenter. *See* letter from White & Case.

above-mentioned dilution effects.[1277]  Further, if investors do not understand the full extent of the dilution, it may not be fully reflected in market prices, and thus we expect that requiring clear and concise dilution disclosures will ameliorate this potential mispricing (especially so for potential warrants or other derivative securities) and improve overall allocative efficiency.[1278]

Given the empirical evidence that visualization improves individuals' perception of information[1279] and that any dilution caused by redemption may have an adverse effect on investors who choose not to redeem, we expect that the tabular format of these disclosures will help investors (especially those that are less financially sophisticated) more easily process the financial implications of dilution and consequently improve their investment decisions.

Moreover, the required dilution disclosure should provide prospective SPAC investors with information (with the aforementioned benefits of the tabular format) that more accurately represents the dilution that they might experience if they invest in the SPAC, as compared to current Item 506 disclosures with regard to the effect of potential redemptions.[1280]  SPACs currently disclose the potential dilution pursuant to Item 506, and commonly focus solely on a single maximum redemption scenario.[1281]  This single threshold may be less useful to investors than the new tabular presentation of quartile intervals of redemption levels because the actual redemptions in connection with a de-SPAC transaction rarely reach the maximum allowable

---

[1277] *See* Klausner, Ohlrogge, & Ruan, *supra* note 30 (finding that "SPAC shareholders bear all costs" associated with the dilution of cash associated with the SPAC structure and redemptions, based on empirical analysis of post-merger performance using the sample of de-SPAC transactions occurring between Jan. 2019 and June 2020).

[1278] *See* Gahng, Ritter & Zhang, *supra* note 30; Klausner, Ohlrogge, & Ruan, *supra* note 30.

[1279] *See* Hattie, *supra* note 1262; Benbasat & Dexter, *supra* note 1263.

[1280] *See supra* note 221.

[1281] *Id*.  SPAC IPO registration filings currently include dilution disclosures, and these disclosures typically present dilution given 100% redemption.

amount.  Commenters largely agreed with this assessment,[1282] with one commenter noting that "more detailed information on the potential impact of dilution on the value of SPAC shares could help investors better understand the various sources of dilution and the extent to which their investments might drop in value" and that this information could "factor into their decision making."[1283]

The reasoning that a tabular disclosure at multiple levels of redemption will better inform expectations of the ultimate dilution is supported by the evidence in Figure 2, which demonstrates that while the maximum redemption level has been very stable over time, the actual redemption levels have been typically far below the maximum threshold.  The final rules will provide investors with more granular information about potential dilution across multiple redemption levels than previously required, which should provide information more congruent with the observed variation in dilution—such as that shown by the variation from one year to another of average realized redemption percentages in Figure 2.  This, in turn, should allow investors to better anticipate the effects of such dilution on future returns to these investors from their investment and better inform their investment decision-making.[1284]

The disclosures may not include some dilution effects in some SPAC structures.  For example, as one commenter explained, "some de-SPAC transactions are structured such that certain funding mechanisms, such as backstop, forward purchase or PIPE arrangements, apply only in the event of certain redemption thresholds."[1285]  We agree that there are significant intricacies involved in SPAC structures that are not known at the time of the SPAC IPO, and that

---

[1282]  *See, e.g.*, letters from Bullet Point Network, CII, Consumer Federation.

[1283]  Letter from Consumer Federation.

[1284]  *See* Klausner, Ohlrogge & Ruan, *supra* note 18.

[1285]  Letter from White & Case.

those intricacies can impact the extent and patterns of dilution faced by non-redeeming shareholders.  However, we believe there is still significant benefit to investors in a tabular presentation of dilution at different redemption levels for those sources of dilution that qualify as "material probable or consummated transactions" as required under the final rule. Further, we note that the requirement for non-tabular disclosure of "each material potential source of future dilution" under Item 1602(c) may discuss a broader set of items than those that are included for purposes of calculating the tabular dilution measure, which could capture some of the complex effects explained by the commenter.  Further, the final rules regarding dilution disclosures should provide more clarity into these complex effects than the current, more simplified disclosures pursuant to Item 506.

We expect the final rules to reduce the costs to investors of conducting a dilution analysis.  Without the tabular disclosures we are requiring, each shareholder wishing to understand the net effects of all the financing arrangements would have to calculate the various conditions themselves—which would require a full understanding of the terms and extents to which they interact—before being able to calculate the ultimate impact on dilution.  Under the final rules, this process will be completed by the registrant, which already has the full understanding of conditions and terms and is best suited to conduct said calculations.

The tabular format of the disclosures required by Items 1602(a)(4) and 1602(c) will standardize the presentation of dilution information, which we expect will allow investors to analyze and compare more easily across SPACs.  This increase in comparability should allow investors to compare the structural differences in dilution across SPACs which, to the extent relevant, should improve investment and capital allocation decisions.

We expect the incremental compliance costs of the final dilution disclosure requirements at the SPAC IPO stage to be low for two reasons.  First, registrants should already have the underlying information at their disposal and are therefore unlikely to incur significant additional costs to procure the necessary data (especially so since SPACs currently conduct a dilution calculation pursuant to Item 506).

Second, while Items 1602(a)(4) and 1602(c) require registrants to account in the tabular disclosure for material probable sources of dilution and analyze several levels of redemption, which may require the services or input of quantitative specialists, the material probable sources of dilution are generally common across SPAC offerings and are generally well known and quantifiable.  For example, sources of dilution at the IPO stage may include shareholder redemptions, SPAC sponsor compensation or "promote," general and administrative expenses, underwriting fees, warrants, and other convertible securities.[1286]  Because of the consistency that a tabular format should promote, it is likely that a standard approach based on best practices will emerge, reducing registrant costs over time.

We are also amending Form S-1 to no longer require Item 506 dilution disclosures for SPAC filings because the dilution disclosures required in Item 1602 will replace those generic dilution disclosures.  We believe these Item 506 disclosures are less informative in the SPAC setting because, based on the Commission staff's experience reviewing recent SPAC filings, SPACs classify the redeemable shares as temporary equity and exclude the cash raised from sales of those shares from the net tangible book value.  This classification results in a dilution

---

[1286] For a detailed discussion of certain potential sources of dilution and the calculation of net tangible book value per share, as adjusted, *see supra* Section II.D.3.  We note that many of these sources of dilution captured by net tangible book value per share, as adjusted, follow treatment under GAAP, thus the cost of calculating them is expected to be low, and in many cases required otherwise as part of the SPAC financial disclosures.

measure that excludes the vast majority of the SPAC's cash holdings.[1287]  Thus, to the extent that current Item 506 dilution calculations are duplicative of or less relevant to investment decisions than the dilution disclosures at the SPAC IPO required by the final rules, we expect the exclusion of the Item 506 dilution disclosures will lessen information acquisition costs for investors without omitting important information.[1288]  Removing the Item 506 disclosure requirement will also remove any disclosures costs that would have otherwise been incurred by registrants to produce those disclosures.

### c. Sponsors and Conflicts of Interest (Item 1603)

At the SPAC IPO, new Item 1603(a) requires disclosure of certain information regarding a SPAC sponsor, its affiliates, and any promoters.  This item requires, among other information, disclosures concerning the SPAC sponsor that include the following: name, form of organization, controlling persons, general character of business, and any arrangements or other agreements between the sponsor and the SPAC, its officers, directors, or affiliates with respect to determining whether to proceed with a de-SPAC transaction.  This item also requires, among other information, disclosures about the SPAC sponsor, its affiliates, and promoters that include the following: their experience; material roles and responsibilities and the nature and amounts of their compensation and reimbursements and SPAC securities issued to them or to be issued to them.[1289]  To the extent that such disclosures are not already provided or are only partially

---

[1287] Several commenters similarly expressed the view that Item 506 net tangible book value is less relevant to SPAC investors.  *See, e.g.*, letter from White & Case (stating that the current net tangible book value calculation according to U.S. GAAP "produces a result that is not practically relevant to prospective investors in the public shares whatsoever.").

[1288] The information acquisition costs mentioned would entail gathering, processing, and incorporating the information from the Item 506 dilution disclosure into investors' existing information and decisions.

[1289] Additionally, Items 1602(a)(5) and 1602(b)(7) will require similar conflict of interest disclosures to be displayed prominently on the prospectus cover page and summary, respectively.  We expect this prominence will further heighten the benefits discussed in this section, while incurring limited additional compliance cost, as the information is largely already disclosed elsewhere in Item 1603.

provided, this new disclosure requirement will provide investors with additional information related to the experience and incentives (such as those due to characteristics of the compensation structure) for the SPAC sponsor and the other parties subject to these disclosures.[1290]

These disclosures about the SPAC sponsor, affiliates, and promoters may benefit investors by enabling them to better evaluate the circumstances that may impact their investment decision regarding a specific SPAC.[1291]  Given that investor expectations about the investment value of a SPAC incorporate expectations about the target search process and resulting de-SPAC transaction, investors assessments likely rely on specifics about the SPAC sponsor and SPAC compensation structure, which these disclosures should help ensure is available.

Item 1603(a) may increase compliance costs at the SPAC IPO, mainly in the form of collecting, preparing, and filing the required information for disclosures about SPAC sponsors, their affiliates, and their promoters.  While SPAC sponsors, their affiliates, and promoters may be external to the SPAC, we believe the close relationships typically between the SPAC and these parties will enable the SPAC to request the data required to be disclosed under the final rules with little additional difficulty compared to compiling the same information from persons internal to the SPAC, such as its officers and directors subject to the rules.  Overall, we do not expect registrant compliance costs to be substantial because most of this information should be readily available; some of this information is currently being provided by SPACs, as suggested by commenters.[1292]  The extent to which this information is already being provided will affect

---

[1290] *See supra* Section II.B for more information about current disclosure requirements.

[1291] Academic literature provides some evidence that characteristics of a SPAC sponsor, such as experience or network, may be indicative of the SPAC's ability to select and execute quality transactions. *See, e.g.*, Chen Lin, Proposing Release, *supra* note 7, at 29462, n.30.  Additionally, the staff's general experience in observing the SPAC industry is that market participants often emphasize the skill or experience of the SPAC sponsor as important to the performance of the SPAC.

[1292] *See, e.g., supra* notes 128 and 182.

413

both the additional compliance costs and marginal information benefits commensurately. The final rules will create a uniform and transparent framework across-the-board, maintaining a minimum floor standard should market practice change.

Item 1603(b) requires disclosure of conflicts of interest between: (1) a SPAC sponsor or its affiliates; the SPAC's officers, directors, or promoters; or the target company's officers and directors and (2) the unaffiliated security holders of the SPAC. We expect these disclosure requirements will enable investors to better assess any actual or potential material conflict of interest, including any material conflict of interest that may arise in determining whether to proceed with a de-SPAC transaction and any material conflict of interest arising from the manner in which the SPAC compensates SPAC sponsors, officers, and directors or the manner in which SPAC sponsors compensate its officers and directors. Such enhanced ability to evaluate conflicts should benefit investors by enabling them to more accurately assess potential adverse selection risks, thereby facilitating better investment decisions. Further, information about conflicts of interest at the SPAC IPO stage should improve investors' ability to differentiate investments in a SPAC from other investment opportunities and to differentiate one SPAC from another SPAC.

With respect to the conflicts of interest disclosures required by Item 1603(b), SPACs could bear direct costs associated with: (i) reviewing and preparing disclosures describing any such conflict of interest; (ii) developing and maintaining methods for tracking any such conflict of interest; and (iii) seeking legal or other advice. While the additional direct costs associated with Item 1603(b) disclosure requirements will depend on the extent to which a SPAC already

414

provides this disclosure under current practices, we expect these costs to generally be low.[1293] SPACs may also incur additional indirect costs if, although not required under Commission rules, they choose to take actions to mitigate any identified conflict of interest as a result of the final rule. For example, there may be cases where the SPAC would not have otherwise reviewed the conflicts or in cases where the SPAC would not have taken actions to mitigate any identified conflict of interest but for the requirement to publicly disclose the conflicts. However, to the extent a SPAC takes such mitigating actions, there will also be an indirect benefit to investors who will face less adverse selection costs as a result.

Item 1603(c) requires disclosure about the fiduciary duties that a SPAC's officers and directors owe to other companies. We expect that this disclosure will allow investors to assess the extent to which the officers and directors may face outside obligations, including the possibility that they might be compelled to act in the interest of another company that competes with the SPAC. The extent that a SPAC's officers or directors owe fiduciary duties to other companies may also limit the attention that they are able to provide to the SPAC. We expect that these disclosures will benefit investors by allowing them to better assess the ability and incentives of the officers and directors managing the SPAC.

We do not expect the disclosures of a SPAC officer's or director's fiduciary duties to other companies pursuant to Item 1603(c) will generally impose significant costs on SPACs. Officers and directors who manage the business of the SPAC should know their own roles in connection with other companies, so this information is likely known and easily accessible to the

---

[1293] The common practice of a SPAC disclosing the presence of actual or potential conflicts of interest as a material risk factor predates SPACs listing on national exchanges. *See* Vijay M. Jog & Chengye Sun, *Blank Check IPOs: A Home Run for Management* (Working Paper, 2007), *available at* https://ssrn.com/abstract=1018242 (retrieved from SSRN Elsevier Database). This evidence suggests that most SPACs are generally aware of these actual or potential conflicts and would therefore only bear costs insofar as our new requirements would involve providing greater detail or specificity in the disclosures of conflicts of interest.

SPAC.  Depending on specific facts and circumstances of a SPAC, however, the SPAC officers and directors may incur costs to comply with Item 1603(c) if they must research or seek the advice of counsel to determine whether a fiduciary relationship with another company exists. These costs may be minimal where little or no research or outside advice is required, such as in the absence of any other fiduciary relationships or when those relationships are already known. However, those costs are likely to increase as more research or outside advice is required.[1294] These additional costs (and the corresponding benefits) will be mitigated to the extent a newly formed SPAC would have provided Item 1603(c)-type disclosure even in the absence of the final rule.

> ### d.  Structured Data Requirement (Item 1610)

Item 1610 requires all disclosures in Items 1601–1609 of Regulation S-K to be tagged in Inline XBRL.[1295]  We expect that this requirement will augment the informational benefits of the new disclosure requirements at the SPAC IPO stage by making them easier to retrieve, aggregate, compare, filter, and analyze.

These final rules should be especially beneficial for investors differentiating between SPAC features, particularly due to the standardization of SPAC IPO disclosures, as specified in Items 1602 and 1603.  Together, we expect the adopted disclosure rules will facilitate investors' ability to process more information across a wider sample of SPAC IPOs (due to Items 1602 and

---

[1294] There may be circumstances in which analysis of the law and governing documents of another company may be required to determine if a role at that company carries fiduciary obligations (such as those that might be commonly owed by a director of a corporation to stockholders depending upon applicable law).  Examples of this include situations in which: (1) the role at the other company is an officer role, (2) the relationship with the other company is as a controlling stockholder, or (3) the role is one where the person is involved in governance of another company that is an alternative entity (such as a limited liability company or limited partnership).

[1295] See supra Section II.I.

1603 requiring SPAC specific information in a standardized format) at a lower relative cost (due to the tagging requirements in Item 1610).

Research evidence suggests that XBRL requirements for public operating company financial statement disclosures mitigate information asymmetry by reducing information processing costs, thereby making the disclosures easier to access and analyze.[1296]  Reductions in information processing costs may facilitate the monitoring of companies by external parties, and, as a result, influence companies' behavior, including their disclosure choices.[1297]

In addition, we expect Inline XBRL will facilitate increased insight into the specialized SPAC IPO disclosures, and will allow for easier, less costly comparisons with other SPACs by providing additional functionality such as detailed filtering by criteria such as offering size,

---

[1296] *See, e.g.*, Joung W. Kim, Jee-Hae Lim & Won Gyun No, *The Effect of First Wave Mandatory XBRL Reporting Across the Financial Information Environment*, 26 J. Info. Sys. 127 (2012) (finding evidence that "mandatory XBRL disclosure decreases information risk and information asymmetry in both general and uncertain information environments"); Yuyun Huang, Jerry Parwada, Yuan George Shan & Joey (Wenling) Yang, *Insider Profitability and Public Information: Evidence from the XBRL Mandate* (working paper, Sept. 17, 2019, last revised May 28, 2020), *available at* https://ssrn.com/abstract=3455105 (retrieved from SSRN Elsevier database) (finding that XBRL levels the playing field between insiders and non-insiders, in line with the hypothesis that "the adoption of XBRL enhances the processing of financial information by investors and hence reduces information asymmetry").  We do not expect these findings to materially differ with regards to Inline XBRL requirements.

[1297] *See, e.g.*, Jeff Zeyun, Hyun A. Hong, Jeong-Bon Kim & Ji Woo Ryou, *Information Processing Costs and Corporate Tax Avoidance: Evidence from the SEC's XBRL Mandate,* 40 J. Acct. & Pub. Policy 106822 (2021) (finding XBRL reporting decreases likelihood of firm tax avoidance because "XBRL reporting reduces the cost of IRS monitoring in terms of information processing, which dampens managerial incentives to engage in tax avoidance behavior"); Paul A. Griffin, Hyun A. Hong, Jeon-Bon Kim & Jee-Hae Lim, *The SEC's XBRL Mandate and Credit Risk: Evidence on a Link between Credit Default Swap Pricing and XBRL Disclosure* (Am. Acct. Assoc. Annual Meeting conference paper, Aug. 6, 2014) *available at* https://www.business.kaist.edu/_prog/seminar/download.php?file=seminar_1_1478854039.pdf&ori_filename=paper.pdf&filedr=kr (finding XBRL reporting enables better outside monitoring of firms by creditors, leading to a reduction in firm default risk); Elizabeth Blankespoor, *The Impact of Information Processing Costs on Firm Disclosure Choice: Evidence from the XBRL Mandate* (Sept, 1, 2019), 57 J. Acct. Research 919 (2019) *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3463897 (retrieved from SSRN Elsevier database) (finding "firms increase their quantitative footnote disclosures upon implementation of XBRL detailed tagging requirements designed to reduce information users' processing costs," and "both regulatory and non-regulatory market participants play a role in monitoring firm disclosures," suggesting "that the processing costs of market participants can be significant enough to impact firms' disclosure decisions").  While these studies looked at operating company financial statement disclosures rather than SPAC disclosures specifically, given the general similarity in disclosure settings, the findings of these studies suggest that the Inline XBRL requirements in the final rules could directly or indirectly (i.e., through information intermediaries, such as financial media, data aggregators, and academic researchers) provide investors in SPACs with similar benefits.

dilutive impact, or SPAC sponsor name.[1298]  Also, as with Inline XBRL tagging of financial statements and notes, the specialized SPAC disclosures will include tagged narrative discussions in addition to tagged quantitative values.[1299]  Tagging narrative disclosures in the context of SPAC IPOs should facilitate beneficial analyses, such as automatic comparison or redlining of these disclosures against those provided by other SPACs or targeted assessments of specific SPAC specialized disclosures. For example, without Inline XBRL tagging, using the search term "warrant" to search through the text of all SPAC IPO registration statements to determine how many such offerings disclosed the inclusion of warrants as part of the SPAC sponsor "promote" could return many narrative disclosures outside of that discussion (e.g., disclosures related to warrants offered to investors as part of the IPO).

We expect the requirement to tag SPAC-specific disclosures in Inline XBRL will impose compliance costs on SPACs at an earlier stage of their life cycle than under the current baseline. Currently, SPACs are required to tag financial statements (including notes) and cover page information in certain registration statements and periodic reports in Inline XBRL.[1300]  However, SPACs are currently not obligated to tag any disclosures until they file their first post-IPO periodic report on Form 10-Q, Form 20-F, or Form 40-F.[1301]

Various preparation solutions have been developed and used by operating companies to fulfill XBRL tagging requirements, and some evidence suggests that XBRL compliance costs

---

[1298] *See, e.g.*, Nina Trentmann, *Companies Adjust Earnings for Covid-19 Costs, But Are They Still a One-Time Expense?*, Wall St. J., Sept. 24, 2020 (*citing* an XBRL research software provider as a source for the analysis described in the article); Bloomberg Lists BSE XBRL Data, XBRL.ORG (2018); Rani Hoitash & Udi Hoitash, *Measuring Accounting Reporting Complexity with XBRL*, 93 Acct. Rev. 259 (2018).

[1299] For example, Item 1603 consists largely of narrative disclosure regarding the SPAC sponsor but also includes quantitative disclosure regarding the compensation paid (or to be paid) to the SPAC sponsor, its affiliates, and any promoters.

[1300] *See supra* Section II.I.

[1301] *See* 17 CFR 229.601(b)(101)(i)(A).

have decreased over time for smaller companies.[1302]  Generally, registrants without prior experience using such compliance solutions often incur initial implementation costs associated with Inline XBRL tagging, such as costs associated with licensing Inline XBRL compliance software and training staff to use the software to tag the disclosures.  Because SPACs are shell companies, which have no or nominal operations, it may be more likely that SPACs outsource their tagging obligations to a third-party service provider.  In such cases, a SPAC would avoid the aforementioned software licensing and training costs but incur the costs of retaining such third-party services.

### iii.  De-SPAC Transactions

Given the hybrid nature of the de-SPAC transaction (i.e., that it contains elements of both an IPO and an M&A transaction), the de-SPAC transaction involves information asymmetries and incentives that are different from those present at the SPAC IPO stage or in traditional IPOs. The de-SPAC transaction represents the introduction of the target company to the SPAC shareholders, who typically vote on approval of the de-SPAC transaction and decide whether to redeem their shares.[1303]  We expect both voting and redemption decisions will benefit from the informational improvements and liability protections arising from the final rules.

---

[1302] An AICPA survey of 1,032 reporting companies with $75 million or less in market capitalization in 2018 found, for fully outsourced XBRL creation and filing, an average cost of $5,850 per year, a median cost of $2,500 per year, and a maximum cost of $51,500 per year.  This represented a 45% decline in average cost and a 69% decline in median cost since 2014.  *See* AICPA, *XBRL Costs for Small Companies Have Declined 45% Since 2014* (2018), *available at* https://us.aicpa.org/content/dam/aicpa/interestareas/frc/accountingfinancialreporting/xbrl/downloadabledocuments/xbrl-costs-for-small-companies.pdf; *Letter from Nasdaq, Inc., Mar. 21, 2019, to the Request for Comment on Earnings Releases and Quarterly Reports*; Release No. 33-10588 (Dec. 18, 2018) [83 FR 65601 (Dec. 21, 2018)] (stating that a 2018 Nasdaq survey of 151 listed registrants found an average XBRL compliance cost of $20,000 per quarter, a median XBRL compliance cost of $7,500 per quarter, and a maximum, XBRL compliance cost of $350,000 per quarter in XBRL costs per quarter).

[1303] *See supra* note 31 and accompanying text.

### a. Sponsors and Conflicts of Interest (Item 1603)

As discussed above, Item 1603 includes, among other things, disclosure of details about the SPAC sponsor, its affiliates, and promotors, and conflicts of interest generally between those parties and SPAC shareholders.  Similar to the final rule requirements that apply at the SPAC IPO stage discussed above, at the de-SPAC transaction stage, Items 1604(a)(4) and 1604(b)(3) require certain conflict of interest disclosures to be displayed prominently on the prospectus outside front cover page and in the summary.

We expect the benefits of Item 1603 (and Items 1604(a)(4) and 1604(b)(3)) in connection with disclosures at the de-SPAC transaction stage on a proxy, information, or registration statement or on a Schedule TO to be largely the same as the effects of the same Item 1603 disclosures made in connection with the SPAC IPO, as discussed above.[1304]  These benefits, however, may be incrementally greater insofar as the disclosures could also guide voting and redemption decisions at the de-SPAC transaction stage, which would not occur in connection with a SPAC IPO.[1305]  We similarly expect the costs of compliance with Item 1603 (and Items 1604(a)(4) and 1604(b)(3)) to be comparable at the de-SPAC transaction stage to the costs of compliance at the SPAC IPO stage, as discussed above.  However, because application of Item 1603 (and Items 1604(a)(4) and 1604(b)(3)) at the SPAC IPO stage results in SPACs already having prepared and disclosed much of the required information, the costs of updating those disclosures for evolved circumstances at the de-SPAC transaction stage should be lower.

---

[1304] *See supra* Section VIII.B.1.a.3.

[1305] *Id.*

*b.   Prospectus Cover Page, Summary, and Other Disclosures (Item 1604)*

Currently, a de-SPAC transaction may be registered on a Form S-4 or Form F-4, and, to the extent that a de-SPAC registration statement must be filed due to the operation of Rule 145a, we expect that there will be additional registered de-SPAC transactions as a result of the final rules.  Items 1604(a) and 1604(b) require any prospectus at the de-SPAC transaction stage to include certain information about the de-SPAC transaction on the outside front cover page and in the prospectus summary, similar to the requirements of Item 1602 at the SPAC IPO stage.[1306] This includes disclosure on the cover page of, among other information: the determination, if any, of the board of directors (or similar governing body) of the SPAC disclosed in response to Item 1606(a) and, if applicable, that the SPAC or the SPAC sponsor received a report, opinion, or appraisal referred to in Item 1607(a); descriptions of certain material financing transactions; compensation received or to be received by the SPAC sponsor, its affiliates and promoters (including securities issued); and any actual or potential conflict of interest between specified parties of the SPAC and target on the one hand and unaffiliated security holders of the SPAC on the other hand.  In the prospectus summary, SPACs will be required to include a brief description of, among other information: the background and material terms of the de-SPAC transaction; the determination, if any, of the board of directors (or similar governing body) of the SPAC disclosed in response to Item 1606(a) and any reports, opinions or appraisals referred to in Item 1607(a); any actual or potential material conflict of interest between specified parties of the SPAC and target on the one hand and unaffiliated security holders of the SPAC on the other hand; compensation received or to be received by the SPAC sponsor, its affiliates, and promoters

---

[1306] *See supra* Section II.E for more information about the regulatory baseline.  The prospectus is a part of the registration statement.

(including securities issued) in tabular format and the impact of these compensation and securities issuances on dilution in narrative form; the material terms of certain financing transactions; and the redemption rights of security holders and the potential dilutive impact of redemptions on the value of the securities owned by non-redeeming shareholders.

We expect that final Items 1604(a) and 1604(b) will have similar potential direct benefits for investors as those we discussed for Item 1602 above—that is, the additional disclosures on the de-SPAC transaction prospectus cover page and in the prospectus summary may increase the likelihood that investors pay attention to and process this information by making it more salient.[1307]  Additionally, the new disclosures in the de-SPAC transaction prospectus summary may reduce information-processing costs for investors, particularly less financially sophisticated investors, by providing certain SPAC-specific disclosures in a concise format.  Moreover, as with Item 1602(b)(6) at the IPO stage, Item 1604(b)(4) requires tabular disclosure in the prospectus summary regarding the terms and amount of the compensation received or to be received by the SPAC sponsor, its affiliates, and promoters and the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities in connection with the de-SPAC transaction or any related financing transaction, and, outside of the table, the extent to which that compensation and securities issuance has resulted or may result in a material dilution of the equity interests of non-redeeming shareholders of the SPAC.  Presenting this information in tabular format may further help reduce information-processing costs for some investors.[1308]  Additionally, Items 1604(a) and 1604(b) standardize the required information across all registration statements filed for de-

---

[1307] *See* discussion in *supra* Section VIII.B.1.ii.b.  Also note that Item 1604(c) is discussed separately in the following section.

[1308] *See supra* notes 1262 and 1263 and accompanying text.

SPAC transactions, making it potentially easier and less costly for investors to compare terms across de-SPAC transactions by different SPACs.  Overall, because of the aforementioned beneficial effects of increasing investors' attention and reducing their information processing costs, we expect the additional disclosures on the prospectus cover page and in the prospectus summary will help improve the compounding of important information into investors' investment decisions at a relatively lower cost.

In addition to the direct benefits discussed above, certain information that Item 1604 requires registrants to disclose may benefit investors through incrementally improved SPAC governance.  For example, the inclusion of disclosures regarding material potential or actual conflicts of interest could increase investors' attention to such issues, allowing them to identify and focus in on those conflicts they deem potentially adverse to their own interests.[1309]  In turn, the disclosures may have an ex ante disciplining effect on SPAC sponsors and others whose conflicts must be disclosed that could mitigate the potential costs to investors of those conflicts of interests.

The additional information that Items 1604(a) and 1604(b) require in the de-SPAC transaction prospectus may increase compliance costs for SPACs if it would result in SPACs needing to gather and disclose information they would not otherwise have provided in a de-SPAC transaction.  Additionally, as with Item 1602, it is possible that the disclosures required under Item 1604 could result in additional processing costs for investors.[1310]  However, to the extent that a SPAC may have otherwise intended to disclose information similar to that required under Item 1604, which based on staff review of existing filings is often the case, or where the

---

[1309] *See supra* Section II.C for more detail on the specifics of the required conflict of interest disclosures.

[1310] *See supra* note 1265 and accompanying text.

SPAC has this information readily available, these additional costs and benefits would be mitigated.[1311]

### c. Dilution (Items 1604(a)(3), 1604(b)(4), 1604(b)(5), 1604(b)(6), 1604(c))

By the time a SPAC finds a target company and prepares its de-SPAC transaction, many facts and circumstances that affect dilution and the financial position of the SPAC have changed, both when compared to the SPAC at its IPO stage as well as when compared to other SPACs. The result of this evolution is that, unlike at the SPAC IPO stage when most SPACs exhibit similar features, de-SPAC transactions are often more complex and idiosyncratic. By the time of the de-SPAC transaction, many new sources of dilution are likely to have arisen. For example, a SPAC may determine a potential PIPE investment or potential change to a SPAC sponsor's compensation or securities issued to a SPAC sponsor is a "material probable transaction." Pursuant to Item 1604(c), in calculating dilution, a SPAC will be required to make adjustments to net tangible book value per share, as adjusted, to reflect such events.

Item 1604(a)(3) requires the outside cover page of the prospectus at the de-SPAC transaction stage to contain a statement as to whether certain compensation and securities issuances disclosed pursuant to this item may result in a material dilution of the equity interests of non-redeeming shareholders who hold the securities until the consummation of the de-SPAC transaction. Item 1604(b)(4) requires disclosure in the prospectus summary of the extent to which certain compensation and securities issuances have resulted or may result in a material dilution of the equity interests of non-redeeming shareholders of the SPAC. Item 1604(b)(5) requires disclosure of the dilutive impact on non-redeeming shareholders that any financing

---

[1311] We note that even when SPACs would have otherwise intended to disclose similar information, the final rules should still provide value to the extent they result in more consistent standardization than has, or would have, arisen organically.

transactions associated with the de-SPAC transaction may have.  Item 1604(b)(6) requires disclosure of the potential dilutive impact on non-redeeming shareholders of the rights of security holders to redeem their outstanding securities.

Item 1604(c) requires tabular disclosure of the impact from dilutive sources on net tangible book value per share, as adjusted, at intervals representing selected potential redemption levels that may occur across a reasonably likely range of outcomes.  Specifically, Item 1604(c) requires disclosure of the net tangible book value per share, as adjusted, as if the selected redemption levels have occurred and to give effect to, while excluding the de-SPAC transaction itself, material probable or consummated transactions and other material effects on the SPAC's net tangible book value per share, as adjusted, from the de-SPAC transaction.  The requirement in Item 1604(c) to provide these disclosures across "a reasonably likely range of outcomes" instead of the fixed quartiles required in Item 1602(c) will allow registrants to account for facts and circumstances that are unique to each SPAC and allow for more customized disclosures that still conform to a consistent and comparable format.[1312]

The tabular disclosure in Item 1604(c) is also required to include separate quantification of the dilutive impact from each source of dilution, which will provide detailed disaggregated information on the various sources of dilution.[1313]  Lastly, Item 1604(c)(1) requires disclosure at each redemption level of the company valuation at or above which the potential dilution results in the amount of the non-redeeming shareholders' interest per share being at least the initial public offering price per share of common stock.

---

[1312]  At this later stage, the SPAC likely has more information with which to estimate the number of shareholders it expects to redeem their shares, potentially allowing for more informative outcome choices in the tabular disclosure.

[1313]  In this respect, Item 1604(c) tabular dilution disclosure should be similar to Item 1602(c) tabular dilution disclosure as, in order to quantify the source of dilution for purposes of the table, registrants should present it as an individual line-item in the calculations in the table.

Generally, we expect Item 1604(c) to result in similar benefits and costs as those discussed above with regard to dilution disclosures at the SPAC IPO stage.[1314]  As the disclosure calculations in Item 1604(c) will likely include additional factors—such as "material probable transactions"—that were not included in the SPAC IPO stage disclosures, we expect these disclosures at the de-SPAC transaction stage will be more informative for investor expectations about dilution.  Consequently, our discussion below focuses on the novel aspects of dilution disclosures at the de-SPAC transaction stage (as compared to dilution disclosure at the IPO stage) and should be considered in addition to our discussion above of the costs and benefits of dilution information at the SPAC IPO stage.

The dilution disclosure at redemption levels across a "reasonably likely range of outcomes" required in Item 1604(c) will provide investors with information that should more accurately represent the dilution that they might experience if they choose not to redeem their shares, as compared to current disclosures.[1315]  Further, the specific redemption levels registrants choose to include in the table should convey information about registrant expectations of redemption scenarios that should allow investors to better anticipate the effects of the dilution on their investment value.[1316]  In addition, as discussed above, we expect that the tabular format of this disclosure will further help investors (especially those that are less financially sophisticated) more easily process the financial implications of dilution.[1317]

Allowing registrants discretion to select "reasonably likely" redemption levels may impact the comparability of these disclosures across SPACs to the extent that the final rule

---

[1314]  *See supra* Section VIII.B.1.a.2.

[1315]  *See supra* note 221.

[1316]  The specific levels selected would be informative to the extent registrants choose redemption levels specific to their circumstances, rather than adopting fixed or industry standard ranges.

[1317]  *See* Hattie, *supra* note 1262; Benbasat & Dexter, *supra* note 1263.

results in tables with different numbers of chosen redemption scenarios or at different values or with differences in both respects.  On the other hand, such allowance should result in registrants selecting redemption levels based on registrant-specific information (for example, if a PIPE investment has a firm commitment to buy if redemption thresholds are reached), which could result in disclosures that are more informative to investors.  We expect the informational value of de-SPAC-transaction-specific redemption sensitivity will offset the reduced direct comparability across SPACs.[1318]  Also, to the extent there is reduced direct comparability, we expect this will be mitigated by some investors using analytic techniques to infer dilution at redemption levels other than those selected by registrants.

