# SEC Adopts Final Rules Affecting SPACs and De-SPACs and Provides Related Guidance

**Skadden**

01 / 29 / 24

If you have any questions regarding the matters discussed in this memorandum, please contact the attorneys listed on the last page or call your regular Skadden contact.

This memorandum is provided by Skadden, Arps, Slate, Meagher & Flom LLP and its affiliates for educational and informational purposes only and is not intended and should not be construed as legal advice. This memorandum is considered advertising under applicable state laws.

One Manhattan West
New York, NY 10001
212.735.3000

On January 24, 2024, the Securities and Exchange Commission (SEC) adopted final rules that impose significant additional procedural and disclosure requirements on initial public offerings (IPOs) by special purpose acquisition companies (SPACs) and in business combination transactions involving SPACs (de-SPACs). The rules will become effective 125 days after publication in the Federal Register. It is possible, however, that the rules may be subject to a legal challenge and the effective date could be delayed.

The final rules significantly impact SPACs in a number of ways, including by:

- Mandating new disclosure requirements in SPAC IPOs and de-SPAC business combinations regarding the sponsor of the SPAC, potential conflicts of interest and dilution of shareholder interests.
- Requiring the target company in a de-SPAC transaction to be a co-registrant with the SPAC (or another shell company) and therefore assume responsibility, together with the target's directors and officers required to sign the registration statement, for the disclosures in the registration statement filed in connection with the de-SPAC transaction.
- Deeming any business combination transaction involving a reporting shell company, including a SPAC, to be a sale of securities to the reporting shell company's shareholders.
- Making the safe harbor for forward-looking statements under the Private Securities Litigation Reform Act (PSLRA) unavailable for SPACs.
- Mandating a 20-calendar-day minimum dissemination period for prospectuses and proxy statements filed for de-SPAC transactions where consistent with local law.
- Requiring a re-determination of smaller reporting company status following the consummation of a de-SPAC transaction.
- Aligning more closely the financial statement requirements in a business combination transaction involving a SPAC and a target company with those in a traditional IPO.

In a significant departure from the proposed rules, in lieu of adopting final rules addressing the status of potential statutory underwriters in de-SPAC transactions as well as SPACs under the Investment Company Act of 1940, the SEC elected to provide guidance on each of these controversial topics. The SEC also provided guidance on the use of projections generally in SEC filings and specifically in de-SPAC transactions.

## Background

Though SPACs have existed as an alternative to blank check companies since the early 1990s, during the SPAC boom of 2020-21 they temporarily became the predominant method for issuers to go public, due to certain perceived advantages over a traditional IPO, including pricing certainty and streamlined disclosure requirements. As SPACs gained in prominence, however, certain commentators expressed concern about potentially insufficient shareholder protections as compared to traditional IPOs.

The final rules, and the related guidance, aim to address these concerns. While acknowledging the decline in SPAC IPOs since 2021, the SEC recognized that SPAC activity has become a much larger part of the securities markets over the last decade and that SPAC activity may increase again in the future.

## New Subpart 1600 of Regulation S-K

New Subpart 1600 to Regulation S-K sets forth specialized disclosure requirements applicable to SPACs regarding the sponsor, potential conflicts of interest and dilution, among other things.

© Skadden, Arps, Slate, Meagher & Flom LLP. All rights reserved.

# SEC Adopts Final Rules Affecting SPACs and De-SPACs and Provides Related Guidance

## SPAC Sponsors

New Item 1603(a) requires detailed disclosure about the sponsor, its affiliates and any promoters of the SPAC in registration statements and schedules filed in connection with SPAC registered offerings and de-SPAC transactions. The new disclosures, which include some notable changes as compared to the proposed rules, address:

- The experience, material roles and responsibilities of these parties, as well as any agreement, arrangement or understanding (1) between the sponsor and the SPAC, its officers, directors or affiliates, in determining whether to proceed with a de-SPAC transaction, and (2) between the SPAC sponsor and unaffiliated security holders of the SPAC regarding the redemption of outstanding securities.

- The controlling persons of the sponsor and any persons who have direct and indirect material interests in the sponsor. In a change from the proposed rules, this disclosure does not require an organizational chart showing the relationship between the SPAC, the sponsor and the sponsor's affiliates.