We expect some incremental compliance costs from Item 1604(c) for registrants in future de-SPAC transactions that did not already intend to provide disclosures similar in nature to what is required by this item.  Many of these incremental costs to registrants are similar to those at the SPAC IPO stage discussed above, such as the costs of aggregating data and employing quantitative expertise.  Factors that mitigate those costs are also similar to those at the IPO stage discussed above, such as data availability and adoption of standard practices.[1319]  To the extent the multiple dilution disclosures at the de-SPAC transaction stage capture more transactions and complexity than those at the IPO stage, we expect the associated costs to registrants to be relatively higher than those incurred by the SPAC at the IPO stage.  However, we also expect these Item 1604 dilution disclosures will have greater informational value to investors at this later, more heterogeneous stage.

---

[1318] If, as mentioned above (*supra* note 1316), registrants adopt industry standard redemption levels for the purposes of this disclosure, then the decrease in registrant-specific information will be concomitant with an increase in comparability due to the industry standard.

[1319] *See supra* Section VIII.B.1.a.2.

d. *Background, Material Terms, and Effects of the De-SPAC Transaction (Item 1605)*

Items 1605 (a) through (c) of Regulation S-K require disclosure of the background of the de-SPAC transaction (e.g., description of any contacts, negotiations, transactions that have occurred), material terms of the de-SPAC transaction, and effects of the de-SPAC transaction and any related financing transactions.  Item 1605(d) requires disclosure of any material interests in the de-SPAC transaction or any related financing transaction: (i) held by the SPAC sponsor or the SPAC's officers or directors, including fiduciary or contractual obligations to other entities as well as any interest in, or affiliation with, the target company; or (ii) held by the target company's officers or directors that consist of any interest in, or affiliation with, the SPAC sponsor or the SPAC.[1320]  These disclosures under Items 1605(a) through (d) should benefit investors by providing them with detailed information about the de-SPAC transaction, thereby enabling them to make more informed investment decisions (including voting and redemption decisions, if allowed).  For example, the required disclosure could allow investors to assess whether the de-SPAC transaction or any related financing transaction has been structured in a manner that would benefit the SPAC sponsor to the detriment of the other security holders of the SPAC.

Item 1605(e) requires disclosure as to whether security holders are entitled to any redemption or appraisal rights, and if so, a summary of the redemption or appraisal rights.  These disclosures should help investors to better understand their rights and assess the impact of any redemption or appraisal rights on a proposed de-SPAC transaction, including whether the

---

[1320] *See supra* Section II.F.1 for information about the regulatory baseline.

428

existence of such rights might lead some investors to redeem their securities after voting in favor of a de-SPAC transaction.[1321]

Item 1605 could increase registrants' compliance costs related to de-SPAC transactions. The magnitude of the incremental increase in these costs will depend on the amount of information that SPACs and target companies would have intended to disclose in connection with future de-SPAC transactions in the absence of the final rule.  Based on staff experience of market practice and current disclosure requirements, we expect registrants to have already planned to disclose much of what is required by Items 1605(a), (b), (d), and (e).[1322]  The disclosures required by Item 1605(c) are not common practice in the staff's experience; thus, they may result in additional costs to registrants (for example, this disclosure may require additional legal advice and management time to gather and analyze information to assess the effects of the de-SPAC transaction).  To the extent that registrants already intended to disclose information required by Item 1605 or have the information readily available, the incremental increase in these costs and benefits would be mitigated.[1323]

### e.  Board Determination about the De-SPAC Transaction (Item 1606)

If the law of the jurisdiction in which the SPAC is organized requires its board of directors (or similar governing body) to determine whether the de-SPAC transaction is advisable and in the best interests of the SPAC and its shareholders, or otherwise make any comparable determination, Item 1606(a) requires disclosure of that determination.  Item 1606(b) requires a

---

[1321] Redemption decisions by investors can have significant impacts on the dilution faced by non-redeeming shareholders.  *See supra* Section VIII.B.1.a.2 and VIII.B.1.b.3.

[1322] This is also consistent with comments received.  *See supra* note 352.

[1323] Again, we note that even when SPACs would have otherwise intended to disclose similar information, the final rules should still provide value to the extent they result in more consistent standardization than has, or would have, arisen organically.

discussion of the material factors considered in making the determination, including but not limited to, to the extent considered, the target company valuation, financial projections relied upon by the board of directors (or similar governing body) of the SPAC, and the terms of financing materially related to the de-SPAC transaction.  Items 1606(c) through 1606(e) require disclosure about the de-SPAC transaction, including whether a majority of unaffiliated security holders is required to approve the de-SPAC transaction, the involvement of any unaffiliated representative acting on behalf of unaffiliated security holders, whether the de-SPAC transaction was approved by a majority of the directors (or members of similar governing body) of the SPAC who are not employees of the SPAC, and if known after making reasonably inquiry, the reason behind any abstentions or votes against the transaction.

Investors should benefit from the requirements of Items 1606(a) and (b) as disclosure thereunder will reduce information asymmetry between the SPAC investors and the SPAC by providing information about the board's determination and decision making regarding the de-SPAC transaction.  Information disclosed under Items 1606(c) through (e) will benefit investors by providing further details about the de-SPAC transaction bargaining and voting process, including important information regarding potential dissenting director votes, which could potentially mitigate conflicts of interest.  These disclosures provide information that collectively should allow investors to understand the multiple factors undergirding the decisions of the board, thereby improving investment decision-making by investors in connection with the de-SPAC transaction.

We expect Items 1606(a) and (b) will result in limited increases in compliance costs for registrants because this information should be readily available to the SPAC as the directors are likely to have already assembled the information necessary to provide these disclosures in

430

carrying out their fiduciary duties to the SPAC, and the disclosure is only required if the law of the jurisdiction in which the SPAC is organized requires such board determination.[1324] Similarly, we expect the compliance costs of Item 1606(c) through (e) to be minimal as, again, the information is likely readily available, for example because it is recorded in board meeting minutes or found in governance documents.  To the extent that registrants already intended to disclose some of the information required by Item 1606 or have this information readily available, the incremental increase in the registrant's costs would be mitigated.

One commenter raised the possibility that requiring the identification of members of the governing body that do not vote for the transaction (and the reasoning for their abstention or vote against) might disincentivize them to vote accordingly and "could also have the effect of inhibiting discussion among directors at board meetings."[1325]  Directors are generally subject to fiduciary duties imposed by State or foreign law.  As a result, we expect that directors will generally seek to make voting decisions consistent with those fiduciary duties to shareholders or the company irrespective of whether they will be identified as voting against the transaction or abstaining.  Further, while it is possible that directors could believe they face increased cost to dissenting publicly (via their official recorded vote) because of this requirement, we do not expect the final rules will detrimentally limit any private conversations among the board of directors, contrary to the assertion of the commenter.[1326]  Consequently, we do not believe this requirement will result in significant instances of de-SPAC transactions being approved even when the majority of directors would have voted against approval but for the final rule, because

---

[1324] Given the data in Table 2, this would apply to most SPACs.

[1325]  Letter from Freshfields.

[1326]  *Id*. The commenter did not provide reasoning nor evidence for the conclusion that the final rule would inhibit private discussion among board members, and we are not aware of any economic cost imposed by the final rule that would affect such private conversations.

in those cases, we expect the privately dissenting majority to communicate their dissent and successfully vote to not approve the transaction, in which case no disclosures would be required for such failing votes.

### f.   Reports, Opinions, Appraisals, and Negotiations (Items 1607)

Item 1607(a) requires disclosure of the information required by Item 1607(b) if the SPAC or the SPAC sponsor received any report, opinion (other than an opinion of counsel), or appraisal from an outside party or an unaffiliated representative referred to in Item 1606(d) that materially relates to any determination disclosed in response to Item 1606(a), the approval of the de-SPAC transaction, the consideration or fairness of the consideration to be offered to security holders of the target company in the de-SPAC transaction, or the fairness of the de-SPAC transaction to the SPAC, its security holders, or SPAC sponsor.  Item 1607(b) requires, among other things, disclosure about the preparer of the reports, opinions or appraisals referred to in Item 1607(a) or negotiations or reports described in response to Item 1606(d), and a summary of those negotiations, reports, opinions or appraisals.[1327]  Item 1607(c) requires all reports, opinions, or appraisals referred to in Items 1607(a) and 1607(b) to be filed as exhibits to the registration statement (e.g., Form S-4, Form F-4) or schedule or included in the schedule if the schedule does not have exhibit filing requirements.[1328]

The Item 1607 disclosures will help ensure that SPAC shareholders have access to information that the SPAC or a SPAC sponsor received from an outside party or unaffiliated representative (referred to in Item 1606(d)) when determining whether to proceed with a de-

---

[1327] *See supra* Section II.F.4.

[1328] The Item 1607(c) requirements to file reports, opinions, or appraisals as exhibits to the schedule or to include them in the schedule if the schedule does not have filing requirements are relevant to Schedules TO, 14A and 14C.

SPAC transaction.  We expect this additional information will improve investors' ability to make informed investment decisions and thus will contribute to price efficiency of the combined company.  Moreover, we expect the reduction in asymmetric information will contribute to improved liquidity of the combined company.

As discussed above, Item 1607 requires, among other things, with respect to certain reports, opinions, or appraisals: a summary of findings and recommendations; filing of the report, opinion, or appraisal; and a summary of the bases for and methods of arriving at the findings and recommendations.  We expect the requirements of Item 1607 will improve investor investment decision-making.  For example, the summary of findings and recommendations should help investors understand the report contents.  Even where a report is brief, it may be written in a particular standardized format that the outside party requires in connection with all such reports they provide, which some investors may have difficulty understanding.  The summary version disclosed in the filing may present the information in a narrative fashion that enhances investor understanding.  If investors prefer additional details, they can consult the actual report filed with the filing that contains the summary.  Additionally, the requirement to disclose the bases and methods underlying the findings should provide important information to the investor that may not be part of the report itself but may be necessary to understand the basis for the report's conclusions.

The Item 1607 disclosures should also help investors assess the reliability and relevance of the report.  In particular, we expect disclosure related to compensation, method of selection, and material relationships will help investors understand the incentives, potential conflicts of interest, or potential biases that could influence the outside party in preparing the report, opinion, or appraisal.  Similarly, we expect the disclosure requirements related to identity, qualifications,

instructions, limitations on scope of the investigation, will help investors assess the relevance of the report to their assessment of the proposed combination.

We expect the cost of gathering the information necessary to make the required Item 1607 disclosures related to identity, qualifications, compensation, selection process, instructions and limitations on the scope of the investigation will not be significant because we expect that the information required will generally be readily available to the registrant or the outside party that prepared the report or both.

Regarding material relationships, we expect the limited two-year look-back period will limit the burden on the SPAC to research relevant past relationships.  We expect the SPAC and SPAC sponsor (or advisor or other unaffiliated representative) will have this information readily available in internal records, such as agreements between the relevant persons or records of financial transactions.  We expect, however, the SPAC or its advisers will incur some costs to perform additional research in order to ensure it has identified the affiliates of the outside party.[1329]

The incremental costs and benefits of the final rules will be somewhat mitigated to the extent that some of these disclosures would otherwise be required to comply with other rules, such as Regulation M-A or FINRA Rule 5150.

Item 1607(c) requires the filing of the relevant report, opinion, or appraisal.  As a result of this requirement, registrants will need to ensure the report, opinion, or appraisal is formatted so it can be filed in EDGAR.  Based on the Commission staff's experience, we do not expect

---

[1329] With respect to affiliates of the SPAC sponsor, we do not expect there will be information-gathering costs in addition to those already incurred in connection with Item 1603(a)(7) (regarding indirect material interests in the SPAC sponsor).  We discuss those costs above in connection with the discussion of Item 1603, *supra* Section VIII.B.1.b.1.

registrants to incur substantial costs in formatting or paying a vendor to format the relevant material for filing in EDGAR.

The final rules may also impact the cost of obtaining third-party reports.[1330]  For example, some parties may be concerned about liability related to reliance on their report, which may prompt them to increase the cost of providing the report.[1331]  Additionally, disclosure requirements about the bases and methods underlying the findings may prompt registrants to ask third parties to include fully comprehensive descriptions of their methods and bases, which would potentially increase the fees charged by those third parties.  Finally, the compensation disclosures could result in the revelation of competitive business information, which may influence fees for these services.

Finally, while Item 1607 does not mandate registrants to obtain any report, opinion, or appraisal, we acknowledge that it is possible that the requirement could prompt some registrants to obtain reports, opinions or appraisals to avoid the appearance of failing to adequately assess the target companies' prospects and financial condition.  As discussed in the baseline, approximately 68% of de-SPAC transactions in 2022 did not disclose that a fairness opinion was obtained in connection with the transaction.  Conversely, the requirement may also deter some SPACs from relying on third-party reports, choosing instead to rely on internal assessments (as Item 1607 does not apply to internal work product).  As a result, some SPACs may fail to identify low-quality targets during the due-diligence process, to the extent that such internal assessments do not include the depth of analysis or expertise that would ordinarily be reflected in

---

[1330]  In 2021, the average costs for fairness opinions obtained by SPAC acquirers where such information was presented in an SEC filing was approximately $270,000.  *See supra* Section IV.B.2.

[1331]  *See*, *e.g.*, letter from Goodwin ("Most professionals preparing these materials are not trained to prepare these documents in a manner that would be appropriate for public disclosure.").

a fairness opinion. Finally, any impact of the rule on decisions to obtain third-party opinions or valuations could depend on the prospects of the target company. That is, sponsors may be more likely to seek third-party opinions for deals that they view as being more likely to result in favorable opinions.

### g. Tender Offer Filing Obligations (Item 1608)

We are adopting Item 1608 of Regulation S-K to codify the staff position that a Schedule TO filed in connection with a de-SPAC transaction should contain substantially the same information about a target company that is required under the proxy rules and clarify that a SPAC must comply with the procedural requirements of the tender offer rules when conducting any transaction for which a Schedule TO is filed, which includes extensions as well as de-SPAC transactions.[1332] For example, Item 1608 clarifies that SPACs that file a Schedule TO for a redemption must comply with the procedural requirements of Rule 13e-4 and Regulation 14E, such as the requirements to keep the redemption period open for at least 20 business days and to include a fixed expiration date.[1333]

There were 23 Schedule TOs filed by 21 SPACs from 2020 to 2022.[1334] A minority of these Schedule TO filings (approximately 35% or 8 Schedule TOs) occurred alone i.e., without

---

[1332] *See supra* Section II.H.

[1333] *Id.*

[1334] A study of 462 de-SPAC transactions that were completed in 2020 and 2021 found that approximately 99% of such transactions were accompanied by proxy disclosures and 81% involved a related filing of a registration statement on either Form S-4 or Form F-4. Of the 81% of de-SPAC transactions that involved the filing of a registration statement, 85.4% were accompanied by a proxy statement on Schedule 14A, and the remaining 14.6% were accompanied by an information statement on Schedule 14C as a result of a consent solicitation. *See* Michael Levitt, Valerie Jacob, Sebastian Fain, Pamela Marcogliese, Paul Tiger, & Andrea Basham, *supra* note 1231. In a corresponding report covering transactions that were completed in 2022, approximately 87% of de-SPAC transactions involved a registration statement filing on either Form S-4 or F-4, of which approximately 91% were accompanied by a proxy statement and 9% by an information statement as a result of a consent solicitation. *See* Freshfields, *2022 De-SPAC Debrief: A Comprehensive Review of all 102 de-SPAC Transactions That Closed in 2022*, FRESHFIELDS.US (Jan. 2023), *available at* https://www.freshfields.us/490963/globalassets/noindex/documents/2022-de-spac-debrief.pdf.

436

the concurrent filing of a proxy statement (Schedule 14A), information statement (Schedule 14C), or registration statement (Form S-4 or F-4) that would provide additional disclosures regarding the de-SPAC transaction.  These findings are consistent with our review of Schedule TO filings from 2000–2021 in the Proposing Release.[1335]

Given that the staff has historically expressed the view that a Schedule TO[1336] should include the same information about the target company that would be required in a Schedule 14A, in view of the requirements of Item 11 of Schedule TO and Item 1011(c) of Regulation M-A and the importance of this information in making a redemption decision, Item 1608 is unlikely to result in a meaningful difference in the nature or amount of information provided by registrants.  Further, Rule 145a may reduce the number of SPACs filing a standalone Schedule TO in connection with a de-SPAC transaction thereby also reducing the number of potential parties affected by Item 1608 going forward.  While we recognize that, for other redemption events where only a Schedule TO is filed—for instance, when a SPAC intends to extend or is

---

[1335] *See* Proposing Release, *supra* note 7, at 29529, n.501.  The historic use of a Schedule TO in connection with a de-SPAC transaction corresponds to a period when share redemption was more limited and de-SPAC transactions were more commonly targeted by hedge funds engaged in 'greenmailing.'  *See, e.g.*, Lucian Bebchuk, Alon Brav, Wei Jiang & Thomas Keusch, *Dancing with Activists*, 137 J. Fin. Econ. 1 (2020) (describing "greenmail" as an event in which a company targeted by an activist shareholder (such as a hedge fund) purchases shares from the activist at a premium to the market price).  In the SPAC context, the activists were most commonly hedge funds that would threaten to prevent an acquisition by voting against a de-SPAC transaction and redeeming a large enough block of shares to cross the SPAC's redemption threshold if the SPAC refused to buy back its shares at a premium.  *See, e.g.*, Leerskov, *supra* note 1227 ("Many of these funds are arbitrage investors…turning a profit by voting against an acquisition, therefore recouping their initial investment while holding the associated warrants against any possible upside from a successful acquisition. Additionally, more investors began threatening to veto potential SPAC mergers in 2006 and 2007 unless they received deal sweeteners.  Mostly, investors asked to be bought out at a premium in exchange for their votes in favor of a merger.").  This activity decreased, as did the use of a Schedule TO in connection with a de-SPAC transaction, as SPAC redemption thresholds increased in the early 2000s from approximately 20% on average to approximately 80% on average.  *See, e.g.*, Milan Lakicevic, Yochanan Shachmurove & Milos Vulanovic, *Institutional Changes of Specified Purpose Acquisition Companies (SPACs)*, 28 N. Am. J. Econ. & Fin. 149 (2014) (20.47% to 84.24% from 2003–2006 to 2009–2012); Vulanovic, *supra* note 1225 (20% to 81.52% from 2003–2013).

[1336] Additionally, relatively few de-SPAC transactions have historically involved the filing of a Schedule TO alone.  *See supra* note 1335 and accompanying text.

otherwise not engaging in a concurrent de-SPAC transaction—an individual SPAC may incur incremental additional transaction and logistic costs,[1337] we nevertheless expect the aggregate costs associated with these requirements to remain small because such events are rare.

### h.  Enhanced Projections Disclosure Requirements (Item 1609)

Item 1609 complements the amendments to Item 10(b) of Regulation S-K[1338] and applies to projections made in a filing (or any exhibit thereto) in connection with a de-SPAC transaction.[1339]  Item 1609 requires registrants to disclose the purpose for which the projections were prepared and the party that prepared the projections.  It also requires a discussion of all material bases of the disclosed projections and all material assumptions underlying the projections, and any material factors that may affect such assumptions.

If the projections relate to the performance of the SPAC, the rule requires a statement of whether or not the projections reflect the view of the SPAC's management or board about its future performance as of the most recent practicable date prior to the date of the disclosure document required to be disseminated to security holders.  If the projections relate to the target company, the rule requires disclosure of whether the target company has affirmed to the SPAC that its projections reflect the view of the target company's management or board about its future performance as of the most recent practicable date prior to the date of the disclosure document required to be disseminated to security holders.  If the projections no longer reflect the views of the SPAC's or the target company's management or board regarding the future performance of their respective companies as of the most recent practicable date prior to the date of the

---

[1337]  *See* Letter from ABA.

[1338]  *See supra* Section V; *infra* Section VIII.B.4.

[1339]  *See supra* Section III.  For additional information about the regulatory baseline for Item 1609, see *supra* Section V.A.

disclosure document required to be disseminated to security holders, the rule requires a statement of the purpose of disclosing the projections and the reasons for any continued reliance by the management or board on the projections.

We expect Item 1609, along with the amendments to Item 10(b), will result in improved disclosure about forward-looking information provided to investors, allowing them to better understand and consider the disclosed projections when making their investment decisions.  We also expect that the final rules will result in increased standardization of the presentation of projections, which will further reduce information acquisition costs and facilitate comparisons across SPACs.

The required disclosure of preparers' identities and purposes for which the projections were prepared should mitigate information asymmetry between the SPAC and investors as those disclosures may reveal preparers' potential conflicts of interest or allow assessment of their qualifications or abilities to perform projections.  This is expected to be beneficial as the existing academic literature provides evidence that SPAC projections are common but often overly optimistic.[1340]  Another study found that optimistic forecasts are correlated with retail investor trading behavior but not so for institutional investor trading, indicating that retail investors may benefit more from the disclosures.[1341]

---

[1340] Blankespoor, Hendricks, Miller & Stockbridge, *supra* note 1240, empirically found that: revenue forecasts occur among 80% of SPACs, only 35% of firms meet or beat those forecasts, and SPACs have growth targets that are approximately three times larger than expected (compared to a matched samples of IPO and established firms).

[1341] Michael Dambra, Omri Even-Tov & Kimberlyn Munevar, *Are SPAC Revenue Forecasts Informative?* 98 Acct. Rev. 1 (2023), empirically found that revenue forecasts are positively associated with abnormal returns in a short window around the merger announcement—and further, that this response is driven by retail investors, with no such response from institutional investors (based on 13F holding filings)—but negatively correlated over longer horizons.  The paper caveats that structural differences between firms could also explain the retail investor trading trends, which would dampen the extent to which protections accrue to retail investors.

We also expect the final rule will benefit investors by providing them with the information necessary to better determine the degree to which they may wish to rely on projections. Specifically, the requirement to discuss material bases and assumptions and their underlying rationales should enable investors to understand how the projections were derived, and subsequently how investors may choose to incorporate these projections into their expectations and decision-making. The requirement to disclose whether any projections disclosed in a filing still reflect the views of management or the board of the SPAC or target company (as the case may be) may also help investors evaluate the reliability of the projections. Because we expect the company that is the subject of the projections to have more information about itself than outsiders, this information also could reduce information asymmetry between the SPAC and/or target company and investors regarding the reliability of those projections. Overall, the adopted disclosure under Item 1609 should benefit investors by helping them assess whether and to what extent to rely on projections used in a de-SPAC transaction in making voting, redemption, and investment decisions.[1342]

---

[1342] D. Eric Hirst, Lisa Koonce & Shankar Venkataraman, *How Disaggregation Enhances the Credibility of Management Earnings Forecasts*, 45 J. Acct. Res. 811 (July 17, 2007), *available at* https://doi.org/10.1111/j.1475-679X.2007.00252.x (experimentally shows that disaggregated forecasts, which include forecasts of individual income statement line items, *e.g.*, revenue and costs, are more credible to investors than aggregated forecasts that provide only the bottom-line earnings forecasts). *See also*, Zahn Bozanic, Darren T. Roulstone, & Andrew Van Buskirk, *Management Earnings Forecasts and Other Forward-looking Statements*, 65 J. Acct. & Econ. 1 (2018), *available at* https://doi.org/10.1016/j.jacceco.2017.11.008 (demonstrating that non-earnings-forecast of items other than earnings forward-looking statements can generate significant responses from both investors and analysts and finding that the forward-looking statements, even statements unrelated to earnings, can provide value-relevant information to the capital market participants).

[1343] Auditing literature provides evidence that audit quality increases and misreporting decreases when engagement partners are required to sign the audit report or when their identities are disclosed. Joseph V. Carcello & Chan Li, *Costs and Benefits of Requiring an Engagement Partner Signature: Recent Experience in the United Kingdom*, 88 Acct. Rev. 1511 (2013), (documenting evidence that audit quality and audit fees increase in the first year when engagement partners are required to sign the audit report in the United Kingdom); Allen D. Blay, Eric S. Gooden, Mark J. Mellon & Douglas E. Stevens, *Can Social Norm Activation Improve Audit Quality? Evidence From an Experimental Audit Market*, 156 J. Bus. Ethics 513 (2019), (experimentally demonstrates that PCAOB's requirement of disclosing engagement partners' identity can reduce misreporting).

As discussed above, Item 1609 requires registrants to identify providers of projections. Studies of the behavior of auditors of financial statements found that similar identification was associated with audit quality increases and misreporting decreases.[1343]  We expect Item 1609 will have analogous effects and will increase preparers' sense of accountability and potentially increase preparers' incentives to make reliable projections.  We expect this benefit will apply regardless of whether the projections are provided by the management or board of the SPAC or the target company or a third-party provider.

We do not expect the direct compliance costs of Items 1609(a) and (b) to be substantial because companies should have the required information readily available given that the information required to be disclosed largely is what is necessary to perform the projections in the first place.

However, there may be indirect costs to these amendments, such as registrants incurring increased liability costs[1344] or increased proprietary or other disclosure costs,[1345] especially in

---

[1343] Auditing literature provides evidence that audit quality increases and misreporting decreases when engagement partners are required to sign the audit report or when their identities are disclosed.   Joseph V. Carcello & Chan Li, *Costs and Benefits of Requiring an Engagement Partner Signature: Recent Experience in the United Kingdom*, 88 Acct. Rev. 1511 (2013), (documenting evidence that audit quality and audit fees increase in the first year when engagement partners are required to sign the audit report in the United Kingdom); Allen D. Blay, Eric S. Gooden, Mark J. Mellon & Douglas E. Stevens, *Can Social Norm Activation Improve Audit Quality? Evidence From an Experimental Audit Market*, 156 J. Bus. Ethics 513 (2019), (experimentally demonstrates that PCAOB's requirement of disclosing engagement partners' identity can reduce misreporting).

[1344] Increased liability costs could occur due to the adoption of the PSLRA amendments resulting in projection disclosures no longer being afforded protection under the PSLRA, thereby increasing the expected costs to registrants of forward-looking disclosures. *See infra* Section VIII.B.2.b.

[1345] For example, if a target has a new product line it has yet to announce, but factors the product line into its disclosed projections, it may be required to disclose the product line as one of the "material bases" for the projections.  Consequently, disclosure of this new product line could inform the target's competitors about the new product line earlier than the target would find otherwise optimal and result in the target choosing not to undertake the action (i.e., go public) that would require such disclosure. *See*, *e.g.*, Michael Dambra, Laura Casares Field & Matthew T. Gustafson, *The JOBS Act and IPO Volume: Evidence That Disclosure Costs Affect the IPO Decision*, 116 J. Fin. Econ 121 (2015) (presenting evidence that firms make decisions not to IPO because of such proprietary costs).  Such costs were discussed by commenters, *see* letter from Michael Dambra, Omri Even-Tov, and Kimberlyn George, *citing* Dambra, Even-Tov & Munevar, *supra* note 1341.

combination with the co-registration requirement and the definition of blank-check company for the purposes of the PSLRA we are also adopting.  If SPACs believe these indirect costs are sufficiently high, these amendments could dampen their willingness to disclose projections, which could lead to a decrease in the amount of forward-looking information made available to investors.  If this leads SPACs to omit projections that are informative to investors, their absence could result in increased valuation uncertainty.  This effect could impact some SPACs more than others, depending on the disclosure requirements of their local jurisdictions, or on other factors.[1346]  In these cases, if SPACs view these additional indirect costs to be too high, this dampening effect could result in not only a decrease in disclosure of projections, but a reduction in the utilization of projections by the SPAC entirely.  However, as the potential dampening is likely to affect projections without reasonable bases more than those with reasonable bases (because the former are likely to be more difficult and costly to justify quantitatively and thus be seen as a larger litigation risk), we expect the potential for this dampening to be heightened in cases where the projections are more uncertain.

We also acknowledge that the requirements of Item 1609(c) may impose additional costs on SPACs due to the timing mismatch between the original preparation of projections and their inclusion in subsequent filings, as echoed by some commenters.[1347]  Further, given the co-registrant rules and new definition of blank check company,[1348] disclosures made in response to Item 1609(c) will not benefit from the PSLRA safe harbor and could be subject to greater litigation risk than under the baseline, and thus could create further liability costs for the SPAC and target.  Therefore, the provisions of Item 1609(c) might result in one or more of: (a)

---

[1346]  *See supra* note 363 and accompanying text.

[1347]  Letters from ABA, Freshfields, Goodwin Procter, Kirkland & Ellis.

[1348]  *See supra* Sections III.E, VIII.B.2.

increased compliance costs due to additional pre-filing verification of circumstances, data, assumptions, etc., that underlie the projections (and updating if so[1349]); (b) disclosure that the board continues to rely on the projections because they have no expectation that circumstances have changed; or (c) disclosure acknowledging that the projections were based on past facts and circumstances, which may have changed and thus are no longer relied upon by the SPAC, but are still being included to provide insight into historical decision-making or for some other reason. These outcomes might result in increased information in the projections (in the case of (a) above), increased information *about* the projections (in the case of (b) or (c) above), and/or increased liability costs for the registrants (in the case of (b) or (c) above).[1350]

To the extent that Item 1609 elicits additional contextual information disclosures related to SPAC projections, investors could incur incremental costs in processing the added information.[1351]

### i. Structured Data Requirement (Item 1610)

As with the specialized disclosure requirements applicable to SPACs at the IPO stage as discussed above, Item 1610 also requires that the disclosures prepared in compliance with respective sections of Regulation S-K Subpart 1600 applicable to de-SPAC transactions be tagged in Inline XBRL.[1352]  For the same reasons discussed above, we expect that the tagging

---

[1349] If SPACs determine that it is necessary to update their projections, further costs might be incurred if they also believe any fairness or best interest determination based on those projections also requires updating, a concern voiced by one commenter. *See* letter from Kirkland & Ellis.

[1350] We differentiate between information *in* the projections, such as the projections being updated to reflect new facts or circumstances, and information *about* the projections, such as investors being able to assess whether or how they should factor those projections into their expectations (for example, knowing to discount outdated projections).

[1351] *See* Elizabeth Blankespoor, Ed deHaan & Iván Marinovic, *Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review*, 70 J. Acct. & Econ. 1 (2020).   The authors suggest that it is costly to process firms' disclosures, even for the most sophisticated investors, and they conceptualize processing costs as awareness cost, acquisition cost, and integration cost.

[1352] *See supra* Section II.I and Section VIII.B.1.ii.d.

requirement for de-SPAC transaction disclosures will augment the informational benefits to investors resulting from the new disclosure requirements.[1353]  For example, tagging the disclosure of terms and amounts of the compensation received or to be received by a SPAC sponsor and its affiliates in connection with a de-SPAC transaction and the potential dilutive effects related to such compensation could allow investors to make quantitative and qualitative comparisons to similar disclosure in other de-SPAC transactions.  Additionally, the tagging requirement will make it easier to compare both numeric values and narrative discussion to those presented at the SPAC's IPO stage.

Unlike the Inline XBRL tagging requirement being adopted for SPAC specialized disclosures, which applies to registration statements for IPOs, the tagging requirement being adopted for de-SPAC transaction disclosures typically will not impose a tagging obligation on a SPAC to which the SPAC was not previously subject because a SPAC would be subject to Inline XBRL tagging obligations as of their first periodic report on Form 10-Q, Form 20-F, or Form 40-F.[1354]  As such, the Inline XBRL tagging requirement for de-SPAC transaction disclosures for the SPAC will be limited to the cost of selecting, applying, and reviewing Inline XBRL tags to a new set of disclosures or paying a third party to do so.  The tagging requirement being adopted will impose compliance costs on SPACs at an earlier stage of the SPAC life cycle than under the baseline.  As noted above, there is some indication that data-tagging costs in general have trended downward in the years since the initial adoption of XBRL requirements for SEC filings, and due to their similarities we expect this trend to hold for Inline XBRL tagging costs as well.[1355]

---

[1353] *See supra* Section VIII.B.1.ii.d.

[1354] *See supra* note 476 and accompanying text.

[1355] *See supra* note 1302 and accompanying text.

### j.   Re-Determination of SRC Status

The final rules provide that, upon the consummation of a de-SPAC transaction, an issuer must re-determine its status as an SRC prior to its first filing, other than pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K, following the de-SPAC transaction and reflect this re-determination in its filings, beginning 45 days after consummation of the de-SPAC transaction.  As an example of the effect of the final rules, consider a SPAC that qualifies as an SRC that conducts a de-SPAC transaction with a target company that results in a post-combination company that does not qualify as an SRC.  Under current rules, the company would retain the SRC status throughout the fiscal year that includes its next re-determination date (at second fiscal quarter-end of that fiscal year), which could be up to 18 months if the de-SPAC transaction occurs at the beginning of the third quarter.  In contrast, that same target company going public via a traditional IPO might not qualify for SRC status at all.  Under the final rules, the post-combination company will have 45 days following the de-SPAC transaction before the loss of SRC status will have to be reflected.

The final rules should result in a level of disclosure appropriate to the post-combination entity's facts and circumstances and be similar to those applicable in the traditional IPO setting. We expect this will reduce any regulatory arbitrage by requiring a target company going public through a de-SPAC transaction to provide an appropriate level of information to investors as it would were it to conduct a traditional IPO.[1356]  For larger target companies, this will require more comprehensive and detailed disclosure to investors soon after the de-SPAC transaction is consummated.  Overall, we expect these final rules will increase investor protection by allowing investors to assess the combined company more thoroughly through access to information

---

[1356] *See infra* Section III.C for more information on the regulatory baseline.

appropriate to the post-combination company's float and revenues.  Large target companies may also reap the benefit of reduced cost of capital insofar as providing additional historical periods of financial statement data improves price efficiency.[1357]

The redetermination of SRC status is based on annual revenues and the public float on the measuring day, with such public float being measured within the four-business day window following the de-SPAC transaction.  The calculation of public float depends on the market price at which the common equity was last sold on that selected date, or the average of the bid and asked prices of the common equity.  The public float calculation allows for secondary market trading to determine the public float of the SPAC used for SRC re-determination.  To the extent that the secondary market might not reflect all the information about the post-combination business within four business days, this could result in an inappropriate determination of SRC status or lack thereof.  However, this reflection of market price in SRC status determination exists at every second quarter-end[1358] for public companies, and thus does not reflect a cost relative to the baseline, timing differences notwithstanding.  Further, because the final rule allows for up to four business days to re-determine this public float, there is some flexibility for firms to avoid volatility they deem temporary, although this discretion also implies potential information asymmetry costs to the extent firm discretion would bias towards SRC status.[1359]

The final rules will increase compliance costs compared to the baseline for combined companies that do not meet the SRC definition as of the accelerated re-determination date.  Those companies may need to provide more detailed disclosure to investors sooner after the de-

---

[1357] *See supra* note 1191.

[1358] *See supra* 633 and accompanying text.

[1359] Because SRC status entails lower disclosure and regulatory compliance costs, it is likely that firms would prefer to have SRC status than not.