- The transfers of SPAC securities by the SPAC sponsor, its affiliates and promoters. This includes potential transfers or arrangements to transfer securities directly or indirectly and cancellation of securities resulting from earn-out provisions. This requirement was not part of the proposed rules and was included in response to several commenters' recommendations.

- Tabular disclosure of the material terms of any lock-up agreements with the sponsor and its affiliates.

- The nature and amounts of all compensation that has or will be awarded to, earned by or paid to the sponsor, its affiliates and any promoters for all services rendered in all capacities to the SPAC and its affiliates, as well as the nature and amounts of any reimbursements to be paid to the sponsor, its affiliates and any promoters upon the completion of a de-SPAC transaction.

In a change from the proposed rules, the final rules take into account the potential returns based on price appreciation from the sponsor promote. The amount of securities issued or to be issued by the SPAC to the sponsor, its affiliates and promoters and the price paid or to be paid for such securities will need to be disclosed. Additionally, in efforts to avoid perceived speculation of sponsor compensation, disclosure of any mechanisms designed to maintain ownership by the sponsor at certain levels and any potential increase in shares to be issued to the sponsor will be necessary.

## Conflicts of Interest

New Item 1603(b) requires the SPAC to disclose any actual or potential material conflict of interest between (1) the sponsor or its affiliates or the SPAC's officers, directors or promoters, and (2) unaffiliated security holders of the SPAC.

Actual or potential conflicts would include:

- The nature of the sponsor's contingent compensation or security ownership (*e.g.*, where the security owned is purchased at a price substantially lower than the price paid by public security holders) that may induce the sponsor and affiliates to pursue a business combination transaction that would not necessarily benefit the shareholders.

- The time pressure the sponsor is under to enter into a business combination.

- Whether the sponsor is involved in multiple SPACs

- When a sponsor and/or its affiliates hold financial interests or have contractual obligations to other entities, including entities with which the SPAC is exploring entering into a business combination.

These potential conflicts of interest may be especially relevant to shareholders at the time the SPAC and sponsor are considering entering into a business combination, especially as the SPAC nears the end of the period to complete such a transaction.

## Dilution

New Items 1602 and 1604 require additional disclosure about the potential for dilution in (1) registration statements filed by SPACs, including those for IPOs, and (2) de-SPAC transactions. Sources of dilution may include sponsor compensation, underwriting fees, shareholder dilution, outstanding warrants, convertible securities and PIPE financings. A simplified tabular dilution disclosure is required on the prospectus cover page in SPAC IPOs on Form S-1 or F-1.

## Prospectus Cover Page

New Item 1602 requires certain fundamental disclosures made in plain English on the SPAC's IPO prospectus cover page, including the time a SPAC has to consummate a de-SPAC transaction, redemptions, sponsor compensation, dilution (including the simplified tabular disclosure described above) and conflicts of interest.

On the de-SPAC cover page, new Item 1604 requires information, if any, on the determination of the board of directors on the de-SPAC transaction and whether the SPAC or SPAC sponsor received a report, opinion or appraisal on the transaction, as well as disclosure regarding material financing transactions, sponsor compensation, dilution and conflicts of interest.

## Prospectus Summary Disclosures

For SPAC IPOs, new Item 1602(b) requires a range of information related to the prospective business combination, including how a target will be identified, whether the business combination requires shareholder approval, the length of time to consummate the transaction (including any possible extensions), plans for and

# SEC Adopts Final Rules Affecting SPACs and De-SPACs and Provides Related Guidance

consequences of seeking additional financing for the business combination, certain material conflicts of interest and dilution.

For de-SPAC transactions, new Item 1604(b) requires information more specifically related to:

- The business combination, including the background and material terms of the transaction.
- Information, if any, on the determination of the board of directors on the de-SPAC transaction, the material factors that impacted such determination and any report, opinion or appraisal on the transaction.
- Investor redemption rights.
- Material conflicts of interest.
- Financing transactions in connection with the de-SPAC.
- A tabular disclosure of sponsor compensation and dilution.