SPAC transaction than they would under current disclosure requirements.  To the extent that the amendment to the public float calculation timing creates an effective difference between the IPO and de-SPAC transaction settings, whereby the latter is affected by secondary market trading where the former is not, the effect of this difference is not expected to systematically generate inefficiencies with regards to the de-SPAC transaction setting.  This is because the effect of market trading on the public float calculation could result in both increases and decreases in post-de-SPAC transaction public float (based on observations of historical de-SPAC outcomes).[1360]

A potential cost of the re-determination is that, under certain circumstances, a SPAC that qualifies as an SRC could file two years of audited financial statements in conjunction with the de-SPAC transaction, but then upon re-determination lose its SRC qualification, and potentially be required to include an additional year of audited financial statements in subsequent registration statements.  This scenario would result in additional costs, such as engaging audit services for the additional historical year, that would not be incurred without the re-determination.[1361]  These costs, however, are partially mitigated by the provision in the final rules of the 45-day window before SRC status is required to be reflected following a de-SPAC transaction.  For combined companies that, based on public float calculations as within four business days following the de-SPAC transaction, no longer qualify for SRC status under the final re-determination rules, this window allows them to continue to reflect SRC status on

---

[1360] Florian Kiesel, Nico Klingelhöfer, Dirk Schiereck & Silvio Vismara, *SPAC Merger Announcement Returns and Subsequent Performance*, 29 Eur. Fin. Mgmt. 399, 399–420 (2023).

[1361] Because SPACs would have an existing history of audits, including for the filings required as part of the de-SPAC transaction, we expect the cost of auditing the additional historical year would be mitigated.  We note that the opposite scenario, namely a non-SRC SPAC resulting in a post-combination firm that is re-determined to be an SRC would file fewer years of financials in subsequent registration statements.  However, this scenario does not represent a concomitant *reduction* of cost, because those auditing or other costs would already be incurred.

registration statements filed within this 45-day window after the de-SPAC transaction, thereby avoiding those extra costs associated with the loss of SRC status.

Some of the companies that lose SRC status but meet the EGC definition could avail themselves of the accommodations associated with EGC reporting requirements, which could mitigate some of the disclosure costs required by the adopted amendment.

### k. Minimum Dissemination Period

We are adopting final rules that require a minimum dissemination period for registration statements, proxy statements, and information statements filed in connection with de-SPAC transactions.[1362]  We expect these rules will benefit SPAC shareholders by providing a minimum amount of time to review the information disclosed in these documents before making voting, redemption, and investment decisions.[1363]  To the extent that this results in investors having more time to review the information than they would otherwise have, the minimum distribution period will allow them to more thoroughly consider their choices.  This amendment will likely provide its greatest potential benefits to SPAC shareholders in de-SPAC transactions where there are no required advance dissemination periods, such as in the cases of SPACs that are not organized in a jurisdiction with equivalent delivery requirements for notices of stockholder meetings,[1364] do

---

[1362]  Specifically, the final rules require dissemination no later than the lesser of 20 calendar days prior to the date on which the meeting of security holders is to be held or action is to be taken in connection with the de-SPAC transaction or the maximum number of days permitted for disseminating the prospectus under the applicable laws of the jurisdiction of incorporation or organization.

[1363]  The final minimum dissemination rules do not apply with respect to Schedule TO.  The combined effect of certain tender offer rules currently effectively provides for a comparable, slightly longer minimum 20-business-day period for investors to make decisions.  *See* 17 CFR 240.14e-1 under the Exchange Act (prohibiting tender offers that are held open for less than 20 business days from the date the tender offer is first published or sent to security holders).

[1364]  For example, while Delaware General Corporation Law only requires that due notice of an upcoming meeting be provided 20 days prior to the event (in connection with certain transactions such as merger) and does not mandate a minimum period for dissemination of proxy statements or joint prospectus/proxy statements required by the Federal securities laws.  As noted in the Proposing Release (*supra*, note 7, at 29531), Commission staff, in reviewing filings, has observed that the notices of the meeting mandated by Delaware General Corporation

448

not file a Schedule TO,[1365] or do not incorporate information by reference in their Form S-4/F-4 filings.[1366]

The costs of this amendment, including printing and mailing costs, management time, and or consulting fees, may be limited by the fact that, under the baseline, SPACs may have incentives to provide the required disclosure materials in advance of a minimum deadline. For example, as retail ownership of its shares increases, a SPAC may face increasing pressure to communicate with its investors earlier, more extensively, and with greater frequency to ensure that a quorum will be present at the shareholder meeting to approve a de-SPAC transaction and that a sufficiently high number of votes are cast in favor of the transaction. In these cases, we do not expect the final rules will cause a change in behavior for firms already submitting these statements 20 calendar days or greater in advance.

The additional time required by the amendment could, in effect, shorten a SPAC's time to otherwise complete a business combination within its limited lifespan, and this amendment will remove the option value inherent in the existing flexibility in dissemination timing. Costs associated with adopting this proposal could also increase in proximity to the SPAC's dissolution

---

Law are often included in the proxy statement or joint prospectus/proxy statements, with many companies then delivering the proxy statements or joint prospectus/proxy statements in time to meet the Delaware General Corporation Law notice requirement. *See also* letter from Vinson & Elkins ("Under the existing regulatory framework, which is dictated by the laws of the SPAC's jurisdiction of formation and the proxy rules, SPACs are typically required to deliver notice of the special meeting not less than 10 days before the meeting and, if the SPAC is a Delaware entity and will be directly merging with another entity, such notice is typically required at least 20 days before the meeting. This notice is included at the beginning of the SPAC's proxy statement and effectively requires that final versions of all proxy materials be delivered to the SPAC's shareholders at least 10 days (or 20 days, as applicable) before the SPAC's special meeting." (footnotes omitted). *See also* Table 3 in Section VIII.A.2.iv.

[1365] Because a Schedule TO filed in connection with a de-SPAC transaction must already be filed 20 business days in advance of the close of the redemption period, the 20-calendar-day minimum dissemination period will not have an incremental effect.

[1366] There will be no incremental effect on the dissemination of Forms S-4 or F-4 in connection with a de-SPAC transaction if the form incorporates information by reference because a 20-business-day minimum dissemination requirement already applies, a period lengthier than 20 calendar days. *See supra* note 501.

date, because, under such conditions, logistical costs like expedited reviewing and printing would accrue.[1367]  It is also possible that the minimum dissemination period could cause SPACs to enter into sub-optimal deals earlier in the process to avoid the risk of failing to acquire a company later in the window, or, in the extreme, a de-SPAC transaction would not be able to proceed due to these new timing requirements.  However, as discussed above, we believe such costs would rarely be incurred given the significance of a de-SPAC transaction to SPACs and targets and the amount of time that SPACs have to find a target and engage in a de-SPAC transaction relative to the length of the dissemination period.  Rather, we believe it is more likely that SPACs and targets will account for the amended dissemination period in establishing a timeline for their business combination in the event that it would not have already been met or otherwise required.

Furthermore, because we are also adopting Rule 145a, which will require the filing of a registration statement or reliance on an exemption for a de-SPAC transaction, and because de-SPAC transactions can incorporate information by reference, we expect there may be few future de-SPAC transactions to which the minimum dissemination period requirement would impose an otherwise additional binding time constraint.

      *l.   Aligning Non-Financial Disclosures in De-SPAC Disclosure Documents*

We are adopting amendments such that target companies in a de-SPAC transaction not subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act must include in their registration statement or schedule filed in connection with the de-SPAC, disclosures relating to the target company that would be provided in a Form S-1 or F-1 for an IPO.  These

---

[1367]  We note discussion in Section III.B clarifying that the deadline is met when the materials are mailed, thus the delivery timing is not a consideration. *See supra* note 512.

final amendments would require disclosure with respect to the target comprising: (1) Item 101 (description of business); (2) Item 102 (description of property); (3) Item 103 (legal proceedings); (4) Item 304 (changes in and disagreements with accountants on accounting and financial disclosure); (5) Item 403 (security ownership of certain beneficial owners and management, assuming the completion of the de-SPAC transaction and any related financing transaction); and (6) Item 701 (recent sales of unregistered securities).[1368]  The final amendments also require, where a Form S-1 or Form F-1 is used to register securities in connection with a de-SPAC transaction, that these registration statements include the information required in Form S-4 and Form F-4, respectively, and that any Schedule TO or Schedule 14A filed for a de-SPAC transaction incorporate the disclosure provisions of Item 1603 through 1609 and the structured data provision of Item 1610.

The costs and benefits of these final amendments depend on the baseline level of information available that is required to be disclosed in the Form 8-K with Form 10 information that is currently disclosed in advance of the filing of the Form 8-K.[1369]  To assess the extent to which registrants may already disclose Form 10 information about the target company in a different Commission filing before filing the Form 8-K, the staff examined the frequency and scope of incorporation by reference in such 8-K filings, finding that 95% of the 8-K filers incorporated at least one of the required Form 10 items by reference.[1370]  Most of the Form 8-K filings that incorporated items by reference referred to disclosures previously filed in a proxy or

---

[1368]  Where the target is an FPI, the amendment includes the option for accordant disclosures.  *See supra* Section III.A.1.

[1369]  The Form 8-K with Form 10 information (often referred to as the "Super 8-K") is due four business days after consummation of the de-SPAC transaction.  *See* Item 2.01(f), Form 8-K.

[1370]  Items 2.01(f), 5.01(a)(8), and 9.01(c) of Form 8-K each provide that if any required disclosure under these items has been previously reported, the registrant may, in lieu of including that disclosure in the Form 8-K, identify the filing in which that disclosure is included.

information statement (88% of filers), and 46% of these filings incorporated disclosures from a registration statement filed in connection with the de-SPAC transaction.[1371]

**Figure 3. Incorporation by Reference in Form 8-K by Regulation S-K Disclosure Item in de-SPAC Transactions[a]**



[a] Data here represents the frequency of incorporation by reference per item that would be affected by the amendment as a percent of Forms 8-K that could be identified, based on staff review, as filed in connection with a de-SPAC transaction that occurred between Jan. 1, 2006, and Dec. 31, 2022, that incorporated any item by reference.

Figure 3 shows the information that is incorporated by reference in the Forms 8-K filed in connection with de-SPAC transactions, as identified by the item requirement of Regulation S-K. Disclosures pursuant to Item 101 (description of business), Item 102 (description of property), and Item 103 (legal proceedings) of Regulation S-K are most commonly incorporated by reference. Less frequently incorporated by reference are disclosures pursuant to Item 304 (changes in and disagreements with accountants on accounting and financial disclosure), Item 403 (security ownership of certain beneficial owners and management, assuming the completion of the de-SPAC transaction and any related financing transaction), and Item 701 (recent sales of

---

[1371] Because some filers incorporate disclosure by reference from more than one source, the total percentage of usage across sources exceeds 100%.

unregistered securities) of Regulation S-K.[1372]  Thus, to the extent that registrants already provide this information in the proxy statements, information statements, registration statements, and Schedules TO filed in connection with the de-SPAC transaction, the benefits and costs of compliance with the final amendments may be mitigated.

These final amendments will ensure information about the target company is provided before shareholders potentially make voting, redemption, or investment decisions in connection with the de-SPAC transaction (whereas under the baseline this information is required to be included in a Form 8-K with Form 10 information that must be filed within 4 business days after the completion of a de-SPAC transaction).  This timing change could reduce potential opportunities to engage in regulatory arbitrage, minimize differences in informational content, timing, and presentation, and potentially provide investors with more information about the target company when making such decisions, relative to the baseline.  The benefits of such alignment to unaffiliated investors would depend on the ability of investors to otherwise procure such information prior to the filing of the Form 8-K with Form 10 information.

As a result of the final amendments, investors may obtain disclosure required by Item 403 of Regulation S-K regarding the target company's beneficial ownership structure before making a voting, redemption, or investment decision in connection with the de-SPAC transaction, which could, in some cases, represent a meaningful change to the informational environment in advance of the completion of a de-SPAC transaction, particularly when this

---

[1372]  While these items are less frequently incorporated by reference, their absence may not indicate missing information.  For example, filers may not have provided Item 304 or Item 701 disclosures in earlier filings because there were no changes in or disagreements with accountants on accounting and financial disclosures or recent sales of unregistered securities to report.  When disclosures are presented in the Form 8-K, Item 304 disclosures are incorporated by reference in approximately 32% of filings and newly disclosed in 68% of filings.  Similarly, for Item 701 disclosures, the proportions of Forms 8-K that incorporate by reference and include new disclosure, are respectively approximately 35% and 65%.

information may be critical to an investor's ability to evaluate potential conflicts of interest. In addition, the disclosures may allow investors to identify potential misalignments of interests between non-redeeming shareholders and other parties to the de-SPAC transaction. The final amendments therefore should provide increased investor protections and generally improve the information environment for investors making a voting, redemption, or investment decision in connection with the de-SPAC transaction.

The final amendments require disclosure of information that must already be included in the "Super 8-K" filed after closing of the de-SPAC transaction. Thus, we expect the compliance costs of these amendments to be low to the extent they will primarily stem from the accelerated filing timeline for these disclosures (with the exception of cases involving failed de-SPAC transaction votes), although we recognize that some items may be more costly to disclose earlier than others. Further, these additional compliance costs should be limited to the extent they are consistent with existing practice, as suggested by commenters.[1373]

*2. Liability-Related Rules*

In addition to the rules discussed above pertaining to disclosures, we are adopting rules and amendments to clarify and amend the existing liability framework to resolve certain ambiguities and protect investors. In this section, we discuss the potential costs and benefits of requiring that the target company be treated as a co-registrant on a Form S-4, Form F-4, Form S-1, or Form S-4 filed in connection with a de-SPAC transaction. In addition, we discuss the amendment to the definition of "blank check company" for purposes of the PSLRA to remove the "penny stock" condition.

---

[1373] Letters from ABA, PwC.

454

i.   *Target Company as Co-Registrant*

Currently, a SPAC, the target company, or a holding company may file the registration statement for a de-SPAC transaction depending on the structure of the transaction.  When the SPAC or holding company files the registration statement for a de-SPAC transaction, Section 11 liability may not apply to the target company.  Given that the target company effectively is an "issuer" of securities in a de-SPAC transaction regardless of transaction structure, the final rules will require that the target company and its related Section 6(a) signatories sign these registration statements when filed by a SPAC or another shell company.[1374]  In addition, in a de-SPAC transaction where the target company consists of a business or assets, the seller of the business or asset is deemed to be a registrant instead of the business or assets.

The primary benefit of this rule will be to align potential Section 11 liability applicable to the target company in a de-SPAC transaction with such liability that may apply in a traditional IPO because, given that the transaction is essentially its IPO, it is the target company that, in substance, issues or proposes to issue its securities or, pursuant to new Rule 145a, the securities of the combined company.[1375]  Under current rules, when the target company does not file this registration statement, it would not have Section 11 liability for any information about its business and operations in the registration statement even though, like a traditional IPO, investors look to the business and prospects of the target company in evaluating an investment in the combined company.  Significant information asymmetries also arise because the filer likely must rely on the target company providing this information for inclusion in the registration statement.[1376]  While exposing the target company to Section 11 liability may increase costs

---

[1374]  *See supra* Section III.C.

[1375]  *See supra* Section III.C.

[1376]  *See supra* note 22 and accompanying text.

(such as compliance costs or the target company obtaining directors and officers insurance where it does not already have coverage and perceives a need to have coverage), ensuring that the target company is subject to such liability for a de-SPAC registration statement should give the target company stronger incentives to provide higher quality information about its financial condition and future prospects.  Thus, we expect that the final rule will lead to better informed voting and investment decisions and reduce adverse selection with regard to de-SPAC transactions.[1377]

A few commenters compared de-SPAC transactions and M&A transactions generally, in which targets typically do not sign a registration statement filed by the acquiror and do not share liability as a signing party.  They argued that, if market forces ensure sufficient information about the target reaches investors in traditional M&A transactions, market forces should serve the same function in de-SPAC transactions.[1378]  However, as noted elsewhere in this release, while the de-SPAC transaction is a type of M&A transaction, we believe de-SPAC transactions can be distinguished from other M&A transactions due to their hybrid nature.  Specifically, the de-SPAC transaction simultaneously: (i) functions as a form of public capital raising for the target company, (ii) transforms a shell company, that is not a business combination related shell company, into an operating company, and (iii) commonly represents the introduction of a formerly private company to the public markets for the first time.  Moreover, SPACs sponsors— who often have significant influence over the de-SPAC—may have weaker incentives than acquiring firm managers in traditional M&A transactions to perform detailed due diligence on information supplied by the target company, because SPAC sponsors benefit from a completed

---

[1377] Adverse selection describes a situation in which investors have incomplete information about potential de-SPAC targets and thus have difficulty distinguishing good investments from bad investments.  As a result, investors may be less willing to participate in the SPAC market out of fear of choosing a bad investment.  Higher quality information about targets mitigates this problem and encourages investor participation and the health of the SPAC market overall.

[1378] *See* letters from ABA, Skadden.

de-SPAC transaction at nearly any price.[1379]  In addition, this information may be more important to investors because unlike a traditional M&A transaction, the SPAC has no business operations of its own, and the business and operations of the target company will typically be the sole business and operations of the combined company after the business combination.  The final rules would address these misaligned market incentives by assigning strict liability under Section 11 to the target company, which is in the best position to ensure the accuracy of the disclosures.  Another reason we expect the final rules will produce a more optimal solution than reliance on existing market incentives is that we do not expect "inherited liability" of target company officials to effectively address the information asymmetry and incentive misalignment issues, as suggested by a few commenters.[1380]  To the extent the target company survives and/or the officers and directors of the target company are officers and directors of the surviving company, they would potentially have liability for statements in the de-SPAC registration statement.  However, that future assumption of liability does not change the fact that, under current regulations, depending on the transaction structure, the target company and its officers and directors may not have liability at the time of sale for the statements made in any registration statement filed in connection with the de-SPAC transaction.  The final rules ensure that target company directors and signing officers have liability for statements made in the de-SPAC registration statement, regardless of whether they remain with the surviving company following the de-SPAC transaction.

The final rules regarding "co-registration" may be associated with additional administrative or other costs.  First, in connection with the filing of the registration statement, the

---

[1379] *See supra* Section VIII.A for discussion of SPAC sponsors' interests in completing the de-SPAC transaction.

[1380] *See* letters from ABA, NYC Bar.  *See* discussion of these comments in Section III.C (regarding whether "Current Requirements Provide Sufficient Incentives" in connection with discussion of the final rules).

co-registrant requirements could increase compliance costs of target companies and introduce the prospect of new potential costs if the target company incurs Section 11 liability.  Compliance costs compared to the baseline may increase in cases where the target would not otherwise have been a registrant of a registration statement for the de-SPAC transaction.  For example, the target company may elect to employ service providers (such as legal, accounting, or financial advisers) to a greater degree or may elect to have its management spend more time preparing and reviewing the registration statement disclosure, since under the final rules, the target company, its directors, and its Section 6(a) signatories will potentially be liable for material misstatements in or material omissions from any effective de-SPAC transaction registration statement pursuant to Section 11.  Potential target companies may also be deterred from engaging in a de-SPAC transaction due to this potential liability, which could result in fewer public companies.

Second, target companies may elect to spend more money than under the baseline for directors and officers insurance coverage, although this would not be a direct compliance cost of the final rules.  A number of commenters raised such concerns.[1381]  Based on staff experience reviewing filings involving SPACs, most target companies already have directors and officers insurance.[1382]  Where a target company expects to enter a de-SPAC transaction, following the

---

[1381]  Letters from ABA ("Targets will be forced to substantially enhance their D&O liability insurance coverage to cover potential federal securities law liability substantially earlier in the De-SPAC Transaction process than is currently the case.  Moreover, if the De-SPAC Transaction is never completed for some reason, Targets would likely not be able to 'ratchet down' their coverage to more typical private company levels until the next policy renewal date."); Anonymous (Apr. 7, 2022); Skadden ("Given the potential for increased risk of liability to boards, we also expect D&O liability insurance premiums to increase significantly, further diluting the value of the transaction to stockholders.").  *See also* letters from ABA, Goodwin, White & Case (each discussing directors and officers insurance premium costs in connection proposed Item 1606(a)) and Job Creators Network (noting that costs generally will increase, as "SPACs and target companies should expect extensive diligence requests from financial institutions, advisors, and their counsel in connection with a de-SPAC transaction" (citations omitted)).

[1382]  These target companies may have directors and officers coverage for several reasons: (a) to cover the target company in connection with any liability to investors in connection with material misstatements or omissions in the registration statement, (b) to cover the target company in connection with government enforcement actions and investigations, (c) to cover the expense of the company in indemnifying directors and officers for their

458

adoption of the final rules, we expect that some of these target companies may seek to expand their existing coverage due to the potential added liability from the above filings, resulting in a higher premium.  We note costs for additional insurance may help offset or substitute for the potential increase in liability-related costs discussed earlier.

Third, depending on when the business combination closes, the target company may incur compliance costs in connection with periodic and current reporting, because, as a registrant of a de-SPAC transaction registration statement, once this registration statement is effective, the target company will become an Exchange Act reporting company.[1383]  This would, among other things, require the filing of Exchange Act periodic reports on Forms 10-K, 10-Q, and 20-F where applicable, and current reports on Forms 8-K and 6-K after the effectiveness of any registration statement for the de-SPAC transaction and until the target company is able to terminate/suspend its Exchange Act reporting obligations.[1384]  This additional cost to target companies may be mitigated to some degree by the fact that much of the information they will have to disclose under the final rules is information that, under the baseline, either was already compiled and disclosed as part of the de-SPAC transaction or would be required in disclosures of the combined company after the de-SPAC transaction.  However, in cases of de-SPAC transactions for which a registration statement becomes effective but the business combination does not close, which based on staff experience is very rare, the final rules will impose a cost upon those target companies that would not be incurred under the baseline, which could affect the cost and benefit

---

liability, and (d) to cover the liability of directors and officers where they are not indemnified by the target company.

[1383]  *See supra* note 558 and accompanying text.

[1384]  *See supra* Section III.C.3.vi for discussion of reporting obligations.  We also note that although these filings will create costs, investors should also benefit from these ongoing disclosures.

calculations of target companies when choosing whether to go public through a de-SPAC transaction.

Finally, we expect audit costs may increase for a minority of target companies as a result of the co-registration requirement. Under the current regulatory regime, filings of U.S. public companies must be audited by PCAOB-registered auditors, including financials of predecessor target companies.[1385] As co-registrants to a de-SPAC transaction, non-predecessor target companies will also need to obtain audits from PCAOB-registered auditors. We expect relatively few targets would need to change auditors as a result of the co-registration requirement for several reasons. First, many target companies may have already decided to work with PCAOB auditors in advance of seeking an acquisition with a public company. Second, we expect there to be relatively few de-SPAC transactions involving non-predecessor target companies. For example, approximately 97% of de-SPAC transactions from 1990–2022 involved a single predecessor target.[1386] Finally, any cost related to this requirement would be limited because audits of the target company's operations and financials for filings subsequent to the de-SPAC transaction closing would need be conducted by PCAOB-registered auditors under the current regulatory regime. With respect to cost of conducting the audits in accordance with PCAOB standards, for predecessor target companies, and PCAOB or GAAS standards for non-predecessor target companies, we do not anticipate meaningful additional costs.

These costs may be factors that a target company that seeks to become public considers when evaluating the route of a traditional IPO versus a de-SPAC transaction. As such, under the final rules, the additional costs for target companies, balanced against reduced adverse selection

---

[1385] *See supra* note 624 and accompanying text.

[1386] Target counts are from Dealogic's SPAC M&A data.

faced by investors, potentially drawing more investors to the SPAC market, may tilt the relative attractiveness of seeking a public listing away from a de-SPAC transaction towards a traditional IPO or away from public listing entirely.  The extent to which these factors influence such a decision would depend on a variety of factors, such as target company preferences toward the de-SPAC transaction method of going public—based on views of the process such as its level of transaction costs, its timing, and its certainty of closing.

### ii.  PSLRA Safe Harbor

As discussed in Section III.E, we are adopting new Securities Act and Exchange Act rule definitions of "blank check company" under the PSLRA.  The effect of the final rules will be that the PSLRA statutory safe harbors will be unavailable for forward-looking statements made in connection with a de-SPAC transaction involving an offering of securities by a SPAC or other issuer meeting the final definition of "blank check company."[1387]

This provision of the final rules has two related benefits: (1) an increase in the likelihood that such issuers will take more care in avoiding the use of unreasonable forward-looking statements, and (2) an increase in the likelihood that investors will have confidence in the forward-looking statements made by such issuers.

First, the final rules will benefit investors by incentivizing SPACs and other blank check companies[1388] to take greater care to avoid making forward-looking statements that are unreasonable.  There is broad acknowledgement that forward-looking statements can be

---

[1387] *See supra* Section VIII.A.3.  *See also supra* Section III.E for more information about the regulatory baseline.

[1388] In this subsection VIII.B.14, where we refer to "blank check companies" in connection with our discussion of the final rules, unless otherwise indicated, we are referring to blank check companies that are not limited by any qualification that the company is an issuer of penny stock.

461

important for investors to aid their valuation of securities.[1389]  As noted above, however, several commenters have raised concerns that forward-looking statements used in de-SPAC transactions are overly optimistic and thus less useful for investors.[1390]  Some academic research has found SPAC forward-looking statements to be overly optimistic[1391] and suggests, with caveats, that less sophisticated investors are more likely to be swayed by such projections.[1392]  One study finds, however, little evidence of "hype" in SPAC forecasts.[1393]  As a result of the final definitions of

---

[1389]  *See, e.g.*, letter from CFA Institute ("FLS are regularly used in connection with de-SPAC merger transactions and are considered key information for assessing prospects for the newly merged entity."); Anne Beyer, Daniel A. Cohen, Thomas Z. Lys & Beverly R. Walther, *The Financial Reporting Environment: Review of the Recent Literature*, 50 J. Acct. & Econ., 296–343 (2010) (Using a sample from 1994 to 2007, this article shows management earnings forecasts contributed over half (55%) of the accounting-based information to the market that explained quarterly stock return variance.); Moonchool Kim & Jay R. Ritter, *Valuing IPOs*, 53 J. Fin. Econ. (1999) (finding that valuing IPOs with comparable firm multiples using analyst forecasts of future accounting performance rather than historical numbers improves accuracy substantially).[1390]       Letters from Americans for Financial Reform Education Fund ("Post-merger investors in SPACs, who are predominantly retail investors, are often lured by ambitious projections of growth—made with the protection of the safe harbor—and unfortunately have already lost significant amounts of money as a result….In some cases, SPACs have lost up to 75% of their value since 2021.  Retail investors are estimated to have lost about $4.8 billion, or 23% of the $21.3 billion of their total $21.3 billion in SPACs."), Better Markets, CFA Institute, CII, Senator Elizabeth Warren ("In 2021, nearly half of all companies with less than $10 million of annual revenue that went public through a SPAC 'have failed or are expected to fail to meet the 2021 revenue or earnings targets they provided to investors.'  These companies fell short on revenue projections by an average of 53%." (referencing a WSJ analysis)).

[1390]  Letters from Americans for Financial Reform Education Fund ("Post-merger investors in SPACs, who are predominantly retail investors, are often lured by ambitious projections of growth—made with the protection of the safe harbor—and unfortunately have already lost significant amounts of money as a result….In some cases, SPACs have lost up to 75% of their value since 2021.  Retail investors are estimated to have lost about $4.8 billion, or 23% of the $21.3 billion of their total $21.3 billion in SPACs."), Better Markets, CFA Institute, CII, Senator Elizabeth Warren ("In 2021, nearly half of all companies with less than $10 million of annual revenue that went public through a SPAC 'have failed or are expected to fail to meet the 2021 revenue or earnings targets they provided to investors.'  These companies fell short on revenue projections by an average of 53%." (referencing a WSJ analysis)).

[1391]  Blankespoor, Hendricks, Miller & Stockbridge, *supra* note 1240, finds that combined companies meet or beat 35% of revenue projections.  This percentage declined as the forecast period increased; SPACs meet or beat 42% of 1-year forecasts but 0% of four-year forecasts.  Note that unbiased forecasts should approximately overshoot as often as undershoot the eventual true value, and thus forecasts should be expected to meet or beat true values approximately 50% of the time.

[1392]  *See supra* notes 1240 and 1341.

[1393]  *See* letter from Cato Institute, which cites Kimball Chapman, Richard Frankel, & Xiumin Martin, *SPACs and Forward-Looking Disclosure: Hype or Information* (Research Paper No. 3920714, last revised Oct 21, 2021), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3920714 (retrieved from SSRN Elsevier database).  Using a sample of 420 SPACs with IPOs between 2015 and 2020, the authors find "a negative association between the redemption rate and *Forecast Intensity* [the number of performance metrics forecasted

"blank check company" for purposes of the PSLRA, we expect SPACs and other affected blank check companies will take greater care to avoid unreasonable forward-looking statements because these issuers will be concerned there may be a higher risk of incurring potential costs or liability in such cases as compared to the baseline.[1394]  The reduced likelihood of unreasonable statements should allow investors to make better investment and voting decisions.  The potential for improvement in decision-making may be particularly pronounced in de-SPAC transactions as there is typically no prior public history of filings or financial information for investors to draw upon to help determine the reasonableness of projections.

It is possible the market already discounts to some extent overly optimistic claims in forward-looking statements by SPACs who were operating under the assumption that their disclosures were subject to PSLRA safe harbor protections, reducing the potential harm from such forward-looking statements that this rule is intended to ameliorate.[1395]  In this regard, we

---

times the number of years forecasted] and the forecasted revenue growth rate, which is the opposite of what the opportunistic disclosure hypothesis would predict.  In other words, we fail to find evidence of 'hyping' when analyzing the association between the redemption rate and SPAC disclosures."  The authors caveat that this inference "is based on the assumption that the perceived deal quality as measured by redemption rate is an unbiased estimate of deal quality."  Put another way, the authors argue that since other studies have observed a positive correlation between lower investor redemption levels and higher de-SPAC-period stock performance, the fact that they find an association between lower investor redemption levels and forecast intensity and growth rates suggests high forecasts are associated with better de-SPAC performance in the year following the de-SPAC.  Thus, they assert SPAC forecasts do not display "hype."  We find this conclusion problematic.  Finding that more intense or higher raw forecasts are associated with better SPAC performance does not mean there is no hype, because both low and high growth rates can be exaggerated.  The study also finds "no evidence of a subsequent return reversal in the de-SPAC period" that is more prevalent for the SPACs with the highest raw forecast growth rates, which the authors argue would have been evidence of overly optimistic "hype." However, the paper's regressions include three sets of returns as dependent variables in a single specification: the returns before merger announcement, right around announcement, after announcement to the day before closing, and trading day 0 to 1 year after closing.  This approach hinders statistical inference since standard errors are not appropriately corrected for heteroskedasticity and the design decision to include multiple return windows simultaneously in a single regression results in biased estimations of the control variables included as regressors, making it difficult to draw firm conclusions from the results.

[1394]  While the Commission has brought enforcement actions alleging the use of baseless or unsupported projections about future revenues and the use of materially misleading underlying financial projections involving both SPACs and other reporting companies (*see supra* note 848),  removal of the PSLRA safe harbors for SPACs will add liability for forward-looking statements in any private right of action under the Securities Act or Exchange Act.

[1395]  Several commenters expressed this view.  *See, e.g.*, letters from Cato Institute, Kirkland & Ellis, Paul Swegle.

note that sophisticated investors are more likely to discount overly optimistic forward-looking statements, and thus the final rules may benefit less sophisticated investors more.

By incentivizing SPACs and other blank check companies to avoid unreasonable forward-looking statements, the final rules will also benefit investors and issuers by increasing the likelihood that those investors will have confidence that the forward-looking statements are reliable.  If investors are aware that SPACs are taking greater care to avoid unreasonable forward-looking statements, investors may be able to analyze SPAC opportunities with greater precision, resulting in less adverse selection and encouraging investment and capital formation.  Similar benefits will accrue to investors in registered securities offerings of non-SPAC registrants that meet the final definition of "blank check company," although this is less likely to have a significant impact on the overall market due to the limited number of business combinations involving these issuers, as observed in recent years.[1396]

Considering the final rules holistically, we note that Item 1609 of Regulation S-K, amended Item 10(b) of Regulation S-K, and other provisions of the final rules intended to increase investor awareness of potential conflicts of interest[1397] may prompt SPACs to improve their projections because of the reasons discussed above[1398] and/or allow investors to better understand and evaluate projections,[1399] which could reduce the incremental benefit of the removal of the PSLRA safe harbor in isolation.

---

[1396] *See supra* Section VIII.A.

[1397] *See supra* Section II.C (discussing rules requiring disclosure of conflicts of interest between public investors and SPAC sponsors).

[1398] *See infra* note 1394.

[1399] For example, Item 1609(b) of Regulation S-K requires disclosure of material assumptions that underlie projections.  This additional detail may allow investors to better assess the validity of projections and detect over-optimism.

This provision of the final rules may entail additional costs.  First, SPACs and other blank check companies may experience greater legal and related costs in connection with defending actions brought against them under the Federal securities laws, particularly if the combined company that results from a business combination transaction underperforms relative to any forward-looking statements.[1400]  The clarity the rule provides about the absence of the PSLRA safe harbor may increase the risk of such legal action.  This cost would be mitigated by the extent that directors and officers of the SPAC and the target company have relevant directors and officers liability insurance, though the cost of that insurance to cover potentially increased legal risk may also likely be higher relative to the baseline.[1401]

Second, SPACs and other blank check companies may incur additional costs related to efforts by these companies to ensure projections they provide investors are not unreasonable.[1402]  For example, SPACs and other blank check companies may employ service professionals (such as lawyers, accountants, and financial advisers) to a greater extent, by having them spend more time reviewing projections.  Also, SPACs and other blank check companies may decide to devote more management time to prepare and validate projections.

Third, given the potential legal and preparation costs, a SPAC or other blank check company may decide not to provide forward-looking statements it otherwise would have provided in connection with a business combination absent the final rules.  In this case, investors may have less information, potentially negatively impacting their ability to accurately value these companies and allocate their investments accordingly to the extent such forward-looking

---

[1400]  Increased legal costs could also concern other transaction participants such as third-parties hired to prepare projections if they determine the disclosure of the projections would subject them to liability.  They may seek compensation for bearing this additional liability.  *See* letter from ABA.

[1401]  *See* letter from Amanda Rose.