## Background of and Reasons for the De-SPAC Transaction; Terms and Effects

New Item 1605 requires disclosure of the background, material terms and effects of the de-SPAC transaction. The disclosures are modeled on certain line-item requirements found in Regulation M-A but tailored to address issues more specific to de-SPAC transactions. The disclosures include:

- A summary of the background of the de-SPAC transaction, including, but not limited to, a description of any contacts, negotiations or transactions that have occurred concerning the de-SPAC transaction.
- A brief description of any related financing transaction, including any payments from the sponsor to investors in connection with the financing transaction.
- The reasons for engaging in the particular de-SPAC transaction and for the structure and timing of the de-SPAC transaction and any related financing transaction.
- An explanation of any material differences in the rights of security holders of the post-business-combination company as a result of the de-SPAC transaction.
- Disclosure regarding the accounting treatment and the federal income tax consequences of the de-SPAC transaction.

## Board Determination About the De-SPAC Transaction

To address concerns regarding perceived potential conflicts of interest and misaligned incentives, new Item 1606 requires disclosure of any determination required to be made by the SPAC's board of directors as to whether the de-SPAC transaction is advisable and in the best interests of the SPAC and its shareholders. This disclosure is required only to the extent such a determination is required by the law of the jurisdiction where the SPAC is organized. Any board

determination disclosure must be supplemented by a discussion of the material factors the board of directors considered in making its determination.

This represents a scaled back approach as compared to the proposed rules, which would have required *all* SPACs to disclose a reasonable belief regarding the fairness of the proposed business combination and any related financing transactions to unaffiliated security holders.

New Item 1606 also requires disclosure of whether a majority of the nonemployee directors of the SPAC retained an unaffiliated adviser to act on behalf of unaffiliated security holders for purposes of the de-SPAC transaction. It also requires disclosure of whether a majority of the nonemployee directors of the SPAC approved the transaction. Any persons that voted against, or abstained from voting on, the approval of the de-SPAC transaction must be identified and, if known, the reasons for their vote must be discussed.

## Reports, Opinions and Appraisals

New Item 1607 requires certain disclosure *if* the SPAC or sponsor received any report, opinion or appraisal from an outside party or an unaffiliated representative materially relating to the de-SPAC transaction. The disclosure requirements address:

- The identity, qualifications and method of selection of the outside party and/or unaffiliated representative.
- Any material relationship between (1) the outside party, its affiliates and/or unaffiliated representative and (2) the SPAC, its sponsor and/or their affiliates, that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship.
- Whether the SPAC or the sponsor determined the amount of consideration to be paid to the private operating company or its security holders, or the valuation of the target company, or whether the outside party recommended the amount of consideration to be paid or the valuation of the target company.
- A summary concerning the negotiation, report, opinion or appraisal, which must include a description of the procedures followed; the findings and recommendations; the bases for and methods of arriving at such findings and recommendations; instructions received from the SPAC or its sponsor; and any limitation imposed by the SPAC or its sponsor on the scope of the investigation.

Any report, opinion or appraisal must be filed as an exhibit to the Form S-4, Form F-4 and Schedule TO for the de-SPAC transaction or included in the Schedule 14A or 14C for the transaction, as applicable.

# SEC Adopts Final Rules Affecting SPACs and De-SPACs and Provides Related Guidance

## Tender Offer Filing Obligations

New Item 1608 codifies the staff position that a Schedule TO filed in connection with a de-SPAC transaction should contain substantially the same information about a target private operating company that is required under the proxy rules and that a SPAC must comply with the typical tender offer procedural requirements when conducting a transaction for which the Schedule TO is filed. SPACs that do not file a Schedule 14A or 14C, such as foreign private issuers (FPIs), in connection with a de-SPAC or extension will need to comply with Item 1608.

## Aligning De-SPAC Transactions With IPOs

### Co-Registrant Status of Private Operating Company

The SEC reiterated its view that a de-SPAC transaction effectively is an IPO of the target private operating company and that a private operating company's method of becoming a public company should not negatively impact investor protection.