[1402]  *See, e.g.*, letter from Winston & Strawn.

statements would have been informative.[1403]  A number of commenters expressed this concern.[1404]  This could result in information only being revealed to market participants in de-SPAC transactions to the extent SPACs are able, like IPOs, to provide investors forward-looking information indirectly through securities analysts.[1405]  Potential loss of information in SPACs may be mitigated in situations where a SPAC or other blank check company may be required to provide forward-looking statements under State law or think investors need such information to fully assess the proposed business combination transaction.[1406]

Fourth, if potential SPACs (or other blank check companies) or target companies determine forward-looking statement disclosures are necessary but are not willing to provide such statements without PSLRA protections, fewer SPACs could form and/or impacted blank check companies such as SPACs may decide not to enter into a business combination transaction, such as a de-SPAC transaction.  In addition, potential target companies may decide not to go public by way of a de-SPAC transaction.  In particular, as stated by a commenter, the combination of the increased liability associated with forward-looking statements and any State law fiduciary requirements to provide such disclosure could result in de-SPAC transactions, on net, facing more liability than IPOs, which have the ability to avoid such liability by not providing forward-looking projections.[1407]  This could lead to fewer public investment opportunities for investors to the extent potential SPAC target companies do not go public

---

[1403] We note that the absence of forward-looking statements regarding a de-SPAC transaction will not preclude investors from valuing the business combination, as financial projections supplied by an entity to be valued are not a requirement for deriving its valuation.

[1404] *See, e.g.*, letters from Cato Institute, CFA Institute, MFA, NYC Bar, SPAC Association, Winston & Strawn.

[1405] *See, e.g.*, letters from Bullet Point Network, SPACInsider, Ropes & Gray, SPAC Association, Vinson & Elkins, White & Case.

[1406] *See, e.g.*, letters from ABA, Andrew Tuch, Cato Institute, CFA Institute, Goodwin Procter, NYC Bar, Paul Swegle, Vinson & Elkins, Winston & Strawn.  *See also supra* note 829.

[1407] *See* letter from Cato Institute.

another way, i.e., via the IPO market.  One commenter provided data showing that the firms

SPACs have taken public are smaller in average market capitalization and are not distributed in

precisely the same industries as firms taken public through IPOs. This might suggest SPAC and

IPO markets do not fully overlap.[1408]  Relatedly, a target company's ability to raise capital may

also be reduced, although these companies may be able to ameliorate any reduction in capital

formation if they receive funding from other capital sources, such as unregistered equity

investments.

### 3.  Shell Company-Related Rules

In addition to the rules discussed above, we are also adopting rules and amendments to

address further areas of incongruity in requirements that guide the disclosures and liabilities in

the context of shell-companies more broadly, excluding those that are business combination

related shell companies.

### i.  Rule 145a

Rule 145a deems any business combination of a reporting shell company (that is not a

business combination related shell company) involving an entity that is not a shell company to

involve a sale of securities under the Securities Act to the reporting shell company's

shareholders.  To the extent that an exemption is unavailable for a de-SPAC transaction, the

transaction must be registered.  Rule 145a is intended to address concerns regarding the use of

reporting shell companies generally as a means by which private companies access the U.S.

capital markets.  One reason for these concerns is that reporting shell company shareholders may

not receive the Securities Act protections (including disclosure and liability) they receive in a

---

[1408] *See* letter from Committee on Capital Markets Regulation.  We note that no tests for statistical significance of these differences in size and industry distribution were conducted and thus we cannot confirm that SPAC and IPO markets are different. *See also* letter from Yuchi Yao, which provides a theoretical analysis suggesting SPACs and IPOs could serve different types of firms that wish to go public.

traditional IPO because of transaction structure.  Under the final rule, these deemed sales will need to be registered under the Securities Act unless there is an applicable exemption.[1409]

Currently, if a reporting shell company buys a target company by issuing its shares as consideration for the interests of the target shareholders, reporting shell company investors are unlikely to receive a Securities Act registration statement in connection with the transaction.  In this example, the reporting shell company shareholders would not receive the protections afforded by the Securities Act, including any enhanced disclosure or liability that would be available if the transaction were registered under the Securities Act.

Rule 145a should provide shareholders in a reporting shell company that is not a business combination related shell company, engaged in a business combination involving a non-shell company, with more consistent Securities Act protections, regardless of the structure used for the business combination.  Because of this consistency, we expect the rule will bolster investor protection for reporting shell company shareholders and reduce the information asymmetry between such investors in the reporting shell company and the target company.  Specifically, we expect this rule to be of particular benefit to shareholders in reporting shell companies that may not otherwise receive timely information about the intended target company, or potentially even notification that the reporting shell company is entering into a business combination until after the transaction has occurred.  Additionally, receipt of registration materials may highlight salient information (e.g., as required by Subpart 1600 of Regulation S-K for transactions involving SPACs) for reporting shell company shareholders who might otherwise not receive or overlook it

---

[1409] *See supra* Section IV.A.2 for more information about the regulatory baseline.

(or those who are vulnerable to inertia[1410]) and call attention to the nature in which their investment will be transformed should they continue to hold their securities.  For these reasons, we expect Rule 145a will result in more consistent information (i.e., timing, disclosure, and format) for investors and thereby improve price discovery and capital formation.  Even if an exemption were available for the transaction (and, as a result, shareholders do not receive a registration statement in connection with the deemed sale), Rule 145a would still confer informational benefits to affected reporting shell company shareholders as such shareholders would receive whatever information the shell company concludes must be provided to satisfy Section 10(b).[1411]  Because it is unclear the extent to which reporting shell company shareholders may be able to anticipate whether such an exemption would be available, the full extent to which Rule 145a will result in these expected price or capital formation benefits is unclear.[1412]

Under Rule 145a in certain business combination transactions where reporting shell companies, including SPACs, are parties, the combined company will be required to register the deemed sale of its securities to the pre-transaction reporting shell company shareholders at the time of the business combination, unless there is an available exemption.  We expect this will increase costs in those cases where the business combination is not structured in a manner that otherwise would need to be registered.  These costs could include, in the extreme case, all costs associated with conducting a registered offering of securities, such as preparing a Securities Act

---

[1410] Investor inertia refers to the tendency to avoid trading.  *See, e.g.*, Laurent E. Calvert, John Y. Campbell, & Paolo Sodini, *Fight or Flight? Portfolio Rebalancing by Individual Investors*, 124 Q. J. Econ. 301 (2009) ("observing little aggregate rebalancing in the financial portfolio of participants").

[1411] In registered public offerings, the extent to which disclosure is required is set forth in detail in SEC registration statement forms, Regulation S-K and Regulation S-X.  The disclosure that may be required in an exempt offering, on the other hand, is primarily driven by Section 10(b) of, and Rule 10b-5 under, the Exchange Act, which enable a buyer to recover against a seller that, among other things, makes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading in connection with a sale of a security.

[1412] *Id*.

registration statement, if no exemption is available.  The rule may also introduce opportunity costs in the form of transactions that might otherwise have occurred but would be disincentivized under the new requirements.  For example, under current rules, a business combination involving a reporting shell company can be structured to avoid registration entirely, if, for example, any securities issued to the target company's shareholders in exchange for their interests in the target can be issued under an exemption.  Because Rule 145a deems such a transaction to involve a sale to reporting shell company shareholders that will need to be registered (unless there is an applicable exemption), affected parties may opt not to pursue such a transaction to avoid the new transaction costs involved.

To the extent that the final rule requires the filing of a Securities Act registration statement, we expect extra costs associated with greater care in preparation and review of the disclosures therein due to the applicability of Section 11.[1413]  Also, there could be some costs associated with timing issues generated by any Commission staff review of any registration statement.  Some of these costs may be mitigated to the extent that the reporting shell company or target company is already preparing disclosure documents, particularly Securities Act registration statements, in connection with a business combination that would be covered by Rule 145a.  For example, in a de-SPAC transaction, the SPAC and/or target company may already be preparing a Schedule 14A, 14C, or TO, or a Form S-4, F-4, S-1, or F-1.  Reporting shell companies and SPACs also typically prepare Forms 8-K containing Form 10 disclosures that are filed shortly after the business combination.

---

[1413] *See generally supra* Section VIII.B.2 for a discussion of the costs of increased liability.

    *ii.  Financial Statement Requirements in Business Combination Transactions Involving Shell Companies*

Article 15 of Regulation S-X and related amendments aim to more closely align the financial statement reporting requirements in business combinations involving a shell company and a private operating company with those in traditional IPOs.  These amendments should ensure the appropriate level of investor protections by reducing the potential for regulatory arbitrage by private companies that go public through a business combination with a shell company rather than a traditional IPO.  Furthermore, the disclosure and audit requirements (e.g., Rule 15-01(a)) should reduce information asymmetry between financial statement disclosures in business combination transactions involving shell companies, including de-SPAC transactions, and traditional IPOs, which may in turn benefit private operating companies going public by reducing the cost of capital.[1414]  The rules and amendments that clarify applicable definitions and requirements (e.g., Rule 15-01(b), (c), (d), and (e)), are expected to reduce potential ambiguity faced by registrants by codifying certain existing interpretive positions, as discussed above in section IV.B and improve comparability.

The final rules and amendments should allow investors to more readily locate and process relevant information and reduce processing costs, and should increase investor confidence in the reporting provided by entities involved in these business combinations.[1415]  In

---

[1414]  *See* Michael Minnis, *The Value of Financial Statement Verification in Debt Financing: Evidence from Private U.S. Firms*, 49 J. Acct. Research 457, 457–506 (2010).   Using a large sample of privately held U.S. firms, the author found that audited firms enjoy a lower interest rate than unaudited firms, and that lenders place more weight on audited financial information in setting the interest rate.   *See also* Mathieu Luypaert & Tom Van Caneghem, *Can Auditors Mitigate Information Asymmetry in M&As? An Empirical Analysis of the Method of Payment in Belgian Transactions*, 33 Auditing: A Journal of Practice & Theory 57, 57–91 (2014).   This study finds that audits can mitigate information asymmetry about the target's value, reducing the need for a contingent payment.

[1415]  *See supra* note 508.

turn, these improvements should lead to more efficient voting, redemption, and investment decisions. Many of the final rules and amendments codify existing staff guidance or financial reporting practices. Thus, to the extent that registrants are already preparing statements and reports in a manner consistent with the rules and amendments, the incremental benefits and costs will be limited. Below, we discuss the benefits and costs of each individual item under Rule 15-01 of Regulation S-X and the other amendments.[1416]

### a. Rule 15-01(a) Audit Requirements of a Predecessor

Rule 15-01(a), in connection with the amendments to Rule 1-02(d) and related new instructions to Forms S-4 and F-4 aligns the level of audit assurance required in business combination transactions involving a shell company with that for an IPO. The rule requires the financial statements of a business that is or will be a predecessor to a shell company to be audited in accordance with the standards of the PCAOB, which are the same auditing standards required in an IPO registration statement. This amendment will codify existing staff guidance. Rule 15-01(a) permits non-predecessor businesses to be audited under PCAOB standards or U.S. GAAS, aligning with the audit standards that would be applied in an IPO registration statement.

Rule 15-01(a) should benefit investors by clarifying that the financial statements of a business that is or will be a predecessor to a shell company are to be audited in accordance with PCAOB standards consistent with a traditional IPO.[1417] To the extent that investors use the audited financial statements to project future cash flows, the new rule also may benefit shell

---

[1416] *See supra* Section IV.B for additional regulatory baseline information.

[1417] *See* Phillip Lamoreaux, *Does PCAOB Inspection Access Improve Audit Quality? An Examination of Foreign Firms Listed in the United States*, 61 J. Acct. & Econ. 313, 313–337 (2016) (documenting that PCAOB-inspected auditors, compared to auditors not subject to PCAOB inspections, provide higher quality audits, which are reflected by more going concern opinions, more reported material weaknesses, and less earnings management).

companies and target companies by lowering their cost of capital.[1418]  The final rules may, however, increase the compliance costs (e.g., audit costs) of the business combination.  To the extent that registrants are, in practice, already including financial statements of target companies audited under PCAOB standards, the above incremental benefits and costs likely would be limited.

###### b.  Rule 15-01(b) Number of Years of Financial Statements

Under Rule 15-01(b), a shell company registrant will be permitted to include in its Form S-4/F-4/proxy or information statement balance sheets as of the end of the two most recent fiscal years and two years of statements of comprehensive income, changes in stockholders' equity, and cash flows for the target company where both the shell company and a target company would qualify as an EGC, and this determination would not be dependent on whether the shell company has filed or was already required to file its annual report.  Rule 15-01(b) will align the number of years required to be disclosed in the financial statement between de-SPAC transactions and traditional IPOs.

For those transactions affected by the rule, registrants that qualify for EGC status and are not SRCs should benefit from reduced cost of producing audited financial statements because this rule will reduce the number of years of financial statements required from three years to two years.  In those cases, this rule could cause some information loss for investors.  However, investors would still have access to two years of financial statements for the target company, the same amount that would be required had the target company gone public via a traditional IPO.

---

[1418] *See* Michael Minnis, *The Value of Financial Statement Verification in Debt Financing: Evidence from Private U.S. Firms*, 49 J. Acct. Research 457, 457–506 (2010) (finding that audited financial statements have more predictive power for future cash flows, which may explain lower cost of capital as well as greater reliance by lenders).

In addition, the omitted "third year" of financial statements would be the oldest information and thus may provide less incremental value to investors than the two most recent fiscal years.

### c. Rule 15-01(c) Age of Financial Statements of the Predecessor

Rule 15-01(c) provides that the age of financial statements for a business that will be acquired by a shell company in a registration statement or proxy statement will be based on the age requirements in Rule 3-12 or Rule 8-08 of Regulation S-X, rather than the target company provisions in Item 17 of Form S-4.  Because this amendment is generally consistent with existing market practice, we do not expect it to have significant economic effects for registrants or investors.  This rule will align disclosure requirements across the different routes of going public, which may reduce compliance uncertainty for registrants and their predecessors and increase investor confidence.

### d. Rule 15-01(d) Acquisition of a Business or Real Estate Operation by a Predecessor

Rule 15-01(d) requires application of Rule 3-05 or Rule 8-04 (or Rule 3-14 or Rule 8-06, respectively, as relates to a real estate operation), the Regulation S-X provisions related to financial statements of an acquired business or real estate operation, to an acquisition by a predecessor of a shell company registrant.  This amendment is consistent with the current market practice of applying Rule 3-05 (or Rule 8-04) to acquisitions by the business that will be the predecessor, therefore we believe that the incremental benefits and costs should be limited.

Rule 15-01(d)(1) pertains to the calculation of significance tests and refers to Rule 1-02(w) of Regulation S-X, which we are amending as well, to require that the significance of the acquired business be calculated using the predecessor's financial information as the denominator instead of that of the shell company registrant.  The use of the shell company registrant, which

has nominal activity, for the denominator in materiality tests under current rules results in limited to no sliding scale for business acquisitions, including those made by the target company that will be the predecessor to the shell company because every acquisition would be significant and thus require financial statements.  The adopted amendment may alleviate compliance burdens to the extent that it would no longer require inclusion of financial statements of acquired businesses or real estate operations that formerly would have been in excess of a significance test in Rule 1-02(w).

Rule 15-01(d)(2) requires a shell company that omits from a registration statement or proxy statement the financial statements of a recently acquired business or real estate operation that is not or will not be its predecessor pursuant to Rule 3-05(b)(4)(i) or 17 CFR 210.3-14(b)(3)(i) of Regulation S-X to file those financial statements in a Form 8-K by the later of the filing of the Item 2.01(f) Form 8-K or 75 days after consummation of the acquisition.[1419]  This amendment will both harmonize the timing with that in the IPO setting and alleviate ambiguity regarding the timing in which these financial statements are required to be filed, which we expect will facilitate compliance for the registrant.  Additionally, this amendment should help ensure that investors receive predictable and timely disclosure about the acquired business, facilitating better informed capital market decision-making.

As a result of these final amendments, we expect registrants' compliance burden will likely be reduced.  Although, the final amendments to the significance test may reduce the information available to investors about business acquisitions by the target company that will be the predecessor to the shell company, it may also reduce investors' information processing costs

---

[1419]  This is a modification from the Proposing Release (Proposing Release, *supra* note 7, at 29492) in response to comments, allowing for the same 75 day grace period as in the IPO setting.  *See supra* Section IV.B.4.

by focusing on financial statements of acquired businesses that are significant rather than those of all acquired businesses. We also believe any potential costs to investors as a result of decreases in disclosure may be mitigated by the fact that registrants must otherwise disclose material information about the acquisition that is necessary to make the required statements not misleading.[1420] Therefore, we believe that investors will still be presented with all the salient information required to make informed investment decisions.

> e. *Rule 15-01(e) Financial Statements of a Shell Company Registrant After the Combination with Predecessor*

Rule 15-01(e) allows a registrant post combination to exclude the pre-acquisition financial statements of a shell company (including a SPAC) for periods prior to the business combination that results in the combined entity no longer being a shell company once the following conditions have been met: (1) the financial statements of the predecessor, as that term is used in financial reporting, have been filed for all required periods through the acquisition date, and (2) the financial statements of the combined entity registrant include the period in which the acquisition was consummated, which would also include the accounting for the business combination. In the vast majority of cases, the target is a predecessor business, and therefore, in effect, this rule requires historical financial information for the shell and target companies up to and including the acquisition, after which the financial statements of the shell can be omitted, because at that point they are not expected to continue providing investor relevant information (at least not beyond the extent to which they are reflected in the registrant's financials). Rule 15-01(e) has been revised from the proposal to clarify that similar requirements apply in cases where the target acquires the shell company. This will, in effect, apply the same

---

[1420] *See* Securities Act Rule 408(a); Exchange Act Rule 12b-20.

476

requirement for reporting SPAC financials post-combination regardless of the structure of the de-SPAC transaction.

It is possible that Exchange Act Rule 12b-20 or Securities Act Rule 408(a), which both require disclosure of additional information "necessary to make the required statements, in the light of the circumstances under which they are made, not misleading," could prompt firms to include these financials notwithstanding the newly final Rule 15-01(e), as mentioned by several commenters.[1421]   However, under the baseline, the decision to disclose these financials comes from the SPAC management and could result in fewer disclosures than desired by investors. Thus, requiring the disclosure of SPAC financials as adopted will provide a consistent set of information for investors to use in their decision-making.  Further, it will harmonize such disclosures across SPACs, allowing for more meaningful comparison.  To the extent that SPAC financials are already known, and relatively less complex than those for the target operating company, we expect the additional cost of providing such financials to be limited (compared to relying on existing materiality discretion on behalf of the SPAC).

Rule 15-01(e) should reduce disclosure requirements for, and associated costs of disclosing, information that may no longer be relevant or meaningful to investors when the pre-business combination financial statements of the shell company are included in previous filings and the historical financial statements of the shell company likely are no longer representative of the combined company.  To the extent that this rule is consistent with existing practice, whereby after a reverse recapitalization a registrant may omit historical SPAC financial statements once the financial statements of the combined company were reflected in a periodic filing, we do not expect this rule to result in a significant change in disclosure behavior.  In addition, to the extent

---

[1421]  Letters from Freshfields, Vinson & Elkins.

477

that the final rule extends the practice to forward acquisitions, we expect the final rule will reduce compliance costs related to continued filing of previous year financial statements of a shell company.  Investors may also benefit from the increased efficiency in processing post-business combination filings that exclude uninformative historical SPAC financials.

### f.   Other Amendments

We are adopting an amendment to Item 2.01(f) of Form 8-K, which will apply to all shell companies, that clarifies that the information required by Item 2.01(f) of Form 8-K should relate to the "acquired business that is its predecessor" and not the "registrant," as currently stated in the Form 8-K.  This amendment is intended to eliminate any potential misunderstanding as to the entity for which Item 2.01(f) disclosure is necessary.  The increased clarity may reduce registrants' compliance costs to the extent there is currently any confusion.  In turn, investors may also benefit from the timely disclosure of information about an "acquired business that is the predecessor" due to registrants' more consistent application of Item 2.01(f).  We are also adopting revisions to Item 2.01(f) to Form 8-K stipulating that when the predecessor meets the conditions of an EGC, the registrant does not need to present audited financial statements of the predecessor for periods prior to the earliest of those presented in the de-SPAC registration, proxy, or information statement of the registrant.  This amendment will harmonize the required disclosures of Form 10 information with the requirements of Rule 15-01(b) and should reduce registrants' compliance costs to the extent they were required to produce a greater number of years of audited financial statements under the baseline.

We are also adopting amendments to Rules 3-01, 8-02, and 10-01(a)(1) of Regulation S-X to clarify that the requirement of "balance sheets" would apply to both the registrant and its predecessors.  Because these amendments codify existing financial reporting practices necessary

for a complete set of financial statements, they should not impact registrants' compliance costs, and should reduce uncertainty regarding regulatory requirements.

>    4. *Enhanced Projections Disclosure (Amendments to Item 10(b) of Regulation S-K)*

Item 10(b) of Regulation S-K sets forth the Commission's views on important factors to be considered in formulating and disclosing projections in filings with the Commission. The final amendments update this guidance, broadening the scope of covered projections and adding detail on the formatting of disclosed projections. More specifically, the final amendments state that the guidelines also apply to projections of future economic performance of persons other than the registrant, such as the target company in a business combination transaction, that are included in the registrant's filings. The amendments to Item 10(b) also state that projections that are not based on historical financial results or operational history should be clearly distinguished from those that are. In addition, the final amendments state that it generally would be misleading to present projections that are based on historical financial results or operational history without presenting such historical financial results or operational history with equal or greater prominence. Finally, for projections that include non-GAAP financial measures, the amendments to Item 10(b) state that the presentation should include a clear definition or explanation of the non-GAAP financial measures, a description of the most closely related GAAP financial measure, and an explanation why the non-GAAP measure was selected instead of a GAAP measure.

Due to these final amendments, investors should gain additional information and context to help them evaluate the reasonableness of the projections and make more informed investment decisions. For example, the final amendments related to historical financial results or operational history could inform investors about potential biases in the financial projections and

help them more efficiently process the underlying assumptions, thereby potentially improving their investment decisions.[1422]  Also, the greater consistency in the contextual and supporting historical information for projections should aid comparability across registrants, further benefiting investors.  These benefits could be mitigated, however, to the extent that registrants are already providing this information or including projections of future economic performance that do not follow some or all of the revised guidance.  A study of management earnings forecasts by public companies from 2000 to 2018 found that management provided earnings forecasts in approximately 31% of the firm-year observations comprising the sample.[1423]

In addition, to the extent that registrants have not previously applied the Commission's guidance in Item 10(b) to third-party projections included in the registrant's filings and choose to do so as a result of the final amendments, investors may benefit from improved presentation with respect to any third-party projections in a registrant's filing.

To the extent that registrants follow the guidance in the amendments to Item 10(b), the incremental compliance costs are likely to be limited.  Registrants should already have information about historical financial results or operational history and GAAP financial

---

[1422]  *See* Anne Beyer, Daniel A. Cohen, Thomas Z. Lys, & Beverly R. Walther, *The Financial Reporting Environment: Review of the Recent Literature*, 50 J. Acct. & Econ. 296, 296–343 (2010) (employing a sample from 1994 to 2007 to show how management forecasts provide over half of accounting-based information to the market).

[1423]  *See* Claude Francoeur, Yuntian Li, Zvi Singer, & Jing Zhang. *Earnings Forecasts of Female CEOs: Quality and Consequences*, Rev. Acct. Stud. (2022).  The authors of the study obtained the management earnings forecast data from IBES.  IBES is a database that includes quantitative (numeric) company earnings forecasts collected from press releases and transcripts of corporate events.  To the extent that some of the management earnings forecasts in the IBES database are not included in SEC filings, these figures may overstate the activity that would be affected.  However, because the study sample is drawn from a period after the adoption of Regulation FD, we believe the likelihood an IBES record would not also be present in an SEC filing is low.  It is more likely that these figures may understate the number of affected projections, because the database does not include all public reporting companies and because management may provide financial projections that are not captured by the IBES database.  *See also* Zahn Bozanic, Darren T. Roulstone & Andrew Van Buskirk, *Management Earnings Forecasts and Other Forward-looking Statements*, 65 J. Acct. & Econ. 1 (2018) (indicating that approximately 33% of Form 8-K filings of earnings announcements include at least one quantitative forecast.).

measures and should be able to easily obtain this information in connection with any included third-party estimates.

## C. Effects on Efficiency, Competition, and Capital Formation

### 1. Efficiency

The final rules and amendments should enhance and standardize disclosure about specific aspects inherent to the SPAC structure at both the SPAC IPO stage and the de-SPAC transaction stage. Requiring the SPAC and the target company to provide such disclosure will provide market participants more information that is likely relevant to voting, redemption, and investment decisions. The final rules will also improve the standardization and comparability of disclosures through changes to the disclosure formatting and presentation, which should make it easier for investors to efficiently process information about SPACs and for market prices to reflect such information. Together we expect these changes to result in more efficient prices and deployment of invested capital.

The final rules, by adopting new definitions of "blank check company" under the PSLRA, should incentivize blank check companies that are not penny stock issuers and underwriters to exercise greater care to ensure any forward-looking disclosures are reasonable, increasing efficiency. The final rules regarding shell company business combination transactions (e.g., Rule 145a) would increase the likelihood that the protections of the Securities Act consistent with those applicable to traditional IPOs are made available to investors, such as liability under the Securities Act and receipt of a Securities Act registration statement. Overall, we expect that the effects of the new definitions of "blank check company" and the requirements regarding shell company business transactions will provide investors with more consistent access to more reliable information when making their investing decisions, which should lead to an

481

increase in price discovery and market efficiency.  It is possible a SPAC or other blank check company that is not a penny stock issuer may be dissuaded from providing forward-looking disclosures due to increased costs and heightened liability concerns, leaving investors with less information, offsetting some efficiency gains.[1424]

### 2. Competition

By improving the informational environment at the SPAC IPO and the de-SPAC transaction stages through changes in disclosure requirements, we expect the final rules will allow investors to make better informed investment decisions which should encourage greater competition among SPAC sponsors, which would further benefit SPAC investors.  For example, by increasing comparability through standardization of the disclosures provided regarding SPAC IPOs and de-SPAC transactions, the final rules should lead to improved investor awareness, greater transparency, and lower search costs.  These improvements to the information available to investors should allow them to better differentiate between SPACs based on factors the investors deem important (such as costs or fees), and in response SPAC sponsors may be forced to compete for those better informed investors by offering better terms such as lower costs.[1425] These improvements to the informational environment could also improve competition between SPACs and other investment avenues generally, further improving overall capital formation.  For example, to the extent that the final rules lead to shell company mergers (including de-SPAC transactions) being more attractive to investors, other capital raising avenues that target companies may consider (e.g., traditional IPOs) may experience greater competitive pressure.

---

[1424] While, in the extreme case, the interaction between the adopted definition of "blank check company" under the PSLRA and jurisdictional requirements for certain forward-looking disclosures may disincentivize companies from engaging in de-SPAC transactions which, as discussed below, could affect capital formation, it is not expected to affect the efficiency of those transactions that do occur.

[1425] For example, SPAC sponsors could set up structures that are more or less dilutive to investors or adjust any forfeiture of their promote used to induce investors not to redeem.

A reduction in shell company business combinations or activity in the SPAC market could reduce competition between SPAC sponsors or for investment opportunities in target companies.[1426]  Such a reduction could result in higher costs for SPAC investors, depending on the elasticity of those costs.  For example, SPAC promoters may offer less attractive terms to SPAC investors.  Fewer SPACs might also lower competitiveness in the traditional IPO market, as companies that wish to go public may see diminished alternatives to IPOs.

### 3.  Capital Formation

Enhanced disclosure at both the SPAC IPO and the de-SPAC stages, combined with a stronger incentive to perform better due diligence at the de-SPAC transaction stage, should improve investor protection at both stages, as should the rules and amendments for shell company mergers.  For example, Rule 145a will help shareholders of reporting shell companies more consistently receive the protections of the Securities Act in business combinations involving reporting shell companies, regardless of the transaction structure, which should reduce adverse selection and improve the availability and reliability of information for investors, incentivizing more investors to invest in reporting shell companies, including SPACs, thus enhancing capital formation.

If the final rules and amendments create significant costs for shell companies, including SPACs, this may reduce the number of private companies that go public through shell companies, including through de-SPAC transactions, and may reduce the overall number of companies that choose to go public.  For example, one commenter asserted that the proposed

---

[1426] Reductions in SPAC formation and de-SPAC mergers could result from increased costs to de-SPAC transactions due to differential liability and disclosure requirements compared to non-SPAC acquirers or other methods of accessing public markets.  For example, the new definitions of "blank check company" under the PSLRA may interact with existing jurisdictional requirements (such as any requirements to provide projections) which could impose significant additional liability costs on de-SPAC transactions.

rules would "overregulate SPACs to such a degree that they will no longer be viable vehicles for companies to access the public markets."[1427]  Other commenters, expressing similar concerns, noted that SPACs have been an important way for younger and more "innovative" companies to access public capital markets.[1428]  Further, the new definitions of "blank check company" under the PSLRA may interact with existing jurisdictional requirements (such as any requirements to provide projections) which could impose significant additional costs on de-SPAC transactions. As a result, SPACs may adopt practices they believe will minimize their liability or other costs, which could result in them providing less information to investors, or, in the extreme, forgoing de-SPAC transactions they otherwise believe would be beneficial, which could harm capital formation.

In response to these comments and concerns, and as previously discussed, the final rules include provisions that reduce expected compliance costs relative to the proposal.  However, given the potential increase in the cost of going public through a shell company merger, such as a de-SPAC transaction, compared to the current baseline, it is possible that some private companies could consider using the traditional IPO channel or a merger with a non-shell company as a more cost-effective alternative.  We are not able to estimate how many companies would consider these alternatives if the cost of the overall SPAC transaction structure increases. It is possible, however, that a significant increase in the cost of shell company mergers and de-SPAC transactions could deter some private companies from going public and, thus, potentially

---

[1427] *See* letter from Virtu.

[1428] *See, e.g.*, letter from National Venture Capital Association (June 13, 2022); Managed Funds Association; I-Bankers Securities, Inc. (June 24, 2022).

reduce overall public offering activity and capital formation.[1429]  Any reduction in public offering activity, however, could be offset by an increase in investor trust in capital markets.

### D.  Reasonable Alternatives

#### 1.  *Disclosure-Related Rules*

##### i.   *Require Disclosure of Policies and Procedures That Address Conflicts of Interest*

As an alternative to Item 1603, we considered whether to adopt a complementary requirement to describe or to file as an exhibit any policies and procedures used or to be used by a SPAC or by a target company to minimize potential or actual conflicts of interest related to disclosures provided in response to Items 1603(b) or to describe any SPAC policies and procedures related to duties of SPAC officers or directors owed to other companies in connection with disclosure required under Item 1603(c).  We considered that such information could assist investors in gauging the economic significance, or lack thereof, of the various conflicts of interest given the presence, absence, and likely degree of effectiveness of the policies and procedures designed to address or ameliorate them.  We also considered, on the other hand, that requiring this information would increase compliance costs for SPACs and target companies and could cause some of these companies to adopt policies and procedures that would not be efficient or cost-effective given their particular organizational structure and determined not to require this information in part for those reasons.  Further, our determination not to adopt such a requirement was also based on our view that there are incentives to provide such disclosure voluntarily, as

---

[1429]  To provide a sense of magnitude, *see* letter from Committee on Capital Markets Regulation which presents data suggesting that from 2017 to 2021, there were roughly 3 de-SPAC transactions for every 10 traditional IPOs. *See also* letter from Committee on Capital Markets Regulation, suggesting differences between SPACs and traditional IPOs on dimensions of size and industry of firms taken public.  To the extent that the SPAC and IPO markets appeal to different firms, it is possible some firms deterred from going public via de-SPAC transaction will not substitute to an alternative form of accessing the public market.

these disclosures would indicate to investors the degree to which conflicts of interest may be ameliorated.

### ii. Certain Reports, Opinions, or Appraisals

We are requiring, in connection with de-SPAC transactions, the filing of certain reports, opinions (other than an opinion of counsel), or appraisals provided to the SPAC or a SPAC sponsor materially relating to any determination described in Item 1606(a), the approval of the de-SPAC transaction, the consideration or the fairness of the consideration to be offered to security holders of the target company in the de-SPAC transaction, or the fairness of the de-SPAC transaction to the SPAC, its security holders or SPAC sponsor (Item 1607) as exhibits to registration statements and schedules (or as part of the schedule if the schedule does not have exhibit filing requirements) filed in connection with a de-SPAC transaction. We are also requiring disclosures summarizing such report, opinion, or appraisal or any negotiation or report by an unaffiliated representative on behalf of unaffiliated security holders. We are also requiring certain additional disclosures, such as for example, information about who prepared the report, opinion, or appraisal and how they were selected.

As an alternative, we considered requiring disclosure of only a summary of the reports, opinions, appraisals, and negotiations (without the requirement that the reports, opinions, and appraisals be filed). We considered that this could avoid costs of additional compensation third parties may require for providing reports that are suitable for public disclosure. At the same time, this alternative would reduce the benefits of the disclosure, as investors and market participants would have less information available to assess the quality and robustness of the analysis underlying such report, opinion, or appraisal.

486

### iii.  *Re-Determine Smaller Reporting Company (SRC) Status of a Post-Business Combination Company Without a Public Float Test*

As another alternative, we considered whether the re-determination for SRC status of the combined company following a de-SPAC transaction should require only a re-measurement of the revenue component of the SRC test and not its public float component.  Generally, SRC status is re-determined on an annual basis at the end of the second fiscal quarter based on the issuer's public float on the last day of the second fiscal quarter, and, if there is no public float or there is a public float of between $250 million or more and $700 million, based as well on a determination of whether the annual revenues as of the most recently completed fiscal year for which audited financial statements are available are less than $100 million (where greater annual revenues than $100 million causes loss of SRC status).  Revenues of the combined company may be more relevant to SRC status than public float because, generally, the target company has generated revenue while the SPAC has not done so.[1430]

Accordingly, the revenue test may be the more determinative factor than the public float test in determining whether the combined company following a de-SPAC transaction remains an SRC because, based on staff experience, the public float of most SPACs and subsequent combined companies typically is between $250 and $700 million, which exceeds the public float threshold for SRC status, unless the company's revenue is under $100 million.  Also, the public float component of this test is measured as of the last business day of the issuer's most recently completed second fiscal quarter.  Given that the public float re-measurement likely would not occur at the end of the second fiscal quarter when the annual public float measurement occurs,

---

[1430] *See supra* note 665 (income statement items such as "Interest earned on marketable securities held in trust account" and "Unrealized gain on marketable securities held in trust account" are generally not revenue for SPACs).

under the final rule the combined company may have to measure its public float more than one time during the same fiscal year, which may impose additional burdens for the company as compared to an alternative of using only revenue as the basis for determining SRC status following the de-SPAC, in which case public float would only need to be measured once during the annual re-determination period.