With this as backdrop, the SEC adopted amendments to Form S-4 and Form F-4 to require that the target company be treated as co-registrant when these registration statements are filed by the SPAC (or another shell company, like a holding company) in connection with a de-SPAC transaction. Accordingly, the target company along with its required officers and directors must sign a registration statement filed by the SPAC (or another shell company); these parties will be subject to Section 11 liability forany material misstatements or omissions in the Form S-4 or Form F-4 at the time of effectiveness, subject to a due diligence for all parties other than an issuer.

To align the signature requirements for the acquisition of a business or assets as closely as possible to the signature requirements adopted for all other target companies, the amended instructions to Forms S-4 and F-4 provide that, in de-SPAC transactions involving the purchase of assets or a business, the term "registrant" includes the seller of the business or assets.

### Minimum Dissemination Period

In efforts to give investors and the market adequate time to assess a proposed de-SPAC transaction, the amendments require that the prospectuses and proxy and information statements filed in connection with de-SPAC transactions be distributed to security holders no later than the lesser of 20 calendar days prior to the meeting of security holders or the date action is to be taken in connection with the de-SPAC transaction, or the maximum number of days permitted for disseminating such disclosure documents under the applicable laws of the SPAC's jurisdiction of incorporation or organization.

## Private Securities Litigation Reform Act Safe Harbor

The PSLRA provides a safe harbor for forward-looking statements under the Securities Act and the Securities Exchange Act of 1934 (the Exchange Act), whereby a company is protected from liability for forward-looking statements in any private right of action under the Securities Act or Exchange Act when, among other things, the forward-looking statement is identified as such and is accompanied by meaningful cautionary statements. The safe harbor is not available, however, when a forward-looking statement is made in connection with an IPO or an offering by a blank check company.

The SEC amended the definition of "blank check company" to include SPACs for purposes of the PSLRA, rendering the statutory safe harbor unavailable for forward-looking statements, such as projections, made in connection with de-SPAC transactions. The unavailability extends to statements regarding the projections of target private operating companies in these transactions.

In the absence of the protections of the PSLRA, the judicially-created "bespeaks caution" doctrine, recognized in numerous federal circuits, potentially could provide protections for defendants, depending on the specific facts and circumstances.

## Redetermination of Smaller Reporting Company Status

In efforts to align the reporting obligations of post-de-SPAC companies with those of post-IPO companies, the new rules require a post-de-SPAC company to redetermine its status as a smaller reporting company within four business days following the consummation of the de-SPAC transaction. The post-de-SPAC company must reflect the redetermined status in its filings beginning 45 days after consummation of the de-SPAC transaction.

The SEC rejected requests from commenters to similarly permit redetermination of filer, EGC or FPI status upon the consummation of the de-SPAC transaction.

## Business Combinations Involving Shell Companies

### Shell Company Business Combinations as Sales to Shell Company Investors

The adopting release reiterated the SEC position that when a reporting shell company conducts a business combination with a company that is not a shell company, the substantive reality of the transaction is that reporting shell company investors effectively have exchanged their security representing an interest in the reporting shell company for a new security representing an interest in the combined operating company.

With a view to providing disclosure and liability protections to investors in reporting shell companies under these circumstances,

# SEC Adopts Final Rules Affecting SPACs and De-SPACs and Provides Related Guidance

new Rule 145a deems any business combination of a reporting shell company involving another entity that is not a shell company to involve a sale of securities to the reporting shell company's securityholders.

Rule 145a is narrowly drawn and the adopting release notes it will not have any impact on conventional business combination transactions between operating businesses, including transactions structured as traditional reverse mergers and traditional business combination transactions that make use of only business combination related shells. However, it is not limited to de-SPAC transactions. Rule 145a will apply in situations where, in substance, a shell company business combination is used to convert a private company into a public company. To illustrate, the adopting release provides, "For example, the requirements applicable to reporting shell company business combinations adopted herein will apply to any company that sells or otherwise disposes of its historical assets or operations in connection with or as part of a plan to combine with a non-shell private company in order to convert the private company into a public one. This is true regardless of whether such sale or disposal of the legacy assets or operations occurs prior to or after the consummation of the business combination."[1]

## De-SPAC Financial Statement Requirement

Currently, the manner by which a private operating company chooses to become a public company may impact its financial statement disclosures due to differing requirements found in applicable SEC forms. The final rules effectively end this transactional asymmetry by amending relevant forms, schedules and rules to more closely align the financial statement reporting requirements in business combinations involving a shell company and a private operating company with those in traditional IPOs.