We considered, however, that compared to joint determination with the public float, revenue, if used as a sole basis of the significance test, may be subject to a greater degree of managerial discretion or manipulation.[1431]  Further, it could result in, for example, firms with revenue below the threshold but public float above the maximum threshold qualifying for SRC status and the resultant lower disclosure requirements.  Because companies with greater public float have greater potential impacts on markets, such an allowance for large public float companies to qualify for SRC status due solely to their revenues being below the threshold value could have commensurately large economic costs.  Thus, we determined it is appropriate that these companies should take both the public float and total revenue into account in re-determining SRC status following the consummation of a de-SPAC transaction and determined not to adopt this alternative.

### iv.  Structured Data Requirement

As another alternative, we considered whether to change the scope of the Inline XBRL tagging requirements for the SPAC disclosures, such as by excluding certain subsets of registrants or disclosures.  For example, the tagging requirements could have excluded the SPAC IPO disclosures.  Under such an alternative, SPACs would have submitted IPO disclosures in

---

[1431] *See* Jenny Zha Giedt, *Modelling Receivables and Deferred Revenues to Detect Revenue Management*, 54 ABACUS181, 181–209 (2018) (focusing on the SEC Accounting and Auditing Enforcement Releases, *i.e.*, AAER, from 1982 to 2016, and documenting that 47% of all financial misstatements are related to revenue).

unstructured HTML or ASCII and would not incur Inline XBRL compliance costs until their first periodic filing on Form 10-Q, 20-F, or 40-F.[1432]  This would have made it incrementally easier for SPACs to consummate an IPO.  However, narrowing the scope of the tagging requirements, whether based on filing, offering size, or other criteria, would have diminished the extent of any informational benefits that would accrue as a result of the adopted disclosure requirements by making the excluded disclosures comparatively costlier to process and analyze.  Thus, we believe it is appropriate to require Inline XBRL for all SPAC disclosures, rather than exclude particular subsets of registrants or disclosures.

We also considered requiring only the quantitative SPAC-related disclosures to be tagged in Inline XBRL.  Excluding qualitative disclosures from the tagging requirements could have provided some incremental cost savings for registrants compared to the rule as adopted, because incrementally less time would have been required to select and review the particular tags to apply to quantitative disclosures.  However, we expect these incremental cost savings would have been low because SPACs are subject to similar Inline XBRL requirements, including requirements to tag quantitative and qualitative disclosures, in other Commission filings.[1433]  The alternative would not impact the fixed startup costs associated with Inline XBRL tagging and would instead only remove the modest variable cost associated with applying additional tags to text blocks within an already tagged filing.

Moreover, narrowing the scope of tagging requirements to exclude qualitative information would have diminished the extent of informational benefits that would accrue to

---

[1432] The Commission's EDGAR electronic filing system generally requires filers to use ASCII or HTML for their document submissions, subject to certain exceptions.  *See* EDGAR Filer Manual (Volume II) version 67 (Sept. 2023), at 5-1; 17 CFR 232.301 (incorporating EDGAR Filer Manual into Regulation S-T).  *See also* 17 CFR 232.101 (setting forth the obligation to file electronically on EDGAR).

[1433] *See supra* Section VIII.B.1.a.5.

investors by inhibiting the efficient extraction and searching of narrative SPAC-related disclosures (*e.g.*, disclosures regarding conflicts of interest, fairness determinations, and financial projections), thus creating the need to manually review search results drawn from entire documents to find these disclosures.[1434]  Such an alternative would have also inhibited the automatic comparison of narrative disclosures against prior periods.  It also may have been harder for investors to perform a targeted assessment of a filing for particular types of narrative SPAC-related disclosures because they would have needed to assess the entire filing for relevant information.  Thus, we believe it is appropriate to include qualitative disclosures within the scope of the tagging requirement.

With respect to the compliance date for tagging requirements, we could have added a separate phase-in period for SRCs and FPIs, as one commenter suggested.[1435]  However, both SRCs and FPIs are subject to Inline XBRL tagging requirements for other disclosures, so we believe any burden reduction for SRCs and FPIs arising from a separate phased-in compliance date would therefore likely be minimal.  Thus, we do not believe it is necessary to provide a separate phased-in compliance date for SRCs and FPIs to comply with the tagging requirements. We note, however, that both SRCs and FPIs (along with other filers) will be subject to a one year phased-in compliance date under the final rules.

---

[1434]  To illustrate, without Inline XBRL, using a search string such as "dilution" to search through the text of all de-SPAC filings, so as to determine the extent to which dilutive effects are among the material factors being considered by SPACs at arriving at fairness determinations, could return many narrative disclosures outside of the fairness determination disclosure required by Item 1606(b) of Regulation S-K, such as disclosures in the risk factors section or in the description of stock incentive plans.   However, when Inline XBRL is used, it enables a user to search for the term "dilution" exclusively within the fairness determination disclosure, thereby likely reducing the number of irrelevant results.

[1435]  *See* letter from XBRL US.

*v.  Dilution Disclosure Measurement Alternatives*

As an alternative to disclosure of net tangible book value, as adjusted, to capture dilution incurred by non-redeeming shareholders, various commenters suggested a measure based on the net cash per share held by the SPAC prior to the de-SPAC transaction.[1436]  These comments generally reflect the desire for dilution disclosures to capture a measure of how much liquidity financing (in the form of cash) is transferred to the target at the de-SPAC transaction.[1437]  To this end, the net cash measure suggested by commenters would be calculated as:[1438] total cash (from SPAC public shareholders, forward purchase agreements (FPA), and PIPE investments) less cash expenses, less the fair value of outstanding warrants and other equity derivatives.  This measure would be scaled to be a per share value by dividing the former quantity by the sum of public shares, founder shares, PIPE and FPA shares, shares issuable under rights according to terms and agreements, and any other shares issued up to the point of the merger.  Notably, this measure does not include shares issued to target shareholders as part of the merger agreement.

We believe that the net tangible book value as adjusted measure that we are adopting and the net cash per share alternative both generally capture expectations of the remaining amount of financing to be provided by the SPAC in the merger transaction, or, according to one commenter, "of the $10 that I am paying per share, how much will actually be invested in the post-merger company?."[1439]  The material difference between the two measures is in their treatment of equity-classified awards and shares issuable by rights.  While some comment letters highlighted that prior dilution disclosures (*e.g.,* those required by Item 506) omitted certain components

---

[1436]  *See* letters from NASAA; Vinson & Elkins; CII; Michael Klasuner, Michael Ohlrogge, and Harald Halbhuber.

[1437]  *See* Klausner, Ohlrogge & Ruan, *supra* note 18.

[1438]  *See* Michael Klausner, Michael Ohlrogge & Harald Halbhuber, *Net Cash Per Share: The Key to Disclosing SPAC Dilution*, 40 Yale J. on Reg. 18, 28 (2022).

[1439]  *Id.*

(such as warrants and other derivative securities), we note that the dilution measure as adopted accounts for them when classified as liabilities, and generally to the same extent as the suggested alternative measure, although we acknowledge that excluding from net tangible book value the value of warrants classified as equity may result in net tangible book value showing less cash dilution than a net cash per share measure. Further, the net tangible book value as adjusted measure that we are adopting relies on the specified adjustments in Item 1602(c) or Item 1604(c) to derive the value of the firm as if the redemptions had occurred, which avoids the issue of temporary equity being excluded.[1440] Therefore, we believe that the approach we are adopting using the net tangible book value as adjusted measure instead of the alternative net cash measure sufficiently captures the desired idea of cash dilution intended by the comments.

Another alternative to the dilution table columns would be to require a fixed range of redemption levels, rather than the fixed range of *feasible* redemption levels as adopted. Some commenters supported such an alternative, suggesting the maximum redemption column be 100%.[1441] The advantage of a fixed range, as those commenters argued, would be to remove the effects of differences in SPAC governing documents and agreements, because those are liable to change. For example, many SPACs put in place a maximum redemption limit to maintain a minimum net tangible asset reserve, but shareholders could vote to waive those limits which would change the maximum redemption threshold in the table as adopted. However, because a fixed range would not take into account the governing documents and agreements specific to that particular SPAC, it may omit information that could be informative to prospective investors from

---

[1440] *See* letter from White & Case ("the calculation of pro forma net tangible book value per share in accordance with U.S. GAAP inevitably produces a deficit and remains the same constant figure across any assumed redemption thresholds because the metric solely takes into account the non-redeemable ["founder shares"], which are classified as permanent equity, and none of the public shares, which are classified as temporary equity.").

[1441] Letters from Vinson & Elkins, White & Case.

those documents or agreements, such as the waiver in this example.  Further, a fixed range requires additional assumptions about future outcomes, for example a successful proxy vote or breaking non-redemption contracts.  The threshold in the final rule of maximum redemptions rather than 100% redemptions does not require these additional assumptions and does include the SPAC specific redemption details, thus is likely more descriptive of possible and expected outcomes.  To the extent SPAC specific features are important to compare across SPACs, we expect the tables as adopted will provide information that will benefit investors more than the alternative.

### 2.  *PSLRA Safe Harbor Guidance*

As an alternative to addressing the use of forward-looking statements in de-SPAC transactions and other business combinations involving blank check companies that are not penny stock issuers by adopting a "blank check company" definition under the PSLRA, we could have issued interpretive guidance stating that the PSLRA safe harbor for forward-looking statements is not available because business combinations with shell companies that are not penny stock issuers are "initial public offerings" by target private operating companies for purposes of the PSLRA.  This alternative would avoid some of the complexity associated with defining blank check companies for purposes of the PSLRA, but issuing guidance rather than a rule may result in weaker incentives for SPACs or target companies to take greater care in preparing forward-looking statements, such as projections, in de-SPAC transactions and thus result in fewer investor protection benefits than the rule as adopted.

### 3.  *Expanding Disclosure in Reporting Shell Company Business Combinations*

Rule 145a specifies that a sale occurs between the shareholders of a reporting shell company and the post-transaction company in situations where a reporting shell company that is

not a business combination related shell company enters into a business combination transaction involving another entity that is not a shell company. As an alternative, instead of deeming all such transactions to be a sale that would need to be registered under the Securities Act, absent an applicable exemption, we could expand the disclosure requirements applicable to reporting shell company business combinations such that the disclosure requirements would be comparable to that which would have been required if the transaction was registered under the Securities Act. Under this alternative, regardless of the document that is filed with the Commission (*e.g.,* proxy or information statement, Schedule TO, or Form 8-K), the set of disclosures investors receive would be comparable to that which they would receive had a registration statement been filed for the transaction. This would ensure that the reporting shell company's shareholders receive largely the same information regardless of how the transaction is structured and would reduce regulatory arbitrage opportunities stemming from different disclosure requirements in different documents that may be filed with the Commission to report a shell company business combination. As a registration statement would not necessarily be required in all transaction structures, the costs of such an alternative would also be less that the costs of liability associated with the purchase and sale of securities and potential Securities Act registration of shell company business combinations under final Rule 145a, to the extent no exemption is available for the transaction.

However, merely expanding the set of disclosures investors receive regardless of transaction structure does not provide investors with the same level of protection because the liability standards differ based on the type of filing, if any, that is required. Only by specifying that a sale occurs would investors necessarily receive all of the protections that apply in connection with all purchases and sales of securities under the Federal securities laws, such as

the availability of private actions under Section 10(b) and Rule 10b-5.  In addition, to the extent there is not an available exemption for the reporting shell company business combination, only with Securities Act registration do investors receive the full panoply of available protections under that Act that they would receive in a traditional IPO, such as a private right of action under Section 11.

### 4.   Enhanced Projections Disclosure

The amendments to Item 10(b) of Regulation S-K present the Commission's updated views on projected performance measures and include a statement that projections based on a non-GAAP financial measure should include a clear definition or explanation of the non-GAAP measure, and a description of the GAAP financial measure to which it is most closely related. As an alternative to this guidance, we could have adopted a rule requiring firms, when providing projections, to present a reconciliation of projections based on a non-GAAP measure to those based on the nearest GAAP measure.  While the reconciliation would further help investors understand the bases of projections involving non-GAAP measures, it would likely also increase compliance costs and in turn might reduce the provision of otherwise useful projections.

## IX. PAPERWORK REDUCTION ACT

### A.  Summary of the Collections of Information

Certain provisions of our rules and forms that will be affected by the final rules contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[1442]  The Commission published a notice requesting comment on changes to these

---

[1442] *See* 44 U.S.C. 3501 *et seq.*

collections of information in the Proposing Release and submitted these requirements to the Office of Management and Budget ("OMB") for review in accordance with the PRA.[1443]

The hours and costs associated with preparing, filing, and sending the forms constitute reporting and cost burdens imposed by each collection of information.[1444]  An agency may not conduct or sponsor, and a person is not required to comply with, a collection of information unless it displays a currently valid OMB control number.  Responses to the information collections are not kept confidential and there is no mandatory retention period for the information disclosed.  The titles for the affected collections of information are:

- Regulation 14A (Commission Rules 14a-1 through 14a-21 and Schedule 14A) (OMB Control No. 3235-0059);

- Regulation 14C (Commission Rules 14c-1 through 14c-7 and Schedule 14C) (OMB Control No. 3235-0057);

- Schedule TO (OMB Control No. 3235-0515);

- Form S-1 (OMB Control No. 3235-0065);

- Form S-4 (OMB Control No. 3235-0324);

- Form F-1 (OMB Control No. 3235-0258);

- Form F-4 (OMB Control No. 3235-0325);

- Form 8-K (OMB Control No. 3235-0060);

- Form 10-K (OMB Control No. 3235-0063); and

- Form 10-Q (OMB Control No. 3235-0070).

---

[1443] *See* 44 U.S.C. 3507(d) and 5 CFR 1320.11.

[1444] The paperwork burdens for Regulation S-X, Regulation S-K, Regulation C, Regulation 12B, and Regulation S-T are imposed through the forms, schedules, and reports that are subject to the requirements in these regulations and are reflected in the analysis of those documents.

The forms, schedules, and regulations listed above were adopted under the Securities Act or the Exchange Act.  These regulations, schedules, and forms set forth the disclosure requirements for registration statements, annual and quarterly reports, proxy and information statements, and tender offer statements filed by registrants to provide investors with information to make informed investment and voting decisions.  Compliance with these information collections is mandatory to the extent applicable to each registrant.  A description of the final rules, including the need for the information and its use, as well as a description of the likely respondents, may be found in Sections II through V above, and a discussion of the economic effects of the final rules may be found in Section VIII above.

**B. Estimates of the Effects of the Final Rules on the Collections of Information**

The following PRA Table 1 summarizes the estimated effects of the final rules on the paperwork burdens associated with the affected forms and schedules.

**PRA Table 1.  Estimated Paperwork Burden Effects of the Final Rules**

| Final Requirement and Effects | Affected Forms and Schedules | Estimated Effect Per Affected Response* |
|---|---|---|
| **Item 1602: Registered offerings by SPACs**<br><br>• Require certain information on the prospectus cover page and in the prospectus summary of registration statements for offerings by SPACs other than de-SPAC transactions.<br><br>• Require enhanced dilution disclosure in these registration statements. | Forms S-1 and F-1 | • 1 hour increase in compliance burden per Form S-1 or F-1 |

497

| Final Requirement and Effects | Affected Forms and Schedules | Estimated Effect Per Affected Response* |
|---|---|---|
| **Item 1603: SPAC sponsor; conflicts of interest**<br><br>• Require certain disclosures regarding a SPAC sponsor, its affiliates, and any promoters of the SPAC.<br><br>• Require disclosure regarding conflicts of interest between: (1) a SPAC sponsor; its affiliates; officers, directors, or promoters of a SPAC; or target company officers or directors; and (2) unaffiliated security holders of the SPAC. | • Forms S-1, F-1, S-4, and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 2 hour increase in compliance burden per Form S-1, F-1, S-4, or F-4<br><br>• 2 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 2 hour increase in compliance burden per Schedule TO |
| **Item 1604: De-SPAC transactions**<br><br>• Require certain information on the prospectus cover page and in the prospectus summary of registration statements for de-SPAC transactions.<br><br>• Require enhanced dilution disclosure in these registration statements. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 1 hour increase in compliance burden per Form S-4 or F-4<br><br>• 1 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 1 hour increase in compliance burden per Schedule TO |
| **Item 1605: Background of and reasons for the de-SPAC transaction; terms of the de-SPAC transaction; effects**<br><br>• Require disclosure on the background, material terms, and effects of the de-SPAC transaction. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 1 hour increase in compliance burden per Form S-4 or F-4<br><br>• 1 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 1 hour increase in compliance burden per Schedule TO |
| **Item 1606: Board determination about the de-SPAC transaction**<br><br>• Require disclosure if the law of the jurisdiction in which the SPAC is organized requires its board of directors (or similar governing body) to determine whether the de-SPAC transaction is advisable and in the best interests of the SPAC and its security holders or otherwise make any comparable determination.<br><br>• Require a discussion of the material factors the board of directors (or similar governing body) considered in making the determination.<br><br>• Require certain disclosures as to the approval of security holders, the approval of directors, and the retention of unaffiliated representatives. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 4 hour increase in compliance burden per Form S-4 or F-4<br><br>• 4 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 4 hour increase in compliance burden per Schedule TO |

| Final Requirement and Effects | Affected Forms and Schedules | Estimated Effect Per Affected Response* |
|---|---|---|
| **Item 1607: Reports, opinions, appraisals, and negotiations**<br><br>• Require disclosure regarding any report, opinion (other than an opinion of counsel), or appraisal received by a SPAC or a SPAC sponsor from an outside party or an unaffiliated representative acting on behalf of unaffiliated security holders relating to any determination described in response to Item 1606(a), approval of the de-SPAC transaction, consideration to be offered in the de-SPAC transaction, or fairness of the de-SPAC transaction to the SPAC, its security holders, or SPAC sponsor.<br><br>• Require disclosure of the qualifications of the outside party or unaffiliated representative, method of selection, and certain material relationships that existed during the past two years. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 1 hour increase in compliance burden per Form S-4 or F-4<br><br>• 1 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 1 hour increase in compliance burden per Schedule TO |
| **Item 1608: Tender offer filing obligations**<br><br>• Require additional disclosures in a Schedule TO filed in connection with a de-SPAC transaction. | • Schedule TO | • 3 hour increase in compliance burden per Schedule TO |
| **Item 1609: Projections in de-SPAC transactions**<br><br>• Require additional disclosures regarding projections disclosed in a disclosure document for a de-SPAC transaction. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO<br><br>• Form 8-K | • 2 hour increase in compliance burden per Form S-4 or F-4<br><br>• 2 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 2 hour increase in compliance burden per Schedule TO<br><br>• 2 hour increase in compliance burden per Form 8-K |
| **Item 1610: Structured data requirement**<br><br>• Require information disclosed pursuant to Subpart 1600 to be tagged in a structured, machine-readable data language. | • Forms S-1, F-1, S-4, and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 1 hour increase in compliance burden per Form S-1, F-1, S-4, or F-4<br><br>• 1 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 1 hour increase in compliance burden per Schedule TO |

| Final Requirement and Effects | Affected Forms and Schedules | Estimated Effect Per Affected Response* |
|---|---|---|
| **Amendments to Regulation S-X\*\***<br><br>Amend financial statement requirements and the forms and schedules filed in connection with business combination transactions involving shell companies (other than business combination related shell companies), including de-SPAC transactions, to align more closely required disclosures about the target company with those required in a Form S-1 or F-1 for an IPO, including:<br><br>• Expanding the circumstances in which target companies may report two years, instead of three years, of audited financial statements (resulting in a decrease in burden) (Rule 15-01(b)); and<br><br>• Further aligning the requirements for audited financial statements in these transactions with those required in a registered IPO (resulting in an increase in burden) (Rule 15-01(c), (d) and (e)). | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 50 hour net decrease in compliance burden per affected Form S-4 or F-4\*\*\*<br><br>• 50 hour net decrease in compliance burden per affected Schedule 14A or 14C\*\*\*<br><br>• 50 hour net decrease in compliance burden per affected Schedule TO\*\*\* |
| **Amendments to Align Non-Financial Statement Disclosures in De-SPAC Transactions**<br><br>• Amend the forms and schedules filed in connection with de-SPAC transactions to align more closely required non-financial statement disclosures about the target company with those required in a Form S-1 or F-1 for an IPO. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 8 hour increase in compliance burden per Form S-4 or F-4<br><br>• 8 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 8 hour increase in compliance burden per Schedule TO |
| **Amendment to Forms S-4 and F-4**<br><br>• Amend Form S-4 and Form F-4 to require that if the securities to be registered on the form will be issued by a SPAC or another shell company in connection with a de-SPAC transaction, the registrants also include the target company. | • Forms S-4 and F-4 | • 100 hour increase in compliance burden per Form S-4 or F-4\*\*\*\* |

| Final Requirement and Effects | Affected Forms and Schedules | Estimated Effect Per Affected Response* |
|---|---|---|
| Notes:<br><br>* Estimated effect expressed as increase or decrease of burden hours on average and, as applicable, derived from Commission staff review of samples of relevant sections of the affected forms.<br><br>** We estimate that there will be a negligible or no change in burden to Form 20-F and Form 8-K as a result of the final amendments to Regulation S-X, in that these final amendments codify how existing rules are applied in practice.<br><br>*** We arrive at an estimate for these amendments to Regulation S-X on the assumption that approximately 30% of affected responses would require one fewer year of audited financial statements under Rule 15-01(b) than under the current rules from registrants that would not otherwise have prepared financial statements for such year.  Coupled with an incremental increase in burden for the amendments to Regulation S-X other than proposed Rule 15-01(b), when this decrease is spread across all affected responses, we arrive at a net burden decrease of 50 hours.<br><br>**** The estimated 100 hour increase in burden is based on an estimate of the additional time that a target company, as a co-registrant, would spend on preparing disclosures in a Form S-4 or F-4 filed by a SPAC for a de-SPAC transaction. | | |

In addition, we are adopting requirements that a post-business combination company re-determine whether it is an SRC following a de-SPAC transaction.  Under the final rules, a post-business combination company is required to reflect this re-determination in its filings beginning 45 days after consummation of the de-SPAC transaction.  We estimate that the re-determination of SRC status will result in increased burdens in filing Forms 10-K, Forms 10-Q, Schedules 14A, Schedules 14C, and Forms S-1 for those post-business combination companies that will lose SRC status, which takes into account the increased incremental burden in providing disclosures pursuant to non-SRC disclosure requirements.  The following PRA Table 2 sets forth our estimates regarding the increase in compliance burden per filing when a post-business combination company loses SRC status:

**PRA Table 2. Increase in Compliance Burden After Losing SRC Status[1445]**

---

[1445] *See* discussion preceding PRA Table 4 below for a brief discussion on the allocation of compliance burdens between internal burden hours and outside professional costs.

501

| Form / Schedule | Estimated Increase in Internal Hours per Filing (A) | Estimated Increase in Outside Professional Hours per Filing (B) | Estimated Increase in Outside Professional Costs per Filing (C) = (B) x $600 | Estimated Increase in Total Hours per Filing (D) = (A) + (B) |
|---|---|---|---|---|
| Form 10-K* | 439.00 | 147.00 | $88,200 | 586.00 |
| Form 10-Q* | 36.57 | 11.88 | $7,128 | 48.45 |
| Schedule 14A** | 0.75 | 0.25 | $150 | 1.00 |
| Schedule 14C*** | 0.75 | 0.25 | $150 | 1.00 |
| Form S-1* | 5.75 | 17.25 | $10,350 | 23.00 |

Notes:

* The estimated increases in compliance burdens for Forms 10-K, 10-Q, and S-1 are based on the difference between the current estimates for the applicable form for non-SRCs and the estimated burden for SRCs in filing the form. We estimate the compliance burden for an SRC in filing these forms using the same methodology as in 2018 when the Commission amended the "smaller reporting company" definition. *See Smaller Reporting Company Definition*, Release No. 33-10513 (June 28, 2018) [83 FR 31992 (July 10, 2018)], at Section V.

** In regard to Schedule 14A, we estimate that a company that loses SRC status would experience an increased compliance burden of 0.75 internal burden hours and a cost of $150 (0.25 professional hours x $600/hour) per schedule, based on our estimate of the compliance burden for 17 CFR 229.407(d)(5) and (e)(4) and (5) (Item 407(d)(5) and (e)(4) and (5) of Regulation S-K), with which SRCs are not required to comply.

*** Similar to Schedule 14A, we estimate that, in regard to Schedule 14C, a company that loses SRC status would experience an increased compliance burden of 0.75 burden hours and a cost of $150 (0.25 professional hours x $600/hour) per filing, based on our estimate of the compliance burden for Item 407(d)(5) and (e)(4) and (5) of Regulation S-K, with which SRCs are not required to comply.

## C. Incremental and Aggregate Burden and Cost Estimates

### 1. *Current Inventory Update to Reflect $600 Per Hour Rather than $400 Per Hour Outside Professional Costs Rate*

At the outset, we note that the current OMB inventory for the above-referenced collections of information reflect an average rate of $400 per burden hour borne by outside professionals. Similarly, in the Proposing Release, the Commission used an estimated cost of $400 per hour, recognizing that the costs of retaining outside professionals may vary depending on the nature of

502

the professional services.[1446]  The Commission recently determined to increase the estimated hourly rate to $600 per hour[1447] to adjust the estimate for inflation from August 2006.[1448]  In order to more accurately present the burden changes as a result of the final amendments in the context of the current burden inventory, in this Section IX.C.1 we present updated numbers for the current inventory for professional cost burden for each of the affected collections of information to reflect the updated $600 per hour rate where it has not yet been reflected in the current burden inventory.  This update is solely derived from the change in the hourly rate; it is not a new burden imposed by the final amendments.  The updated cost estimates using the $600 per hour rate are set out in PRA Table 3 below.

**PRA Table 3: Change in PRA Burden Due to Updated Outside Professional Cost Estimate**

| Collection of Information | Current Inventory Professional Cost Burden (@ $400/hr.) (A) | Updated Professional Cost Burden (@ $600/hr.) (B) | Increased Burden Due to Update (C) = (B) – (A) |
|---|---|---|---|
| Schedule 14A | $113,410,112 | $170,115,168 | $56,705,056 |
| Schedule 14C | $8,407,344 | $12,611,016 | $4,203,672 |
| Schedule TO | $12,333,000 | $18,499,500 | $6,166,500 |
| Form S-1 | $174,015,643 | $261,023,465 | $87,007,822 |
| Form S-4 | $675,605,379 | $1,013,408,069 | $337,802,690 |
| Form F-1 | $32,130,375 | $48,195,563 | $16,065,188 |
| Form F-4 | $17,013,425 | $25,520,138 | $8,506,713 |
| Form 8-K | $99,204,430 | $148,806,645 | $49,602,215 |

---

[1446]  *See* Proposing Release, Section X.C.

[1447]  We recognize that the costs of retaining outside professionals may vary depending on the nature of the professional services, but for purposes of this PRA analysis, we estimate that such costs would be an average of $600 per hour.  This is the rate we typically estimate for outside legal services used in connection with public company reporting.

[1448]  *See* Listing Standards for Recovery of Erroneously Awarded Compensation, Rel. No. 33-11126 (Oct. 26, 2022) [87 FR 73076 (Nov. 28, 2022)].

| Form 10-K | $1,835,594,519 | $2,753,391,779 | $917,797,260 |
| Form 10-Q | $410,257,154 | $615,385,731 | $205,128,577 |

### 2. PRA Burden and Cost Estimates Resulting from the Final Rules

Next, we estimate the incremental and aggregate increase in paperwork burden as a result of the final amendments.  These estimates represent the average burden for all respondents, both large and small.  In deriving our estimates, we recognize that the burdens will likely vary among individual respondents based on a number of factors, including the size and complexity of their business.  These estimates include the time and the cost of preparing and reviewing disclosure and filing documents.  We believe that some registrants will experience costs in excess of this average and some registrants will experience lower than the average costs.  Our methodologies for deriving these estimates are discussed below.

Our estimates represent the burden for all SPACs that file registration statements with the Commission for registered offerings and all registrants that file disclosure documents in connection with a de-SPAC transaction or a business combination involving a shell company or a reporting shell company.[1449]  Additionally, our estimates take into account an expected increase in the number of Securities Act registration statements as a result of final Rule 145a. Based on a review of Commission filings during the period 2012–2022 and an analysis of the effects of the final new rules and amendments,[1450] the staff estimates that:

---

[1449]  Throughout this release and as stated earlier, we use "shell company" and "reporting shell company" in lieu of the phrases "shell company, other than a business combination related shell company" and "reporting shell company, other than a business combination related shell company."

[1450]  We based our estimates, in part, on a review of Commission filings over a 10-year period because we believe that this longer timeframe would more accurately reflect the average number of registration statements filed by SPACs and disclosure documents for de-SPAC transactions in a given year.

- SPACs will file an average of 90 registration statements each year for registered offerings on Form S-1 and eight registration statements on Form F-1, other than for de-SPAC transactions;

- Regarding filings made per year in connection with de-SPAC transactions, we estimate there will be an average of: 50 registration statements on Form S-4 and eight registration statements on Form F-4;[1451] four definitive proxy statements on Schedule 14A; two definitive information statements on Schedule 14C;[1452] two tender offer statements on Schedule TO; and 58 Current Reports on Form 8-K;[1453] and

- An average of 20 registration statements on Form S-4 and two registration statements on Form F-4 will be filed each year for business combination transactions involving a

---

[1451] Of the estimated 50 Form S-4 filings, we expect 30 filings would have been made irrespective of Rule 145a and an additional 20 filings will be made as a result of Rule 145a (whereas in the absence of Rule 145a, these latter 20 filings potentially may have been made on other forms, such as Schedule 14A, Schedule 14C, or Schedule TO). Similarly, our estimate of eight Form F-4 filings is based on four Form F-4 filings that we expect would have been made irrespective of Rule 145a and four additional filings as a result of Rule 145a.

[1452] Our estimates of proxy statements (4) and information statements (2) do not include any combined registration/proxy statements or combined registration/information statements, which are included in the estimates of registration statements on Forms S-4 (50) and F-4 (8). Additionally, we have changed our estimate of the number of proxy statement filings on Schedule 14A from the 30 estimated in the Proposing Release to four because we expect fewer proxy statements as a result of Rule 145a. We have also changed our estimate of the number of information statement filings on Schedule 14C from four to two because we expect fewer information statements as a result of Rule 145a. Our estimates of proxy statements and information statements are greater than zero because, as we discuss in Section IV.A, notwithstanding Rule 145a, depending on the facts and circumstances, an exemption from registration could potentially apply, and, because, even where a registration statement has been filed, we expect some SPACs may still file a stand-alone proxy or information statement that is not combined with the registration statement.

[1453] While the final rules apply Item 1609 to projections in a Form 8-K filed pursuant to Item 1.01, we are unable to estimate the number of such filings that may include projections. We are estimating as an upward bound that every domestic registrant that engages in a de-SPAC transaction may include such disclosure. Accordingly, our estimate of 58 Forms 8-K is the sum of the number of estimated Form S-4, Schedule 14A, Schedule 14C, and Schedule TO filings in connection with a de-SPAC. We note that, to the extent that a registrant prepares responsive disclosure that is included in a Form 8-K and is later included in one of these filings, the total burden assumed by the registrant would be mitigated, which our estimates do not reflect.

505

reporting shell company that is not a business combination related shell company and a non-shell company, other than de-SPAC transactions.[1454]

For purposes of the PRA, the burden is allocated between internal burden hours and outside professional costs.  The portion of the burden carried by outside professionals is reflected as a cost, while the portion of the burden carried by the company internally is reflected in hours.  The following PRA Table 4 sets forth the percentage estimates we use for the burden allocation for each form and schedule, consistent with current OMB estimates and recent Commission rulemakings.  We estimate that the average cost of retaining outside professionals is $600 per hour.

**PRA Table 4.  Standard Estimated Burden Allocation for Specified Collections of Information**

| Form / Schedule | Internal | Outside Professionals |
|---|---|---|
| Forms S-1, F-1, S-4, and F-4 | 25% | 75% |
| Schedules 14A and 14C | 75% | 25% |
| Schedule TO | 50% | 50% |
| Form 8-K, Form 10-K, and Form 10-Q | 75% | 25% |

The following PRA Table 5 summarizes the estimated effects of the final new rules and amendments on the paperwork burdens associated with the affected forms, schedules, and records, including those effects related to Rule 145a, which have been broken out to demonstrate the impact of that rule on certain forms:

---

[1454]  This estimate represents the upper bound of the estimated number of Forms S-4 and F-4 filed for these transactions as a result of Rule 145a.  *See supra* note 78 (discussing data on non-SPAC reverse mergers, including limitations on data for more recent years).

**PRA Table 5. Calculation of the Incremental Change in Burden Estimates of Current Responses Resulting from the Final New Rules and Amendments, Including Certain Effects of Rule 145a**

| Form / Schedule | Number of Estimated Affected Responses | Estimated Burden Hour Increase or (Decrease) per Affected Response | Total Estimated Incremental Increase or (Decrease) in Burden Hours | Estimated Increase or (Decrease) in Internal Burden Hours | Estimated Increase or (Decrease) in Outside Professional Hours | Total Estimated Increase or (Decrease) in Outside Professional Costs |
|---|---|---|---|---|---|---|
| | (A) | (B) | (C) = (A) x (B) | (D) = (C) x (Allocation % from PRA Table 4, Internal) | (E) = (C) x (Allocation % from PRA Table 4, Outside Professionals) | (F) = (E) x $600 |
| Schedule 14A | 4 | (30) | (120) | (90) | (30) | ($18,000) |
| Schedule 14C | 2 | (30) | (60) | (45) | (15) | ($9,000) |
| Schedule TO | 2 | (27) | (54) | (27) | (27) | ($16,200) |
| Form S-1 | 90 | 4 | 360 | 90 | 270 | $162,000 |
| Form S-4 (other than 145a) | 30 | 70 | 2,100 | 525 | 1,575 | $945,000 |
| Form S-4 (from Rule 145a) | 40 | 70 | 2,800 | 700 | 2,100 | $1,260,000 |
| Form F-1 | 8 | 4 | 32 | 8 | 24 | $14,400 |
| Form F-4 (other than 145a) | 4 | 70 | 280 | 70 | 210 | $126,000 |
| Form F-4 (from Rule 145a) | 6 | 70 | 420 | 105 | 315 | $189,000 |
| Form 8-K | 58 | 2 | 116 | 87 | 29 | $17,400 |
| **Total** | **244** | **203** | **5,874** | **1,423** | **4,451** | **$2,670,600** |

In addition, we estimate that an average of 50 fewer post-business combination companies following a de-SPAC transaction will qualify as SRCs than under the current rules until the next annual re-determination date.[1455]  While we cannot predict with certainty the number of these post-business combination companies, we estimate for purposes of our PRA

---

[1455]  This estimate is based, in part, on our estimate of the number of de-SPAC transactions in which the SPAC is the legal acquirer.

calculations that currently all post-business combination companies qualify as SRCs following de-SPAC transactions in which the SPAC is the legal acquirer and that 80% of these companies that are eligible to use the scaled SRC disclosure provisions do so.[1456]  We estimate that these registrants would file, on average, one Form 10-K, 1.5 Forms 10-Q, one Schedule 14A, 0.1 Schedule 14C, and one registration statement on Form S-1 prior to the next re-determination of SRC status.