This harmonization extends to the number of years of financial statements that are required, the audit requirements of a predecessor target business and the age of the financial statements of a predecessor target business, among other things.

The final rules clarify that the historical financial statements of the legacy shell company are not required in filings (including registration statements) made after the consummation of a business combination once the financial statement of the predecessor business have been filed for all the required periods through the acquisition date, so long as the financial statements of the registrant include the period in which the acquisition was consummated (*e.g.*, the combined company registrant has filed a Form 10-Q that includes post-business combination financial statements). The final

rules apply equally in the case of a business combination accounted for by the shell company as a forward acquisition of the business or a reverse recapitalization of the business.

One prominent change expands the circumstances in which a target company may report only two years of historical financial statements: The amendments permit a shell company registrant to include in its Form S-4/F-4/proxy or information statement two years of statements of comprehensive income, changes in stockholders' equity and cash flows for the private operating company for all transactions involving an emerging growth company (EGC) shell company and a private operating company that would qualify as an EGC without regard to whether the shell company has filed or was already required to file its annual report.

Another notable accommodation reflected in the adopting release has implications for SPACs that enter into de-SPAC transactions with FPI targets. For SPACs that are "foreign issuers" (as defined in Securities Act Rule 405 and as distinguished from FPIs) and that acquire an FPI target, the SPAC now will be able to use Form F-4 and present the target FPI financial statements in IFRS as issued by IASB. However, the adopting release clarifies that in a de-SPAC transaction involving a domestic SPAC that acquires an FPI target, Form S-4 rather than Form F-4 must be used and the financial statements must be presented in U.S. GAAP, even when the combined company otherwise would be an FPI upon consummation of the transaction.

## Enhanced Projections Disclosure

### Financial Projections Generally

To address concerns with the potential for abuse of financial projections, the SEC amended its guidance in Item 10(b) of Regulation S-K to state that:

- Any projected measures that are not based on historical financial results or operational history should be clearly distinguished from projected measures that are based on historical financial results or operational history.

- Presenting projections that are based on historical financial results or operational history without presenting such historical measure or operational history with equal or greater prominence generally would be misleading.

- Projections that include a non-GAAP financial measure should also clearly define or explain the measure, describe the GAAP financial measure to which it is most closely related, and explain why the non-GAAP financial measure was used instead of a GAAP measure.

- The guidance also applies to projections of future economic performance of persons other than the registrant that are included in the registrant's SEC filings.

---

[1] Special Purpose Acquisition Companies, Shell Companies, and Projections, SEC Release 33-11265 (Jan. 24, 2024), at n. 943.

# SEC Adopts Final Rules Affecting SPACs and De-SPACs and Provides Related Guidance

**SPAC Financial Projections**

The SEC believes that financial projections used in de-SPAC transactions present increased risks due to the nature of such transactions and the SPAC structure. For example, the compensation of the sponsor of a SPAC may depend largely on whether a de-SPAC transaction is completed, and the financial projections of a private target company may influence how investors evaluate a proposed de-SPAC transaction. To address these concerns, new Item 1609 imposes the following disclosure requirements for financial projections used in a de-SPAC transaction:

- The purpose of the projections and the party that prepared them.

- All material bases and assumptions underlying the projections, and any factors that may materially impact such assumptions.

- Any material growth or reduction rates or discount rates used in preparing the projections, and the reasons for selecting such growth or reduction rates or discount rates.

- Whether the disclosed projections reflect the view of the SPAC's board or management as of the most recent date practicable prior to the date of the filing, and if not, the purpose of disclosing the projections and the reasons for the board's or management's continued reliance on the projections.

- Where the projections relate to the target company, whether the target company has affirmed to the SPAC that its projections reflect the view of its management or board as of the most recent date practicable prior to the date of the filing, and if not, the purpose of disclosing the projections and the reasons for the continued reliance on the projections by the SPAC's management or board.