The following PRA Table 6 summarizes the estimated effects of the re-determination of SRC status on the paperwork burdens associated with the affected forms and schedules:

---

[1456]  This estimated realization rate is based on the same methodology and data set forth in Release No. 33-10513, Section V.D.  Though the estimated realization rate in Release No. 33-10513 preceded the effective date of the amendments to the "smaller reporting company" definition in 2018, we expect that the current realization rate for eligible companies using the scaled SRC disclosure provisions to be generally consistent with the estimated realization rate in 2018.

**PRA Table 6. Calculation of the Incremental Change in Burden Estimates of Current Responses Resulting from the Re-Determination of SRC Status**

| Form / Schedule | Number of Estimated Affected Responses * | Estimated Burden Hour Increase per Affected Response** | Total Estimated Incremental Increase in Burden Hours | Estimated Increase in Internal Burden Hours | Estimated Increase in Outside Professional Hours | Total Estimated Increase in Outside Professional Costs |
|---|---|---|---|---|---|---|
| | (A) | (B) | (C) = (A) x (B) | (D) = (C) x (Internal % PRA Table 4) | (E) = (C) x (Outside Professionals % PRA Table 4) | (F) = (E) x $600 |
| Schedule 14A | 40 | 1 | 40 | 30 | 10 | $6,000 |
| Schedule 14C | 4 | 1 | 4 | 3 | 1 | $600 |
| Form S-1 | 40 | 23 | 920 | 230 | 690 | $414,000 |
| Form 10-K | 40 | 586 | 23,440 | 17,580 | 5,860 | $3,516,000 |
| Form 10-Q | 60 | 48.45 | 2,907 | 2,180.25 | 726.75 | $436,050 |
| **Total** | **184** | **659.45** | **27,311** | **20,023.25** | **7,287.75** | **$4,372,650** |

Notes:

*Estimated Number of Affected Responses is calculated as: (50 companies) x (.8 usage of scaled disclosure) x (applicable incidence of filing relevant form as discussed above, e.g., one for Form 10-K).

** The figures in Column B (Estimated Burden Hour Increase per Affected Response) are taken from PRA Table 2, Column D (Estimated Increase in Total Hours per Filing).

The following PRA Table 7 summarizes the requested paperwork burden changes to existing information collections, including the estimated total reporting burdens and costs, under the final rules.

## PRA Table 7.  Requested Paperwork Burden under the Final Rules[+]

| Form / Schedule | Current Burden, as adjusted* | | | Program Change | | | Requested Change in Burden | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current Annual Responses | Current Burden Hours | Current Cost Burden, as adjusted* | Number of Estimated Affected Responses ** | Estimated Increase or (Decrease) in Internal Burden Hours*** | Estimated Increase or (Decrease) in Outside Professional Costs**** | Annual Responses | Burden Hours | Cost Burden |
| | (A) | (B) | (C) | (D) | (E) | (F) | (G) = (A) | (H) = (B) + (E) | (I) = (C) + (F) |
| Schedule 14A | 6,369 | 850,836 | $170,115,168 | 44 | (60) | ($12,000) | 6,369 | 850,776 | $170,103,168 |
| Schedule 14C | 569 | 63,048 | $12,611,016 | 6 | (42) | ($8,400) | 569 | 63,006 | $12,602,616 |
| Schedule TO | 1,378 | 30,834 | $18,499,500 | 2 | (27) | ($16,200) | 1,378 | 30,807 | $18,483,300 |
| Form S-1 | 898 | 141,978 | $261,023,465 | 130 | 320 | $576,000 | 898 | 142,298 | $261,599,465 |
| Form S-4 | 588 | 560,988 | $1,013,408,069 | 70 | 1,225 | $2,205,000 | 588 | 562,213 | $1,015,613,069 |
| Form F-1 | 66 | 26,571 | $48,195,563 | 8 | 8 | $14,400 | 66 | 26,579 | $48,209,963 |
| Form F-4 | 39 | 13,999 | $25,520,138 | 10 | 175 | $315,000 | 39 | 14,174 | $25,835,138 |
| Form 8-K | 118,387 | 99,204,430 | $148,806,645 | 58 | 87 | $17,400 | 118,387 | 99,204,517 | $148,824,045 |
| Form 10-K | 8,292 | 13,988,811 | $2,753,391,779 | 40 | 17,580 | $3,516,000 | 8,292 | 14,006,391 | $2,756,907,779 |
| Form 10-Q | 22,925 | 3,098,084 | $615,385,731 | 60 | 2,180 | $436,050 | 22,925 | 3,100,264 | $615,821,781 |
| **Total** | **159,511** | **117,979,579** | **$5,066,957,074** | **428** | **21,446** | **$7,043,250** | **159,511** | **118,001,025** | **$5,074,000,324** |

+ Figures in this table have been rounded to the nearest whole number.

Notes:
* Current cost burden updated to reflect change in hourly rate of the costs of outside professionals to $600, as reflected in PRA Table 3.
** Number of Estimated Affected Responses (Column D in this PRA Table 7) is the sum of affected responses from PRA Tables 5 and 6, as applicable.
*** Estimated Increase or (Decrease) in Internal Burden Hours (Column E in this PRA Table 7) is calculated as the sum of the following, as applicable: PRA Table 5, Column D (Estimated Increase or (Decrease) in Internal Burden Hours) plus PRA Table 6, Column D (Estimated Increase in Internal Burden Hours).
**** Estimated Increase or (Decrease) in Outside Professional Costs (Column F in this PRA Table 7) is calculated as the sum of the following, as applicable: PRA Table 5, Column F (Total Estimated Increase or (Decrease) in Outside Professional Costs) plus PRA Table 6, Column F (Total Estimated Increase in Outside Professional Costs).

## X.  FINAL REGULATORY FLEXIBILITY ANALYSIS

The Regulatory Flexibility Act ("RFA")[1457] requires the Commission, in promulgating rules under Section 553 of the Administrative Procedure Act of 1946, to consider the impact of those rules on small entities.  We have prepared this Final Regulatory Flexibility Analysis ("FRFA") in accordance with Section 604 of the RFA.  An Initial Regulatory Flexibility Analysis ("IRFA") was prepared in accordance with the RFA and was included in the Proposing Release.[1458]

### A.  Need for, and Objectives of, the Final Rules

We are adopting new Subpart 1600 of Regulation S-K and amendments to existing forms and schedules to require certain disclosures in registered offerings by SPACs, including IPOs, and in disclosure documents for de-SPAC transactions with respect to, among other things, compensation paid to SPAC sponsors, conflicts of interest, and dilution.  For de-SPAC transactions, we are also adopting final rules that require disclosure of a determination of the board of directors (or similar governing body) of the SPAC whether the de-SPAC transaction is advisable and in the best interests of the SPAC and its security holders if such a determination is required by the law of the jurisdiction in which the SPAC is organized or disclosure of any comparable determination that is required under such law, additional disclosures about the target company, a re-determination of SRC status following the completion of a de-SPAC transaction, and a minimum dissemination period for certain disclosure documents in these transactions.  The final rules apply to, depending on the circumstances, registration statements on Forms S-1, F-1, S-4, and F-4 filed under the Securities Act and Schedules 14A, 14C, and TO under the Exchange

---

[1457]  5 U.S.C. 601 *et seq.*

[1458]  Proposing Release, *supra* note 7, at 29558–29560.

Act.  In addition, the first filing in which re-determination of SRC status following a de-SPAC transaction is reflected may be in a Form 10-K or Form 10-Q filing under the Exchange Act. The final rules also provide that if securities to be registered on Form S-4 or F-4 will be issued by a SPAC or another shell company in connection with a de-SPAC transaction, the registrants must also include the target company, except that in a de-SPAC transaction where the target company consists of a business or assets, the seller of the business or assets is deemed to be a registrant instead of the business or assets.  Further, we are adopting: new definitions of "blank check company" under the PSLRA such that the safe harbor under the PSLRA for forward-looking information would not be available to SPACs and certain other blank check companies; updated and expanded guidance in Item 10(b) of Regulation S-K regarding the use of projections in Commission filings;[1459] and requirements to provide additional disclosure when projections are disclosed in connection with de-SPAC transactions.

In regard to business combination transactions involving a reporting shell company,[1460] we are adopting Securities Act Rule 145a that provides, with respect to a reporting shell company's shareholders, any direct or indirect business combination of a reporting shell company involving another entity that is not a shell company, is deemed to involve an offer, offer to sell, offer for sale, or sale within the meaning of Securities Act Section 2(a)(3).  In addition, we are adopting amendments to the financial statement reporting requirements in Regulation S-X for transactions involving shell companies.

---

[1459]  Item 10(b) sets forth guidelines representing the Commission's views on important factors to be considered in formulating and disclosing management's projections of future economic performance in Commission filings.

[1460]  Throughout this release and as stated earlier, we use "shell company" and "reporting shell company" in lieu of the phrases "shell company, other than a business combination related shell company" and "reporting shell company, other than a business combination related shell company."

The need for and objectives of the final rules are discussed in more detail in Sections II through V above.  We discuss the economic impact, including the estimated costs and burdens, of the final rules on all registrants, including small entities, in Sections VIII and IX above.

## B. Significant Issues Raised by Public Comments

In the Proposing Release, we requested comment on all aspects of the IRFA, including the number of small entities that would be affected by the proposed rules, the existence or nature of the potential impact of the proposals on small entities discussed in the analysis, how the proposed rules could further lower the burden on small entities, and how to quantify the impact of the proposed rules.  While we did not receive any comments specifically addressing the IRFA, as discussed above, one commenter suggested that the Commission consider a phased-in compliance period for smaller reporting companies for the tagging requirements.[1461]  We also received a number of comments on the proposed rules generally[1462] and have considered these comments in developing the FRFA.

## C. Small Entities Subject to the Final Rules

The final rules will affect registrants that are small entities.  The RFA defines "small entity" to mean "small business," "small organization," or "small governmental jurisdiction."[1463] 17 CFR 230.157 under the Securities Act defines an issuer, other than an investment company, to be a "small business" or "small organization" for purposes of the RFA if it had total assets of $5 million or less on the last day of its most recent fiscal year and is engaged or proposing to engage in an offering of securities not exceeding $5 million.  17 CFR 240.0-10(a) under the Exchange Act defines an issuer, other than an investment company, to be a "small business" or

---

[1461]  *See supra* Section II.I.

[1462]  *See supra* Sections II through VI.

[1463]  5 U.S.C. 601(6).

"small organization" if it had total assets of $5 million or less on the last day of its most recent fiscal year.

The final disclosure and other requirements applicable to SPACs would not apply to issuers that raise less than $5 million at the time of their IPOs.[1464]  However, we acknowledge that there may be instances where a small entity may be affected by the final rules, including at the time of a subsequent registered offering or at the time of a de-SPAC transaction.[1465]  While the Commission solicited comment on the number of SPACs that were small entities in such instances, we did not receive any feedback on this point.  We remain unaware of any such instances to date.  The Commission also solicited comment on the number of target private operating companies in de-SPAC transactions that may be small entities, and likewise did not receive feedback on this point.  As noted in the Proposing Release, due to data limitations, we are unable to estimate the number of potential target private operating companies in de-SPAC transactions that may be small entities, however, we expect this number to be relatively low.[1466]

In regard to final Rule 145a and the final amendments to Regulation S-X, we estimate that there are 136 non-SPAC reporting shell companies that are small entities.[1467]  The Commission requested comment in the Proposing Release regarding the number of private operating companies and private shell companies that are small entities and may engage in a

---

[1464] *See* discussion of the definition of "special purpose acquisition company" in Section II.A.

[1465] According to data from Dealogic, the vast majority of IPOs by SPACs in 2020 and 2021 raised more than $50 million and in 2022 all SPAC IPOs raised $50 million or more.  In 2020, the smallest amount raised in a SPAC IPO was $40 million.  In 2021, the smallest amount raised in a SPAC IPO was $44 million.  In 2022, the smallest amount raised in a SPAC IPO was $50 million.

[1466] In this regard, we note that exchange listing requirements and provisions in the governing instruments of many SPACs, along with how SPACs are structured to avoid the application of Rule 419, make it less likely that SPACs would merge with or acquire a small entity.  *See supra* note 1203 (regarding exchange requirements that the SPAC complete a business combination(s) having an aggregate fair market value of at least 80% of the value of the net assets in the trust account excluding certain costs).[1467]  This estimate does not include business combination related shell companies.

[1467] This estimate does not include business combination related shell companies.

business combination transaction but did not receive any information on this point. Due to data limitations, we remain unable to estimate this number.

### D. Projected Reporting, Recordkeeping, and Other Compliance Requirements

We expect that the final disclosure and other requirements applicable to registrants, including target companies, will have an incremental effect on reporting, recordkeeping, and other compliance burdens for registrants (including target companies), including small entities. These requirements will increase compliance costs for registrants (including target companies), and compliance with these requirements will require the use of professional skills, including accounting, legal, and technical skills. We generally expect that the nature of any benefits and costs associated with the final rules to be similar for large and small entities. We also anticipate that the economic benefits and costs likely could vary among small entities based on a number of factors, such as the nature and conduct of their businesses, which makes it difficult to project the economic impact on small entities with precision. The final rules are discussed in detail in Sections II through V above. We discuss the economic effects, including the estimated costs and burdens, of the final rules on all registrants (including target companies), including small entities, in Sections VIII and IX above.

Final Rule 145a may impose reporting or compliance requirements and related costs on a small entity to the extent it would require such a small entity to register the transaction under the Securities Act or comply with an exemption from registration.

### E. Duplicative, Overlapping or Conflicting Federal Rules

The final disclosure requirements in Subpart 1600 of Regulation S-K partially duplicate and overlap with a number of existing disclosure requirements under Regulation S-K that are

currently applicable to SPAC registered offerings and in de-SPAC transactions.[1468]  To the extent that the disclosure requirements in final Subpart 1600 overlap with these existing disclosure requirements, a registrant would not be required to duplicate the resulting disclosure, and as such there should not be a duplicative or increased burden.  As discussed in Section II.C, if there are facts and circumstances that may result in required disclosure under a current rule being the same as under any of the rules we are adopting, then registrants could cross-reference rather than repeat disclosures.

Other than these disclosure requirements, we believe that the final rules and amendments would not duplicate, overlap, or conflict with other Federal rules.

### F.  Agency Action to Minimize Effect on Small Entities

The RFA directs us to consider alternatives that would accomplish our stated objectives, while minimizing any significant adverse impact on small entities.  Accordingly, we considered several alternatives, including the following:

- Establishing different compliance or reporting requirements or timetables that take into account the resources available to small entities;

- Clarifying, consolidating or simplifying compliance and reporting requirements under the rules for small entities;

- Using performance rather than design standards; and

- Exempting small entities from all or part of the requirements.

The final rules will enhance and clarify information provided to investors, including by enabling investors to make better informed decisions as to whether to purchase securities in SPAC registered offerings or to purchase or sell SPAC securities in secondary trading markets

---

[1468] *See supra* Sections II through V.

and as to voting, investment, redemption, and tender decisions in connection with de-SPAC transactions. Further, with respect to Rule 145a and co-registration requirements, as discussed above in Sections III.C and IV.A, the final rules will help ensure that a private operating company's method of becoming a public company does not negatively impact the protection of investors. Due to the nature of SPAC transactions and the investor protection concerns discussed above, we believe that the final rules are equally appropriate for SPACs of all sizes that are engaged in a registered offering and for SPACs and target companies of all sizes that are engaged in a de-SPAC transaction because we believe investors should receive the enhanced protections of the final rules regardless of the size of the entity engaged in the SPAC transaction. For the same reason, we believe that the final rules that apply to shell companies and/or blank check companies, including SPACs, are equally appropriate for such shell companies and/or blank check companies of all sizes.[1469] As a result, we do not believe that it is appropriate: to adopt different compliance or reporting requirements for small entities; to clarify, consolidate or simplify small entity compliance and reporting requirements;[1470] or to provide for small entity exemptions. As noted above, in our view, a private operating company's method of becoming a public company should not negatively impact investor protection. We believe that exempting certain entities based on size from the requirements of the final rules would mean the benefits discussed above would be inappropriately unavailable to investors in those registrants. With respect to using performance rather than design standards, the final rules use primarily design standards in order to promote uniform compliance requirements for all registrants. Further, we

---

[1469] The final definitions, for purposes of the PSLRA, of "blank check company", final Rule 145a, and the final amendments to Regulation S-X are not limited to SPACs. *See* discussion in Sections III.E., IV.A, and IV.B.

[1470] Certain rules we are adopting may provide benefits of clarity and simplicity for entities of all sizes, as we discuss in Sections II through V.

believe that the requirements would be more beneficial to investors if there are specific disclosure requirements that apply to all registrants, regardless of size, for the reasons discussed above.

As discussed in Section IV.A above, Rule 145a is designed to ensure that shareholders more consistently receive the full protections of Securities Act disclosure and liability provisions, as applicable, and that such investor protections will apply more consistently regardless of transaction structure. As a result, with respect to Rule 145a, we do not believe that it is appropriate to adopt different compliance or reporting requirements for small entities, to clarify, consolidate, or simplify small entity compliance and reporting requirements, or to provide for small entity exemptions.

The amendments to Regulation S-X that we are adopting would generally codify existing staff guidance on financial statement requirements for certain business combinations involving shell companies, and, based on staff analysis of disclosures in these transactions, we believe that most companies, including small entities, already report consistently with this staff guidance. The amendments are not expected to have any significant adverse effect on small entities (and are expected to reduce compliance burdens as discussed in Sections VIII and IX). Accordingly, we do not believe that it is necessary: to exempt small entities from all or part of the amendments to Regulation S-X; to establish different compliance or reporting requirements for such entities; or to clarify, consolidate, or simplify compliance and reporting requirements for small entities. Furthermore, the final amendments to Regulation S-X regarding financial statement requirements use design standards to a greater degree than performance standards in order to promote consistency in financial reporting which benefits investors who use financial data in making investment decisions, including by comparing financial data across companies.

**STATUTORY AUTHORITY**

We are adopting the rule and form amendments contained in this document under the authority set forth in Sections 6, 7, 10, 19(a), and 28 of the Securities Act; and Sections 3, 12, 13, 14, 15, 23(a), and 36 of the Exchange Act.

**List of Subjects**

**17 CFR Part 210**

Accountants, Accounting, Banks, Banking, Employee benefit plans, Holding companies, Insurance companies, Investment companies, Oil and gas exploration, Reporting and recordkeeping requirements, Securities, Utilities.

**17 CFR Parts 229, 230, 232, 239, 240, and 249**

Administrative practice and procedure, Reporting and recordkeeping requirements, Securities.

**TEXT OF RULE AND FORM AMENDMENTS**

For the reasons set out in the preamble, to the Commission is adopting amendments to title 17, chapter II of the Code of Federal Regulations as follows:

**PART 210—FORM AND CONTENT OF AND REQUIREMENTS FOR FINANCIAL STATEMENTS, SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934, INVESTMENT COMPANY ACT OF 1940, INVESTMENT ADVISERS ACT OF 1940, AND ENERGY POLICY AND CONSERVATION ACT OF 1975**

1. The authority citation for part 210 continues to read as follows:

**Authority:** 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 77z-2, 77z-3, 77aa(25), 77aa(26), 77nn(25), 77nn(26), 78c, 78j-1, 78*l*, 78m, 78n, 78*o*(d), 78q, 78u-5, 78w, 78*ll*, 78mm, 80a-8, 80a-

20, 80a-29, 80a-30, 80a-31, 80a-37(a), 80b-3, 80b-11, 7202 and 7262, and sec. 102(c), Pub. L. 112-106, 126 Stat. 310 (2012), unless otherwise noted.

2. Amend § 210.1-02 by revising paragraphs (d) and (w)(1) to read as follows:

**§ 210.1-02 Definitions of terms used in Regulation S-X (17 CFR part 210).**

\* \* \* \* \*

(d) *Audit (or examination).* The term *audit* (or *examination*), when used in regard to financial statements of issuers as defined by Section 2(a)(7) of the Sarbanes-Oxley Act of 2002, means an examination of the financial statements by an independent accountant in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB") for the purpose of expressing an opinion thereon. See § 210.15-01(a) for definition of an audit when used in regard to financial statements of an entity that will combine with an entity that is a shell company (other than a business combination related shell company). When used in regard to financial statements of entities that are not issuers as defined by Section 2(a)(7) of the Sarbanes-Oxley Act of 2002, other than in transactions where § 210.15-01(a) applies, the term means an examination of the financial statements by an independent accountant in accordance with either the standards of the PCAOB or U.S. generally accepted auditing standards ("U.S. GAAS") as specified or permitted in the regulations and forms applicable to those entities for the purpose of expressing an opinion thereon. The standards of the PCAOB and U.S. GAAS may be modified or supplemented by the Commission.

\* \* \* \* \*

(w) \* \* \*

(1) The term *significant subsidiary* means a subsidiary, including its subsidiaries, which meets any of the conditions in paragraph (w)(1)(i), (ii), or (iii) of this section; however if the

registrant is a registered investment company or a business development company, the tested subsidiary meets any of the conditions in paragraph (w)(2) of this section instead of any of the conditions in this paragraph (w)(1). In an acquisition by a predecessor to a shell company, use the predecessor's consolidated financial statements instead of those of the shell company registrant in applying the significance tests in paragraphs (w)(1)(i), (ii), and (iii) of this section. A registrant that files its financial statements in accordance with or provides a reconciliation to U.S. Generally Accepted Accounting Principles (U.S. GAAP) must use amounts determined under U.S. GAAP. A foreign private issuer that files its financial statements in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board (IFRS–IASB) must use amounts determined under IFRS–IASB.

*   *   *   *   *

3. Amend § 210.3-01 by revising paragraph (a) to read as follows:

**§ 210.3-01 Consolidated balance sheets.**

(a) There must be filed, for the registrant and its subsidiaries consolidated and for its predecessors, audited balance sheets as of the end of each of the two most recent fiscal years. If the registrant has been in existence for less than one fiscal year, there must be filed an audited balance sheet as of a date within 135 days of the date of filing the registration statement.

*   *   *   *   *

4. Amend § 210.3-05 by revising paragraph (b)(4)(ii) to read as follows:

**§ 210.3-05 Financial statements of businesses acquired or to be acquired.**

*   *   *   *   *

(b) *   *   *

(4) *   *   *

(ii) A registrant, other than a foreign private issuer required to file reports on Form 6-K (§ 249.306 of this chapter) or a shell company (other than a business combination related shell company), that omits from its initial registration statement financial statements of a recently consummated business acquisition pursuant to paragraph (b)(4)(i) of this section must file those financial statements and any pro forma information specified by §§ 210.11-01 through 210.11-03 (Article 11) under cover of Form 8-K (§ 249.308 of this chapter) no later than 75 days after consummation of the acquisition.  When a predecessor to a shell company (other than a business combination related shell company) acquires a business and the financial statements of that recently consummated business are omitted from a registration statement or proxy statement pursuant to (b)(4)(i) of this section refer to § 210.15-01(d)(2).

\* \* \* \* \*

5. Amend § 210.3-14 by revising paragraph (b)(3)(ii) to read as follows:

**§ 210.3-14 Special instructions for financial statements of real estate operations acquired or to be acquired.**

\* \* \* \* \*

(b) \* \* \*

(3) \* \* \*

(ii) A registrant, other than a foreign private issuer required to file reports on Form 6-K (§ 249.306 of this chapter) or shell company (other than a business combination related shell company), that omits from its initial registration statement financial statements of a recently consummated acquisition of a real estate operation pursuant to paragraph (b)(3)(i) of this section must file those financial statements and any pro forma information specified by §§ 210.11-01 through 210.11-03 (Article 11) under cover of Form 8-K (§ 249.308 of this chapter) no later than

75 days after consummation of the acquisition.  When a predecessor to a shell company (other than a business combination related shell company) acquires a real estate operation and the financial statements of that recently consummated acquisition of a real estate operation are omitted from a registration statement or proxy statement pursuant to (b)(3)(i) of this section refer to § 210.15-01(d)(2).

\* \* \* \* \*

6. Amend § 210.8-02 by revising it to read as follows:

**§ 210.8-02 Annual financial statements.**

Smaller reporting companies must file an audited balance sheet for the registrant and its subsidiaries consolidated and for its predecessors as of the end of each of the most recent two fiscal years, or as of a date within 135 days if the issuer has existed for a period of less than one fiscal year, and audited statements of comprehensive income, cash flows and changes in stockholders' equity for each of the two fiscal years preceding the date of the most recent audited balance sheet (or such shorter period as the registrant has been in business).

7. Amend § 210.10-01 by revising paragraph (a)(1) to read as follows:

**§ 210.10-01 Interim financial statements.**

(a) \* \* \*

(1) Interim financial statements required by this rule need only be provided as to the registrant and its subsidiaries consolidated and its predecessors and may be unaudited.  Separate statements of other entities which may otherwise be required by this regulation may be omitted.

\* \* \* \* \*

8. Add an undesignated center heading and § 210.15-01 to read as follows:

523

*Acquisitions of Businesses by a Shell Company (Other Than a Business Combination*

*Related Shell Company)*

**§ 210.15-01 Acquisitions of businesses by a shell company (other than a business combination related shell company).**

(a) *Audit requirements.* The term *audit* (or *examination*), when used in regard to financial statements of an entity that is or will be a predecessor to a shell company (other than a business combination related shell company), means an examination of the financial statements by an independent accountant in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") for the purpose of expressing an opinion thereon. When used in regard to financial statements of an entity that is not a predecessor that are included in a registration statement or proxy statement filed for a combination with an issuer that is a shell company (other than a business combination related shell company), the term means an examination of the financial statements by an independent accountant in accordance with either the standards of the PCAOB or U.S. generally accepted auditing standards ("U.S. GAAS") as specified or permitted in the regulations and forms applicable to those entities for the purpose of expressing an opinion thereon. In transactions involving a shell company that is not a SPAC (as defined in §§ 229.1601(b)), the predecessor must be audited by an independent accountant registered with the PCAOB.

(b) *Financial statements.* When a registrant is a shell company (other than a business combination related shell company) and the financial statements of a business that will be combining with such registrant are required in a registration statement or proxy statement, such registrant must file financial statements of the business in accordance with §§ 210.3-01 through 210.3-12 and 210.10-01 (Articles 3 and 10 of Regulation S-X) as if the filing were a Securities

Act registration statement for the initial public offering of the business's equity securities.  The financial statements of the business may be filed pursuant to §§ 210.8-01 through 210.8-08 (Article 8) when that business would qualify to be a smaller reporting company based on its annual revenues as of the most recently completed fiscal year for which audited financial statements are available, if it were filing a registration statement alone.

(c) *Age of financial statements.*  The financial statements of a business that will be acquired by a shell company (other than a business combination related shell company) must comply with the requirements in § 210.3-12 (§ 210.8-08 when that business would qualify to be a smaller reporting company based on its annual revenues as of the most recently completed fiscal year for which audited financial statements are available, if it were filing a registration statement alone) as if the financial statements were included in an initial registration statement in determining the age of financial statements of the business in the registration statement or proxy statement of the registrant.

(d) *Acquisition of a business or real estate operation by a predecessor.*  Registrants must apply § 210.3-05 (§ 210.8-04 when the predecessor would qualify to be a smaller reporting company based on its annual revenues as of the most recently completed fiscal year for which audited financial statements are available if it were filing a registration statement alone) or §210.3-14 (§ 210.8-06 when the predecessor would qualify to be a smaller reporting company based on its annual revenues as of the most recently completed fiscal year for which audited financial statements are available if it were filing a registration statement alone) to acquisitions of a business or real estate operation, respectively, by a predecessor.

(1) See § 210.1-02(w)(1) for rules on applying the significance tests to acquisitions of a business or real estate operation that is not or will not be the predecessor.

(2) When the financial statements of a recently acquired business or real estate operation that is not or will not be the predecessor are omitted from a registration statement or proxy statement pursuant to Rule 3-05(b)(4)(i) of Regulation S-X (§ 210.3-05(b)(4)(i)) or Rule 3-14(b)(3)(i) of Regulation S-X (§ 210.3-14(b)(3)(i)) those financial statements must be filed in a Form 8-K by the later of the filing of the Form 8-K filed pursuant to Item 2.01(f) or 75 days after consummation of the acquisition.

(e) *Financial statements of shell company.* After a shell company registrant (other than a business combination related shell company) acquires a business that is its predecessor, the financial statements of the shell company for periods prior to consummation of the acquisition are not required to be included in any filing once the financial statements of the predecessor have been filed for all required periods through the acquisition date and the financial statements of the registrant include the period in which the acquisition was consummated. If a registrant is to acquire or has acquired a shell company (other than a business combination related shell company), the financial statements of the shell company are required to be included in any filing that requires the registrant's financial statements, as if the shell company were the registrant for the filing, unless the financial statements of the registrant include the period in which the acquisition of the shell company was consummated.

**PART 229—STANDARD INSTRUCTIONS FOR FILING FORMS UNDER SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934 AND ENERGY POLICY AND CONSERVATION ACT OF 1975—REGULATION S-K**

9. The authority citation for part 229 continues to read as follows:

**Authority:** 15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa(25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 77iii, 77jjj, 77nnn, 77sss, 78c, 78i, 78j, 78j-3, 78*l*, 78m, 78n, 78n-1,

78*o*, 78u-5, 78w, 78*ll*, 78mm, 80a-8, 80a-9, 80a-20, 80a-29, 80a-30, 80a-31(c), 80a-37, 80a-38(a), 80a-39, 80b-11 and 7201 *et seq.*; 18 U.S.C. 1350; sec. 953(b), Pub. L. 111-203, 124 Stat. 1904 (2010); and sec. 102(c), Pub. L. 112-106, 126 Stat. 310 (2012).

10. Amend § 229.10 by:

a. Revising paragraph (b); and

b. Adding paragraph (f)(2)(iv).

The revision and addition read as follows:

### § 229.10 (Item 10) General.

*   *   *   *   *

(b) *Commission policy on projections.* The Commission encourages the use in documents specified in Rule 175 under the Securities Act (§ 230.175 of this chapter) and Rule 3b-6 under the Exchange Act (§ 240.3b-6 of this chapter) of management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format. The guidelines set forth herein represent the Commission's views on important factors to be considered in formulating and disclosing such projections. These guidelines also apply to projections of future economic performance of persons other than the registrant, such as the target company in a business combination transaction, that are included in the registrant's Commission filings.

(1) *Basis for projections.* The Commission believes that management must have the option to present in Commission filings its good faith assessment of a registrant's future performance. Management, however, must have a reasonable basis for such an assessment. Although a history of operations or experience in projecting may be among the factors providing a basis for management's assessment, the Commission does not believe that a registrant always

must have had such a history or experience in order to formulate projections with a reasonable basis.  An outside review of management's projections may furnish additional support for having a reasonable basis for a projection.  If management decides to include a report of such a review in a Commission filing, there also should be disclosure of the qualifications of the reviewer, the extent of the review, the relationship between the reviewer and the registrant, and other material factors concerning the process by which any outside review was sought or obtained.  Moreover, in the case of a registration statement under the Securities Act, the reviewer would be deemed an expert and an appropriate consent must be filed with the registration statement.

(2) *Format for projections.*  (i) In determining the appropriate format for projections included in Commission filings, consideration must be given to, among other things, the financial items to be projected, the period to be covered, and the manner of presentation to be used.  Although traditionally projections have been given for three financial items generally considered to be of primary importance to investors (revenues, net income (loss) and earnings (loss) per share), projection information need not necessarily be limited to these three items.  However, management should take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items.  Revenues, net income (loss) and earnings (loss) per share usually are presented together in order to avoid any misleading inferences that may arise when the individual items reflect contradictory trends.  There may be instances, however, when it is appropriate to present earnings (loss) from continuing operations in addition to or in lieu of net income (loss).  It generally would be misleading to present sales or revenue projections without one of the foregoing measures of income (loss).  The period that appropriately may be covered by a projection depends to a large extent on the particular circumstances of the company involved.  For certain companies in

528

certain industries, a projection covering a two- or three-year period may be entirely reasonable. Other companies may not have a reasonable basis for projections beyond the current year. Accordingly, management should select the period most appropriate in the circumstances. In addition, management, in making a projection, should disclose what, in its opinion, is the most probable specific amount or the most reasonable range for each financial item projected based on the selected assumptions. Ranges, however, should not be so wide as to make the disclosures meaningless. Moreover, several projections based on varying assumptions may be judged by management to be more meaningful than a single number or range and would be permitted.

(ii) The presentation of projected measures that are not based on historical financial results or operational history should be clearly distinguished from projected measures that are based on historical financial results or operational history.

(iii) It generally would be misleading to present projections that are based on historical financial results or operational history without presenting such historical financial results or operational history with equal or greater prominence.

(iv) The presentation of projections that include non-GAAP financial measures should include a clear definition or explanation of those financial measures, a description of the Generally Accepted Accounting Principles (GAAP) financial measure to which it is most directly comparable, and an explanation why the non-GAAP measure was selected instead of a GAAP measure.

*    *    *    *    *

(f) *   *   *

(2) *   *   *

529

(iv) Upon the consummation of a de-SPAC transaction, as defined in § 229.1601(a) (Item 1601(a) of Regulation S-K), an issuer must re-determine its status as a smaller reporting company pursuant to the thresholds set forth in paragraph (f)(1) of this section prior to its first filing, other than pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K, following the de-SPAC transaction and reflect this re-determination in its filings, beginning 45 days after consummation of the de-SPAC transaction.

(A) Public float is measured as of a date within four business days after the consummation of the de-SPAC transaction and is computed by multiplying the aggregate worldwide number of shares of its voting and non-voting common equity held by non-affiliates as of that date by the price at which the common equity was last sold, or the average of the bid and asked prices of common equity, in the principal market for the common equity; and

(B) Annual revenues are the annual revenues of the target company, as defined in § 229.1601(d) (Item 1601(d) of Regulation S-K), as of the most recently completed fiscal year reported in the Form 8-K filed pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K.

*  *  *  *  *

11. Amend § 229.601 by:

a. In the exhibit table in paragraph (a), revising entry 98;

b. Revising paragraph (b)(98); and

c. Adding paragraph (b)(101)(i)(D).