**Underwriter Status and Liability**

In a significant development, the SEC declined to adopt proposed Rule 140a, which was arguably the most controversial of the proposed rules. Proposed Rule 140a aimed to clarify that a person who acted as an underwriter in a SPAC IPO (SPAC IPO Underwriter) and participated in the distribution by taking steps to facilitate the de-SPAC transaction, or any related financing transaction, or otherwise participated (directly or indirectly) in the de-SPAC transaction would be deemed engaged in the distribution of the securities of the surviving public entity in a de-SPAC transaction, *i.e.*, that person would be an underwriter within the meaning of Section 2(a)(11) of the Securities Act. The proposing release argued that attaching underwriter status to SPAC IPO Underwriters in connection with de-SPAC transactions would incentivize them to help ensure the accuracy of the disclosures in de-SPAC transactions, given the attendant liability for registered de-SPAC transactions.

In declining to adopt proposed Rule 140a, the SEC acknowledged the term underwriter does not have "unlimited applicability," but the SEC reiterated that it intends to follow longstanding practices of applying the relevant statutory terms "distribution" and "underwriter" broadly and flexibly, as warranted by the applicable facts and circumstances.

In this regard, the SEC stated that a de-SPAC transaction is a distribution of the securities and "there would be an underwriter present where someone is selling for the issuer or participating in the distribution of securities in the combined company to the SPAC's investors and the broader public."[2]

To address commenters' concerns about the breadth of proposed Rule 140a, the adopting release clarifies that the rule was not intended to address any business combinations not involving a de-SPAC transaction and that the new SEC guidance is not intended to influence current practice in traditional M&A business combination transactions.

**Status of SPACs Under the Investment Company Act and Safe Harbor**

In the face of considerable criticism of its threshold conclusion that SPACs are investment companies, the SEC declined to adopt proposed Rule 3a-10 under the Investment Company Act, which would have provided a safe harbor from the definition of "investment company" under Section 3(a)(1)(A) of the Investment Company Act to SPACs that complied with certain conditions.

The SEC instead opted to provide its views on the considerations that it believes are relevant to determining whether a SPAC meets the definition of "investment company." In doing so, the SEC stated that investment company status is a question of facts and circumstances and that a SPAC could be an investment company at any stage of its operations, such that providing a safe harbor based on duration would not be appropriate.

The guidance provided by the SEC is based on the application of the five factor test traditionally used to determine whether any issuer is an investment company under Section 3(a)(1)(A) known as the *Tonopah* factors. These factors are:

1. The nature of the issuer's assets.

2. The sources of its income.

3. The activities of its directors, officers and employees.

4. Its public statements concerning the nature of its business.

5. Its historical development.

---

[2] *Id.*, at Section III.F.3(ii).

# SEC Adopts Final Rules Affecting SPACs and De-SPACs and Provides Related Guidance

Using these factors, the SEC provided guidance regarding the types of activities that would "likely raise serious questions about a SPAC's status as an investment company under the Investment Company Act" and gave various examples of such activities. Evaluation of these factors requires a balancing of an issuer's facts and circumstances, and no one factor is determinative of whether an issuer is an investment company in all cases. The SEC, however, paid particular attention to the duration between a SPAC's inception and its entering into an agreement to purchase one or more operating businesses and indicated a period greater than 18 months would, in the SEC's view, be indicative of investment company status. The SEC also stated that a SPAC should evaluate its status "at its inception and throughout its existence." This language suggests the SEC staff may evaluate a SPAC's proposed operations, including the time it intends to take to enter into an agreement to acquire an operating business, at the time of a SPAC's IPO, and the staff could refuse to accelerate a registration statement that describes operations, including duration, that the staff believes are indicative of investment company status. The SEC staff subsequently may hold SPACs to those initial disclosures throughout its life cycle and use those disclosures as a basis for enforcement decisions under the Investment Company Act.

**Nature of a SPAC's Assets and Income.** The SEC stated that a SPAC that limits its investments to U.S. government securities, money market funds and cash items prior to the completion of its de-SPAC transaction is less likely to be considered an investment company than a SPAC that invests in other types of securities. The SEC also stated that a SPAC's primary business activity should not be to seek to achieve returns on these assets instead of its de-SPAC transaction.