The revisions and additions read as follows:

**§ 229.601 (Item 601) Exhibits.**

(a) *  *  *

530

| EXHIBIT TABLE | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Securities Act Forms | | | | | | | | | | Exchange Act Forms | | | | |
| | S-1 | S-3 | SF-1 | SF-3 | S-4[1] | S-8 | S-11 | F-1 | F-3 | F-4[1] | 10 | 8-K[2] | 10-D | 10-Q | 10-K | ABS-EE |
| | * * * * * * * | | | | | | | | | | | | | | |
| (98) Reports, opinions, or appraisals in de-SPAC transactions[8] | X | | | | X | | | X | | X | | | | | | |
| | * * * * * * * | | | | | | | | | | | | | | |

[1] An exhibit need not be provided about a company if: (1) With respect to such company an election has been made under Form S-4 or F-4 to provide information about such company at a level prescribed by Form S-3 or F-3; and (2) the form, the level of which has been elected under Form S-4 or F-4, would not require such company to provide such exhibit if it were registering a primary offering.

[2] A Form 8-K exhibit is required only if relevant to the subject matter reported on the Form 8-K report.  For example, if the Form 8-K pertains to the departure of a director, only the exhibit described in paragraph (b)(17) of this section need be filed.  A required exhibit may be incorporated by reference from a previous filing.

* * * * *

[8] If required pursuant to § 229.1607(c) (Item 1607(c) of Regulation S-K).

* * * * *

(b) * * *

(98) *Reports, opinions, or appraisals in de-SPAC transactions*.  If the securities to be registered on the form will be issued in a de-SPAC transaction, as defined in § 229.1601(a) (Item 1601(a) of Regulation S-K), all reports, opinions, or appraisals required to be filed or included by § 229.1607(c) (Item 1607(c) of Regulation S-K).

* * * * *

(101) * * *

(i) * * *

(D) Is required in any filing that is excluded by paragraphs (b)(101)(i)(A), (B), or (C) of this section, that contains any disclosure required by subpart 229.1600 of this part but only as to such disclosure.

\* \* \* \* \*

12. Amend part 229 by adding subpart 229.1600 to read as follows:

**Subpart 229.1600—Special Purpose Acquisition Companies**

Sec.

229.1601 (Item 1601) Definitions.

229.1602 (Item 1602) Registered offerings by special purpose acquisition companies.

229.1603 (Item 1603) SPAC sponsor; conflicts of interest.

229.1604 (Item 1604) De-SPAC transactions.

229.1605 (Item 1605) Background of and reasons for the de-SPAC transaction; terms of the de-SPAC transaction; effects.

229.1606 (Item 1606) Board determination about the de-SPAC transaction.

229.1607 (Item 1607) Reports, opinions, appraisals, and negotiations.

229.1608 (Item 1608) Tender offer filing obligations.

229.1609 (Item 1609) Projections in de-SPAC transactions.

229.1610 (Item 1610) Structured data requirement.

**Subpart 229.1600—Special Purpose Acquisition Companies**

**§ 229.1601 (Item 1601) Definitions.**

For the purposes of this subpart 229.1600:

(a) *De-SPAC transaction*.  The term *de-SPAC transaction* means a business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or

similar transaction, involving a special purpose acquisition company and one or more target companies (contemporaneously, in the case of more than one target company).

(b) *Special purpose acquisition company (SPAC)*.  The term *special purpose acquisition company (SPAC)* means a company that has:

(1) Indicated that its business plan is to:

(i) Conduct a primary offering of securities that is not subject to the requirements of § 230.419 (Rule 419 under the Securities Act);

(ii) Complete a business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or similar transaction, with one or more target companies within a specified time frame; and

(iii) Return proceeds from the offering and any concurrent offering (if such offering or concurrent offering intends to raise proceeds) to its security holders if the company does not complete a business combination, such as a merger, consolidation, exchange of securities, acquisition of assets, reorganization, or similar transaction, with one or more target companies within the specified time frame; or

(2) Represented that it pursues or will pursue a special purpose acquisition company strategy.

(c) *SPAC sponsor*.  The term *SPAC sponsor* means any entity and/or person primarily responsible for organizing, directing, or managing the business and affairs of a special purpose acquisition company, excluding, if an entity is a SPAC sponsor, officers and directors of the special purpose acquisition company who are not affiliates of any such entity that is a SPAC sponsor.

(d) *Target company.*  The term *target company* means an operating company, business or assets.

**§ 229.1602 (Item 1602) Registered offerings by special purpose acquisition companies.**

(a) *Forepart of registration statement and outside cover page of the prospectus.*  In addition to the information required by § 229.501 (Item 501 of Regulation S-K), provide the following information on the outside front cover page of the prospectus in plain English as required by § 230.421(d) of this chapter:

(1) State the time frame for the special purpose acquisition company to consummate a de-SPAC transaction and whether this time frame may be extended.

(2) State whether security holders will have the opportunity to redeem the securities offered and whether the redemptions will be subject to any limitations.

(3) State the amount of the compensation received or to be received by the SPAC sponsor, its affiliates, and promoters, the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities, and whether this compensation and securities issuance may result in a material dilution of the purchasers' equity interests.  Provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

(4) Disclose in the tabular format specified below at quartile intervals based on percentages of the maximum redemption threshold: the offering price; as of the most recent balance sheet date filed, the net tangible book value per share, as adjusted, as if the offering and assumed redemption levels have occurred and to give effect to material probable or consummated transactions (other than the completion of a de-SPAC transaction); and the difference between the offering price and such net tangible book value per share, as adjusted.

Provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus:

**Table 1 to Paragraph (a)(4)**

| Net Tangible Book Value Per Share, as Adjusted | | | | |
|---|---|---|---|---|
| Offering Price of _____ | 25% of Maximum Redemption | 50% of Maximum Redemption | 75% of Maximum Redemption | Maximum Redemption |
| | | | | |

*Instruction 1 to paragraph (a)(4).* If the offering includes an over-allotment option, include separate rows in the tabular disclosure showing the information required by paragraph (a)(4) with and without the exercise of the over-allotment option.

(5) State whether there may be actual or potential material conflicts of interest between the SPAC sponsor, its affiliates, or promoters; and purchasers in the offering. Provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

(b) *Prospectus summary.* The information required by § 229.503(a) (Item 503(a) of Regulation S-K) must include a brief description of the following in plain English as required by § 230.421(d) of this chapter:

(1) The manner in which the special purpose acquisition company will identify and evaluate potential business combination candidates and whether it will solicit shareholder approval for the de-SPAC transaction;

(2) The material terms of the trust or escrow account and the amount or percentage of the gross offering proceeds that the special purpose acquisition company will place in the trust or escrow account;

535

(3) The material terms of the securities being offered, including redemption rights, and whether the securities are the same class as those held by the SPAC sponsor and its affiliates;

(4) The period of time in which the special purpose acquisition company intends to consummate a de-SPAC transaction and its plans in the event that it does not consummate a de-SPAC transaction within this time period, including whether, and if so, how, it may extend the time period; any limitations on extensions, including the number of times; the consequences to the SPAC sponsor of not completing an extension of this time period; and whether security holders will have voting or redemption rights with respect to such an extension;

(5) Any plans to seek additional financings and how the terms of additional financings may impact unaffiliated security holders;

(6) In a tabular format, the nature and amount of the compensation received or to be received by the SPAC sponsor, its affiliates, and promoters, the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities, and, outside of the table, the extent to which this compensation and securities issuance may result in a material dilution of the purchasers' equity interests; and

(7) Any actual or potential material conflict of interest between the SPAC sponsor, its affiliates, or promoters; and purchasers in the offering, including those that may arise in determining whether to pursue a de-SPAC transaction.

(c) *Dilution*.  Disclose in a tabular format for the same quartile intervals as in Item 1602(a)(4): the offering price; net tangible book value per share, as adjusted, determined in the same manner as in paragraph (a)(4) of this section (Item 1602(a)(4)); and the difference between the offering price and such net tangible book value per share, as adjusted.  The tabular disclosure must show: the nature and amounts of each source of dilution used to determine net tangible

536

book value per share, as adjusted; the number of shares used to determine net tangible book value per share, as adjusted; and any adjustments to the number of shares used to determine the per share component of net tangible book value per share, as adjusted.  Outside of the table, describe each material potential source of future dilution following the registered offering by the special purpose acquisition company, including sources not included in the table with respect to the determination of net tangible book value per share, as adjusted.  Provide a description of the model, methods, assumptions, estimates, and parameters necessary to understand the tabular disclosure.

**§ 229.1603 (Item 1603) SPAC sponsor; conflicts of interest.**

(a) *SPAC sponsor, its affiliates, and promoters.*  Provide the following information about the SPAC sponsor, its affiliates, and promoters of the special purpose acquisition company:

(1) State the SPAC sponsor's name and describe the SPAC sponsor's form of organization.

(2) Describe the general character of the SPAC sponsor's business.

(3) Describe the experience of the SPAC sponsor, its affiliates, and any promoters in organizing special purpose acquisition companies and the extent to which the SPAC sponsor, its affiliates, and the promoters are involved in other special purpose acquisition companies.

(4) Describe the material roles and responsibilities of the SPAC sponsor, its affiliates, and any promoters in directing and managing the special purpose acquisition company's activities.

(5) Describe any agreement, arrangement, or understanding between the SPAC sponsor and the special purpose acquisition company, its officers, directors, or affiliates with respect to determining whether to proceed with a de-SPAC transaction.

(6) Disclose the nature (*e.g.*, cash, shares of stock, warrants and rights) and amounts of all compensation that has been or will be awarded to, earned by, or paid to the SPAC sponsor, its affiliates, and any promoters for all services rendered or to be rendered in all capacities to the special purpose acquisition company and its affiliates and the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and any promoters and the price paid or to be paid for such securities.  Disclose any circumstances or arrangements under which the SPAC sponsor, its affiliates, and promoters, directly or indirectly, have transferred or could transfer ownership of securities of the SPAC, or that have resulted or could result in the surrender or cancellation of such securities.  In addition, disclose the nature and amounts of any reimbursements to be paid to the SPAC sponsor, its affiliates, and any promoters upon the completion of a de-SPAC transaction.

(7) Identify the controlling persons of the SPAC sponsor.  Disclose, as of the most recent practicable date, the persons who have direct and indirect material interests in the SPAC sponsor, as well as the nature and amount of their interests.

(8) Describe any agreement, arrangement, or understanding, including any payments, between the SPAC sponsor and unaffiliated security holders of the special purpose acquisition company regarding the redemption of outstanding securities of the special purpose acquisition company.

(9) Disclose, in a tabular format to the extent practicable, the material terms of any agreement, arrangement, or understanding regarding restrictions on whether and when the SPAC sponsor and its affiliates may sell securities of the special purpose acquisition company, including the date(s) on which the agreement, arrangement, or understanding may expire; the natural persons and entities subject to such an agreement, arrangement, or understanding; any

538

exceptions under such an agreement, arrangement, or understanding; and any terms that would result in an earlier expiration of such an agreement, arrangement, or understanding.

(b) *Conflicts of interest.*  Describe any actual or potential material conflict of interest, including any material conflict of interest that may arise in determining whether to proceed with a de-SPAC transaction and any material conflict of interest arising from the manner in which the special purpose acquisition company compensates a SPAC sponsor, officers, or directors or the manner in which a SPAC sponsor compensates its officers and directors, between:

(1) The SPAC sponsor or its affiliates; the special purpose acquisition company's officers, directors, or promoters; or the target company's officers or directors; and

(2) Unaffiliated security holders of the SPAC.

(c) *SPAC officer and director fiduciary duties*.  Briefly describe the fiduciary duties of each officer and director of the special purpose acquisition company to other companies to which they have fiduciary duties.

**§ 229.1604 (Item 1604) De-SPAC transactions.**

(a) *Forepart of registration statement and outside cover page of the prospectus.*  In addition to the information required by § 229.501 (Item 501 of Regulation S-K), provide the following information on the outside front cover page of the prospectus in plain English as required by § 230.421(d) of this chapter:

(1) State the determination, if any, of the board of directors (or similar governing body) of the special purpose acquisition company disclosed in response to § 229.1606(a) (Item 1606(a) of Regulation S-K) and, if applicable, that the special purpose acquisition company or the SPAC sponsor has received a report, opinion, or appraisal referred to in § 229.1607(a) (Item 1607(a) of Regulation S-K).

(2) Describe briefly any material financing transactions that have occurred since the initial public offering of the special purpose acquisition company or will occur in connection with the consummation of the de-SPAC transaction.

(3) State the amount of the compensation received or to be received by the SPAC sponsor, its affiliates, and promoters in connection with the de-SPAC transaction or any related financing transaction; the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities in connection with the de-SPAC transaction or any related financing transaction; and whether this compensation and securities issuance may result in a material dilution of the equity interests of non-redeeming shareholders who hold the securities until the consummation of the de-SPAC transaction.  Provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

(4) State whether, in connection with the de-SPAC transaction, there may be any actual or potential material conflict of interest, including any material conflict of interest that may arise in determining whether to proceed with a de-SPAC transaction and any material conflict of interest arising from the manner in which the special purpose acquisition company compensates a SPAC sponsor, officers, and directors or the manner in which a SPAC sponsor compensates its officers and directors, between: on one hand, the SPAC sponsors, their affiliates, SPAC officers, SPAC directors, or promoters, target company officers or target company directors; and, on the other hand, unaffiliated security holders of the SPAC.  Provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

(b) *Prospectus summary.* The information required by § 229.503(a) (Item 503(a) of Regulation S-K) must include a brief description of the following in plain English as required by § 230.421(d) of this chapter:

(1) The background and material terms of the de-SPAC transaction;

(2) The determination, if any, of the board of directors (or similar governing body) of the special purpose acquisition company disclosed in response to § 229.1606(a) (Item 1606(a) of Regulation S-K), the material factors that the board of directors (or similar governing body) of the special purpose acquisition company considered in making such determination, and any report, opinion, or appraisal referred to in § 229.1607(a) (Item 1607(a) of Regulation S-K);

(3) In connection with the de-SPAC transaction, any actual or potential material conflict of interest between:

(i) The SPAC sponsor, SPAC officers, SPAC directors, SPAC affiliates or promoters, target company officers, or target company directors; and

(ii) Unaffiliated security holders of the SPAC;

(4) In a tabular format, the terms and amount of the compensation received or to be received by the SPAC sponsor, its affiliates, and promoters in connection with the de-SPAC transaction or any related financing transaction, the amount of securities issued or to be issued by the SPAC to the SPAC sponsor, its affiliates, and promoters and the price paid or to be paid for such securities in connection with the de-SPAC transaction or any related financing transaction; and, outside of the table, the extent to which that compensation and securities issuance has resulted or may result in a material dilution of the equity interests of non-redeeming shareholders of the special purpose acquisition company;

(5) The material terms of any material financing transactions that have occurred or will occur in connection with the consummation of the de-SPAC transaction, the anticipated use of proceeds from these financing transactions and the dilutive impact, if any, of these financing transactions on non-redeeming shareholders; and

(6) The rights of security holders to redeem the outstanding securities of the special purpose acquisition company and the potential dilutive impact of redemptions on non-redeeming shareholders.

(c) *Dilution.* Disclose in a tabular format that includes intervals representing selected potential redemption levels that may occur across a reasonably likely range of outcomes: the offering price disclosed pursuant to Item 1602(a)(4) in the initial registered offering by the SPAC; as of the most recent balance sheet date filed, the net tangible book value per share, as adjusted, as if the selected redemption levels have occurred, and to give effect to, while excluding the de-SPAC transaction itself, material probable or consummated transactions and other material effects on the SPAC's net tangible book value per share from the de-SPAC transaction; and the difference between such offering price and such net tangible book value per share, as adjusted. The tabular disclosure must show: the nature and amounts of each source of dilution used to determine net tangible book value per share, as adjusted; the number of shares used to determine net tangible book value per share, as adjusted; and any adjustments to the number of shares used to determine the per share component of net tangible book value per share, as adjusted. Outside of the table, describe each material potential source of future dilution that non-redeeming shareholders may experience by electing not to tender their shares in connection with the de-SPAC transaction, including sources not included in the table with respect to the determination of net tangible book value per share, as adjusted.

542

(1) With respect to each redemption level, state the company valuation at or above which the potential dilution results in the amount of the non-redeeming shareholders' interest per share being at least the initial public offering price per share of common stock.

(2) Provide a description of the model, methods, assumptions, estimates, and parameters necessary to understand the tabular disclosure.

**§ 229.1605 (Item 1605) Background of and reasons for the de-SPAC transaction; terms of the de-SPAC transaction; effects.**

(a) Provide a summary of the background of the de-SPAC transaction.  Such summary must include a description of any contacts, negotiations, or transactions that have occurred concerning the de-SPAC transaction.

(b) State the material terms of the de-SPAC transaction, including but not limited to:

(1) A brief description of the de-SPAC transaction;

(2) A brief description of any related financing transaction, including any payments from the SPAC sponsor to investors in connection with the financing transaction;

(3) A reasonably detailed discussion of the reasons of the SPAC and the target company for engaging in the de-SPAC transaction and reasons of the SPAC for the structure and timing of the de-SPAC transaction and any related financing transaction;

(4) An explanation of any material differences in the rights of SPAC and target company security holders as compared with security holders of the combined company as a result of the de-SPAC transaction;

(5) A brief statement as to the accounting treatment of the de-SPAC transaction; and

(6) The Federal income tax consequences of the de-SPAC transaction to the SPAC, the target company, and their respective security holders.

(c) Describe the effects of the de-SPAC transaction and any related financing transaction on the special purpose acquisition company and its affiliates, the SPAC sponsor and its affiliates, the target company and its affiliates, and unaffiliated security holders of the special purpose acquisition company.  The description must include a reasonably detailed discussion of both the benefits and detriments of the de-SPAC transaction and any related financing transaction to the special purpose acquisition company and its affiliates, the SPAC sponsor and its affiliates, the target company and its affiliates, and unaffiliated security holders of the special purpose acquisition company.  The benefits and detriments of the de-SPAC transaction and any related financing transaction must be quantified to the extent practicable.

(d) Disclose any material interests in the de-SPAC transaction or any related financing transaction: held by the SPAC sponsor or the special purpose acquisition company's officers or directors, including fiduciary or contractual obligations to other entities as well as any interest in, or affiliation with, the target company; or held by the target company's officers or directors that consist of any interest in, or affiliation with, the SPAC sponsor or the special purpose acquisition company.

(e) State whether or not security holders are entitled to any redemption or appraisal rights.  If so, summarize the redemption or appraisal rights.  If there are no redemption or appraisal rights available for security holders who object to the de-SPAC transaction, briefly outline any other rights that may be available to security holders.

**§ 229.1606 (Item 1606) Board determination about the de-SPAC transaction.**

(a) *Board determination.*  If the law of the jurisdiction in which the special purpose acquisition company is organized requires its board of directors (or similar governing body) to determine whether the de-SPAC transaction is advisable and in the best interests of the special

544

purpose acquisition company and its security holders, or otherwise make any comparable determination, disclose that determination.

(b) *Factors considered in board determination*.  Discuss the material factors the board of directors (or similar governing body) of the special purpose acquisition company considered in making any determination disclosed in response to paragraph (a) of this section.  To the extent considered, such factors must include, but need not be limited to, the valuation of the target company, financial projections relied upon by the board of directors (or similar governing body), the terms of financing materially related to the de-SPAC transaction, any report, opinion, or appraisal referred to in § 229.1607(a) (Item 1607(a) of Regulation S-K), and the dilution described in § 229.1604(c) (Item 1604(c) of Regulation S-K).

(c) *Approval of security holders*.  State whether or not the de-SPAC transaction is structured so that approval of at least a majority of unaffiliated security holders of the special purpose acquisition company is required.

(d) *Unaffiliated representative*.  State whether or not a majority of the directors (or members of similar governing body) who are not employees of the special purpose acquisition company has retained an unaffiliated representative to act solely on behalf of unaffiliated security holders for purposes of negotiating the terms of the de-SPAC transaction and/or preparing a report concerning the approval of the de-SPAC transaction.

(e) *Approval of directors*.  State whether or not the de-SPAC transaction was approved by a majority of the directors (or members of similar governing body) of the special purpose acquisition company who are not employees of the special purpose acquisition company.  If any director (or member of a similar governing body) of the special purpose acquisition company voted against, or abstained from voting on, approval of the de-SPAC transaction, identify such

545

persons, and indicate, if known after making reasonable inquiry, the reasons for the vote against the transaction or abstention.

**§ 229.1607 (Item 1607) Reports, opinions, appraisals, and negotiations.**

(a) *Report, opinion, or appraisal.*  Disclose the information required by paragraph (b) of this section if the special purpose acquisition company or SPAC sponsor has received any report, opinion (other than an opinion of counsel) or appraisal from an outside party or an unaffiliated representative referred to in paragraph (d) of Item § 229.1606 (Item 1606(d) of Regulation S-K) materially relating to:

(1) Any determination disclosed in response to paragraph (a) of Item § 229.1606 (Item 1606(a) of Regulation S-K);

(2) The approval of the de-SPAC transaction;

(3) The consideration or the fairness of the consideration to be offered to security holders of the target company in the de-SPAC transaction; or

(4) The fairness of the de-SPAC transaction to the special purpose acquisition company, its security holders, or SPAC sponsor.

(b) *Preparer and summary of the report, opinion, appraisal, or negotiation.*  For each report, opinion, or appraisal referred to in paragraph (a) of this section or any negotiation or report described in response to § 229.1606(d) (Item 1606(d) of Regulation S-K) concerning the terms of the transaction:

(1) Identify the outside party and/or unaffiliated representative;

(2) Briefly describe the qualifications of the outside party and/or unaffiliated representative;

(3) Describe the method of selection of the outside party and/or unaffiliated representative;

(4) Describe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between:

(i) The outside party, its affiliates, and/or unaffiliated representative; and

(ii) The special purpose acquisition company, the SPAC sponsor and/or their respective affiliates;

(5) If the report, opinion, or appraisal relates to the fairness of the consideration to be offered to security holders of the target company in the de-SPAC transaction, state whether the special purpose acquisition company or SPAC sponsor determined the amount of consideration to be paid to the target company or its security holders, or the valuation of the target company, or whether the outside party and/or unaffiliated representative recommended the amount of consideration to be paid or the valuation of the target company; and

(6) Furnish a summary concerning the negotiation, report, opinion, or appraisal.  The summary must include but need not be limited to: the procedures followed; the findings and recommendations; the bases for and methods of arriving at such findings and recommendations; instructions received from the special purpose acquisition company or SPAC sponsor; and any limitation imposed by the special purpose acquisition company or SPAC sponsor on the scope of the investigation.

*Instruction 1 to paragraph (b):* The information called for by paragraphs (b)(1), (2), and (3) of this section must be given with respect to the firm that provides the report, opinion, or

appraisal or participates in the negotiation rather than the employees of the firm that prepared the report, opinion, or appraisal or participated in the negotiation.

(c) All reports, opinions, or appraisals referred to in paragraphs (a) and (b) of this section must be, as applicable, filed as exhibits to the registration statement or schedule or included in the schedule if the schedule does not have exhibit filing requirements.

**§ 229.1608 (Item 1608) Tender offer filing obligations.**

If the special purpose acquisition company files a Schedule TO (§ 240.14d-100) pursuant to § 240.13e-4(c)(2) (Rule 13e-4(c)(2)) for any redemption of securities offered to security holders, such Schedule TO must provide the information required by General Instruction L.2. to Form S-4, General Instruction I.2. to Form F-4, and Item 14(f)(2) of Schedule 14A (§ 240.14a-101), as applicable, in addition to the information otherwise required by Schedule TO.  Such redemption must be conducted in compliance with all other provisions of § 240.13e-4 (Rule 13e-4) and §§ 240.14e-1 to 240.14e-8 (Regulation 14E).

**§ 229.1609 (Item 1609) Projections in de-SPAC transactions.**

(a) With respect to any projections disclosed in the filing (or any exhibit thereto), disclose the purpose for which the projections were prepared and the party that prepared the projections.

(b) Disclose all material bases of the disclosed projections and all material assumptions underlying the projections, and any material factors that may affect such assumptions.  The disclosure referred to in this section should include a discussion of any material growth or reduction rates or discount rates used in preparing the projections, and the reasons for selecting such growth or reduction rates or discount rates.

(c) If the projections relate to the performance of the special purpose acquisition company, state whether or not the projections reflect the view of the special purpose acquisition

company's management or board of directors (or similar governing body) about its future performance as of the most recent practicable date prior to the date of the disclosure document required to be disseminated to security holders.  If the projections relate to the target company, disclose whether or not the target company has affirmed to the special purpose acquisition company that its projections reflect the view of the target company's management or board of directors (or similar governing body) about its future performance as of the most recent practicable date prior to the date of the disclosure document required to be disseminated to security holders.  If the projections no longer reflect the views of the special purpose acquisition company's or the target company's management or board of directors (or similar governing body) regarding the future performance of their respective companies as of the most recent practicable date prior to the date of the disclosure document required to be disseminated to security holders, state the purpose of disclosing the projections and the reasons for any continued reliance by the management or board of directors (or similar governing body) on the projections.

### § 229.1610 (Item 1610) Structured data requirement.

Provide the disclosure required by this subpart 229.1600 in an Interactive Data File in accordance with 17 CFR 232.405 (Rule 405 of Regulation S-T) and the EDGAR Filer Manual.

### PART 230—GENERAL RULES AND REGULATIONS, SECURITIES ACT OF 1933

13. The general authority citation for part 230 continues to read as follows:

**Authority**: 15 U.S.C. 77b, 77b note, 77c, 77d, 77f, 77g, 77h, 77j, 77r, 77s, 77z-3, 77sss, 78c, 78d, 78j, 78*l*, 78m, 78n, 78*o*, 78*o*-7 note, 78t, 78w, 78*ll*(d), 78mm, 80a-8, 80a-24, 80a-28, 80a-29, 80a-30, and 80a-37, and Pub. L. 112-106, sec. 201(a), sec. 401, 126 Stat. 313 (2012), unless otherwise noted.

\*　\*　\*　\*　\*

14. Add § 230.145a to read as follows:

**§ 230.145a Business combinations with reporting shell companies.**

With respect to a reporting shell company's shareholders, any direct or indirect business combination of a reporting shell company that is not a business combination related shell company involving another entity that is not a shell company, as those terms are defined in § 230.405, is deemed to involve an offer, offer to sell, offer for sale, or sale within the meaning of section 2(a)(3) of the Act.  For purposes of this rule, a reporting shell company is a company other than an asset-backed issuer as defined in § 229.1101(b) of this chapter (Item 1101(b) of Regulation AB), that has:

(a) No or nominal operations;

(b) Either:

(1) No or nominal assets;

(2) Assets consisting solely of cash and cash equivalents; or

(3) Assets consisting of any amount of cash and cash equivalents and nominal other assets; and

(c) An obligation to file reports under Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78*o*(d)) of the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*).

15. Amend § 230.405 by:

a. Adding in alphabetical order the definition for "blank check company"; and

b. Adding paragraph (3)(iv) to the definition for "smaller reporting company".

The additions read as follows:

**§ 230.405 Definitions of terms.**

\*   \*   \*   \*   \*

*Blank check company.* For purposes of Section 27A of the Securities Act of 1933 (15 U.S.C. 77z-2), the term *blank check company* means a company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person.

\* \* \* \* \*

*Smaller reporting company.* \* \* \*

(3) \* \* \*

(iv) Upon the consummation of a de-SPAC transaction, as defined in § 229.1601(a) (Item 1601(a) of Regulation S-K), an issuer must re-determine its status as a smaller reporting company pursuant to the thresholds set forth in paragraphs (1) and (2) of this definition prior to its first filing, other than pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K, following the de-SPAC transaction and reflect this re-determination in its filings beginning 45 days after consummation of the de-SPAC transaction.

(A) Public float is measured as of a date within four business days after the consummation of the de-SPAC transaction and is computed by multiplying the aggregate worldwide number of shares of its voting and non-voting common equity held by non-affiliates as of that date by the price at which the common equity was last sold, or the average of the bid and asked prices of common equity, in the principal market for the common equity; and

(B) Annual revenues are the annual revenues of the target company, as defined in § 229.1601(d) (Item 1601(d) of Regulation S-K), as of the most recently completed fiscal year reported in the Form 8-K filed pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K.

\* \* \* \* \*

551

**PART 232—REGULATION S-T—GENERAL RULES AND REGULATIONS FOR ELECTRONIC FILINGS**

16. The general authority citation for part 232 continues to read as follows:

**Authority:** 15 U.S.C. 77c, 77f, 77g, 77h, 77j, 77s(a), 77z-3, 77sss(a), 78c(b), 78*l*, 78m, 78n, 78*o*(d), 78w(a), 78*ll*, 80a-6(c), 80a-8, 80a-29, 80a-30, 80a-37, 80b-4, 80b-6a, 80b-10, 80b-11, 7201 *et seq.*; and 18 U.S.C. 1350, unless otherwise noted.

\* \* \* \* \*

17. Amend § 232.405 by:

a. Revising the introductory text and paragraphs (a)(2) and (4);

b. Removing "and" from the end of the paragraph (b)(4)(i);

c. Removing the period and adding in its place "; and" in paragraph (b)(4)(v);

d. Adding paragraph (b)(4)(vi); and

e. Revising Note 1 to § 232.405.

The revisions and additions read as follows:

**§ 232.405 Interactive Data File Submissions.**

This section applies to electronic filers that submit Interactive Data Files.  Section 229.601(b)(101) of this chapter (Item 601(b)(101) of Regulation S-K), General Instruction F of § 249.311 (Form 11-K), paragraph (101) of Part II—Information Not Required to be Delivered to Offerees or Purchasers of § 239.40 of this chapter (Form F-10), § 240.13a-21 of this chapter (Rule 13a-21 under the Exchange Act), paragraph 101 of the Instructions as to Exhibits of § 249.220f of this chapter (Form 20-F), paragraph B.(15) of the General Instructions to § 249.240f of this chapter (Form 40-F), paragraph C.(6) of the General Instructions to § 249.306 of this chapter (Form 6-K), § 240.17Ad-27(d) of this chapter (Rule 17Ad-27(d) under the Exchange

Act), Note D.5 of § 240.14a-101 of this chapter (Rule 14a-101 under the Exchange Act), Item 1 of § 240.14c-101 of this chapter (Rule 14c-101 under the Exchange Act), General Instruction L of § 240.14d-100 of this chapter (Rule 14d-100 under the Exchange Act), General Instruction I of § 249.333 of this chapter (Form F-SR), General Instruction C.3.(g) of §§ 239.15A and 274.11A of this chapter (Form N-1A), General Instruction I of §§ 239.14 and 274.11a-1 of this chapter (Form N-2), General Instruction C.3.(h) of §§ 239.17a and 274.11b of this chapter (Form N-3), General Instruction C.3.(h) of §§ 239.17b and 274.11c of this chapter (Form N-4), General Instruction C.3.(h) of §§ 239.17c and 274.11d of this chapter (Form N-6), General Instruction 2.(*l*) of § 274.12 of this chapter (Form N-8B-2), General Instruction 5 of § 239.16 of this chapter (Form S-6), and General Instruction C.4 of §§ 249.331 and 274.128 of this chapter (Form N-CSR) specify when electronic filers are required or permitted to submit an Interactive Data File (§ 232.11), as further described in note 1 to this section.  This section imposes content, format, and submission requirements for an Interactive Data File, but does not change the substantive content requirements for the financial and other disclosures in the Related Official Filing (§ 232.11).

(a) *  *  *

(2) Be submitted only by an electronic filer either required or permitted to submit an Interactive Data File as specified by § 229.601(b)(101) of this chapter (Item 601(b)(101) of Regulation S-K), General Instruction F of § 249.311 (Form 11-K), paragraph (101) of Part II—Information Not Required to be Delivered to Offerees or Purchasers of § 239.40 of this chapter (Form F-10), § 240.13a-21 of this chapter (Rule 13a-21 under the Exchange Act), paragraph 101 of the Instructions as to Exhibits of § 249.220f of this chapter (Form 20-F), paragraph B.(15) of the General Instructions to § 249.240f of this chapter (Form 40-F), paragraph C.(6) of the

General Instructions to § 249.306 of this chapter (Form 6-K), Rule 17Ad-27(d) under the Exchange Act, Note D.5 of Rule 14a-101 under the Exchange Act, Item 1 of Rule 14c-101 under the Exchange Act, General Instruction L of § 240.14d-100 of this chapter (Rule 14d-100 under the Exchange Act), General Instruction I to § 249.333 of this chapter (Form F-SR), General Instruction C.3.(g) of §§ 239.15A and 274.11A of this chapter (Form N-1A), General Instruction I of §§ 239.14 and 274.11a-1 of this chapter (Form N-2), General Instruction C.3.(h) of §§ 239.17a and 274.11b of this chapter (Form N-3), General Instruction C.3.(h) of §§ 239.17b and 274.11c of this chapter (Form N-4), General Instruction C.3.(h) of §§ 239.17c and 274.11d of this chapter (Form N-6), General Instruction 2.(*l*) of § 274.12 of this chapter (Form N-8B-2), General Instruction 5 of § 239.16 of this chapter (Form S-6), or General Instruction C.4 of §§ 249.331 and 274.128 of this chapter (Form N-CSR), as applicable;

\*   \*   \*   \*   \*

(4) Be submitted in accordance with the EDGAR Filer Manual and, as applicable, § 229.601(b)(101) of this chapter (Item 601(b)(101) of Regulation S-K), paragraph (101) of Part II - Information Not Required to be Delivered to Offerees or Purchasers of § 239.40 of this chapter (Form F-10), § 240.13a-21 of this chapter (Rule 13a-21 under the Exchange Act), paragraph 101 of the Instructions as to Exhibits of § 249.220f of this chapter (Form 20-F), paragraph B.(15) of the General Instructions to § 249.240f of this chapter (Form 40-F), paragraph C.(6) of the General Instructions to § 249.306 of this chapter (Form 6-K), § 240.17Ad-27(d) of this chapter (Rule 17Ad-27(d) under the Exchange Act), Note D.5 of § 240.14a-101 of this chapter (Rule 14a-101 under the Exchange Act), Item 1 of § 240.14c-101 of this chapter (Rule 14c-101 under the Exchange Act), General Instruction L of § 240.14d-100 of this chapter (Rule 14d-100 under the Exchange Act),General Instruction I to § 249.333 of this chapter (Form F-SR), General

Instruction C.3.(g) of §§ 239.15A and 274.11A of this chapter (Form N-1A), General Instruction I of §§ 239.14 and 274.11a-1 of this chapter (Form N-2), General Instruction C.3.(h) of §§ 239.17a and 274.11b of this chapter (Form N-3), General Instruction C.3.(h) of §§ 239.17b and 274.11c of this chapter (Form N-4), General Instruction C.3.(h) of §§ 239.17c and 274.11d of this chapter (Form N-6); General Instruction 2.(*l*) of § 274.12 of this chapter (Form N-8B-2); General Instruction 5 of § 239.16 of this chapter (Form S-6); or General Instruction C.4 of §§ 249.331 and 274.128 of this chapter (Form N-CSR).