**Management Activities.** The SEC stated that SPAC officers, directors and employees failing to actively seek a de-SPAC transaction or spending a considerable amount of time actively managing the SPAC's portfolio for the primary purpose of achieving investment returns would be indicative of investment company status.[3]

**Public Statements and Historical Development.** The SEC's guidance with respect to these two *Tonopah* factors focused on a SPAC's public statements about its business plans and activities, the nature of any business acquired in a de-SPAC transaction and the duration of a SPAC's activities prior to its de-SPAC transaction.

With respect to public pronouncements, the SEC stated that a SPAC should not market itself primarily as a fixed-income investment, an alternative to an investment in a mutual fund or an opportunity to invest in Treasury securities or money market funds. Similarly, the SEC stated that if a SPAC were to engage or propose to engage in a de-SPAC transaction with an investment company, such as a business development company or a closed-end fund, the SPAC "likely" would be an investment company under Section 3(a)(1)(A).

The SEC's guidance spent a considerable amount of time discussing the length of time that a SPAC operates prior to entering into a de-SPAC transaction. Although the SEC stated that this fact is not the sole determinant of its status as an investment company, the SEC emphasized that a SPAC's activities may become more difficult to distinguish from those of an investment company the longer the SPAC takes to enter into a de-SPAC transaction. In this connection, the SEC noted the one-year grace period provided to issuers generally in Rule 3a-2 under the Investment Company Act and the 18-month period permitted for blank check companies under Rule 419 under the Securities Act and stated that a "SPAC that operates beyond these timelines raises concerns that the SPAC may be an investment company, and those concerns increase as the departure from these timelines lengthens." The SEC also stated that it "believes that a SPAC should reassess its status and analyze whether it has become an investment company if it has ... failed to enter into an agreement with a target company beyond such timelines."

In light of these statements, we believe that the SEC staff may require SPACs to disclose their proposed timelines in their prospectuses when conducting an IPO and may raise enforcement concerns under the Investment Company Act if SPACs fail to comply with these timelines. A SPAC that has not entered into an acquisition agreement prior to the 18 months after the completion of its IPO may want to consider moving its assets to demand deposits at banks or consider whether there are other facts and circumstances that would indicate that it is not an investment company.

---

[3] The SEC also stated that such management of a SPAC could cause SPAC sponsors to come within the definition of "investment adviser" in Section 202(a)(11) of the Investment Advisers Act. Section 202(a)(11) generally defines an investment adviser as any person who, for compensation, engages in the business of advising others either directly or indirectly as to the valuation of securities or the advisability of investing in, purchasing or selling securities, among other things. Importantly, a person must "advise others" to be considered an investment adviser, such that officers, directors and employees of a company that manage the company's portfolio are not considered investment advisers subject to regulation under the Investment Advisers Act.

# SEC Adopts Final Rules Affecting SPACs and De-SPACs and Provides Related Guidance

## Contacts

**Brian V. Breheny**
Partner / Washington, D.C.
202.371.7180
brian.breheny@skadden.com

**C. Michael Chitwood**
Partner / New York
212.735.2535
michael.chitwood@skadden.com

**Howard L. Ellin**
Partner / New York
212.735.2438
howard.ellin@skadden.com

**Raquel Fox**
Partner / Washington, D.C.
202.371.7050
raquel.fox@skadden.com

**Michael K. Hoffman**
Partner / New York
212.735.3406
michael.hoffman@skadden.com

**Michael J. Mies**
Partner / Palo Alto
650.470.3130
michael.mies@skadden.com

**Gregg A. Noel**
Partner / Palo Alto
650.470.4540
gregg.noel@skadden.com

**Susan L. Saltzstein**
Partner / New York
212.735.4132
susan.saltzstein@skadden.com

**Andrew J. Brady**
Of Counsel / Washington, D.C.
202.371.7513
andrew.brady@skadden.com

**Joshua Shainess**
Associate / Washington, D.C.
202.371.7594
joshua.shainess@skadden.com