\*   \*   \*   \*   \*

(b) \*   \*   \*

(4) \*   \*   \*

(vi) The information required by § 229.1601 through § 229.1610 of this chapter (Subpart 1600 of Regulation S-K).

\*   \*   \*   \*   \*

Note 1 to § 232.405: Section 229.601(b)(101) of this chapter (Item 601(b)(101) of Regulation S-K) specifies the circumstances under which an Interactive Data File must be submitted and the circumstances under which it is permitted to be submitted, with respect to § 239.11 of this chapter (Form S-1), § 239.13 of this chapter (Form S-3), § 239.25 of this chapter (Form S-4), § 239.18 of this chapter (Form S-11), § 239.31 of this chapter (Form F-1), § 239.33 of this chapter (Form F-3), § 239.34 of this chapter (Form F-4), § 249.310 of this chapter (Form 10-K), § 249.308a of this chapter (Form 10-Q), and § 249.308 of this chapter (Form 8-K). General Instruction F of § 249.311 of this chapter (Form 11-K) specifies the circumstances under which an Interactive Data File must be submitted, and the circumstances under which it is permitted to be submitted, with respect to Form 11-K.  Paragraph (101) of Part II—Information

555

not Required to be Delivered to Offerees or Purchasers of § 239.40 of this chapter (Form F-10) specifies the circumstances under which an Interactive Data File must be submitted and the circumstances under which it is permitted to be submitted, with respect to Form F-10.  Paragraph 101 of the Instructions as to Exhibits of § 249.220f of this chapter (Form 20-F) specifies the circumstances under which an Interactive Data File must be submitted and the circumstances under which it is permitted to be submitted, with respect to Form 20-F.  Paragraph B.(15) of the General Instructions to § 249.240f of this chapter (Form 40-F) and Paragraph C.(6) of the General Instructions to § 249.306 of this chapter (Form 6-K) specify the circumstances under which an Interactive Data File must be submitted and the circumstances under which it is permitted to be submitted, with respect to § 249.240f of this chapter (Form 40-F) and § 249.306 of this chapter (Form 6-K).  Section 240.17Ad-27(d) of this chapter (Rule 17Ad-27(d) under the Exchange Act) specifies the circumstances under which an Interactive Data File must be submitted with respect the reports required under Rule 17Ad-27.  Note D.5 of § 240.14a-101 of this chapter (Schedule 14A) and Item 1 of § 240.14c-101 of this chapter (Schedule 14C) specify the circumstances under which an Interactive Data File must be submitted with respect to Schedules 14A and 14C.  General Instruction L of § 240.14d-100 of this chapter (Schedule TO) specifies the circumstances under which an Interactive Data File must be submitted with respect to Schedule TO. § 240.13a-21 of this chapter (Rule 13a-21 under the Exchange Act) and General Instruction I to § 249.333 of this chapter (Form F-SR) specify the circumstances under which an Interactive Data File must be submitted, with respect to Form F-SR. §§ 242.829 and 242.831 of this chapter (Rules 829 and 831 of Regulation SE) and the Registration Instructions to § 249.1701 of this chapter (Form SBSEF), as applicable, specify the circumstances under which an Interactive Data File must be submitted with respect to filings made under Regulation SE.  Item

601(b)(101) of Regulation S-K, paragraph (101) of Part II—Information not Required to be Delivered to Offerees or Purchasers of Form F-10, paragraph 101 of the Instructions as to Exhibits of Form 20-F, paragraph B.(15) of the General Instructions to Form 40-F, and paragraph C.(6) of the General Instructions to Form 6-K all prohibit submission of an Interactive Data File by an issuer that prepares its financial statements in accordance with §§ 210.6-01 through 210.6-10 of this chapter (Article 6 of Regulation S-X).  For an issuer that is a management investment company or separate account registered under the Investment Company Act of 1940 (15 U.S.C. 80a et seq.) or a business development company as defined in section 2(a)(48) of the Investment Company Act of 1940 (15 U.S.C. 80a-2(a)(48)), General Instruction C.3.(g) of Form N-1A (§§ 239.15A and 274.11A of this chapter), General Instruction I of Form N-2 (§§ 239.14 and 274.11a-1 of this chapter), General Instruction C.3.(h) of Form N-3 (§§ 239.17a and 274.11b of this chapter), General Instruction C.3.(h) of Form N-4 (§§ 239.17b and 274.11c of this chapter), General Instruction C.3.(h) of Form N-6 (§§ 239.17c and 274.11d of this chapter), General Instruction 2.(l) of § 274.12 of this chapter (Form N-8B-2), General Instruction 5 of § 239.16 of this chapter (Form S-6), and General Instruction C.4 of §§ 249.331 and 274.128 of this chapter (Form N-CSR) specify when electronic filers are required or permitted to submit an Interactive Data File (§ 232.11), as further described in note 1 to this section and General Instruction C.4 of Form N-CSR (§§ 249.331 and 274.128 of this chapter), as applicable, specifies the circumstances under which an Interactive Data File must be submitted.

**PART 239—FORMS PRESCRIBED UNDER THE SECURITIES ACT OF 1933**

18. The authority citation for part 239 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 77c, 77f, 77g, 77h, 77j, 77s, 77z-2, 77z-3, 77sss, 78c, 78*l*, 78m, 78n, 78*o*(d), 78*o*-7 note, 78u-5, 78w(a), 78*ll*, 78mm, 80a-2(a), 80a-3, 80a-8, 80a-9, 80a-10, 80a-

13, 80a-24, 80a-26, 80a-29, 80a-30, 80a-37, and sec. 71003 and sec. 84001, Pub. L. 114-94, 129 Stat. 1321, unless otherwise noted.

\* \* \* \* \*

Sections 239.31, 239.32 and 239.33 are also issued under 15 U.S.C. 78*l*, 78m, 78*o*, 78w, 80a-8, 80a-29, 80a-30, 80a-37 and 12 U.S.C. 241.

\* \* \* \* \*

19. Amend Form S-1 (referenced in § 239.11) by:

a. Adding General Instruction VIII; and

b. Revising Item 6. Dilution.

**Note: Form S-1 is attached as Appendix A to this document. Form S-1 will not appear in the Code of Federal Regulations.**

20. Amend Form S-4 (referenced in § 239.25) by:

a. Adding General Instruction L;

b. Revising paragraph (b)(7) introductory text of Item 17 and Instruction 1 of paragraph (b)(7) of Item 17; and

c. Revising Instruction 1 to the signature block.

**Note: Form S-4 is attached as Appendix B to this document. Form S-4 will not appear in the Code of Federal Regulations.**

21. Amend Form F-1 (referenced in § 239.31) by adding General Instruction VII.

**Note: Form F-1 is attached as Appendix C to this document. Form F-1 will not appear in the Code of Federal Regulations.**

22. Amend Form F-4 (referenced in § 239.34) by:

a. Adding General Instruction I;

b. Revising Instruction 1 to paragraph (b)(5) of Item 17;

c. Revising the Instructions to paragraph (b)(5) and (b)(6) of Item 17; and

d. Revising Instruction 1 to the signature block.

**Note: Form F-4 is attached as Appendix D to this document.  Form F-4 will not appear in the Code of Federal Regulations.**

**PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934**

23. The authority citation for part 240 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c-3, 78c-5, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78j-4, 78k, 78k-1, 78*l*, 78m, 78n, 78n-1, 78*o*, 78*o*-4, 78*o*-10, 78p, 78q, 78q-1, 78s, 78u-5, 78w, 78x, 78dd, 78*ll*, 78mm, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4, 80b-11, 7201 *et seq.*, and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350; Pub. L. 111-203, 939A, 124 Stat. 1376 (2010); and Pub. L. 112-106, sec. 503 and 602, 126 Stat. 326 (2012), unless otherwise noted.

\*  \*  \*  \*  \*

Sections 240.12b-1 to 240.12b-36 also issued under secs. 3, 12, 13, 15, 48 Stat. 892, as amended, 894, 895, as amended; 15 U.S.C. 78c, 78*l*, 78m, 78*o*;

\*  \*  \*  \*  \*

Sections 240.14c-1 to 240.14c-101 also issued under sec. 14, 48 Stat. 895; 15 U.S.C. 78n;

\*  \*  \*  \*  \*

24. Amend § 240.12b-2 by:

a. Adding in alphabetical order the definition for "blank check company"; and

b. Adding paragraph (3)(iv) to the definition of "smaller reporting company".

The additions and revisions read as follows:

**§ 240.12b-2 Definitions.**

\*   \*   \*   \*   \*

*Blank check company.*  For purposes of Section 21E of the Securities and Exchange Act of 1934 (15 U.S.C. 78u-5), the term *blank check company* means a company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person.

\*   \*   \*   \*   \*

*Smaller reporting company.* \*   \*   \*

(3) \*   \*   \*

(iv) Upon the consummation of a de-SPAC transaction, as defined in § 229.1601(a) (Item 1601(a) of Regulation S-K), an issuer must re-determine its status as a smaller reporting company pursuant to the thresholds set forth in paragraphs (1) and (2) of this definition prior to its first filing, other than pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K, following the de-SPAC transaction and reflect this re-determination in its filings, beginning 45 days after consummation of the de-SPAC transaction.

(A) Public float is measured as of a date within four business days after the consummation of the de-SPAC transaction and is computed by multiplying the aggregate worldwide number of shares of its voting and non-voting common equity held by non-affiliates as of that date by the price at which the common equity was last sold, or the average of the bid and asked prices of common equity, in the principal market for the common equity; and

(B) Annual revenues are the annual revenues of the target company, as defined in § 229.1601(d) (Item 1601(d) of Regulation S-K), as of the most recently completed fiscal year reported in the Form 8-K filed pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K.

\* \* \* \* \*

25. Amend § 240.14a-6 by adding paragraph (q) to read as follows:

**§ 240.14a-6 Filing requirements.**

\* \* \* \* \*

(q) *De-SPAC transactions*.  If a transaction is a de-SPAC transaction, as defined in § 229.1601(a) of this chapter (Item 1601(a) of Regulation S-K), the proxy statement of the special purpose acquisition company, as defined in § 229.1601(b) of this chapter (Item 1601(b) of Regulation S-K), must be distributed to security holders no later than the lesser of 20 calendar days prior to the date on which the meeting of security holders is to be held or action is to be taken in connection with the de-SPAC transaction or the maximum number of days permitted for disseminating the proxy statement under the applicable laws of the jurisdiction of incorporation or organization.

26. Amend § 240.14a-101 by:

a. Adding paragraph (f) to Item 14;

b. Removing "and" from the end of paragraph (a) to Item 25;

c. Redesignating paragraph (b) to Item 25 as paragraph (c); and

d. Adding new paragraph (b) to Item 25.

The additions read as follows:

**§ 240.14a-101 Schedule 14A. Information required in proxy statement.**

\* \* \* \* \*

**Item 14.**  \*   \*   \*

\*   \*   \*   \*   \*

(f) *De-SPAC transactions.* (1) If the transaction is a de-SPAC transaction, as defined in § 229.1601(a) (Item 1601(a) of Regulation S-K), then the disclosure provisions of §§ 229.1603, 229.1604(b)(1) through 229.1604(b)(6), 229.1604(c), 229.1605 through 229.1607 and 229.1609 (Items 1603, 1604(b)(1) through 1604(b)(6), 1604(c), 1605 through 1607 and 1609 of Regulation S-K) apply in addition to the provisions of this schedule and disclosure thereunder must be provided in the proxy statement, and the structured data provisions of § 229.1610 (Item 1610 of Regulation S-K) apply to those disclosures.  The information required by § 229.1604(b)(1) through 229.1604(b)(6) must be briefly described in the front of the disclosure document.  To the extent that the applicable disclosure requirements of Subpart 229.1600 are inconsistent with the disclosure requirements of this schedule, the requirements of Subpart 229.1600 are controlling.

(2) Provide the following additional information for the target company:

(i) Information required by § 229.101 of this chapter (Item 101 of Regulation S-K, description of business);

(ii) Information required by § 229.102 of this chapter (Item 102 of Regulation S-K, description of property);

(iii) Information required by § 229.103 of this chapter (Item 103 of Regulation S-K, legal proceedings);

(iv) Information required by § 229.304 of this chapter (Item 304 of Regulation S-K, changes in and disagreements with accountants on accounting and financial disclosure);

(v) Information required by § 229.403 of this chapter (Item 403 of Regulation S-K, security ownership of certain beneficial owners and management), assuming the completion of the de-SPAC transaction and any related financing transaction; and

(vi) Information required by § 229.701 of this chapter (Item 701 of Regulation S-K, recent sales of unregistered securities).

*   *   *   *   *

**Item 25.** *   *   *

*   *   *   *   *

(b) If the transaction is a de-SPAC transaction, as defined in § 229.1601(a) (Item 1601(a) of Regulation S-K), all reports, opinions, or appraisals required to be filed or included by § 229.1607(c) (Item 1607(c) of Regulation S-K); and

*   *   *   *   *

27. Amend § 240.14c-2 by adding paragraph (e) to read as follows:

**§ 240.14c-2 Distribution of information statement.**

*   *   *   *   *

(e) If a transaction is a de-SPAC transaction, as defined in § 229.1601(a) of this chapter (Item 1601(a) of Regulation S-K), the information statement of the special purpose acquisition company, as defined in § 229.1601(b) (Item 1601(b) of Regulation S-K), must be distributed to security holders no later than the lesser of 20 calendar days prior to the date on which the meeting of security holders is to be held or action is to be taken in connection with the de-SPAC transaction or the maximum number of days permitted for disseminating the information statement under the applicable laws of the jurisdiction of incorporation or organization.

28. Amend § 240.14d-100 by:

a. Redesignating General Instruction K as General Instruction M;

b. Adding new General Instructions K and L;

c. Removing "and" from the end of paragraph (a) to Item 12;

d. Redesignating paragraph (b) to Item 12 as paragraph (c); and

e. Adding new paragraph (b) to Item 12.

The additions and revisions read as follows:

**§ 240.14d-100 Schedule TO. Tender offer statement under section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934.**

\* \* \* \* \*

*General Instructions:*

\* \* \* \* \*

K. If the filing relates to a de-SPAC transaction, as defined in § 229.1601(a) of this chapter (Item 1601(a) of Regulation S-K), then the provisions of §§ 229.1603, 229.1604(b)(1) through 229.1604(b)(6), 229.1604(c), and 229.1605 through 229.1609 of this chapter (Items 1603, 1604(b)(1) through 1604(b)(6), 1604(c), and 1605 through 1609 of Regulation S-K) apply in addition to the provisions of this schedule and disclosure thereunder must be provided in this schedule, and the structured data provisions of § 229.1610 of this chapter (Item 1610 of Regulation S-K) apply to those disclosures.  The information required by §§ 229.1604(b)(1) through 229.1604(b)(6) must be briefly described in the front of the disclosure document.  If the filing by a special purpose acquisition company, as defined in § 229.1601(b) of this chapter (Item 1601(b) of Regulation S-K), relates to any other redemption of securities offered to security holders, then the provisions of § 229.1608 of this chapter (Item 1608 of Regulation S-K) apply in addition to the provisions of this schedule and disclosure thereunder, if applicable, must

564

be provided in this schedule and the structured data provisions of § 229.1610 of this chapter (Item 1610 of Regulation S-K) apply to those disclosures.  To the extent that the applicable disclosure requirements of Subpart 229.1600 of this chapter are inconsistent with the disclosure requirements of this filing, the requirements of Subpart 229.1600 of this chapter are controlling.

L. An Interactive Data File must be included in accordance with § 232.405 of this chapter (Rule 405 of Regulation S-T) and the EDGAR Filer Manual where applicable pursuant to General Instruction K and § 232.405(b) of this chapter.

*   *   *   *   *

**Item 12.** *   *   *

*   *   *   *   *

(b) If the filing relates to a de-SPAC transaction, as defined in § 229.1601(a) (Item 1601(a) of Regulation S-K), all reports, opinions, or appraisals required to be filed or included by § 229.1607(c) (Item 1607(c) of Regulation S-K); and

*   *   *   *   *

**PART 249—FORMS, SECURITIES EXCHANGE ACT OF 1934**

29. The authority citation for part 249 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 78a *et seq.* and 7201 *et seq.*; 12 U.S.C. 5461 *et seq.*; 18 U.S.C. 1350; Sec. 953(b) Pub. L. 111-203, 124 Stat. 1904; Sec. 102(a)(3) Pub. L. 112-106, 126 Stat. 309 (2012), Sec. 107 Pub. L. 112-106, 126 Stat. 313 (2012), Sec. 72001 Pub. L. 114-94, 129 Stat. 1312 (2015), and secs. 2 and 3 Pub. L. 116-222, 134 Stat. 1063 (2020), unless otherwise noted.

Section 249.220f is also issued under secs. 3(a), 202, 208, 302, 306(a), 401(a), 401(b), 406 and 407, Pub. L. 107-204, 116 Stat. 745, and secs. 2 and 3, Pub. L. 116-222, 134 Stat. 1063.

*   *   *   *   *

Section 249.308 is also issued under 15 U.S.C. 80a-29 and 80a-37.

*   *   *   *   *

30. Amend Form 20-F (referenced in § 249.220f) by adding Instruction 4 to Item 8.

**Note: Form 20-F is attached as Appendix E to this document.  Form 20-F will not appear in the Code of Federal Regulations.**

31. Amend Form 8-K (referenced in § 249.308) by:

a. Adding General Instruction B.7; and

b. Revising paragraph (f) of Item 2.01.

**Note: Form 8-K is attached as Appendix F to this document.  Form 8-K will not appear in the Code of Federal Regulations.**

By the Commission.

Dated: January 24, 2024.

**J. Matthew DeLesDernier**,

*Deputy Secretary*.

Note: The following appendices will not appear in the Code of Federal Regulations.

**Appendix A—Form S-1**

**FORM S-1**

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

**VIII. Offering by a Special Purpose Acquisition Company.**

If a registration statement on this Form S-1 is being used to register an offering of securities of a special purpose acquisition company, as defined in Item 1601(b) of Regulation S-K (17 CFR 229.1601(b)), other than in connection with a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), the registrant must furnish in the prospectus the information required by Items 1602 and 1603 of Regulation S-K (17 CFR 229.1602 and 229.1603), in the manner set forth by the structured data provision of Item 1610 of Regulation S-K (17 CFR 229.1610), in addition to the Items that are otherwise required by this Form. If the securities to be registered on this Form will be issued in a de-SPAC transaction, the requirements of Form S-4 applicable to de-SPAC transactions apply to this Form, including, but not limited to, Item 17 and General Instruction L.

\* \* \* \* \*

**Item 6. Dilution.**

Provide the information required by Item 506 of Regulation S-K (§229.506 of this chapter), unless the registrant is a special purpose acquisition company (as defined in Item 1601 of Regulation S-K).

\* \* \* \* \*

**SIGNATURES**

567

\* \* \* \* \*

Instructions.

1. The registration statement shall be signed by the registrant, its principal executive officer or officers, its principal financial officer, its controller or principal accounting officer and by at least a majority of the board of directors or persons performing similar functions. If the registrant is a foreign person, the registration statement shall also be signed by its authorized representative in the United States. Where the registrant is a limited partnership, the registration statement shall be signed by a majority of the board of directors of any corporate general partner signing the registration statement. If the securities to be registered on this Form will be issued by a special purpose acquisition company, as such term is defined in Item 1601 of Regulation S-K, or another shell company in connection with a de-SPAC transaction, as such term is defined in Item 1601 of Regulation S-K, the term "registrant" for purposes of this instruction and the Signatures section of this form also includes the target company, as such term is defined in Item 1601 of Regulation S-K, except that in connection with any de-SPAC transaction involving the purchase of assets or a business, with respect to the purchase of assets or a business, the term "registrant" also includes the seller of the business or assets.

\* \* \* \* \*

**Appendix B—Form S-4**

## FORM S-4

\*  \*  \*  \*  \*

## GENERAL INSTRUCTIONS

\*  \*  \*  \*  \*

**L. De-SPAC Transactions.**

1. If securities to be registered on this Form will be issued in a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), then the disclosure provisions of Items 1603 through 1607 and 1609 of Regulation S-K (17 CFR 229.1603 through 229.1607 and 229.1609) apply in addition to the provisions of this Form and disclosure thereunder must be provided in the prospectus, and the structured data provisions of Item 1610 of Regulation S-K (17 CFR 229.1610) apply to those disclosures.  To the extent that the applicable disclosure requirements of Subpart 229.1600 are inconsistent with the disclosure requirements of this Form, the requirements of Subpart 229.1600 are controlling.  If the securities to be registered on this Form will be issued by a special purpose acquisition company (as such term is defined in Item 1601 of Regulation S-K) or another shell company in connection with a de-SPAC transaction, the registrants also include the target company (as such term is defined in Item 1601 of Regulation S-K), and it must be so designated on the cover page of this Form.  In such a de-SPAC transaction, where the target company consists of a business or assets, the seller of the business or assets is deemed to be a registrant instead of the business or assets and must be so designated on the cover page of this Form.  Further, in such a de-SPAC transaction, the term "registrant" for purposes of the disclosure requirements of this Form means the special purpose

569

acquisition company, and the term "company being acquired" for the purposes of the disclosure requirements of this Form means the target company.

2. If the target company, as defined in Item 1601(d) of Regulation S-K (17 CFR 229.1601(d)), in a de-SPAC transaction, as defined in Item 1601 of Regulation S-K (17 CFR 229.1601), is not subject to the reporting requirements of either Section 13(a) or 15(d) of the Exchange Act, provide the following additional information with respect to the target company:

a. Item 101 of Regulation S-K (§ 229.101 of this chapter, description of business);

b. Item 102 of Regulation S-K (§ 229.102 of this chapter, description of property);

c. Item 103 of Regulation S-K (§ 229.103 of this chapter, legal proceedings);

d. Item 304 of Regulation S-K (§ 229.304 of this chapter, changes in and disagreements with accountants on accounting and financial disclosure);

e. Item 403 of Regulation S-K (§ 229.403 of this chapter, security ownership of certain beneficial owners and management), assuming the completion of the de-SPAC transaction and any related financing transaction; and

f. Item 701 of Regulation S-K (§ 229.701 of this chapter, recent sales of unregistered securities).

If the target company is a foreign private issuer, as defined in Rule 405 (§ 230.405 of this chapter), information with respect to the target company may be provided in accordance with Items 4, 6.E, 7.A, 8.A.7, and 16F of Form 20-F, in lieu of the information specified above.

3. If securities to be registered on this Form will be issued in a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), the prospectus must be distributed to security holders no later than the lesser of 20 calendar days prior to the date on which the meeting of security holders is to be held or action is to be taken in connection with the

de-SPAC transaction or the maximum number of days permitted for disseminating the prospectus under the applicable laws of the jurisdiction of incorporation or organization.

\*   \*   \*   \*   \*

**Item 17. Information with Respect to Companies Other Than S-3 Companies.**

\*   \*   \*   \*   \*

(7) Financial statements that would be required in an annual report sent to security holders under Rules 14a-3(b)(1) and (b)(2) (§ 240.14b-3 of this chapter), if an annual report was required.  In a de-SPAC transaction, see § 240.15-01 (Rule 15-01 of Regulation S-X).  If the registrant's security holders are not voting, the transaction is not a roll-up transaction (as described by Item 901 of Regulation S-K (§ 229.901 of this chapter)), and:

\*   \*   \*   \*   \*

**Instructions:**

1. The financial statements required by this paragraph for the latest fiscal year need be audited only to the extent practicable.  The financial statements for the fiscal years before the latest fiscal year need not be audited if they were not previously audited.  For a company combining with a registrant that is a shell company, see § 210.15-01(a).

\*   \*   \*   \*   \*

**SIGNATURES**

\*   \*   \*   \*   \*

*Instructions.*

1. The registration statement must be signed by the registrant, its principal executive officer or officers, its principal financial officer, its controller or principal accounting officer, and by at least a majority of the board of directors or persons performing similar functions.  If the

registrant is a foreign person, the registration statement must also be signed by its authorized representative in the United States.  Where the registrant is a limited partnership, the registration statement must be signed by a majority of the board of directors of any corporate general partner signing the registration statement.  If the securities to be registered on this Form will be issued by a special purpose acquisition company, as such term is defined in Item 1601 of Regulation S-K, or another shell company in connection with a de-SPAC transaction, as such term is defined in Item 1601 of Regulation S-K, the term "registrant" for purposes of this instruction and the Signatures section of this form also includes the target company, as such term is defined in Item 1601 of Regulation S-K, except that in connection with any de-SPAC transaction involving the purchase of assets or a business, with respect to the purchase of assets or a business, the term "registrant" also includes the seller of the business or assets.

\*   \*   \*   \*   \*

**Appendix C—Form F-1**

**FORM F-1**

\*   \*   \*   \*   \*

**GENERAL INSTRUCTIONS**

\*   \*   \*   \*   \*

**VII. Offering by a Special Purpose Acquisition Company.**

If a registration statement on this Form F-1 is being used to register an offering of securities of a special purpose acquisition company, as defined in Item 1601(b) of Regulation S-K (17 CFR 229.1601(b)), other than in connection with a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), the registrant must furnish in the prospectus the information required by Items 1602 and 1603 of Regulation S-K (17 CFR 229.1602 and 229.1603), in the manner set forth by the structured data provision of Item 1610 of Regulation S-K (17 CFR 229.1610), in addition to the Items that are otherwise required by this Form.  If the securities to be registered on this Form will be issued in a de-SPAC transaction the requirements of Form F-4 applicable to de-SPAC transactions apply to this Form, including, but not limited to, Item 17 and General Instruction I.

\*   \*   \*   \*   \*

**Item 9. The Offer and Listing.**

\*   \*   \*   \*   \*

E.   Dilution.     The following information shall be provided:

\*   \*   \*   \*   \*

4.   Where the registrant is a special purpose acquisition company (as defined in Item 1601 of Regulation S-K), in lieu of providing the information required under Item 9.E.1 and Item 9.E.2,

573

provide the disclosure required pursuant to Items 1602(a)(4) and 1602(c) of Regulation S-K in an offering other than a de-SPAC transaction (as defined in Item 1601 of Regulation S-K) and provide the disclosure required under Item 1604(c) of Regulation S-K in connection with a de-SPAC transaction.

\*   \*   \*   \*   \*

**SIGNATURES**

\*   \*   \*   \*   \*

*Instructions*

1. The registration statement shall be signed by the registrant, its principal executive officer or officers, its principal financial officer, its controller or principal accounting officer, at least a majority of the board of directors or persons performing similar functions, and its authorized representative in the United States.  Where the registrant is a limited partnership, the registration statement shall be signed by a majority of the board of directors of any corporate general partner signing the registration statement.  If the securities to be registered on this Form will be issued by a special purpose acquisition company, as such term is defined in Item 1601 of Regulation S-K, or another shell company in connection with a de-SPAC transaction, as such term is defined in Item 1601 of Regulation S-K, the term "registrant" for purposes of this instruction and the Signatures section of this form also includes the target company, as such term is defined in Item 1601 of Regulation S-K, except that in connection with any de-SPAC transaction involving the purchase of assets or a business, with respect to the purchase of assets or a business, the term "registrant" also includes the seller of the business or assets.

\*   \*   \*   \*   \*

**Appendix D—Form F-4**

## FORM F-4

\* \* \* \* \*

## GENERAL INSTRUCTIONS

\* \* \* \* \*

## I. De-SPAC Transactions.

1. If securities to be registered on this Form will be issued in a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), then the disclosure provisions of Items 1603 through 1607 and 1609 of Regulation S-K (17 CFR 229.1603 through 229.1607 and 1609) apply in addition to the provisions of this Form and disclosure thereunder must be provided in the prospectus, and the structured data provisions of Item 1610 of Regulation S-K (17 CFR 229.1610) apply to those disclosures.  To the extent that the applicable disclosure requirements of Subpart 229.1600 are inconsistent with the disclosure requirements of this Form, the requirements of Subpart 229.1600 are controlling.  If the securities to be registered on this Form will be issued by a special purpose acquisition company (as such term is defined in Item 1601 of Regulation S-K), or another shell company in connection with a de-SPAC transaction, the registrants also include the target company (as such term is defined in Item 1601 of Regulation S-K), and it must be so designated on the cover page of this Form.  In such a de-SPAC transaction, where the target company consists of a business or assets, the seller of the business or assets is deemed to be a registrant instead of the business or assets and must be so designated on the cover page of this Form.  Further, in such a de-SPAC transaction, the term "registrant" for purposes of the disclosure requirements of this Form means the special purpose

575

acquisition company, and the term "company being acquired" for the purposes of the disclosure requirements of this Form means the target company.

2. If the target company, as defined in Item 1601(d) of Regulation S-K (17 CFR 229.1601(d)), in a de-SPAC transaction, as such term is defined in Item 1601 of Regulation S-K, is not subject to the reporting requirements of either Section 13(a) or 15(d) of the Exchange Act, provide the following additional information with respect to the company:

a. Item 101 of Regulation S-K (§ 229.101 of this chapter, description of business);

b. Item 102 of Regulation S-K (§ 229.102 of this chapter, description of property);

c. Item 103 of Regulation S-K (§ 229.103 of this chapter, legal proceedings);

d. Item 304 of Regulation S-K (§ 229.304 of this chapter, changes in and disagreements with accountants on accounting and financial disclosure);

e. Item 403 of Regulation S-K (§ 229.403 of this chapter, security ownership of certain beneficial owners and management), assuming the completion of the de-SPAC transaction and any related financing transaction; and

f. Item 701 of Regulation S-K (§ 229.701 of this chapter, recent sales of unregistered securities).

If the target company is a foreign private issuer, as defined in Rule 405 (§ 230.405 of this chapter), information with respect to the target company may be provided in accordance with Items 4, 6.E, 7.A, 8.A.7, and 16F of Form 20-F, in lieu of the information specified above.

3. If securities to be registered on this Form will be issued in a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), the prospectus must be distributed to security holders no later than the lesser of 20 calendar days prior to the date on which the meeting of security holders is to be held or action is to be taken in connection with the

de-SPAC transaction or the maximum number of days permitted for disseminating the prospectus under the applicable laws of the jurisdiction of incorporation or organization.

\* \* \* \* \*

**PART I**

\* \* \* \* \*

**Item 17. Information with Respect to Foreign Companies Other Than F-3 Companies.**

\* \* \* \* \*

*Instructions:*

1. The financial statements required by this paragraph for the latest fiscal year need be audited only to the extent practicable.  The financial statements for the fiscal years before the latest fiscal year need not be audited if they were not previously audited.  For a company combining with a registrant that is a shell company, see § 210.15-01(a).

\* \* \* \* \*

*Instructions to paragraph (b)(5) and (b)(6):*

If the financial statements required by paragraphs (b)(5) and (b)(6) are prepared on the basis of a comprehensive body of accounting principles other than U.S. GAAP, provide a reconciliation to U.S. GAAP in accordance with Item 18 of Form 20-F (§ 249.220f of this chapter) if the foreign business being acquired will be a predecessor to the issuer that is a shell company or, in all other circumstances, with Item 17 of Form 20-F (§ 249.220f of this chapter) unless a reconciliation is unavailable or not obtainable without unreasonable cost or expense.  At a minimum, provide a narrative description of all material variations in accounting principles, practices and methods used in preparing the non-U.S. GAAP financial statements from those accepted in the U.S. when the financial statements are prepared on a basis other than U.S. GAAP.

577

**SIGNATURES**

*  *  *  *  *

Instructions

1. The registration statement must be signed by the registrant, its principal executive officer or officers, its principal financial officer, its controller or principal accounting officer, at least a majority of the board of directors or persons performing similar functions and its authorized representative in the United States.  Where the registrant is a limited partnership, the registration statement must be signed by a majority of the board of directors of any corporate general partner signing the registration statement.  If the securities to be registered on this Form will be issued by a special purpose acquisition company (as such term is defined in Item 1601 of Regulation S-K) or another shell company in connection with a de-SPAC transaction, as such term is defined in Items 1601 of Regulation S-K, the term "registrant" for purposes of this instruction and the Signatures section of this form also includes the target company (as such term is defined in Item 1601 of Regulation S-K), except that in connection with any de-SPAC transaction involving the purchase of assets or a business, with respect to the purchase of assets or a business, the term "registrant" also includes the seller of the business or assets.

*  *  *  *  *

579

**Appendix E—Form 20-F**

**FORM 20-F**

\* \* \* \* \*

**Item 8. Financial Information**

\* \* \* \* \*

***Instructions to Item 8***:

\* \* \* \* \*

4. For filings on Form 20-F filed pursuant to General Instruction A.(d) of this form and for registration statements, when the issuer is a shell company that is combining with a business, see § 240.15-01 (Rule 15-01 of Regulation S-X).

\* \* \* \* \*

**Appendix F—Form 8-K**

**FORM 8-K**

\*   \*   \*   \*   \*

**B. Events to be Reported and Time for Filing of Reports.**

\*   \*   \*   \*   \*

7. If a registrant's report or exhibit to such report relates to a de-SPAC transaction (as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)) and includes projections that relate to the performance of the special purpose acquisition company or the target company, the report or exhibit, as applicable, must include the information required by paragraphs (a) and (b) of Item 1609 of Regulation S-K (17 CFR 229.1609(a), (b)).

\*   \*   \*   \*   \*

**Item 2.01 Completion of Acquisition or Disposition of Assets.**

\*   \*   \*   \*   \*

(f) if the registrant was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before the transaction in which the registrant acquired a business that is its predecessor, disclose the information that would be required if the acquired business or real estate operation that is its predecessor were filing a general form for registration of securities on Form 10 under the Exchange Act reflecting all classes of the registrant's securities subject to the reporting requirements of Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78$o$(d)) of such Act upon consummation of the transaction.  However, when, at the time of filing, the predecessor meets the conditions of an emerging growth company, as defined in § 230.405 of this chapter (Rule 405 of the Securities Act) or § 240.12b-2 of this chapter (Rule 12b-2 of the

580

581

Exchange Act), the registrant need not present audited financial statements for the predecessor for any period prior to the earliest audited period presented in its financial statements included in a previously filed registration or proxy statement for the transaction resulting in the loss of shell company status.  Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 2.01(f) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

*   *   *   *   *